Pages 1 - 49

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA


Before The Honorable Beth L. Freeman, Judge


IN RE:  GOOGLE ASSISTANT         )
PRIVACY LITIGATION.              )**NO. C 19-04286 BLF**
_____ )


San Jose, California
Thursday, May 6, 2021

**TRANSCRIPT OF ZOOM WEBINAR PROCEEDINGS**

**APPEARANCES VIA ZOOM**:

For Plaintiffs Spurr, E.G. and Kumandan:

                LOWEY DANNENBERG P.C.
                44 South Broadway - Suite 1100
                White Plains, New York  10601
       **BY:  ANDREA FARAH, ATTORNEY AT LAW**

                SCOTT & SCOTT ATTORNEYS AT LAW LLP
                600 West Broadway - Suite 3300
                San Diego, California  92101
       **BY:  JOHN T. JASNOCH, ATTORNEY AT LAW**

For Plaintiffs Brekhus and Hernandez:

                GUTRIDE SAFIER LLP
                100 Pine Street - Suite 1250
                San Francisco, California  94111
       **BY:  HAYLEY REYNOLDS, ATTORNEY AT LAW**

(APPEARANCES CONTINUED ON THE FOLLOWING PAGE)


Reported By:        Marla F. Knox, RPR, CRR, RMR
                   Official Reporter

1   **APPEARANCES VIA ZOOM:   (CONT'D)**

2   For Defendant:

3                           PERKINS COIE LLP
                            Four Embarcadero Center - Suite 2400
                            San Francisco, California  94111
4                   BY:    **SUNITA BALI, ATTORNEY AT LAW**
                           **BOBBIE J. WILSON, ATTORNEY AT LAW**
5
    Also Present:          **MAKESHA PATTERSON, GOOGLE**
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| | |
|---|---|
1  **Thursday - May 6, 2021**                              **9:46 a.m.**

2                 **P R O C E E D I N G S**

3                     **---oOo---**

4       **THE CLERK:** Calling case 19-4286, In Re: Google

5 Assistant Privacy Litigation.

6     Counsel, if you would please state your appearances; and

7 if we can begin with Plaintiff and then move to Defendant.

8       **MS. FARAH:** Good morning, Your Honor, Andrea Farah of

9 Lowey Dannenberg on behalf of Plaintiffs.

10       **THE COURT:** Good morning.

11       **MR. JASNOCH:** Good morning, Your Honor, John Jasnoch

12 from the law firm Scott & Scott on behalf of Plaintiffs.

13       **THE COURT:** Good morning.

14       **MS. REYNOLDS:** Good morning, Your Honor, Hayley

15 Reynolds from Gutride Safier on behalf of Plaintiffs Brekhus

16 and Hernandez.

17       **THE COURT:** Good morning.

18       **MS. BALI:** Good morning, Your Honor, this is Sunita

19 Bali from Perkins Coie on behalf of Defendants.

20     I have my colleague Bobbie Wilson, also from Perkins Coie

21 for the Defendants, and our client Makesha Patterson, in-house

22 counsel for Google, is here although not visible on the screen.

23       **THE COURT:** All right. Welcome. I appreciate that.

24     Okay. Good morning.

25       **MS. BALI:** Good morning.

1          **THE COURT:**  Ms. Bali, will you be arguing for the

2    Defendants?

3          **MS. BALI:**  Yes, I will.

4          **THE COURT:**  Okay.  I will I saw your name all over the

5    papers, so that's not to see.  And who will be arguing for

6    Plaintiffs?

7          **MS. FARAH:**  Andrea Farah, Your Honor.

8          **THE COURT:**  All right.  Ms. Farah, thank you.

9          **MS. REYNOLDS:**  And, Your Honor, Hayley Reynolds.  I

10   will be addressing any issues specific to Plaintiffs Brekhus

11   and Hernandez that would relate to the software change

12   allegations.

13         **THE COURT:**  Okay.  I appreciate that.  Thank you.

14      All right.  Well, we have been through an earlier

15   iteration of the complaint.

16      And I recognize that in the consolidation Ms. Reynolds'

17   clients have joined and some of their claims have joined in the

18   consolidated complaint.  So there are some new things here.

19      Ms. Bali, I appreciate that you have taken a very surgical

20   approach to the pleadings and -- in trying to focus on what the

21   individual Plaintiffs have alleged and whether they can make

22   out the claim in their own name.

23      And I -- so that -- it is going to make it a little bit

24   hard for me to give you clear guidance on how I'm going to rule

25   because the issues you raised were very pinpoint, and I think

1  appropriately; but obviously you know that because you put a

2  lot of effort into dissecting the pleading in order to come up

3  with that.

4      So I want to be certain that I don't put the Plaintiffs to

5  too high a pleading standard at this stage.  I often take a

6  very strong view about what the pleadings need to say at the

7  first go-round and certainly -- well, I took the lead from the

8  motion itself, but I issued a very extensive order last time.

9      And I certainly think that in many regards that Ms. Farah

10  has -- and Ms. Reynolds have addressed those issues.

11      So -- but these claims are particularly difficult, I

12  think, to analyze because there are so many pieces to it.

13      I have continuing concern about the failure of the

14  Plaintiffs to identify the sufficient recorded conversations

15  that were not intended by them to be overheard by their Google

16  device.

17      But -- and so that goes to the issue of frequency that

18  Ms. Bali raises in her papers, and I -- you know, it is fine to

19  say 11 out of the 11 that were recorded were private.

20      But it doesn't tell me anything about whether there were a

21  hundred thousand conversations that weren't.  So I have a

22  concern about that.

23      I have a concern about the -- the ad targeting theory is

24  interesting.  It looks like that's E.G. and is that Mr. --

25  Mr. Ramandan that has the other ad targeting claim --

1      **MS. FARAH:**  Kumandan.

2      **THE COURT:**  Okay.  Oh, I wrote his name Ramandan,

3   sorry.  I have another party with -- that is Ramandan.  Sorry,

4   Kumandan.

5      I'm just looking here.  I would say that -- I think that

6   the -- it appears to me that the wire tap and the SCA claims,

7   Ms. Bali, you are only trying to exclude certain of the

8   Plaintiffs -- not all of them -- so the claim goes forward; is

9   that right?

10     **MS. BALI:**  Yes, Your Honor.  We only challenge the

11  sufficiency of the reasonable expectation of privacy

12  allegations with respect to Plaintiffs Galvan -- excuse me --

13  sorry.

14     **THE COURT:**  Galvan, E.G. and Kumandan?

15     **MS. BALI:**  Exactly, Galvan, E.G. and Kumandan.

16     **THE COURT:**  Okay.  All right.  Let me just -- I made

17  notes of my notes because there was so much here.

18     **MS. BALI:**  I will just also say that the Wire Tap Act

19  also has that additional theory of ad targeting, and we did

20  challenge that theory with respect to all of the Plaintiffs

21  that asserted.

22     **THE COURT:**  Well, I'm going to let -- I'm going to

23  actually just go through a couple of things.

24     I would appreciate it, Ms. Bali, in your comments if you

25  would address the issue under your breach of contract argument;

1    and it has to do with the language when audio features are

2    used.

3        In my view the Plaintiffs have that right that audio

4    features are used when the consumer chooses to use them, not

5    when the device mistakenly or otherwise picks up unintended

6    conversations.

7        And so I think it is at least a reasonable inference that

8    the phrase "when audio features are used" really is limited to

9    when there is a decision to manually engage or to state a hot

10   word.

11       I'm not inclined to allow the theory of breach of a --

12   breach of contract from a unilateral change in the collection

13   and use of information.  That is the alarm events.

14       I don't actually -- I haven't actually seen anything in

15   the pleading that would tell me that Google promised not to do

16   that.

17       I'm inclined to allow the damages theory on -- regarding

18   privacy interest.  And on benefit of the bargain it looks as

19   though any party who didn't purchase the device cannot make a

20   claim for damages.  That would apply to the UCL as well.

21       I'm not inclined to let the CLRA and fraud claims to go

22   forward.  I haven't seen them before.

23       And so, Ms. Reynolds, if you think you can amend, I guess,

24   I would have no choice because -- but I don't think those have

25   legs.

1    I'm inclined to dismiss the declaratory judgment claim

2  because your UCL claims cover the same thing.

3    If you insist on leaving those things in for alternative

4  relief in case I dismiss the UCL, that doesn't really take up

5  much room in the work that we are doing here.  So I don't think

6  that's a big deal.

7    All right.  I have only given a few comments.  This is one

8  of those things where I just have to sit down and do it

9  issue-by-issue, party-by-party.

10    So I can't give you much overall.  I hope I haven't

11  muddled things too much, Ms. Bali.

12    Now, I will turn it over to you and hear your full

13  argument; and then I will hear from Ms. Farah and Ms. Reynolds.

14    **MS. BALI:**  Thank you, Your Honor.  I appreciate the

15  challenges with sort of addressing all these nuanced issues in

16  this context.  And I hope the briefs will be helpful to you --

17    **THE COURT:**  They are.  They are.

18    **MS. BALI:**  -- as you go through them in thinking

19  through the issues.

20    I will start just with the reasonable expectation of

21  privacy issue which is -- you know, speaks to the Wire Tap Act,

22  the CIPA claim, Section 632 of CIPA, invasion of privacy and

23  intrusion upon seclusion.

24    You know, as Your Honor noted earlier, we are only

25  challenging the allegations as to Galvan, E.G. and Kumandan.

And it is based on very specific failures on their part to satisfy the pleading standard that the Court set forth very clearly in its order on the first Motion To Dismiss.

And, you know, I won't sort of painstakingly go through the detailed points.  I think they are all laid out very clearly in our briefing.

But, you know, the Court was very clear in setting out the standard.  And, you know, the Plaintiffs just didn't meet them with respect to the particular circumstances that would give rise to a reasonable expectation of privacy, as to the specific examples that they provide or with the more lenient standard that the Court set forth of alleging that they frequently have, you know, private conversations near their devices under circumstances giving rise to a reasonable expectation of privacy and that also accepts a routine.

And, in fact, the Plaintiffs had provided numbers about the false accepts; specifically Plaintiff Galvan that said, you know, 11 out of 11 of the recorded conversations in her account were false accepts.

And Plaintiff Kumandan who alleges that 5 out of the 7 recorded conversations were false accepts, as Your Honor noted, doesn't say anything about how frequent false accepts are.

And, in fact, their allegations suggest the contrary.  It suggests that they are actually quite rare because they allege that they frequently speak in the presence of their devices.

1      And so the denominator, so to speak, is really how many

2   conversations they have had in the presence of a Google

3   assisted enabled device.

4      And if they are carrying their mobile phones around with

5   them all the time constantly speaking in the presence of their

6   device, and there is only 11 times or 5 times that the device

7   mistriggered, you know, I actually think their allegations now

8   affirmatively show that false accepts are quite rare.

9      And so --

10      **THE COURT:**  The only question is:  Can I determine

11   that issue at the pleading stage?  Do I -- I'm not sure I can

12   say as a matter of law that that evidence is enough to dismiss

13   their claims.

14      I also have concern that at the pleading stage the fact

15   that --

16                  (Audio interruption.)

17      **THE COURT:**  Oops, let's get that back on although --

18   I'm also concerned that the fact -- they allege that they have

19   the phone in their pocket essentially wherever they go -- and

20   that could be in their bedroom, in their living room or it

21   could be out in the park with their friends -- I have to draw

22   all reasonable inferences in favor of the Plaintiff.

23      And I can't quantify how often they are talking out in

24   public versus in private.

25      And even if most of the time they are in public, it

1  doesn't tell me anything about the nature and quality of the

2  conversations in private.

3       So I'm not actually sure I can -- I'm not sure I can

4  dismiss all of those claims based on reasonable expectation of

5  privacy on their resuscitation of where they were.

6       You know, in depositions maybe you will come up with

7  something or ultimately it may be a judgment call that the jury

8  has to make.

9       That is a tricky issue, and I don't think this case gets

10 narrowed or scuttled on that issue.

11       MS. BALI:  Yeah, I understand.  And just to your point

12 about frequency, you know, when we were here the last time

13 around, you know, they didn't have any of these allegations;

14 right.

15       So I understand that that's -- that that could present a

16 question of fact that would not be appropriate for resolution

17 at the pleading stage.

18       But now they have affirmatively alleged frequency, and

19 they have done it in a way that shows that it is quite

20 infrequent.

21       And so, you know, Your Honor -- and, you know, the

22 pleading standard probably better than anybody.

23                      (Laughter)

24       MS. BALI:  But, you know, you have to accept the facts

25 that they allege as true.

1    And they have alleged that they frequently have

2  conversations in the presence of their device, and that only 11

3  of them were false accepts and 5 -- you know, 11 and 5

4  respectively for Galvan and Kumandan.

5    And just accepting that as true just shows you that they

6  not only fail on the frequency allegation, but they just --

7  they haven't established a reasonable expectation of privacy

8  under the standard that the Court has set.

9    And so, you know, on your -- on your other point about --

10  I forgot.  I had a response to the other point that you made,

11  and now I can't -- I will just go onto the unlawful disclosure

12  and use issue.

13    So again, our challenge with respect to that -- those

14  provisions of the Wire Tap Act are specific to the ads

15  targeting allegations.

16    And really we are only looking at one paragraph in the

17  complaint on this because we made arguments as to Galvan and

18  Kumandan.  It is really only Galvan and E.G. and Kumandan that

19  arguably have any allegations on this theory at all in the

20  complaint.

21    And we made arguments as to Galvan and Kumandan in our

22  motion, and they didn't even address them.

23    And so I really think they have abandoned that theory with

24  respect to those Plaintiffs.

25    With respect to E.G., who was the only one who is left,

1    you know, I think that -- that there is just no doubt that her

2    allegations fail to show any usage.

3        So, you know, first, they have to show that the

4    communication was -- that the communication was the -- the

5    recording was the result of an unlawful interception in the

6    first place.

7        And for the reasons that we discussed already with respect

8    to reasonable expectation of privacy, they haven't made that

9    showing.

10       And they also -- you know, this is again sort of taking a

11   scalpel to their complaint, but these are very important

12   points.

13       They don't allege that the communication was even made in

14   the presence of a device at all, much less that it was recorded

15   by the Google Assistant.

16       **THE COURT:**  But I think it is a reasonable inference

17   that if E.G. has her phone with her all the time -- she had the

18   conversation about gangs or whatever it was -- and then she

19   started seeing pop-up ads, I think the reasonable inference is

20   that it ties all those together.  I mean, the coincidence of

21   that is just too remote.

22       Whether the Plaintiffs can prove it is another matter, but

23   it is a reasonable inference.  It is circumstantial evidence

24   that I think -- that may be all they ever have at trial, but I

25   think it could be developed to be sufficient.

1          **MS. BALI:**  Well, I just think that the facts that they

2     allege are just not there.  I mean, they don't even allege that

3     the research or the conversation happened in close proximity to

4     the viewing the ad.

5          I mean, there is no facts about whether, you know, it was

6     five minutes later or six months later.  And, you know, I

7     just -- I think that they could do more, particularly because

8     we know that they have access to their information via their

9     Google account.

10          **THE COURT:**  Well, you know, this gets us into the

11     endless pleading stage that is not productive to litigation.

12          And it is so easy for you to propound an interrogatory on

13     that that I'm not going to -- as opposed to waiting a year for

14     me to hear your next Motion To Dismiss.

15          So I'm not saying you are wrong.  I'm just saying --

16          **MS. BALI:**  Yeah.

17          **THE COURT:**  -- I think I have enough to go on

18     reasonable inference.

19          **MS. BALI:**  I understand.  I understand.

20          Okay.  Well, moving to the 2702 disclosure claim.  You

21     know, the arguments are quite similar.  There is just no

22     allegations in the complaint that anything was ever disclosed.

23          The example that E.G. alleges is that, you know, she

24     received a -- a YouTube video suggestion.  YouTube is a Google

25     entity.  You know, the Google terms of service and privacy

1    policy make clear that YouTube is among Google services.

2         So their allegations just don't give rise to any inference

3    that there was any disclosure to a third party for purposes of

4    2702.

5         Now, I will go to the breach of contract arguments which

6    Your Honor asked me specifically to address.  This is another

7    sort of complicated claim because there's a lot of different

8    theories of breach.

9         And, you know, I just don't think that they have satisfied

10   any of them.  They haven't -- I don't think that they have

11   pointed to any language by Google at all and any -- in the

12   privacy policy or otherwise that essentially says that Google

13   Assistant devices will never activate an error; that Google

14   Assistant devices will never experience an error at all.

15        And, in fact, there is language in the terms that say

16   Google provides its services as-is.  Google doesn't make any

17   warranty about -- you know, about the level of service that its

18   services provide.

19        And the specific language that Your Honor noted and that

20   Plaintiffs have grasped onto for purposes of their breach of

21   contract claim, it says:  We collect information about your

22   activity in our services which we use to do things like

23   recommend a YouTube video that you might like.  The activity

24   information we collect may include voice and audio information

25   when you use audio features.

1        You know, I take, Your Honor's point that "when you use

2    audio features" implies some affirmative use by the user.  But

3    from Google's standpoint, this was affirmative use by the user;

4    right.

5        I mean, how can Google decipher between, you know, an

6    intentional use and an erroneous activation?

7        I mean, at that point Google does interpret that use as a

8    legitimate usage of its audio and video -- audio systems.

9            **THE COURT:**  In isolation.  But as we discussed at the

10    last hearing and I discussed in my order, once Google is on

11    notice of the false accepts, it has an obligation to go back

12    and try to correct that.

13        So, you know, siloing off that issue just doesn't really

14    quite work.  And, you know, I appreciate that the warranty

15    claims are gone.  I think that was wise.

16        But on the breach of contract, you know, I think their --

17    as Ms. Farah argues, she only needs one theory.  She doesn't

18    need all three.

19            **MS. BALI:**  She only needs one theory, and I will focus

20    on this one because I think this is the one, Your Honor, that

21    you think has the most legs.

22            **THE COURT:**  Okay.

23            **MS. BALI:**  I think to your point about what you said

24    in the prior order, I think you were particularly persuaded by

25    the allegations that Google had not deleted information after

```
 1   it determined that it was the result of a false accept.

 2       But that doesn't give rise to a claim for violation of

 3   this provision; right.  Failure to delete well after the fact

 4   is not a violation of this provision that talks about when

 5   Google will collect -- you know, what information Google

 6   collects and when it will collect information about your

 7   activity in its services.

 8       And so really what they are alleging is at the time that

 9   Google collected this information, there was somehow a breach

10   of this provision.

11       But this provision does not say anything about, you know,

12   Google will collect your -- you know, voice and audio

13   information only when you intentionally use its services.

14       You know, and at that point -- at the point of the

15   collection, it was an intentional use as far as Google is --

16       THE COURT:  You know, I think at the end of the day,

17   this is going to be a judgment call based on the evidence

18   submitted to a jury.

19       I don't even -- maybe the evidence will develop so I can

20   decide as a matter of law and summary judgment, but I think

21   these are judgment calls on what actually is happening so that

22   the contract can be applied.

23       MS. BALI:  I understand your point about judgment

24   calls.  I just think for them to have a breach of contract

25   claim, they have got to point to an affirmative promise.  And
```

1    Your Honor was very clear about that in the last order.

2        And there has got to be an affirmative promise.  And there

3    just simply -- I mean, it doesn't even comport with common

4    sense that Google would ever affirmatively promise that the

5    device would never experience an error; right.

6        I mean, this is a speech-activated device.  And there is

7    no language in the privacy policy or otherwise where Google

8    promised that it would never activate unless a user

9    intentionally, you know, uses the device or uses the Assistant.

10        And, you know, Plaintiffs have frequently pointed to that

11    FAQ, which I think they have now backed off of, as that being a

12    basis for a breach of contract claim.

13        But that FAQ expressly says that when Google detects a hot

14    word, it will activate and begin recording.  And that's really

15    what it is.  It's when Google detects.  And here when Google

16    collects audio data, it is detecting your use of its audio

17    services.

18        **THE COURT:**  And I think that is a very strong point in

19    your client's favor on this issue of detecting because that

20    would allow for mistakes to be within the accepted conduct of

21    Google under the agreement.

22        And I -- I don't mean to diminish that at all.  The

23    contract doesn't provide that recordings will only take place

24    when hot words are spoken.  It is when they are detected.

25        And, quite frankly, now that we have all been on Zoom, we

1  certainly know how often we misunderstand what people are

2  saying, even with our human ears.

3        **MS. BALI:**  Right.

4        **THE COURT:**  So I think that -- you know, Ms. Bali, I

5  want to be clear.  I think you have raised some very

6  significant hurdles that the Plaintiffs I know are thinking

7  carefully about; they are going to make this a very hard case

8  to make.

9        But to the extent it is a roadmap for them and, you know,

10  Defendants often educate Plaintiffs along the way to see where

11  the hardest issues are going to be that helps gear the case,

12  but I'm just reluctant to disallow this case to go forward

13  because of those -- those nuances in the language.

14        But, you know, I think detect versus spoken is a huge,

15  huge issue that I raised before as well.  I agree with you on

16  that.

17        **MS. BALI:**  Understood.  Understood.  Well, I won't

18  belabor the point.  You know, I think -- I'm inclined to just

19  agree with Your Honor on their other breach theories.  I don't

20  think that the others have legs.

21        I mean, one is a breach of a disclosure provision, which,

22  you know, is expressly set forth in the privacy policies as,

23  you know, being permitted.

24        And the other is with respect to alarm events which, you

25  know, for what it is worth, that one is really sort of Brekhus

```
 1    and Hernandez theory.  And they don't even allege that it
 2    happened to them.
 3            THE COURT:  No.  I think that is a real problem.
 4            MS. BALI:  Yeah, that is a real problem.  We are sort
 5    of back -- they obviously weren't here the first go-round, but
 6    we are sort of back where we started on that where they, you
 7    know, read a Reddit post and now are asserting a claim, you
 8    know, based on themselves in a class -- you know, really based
 9    on somebody else's experience that they read on Reddit.
10            And that just doesn't give rise to a claim.  I think, you
11    know, that their breach of claim suffers from that.  Their
12    fraud claim suffers from that.  And their CLRA claim suffers
13    from that in addition to all of the other deficiencies that we
14    have identified in our briefing.
15            THE COURT:  Right.  I think those are the weakest
16    claims in the case.  I don't think those claims are driving the
17    case, but I think that they may be driving those particular
18    Plaintiffs.
19            And if Ms. Reynolds thinks she can amend, I may have no
20    choice; but I think she has got a tall mountain to climb.
21            All right.  And then you had quite a few arguments on
22    damages.  You know, I really think this privacy and the value
23    of the privacy interest has been -- you know, that has
24    developed over the last few years.  You know it better than I
25    do.  This is your specialty area.
```

1    I think that -- I think I have to let that through.  I

2    think on benefit of the bargain, you know, for the Plaintiffs

3    who bought -- who allege that they bought their devices, I

4    think that goes through.

5        And even if they bought one out of three of their devices,

6    I think that -- again, I think they can make out.

7        At the pleading stage I don't think they have to quantify

8    which device was used and how often it was used.

9        **MS. BALI:**  Yeah, I will just say on those points, you

10   know, I think California law -- I know the law has evolved but

11   California cases are very clear; that there has to be some

12   actual and appreciable harm to support a breach of contract

13   claim.

14       And, you know, I think that there is still ample authority

15   for that proposition.  You know -- and I will just leave it at

16   that.  I think you know.

17       **THE COURT:**  Okay.

18       **MS. BALI:**  And with respect to benefit of the bargain,

19   there is no dispute that the Assistant is free.  And what

20   their -- their claims are really with the Assistant, not with

21   any particular device.

22       And a lot of these devices do a lot more than simply serve

23   up the Assistant, and they don't allege that they paid anything

24   specifically for --

25       **THE COURT:**  So that's an interesting thing because I

1  always think back to Quickset when we get under the UCL and

2  Made in America and how that had value.

3      But, of course, those Plaintiffs said:  I bought this at

4  a -- what, I believe, was a higher price because I wanted

5  something made in America.

6      You are right.  I don't have anyone here who is saying

7  I -- I bought my device because of the Assistant or

8  especially -- is it Mr. Brekhus who I got my Spotify

9  subscription so I could get Google Assistant.  That is pretty

10  farfetched.

11          **MS. BALI:**  Right.

12          **THE COURT:**  I'm not sure he can say that with a

13  straight face.  It came with and I'm not even sure he looked.

14  His fraud claim has no evidence -- no allegations of reliance

15  there.

16      Again, he was buying Spotify.  This was the junk package

17  that came along with it.  Maybe he wanted it.  Maybe he didn't.

18      You know, KQED is starting their new fundraising drive.

19  And they are giving away all kinds of things I don't want.

20      So I'm not looking at the disclosures on that, and I don't

21  know what he will be able to say.  It doesn't seem very

22  plausible.

23          **MS. BALI:**  So I would just say they need to tether

24  some -- even for those who have made a purchase -- which is not

25  all of them; many of them have not -- but even with those who

allege a purchase, they have got to tether some component of
their purchase price to the Assistant and even more
specifically to some privacy expectation or privacy promise;
right.

I mean, there is just -- there is no attempt to do that in
the pleadings.  And so for that reason --

**THE COURT:**  Do you really want -- I mean, maybe your
client would like this case to go to trial never.  But you are
delaying -- the case gets delayed 8 or 9 months if we go
through another round of pleading.

And I'm -- I just think these issues can be nailed down
more appropriately through discovery and that there is enough
here in the pleadings for those reasonable inferences.

**MS. BALI:**  I understand that, Your Honor, and I
appreciate that.  I appreciate that we have already been
through this exercise now a number of times.  And that, you
know, even if some of their claims really are subject to
dismissal, you know, that -- you know, is it really to
anybody's benefit to spend another 8 to 9 months on that?

But -- and I do think -- I do think they have got to do
their job at the pleading stage, and I just don't think they
have done that in a number of instances.

And I also think that they have got just a ton of claims,
and that it would really lend itself to a more streamlined
litigation if we really had just the claims in the case that

1  really should be in the case and not claims that just -- that

2  are not only not properly pled but just don't have any legs

3  anyway.  And so --

4         **THE COURT:**  I know.  I -- I -- it's not for me to say

5  which claims should come forward, and it is not for me to say

6  which -- who should be the representative Plaintiffs.

7       There are too much of both in general here, but it's

8  not -- I don't get to just say:  Here is your strongest case.

9  Why don't you just litigate that?

10      Some of these motions either I will myself dismiss some

11  claims because they are not plausibly pled or through my

12  comments about the strengths and weaknesses, the Plaintiffs

13  will make that decision.

14      I mean, the warranty claims -- I don't think I dismissed

15  the warranty claims out of hand last time.  I can't remember.

16  I wasn't focusing on that.

17      But, you know, I think hopefully there will be some

18  natural narrowing of the claims because it -- it's unmanageable

19  otherwise.

20         **MS. BALI:**  I agree.  And I hope so as well.  You

21  didn't dismiss them without leave.  You gave them leave and --

22         **THE COURT:**  Okay.

23         **MS. BALI:**  -- and they abandoned them.

24         **THE COURT:**  All right.  So I think we do find that

25  narrowing.  All right.

 1          Let me turn then to Plaintiffs.  And I appreciate that it

 2     will be a split argument here, and I welcome that.

 3          So, Ms. Farah, are you going to start?

 4          **MS. FARAH:**  Yes, certainly good morning, Your Honor.

 5     Can you hear me well?

 6          **THE COURT:**  I can.  Thank you.

 7          **MS. FARAH:**  Great.  So, Your Honor, just a few points

 8     I want to make; more specifically responding to Google's

 9     argument rather than just going through the briefing.

10          So on the issue of confidentiality, Plaintiffs were not

11     required to plead specific communications but they did so.

12          And, you know, based on the Court's articulation of the

13     minimum standard that they have to meet, which is alleging

14     specific participants or giving examples of participants'

15     location, examples of content of conversations, Plaintiffs has

16     done -- have done precisely that.

17          And as a result, Defendants have abandoned their

18     challenges with respect to Plaintiff Spurr, her minor child,

19     and Plaintiffs Brekhus and Hernandez.

20          They do continue to challenge Galvans' allegations despite

21     the fact that Galvans have alleged just as much as Hernandez

22     did.

23          So as to the minimum threshold, Galvans have alleged

24     conversations in their home among family members regarding a

25     personal responsibility without triggering Assistant.

1    Hernandez alleged conversations at home with his partner

2    regarding personal matter without the triggering word.

3    I don't understand how Defendants are drawing a

4    distinction between these allegations as to the standard.

5    It appears to me that the distinction that they are

6    drawing is that Galvans and Kumandan actually were recorded by

7    a mobile device as opposed to Google Home as is the case for

8    the remaining Plaintiffs.

9    But the fact that Galvans were recorded by a mobile device

10    as opposed to Google Home is of no consequence to the analysis

11    whether a reasonable expectation existed in -- expectation of

12    privacy existed in their homes only.

13    Just because a mobile device is capable of traveling

14    outside of one's home and be present in a car or in public

15    place doesn't necessarily mean that when it is located at home,

16    that that somehow reduces or deprives the residents of

17    reasonable expectation of privacy.

18    Privacy certainly is a relative term, and privacy could be

19    found even in public places, if we are already talking about

20    it.

21    So the fact that Galvans were recorded by their mobile

22    devices is of no monument to the analysis.

23    And in this regard, Google is trying to fit this case and

24    analogize this case to the *Sachell v. Sonic Notify* case.

25    I just want to point out that the *Sonic Notify* case is

nothing like the case here.  In *Sonic Notify*, the Plaintiff was
recorded by her mobile device except she wasn't capable of
identifying any specific locations when she was recorded.

     She certainly did not identify any participants to her
conversation, and she did not produce any examples of
confidential recordings.

     So that case certainly doesn't aid Google's argument.

     With respect to the -- to the targeted advertising, a
final point here is that the Court, based on new allegations
regarding confidentiality, will believe we have satisfied the
standard for Wire Tap Act.

     The use and disclosure creates a separate liability under
Wire Tap Act.  And our new allegations regarding targeted
advertising is supposed to support the use and disclosure part.

     So here we have Kumandan who has alleged that he had
private conversations with his wife in his residence about a
food product and then it appeared on his Instagram page; right.
And Instagram is a third-party entity unrelated to Google.

     We also have the Galvans who are alleging that they had a
conversation on a specific topic which then appeared on their
YouTube app.

     And I think here, Your Honor, with regards to the targeted
advertising, the Court is getting it exactly right; is that
this is where the pleading standard comes into play.

     We have situations where Plaintiffs are speaking as to a

```
 1   specific and very particular type of topic which then magically
 2   appears on their devices.
 3       You know, in terms of plausibility Plaintiffs have done
 4   what they could in suggesting that the Google Assistant is
 5   responsible for the information traveling from being spoken to
 6   the devices --
 7            THE COURT:  Oh, I would agree with you regarding
 8   Mr. Kumandan because it's Instagram, which is clearly a
 9   third-party; but I am he inclined to say that for Galvan and
10   E.G., that YouTube is -- as a matter of law is Google, and it
11   is not a third-party.  And YouTube is actually even identified
12   in the terms of service.
13       So I'm inclined to excise E.G.'s claim on targeted ads,
14   but I think you are right on Mr. Kumandan.  Needless to say,
15   this was the surgical approach that Ms. Bali took.
16       But if you go forward, you just don't have one of your
17   parties.  The YouTube thing is a loser.  I don't even know
18   why -- you are going to have Kumandan deposed to establish that
19   it is not one in the same.
20            MS. FARAH:  Certainly, Your Honor.  So I will just
21   point out merely because YouTube is an entity owned by Google
22   doesn't necessarily mean that the information didn't travel
23   through other third parties.
24            THE COURT:  You don't allege that.  You don't allege
25   that.
```

1          **MS. FARAH:**  Right.  So --

2          **THE COURT:**  You are just guessing.  What are you going

3   to say?  There is some server somewhere?  I mean, come on.

4          **MS. FARAH:**  Certainly, Your Honor.  As to the policy

5   that Defendants rely on in saying that they were expressly

6   permitted to populate these personal -- these personalized

7   content and targeted advertising, that policy is at issue.  And

8   we dispute whether Google was even authorized to collect that

9   information in the first place.

10      If the collection was unauthorized in any use, whether it

11  is for personalized content or --

12          **THE COURT:**  Of course.  But that goes to a different

13  theory, not on the targeted ad theory.

14          **MS. FARAH:**  Right, right.  I just wanted to respond to

15  the points they just made in this context.

16          **THE COURT:**  Okay.

17          **MS. FARAH:**  And so with respect to the breach of

18  contract claim, Your Honor, so we are relying on three

19  promises.

20      One is a promise not to record individuals.  The other

21  one, not to share any information; and then not to unilaterally

22  change the collection practices.

23      You know, as to the first category, we have offered a

24  specific written representation by Google that comes directly

25  from their privacy policy and that statement says that Google

1    may collect voice and audio information when you use audio

2    features.

3        Our Plaintiffs' reasonable interpretation of that language

4    is that it requires users to affirmatively activate -- interact

5    with Google before it may collect anything.

6        Google offers a convenient interpretation that actually

7    conflicts with the words you use.

8        And, you know, to support our reading of the contract, we

9    pointed to a number of other representations that Google has

10   made in their written materials, in their videos, in their ads.

11       These are alleged in paragraphs 90 through 97 of our

12   complaint.

13       One of which we highlighted is the Frequently Asked

14   Questions in the privacy policy where Google denies recording

15   individuals absent a hot word or manual activation.

16       And so in that context, arises the issue of detect and the

17   meaning of "detect."

18       You know, Your Honor, here we are on a reasonable consumer

19   standard; right.  So despite that Google --

20       **THE COURT:**  No, not for breach of contract you are

21   not.  There is no reasonable consumer standard for breach of

22   contract.

23       It is a reasonable interpretation and a plain meaning

24   interpretation of the contract, but let's not merge your UCL

25   claim.  That would be a reasonable consumer standard.

1          **MS. FARAH:**  Right; right.  So, Your Honor, you know

2    whether -- what the term "you use" actually means and what does

3    the word "detect" refer to --

4          **THE COURT:**  Sure.

5          **MS. FARAH:**  -- is going to be subject of -- will have

6    to be subject of factual --

7          **THE COURT:**  I agree with you.  I think your first

8    theory is probably going to get through.

9       It is the third theory that I think is probably the most

10   at risk.

11      And why don't we move onto your second theory of not

12   sharing.

13         **MS. FARAH:**  Certainly.  Your Honor, if I could just

14   make one point about -- about the disclaimers, which are -- you

15   know, which Google uses as a method to negate some of the

16   contractual promises that we allege were made.

17      I would just point out that the disclaimer such as as-is

18   and may not meet users needs aren't going to be sufficient to

19   disclaim some of the specific contractual promises.  This has

20   been held time and again in other cases.

21      You know, there is the *Grace v. Apple* case.  I apologize.

22   I believe that is not part of our briefing.  It is 2017 Westlaw

23   3232464 where Apple actually disclaimed, you know, its product

24   as-is may come with fault; may not meet your requirements; may

25   not operate error free.

 1          And those disclaimers were not sufficient to actually

 2     justify the unavailability of one particular feature of the

 3     phone because they are just very generalized and not specific

 4     enough.

 5          More recently in the *iPhone Privacy Litigation*, Judge

 6     White has left those very broad disclaimers for a later date

 7     concluding that it is a factual dispute whether these

 8     disclaimers are effective to disclaim specific contractual

 9     promises.

10          Your Honor, with regard to error-free, I would also point

11     out that we don't even -- there is nothing before the Court

12     that establishes what the term "error free" even means.

13          What does an error mean in the context of a speech

14     recognition device?  Does it mean that when I ask for a

15     direction in New York, I'm going to get directions to Newark?

16     Or does it mean --

17          **THE COURT:**  Perhaps.

18          **MS. FARAH:**  -- right, and does it mean that if I'm

19     speaking with a dialect or an accent, it is not going to pick

20     it up correctly?

21          I mean, that has not been established.  Just to use a

22     blanket disclaimer "error free" is not going to --

23          **THE COURT:**  I agree with you.  I'm not going to decide

24     as a matter of law on that issue.

25          **MS. FARAH:**  Certainly.

 1          Yes.  And, Your Honor, with respect to the shared -- to

 2     the disclosure, so we were specifically instructed to address

 3     the deficiencies relating to the other exceptions that could

 4     potentially create --

 5          **THE COURT:**  You have imported consent into the other

 6     three items, and I have already ruled on that.  And you have

 7     given me no reason to change my ruling.

 8          **MS. FARAH:**  Right, Your Honor.  So I just want to

 9     point the Court's attention to paragraphs 245 and 246, which is

10     where we address those exceptions; not so much in our briefing

11     but in those paragraphs of the Complaint.

12          **THE COURT:**  Okay.  I will --

13          **MS. FARAH:**  As to external processing, you know, that

14     is fully briefed.  By Google's own terms, we don't believe

15     external processing relates to personal information.

16          And in any event, sharing of sensitive personal

17     information would require explicit consent.

18          One minor point.  So, as to damages, Your Honor has

19     indicated last time that if we can establish invasion of

20     privacy, then we likely would have satisfied contractual

21     damages --

22          **THE COURT:**  That's right.

23          **MS. FARAH:**  -- based on harm to privacy.  And

24     I believe that we have done that now.

25          **THE COURT:**  I'm inclined to let that go through as

1  well.

2      **MS. FARAH:**  Great.  As to the benefit of the bargain

3  claim, yeah, Your Honor, so for the individuals who purchased

4  their Google devices from Google, I really don't believe that

5  the fact that Google Assistant comes free or that it doesn't

6  have a separate price tag attached to it does not mean that it

7  doesn't have value.  You know, certainly Google Assistant --

8      **THE COURT:**  Oh, so your Plaintiffs are going to have

9  to truthfully testify that at the time they purchased the

10  device, that that had value to them.

11      This issue isn't going away even if I let you through on

12  benefit of the bargain.  So, you know, what Ms. Bali has done

13  here has, I think, really shown you that this is going to be

14  very difficult.

15      So Mr. Brekhus is probably in the most difficult

16  circumstance because he didn't even buy the device.  He bought

17  Spotify and this came with.

18      And, you know, so all I can say is that they are going to

19  have to truthfully testify about what they did and thought at

20  the time of the purchase.

21      And then if we get to a jury trial, the jury can decide

22  whether they believe what your clients are saying.  But --

23      **MS. FARAH:**  Right.

24      **THE COURT:**  You know, that's a big hurdle.  You know,

25  I don't expect them just to mouth off.  I expect them to

1    thoughtfully go back over their considerations at the time they

2    purchased the product and under oath give truthful testimony.

3        So I don't know how that will come out.  But I know you

4    will give them good advice on their obligation to be honest.

5        **MS. FARAH:**  Yes, absolutely, Your Honor.  Absolutely.

6    You know, so my concern is -- I mean, Ms. Reynolds represents

7    Brekhus and Hernandez, so she can speak to this more if she

8    wishes.

9        **THE COURT:**  Sure.

10       **MS. FARAH:**  My concern is Spurr, Galvan and Kumandan.

11       **THE COURT:**  Sure.

12       **MS. FARAH:**  And, you know, to the extent they

13   purchased their devices, I believe, that their allegations

14   would be sufficient for the benefit of the bargain theory.

15       Here, you know, you have Plaintiffs who have purchased

16   devices which they anticipated receiving a certain benefit.

17       And the benefit is that Google Assistant will retrieve

18   information from the Internet; will complete certain tasks; and

19   will do so while keeping their information private and secure.

20       But what they received was, perhaps, a retrieval of the

21   information but not the privacy that they bargained for.

22       On the other hand, you have Google who did receive the

23   full benefit of their bargain.

24       I would say that this is analogous to the *Svenson* II case

25   where Plaintiffs succeeded on the benefit of a bargain theory

1  based on similar allegations that Google Wallet disclosed

2  information to other third parties based on money transactions

3  and money processing.

4      One quick point on the UCL, Your Honor has sustained us on

5  the unlawful prong based on the violation of Stored

6  Communications Act, Section 2702.

7      I believe that under the balancing test pertinent to the

8  unfair prong, we also have satisfied the standard.

9      The Court weighed the utility of the conduct here versus

10  the harm to victims.  The utility has been set aside for a

11  later day as a factual question.  And now that we have

12  established harm to privacy, I believe we should also prevail

13  on the unfair prong.

14      And I just realized, Your Honor, I forgot to address one

15  other point as to the frequency of allegations which Google now

16  uses as a -- as a means to rehash the same arguments that were

17  already settled.

18      The frequency of false rights in this case certainly

19  cannot be quantified and cannot be determined.  You know,

20  Google in its briefing says that the recordings are far from

21  reliable.

22      So it's hard to understand how if the -- if the recordings

23  are far from reliable, why are they sufficient to establish

24  that false accepts do not routinely occur?

25      You know, just because we also don't know which

1  conversations actually are recorded and logged on Google's

2  accounts, we cannot say that other recordings --

3        THE COURT:  I thought they have complete access to

4  everything that was logged onto their accounts.  I thought

5  that's what Ms. Bali told me last time and then --

6        MS. FARAH:  Your Honor, they do have access to Google

7  account.  That is not the same to say that every conversation

8  that is recorded will ultimately be logged in the --

9        THE COURT:  Well, you will hire an expert to tell me

10 that.

11       MS. FARAH:  Exactly, exactly right, later in

12 discovery.  So, I guess --

13       THE COURT:  Okay.  Maybe we can turn over to

14 Ms. Reynolds.

15       MS. REYNOLDS:  Thank you, Your Honor.

16    I know there has been a lot kind of to run through with

17 regards to Plaintiffs Brekhus and Hernandez.  And so maybe I

18 will start by addressing the concerns about whether the

19 software update occurred for the -- for those Plaintiffs'

20 devices.

21    Our allegations are based on the Google admission that --

22 that the software update occurred on Google Home devices as

23 alleged in paragraph 110 of the complaint and relying on the

24 protocol article wherein Google represents that this software

25 update occurred on Google Home devices.

1        And, therefore, we rely on a reasonable inference that our

2   Plaintiffs' Google Home devices also experienced the software

3   update.

4        The Reddit posts are in the complaint in order to

5   illustrate what that meant; how the update operated.

6        However, the actual execution of a recording based on an

7   alarm event is not necessary for our theory of the case, which

8   is simply that the software update occurred on our Plaintiffs'

9   devices.

10        **THE COURT:**  So are you saying that your clients would

11   like Google to block all updates and make their device obsolete

12   in about 90 days because it receives no updates?

13        That is the implausibility of your argument, Ms. Reynolds;

14   is that your clients don't get to pick which updates they want

15   and which updates they don't want.

16        So I'm sure Ms. Bali will contact Google right away and

17   deactivate their devices tomorrow, and they will no longer be

18   Google customers.

19        But, frankly, your argument is so implausible that I

20   don't -- I just don't -- I don't actually know that I will give

21   you leave to amend.

22        You have pointed to nothing in the documents -- in the

23   contracts that tells me that Google promised to never update

24   and -- or to say:  We promise we will never do a software

25   update you don't like.

1    And that's really what you are saying.  So, I'm sorry.  It

2  just -- I don't even know how you can amend, Ms. Reynolds.

3        **MS. REYNOLDS:**  Your Honor, that's not what we are

4  saying.

5        **THE COURT:**  What --

6        **MS. REYNOLDS:**  We would certainly agree that it would

7  be impossible to ask that we never get updates.

8    All that we are saying is that those updates must not

9  render any representations or contract terms to be false or

10  breached.

11        **THE COURT:**  So --

12        **MS. REYNOLDS:**  Here, the update -- as we have spent a

13  long time discussing in this case, this is a voice-activated

14  speaker.  That's what the title of the speaker is.

15    We have gone over how the operation is reliant on

16  detection of a voice, whether it is okay and it activates an

17  error or okay Google, it is reliant on voice activation.

18        **THE COURT:**  Of course.

19        **MS. REYNOLDS:**  This particular software update changed

20  the functionality to be that it is no longer a voice-activated

21  speaker but instead a speaker that activates on the sound of

22  glass breaking or an alarm sound.

23        **THE COURT:**  You don't actually have any allegation

24  that -- that is what Google intended it to do.  I mean,

25  actually the alarm, the glass breaking, if they intended to do

1    it, then the default would have been that your device calls 911

2    because these are crimes that you are saying that these noises

3    are.

4        That's why I just can't even wrap my head around this

5    theory because you have shown me nothing in the contractual

6    agreements that says that there won't be updates; there won't

7    be updates you don't like; there won't be updates that actually

8    do something we didn't think -- we didn't want them to do.

9        There is evidence that they -- I think it is in the

10   complaint -- you allege it -- when they learned about this,

11   they withdrew the update and fixed it.

12       I mean, this was -- you are basically suing on a bug that

13   was unintentional, claiming it to be a breach of contract.

14   That's why I think this claim just really doesn't go forward.

15       **MS. REYNOLDS:**  Your Honor, perhaps that's where the

16   room for amendment would be to better fill out the allegations

17   regarding what the software update did and how it was intended

18   because there are other articles and Google admissions on which

19   we can rely that we have since found that could potentially

20   fulfill -- fill in that gap.

21       But I just would caution against characterizing this --

22   our Plaintiffs' claims as being regarding any update.

23   Certainly, improving services is certainly fine; but --

24       **THE COURT:**  Well, I just don't think you have pointed

25   to the terms of service or the privacy agreement that would

```
 1    have -- that obligated Google to not do what happened here
 2    because you don't actually -- I mean, you allege the
 3    consequence of the update, but you don't allege that it was the
 4    intent of the update to capture these sounds.
 5         And --
 6         MS. REYNOLDS:  Well, I believe that we could -- we
 7    can -- have information and belief allege that --
 8         THE COURT:  If there is an amendment, I'm going to
 9    stay discovery until you amend.  This is not fair to have this
10    pleading not settled for three years.
11         Now, I may not give you leave to amend; but I'm not going
12    to have endless -- I'm not going to stay in Motion To Dismiss
13    land where you have continual discovery.  It is not appropriate
14    for Google.
15         MS. REYNOLDS:  Your Honor, I understand that.  Google
16    hasn't produced any discovery to us so far in this case.  As I
17    will remind you, you know, our case was filed in, I believe,
18    August 2020.
19         So I understand the frustration with how long this has
20    been pending, but simply remind the Court that this is our
21    first Motion To Dismiss briefing.
22         THE COURT:  I understand.  All right.
23         MS. REYNOLDS:  And I would also suggest that I believe
24    that we can amend to clarify your concerns that there was an
25    intent.
```

1    That is also informed by the timing of this update and

2    other Google admissions, which are not currently in the

3    complaint but relate to a relationship with ADT Home Alarm

4    System and also the intent that this software update be

5    provided for certain users who wanted this service.

6        **THE COURT:** But, you know, you still haven't pointed

7    to me in the contract in the terms of service or the privacy

8    where this -- where these changes wouldn't be made.

9    You are saying that they promised it would only be voice

10   activated.  Is that what you are saying?

11       **MS. REYNOLDS:** Essentially, Your Honor.  And in

12   paragraph 252 we identify the specific policy -- the privacy

13   policy language in which Google promises that the information

14   Google collects and how that information is used depends on how

15   you use our services and how you manage your privacy controls.

16   And here, Google took that ability away and breached that

17   contract by changing it so that the user did not control the

18   way in which the information was -- excuse me -- audio was

19   recorded and transmitted and also took -- not only made it so

20   the user wasn't in control but that it was no longer voice

21   activated; that it was based on other alarm events.

22       **MS. BALI:** Your Honor, if I could just be heard on

23   this -- I can wait if you want to --

24       **THE COURT:** Let me hear about the fraud claims because

25   that's also Ms. Reynolds' domain.

1          **MS. REYNOLDS:**  Certainly, Your Honor.  I think based

2     on -- I'm not sure exactly what your concerns are with the

3     fraud claims.

4          The Plaintiffs do allege that they relied on the

5     representations of Google in paying money to obtain the Google

6     device.  It was through the purchase of the Spotify paid

7     subscription.

8          But Plaintiffs do allege -- including in paragraph 46

9     Brekhus alleges that he purchased the Spotify paid subscription

10    in part to obtain the Google Home device; that he subsequently

11    enters into a separate transaction with Google for that device;

12    receives a receipt from Google; and, therefore, has fulfilled

13    the obligation -- excuse me -- Plaintiffs have alleged

14    sufficiently to a claim under the CLRA because they entered

15    into a transaction because they made money -- excuse me -- paid

16    money and suffered economic harm as a result of that

17    transaction in reliance on the representations made by Google,

18    which were false and misleading as alleged in the complaint.

19         **THE COURT:**  So your -- are you claiming that at the

20    time that Brekhus and Hernandez purchased their devices that

21    Google knew it was going to add the alarm software and

22    intentionally misrepresented it to your clients' detriment?  Is

23    that what you want to prove for fraud?

24         **MS. REYNOLDS:**  Um --

25         **THE COURT:**  Later they had this idea, this would be

1    cool to also capture these other things.

2        Do you have a basis to allege under Rule 11 that at the

3    time Google entered into the terms of service and privacy

4    agreements with your clients, that they already had the

5    intention to add the alarm activation and failed to disclose

6    and misrepresented that to your client?

7            **MS. REYNOLDS:**  Your Honor, I don't think that our

8    fraud allegations relate to this specific software update.

9            **THE COURT:**  So what do they relate to?

10           **MS. REYNOLDS:**  Well, they relate to the ability and to

11   change the circumstances under which Google could -- excuse

12   me -- the devices could record and transmit --

13           **THE COURT:**  So you are saying that Google had a

14   present intention to change the terms that it didn't disclose?

15   That's what you are saying?

16           **MS. REYNOLDS:**  Yes, Your Honor.

17           **THE COURT:**  It can't just be this amorphous into the

18   future we might do something we haven't thought of yet.  That

19   is not what fraud is.

20           **MS. REYNOLDS:**  Well, we don't allege that they hadn't

21   thought of it yet.  We allege that at the time they made those

22   representations, they knew that they could and would change the

23   circumstances --

24           **THE COURT:**  Well, could is very different than had a

25   present intent to do it.

 1        See, I mean, that's the problem with fraud is that -- it

 2    all lives at the time the agreement -- the contract is being

 3    formed.

 4        And if Google -- I mean, if you don't have any shred of a

 5    suggestion of evidence that Google had that present intent, you

 6    don't have fraud because it is detrimental reliance.

 7        And the fraudster has to know the true facts and

 8    intentionally mislead or omit information that would provide --

 9    upon which the other party relied and that it knew and intended

10    the other party to rely on it.

11        So I guess if I'm going to let you amend, I have to let

12    you amend there.  Let me tell you that I think you have got a

13    very hard job.

14        So, all right.  Then we are going to call this.  Well --

15    no, Ms. Bali, I said I would let you have the last word.  It is

16    your motion.

17        And then I will let you know where we are going to go from

18    here.

19        **MS. BALI:**  Thank you, Your Honor.  I will just be very

20    brief.

21        I think Your Honor hit the nail on the head when you said

22    with what Brekhus and Hernandez are suing is on a bug that

23    Google fixed two days later; that they, by the way, never even

24    experienced or at least haven't alleged that they experienced.

25        And you just can't -- you know, you don't have claims

 1  based on that.  There was no -- there is no allegations at all

 2  that any of this happened to them.  There is no allegations

 3  that this was intentional.

 4      And, in fact, the fact that it was fixed days later

 5  actually bellies any claims that it was intentional.

 6      And you are absolutely right.  This is a bug that was

 7  fixed days later, and that just doesn't provide a basis for a

 8  fraud claim, a CLRA claim, particularly from somebody who never

 9  made any purchase from Google at all.

10      And this separate transaction that the Plaintiffs

11  allegedly had with Google, it is not even clear what that is.

12      There was no purchase.  And to the extent they are

13  referring to agreement, to the terms of service or privacy

14  policy, that doesn't make them a consumer under the CLRA, which

15  is what the CLRA requires.

16      And so, you know, I think a dismissal -- an outright

17  dismissal without leave as to those Plaintiffs would be

18  appropriate because there is really no set of facts that they

19  could allege to have a viable claim.

20      And just to respond to a up to a couple of the points --

21          **THE COURT:**  I need to wrap this up, in 30 seconds.

22          **MS. BALI:**  I will just be really quick.  And I will

23  say on particularly the disclosure provision of the breach of

24  contract -- the disclosure theory of their breach of contract

25  claim, they seem to try to make this distinction between

1    personal information and sensitive personal information and

2    somehow argue that this is sensitive personal information, so

3    somehow consent is required.

4         And, you know, sensitive personal information is clearly

5    defined in the privacy policy as information about medical

6    facts, racial or ethnic origins, political or religious

7    beliefs.

8         And there is no allegations that any of this that -- this

9    implicated audio data qualified as sensitive personal

10   information.

11        So, you know, we should really be looking at the external

12   processing provision which, you know, we have already pointed

13   the Court to and Your Honor has already recognized is separate

14   from the consent provision.

15        **THE COURT:**  All right.  Thank you all.  This is a

16   complicated case.

17        So my impression is that I am going to allow through

18   really all the claims maybe with a little haircut here and

19   there for some of the Plaintiffs but very minor, Ms. Farah.

20        And so on those claims, I would not be granting leave to

21   amend.  I think we are done.  And I think really everything

22   gets through.

23        I think you may lose the theory on breach of contract.

24   But, again, as you said, all you need is one.

25        On the new claims for Brekhus and Hernandez, if I grant

1    leave to amend, I want you to be aware of this -- I'm not

2    promising this order soon.  That's one of the problems.  But

3    from the date I issue the order, Plaintiffs will have 7 days to

4    amend the complaint.

5        If there is a Motion To Dismiss, the briefing will be

6    limited to 5 pages because I'm only granting leave to amend on

7    very little because Mr. -- because some of it we have been

8    through.  You have got a 55-page order the first time.

9        I just -- there is nothing more I can say.  This is why

10   this is going to go through, and I think we have had enough

11   here.

12       It's unlikely there will be argument, but it will depend

13   on the clarity of the brief, 5 pages should -- frankly, 3

14   should be enough.  I'm giving you 5, but there is not -- you

15   had 25 pages for all ten claims limited now to these two, 5

16   should be more than enough.

17       And so I will not -- it is unlikely I will allow amendment

18   on anything else with -- and so, I mean, clearly if you want to

19   seek leave to amend the complaint, that's completely separate.

20       It is just that under the aegis of the order I will issue,

21   I'm not granting open season on amending the complaint.

22       So if Plaintiffs wish further amendment, there are -- you

23   know, Rule 15 and Rule 16 gives you ample opportunity to seek

24   leave to amend.  I'm not foreclosing any of that.

25       All right.  Thank you all.

1          **MS. BALI:**  Your Honor, could I just ask one procedural

2    question?  You made reference to a stay of discovery as to

3    Brekhus and Hernandez.

4          We haven't sent any discovery to them, but they have

5    propounded some and we have responses --

6          **THE COURT:**  No, I'm not going to stay discovery on --

7    because it is very narrow, and I will allow the discovery to

8    continue.

9          **MS. BALI:**  Just as to those Plaintiffs.  I realize --

10          **THE COURT:**  I think I will let it go.  All right.

11    Thank you all.

12          As I say, the case goes on.  I just -- we need to focus in

13    on things that are viable and not waste our time on things that

14    are not.

15          So I'm sure that the amendment process will help me

16    through -- help me to wade through that.  Thank you.

17          **MS. FARAH:**  Thank you, Your Honor.

18          **MS. BALI:**  Thank you, Your Honor.

19          **MS. REYNOLDS:**  Thank you, Your Honor.

20              (Proceedings adjourned at 10:51 a.m.)

21                        ---oOo---

22

23

24

25

### CERTIFICATE OF REPORTER

We certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:   Wednesday, June 9, 2021

_____

Marla F. Knox, RPR, CRR
U.S. Court Reporter