1                    UNITED STATES DISTRICT COURT

2                   NORTHERN DISTRICT OF CALIFORNIA

3       Before The Honorable Susan van Keulen, Magistrate Judge

4

5   IN RE GOOGLE ASSISTANT          )   No. C 19-04286-BLF
    PRIVACY LITIGATION              )
6   _____)

7

8                                       San Jose, California
                                        Friday, July 26, 2022

9

    TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND
10     RECORDING 10:00 - 11:01 and 11:34 - 12:15 = 102 MINUTES

11  APPEARANCES:

12  For Plaintiffs:

13                              Lowey Dannenberg, P.C.
                                44 South Broadway, Suite 1100
14                              White Plains, New York 10601
                                (514) 557-6500
15                         BY:  CHRISTIAN LEVIS, ESQ.
                           BY:  MARGARET MACLEAN, ESQ.
16                         BY:  ANDREA FARAH, ESQ.

17                              ScottScott, Attorneys at Law,
                                  LLP
18                              600 West Broadway, Suite 3300
                                San Diego, California 92101
19                         BY:  JOHN T. JASNOCH, ESQ.
                           BY:  ALEX M. OUTWATER, ESQ.

20

21  For Defendants:
                                Perkins Coie, LLP
22                              505 Howard Street, Suite 1000
                                San Francisco, California
23                                94105
                           BY:  SUNITA BALI, ESQ.
24                         BY:  BOBBIE J. WILSON, ESQ.

25

2

1  Transcribed by:                 Echo Reporting, Inc.
                                   Contracted Court Reporter/
2                                  Transcriber
                                   echoreporting@yahoo.com
3

3

1  <u>Friday, July 26, 2022</u>                                    10:00 a.m.

2                      P-R-O-C-E-E-D-I-N-G-S

3                            --oOo--

4           THE CLERK:  Calling case 19-CV-4286, In Re Google

5  Assistant Privacy Litigation.

6       Counsel, please identify yourself for the record,

7  beginning with Plaintiff.

8           MR. LEVIS (via Zoom):  Good morning, your Honor.

9  This is Christian Levis from Lowey Dannenberg on behalf of

10 the Plaintiffs.

11          THE COURT:  Mr. Levis, good morning.

12          MS. MACLEAN (via Zoom):  Good morning, your Honor.

13 Margaret MacLean from Lowey Dannenberg for the Plaintiffs.

14          THE COURT:  Ms. MacLean, hello.

15          MS. FARAH (via Zoom):  Good morning, your Honor.

16 Andrea Farah, Lowey Dannenberg on behalf of the Plaintiffs.

17          THE COURT:  Ms. Farah, good morning.

18          MS. FARAH:  Good morning.

19          MR. JASNOCH (via Zoom):  Good morning, your Honor.

20 John Jasnoch, Scott and Scott, on behalf of Plaintiffs.

21          THE COURT:  Mr. Jasnoch, hello.

22          MR. OUTWATER (via Zoom):  Good morning, your

23 Honor.  Alex Outwater, also from Scott and Scott, on behalf

24 of the Plaintiffs.

25          THE COURT:  Mr. Outwater, good morning.

4

1      And from the Defendants today?

2           MS. BALI (via Zoom):  Good morning, your Honor.

3  This is Sunita Bali from Perkins Coie for Defendants.

4           THE COURT:  Ms. Bali, hello.

5           MS. WILSON (via Zoom):  Good morning, your Honor.

6  Bobbie Wilson for the Defendants.

7           THE COURT:  Ms. Wilson, good morning.

8      All right.  Did I get everybody.  I think so.

9  Excellent.

10      All right.  If you are not speaking and can turn off

11  your video, I appreciate that, and I see I now have Mr.

12  Levis and Ms. Bali.  So, that is helpful.  That doesn't mean

13  that if you feel like it's important you be on camera or if

14  you may, because we're going to cover a wide swath of

15  issues.  You're welcome to turn it on at any time, and we'll

16  -- we'll get caught up.  So, but I do appreciate it.  It

17  makes the screen easier obviously for me.

18      All right.  So, we're on today for a discovery hearing

19  on two matters, two of the three matters that are currently

20  pending before the Court.  Before I turn to those, I have

21  some general background questions that I want to ask and

22  have answered and then go from there.

23      Hang on just a second.  It looks like I may have an

24  issue with my law clerk coming in.

25           (Pause.)

5

1          THE COURT:  Hold on just a moment, please.  I want
2  to be sure everybody's here obviously.  Okay.  Excellent.
3  Looks like we're all -- all together now.
4      Okay.  So, as I say, I have some general questions with
5  regards to the technology and the operation, very high
6  level, very high level, that I want to -- that I want to
7  address first, and then we'll turn to the -- the issues at
8  hand.
9      I'm going to keep this moving because there is a lot of
10 ground to cover, and I have an 11:00 o'clock calendar.  So
11 -- and, anything more that you think is helpful for the
12 Court to know, I'm sure we'll have other opportunities.
13     Okay.  So, my -- where I'd like to begin is with Google
14 Assistant.  It's not a product that I use.  So, my -- you
15 know, my first most basic question, I -- I understand
16 certainly it's software and it comes -- you know, if you
17 have an android phone, I guess you can get it or perhaps it
18 comes on it.  And then, so, I want to know the weather in
19 San Jose today.  How do I -- how do I activate that?
20     So, let me start with counsel for Google, and then I
21 can hear from counsel for Plaintiff if you think there's
22 some discrepancy.  I -- I don't intend any of -- this should
23 not be controversial.  This should all be fairly
24 straightforward, but I do appreciate parties have different
25 perspectives.

6

1      So, Ms. Bali, is that -- is that you who has the ball

2  for this one?

3          MS. BALI:  That's me.  Good morning, your Honor.

4          THE COURT:  Excellent.  Thank you.

5          MS. BALI:  So, are you just looking for a general

6  overview of how the Assistant works and --

7          THE COURT:  Yeah.

8          MS. BALI:  Okay.

9          THE COURT:  Yeah.

10          MS. BALI:  Okay.  So, you're right, your Honor,

11  that the Google Assistant is software that's available on a

12  wide range of first party and third party devices, including

13  devices like the Google Home or, you know, Nest speakers or

14  smart displays, as well as android phones which may or may

15  not be manufactured by Google, as well as a bunch of other

16  -- of other types of devices, and it can work -- you can

17  activate it in a couple of ways.  One way is you can --

18  different devices have different abilities to activate based

19  on tactile sensation.  So, you can press a button or, you

20  know, touch a screen, depending on the type of device.

21  There's a lot of variation depending on the type of device.

22      You can also activate it on most types of devices by

23  saying what we refer to as a hotword, which is "Okay Google"

24  or "Hey Google."  And if the algorithm -- the -- the device

25  essentially waits in standby mode until it detects a

1  hotword.  When it detects a hotword, it, you know, activates

2  -- it records the query, and it sends the query -- you know,

3  it processes the query.  Oftentimes that means it sends the

4  query to Google servers for processing.

5      Depending on a user's setting, Google may log the query

6  but only if a user has enabled that setting.  So, if there's

7  -- if the user does not have that setting enabled, the data

8  will be disposed of.

9          THE COURT:  So, when you say -- if I -- if I

10 intend to active Google Assistant and I say, "Hey, Google,

11 what's the weather in San Jose today," is that query -- you

12 referenced the query being recorded.  Is that --

13         MS. BALI:  Correct.

14         THE COURT:  So, it's recorded and transmitted to

15 Google servers and --

16         MS. BALI:  For -- for processing, so that --

17         THE COURT:  Right.

18         MS. BALI:  -- Google can -- the product can

19 deliver a response to the query.

20         THE COURT:  Right.  And then I get the voice

21 response back?

22         MS. BALI:  Exactly.

23         THE COURT:  Okay.  And, then, what's the role of

24 transcription if that process, if any?  And I'm setting

25 aside the -- the false accept issue for the moment because I

8

1   just want to understand generally.  What -- what's the role

2   of transcription?

3          MS. BALI:  So, there's -- there's sort of two

4   types of transcription that happens.  One is there is a

5   machine-generated transcript.  Again, this depends on -- it

6   depends on the user's setting with respect to whether this

7   is saved or not.  But, in order to process the query, Google

8   needs to reduce the audio to written form.  So, there's a

9   machine-generated transcript that's created that is used to

10  process the query.

11      There's another type of transcription that happens

12  where, you know, a subset of audio for those users that have

13  elected to have their audio saved and have agreed to have

14  their audio reviewed by human reviewers to transcribe it to

15  help improve Google's system.  So, Google's trying to --

16  always trying to get better and better at detecting the

17  hotword and detecting the -- you know, getting the substance

18  of the query right.

19      And, so, they use human reviewers to help transcribe

20  and annotate data so that it can determine whether or not

21  the machine algorithm got it right, and it uses that data to

22  help improve the performance of the Google Assistant.

23          THE COURT:  Okay.  So, I heard two -- two forms of

24  transcription.  That is, in the first instance, any query

25  has to be transcribed to be sent and processed because it's

9

1   -- it's reading words.  It's not taking an audio file.  Is

2   that a fair characterization?

3         MS. BALI:  Yeah.  I mean, it takes the audio file

4   but then has to convert it into words to be able to process

5   it and deliver a response.

6         THE COURT:  Understood.  Okay.  Let me just make a

7   note here.  Okay.  And then if I just -- let's say I have

8   Google Assistant at home, you know, the device, and I say,

9   you know, "Morning, Google.  What's the weather in San

10  Jose," so, that's recorded, and it's transcribed, just

11  machine generated, goes off, gets processed, and all this

12  happens incredibly quickly, and then I get a -- an audio

13  response back, right?  Is that fair?

14        MS. BALI:  Correct.  And -- correct.  On some

15  devices, I think it can display the response and text.

16  There's a lot of --

17        THE COURT:  I'm sure I could set it that way if

18  I'm using my phone probably.

19        MS. BALI:  Yeah, but you're right.

20        THE COURT:  Okay.

21        MS. BALI:  You're right.

22        THE COURT:  So, then, what happens to my

23  transcribed query?  I've asked.  It's answered.  You know,

24  use the machine generated.  What happens to it?

25        MS. BALI:  Well, it depends on your settings.  So,

1  there's a --

2          THE COURT:  Okay.

3          MS. BALI:  -- variety of settings that control

4  what happens to -- to the query.  So, a user has to opt in

5  to what we call the voice and activity account setting which

6  will -- excuse me.  It's called voice and audio activity is

7  the name of the setting, and a user has to opt into that

8  setting for their audio to be saved or logged, and then a

9  user can log into what we -- what we refer to as their "My

10 Activity" to view all of the audio recordings that the

11 Assistant has saved, and they can delete them.  They can do

12 anything they want with them, download them, delete them.

13 You know, but they have -- they have access to view any

14 audio that Google has saved.

15         THE COURT:  Okay.

16         MS. BALI:  But if a user has not opted into that

17 setting, that audio is disposed of.  It's not stored.  And

18 there's another setting that affects whether or not the

19 machine-generated transcript that is created to process the

20 query is saved.  That's called the Web and App Activity

21 setting.

22         THE COURT:  Um-hmm.

23         MS. BALI:  If that setting is enabled, that

24 machine-generated transcript will be saved and, again,

25 visible to the user and their My Activity page, if that

1  setting is off, my understanding is that that transcript is

2  also disposed of.

3          THE COURT:  And what setting is that, the Web

4  what?

5          MS. BALI:  Web and App Activity.

6          THE COURT:  Okay.  Then, now, tell me about the

7  transcriptions for the HR reviewers that -- I think of that

8  as the human -- human reviewers.  So --

9          MS. BALI:  Human reviewers.  That's a good code

10 name for them, HR.  So, those transcripts are created -- so

11 -- so, Google uses human -- what they refer to as human

12 raters.

13         THE COURT:  I get that.  Do I have to opt into

14 that or does Google just do that randomly for improvement

15 purposes?

16         MS. BALI:  That's part of the Voice and App

17 Activity setting.  So, as part of that setting, Google

18 discloses that if you opt to store your audio, it might be

19 used to improve the Assistant, including being subject to

20 this unit review process.

21         THE COURT:  Okay.  So, if the setting is selected,

22 then random transcriptions of my queries and responses may

23 -- may get reviewed.  And what's the -- is there a

24 percentage?  What, does Google humanly -- have humans review

25 five percent, two percent, one percent?  What's --

12

1        MS. BALI:  Yeah.  My understanding was it was less

2   than two percent the last time they've given a percentage on

3   that.

4        THE COURT:  And once the human review process, if

5   they look at it and they're like, oh, yeah, you know, Google

6   Assistant got it right, good job, what do they do with that

7   transcription?

8        MS. BALI:  I believe that the transcript is stored

9   along with the audio.  That -- that human-generated

10  transcript is stored along with the audio.

11       THE COURT:  Okay. All right.  Okay.  Now --

12       MS. BALI:  I'll just note -- I'll just note, your

13  Honor, I know you haven't gotten into the world of false

14  accepts yet, but I will note that human reviewers are also

15  instructed to identify any audio that they believe is not

16  intended for Google, and that audio is deleted.  So, they

17  can identify audio as not intended for Google, and it -- it

18  is immediately directed to a deletion pipeline.

19       THE COURT:  Okay.  And that's where I want to go

20  next, that is, to false accept.  Same level of questions,

21  very general.

22     Mr. Levis, I -- I don't want to go in detail back and

23  forth.  I just want to know --

24       MR. LEVIS:  Sure, your Honor.

25       THE COURT:  -- anything on this very general

1 description so far?  Is there some giant red flag that you

2 want the court to know about?

3          MR. LEVIS:  Yeah.  I think there's just a couple

4 quick things to clarify, if that's all right with your

5 Honor.

6     So --

7          THE COURT:  It's not a Q and A between you and

8 counsel.

9          MR. LEVIS:  No.  In the --

10          THE COURT:  Raise it with me.

11          MR. LEVIS:  In the activation point, whether it's

12 manual activation or activation by voice --

13          THE COURT:  Uh-huh.

14          MR. LEVIS:  -- we're only concerned here with the

15 second scenario of --

16          THE COURT:  Understood.

17          MR. LEVIS:  -- activation of the hotword.

18          THE COURT:  Got it.

19          MR. LEVIS:  As to the human transcription and the

20 agreement to that, that was an issue that was briefed on the

21 motion to dismiss, and the Court found that was not properly

22 disclosed.  So, I just took issue I think that counsel had

23 stated that you would agree to or they disclosed that that

24 was transcribed and --

25          THE COURT:  There's no prejudice here to that.

14

Understood.

MR. LEVIS:  And then I would note that just on the transcription issue of human transcription versus machine transcription --

THE COURT:  Uh-huh.

MR. LEVIS:  -- that when audio is actually shared with human reviewers and whether it is transcribed by humans, that is a feature that is annotated in the data. So, the data exists to show which audio goes to human reviewers and which is human transcribed and which is not.

THE COURT:  Okay.  All right.  Okay.  So, let's go to false accepts, which I think I gather from the disputes as articulated -- excuse me -- in the papers before me, which is, I assume, if I, you know, am talking to my kid and they're frustrated with a research assignment and I said, "Well, did you Google it," maybe Google Assistant picks that up and thinks it's supposed to do something, and as -- is that the -- is that what we're talking about?

Ms. Bali, let me go back to you with regard to false accepts.

MS. BALI:  Thank you, your Honor.  Yeah, I think that that -- that is generally correct.  It's -- I will say that the term "false accept" sort of isn't used consistently across Google.  I think probably the more accurate term is misactivations and, specifically, non-rejected

1 misactivations, but essentially it is instances in which the

2 Google Assistant perceived some other word or sound as the

3 hotword and activates when -- when -- you know, in fact, no

4 hotword was spoken or the user did not intend to activate

5 the Assistant.

6        THE COURT:  Um-hmm.  Um-hmm.  Okay.  So, I say

7 something that Google Assistant misconstrues, but it still

8 -- it takes it as a query, transcribes it, sends it to a

9 Google server, and then what happens?

10       MS. BALI:  Well, it depends on sort of the outcome

11 of that analysis.

12       THE COURT:  Right.

13       MS. BALI:  So, in addition -- so, there's an

14 initial check for the hotword that happens on the device.

15       THE COURT:  Um-hmm.

16       MS. BALI:  There are subsequent checks that happen

17 at later points, and I guess an engineer would call it the

18 stack or the analysis that happens.

19       THE COURT:  Um-hmm.

20       MS. BALI:  And if it's caught in that process, it

21 will be rejected, and no response will be given.  If it's

22 not caught in that process and it's still -- the system

23 still thinks it's a legitimate query, it will attempt to

24 respond to the query.

25       THE COURT:  Okay.  And then I look at it because

1 I'm surprised that I'm getting a response because I don't

2 think I asked a question.  Got it.

3          MS. BALI:  Right.  And, of course, you can say,

4 you know, "Hey, Google, that wasn't for you" or "Delete that

5 last query" or go to you're my Activity and see that there's

6 something that -- you know, see that it captured something

7 that was not intended for Google and you can delete it.

8 There's -- there's options for that.

9          THE COURT:  All right.  But there's a machine-

10 generated transcript of my query because it's gone to the

11 serve, I mean, assuming it gets out -- out of the device

12 past perhaps the first or second check.  Okay.

13     And then, if I haven't elected to retain my queries,

14 then it's -- it either tries to answer or it decides it

15 can't answer and that mixed activation is not retained, is

16 that correct?

17          MS. BALI:  That's my understanding, your Honor.

18          THE COURT:  All right.  So, some number of

19 misactivations would end up, I assume, in the hands of the

20 human reviewers?

21          MS. BALI:  I mean, you know --

22          THE COURT:  Right.  If Google tried to answer it,

23 right?  If they tried to give me an answer --

24          MS. BALI:  If they tried to give -- correct.  If

25 they try to give you an answer because they believe it's a

17

1  legitimate query, it doesn't -- it doesn't get rejected as

2  part of the ordinary processing of the query.

3          THE COURT:  Right.

4          MS. BALI:  Then, you know, when a random sample of

5  audio is taken and sent to human reviewers for, you know,

6  transcription and processing, it's possible that there would

7  be some, you know, misactivations that get swept in there.

8  And then, as I mentioned --

9          THE COURT:  Sure.

10          MS. BALI:  Yeah.  And then, as I mentioned, when

11  the human reviewers listen to the audio, they are instructed

12  to mark for deletion any audio not intended for Google.

13  And, so, that would be brought into a deletion pipeline.

14          THE COURT:  Okay.  All right.  Okay.  Now, does

15  Google track queries by devices?  That is, if I've got an

16  android, if I use Google Assistant on my android phone and I

17  use Google Assistant, you know, on a device in my house and

18  I'm -- you know, sometimes I'm doing it off my phone.

19  Sometimes I'm doing it off -- is Google tracking the queries

20  by device?

21          MS. BALI:  So, I believe that device type is one

22  of the elements of metadata that gets captured when a query

23  comes in.

24          THE COURT:  Um-hmm.

25          MS. BALI:  I can't promise that that happens

18

1 across the board, but that's my general understanding.

2          THE COURT:  Um-hmm.  Okay.  Is -- does Google

3 capture queries by user?  That is, if I ask, you know, three

4 or four questions from my phone and three or four questions

5 while I'm wandering around my house to the -- to a different

6 advice, to Google Assistant, then at the end of the day, is

7 -- does Google have a record that Judge van Keulen, you

8 know, asked eight questions today?  There were eight queries

9 from this user, assuming that they all have the same user

10 ID, et cetera, because they're my devices.

11          MS. BALI:  Yeah.  So -- so, if a user is signed in

12 with their Google account and interacts with the assistant

13 in a signed-in state, that -- and the user has the setting

14 enabled to have their audio logged, that audio will be

15 associated with the account at sign in.  However, you know,

16 your daughter could, for example, interact with your --

17          THE COURT:  Oh, understood.

18          MS. BALI:  -- speaker.

19          THE COURT:  Understood.

20          MS. BALI:  Yeah, that's logged in with your

21 account name and, you know -- you know.  So, other people

22 can use someone else's device, but --

23          THE COURT:  Correct.

24          MS. BALI:  -- Google will have -- if -- assuming

25 that the user is signed in, Google will have a -- you know,

1  a record that a particular Google account is associated with

2  that query.

3          THE COURT:  Um-hmm.  And then I -- I'm going to

4  assume that Google tracks that and at some level they know

5  how much I use it, either by user or by device?

6          MS. BALI:  I don't know if I would say google

7  tracks that.  I think, you know, what I -- what I can say is

8  that is -- if a user interacts with the assistant with their

9  account in a signed-in state, that is -- that is sort of

10 recorded and captured in the user's My Activity, right.  So,

11 they can go into My Activity and view all of the

12 interactions that happened with the Assistant using their

13 account.

14         THE COURT:  Um-hmm.  Okay.  All right.  All right.

15 Let's talk for just a minute -- and this has been very

16 helpful.  Thank you.  Let's talk for a moment about Google

17 Assistant enabled devices.  I don't know if you all

18 pronounce that acronym in some way or not.  So, don't

19 hesitate to inform me.  But I assume any device that -- that

20 the software is on, I mean, is that a -- well, there's one

21 thing -- there are devices where the software -- you know,

22 you buy the device and you always get a set -- a set of

23 software, and maybe Google Assistant is included in that,

24 but it's not enabled until I decide I want to enable it and

25 activate that app.  Is that accurate, Ms. Bali?

1          MS. BALI:  Your Honor, there are so many

2    variations for this depending on the type of device.  It

3    really -- it really depends a lot on the specific type of

4    device.

5          So, for example, I believe it comes pre-installed on

6    certain, you know, android devices, including like the Pixel

7    Phone.

8          THE COURT:  Um-hmm.

9          MS. BALI:  But, you know, it's not -- it's not

10   obviously pre-installed on the iPhone.  You'd have to

11   download an app for that.  And, so --

12         THE COURT:  Understood.

13         MS. BALI:  And, you know, there's a number of

14   devices, for example, like smart speakers that you have to

15   control from your phone.  So, you have to download a

16   separate app because they don't have, you know, a screen or

17   buttons.  There's also, you know, a host of other smart

18   devices like smart clocks and watches that also don't have,

19   you know, a screen or any way to -- to sort of control them

20   from the device.  So, those would be also controlled via a

21   smart phone.  There's -- you know, there's so many

22   different --

23         THE COURT:  So, but if you have a device that

24   doesn't -- so, like you say, a smart clock, you control it

25   by your phone, how does that interact -- or how does Google

1  Assistant -- how does that --

2          MS. BALI:  So -- so, my understanding is that you

3  can say to the Google Assistant to, for example, set an

4  alarm on that -- on that device.

5          THE COURT:  Um-hmm.

6          MS. BALI:  But, you know, to actually set up the

7  -- the device so that it's compatible with the Assistant,

8  you would do that via your smart phone.

9          THE COURT:  Um-hmm.  So, you have to get the

10 device to talk to Google Assistant?

11         MS. BALI:  Correct.

12         THE COURT:  Okay.

13         MS. BALI:  And there are so many different

14 variations, your Honor.  I mean, there are some TV's that

15 come with Google Assistant, you know, built in through the

16 remote control.  There are some, you know, automobiles that

17 have the Google Assistant built in.  There's just -- there's

18 just, you know, a ton of different variations for the types

19 of devices that -- that can be used to access the Google

20 Assistant, and there's differences I think in the user

21 experience across those devices.

22         THE COURT:  Okay.  All right.  That's all very

23 helpful.  Thank you.

24     Mr. Levis, any small quick points of clarification?

25         MR. LEVIS:  Yeah, just to -- if I can go back a

22

1  little bit to a question you asked about tracking usage by

2  -- by user.

3          THE COURT:  Uh-huh.

4          MR. LEVIS:  We know from data that we received in

5  production 18 that Google does track daily, weekly, monthly

6  usage statistics for its users.  So, that data does exist

7  and is available.  We know that from looking at the data

8  that was produced with -- with respect to Plaintiffs from

9  Google -- and if this is something that would help your

10 Honor with the questions you were asking about data, there's

11 a way we -- I'm sure we could submit it to you -- that -- it

12 looks like a spreadsheet that would identify the originating

13 device associated with the user's unique identifier which is

14 referred to as a GAI (phonetic) ID, and that -- that

15 information shows the query, when it was -- when it was

16 made, what's in the transcript, what device it comes from,

17 where the device is located, and that's all associated with

18 each user in a pretty easy to use format.

19      On the -- on the Google Assistant enabled device point,

20 I think that is correct.  I would just note that because the

21 devices are identified in connection with the false accepts

22 or other audio recordings, that the -- what we're -- what

23 we're really talking about here would be those devices that

24 are going to be associated with those requests.  So, you

25 know, there might be devices, for example, that only are

23

1  activatable by manual activation.  And, like I mentioned

2  before, because we're dealing with voice activation, that

3  would necessarily, you know, limit the type of Google

4  Assistant enabled devices we're talking about, and those

5  could be identified from the data itself because it shows

6  the device that made the query.  So --

7              THE COURT:  All right.  Thank you, Mr. Levis.

8       Okay.  All right.  Let's -- let's turn to Docket 217,

9  which is Google's motion to compel a response to request for

10 production 10.  I read through the parties' submission, and

11 I saw that Google had proposed a compromise with four

12 components to it, and the Plaintiffs' response to that was

13 that -- that they have searched for and produced documents

14 responsive to categories one, three, and four, and so it

15 looks like issue two is what's remaining, but that's my

16 first question is did that production happen and is it

17 complete, and let me hear from Mr. Levis first, just that

18 question, the Plaintiffs' production.  Did it --

19             MR. LEVIS:  Yes.

20             THE COURT:  -- happen and is it complete?

21             MR. LEVIS:  Yes.

22             THE COURT:  Okay.  And, so --

23             MS. BALI:  Your Honor --

24             THE COURT:  I'm coming to you, Ms. Bali.  Don't

25 worry.  So, Mr. Levis, from Plaintiffs' perspective, is

1  category two the remaining issue?

2          MR. LEVIS:  Yeah.  So, I think, as indicated in

3  the letter, we --

4          THE COURT:  Yes or no question.  Is category two

5  the remaining issue?

6          MR. LEVIS:  Yes, category two is the remaining

7  issue.

8          THE COURT:  Okay.  Thank you.

9      And, Ms. Bali, does Google agree that Plaintiffs have

10  produced the material in response to one, three, and four?

11          MS. BALI:  Well, they haven't produced anything,

12  your Honor.  They've said that they don't have anything.

13  So, you know --

14          THE COURT:  Okay.

15          MS. BALI:  -- I mean, we haven't gotten any -- we

16  haven't gotten a single document as a result of this -- this

17  proposed compromise, but they say they don't have anything

18  with respect to one, three, and four, but -- but, so, I do

19  agree that -- that two is what we have remaining.

20          THE COURT:  Okay.  All right.  Then let's turn to

21  category number two, which is, again, under Google's

22  proposed compromise, documents that show Plaintiffs'

23  activity on other virtual assistants, including but not

24  limited to transcripts of voice queries and records showing

25  the frequency of Plaintiffs' voice queries.

1       And let me preface this by saying I gave this request
2   careful consideration.  Obviously, under the parameters of
3   Rule 26, I had some concerns about its breadth and -- and
4   relevancy, but I do -- I do think that certainly to the
5   extent that responses to the request inform Google as to the
6   Plaintiffs' subjective expectation of privacy, that there's
7   -- that there's -- you know, that it's relevant in that
8   regard.  And, to that end, I think that documents showing
9   their activity, the frequency of their activity, how much --
10  what other devices do they have, what -- how often do they
11  -- how much do they use them, may inform that.  So, I think
12  that to that degree, the request is appropriate and that
13  material should be produced.  I do not think that specific
14  transcripts of queries are relevant, and I will not require
15  production of those.

16      Now, my question to Mr. Levis is have the Plaintiffs
17  figured out how to get their activity report from other
18  devices?  It seems like that's not -- probably not that
19  hard.  Where are you?

20          MR. LEVIS:  Yes.  So, I think -- I think that
21  might be the issue with the request, and maybe the response
22  is it is not that we are not willing to look for and try to
23  produce this.  It is that for other types of assistants, it
24  is actually not possible for us to produce it, and that is
25  what we've told Google is that we do not have the data to

26

1   produce.  And -- and, so, we offered in our response back to

2   their request on this specific issue to meet and confer to

3   discuss to see if there was either something else we could

4   produce or if there was a way that they thought we could get

5   this, because, in trying to access this data from working

6   with our Plaintiffs, it is not the same as, for example,

7   using Google System where we can log into a page and get

8   that information.  For a device like Siri, for example, it

9   doesn't actually let us download any of the information.  We

10  -- we don't have access to it.  So, it's not clear to us how

11  we could do more than we've done to try and identify it when

12  we can't get the data that they're looking for.

13          THE COURT:  Is it your position that, say, for

14  Siri -- and I'll just use that as an example, but for any

15  other virtual assistant, that a user cannot access their

16  history, that they can't select and say, "I want to keep

17  track of my queries.  In fact, I want to know if I'm the

18  only one using Siri at home or if my kids are doing it or

19  whatever"?  So, and I can't -- I can't log in and find a

20  list --

21          MR. LEVIS:  I don't --

22          THE COURT:  -- which I could then screenshot and

23  produce?

24          MR. LEVIS:  I'm not saying --

25          THE COURT:  Is that your position?

1        MR. LEVIS:  No.  I'm not saying that for every

2   assistant that is the case, but we cannot do something like

3   download the audio data or transcripts in all the --

4        THE COURT:  Forget about audio data or

5   transcripts.  Focus on your history.  How -- history of use

6   of the assistant, you know, virtual assistant, whatever make

7   it may be.  Surely, the Plaintiffs can access their history

8   of use, not transcripts but how many queries did I make to

9   Siri last month.  Surely I can get that information.

10        MR. LEVIS:  I -- I think that is information that

11   might be available for one of the assistants but not all of

12   them.  So, for -- for Siri, for example, that is not

13   information I think we have access to.  It might be

14   available for something else.

15        THE COURT:  I find that hard to believe, but I

16   haven't tried.

17        MR. LEVIS:  Yeah.  I'm just -- I'm just reporting

18   based on our -- our dealing with Plaintiffs in trying to

19   respond to their request what we've been able to do, and --

20   and we've actually tried to respond to it.  So, it's not as

21   though we did not search, we didn't look, we didn't try to

22   produce what we thought was responsive.

23        THE COURT:  Okay.  Well, I'm concerned a little

24   bit about that the response may be, "Well, I asked my

25   client, and they don't have it," and that's not always good

28

1  enough.  You know, the lawyer has a responsibility to figure

2  out if the data request -- the relevant data requested is

3  within their client's custody and control, and that may

4  require some separate independent effort by the lawyers to

5  determine, yeah, in fact, on these five devices, you can

6  find your history.  And then you need to have that

7  conversation with your clients and identify that history and

8  produce it.

9       So, again, I'm not -- I'm not sure that that's what's

10 going on, but I have a very hard time accepting that a user

11 of a virtual assistant cannot access their history.  And,

12 again, screenshots if necessary.  They may not be able to

13 get into a database.  Who knows?  But I -- I find that very

14 hard to believe, and I'm -- I'm sure you can understand why

15 that seems like such a head scratcher, unless there's

16 something more specific you can tell me.

17      Now, Ms. Bali, is that -- I -- is that -- does that

18 capture Google's concern, and if you have a -- a user

19 history from the devices, assuming it's accessible, is that

20 -- is that what Google's looking for here?

21         MS. BALI:  Yeah, you're right, your Honor.  It

22 does capture Google's concern, and I -- I just know from,

23 you know, spending 10 minutes on Google, you know, that

24 Amazon's -- Amazon Alexa's activity, which -- which at least

25 one of our Plaintiffs, I think Plaintiff Kumandan, has

1   already confirmed he has used is available online, and it's

2   very easy to download.  So, I'm not -- I'm having a hard

3   time understanding what the difficulty is, particularly with

4   respect to that product.  You know, counsel may be right

5   that Apple's is a little bit more difficult.  I'm certainly

6   no expert in how to download, you know, this type of

7   information from other services, but it would seem to me

8   that, you know, at a minimum, you know -- you know, a reach

9   out to Apple to figure out how to get this information is

10  reasonable.

11       I mean, I'm not -- we're not trying to impose, you

12  know, an undue burden on the Plaintiffs, but we do think

13  this information is relevant.  It does go to their

14  subjective expectation of privacy, and, you know, it goes to

15  -- to other issues as well.  I mean, if they're -- if -- if

16  these devices have the same, you know, false -- false accept

17  rate as, you know --

18           THE COURT:  I -- I understand -- I understand the

19  argument, Ms. Bali.

20           MS. BALI:  Yeah, yeah.

21           THE COURT:  Let me stop you there.

22           MS. BALI:  Yes.

23           THE COURT:  Just in the interest of keeping this

24  moving.

25           MS. BALI:  Sure.

1          THE COURT:  So, Mr. Levis, I don't know what the

2     detail level of work or inquiry -- again, the issue is

3     custody and control and if Plaintiffs can access this

4     information.  They don't have to hire a technical expert to

5     do it, but if you can go online and get instruction or call

6     customer service -- does anybody call customer service

7     anymore -- or assuming someone would answer if you called

8     customer service -- and get -- and be instructed on how to

9     access your query history, I think that that is within

10    bounds and is appropriate.  So, Plaintiffs need to do that

11    and find access to this information and produce it.  And if

12    they -- if they -- if there's a device that you -- you can't

13    get it, then it's only available from the virtual assistant

14    -- on the virtual assistant side, then the Plaintiffs will

15    need to provide a detailed explanation of their efforts to

16    get it and what they -- you know, how -- how they tried to

17    get it and what they were informed, and that's why they

18    don't have it for any device that they use.  Okay?

19         So, access to and production of their query history, no

20    transcripts but their query history, and that will -- and

21    this will go for all of these where production is ordered.

22    Production is to begin immediately and to be completed in 21

23    days by August 16th.

24         If they -- if they make efforts and it -- make the

25    determination, after a reasonable and diligent search, that

1  they cannot access a query history for a specific device,

2  then Plaintiff needs to provide a -- a detailed explanation

3  of what they tried to do, and that response to the RFP will

4  need to be verified so that it's very clear as to why no

5  history is being produced.  Okay.  All right.  That takes

6  care of Docket 217.

7       Let's turn to 218, starting with the 30(b)(6)

8  deposition issue that was at the top of the -- top of the

9  list.  I understand -- excuse me.  I understood that there

10  was going to be a deposition last week or that Plaintiffs'

11  class cert was filed -- was to be filed last week and there

12  was going to be a deposition on the document, the PROD 18

13  last week as well.

14      So, did that -- did those things happen?  Ms. Bali, let

15  me start with you.

16          MS. BALI:  Yes, your Honor, Plaintiffs did file

17  their class certification motion last Monday I believe it

18  was, and we did produce a witness who was the -- from

19  Google's finance department that heads up the Google

20  Assistant finance piece, to speak on all of the documents

21  that we included in our Production 18, which was the

22  production that we made pursuant to the Court's last order

23  on the parties' joint discovery letter brief, and she -- you

24  know, she was able to explain, you know, all aspects of

25  those documents.

1          THE COURT:  And how long did that deposition last?

2          MS. BALI:  Counsel negotiated a limited deposition

3   of three hours.

4          THE COURT:  Okay.  All right.  And, Mr. Levis, was

5   that sufficient with regards to Production 18?

6          MR. LEVIS:  So, we understand that the witness was

7   the one that was involved in collecting the documents that

8   had been collected several months ago, and -- and she was

9   able to talk about some of the aspects of those documents,

10  but her role in Google, just so we can clarify from what we

11  learned during the deposition was limited to really cost

12  accounting and a specific aspect of the finance team.

13      One of the reasons why we were looking for additional

14  testimony from a 30(b)(6) perspective is that her knowledge

15  was limited to a specific part of the finance operation, and

16  -- and she testified in a few instances that she personally

17  would not have access to data or to certain types of

18  documents related to revenue generated by the Assistant

19  itself, including the revenue that is generated by the

20  Assistant but that Google books in different business units

21  related to ads, search, product sales, et cetera.

22          THE COURT:  Okay.  So --

23          MR. LEVIS:  And, so --

24          THE COURT:  -- let me just -- I think this is

25  maybe where you're headed.  I do see that in this party

1    submission, Google made the representation that the witness

2    would be prepared to testify with regards to any

3    inconsistencies between Production 18 and the prior topic

4    eight from prior 30(b)(6).

5         Did -- were those questions asked and answered?

6              MR. LEVIS:  We asked questions about the use of

7    Google Assistant data for advertising purposes, which is

8    what was covered by topic eight, but based on the witness's

9    limited knowledge.  She was talking about the -- in some

10   instances, how revenue from those ads were -- would be

11   booked, let's say, to search or booked to ads or booked to

12   different business units.  It was not necessarily clear to

13   us that she understood how the -- for example, how the data

14   from the Assistant, the query itself that gets sent to

15   search that is used to create the ad, is actually used in

16   that process works.  She had -- she had visibility into

17   presentations showing, for example, ad revenue related to

18   those queries and other things but not necessarily the usage

19   of the data itself.

20             THE COURT:  All right.  All right.  And, so, I

21   assume that Plaintiffs' position is that you still need

22   someone to testify about that overlap area between

23   Production 18 and topic eight, is that --

24             MR. LEVIS:  Correct.

25             THE COURT:  -- fair?  Okay.

34

1        All right.  Briefly, Ms. Bali?

2             MS. BALI:  Yeah.  Your Honor, I just -- I just

3   disagree with counsel's characterization of her testimony.

4   I mean, she was able to -- the first thing those documents

5   explain -- the first thing they show that there is zero or

6   negative revenue attributed to the Assistant.  There was

7   also an effort by the Google Assistant finance team to get a

8   sense of how the Assistant contributes to revenue generated

9   by other products that could be indirectly tangentially

10  related to the Assistant, and those documents set forth

11  those numbers, and this witness was able to testify about

12  exactly how that revenue was generated, why it's attributed

13  to other products and not the Assistant, and she provided

14  complete testimony on that point.  There is no gap.  And we

15  already had a 30(b)(6) witness testify about -- about the

16  topic eight in detail.

17       And, so, you know, I think existing 30(b)(6) testimony

18  combined with the testimony of the finance manager for

19  Search and Assistant who was able to explain each of those

20  revenue line items and -- and sort of how they're generated,

21  how they relate to the Assistant --

22             THE COURT:  All right.  I got it.

23             MS. BALI:  -- is sufficient.

24             THE COURT:  I got it.  Okay.

25             MS. BALI:  There's no -- there's no gap.  There is

35

1  no gap.

2         THE COURT:  All right.  Plaintiffs had expressed

3  some concern that the additional information that they

4  either would get last week or from further deposition if I

5  were to order it may -- may require from their view

6  supplementation of the class -- their class certification

7  brief.  And, obviously, that is not something that -- that I

8  would grant.  That is something that would be for Judge

9  Freeman to allow.

10      On that point, let me just for perspective, when is the

11  opposition to class certification due?  Ms. Bali?

12         MS. BALI:  It's September, I believe September

13  13th.

14         THE COURT:  Okay.  And then -- all right.  Okay.

15  All right.  Here's what I'm going to do with regards to the

16  30(b)(6) deposition.  I was concerned about the late

17  production and the timing of the deposition.

18      Mr. Levis, you are to articulate for Google the -- the

19  precise area of overlap that you feel was not addressed --

20  all right -- as a single topic that reflects, you know,

21  here's -- here's the piece from Production 18, here's the

22  piece from topic eight, and this is what we still need.  All

23  right.  A person most knowledgeable on that specific area of

24  overlap, and provide that to Google -- where are we now

25  already -- on the 26th.  All right.  So, provide that to

36

1  Google by the 28th.

2      And then, Google, you're to identify a witness by

3  Monday, the 1st.  Let me just make that note here, the

4  category -- Google identify the witness on Monday, the 1st,

5  and provide -- well, then you all meet and confer on

6  available -- availability for a two-hour -- two-hour

7  additional deposition to be completed by August 15 -- to be

8  completed by August 15, two-hour deposition on that narrow

9  topic.  All right.

10      I expect you all to be able to agree on a date.  It

11 will be a weekday, during normal business hours.  I don't

12 expect that to be a problem.  All right.

13          MR. LEVIS:  Okay.

14          THE COURT:  Okay.  Here's what we're going to do

15 now.  I have some general questions with regards to

16 Plaintiffs' complaints about Google's document production.

17 Some of these are for Plaintiffs.  Some of these are for --

18 some of these are for Google.  I'm going to get that

19 information from you.  Then we're going to take a break from

20 this hearing.  I'm going to take care of my 11:00 o'clock

21 calendar, which I do not expect will take a lot of time, and

22 then we're going to come back and -- and work through these

23 in a -- in a broad and abbreviated fashion, trust me.  But I

24 want to get through them carefully, and I don't want to keep

25 my 11:00 o'clock folks waiting.

1       So, my first question is that in response to a number

2   of the requests -- and, again, I'm focused on document 218,

3   which was Plaintiffs' complaint first about a deposition,

4   which we've addressed and, second, about a series of

5   requests for productions and interrogatories.

6       In response to a number of these, Google identifies

7   documents that have been produced, takes the position that

8   responsive documents it has searched for and produce

9   responsive documents.

10      So, my first question is what is the date of these

11  productions, and I don't -- I don't know what your

12  production history is, and I don't know if it breaks down or

13  it's easy to identify.  But, to the extent that documents

14  are identified in Google's response here -- and I'm looking

15  at the chart that you gave me -- are those recent

16  productions?  Have those been over the course of the

17  litigation?  Can you tie those to dates?  Help me to

18  understand when these documents have been produced, Ms.

19  Bali, if you can.

20          MS. BALI:  Sure.  So, I'd have to do some legwork

21  to tie these particular Bates numbers to dates.  But, you

22  know, essentially, Google's been producing documents for,

23  you know, probably a year and a half at this point or more.

24  We -- you know, we negotiated search terms with Plaintiffs.

25  We, you know, produced documents based on those search

38

terms.  There are other instances where we -- you know, some
-- there were some sort of targeted searches we did for
other responsive documents in addition to those that were
picked up via the search terms, and they've all been
produced.  And -- and the production happened on a rolling
basis, you know, as Google sort of reviewed and -- and got
through all the documents and has produced, you know, over
three million pages of documents in -- in response to
Plaintiffs' discovery request.

THE COURT:  Okay.  Then, with regards to the RFP's
that are here in the chart before me, Mr. Levis, have --
have these RFP's, were they the subject of meet and confer?
I mean, is this a process where Plaintiffs received
documents, reviewed them, found deficiencies, went back to
Google and said, "Look, request -- you know, set number one,
request three, we don't see documents.  Set number two,
request seven, we don't -- you know, we're missing this,
this, and this"?  Is that -- did Plaintiffs review the
documents and then get back to Google with deficiencies?
Tell me how this has worked.

MR. LEVIS:  Sure.  So, I mean, we've been meeting
and conferring about the requests for quite a while and
these requests and the data that we're talking about are
definitely and were subject to sort of the ongoing
discussions that we've had over time.

1    What Google is referring to in the documents that are

2  produced in their chart are documents that are really going

3  to different things other than the data or documents that

4  would show the specific instances of false accepts,

5  recordings or things that were --

6         THE COURT:  Well, we're going to get -- we're

7  going to get to specifics.  What I want to know is have the

8  documents that Google says, "Look, these are the responsive

9  documents we have," have those been reviewed and evaluated

10 by Plaintiffs or has there been some level of we're not --

11 we just -- I -- you know, I'm not seeing what I want?  I see

12 the -- I see Plaintiffs' proposed compromise, but it's not

13 at all clear to me that these productions have been

14 evaluated for responsive information.

15        MR. LEVIS:  Sure.  I mean, as to the specific

16 Bates numbers listed, I would have to double check.  I'm

17 confident we have reviewed the documents produced, but I

18 don't -- I don't want to speak to every individual document

19 identified in the list because I do not know off the top of

20 my head the status of every one of those documents.  I can

21 find that out, and I can report back that we've reviewed

22 every one of those specific documents, but we have been

23 raising this issue consistently throughout the --

24        THE COURT:  Well, that's -- I hear that, but

25 that's what concerns me is raising an issue but have --

1 what's been being produced, has that been being evaluated to

2 see if the issues you raised have been resolved or not or

3 are you just -- are you pushing because you want Google to

4 answer -- answer certain questions in certain ways?

5 And let me preface this discussion -- and I should have

6 started this -- by saying I see these -- the RFP's and

7 interrogatories in very broad brush.  There are really three

8 categories of -- of disputes I think, which is is there data

9 that reflects a number of Google Assistant Enabled Devices,

10 a GAED number.

11 Are there documents that reflect the number of false

12 accepts?  I see several requests going to, well, what's --

13 what's the number of false accepts -- quantification I guess

14 I should say -- quantification of GAED's, quantification of

15 false accepts.

16 And then third category is around transcripts and

17 records that reflect false accepts in more detail.

18 Again, that's broad brush, but when I read through

19 these, I see that pretty much all of the requests fall into

20 one of those three categories.  And that's what really leads

21 to my questions.

22 Ms. Bali, back to you.  What -- when was Google's

23 production completed?  That is, what was the date of its

24 last production?  Do you know?

25 MS. BALI:  That's a good question, your Honor.  We

1  substantially completed our production, you know, most --

2  and I'd have to go back and -- and just refresh my memory on

3  this, but I think that we substantially completed our

4  production, you know, probably around, you know, March or

5  May.  You know, and, again, they were rolling.  So, they

6  were --

7          THE COURT:  No, I understand.

8          MS. BALI:  All right.

9          THE COURT:  I understand.

10         MS. BALI:  But -- but there may have -- you know,

11 I think towards the end of fact discovery cutoff, there

12 were, you know, sort of little handfuls of things that --

13 that we produced in addition, but most of the sizable

14 production was sometime ago.

15     And I'll just say that, you know, we've never had any

16 substantive meet and confer about the vast majority of the

17 requests in this chart.  You know, what happened was right

18 prior to fact discovery cutoff, Plaintiffs sent us their

19 proposed compromise like three days before our joint letter

20 was --

21         THE COURT:  I understand that.  I understand that.

22         MS. BALI:  Yeah.

23         THE COURT:  What Mr. Levis -- the representation

24 from Plaintiffs is that meet and confer has been ongoing

25 essentially throughout the course of the litigation or

42

1  certainly during the time of -- you know, there's been

2  outstanding requests, and there's been rolling productions,

3  and there's been efforts to meet and confer as that has

4  processed.

5      The parties tell me -- one says the light is red, and

6  one says the other is green in the submission, which cannot

7  be the case.

8          MS. BALI:  Right.

9          THE COURT:  So --

10          MS. BALI:  And we have met and conferred.

11          THE COURT:  Ah, ah, ah.

12          MS. BALI:  Yes.

13          THE COURT:  So, very quickly, from Google's

14  perspective, characterize for me the status of meet and

15  confers to the disputes requests and --

16          MS. BALI:  Sure.  So, we have --

17          THE COURT:  -- Levis, I'm coming to you next, and

18  then we're taking our break.

19          MS. BALI:  Sure.  So -- so, we have met and

20  conferred, you know, consistently but not about these

21  requests.  These requests have never been the topic of any

22  specific --

23          THE COURT:  Well, what have you met and conferred

24  about?

25          MS. BALI:  Other requests.  So, for example, the

1 request for revenue information, you know, things of that

2 nature.  We've never talked about these specific requests,

3 and never have they said "We don't think your document

4 production is sufficient to comply with the requests set

5 forth in this chart."  That was -- that was a surprise to us

6 until, you know, right before the -- the joint letter brief

7 was due.

8          THE COURT:  Okay.  Thank you, Ms. Bali.

9      All right.  Mr. Levis, have -- characterize for me

10 briefly but accurately from Plaintiffs' perspective --

11          MR. LEVIS:  Sure.

12          THE COURT:  -- the meet and confer efforts between

13 Plaintiffs and Google with regards to these requests.

14          MR. LEVIS:  Absolutely.  And -- and I'm -- I'm not

15 trying to use general meet and confers to cover these.

16          THE COURT:  I understand.

17          MR. LEVIS:  We -- we have met and conferred about

18 these over time, and we had only continually made this an

19 issue because we did not see the data that we thought was

20 responsive.  The last most recent round of meet and confers

21 of this occurred just before we filed our class

22 certification motion where we had a meet and confer on July

23 11th, and we had two other calls before that in which Google

24 actually offered to stipulate to ascertainability in order

25 to not have to --

1          THE COURT:  Right.

2          MR. LEVIS:  -- produce these documents.  So -- so,

3   to say that we hadn't talked about the documents or the

4   scope of the requests when we were discussing a potential

5   offer to stipulate for class purposes to ascertainability in

6   lieu of production just doesn't bear out with this idea that

7   we never spoke about it, that we never communicated our --

8   our position on the data or what we were looking for.  We

9   wouldn't have gotten to that point and to the proposal we

10  made by email on July 12th, which tracks what we put in our

11  -- our response, which was really an effort on our part to

12  address what we understood was a concern about the work

13  required to actually produce all the data fields by

14  narrowing this to a request really for at least on a -- for

15  class purposes, extracts or reports that would get to the

16  specific data points we thought we needed.  We --

17          THE COURT:  Okay.  Let me -- let me interrupt you

18  there because I'm out of time.

19      One last question for Ms. Bali, which is in several of

20  these there is a Google supplemental response.  I'd like to

21  know the date of those supplemental responses.  And if you

22  can provide it now, that would be helpful, or you can

23  confirm it over the break.

24          MS. BALI:  Yeah.  I believe that that was -- those

25  were served on the -- I'll confirm it over the break, just

1 so I'm -- I'm completely accurate.  I'll do that.

2          THE COURT:  Okay.  All right.  All right.  Ladies

3 and Gentlemen, here's what we're going to do.  We're going

4 to pass this matter now.  I anticipate my next calendar, it

5 may be 15 minutes.  It may be 20.  I'm a terrible estimator

6 of time.  So, don't go away.  You may turn off your screens.

7 Please stay in earshot.

8      (Proceedings recessed while the Court heard other

9 matters.)

10          THE CLERK:  Recalling case 19-CV-4286, In Re

11 Google Assistant Privacy Litigation.  I believe all same

12 counsel is present.

13          THE COURT:  All right.  Let me just get my other

14 set of notes here.  All right.  The only issue for me is on

15 my Google screen both of you have switched positions, but

16 that's all right.  It will keep me on my toes.

17          Ms. Bliss, the date of Google's supplemental

18 response, please?

19          MS. BALI:  Yes, your Honor.  Ms. Bali, and --

20          THE COURT:  Oh, Ms. Bali.  Pardon me.

21          MS. BALI:  That's okay.  And Google's supplemental

22 responses were served on July 8th.

23          THE COURT:  Okay.

24          MS. BALI:  Also, just -- excuse me.  I wanted to

25 correct a statement that I made last time about when our

46

1  document production was substantially complete.

2          THE COURT:  Uh-huh.

3          MS. BALI:  We made our last sort of big production

4  based on search terms on April 5th, and there were a couple

5  of productions that followed of, you know, sort of certain

6  targeted information and documents responsive to Plaintiffs'

7  second set of RFP's that hadn't been served, you know,

8  earlier.  And, so, but I -- I just wanted to give you a

9  sense of when our last production based on search terms took

10 place.

11         THE COURT:  Okay.  All right.  And -- pardon me --

12 I neglected to address this issue before the break.  But,

13 Ms. Bali, did -- has Google had an opportunity now to review

14 and consider the proposed -- the compromise proposal that

15 came from the Plaintiffs shortly before making the joint

16 submission?

17         MS. BALI:  Not -- not -- you know, as you can

18 imagine, your Honor, things take some time to run down in a

19 company as big as Google.  So, I probably have a little bit

20 more information than I had at the time that we filed the --

21 the joint statement and chart when I'd only had their

22 request for like three days, but I don't -- I can't say that

23 I have run down every item in their proposal.

24         THE COURT:  Okay.  Why don't you tell me what you

25 have in terms of reaction to the proposal.

1          MS. BALI:  Sure.  So -- okay.  So, looking at the

2  first item where they ask for the identity of class and

3  subclass members --

4          THE COURT:  Um-hmm.

5          MS. BALI:  -- I will say at the time that they

6  sent this proposal, all we had as far as class definitions

7  was what was in their fourth amended complaint.

8          THE COURT:  Um-hmm.

9          MS. BALI:  Their classes and subclasses have since

10  changed since they filed their class certification motion.

11  So, I'm not actually clear, you know, with what they're

12  looking for, whether it's based on the definitions in their

13  class cert motion or based on what they had alleged in their

14  fourth amended complaint.  I --

15          THE COURT:  All right.  So, let me stop you there

16  because --

17          MS. BALI:  Okay.

18          THE COURT:  -- Mr. Levis, I was not aware of any

19  change, and I looked to the fourth amended complaint for

20  class definition.  So, how has that changed?

21          MR. LEVIS:  Yes.  So, the -- the class definitions

22  that we have identified in our class motion are based on

23  categories of information that we have identified based on

24  the data that we've received from our own named Plaintiffs

25  and what we know is ascertainable and identifiable from

48

1  those records that Google has.  So, the classes are relating

2  to -- for example, there was discussion before dealing with

3  users that --

4          THE COURT:  Can you just tell me what the class

5  definitions are?

6          MR. LEVIS:  Oh, if you want the class definitions,

7  I can pull them up specifically.  Just give me one second.

8          MS. BALI:  I have them in front of me, your Honor,

9  if that would be helpful.

10         THE COURT:  All right.  Is it -- I don't know how

11 they relate to the allegation in the complaint.  So, let's

12 start there.

13         MR. LEVIS:  Sure.  I have them if it's easier.

14 So, there's -- there is a class of purchasers, which is all

15 purchasers that purchased a Google-made device.

16         THE COURT:  Um-hmm.

17         MR. LEVIS:  There is a privacy class which is all

18 opted-in users, and opted in is referring to the discussion

19 we had before about the voice and app activity.

20         THE COURT:  Yeah, I'm aware.  Um-hmm.

21         MR. LEVIS:  All opted-in users of Google Home

22 devices who have a recording resulting from a false accept

23 associated with their Google account.

24         THE COURT:  Um-hmm.

25         MR. LEVIS:  There is a privacy disclosure

1  subclass, which is all members of the privacy class for whom

2  Google shared at least one recording resulting from a false

3  accept with a human reviewer.

4  There is a privacy use subclass, which is all members

5  of the privacy class for whom Google used at least one

6  recording or transcript resulting from a false accept for

7  testing or training of Google technology or targeted

8  advertising.

9  And, lastly, there is a Stored Communications Act class

10  which is all opted-in users of Google Assistant Enabled

11  Devices for whom Google shared at least one recording with a

12  human reviewer.

13  And -- and those track the claims that remain after the

14  motion to dismiss and track the data that we have -- the

15  sample data we have so far relating to what we know is

16  available from the information about Plaintiffs.

17  THE COURT:  All right.  Go back to the privacy

18  class.  You first defined that as all opt-in users of

19  GAED's?

20  MR. LEVIS:  Of Google home devices.  It's --

21  THE COURT:  Oh, okay.

22  MR. LEVIS:  Yeah.

23  THE COURT:  Okay.  And then you said home devices

24  -- users of home devices with recordings?

25  MR. LEVIS:  Who have -- yeah, who have a recording

50

1 resulting from a false accept.

2            THE COURT:  Is that -- is that a subset?  Is that

3 a subclass?

4            MR. LEVIS:  No.  That is -- that is -- the top

5 level privacy class is --

6            THE COURT:  Oh, got it.

7            MR. LEVIS:  -- opted-in users of Google home

8 devices --

9            THE COURT:  Okay.

10           MR. LEVIS:  -- who have --

11           THE COURT:  Recordings of false accepts.  Got it.

12           MR. LEVIS:  Right.  Associated with their account.

13           THE COURT:  Okay.  And then your privacy subclass,

14 your first one was -- just read that one more time.

15           MR. LEVIS:  Yeah.  All members of the privacy

16 class --

17           THE COURT:  Um-hmm.

18           MR. LEVIS:  -- for whom Google shared at least one

19 recording resulting from a false accept with a human

20 reviewer.

21           THE COURT:  Um-hmm.  And the second privacy

22 subclass?

23           MR. LEVIS:  Yeah.  All members of the privacy

24 class for whom Google used at least one recording or

25 transcript resulting from a false accept for (a) testing or

1  training of Google technology or (b) targeted advertisement.

2          THE COURT:  Okay.  And then your Stored

3  Communications Act?

4          MR. LEVIS:  Yeah, is all opted-in users.

5          THE COURT:  Got it.

6          MR. LEVIS:  Of -- yeah, Google Assistant Enabled

7  Devices for whom Google shared at least one recording with a

8  human reviewer.

9          THE COURT:  So, that's like your privacy subclass,

10  right?  Only it's --

11          MR. LEVIS:  It is -- it is slightly different in

12  that the claim related to the Stored Communications Act

13  would extend to users of devices other than Google home

14  devices in that the unauthorized disclosure of a stored

15  communication would give them a claim.  And, so, it's -- it

16  is not -- it is different from --

17          THE COURT:  Not identical, got it.

18          MR. LEVIS:  Right.

19          THE COURT:  Okay.  All right.  All right.  So,

20  refinement of the class definitions in the motion.  And, so,

21  now, Ms. Bali, back to you with regards to Plaintiffs'

22  proposed compromise, identity of class and subclass members.

23          MS. BALI:  Yeah, your Honor.  I mean, you know,

24  there's a lot of classes and subclasses here, but, you know,

25  to the extent that they are asking Google to identify

52

1  everybody that has experienced a false accept, that's
2  obviously not something that Google can do.  And, you know,
3  for the reasons that we explained in our joint letter brief
4  and -- and the reasons that have been born out in discovery,
5  you know, obviously Google does not know whether the
6  Assistant was activated in error every time.  I mean, you
7  know, there are instances where Google identifies during the
8  processing of a query that a query did not result from --
9  you know, that it may have --
10        THE COURT:  So, let me -- let me cut to the chase
11  this way --
12        MS. BALI:  Yes.
13        THE COURT:  -- Ms. Bali, with regards to --
14        MS. BALI:  Sure.
15        THE COURT:  -- Google's position or response to
16  Plaintiffs' --
17        MS. BALI:  Sure.
18        THE COURT:  -- proposed -- proposed compromise,
19  which identifies, you know, eight categories of documents,
20  some which may or may not be appropriate, like identify all
21  class members.  But is it Google's position that -- I mean,
22  is some of this information available?  Has some of it been
23  produced?  Is most of it not available?  Can you address the
24  categories at that -- at that level?  And I appreciate I
25  didn't foreshadow this.  I just want to know, if you've had

53

1  discussions, what can you tell me about them.

2        MS. BALI:  Yeah.  Let me just say that I do think

3  that their proposed compromise, the eight categories of

4  information that they've asked for, is not information that

5  they've asked for in discovery previously.  So, if you

6  compare the --

7        THE COURT:  Well, some of it is.  Some of it is.

8  I mean, some of it tracks pretty neatly with outstanding

9  discovery -- with -- with RFP's, like --

10        MS. BALI:  I don't --

11        THE COURT:  -- you know, the -- the number of all

12  FA's in the class period.  I mean, that's -- that's

13  reflected in an RFP.

14        MS. BALI:  I don't think it is, your Honor.  I

15  don't think that there is -- I don't think that -- I don't

16  think -- I think that there is a big disconnect between the

17  information that they've asked for in their proposed

18  compromise and what they actually asked for in discovery.

19     Now, I will say with respect to documents showing a

20  rate of false accepts, we're not opposed to producing that,

21  and I think we have produced what we have on that.  And, to

22  the extent that there's anything that we learn or --

23        THE COURT:  No, I know.  I know.  We're going to

24  get --

25        MS. BALI:  Right.

1          THE COURT:  We're going to get to the reports on

2   false accepts.  I just --

3          MS. BALI:  Yeah.

4          THE COURT:  -- want to know if you're able to

5   address these eight categories in terms of either we have

6   produced all that information or that information doesn't

7   exist.  That's -- I want to know is if we can work from the

8   compromise or not.  That's my question.

9          MS. BALI:  I don't think we can, your Honor, work

10  from the compromise because the compromise has false

11  assumptions built in, right.  I mean, when they're asking

12  for, you know, identify all false accepts or identify all,

13  you know, class members who have experienced a false accept,

14  that's not something that we have data to -- to provide.

15  So, I actually don't think that their compromise sort of

16  takes into account the reality of how this product works,

17  what kind of information Google has, and sort of how

18  discovery has born out on that.

19      I mean, you know, we've produced what we have in

20  response to their request as propounded, and I don't think

21  that their proposed compromise really does provide a

22  workable starting point.  I mean, if I had --

23          THE COURT:  All right.  Let me --

24          MS. BALI:  Yeah.

25          THE COURT:  Let me -- I think the answer to my

1   question is no.  So --

2           MS. BALI:  Yes.

3           THE COURT:  -- let's turn, as I say, the RFP's and

4   interrogatories break down generally into the three

5   categories I identified, which is requests relating to the

6   number of GAED's, the request -- requests relating to

7   numbers of false accepts, and requests for transcripts and

8   records regarding false accepts or that reflect false

9   accepts.

10      So, the first request, number three, asks for documents

11  that show error rate of the speech recognition software, and

12  Google's supplemental response, which I now understand was

13  served on the 8th -- that's pretty close in time to the

14  submission before me on the 15th -- does seem to address

15  here Google is making an affirmative representation that it

16  has produced responsive documents that show rates of --

17  what's -- what would be the way to explain that -- hotword

18  initiated queries that result in misactivations and the

19  results of evaluations performed on hotword models that may

20  be used by Google Assistant, and they identify a list of

21  documents.

22      As to this request, I have to say that the supplemental

23  response with the reference to specific documents does seem

24  to -- it seems -- it certainly appears to be responsive, and

25  that was really the point of my question, Mr. Levis, of has

1   that been -- have those documents been reviewed and

2   evaluated?  Is there a specific deficiency that Plaintiffs

3   can identify?

4            MR. LEVIS:  Yes.  I can -- I can speak to what is

5   in those documents.  The documents identified relate to

6   tests that came up in a few I think correspondence.  They

7   may have been referred to as (indiscernible) emails, but

8   what these are are really the output, like a log file of a

9   process that looks like it's an experiment that Google

10  employees can run to run audio through a speech model and

11  see what the output is.

12       What it does not address -- and it's kind of a high-

13  level overview of what that looks like -- it does not

14  address the data or the data compilations or sets showing

15  the error rate of the speech recognition software.  It

16  doesn't include statistical analysis and reports.  It

17  doesn't actually speak to the rate of false accepts in the

18  technology.  It's more of an output file of experiments that

19  Google Assistant -- not Google Assistant engineers, but

20  engineers at Google can run to train or test speech models.

21            THE COURT:  Okay.

22            MR. LEVIS:  They're very --

23            THE COURT:  Did Plaintiffs get a -- did Plaintiffs

24  take a deposition, 30(b)(6) or otherwise, of -- with regards

25  to error rates from speech activation?

1          MR. LEVIS:  So, we -- we did cover some of this in

2   depositions, and we deposed a witness about some of these

3   documents and asked some questions about them.  I think

4   where we were going relating to the underlying data itself

5   or the data showing false accepts or the rates of false

6   accepts is just beyond the top level kind of output of this

7   log file and that this is -- this is a document that

8   indicates that there is testing run around false accept

9   rates, but it doesn't seem to respond to the -- the broader

10  request that we're asking.  It is a -- it is an example of a

11  false accept rate test but not really documents relating to

12  false accept rates more generally.

13         THE COURT:  Okay.  And Google says this is what we

14  have.  We don't have specific quantification of false

15  accepts.  I'm paraphrasing, but that's how I read the

16  response to this request and to the others in this category.

17      Do you have reason to dispute that?

18         MR. LEVIS:  Well, we know from other documents

19  that there was other testing done both on real world

20  conditions.  So, these are, for example, what I'll refer to

21  as lab tests in that they're -- they're experiments that

22  people within Google run.  There are real world testing, and

23  there's a lot of effort inside Google that is documented to

24  better understand the real world rate experienced by its

25  users, and that occurs both through surveying its user base

1  but then actively by trying to measure the audio files

2  themselves in order to come up with --

3          THE COURT:  Okay.  So, did you raise that with

4  Google and meet and confer and say, "Look, we've got these

5  other documents that show much more specific," not -- not

6  lab results but show where -- where is the data underlying

7  that?  I mean, again --

8          MR. LEVIS:  Yeah, so --

9          THE COURT:  -- has it been -- has that specific

10  issue been the subject of meet and confer?

11          MR. LEVIS:  To respond to that and Google's

12  indication that these specific documents are what's

13  responsive to their request, we've not discussed those

14  specific documents with Google because the list and their

15  position that this was what was responsive to request three

16  was not provided to us until this chart was -- was prepared

17  for filing.  So, we've not gone back and explained why we

18  think these documents are not responsive to this request

19  because that position wasn't raised until the joint letter

20  was actually filed.  We didn't have this list in their

21  position that, "This is what we gave you that's responsive

22  to -- to RFP three" until July 15th or whenever we filed

23  this letter.

24          THE COURT:  But you had the documents?

25          MR. LEVIS:  We had -- we had these documents.  We

did.  Correct.

THE COURT:  Let me just make a note here.

MR. LEVIS:  I will just add that I would not have assumed from looking at these documents that those were the documents that they were taking the position was sufficient for their response to RFP number three.

MS. BALI:  Those aren't the only documents, your Honor, that we produced in response to this RFP.

THE COURT:  Sure sounds to me like the parties haven't engaged in an adequate meet and confer on either side, on either side.  I can't believe for a moment that this is a total surprise to Google with regards to production.  But if Plaintiffs have not raised concerns about deficiencies in production until after the close of discovery, that is problematic.

All that being said, our Rules do allow for motions to be brought seven days within the close of discovery. So, it's not untimely, but setting forth positions in the chart that comes to the Court is not a start of the process, Ladies and Gentlemen.  It is the end.  It is the end.  It reflects the end, and Google -- these documents should have been identified.  I would have expected these documents to have been identified to Plaintiffs in a meet and confer process saying these are the responsive -- hold on -- responsive documents we have.

1    Of course, Google can only do that if Plaintiffs have

2  raised the issue of we are not seeing documents responsive

3  to this request.  We are not seeing our -- you know, any

4  actual failure analysis referring to either other documents

5  that lead you to believe that exists or to -- or to

6  deposition testimony that leads you to believe those exist.

7    So, these are Plaintiffs' requests.  The questions have

8  to be asked.  The responses have to be made.  I know how

9  busy everyone is in these litigations, and you're trying to

10 keep everything moving forward on a tight schedule.  You're

11 in front of Judge Freeman.  You've got -- the ball is

12 rolling, but I'm very concerned about the genesis of the

13 dispute and -- and the work that's been done to resolve it

14 before you come to me.

15   I do share -- well, I did take a look at Plaintiffs'

16 proposed compromise, and I have the same concern.  I was

17 looking for links of it to -- from those eight categories to

18 the RFP's before me.  As I say, I see some -- I see some

19 ties, but there are several that I don't see.  So, I -- and

20 I'm very troubled, again, that the parties hadn't been

21 discussing that process.  Although it was not set forth for

22 the first time in the chart, I appreciate it was within a

23 few days.

24   Let's look -- so, that's -- you know, in -- pardon me

25 -- broad brush strokes, those are my concerns.

1    Let's take a look for a moment with regards to RFP 5,

2  and I make notes on the chart, and I number it, which won't

3  mean anything to you because my pages now are -- are much

4  different than yours because they reflect my chart, but for

5  my record keeping for the recording and for my clerk, I'm on

6  page six of my chart, page six.  So, RFP 5, which asks for

7  documents sufficient to show the types of GAED's in use in

8  the United States, and Google's supplemental response says

9  that it has produced responsive nonprivileged documents that

10 -- sufficient to show the types of GAED's in use in the

11 United States.  And Google identifies, obviously, a long

12 list of documents.

13    So, it would seem to me that if that's -- if that's

14 what those documents reflect, then this -- then this inquiry

15 has been resolved.

16    Mr. Levis, did you have remaining concerns?

17 Understanding that -- I assume your position is you haven't

18 -- Plaintiffs haven't reviewed those specific documents

19 identified herein because you just got them -- you just got

20 the identification in the chart.  Is that fair?

21         MR. LEVIS:  Yes, I think that is -- that is

22 correct, and that I -- I don't say that it's necessarily

23 complete or fully responds because I'd have to check those

24 specific Bates numbers.

25         THE COURT:  Okay.  Okay.  Let's turn to RFP 7

62

1  because it relates to several others that are in the -- that

2  are in this dispute.  Let me just make a note.

3      Pardon me.  All right.  RFP 7 is for documents

4  sufficient to show the number of false accepts that have

5  been analyzed by Google or any vendor or subcontractor.  So,

6  the number of false accepts that have been analyzed by

7  Google, and Google's response was that it was willing to

8  meet and confer to -- to clarify the request and in the

9  chart in the compromised position, Google indicates that it

10  doesn't have documents in its possession, custody, or

11  control that show the number of false accepts analyzed by

12  Google, and they refer specifically to the transcript of

13  Kenny (phonetic), the Kenny transcript.

14      What was the date of that deposition, Ms. Bali?  Do you

15  know?  Or Mr. Levis, if you know?

16          MS. BALI:  I can provide it in just one moment.  I

17  believe it was April 14th.

18          THE COURT:  Of this year?

19          MS. BALI:  Correct.

20          THE COURT:  Okay.  So, Google's position is that

21  it doesn't have documents that reflect the number, is that

22  right, the number --

23          MS. BALI:  That's correct.

24          THE COURT:  -- of false accepts?

25          MS. BALI:  That's correct, your Honor.

63

1          THE COURT:  Okay.  And this relates as well to

2  requests -- this is request seven.  It also requests --

3  excuse me -- relates to request 10, which is for all

4  instances of false accepts, and request 18, as well as

5  interrogatory 16.

6       So, Mr. Levis, when request -- when was RFP 7, set

7  number one, when was that served?

8          MR. LEVIS:  I'm just checking the date.

9          THE COURT:  Thank you.  Or Ms. Bali, if you have

10  the date, whoever has that.

11          MS. BALI:  I can tell you our responses -- our

12  objections and responses were first served in July of 2020.

13          MR. LEVIS:  I have May 4th, 2020.

14          THE COURT:  Okay.  Responses in July, at least

15  initial responses in July of 2020.

16          MS. BALI:  July 14th.

17          THE COURT:  Okay.  And then the Kenney --

18          MS. BALI:  July 10th.  Sorry.

19          THE COURT:  The Kenny --

20          MS. BALI:  July 10.

21          THE COURT:  -- deposition was -- was then this

22  year, in spring of '22.  So, following the Kenny deposition,

23  was there further discussions between the parties with

24  regards to Google's ability to identify the number of false

25  accepts?

1    MR. LEVIS:  So, I think this goes to the issue we

2  were talking about regarding the data and that our

3  understanding -- and this is based on the data that we have

4  received associated with Plaintiffs' accounts, and part of

5  what we raised in our discussions with counsel before filing

6  this letter is that the data itself -- and this came out in

7  subsequent deposition testimony after Ms. Kenny -- does

8  indicate the audio that is sent to human reviewers, vendors

9  and subcontractors, and from the audio itself, there are

10  transcripts in the data that we see that indicate whether or

11  not there is a hotword detected, whether or not the server

12  identified a hotword, whether or not --

13    THE COURT:  I understand.  I understand, Mr.

14  Levis, but --

15    MR. LEVIS:  And, so, that was our issue is it does

16  not seem to be true that Google does not have any data

17  reflecting the number of false accepts.  It has the data

18  itself, the raw data that does identify the false accepts

19  that exist, and that's -- we would -- that to us is

20  responsive to this question in that it identifies the

21  requests that are false accepts, and it would identify them

22  as being sent to third party vendors.

23    THE COURT:  But that would only be if Google

24  counts or tracks them, that is, it's sent, but if it's a

25  false accept, it's routed to delete, as Ms. Bali explained.

1          MS. BALI:  And, your Honor, just to add a little

2  bit more color, at earlier points in the class period, human

3  reviewers were just instructed to skip audio for a variety

4  of reasons.  So, it could be that the audio wasn't intended

5  for Google.  It could be that, you know, they couldn't

6  detect speech.  So, there's no way to parse out for the

7  entire class period, you know, audio not intended for

8  Google, and there's no -- there's nothing in those -- those

9  charts that counsel is referring to that were produced with

10  respect to the named Plaintiffs that indicate whether

11  something is a false accept or not.

12      This exercise would require somebody to listen to audio

13  to determine whether or not it's a false accept.  It doesn't

14  say -- you know, it might say hotword detected, but just

15  because the algorithm detected a hotword does not

16  necessarily mean that it's a -- it's a legitimate query or a

17  false accept, right.  It means that the algorithm detected a

18  hotword.  This is not something that Google tracks and has

19  readily accessible documents to produce.

20      The other thing is --

21          THE COURT:  Okay.  Okay.  I got it, Ms. Bali.  I

22  got it.  I got it.

23      And, Mr. Levis, you're saying that you have seen that

24  -- from your Plaintiffs' data review, that this information

25  should be discernible, is that correct?

66

1        MR. LEVIS:  Yes, that's correct, from the data

2   that Google produced from its system that is associated with

3   our --

4        THE COURT:  Okay.

5        MR. LEVIS:  -- Plaintiffs.

6        THE COURT:  It is very clear to me -- thank you,

7   Mr. Levis.  Let me interrupt you because it's very clear to

8   me that the parties have not sufficiently vetted these

9   issues, and perhaps it was a good exercise to put together

10  this chart and to submit it to the Court in that your

11  respective positions -- well, let me put it this way.

12  Plaintiffs' request and Google's response, including

13  supplemental response and identification of response -- of

14  responsive documents are reflected here.  What's not

15  reflected is Plaintiffs' reply to Google's position.  That

16  is if -- where Google says, "Look, we don't track this," Mr.

17  Levis, you're saying, "Well, yes, you do because, you know,

18  here we see it in the Plaintiffs' data."  That's not

19  reflected in the papers before me, and it doesn't sound like

20  you all have had that discussion.

21     Now, here's what you are going to do is you are going

22  to meet and confer with all necessary team members who have

23  information on Google's side about the existence or

24  nonexistence of responsive documents to each and every one

25  of the RFP's and interrogatories in front of me, and

1 Plaintiff is going to have on their side the persons who are

2 able to speak to each and every reply that is why you think

3 this information is available and exactly what you're

4 pointing to.

5      And each team -- each meet and confer team will have at

6 least one person who is fully authorized, fully authorized

7 to negotiate and compromise, has full authority to negotiate

8 and compromise.  You are going to conduct this meet and

9 confer live -- well, live.  You're going to do it, yes,

10 live, if not in person.  You can do it by Zoom.  You are not

11 doing it by phone.  You may preface it with -- as helpful

12 with exchanges of, you know, lists of documents, and it

13 looks to me like the move here is Plaintiffs need to respond

14 to Google's proposed compromises in response to each of

15 these because Google has the RFP, and Google has responded

16 saying either it doesn't exist or we've produced -- they've

17 identified documents or they've identified in a couple of

18 cases deposition testimony that they say support their

19 position.

20      So, the next step -- the first step in this meet and

21 confer that I am ordering is for -- is for Plaintiffs to

22 prepare -- be prepared and to respond to Google's position.

23 All right.  The meet and confer is clearly not done, and I

24 do not believe that the proposed compromise by Plaintiffs is

25 sufficiently tied to the disputed requests, and it does not

1 reflect Google's responses that are set forth in its

2 proposed compromised column here at chart A.

3      Now, there may well be a -- a good proposed compromise,

4 and -- that is sufficiently tied to the RFP's and

5 sufficiently backed up, but you all need to roll up your

6 sleeves and get the hard work done, and it's going to take

7 your teams, and it's going to take review of documents, and

8 you're going to have to move quickly because discovery has

9 closed, and I appreciate that you're in -- you know, in a

10 briefing cycle, and I am mindful of that.  You're going to

11 have to move this along efficiently.

12      All right.  So, you will have two weeks to engage in

13 this meet and confer process.  It may take more than one

14 session.  There's a lot of material here.  You will be

15 working off of the Exhibit A that you submitted to me in the

16 first instance, and that's what Plaintiffs will be working

17 off of and prepared to respond to and address as to whether

18 or not you dispute Google's position as set forth in its

19 proposed compromise, supplemental response and documents

20 identified.

21      Then, Google, you'll need to respond, and the parties

22 will need to go back and forth, but you're going to have to

23 turn this around.  Your turnaround times is going -- are

24 going to have to be fairly swift.  If there are any

25 remaining disputes, any remaining disputes, you may submit

69

1  those to me on August 19th, August 19th.  You may each

2  submit up to five pages, pleading pages.  You may each make

3  a discovery submission of not more than five pages, but you

4  are to meet and confer and exchange your drafts just as if

5  it were a joint submission, but you may each have five, and

6  it -- pleading pages, and a refreshed and updated Exhibit A

7  which I would fully expect will be much slimmer.

8       And you may be able to work it out, but you need to

9  have a reasoned discussion pointing to evidence to each

10  other.  Where you have remaining disputes, you may bring

11  those to my attention.  I strongly encourage you to organize

12  your statements if -- if it fits, by categories of remaining

13  disputes.  Okay.

14       And maybe every request in dispute doesn't fit neatly

15  into a category, but perhaps it does.  That will help you to

16  be most organized and to address this sufficiently, and

17  obviously it will help the Court.

18       I will review those materials.  I will let you know if

19  I can have a -- if I need a hearing on what is remaining,

20  but I'm not going to get to that -- I don't know that I

21  would get to a hearing before Labor Day.  So, it may -- I

22  may well not.  But you're going to get your submissions to

23  me on that time table.  You're going to roll up your

24  sleeves, get your teams organized, and have a meaningful

25  meet and confer over these categories of documents.

1      Mr. Levis, from Plaintiffs, any questions on how to

2  proceed?

3           MR. LEVIS:  No.  I think we understand your

4  Honor's directions.

5           THE COURT:  Ms. Bali, any questions from Google?

6           MS. BALI:  No questions.  Thank you, your Honor.

7           THE COURT:  Okay.  I know both of you here today

8  and the teams behind you are -- are good at what you do and

9  good and upstanding in your representations to the Court,

10  and I expect this process to be engaged in in absolute good

11  faith.  I appreciate that you are adversaries, but you know

12  the rules, and I want to see that evidenced should you be

13  back before me.

14      All right.  Thank you very much for your time and your

15  preparation today.  I appreciate the background and

16  tutorial, and I want you to proceed as directed and come

17  back to me if needed.  All right.

18           MS. BALI:  Thank you, your Honor.

19           THE COURT:  Thank you.  Thank you both for your

20  preparation for today.  I appreciate it.

21           MR. LEVIS:  Thank you.

22           THE COURT:  That concludes this matter, and we are

23  adjourned.

24      (Proceedings adjourned at 12:15 p.m.)

25

71

1          <u>CERTIFICATE OF TRANSCRIBER</u>

2

3          I certify that the foregoing is a true and correct

4    transcript, to the best of my ability, of the above pages of

5    the official electronic sound recording provided to me by

6    the U.S. District Court, Northern District of California, of

7    the proceedings taken on the date and time previously stated

8    in the above matter.

9          I further certify that I am neither counsel for,

10   related to, nor employed by any of the parties to the action

11   in which this hearing was taken; and, further, that I am not

12   financially nor otherwise interested in the outcome of the

13   action.

14

15   

16

17            Echo Reporting, Inc., Transcriber

18              Wednesday, July 27, 2022

19

20

21

22

23

24

25