# EXHIBIT 29
# (REDACTED)



# HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY

## *IN RE GOOGLE ASSISTANT PRIVACY LITIGATION*

### *Case No. 5:19-cv-04286, U.S.District Court,*
### *Northern District of California*

## Class Economic Damages Declaration
## of Fernando Torres, MSc.

---

Submitted to:
**LOWEY DANNENBERG, P.C.**
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
Attorneys for Plaintiffs

Submitted by



9320 Chesapeake Drive, Suite 110
San Diego, CA  92123
858.538.1533

July 18, 2022

© IPmetrics, LLC – CONFIDENTIAL – Dissemination is subject to the Court's Protective Order



In re Google Assistant
Privacy Litigation
July 18, 2022

HIGHLY CONFIDENTIAL – Attorney's Eyes Only
Class Economic Damages Declaration
Page i

## TABLE OF CONTENTS

1. QUALIFICATIONS AND EXPERIENCE .................................................................................. 1

2. ASSIGNMENT AND BACKGROUND ..................................................................................... 2

    A. CASE SUMMARY .......................................................................................................... 3
    B. CLASSES AND SUBCLASSES ......................................................................................... 6

3. SUMMARY OF OPINIONS .................................................................................................... 7

    A. BREACH OF CONTRACT ............................................................................................... 7
    B. STATUTORY DAMAGES ................................................................................................ 8
    C. NOMINAL DAMAGES ................................................................................................... 9
    D. DEFENDANTS' PROFITS ............................................................................................... 9
    E. SUMMARY ................................................................................................................ 10

4. ANALYTICAL FRAMEWORK ............................................................................................. 11

    A. ECONOMICS OF PRIVACY .......................................................................................... 12
    B. GOOGLE'S BUSINESS MODEL ..................................................................................... 14
    C. CONCEPTUAL MODEL ............................................................................................... 15
    D. MARKET DYNAMICS AND PRIVATE DATA .................................................................. 18
        *Supply and Demand of Private Data* ....................................................................... 18
        *Willingness to Pay and to Accept* ........................................................................... 19
        *Interaction of Supply and Demand* .......................................................................... 20
    E. ECONOMIC DAMAGE TO PRIVACY .............................................................................. 22

5. MEASURING ECONOMIC DAMAGES ................................................................................ 23

    A. CONJOINT ANALYSIS ................................................................................................. 23
    B. BREACH OF CONTRACT DAMAGES .............................................................................. 25
    C. STATUTORY DAMAGES .............................................................................................. 28
        *Federal Wiretap Act* .............................................................................................. 28
        *Stored Communications Act* .................................................................................... 29
        *California Invasion of Privacy Act* ........................................................................... 29
    D. NOMINAL DAMAGES ................................................................................................. 29
    E. DEFENDANTS' PROFITS ............................................................................................. 29
        *Advertising Revenue* .............................................................................................. 30
        *Market Value of Speech Data* ................................................................................. 33

6. SUMMARY AND CONCLUSIONS ....................................................................................... 36

    A. BREACH OF CONTRACT DAMAGES .............................................................................. 37
    B. STATUTORY DAMAGES .............................................................................................. 38
    C. NOMINAL DAMAGES ................................................................................................. 38
    D. DEFENDANTS' PROFITS ............................................................................................. 38

APPENDICES ............................................................................................................................. 42



In re Google Assistant
Privacy Litigation
July 18, 2022

HIGHLY CONFIDENTIAL – Attorney's Eyes Only
Class Economic Damages Declaration
Page 1

## 1. QUALIFICATIONS AND EXPERIENCE

My name is Fernando Torres. I am a professional economist and have over 30 years of experience in applied and theoretical economics. During this time, I have been a consultant, a university professor, and a business manager. Both my undergraduate and post-graduate degrees are in Economics, the latter with a concentration in Econometrics, the study of the application of mathematics, statistical methods, and computer science to economic data. Since 2005, I have specialized in the analysis and valuation of Intangible Assets, including Intellectual Property, rights of publicity, and privacy issues. Currently, I am a member and Chief Economist of IPmetrics LLC, an independent consulting firm, and reside in Santa Fe, New Mexico.

During the past 18 years, I have undertaken a plurality of valuation engagements where I have appraised the value of a variety of intangible assets in several contexts, such as for licensing and transaction rate setting, for loan collateral analysis, and generally to assist in the decision-making process regarding the economic role of intangible assets, including intellectual property. I also regularly give presentations and write about valuation techniques as applicable to intangibles and have co-designed and taught the course "Valuing Intangible Assets for Litigation" for the National Association of Valuation Analysts.

Additionally, I have served as a consultant on numerous cases involving intellectual property infringement issues and contractual disputes. I have prepared over 90 expert reports and have trial, arbitration, and deposition



In re Google Assistant
Privacy Litigation
July 18, 2022

HIGHLY CONFIDENTIAL – Attorney's Eyes Only
Class Economic Damages Declaration
Page 2

testimony experience as an economic damages[1] expert witness on behalf of both plaintiffs and defendants. I have experience in complex commercial litigation cases nationally.

In recent years, I have been called upon to testify in cases where the intersection of social media and advertising has been alleged to have breached rights and principles of privacy, publicity, trademarks, and patents. In some cases, the issues I have reported on for the courts were the benefits derived by the social media/advertising platform infringing the rights of publicity of a class of users,[2] while in others the issue has been the economic value of social media marketing in sustaining the viability of traditional media properties.[3] In other cases, the issue of consumers' privacy has been at the core.[4]

My curriculum vitae is included as Appendix A to this Declaration. Appendix B contains my testimony history, including all matters in which I have provided expert testimony in the previous four years. Appendix C lists the documents considered in forming my opinions in this case.

## 2.  ASSIGNMENT AND BACKGROUND

I have been retained by the law firms of Scott+Scott Attorneys at Law LLP and Lowey Dannenberg, P.C., counsel for Plaintiffs in "In re Google Assistant Privacy

---

[1] In this Declaration, I use the term "damages" in an economic sense to refer to the concept of harm to the Plaintiffs and the Class or the gain realized by Defendants. I am not using the term "damages" in a legal sense.

[2] In: *Fraley et al. v. Facebook, Inc.*, case 11-1726 before the USDC for the Northern District of California.

[3] In: *S. Mattocks v. Black Entertainment Television, LLC*, case 13-61582 before the USDC for the Southern District of Florida.

[4] In: *In Re Google, Inc., Privacy Policy Litigation*, case 12-cv-1382; and *Campbell et al. v. Facebook, Inc.*, case 13-05996, both before the USDC for the Northern District of California.



Litigation," [5] (hereinafter "Counsel"). Appendix D details the compensation arrangements between me and Counsel.

Specifically, Counsel has engaged me to analyze whether a common methodology is available to estimate damages suffered by Plaintiffs and the putative class members (the "Class") as a result of the alleged false, deceptive, and unlawful conduct of defendant Google, LLC ("Google" or the "Company").

My analysis is based on assumptions about what the applicable law is, and I do not express any legal opinions on this topic. I do not express any opinions on whether Google is ultimately liable under any of the causes of action pled by Plaintiffs.

Furthermore, this analysis is based on the information I have received to date; I may revise this Declaration based on the receipt of additional documents or information. In addition, I expect to consider any criticisms of my analysis offered by Defendants or any of Defendants' experts.

If called to testify in this matter, I may at the request of Counsel prepare demonstrative exhibits to reflect or summarize the information I describe in this analysis, as permitted by the Court's orders.

## A.  Case Summary

It is my understanding that this case is brought on behalf of Plaintiffs and a Class of consumers whose communications were allegedly recorded by Google without their consent and/or subsequently used by Google for its

---

[5] Fourth Amended Consolidated Class Action Complaint, in case 5:19-cv-04286-BLF, before the USDC for the Northern District of California ("FAC"), filed August 2, 2021.



own commercial purposes, including for example to improve its speech technology or for targeted advertising.[6]

I further understand that the alleged misconduct ultimately stems from several allegedly false, deceptive, and unlawful actions undertaken by Defendants, as follows:[7]

1.  The interception and recording, by Google's Assistant service, of Plaintiffs' confidential communications without their consent.

2.  Google's use of the allegedly wrongfully obtained communications for commercial purposes, including for training and testing algorithms and models in order to improve its speech technology in addition to targeted advertising.

3.  Google's sharing of the allegedly wrongfully obtained communications with human reviewers who listened to and manually transcribed or annotated the recorded audio.

4.  False and deceptive statements in Google's contracts with consumers, including the Terms of Service and Privacy Policy, regarding Google's practice of collecting, recording, sharing, and using users' audio.

I understand that these actions by Defendants are alleged to have taken place starting in May 18, 2016 through the present, violated a number of federal and state statutes and the common law and constituted a breach of contract between Google and the Plaintiffs and Class members.[8]

---

[6] *Ibid*, at §1
[7] *Ibid*. at §1, 4, 6-10.
[8] *Ibid*. at §1, 243-264.



In re Google Assistant
Privacy Litigation
July 18, 2022

HIGHLY CONFIDENTIAL – Attorney's Eyes Only
Class Economic Damages Declaration
Page 5

I understand that Plaintiffs in this case argue that Google made the following promises to consumers in its Terms of Service and Privacy Policy regarding its collection, recording, sharing, and use of their audio, which were in fact untrue:

(1) That Google would not collect Plaintiffs' and Class members' communications without their consent or knowledge; and

(2) that it would not then use and/or share the allegedly unlawfully obtained information.

Plaintiffs in this case argue that as a result of Google's misrepresentations in its Privacy Policy and Terms of Service, Plaintiffs and the Class paid an unjustified price premium for products equipped with Google Assistant.[9] Specifically, Google's representations that Google Assistant does not record Plaintiffs' and the Class's confidential communications absent the utterance of a "Hotword" or manual activation, and that it does not share the recordings with third party human reviewers (the "Challenged Claims").

Further, I understand that some of the federal and state statutes, make available to Plaintiffs and the Class specific statutory remedies. Plaintiffs and the Class also have available actual damages, statutory damages, and a return of the profits realized by Defendants. Based on the information from Counsel, I also understand that Plaintiffs may also seek nominal damages.

In summary, my analysis focuses on identifying and developing a methodology to measure the relevant economic damages caused by the

---

[9] *Ibid.* at §262, *inter alia*.

© IPmetrics, LLC – CONFIDENTIAL – Dissemination is subject to the Court's Protective Order



In re Google Assistant
Privacy Litigation
July 18, 2022

HIGHLY CONFIDENTIAL – Attorney's Eyes Only
Class Economic Damages Declaration
Page 6

accused business practices of Defendants to Plaintiffs and the Class on a class-wide basis.

## B.  Classes and Subclasses

I understand from Counsel that for purposes of this Declaration, I should assume the following Classes and Subclasses:

i)   All Users[10] who purchased a Google-Made Device[11] (the "Purchaser Class").

ii)  All Opted-In Users[12] of Google Home Devices who have a recording resulting from a False Accept[13] (the "Privacy Class).

iii) All members of the Privacy Class for whom Google shared at least one recording resulting from a False Accept with a human reviewer ("the Privacy Disclosure Subclass").

iv)  All members of the Privacy Class for whom Google used at least one recording resulting from a False Accept for (i) testing or training to improve the functionality of Google speech technology, or (ii) targeted advertising (the "Privacy Use Subclass").

v)   All Opted-In Users of GAEDs for whom Google shared a recording with a human reviewer (the "SCA Class"[14]).

---

[10] "Users" are individuals whose Gmail accounts were associated with at least one Google-Assistant Enabled Device or "GAED" during the Class Period.

[11] "Google-Made Devices" refers to GAEDs manufactured and sold by Google, including Google's own smart home speakers, Google Home, Home Mini, and Home Max; smart displays, Google Nest Hub, and Nest Hub Max; and its Pixel smartphones, laptops, and tablets.

[12] "Opted-In Users" means Users who have enabled Voice and Audio Activity.

[13] "False Accept" means an instance in which Google Assistant records and transmits audio to Google without manual activation or a Hotword.

© IPmetrics, LLC – CONFIDENTIAL – Dissemination is subject to the Court's Protective Order



In re Google Assistant
Privacy Litigation
July 18, 2022

HIGHLY CONFIDENTIAL – Attorney's Eyes Only
Class Economic Damages Declaration
Page 7

## 3. SUMMARY OF OPINIONS

The central conclusions of this analysis[15] can be summarized, with reference to the general characteristics of the various categories involved, as follows.

### A. Breach of Contract

From the perspective of the Purchaser Class, a breach of the sales contract corresponding to the Google Home Devices occurred, at least to the extent this Class was promised privacy (in that Google will not share their recordings with third parties) and no collection of information from unintended recordings ("False Accepts"),[16] while they were actually subject to a Google Assistant service that records, shares, and uses communications not intended for Google. The measure of economic damages in this instance is a price premium representing the difference between the market price of the promised device and service (i.e., with privacy protections), and that of the device and service delivered by Google (i.e., a set that records, shares, and uses Users' communications).

As further explained in the detailed sections that follow, a reliable measure of this premium can be derived on the basis of the applicable statistical technique of Conjoint Analysis. This technique has been developed and in broad use since the early 1970s to value individual attributes of a consumer product or service.

---

[14] "SCA" refers to the Stored Communications Act.

[15] Given that the analysis relies on currently available information, the conclusions summarized here may be further refined as a result of additional production by Google or the ability to consider additional information.

[16] See, e.g., FAC, at §252.

© IPmetrics, LLC – CONFIDENTIAL – Dissemination is subject to the Court's Protective Order



In re Google Assistant
Privacy Litigation
July 18, 2022

HIGHLY CONFIDENTIAL – Attorney's Eyes Only
Class Economic Damages Declaration
Page 8

Moreover, while the Purchaser Class thus overpaid for what Defendants delivered, at least some of those sales would not have been forthcoming had the full information about the service been disclosed by the time of purchase. Thus, the number of units sold of the Google Home Devices was likely greater than the number of units warranted by the actual service characteristics, given consumers' privacy concerns.

## B.  Statutory Damages

I understand from Counsel that a number of state and federal statutes under which Plaintiffs assert claims provide for statutory damages. These statutory damages can be applied to all affected Plaintiffs and Class members uniformly and I provide several example calculations demonstrating this below.[17]

Specifically, I understand that the Federal Wiretap Act ("FWA") may be applicable based on the alleged unlawful interception and that members of the Privacy Class may seek such statutory damages. Further, I understand the FWA provides for distinct statutory damages for the use and/or disclosure of the intercepted communications. I am advised by Counsel that the Privacy Use Subclass and the Privacy Disclosure Subclass would be seeking these statutory damages.

Moreover, I understand the SCA Class and the Privacy Disclosure Subclass would be seeking statutory damages as provided for by the SCA. Finally, the Privacy Class would be seeking statutory damages provided for by the California Invasion of Privacy Act ("CIPA").

---

[17] FAC, at §2 *et seq.*

In re Google Assistant
Privacy Litigation
July 18, 2022

HIGHLY CONFIDENTIAL – Attorney's Eyes Only
Class Economic Damages Declaration
Page 9



## C. Nominal Damages

I was asked to assume that the classes may seek nominal damages of certain amounts for each of the alleged violations in the case.

## D. Defendants' Profits

From my analysis of documents listed in Appendix C, I further concluded that there is evidence common to the Class capable of showing that Google profited or otherwise benefited from the taking of individuals' audio recordings. Specifically, as explained in the body of this Declaration, I have concluded that the profits and other unjustly obtained benefits may be analyzed and quantified based upon Google's records without reference to individual proof with respect to any member of the Class and/or Subclass. I understand such Class membership is identifiable and ascertainable based upon Google's records.[18]

Google obtains economic benefits from the undisclosed and unauthorized collection and storage of Class members' audio in a number of ways███

███████████████████████████████████████████████████

███████████████████████████████████ For example, I understand that

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████ Google also ███████████████████████████

███████████████████████████████████████████████████

████████████████████ Google benefits from ██████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

---

[18] FAC, at §142.



In re Google Assistant
Privacy Litigation
July 18, 2022

HIGHLY CONFIDENTIAL – Attorney's Eyes Only
Class Economic Damages Declaration
Page 10

██████████████████████████████████████████████████ and incorporates as part of the Google Voice telephone service,[19] ████████████ ████████

Moreover, ████████████████████████████████████████ ████████████████████████ the voice data captured from the Class members █████████████████████████████████████ █████████████████████████████████████ █████████████████████████████████

Internally, █████████████████████████████████████ ███████████████████: [20]

a) █████████████████████████████████████
   ████████████████████████

b) ██████████████████████████████████

c) █████████████████████████████████████
   ██████████████████████

Thus, Google ultimately monetarily benefits from the captured audio recordings ████████████████████████████ █████████████████████████████████████ ██████████████████

## E.  Summary

The various types of damages and the applicable Classes and Subclasses to which they apply are summarized in the following table.

---

[19] See: https://voice.google.com/about.
[20] See, e.g., GOOG-ASST-03045635 and 3045642.

© IPmetrics, LLC – CONFIDENTIAL – Dissemination is subject to the Court's Protective Order



In re Google Assistant
Privacy Litigation
July 18, 2022

HIGHLY CONFIDENTIAL – Attorney's Eyes Only
Class Economic Damages Declaration
Page 11

**Table 1**
**Summary Damages Conclusions**

| Category | Purchaser Class | Privacy Class | Privacy Use Subclass | Privacy Disclosure Subclass | SCA Class |
|---|---|---|---|---|---|
| Breach of Contract: Price Premium | ✓ | | | | |
| Statutory Damages: Federal Wiretap Act (Interception) | | ✓ | | | |
| Statutory Damages: Federal Wiretap Act (Use/Disclosure) | | | ✓ | ✓ | |
| Statutory Damages: Stored Communications Act | | | | ✓ | ✓ |
| Defendants' Profits | | ✓ | ✓ | ✓ | |
| Nominal Damages | ✓ | ✓ | ✓ | ✓ | ✓ |

## 4. ANALYTICAL FRAMEWORK

The detailed consideration of the issues of economic damages that the case at hand involves consideration of the economic nature of the transaction between Defendants, Plaintiffs, and the Class members. To that end, I first considered the general economic characteristics of privacy and private information, as well as the relevant characteristics of Google's business model. The analyses from those sections are then the basis to specify a conceptual model of the transaction and the consequent analysis of the economic nature of the harm to consumers' privacy interests when the terms of the transaction are violated.



In re Google Assistant
Privacy Litigation
July 18, 2022

HIGHLY CONFIDENTIAL – Attorney's Eyes Only
Class Economic Damages Declaration
Page 12

## A. Economics of Privacy

Privacy as a general concept has long been the subject of philosophical and legal interpretations.[21]  The scope of the present analysis, however, is limited to the economic aspects of privacy and a corresponding framework for valuing its loss as a result of the violations alleged in this action.

Economics is concerned with consumers' privacy as the value of controlling information about oneself.[22]  The ability to control the private information that a product manufacturer, or a service provider, receives is part of that product or service's value to consumers.

This is particularly relevant since the advent of the Internet and the rise of myriad ways in which consumers' information is collected, analyzed, and monetized.[23] Given that the unintended revelation of private information[24] may be permanent and have negative economic consequences (such as higher prices or restrictions in choices), it is in consumers' economic interest to protect their private information in the market transactions they engage in.[25]

Consequently, when facing the choice, it is in consumers' best interest to only reveal private information if the "privacy cost" – the value of the extent of privacy revealed – is offset by the compensating offer provided by

---

[21] See, e.g., Posner, Richard A., "The Right of Privacy" (1978). Georgia Law Review, 12(3), 393–422. https://digitalcommons.law.uga.edu/lectures_pre_arch_lectures_sibley/22.

[22] See, e.g., Posner, R. A., 1981. "The Economics of Privacy." American Economic Review, 71(2), 405–409.

[23] In particular, as many transactions and activities involving sensitive information are now conducted online. See, e.g., Acquisti, A. et al, "The Economics of Privacy", Journal of Economic Literature, 2016, 54(2), 442–492 (http://dx.doi.org/10.1257/jel.54.2.442).

[24] In most economic settings, examples of such information are encompassed by health status, education and demographic characteristics, purchase intentions, and other economic interests.

[25] Acquisti (2016).



In re Google Assistant
Privacy Litigation
July 18, 2022

HIGHLY CONFIDENTIAL – Attorney's Eyes Only
Class Economic Damages Declaration
Page 13

information acquirers, such as a discount or other meaningful convenience or specific desirable payoff. In making this choice, consumers rely on the representations of the counter party about the extent of the information captured and the secondary or further use of that information, if any. Of course, in order to accurately assess a product's value, consumers must have access to accurate information about its privacy cost.

The economic analysis of the prototypical "privacy transaction" thus defined, whereby the consumer is offered goods or services,[26] nominally in exchange for access to certain types of otherwise private information,[27]  has certain identifiable core characteristics:

1) Intrinsically, "data privacy" is similar to other economic goods, in the sense consumers have a preference to keep private information undisclosed unless a sufficiently attractive trade-off is offered for disclosure.

2) Considering the viewpoint of what revealing certain data can get the consumer, there is an "instrumental" preference for privacy which is influenced in the market by what the information acquirer promises as a payoff for disclosure. This instrumental preference for privacy reflects consumers' preference for concealing their data on account of knowing what disclosure can do for them.

3) The economic measure of the benefit received from the transaction, i.e., consumers' utility, is a further concept which does not depend on

---

[26] Such as search, directions, weather, gaming, etc.
[27] Such as topics of interest, destination, location, etc.

© IPmetrics, LLC – CONFIDENTIAL – Dissemination is subject to the Court's Protective Order



In re Google Assistant
Privacy Litigation
July 18, 2022

HIGHLY CONFIDENTIAL – Attorney's Eyes Only
Class Economic Damages Declaration
Page 14

what the disclosed information reveals, but on the amount of value received by consumers as a whole.

The fact that consumers may, under certain circumstances, reveal private data in exchange for a suitable value proposition, has been noted and leveraged by companies such as Google. For example, in a recent online seminar for advertisers on their platform, Google highlighted the fact that "90% of consumers are willing to share their personal information for the right incentive."[28]

Finally, while preferences may vary among the population,[29] the economic transaction for private data thus far analyzed implies a common measure of what consumers exchange for their privacy: The value of the data acquirer's stated offer offsets the value attached by consumers to revealing information.

## B. Google's Business Model

According to the Company's public disclosures,[30] Google's mission is "to organize the world's information and make it universally accessible and useful."[31]

While Google Search remains the core service, according to the Company, Google Assistant is meant to offer "the best way to get things done

---

[28] Talk titled "Get the playbook to privacy success", part of the "Google Marketing Live 2022" event, available at: (adsonair.withgoogle.com/events/google-marketing-live-2022/watch?talk=get-the-playbook-to-privacy-success).

[29] From an economic perspective, preferences are individuals' hierarchical pairwise orderings over the set of goods and services (the Consumption Set) they encounter in the market. See, *inter alia*, Jehle, G.A. and Reny, P.J., Advanced Microeconomic Theory, 3rd Ed., FT Prentice Hall, 2011, pp 4-13.

[30] For example, Alphabet Inc.'s SEC Form 10-K Report for the fiscal year ended December 31, 2021 ("Alphabet 2022 10K").

[31] Alphabet 2022 10K, p 4.

© IPmetrics, LLC – CONFIDENTIAL – Dissemination is subject to the Court's Protective Order



In re Google Assistant
Privacy Litigation
July 18, 2022

HIGHLY CONFIDENTIAL – Attorney's Eyes Only
Class Economic Damages Declaration
Page 15

seamlessly across different devices, providing intelligent help throughout a person's day, no matter where they are."[32]



In relation to the specific class of data in the case at hand, i.e., audio recordings,

## C. Conceptual Model

Based on the Economic literature we can describe a formal model of the value considerations in a general transaction involving private information by considering the following variables:[36]

---

[32] Alphabet 2022 10K, p 4.
[33] "                                    , GOOG-ASST-00032096.
[34] See, inter alia,                        GOOG-ASST-00032102; 32104-32110.
[35] See, e.g., service description at: https://cloud.google.com/speech-to-text.
[36] This model follows the analysis in T. Lin "Valuing Intrinsic and Instrumental Preferences for Privacy."  Boston University Questrom School of Business SSRN-id3406412 (March 5, 2021).



In re Google Assistant
Privacy Litigation
July 18, 2022

HIGHLY CONFIDENTIAL – Attorney's Eyes Only
Class Economic Damages Declaration
Page 16

Private information about a representative consumer $i$ is symbolized as: $d_i$. This information may include gender, income, purchase intentions, or other types of information (like private conversations) that individuals may consider private and, thus, have a preference to conceal from others.

In requesting data, the firm offers a form of compensation to consumers as an incentive to share information. In the case at hand, this is represented by the information retrieval or voice-activated controls the Google Assistant service provides.[37] Economically, this incentive has a certain value, denoted here as a "perk" value of $P$.[38]

The representative consumer $i$ decides whether to share ($s_i$) his/her data with the service provider. An individual's decision, $s_i$, takes on the value of either 1 or 0, symbolizing whether the choice is to share or not, respectively. To make that decision, the consumer takes into account the value of the product or service provided and his/her intrinsic preference for privacy, expressed as a certain cost of sharing private data, $c_i$, which reflects the monetary value lost if that information is involuntarily disclosed.

If the choice is to share the data ($s_i = 1$), the consumer gains access to the relevant products or service which, conceptually, may have a benefit (e.g.,

---

[37] Google's offerings are diverse and are broader than the Assistant service. The best known are its search engine, the YouTube video library, and the email service Gmail. The Assistant service is a way to access information in those other offerings, e.g., it allows for a user to perform a search using their voice by converting speech to text and vice versa, it also allows users to play YouTube videos or read back messages from their email, thereby integrating with these other services. See, e.g., Alphabet 2022 10K, pp 5-7, and the dedicated website at: https://assistant.google.com/.

[38] This value reflects the economic benefit to users of hands-free use of their devices, for example.

© IPmetrics, LLC – CONFIDENTIAL – Dissemination is subject to the Court's Protective Order



In re Google Assistant
Privacy Litigation
July 18, 2022

HIGHLY CONFIDENTIAL – Attorney's Eyes Only
Class Economic Damages Declaration
Page 17

saving time or aggravation) in exchange for the value of the data shared, symbolized as a function $T(d_i)$. [39]

If the choice is to not share the data ($s_i = 0$), the firm can only give the consumer more generic "average" ads (or targeted based on existing data gathered about the consumer), for example. Symbolically, this response from the service provider has a base value of $T(0)$.

Anticipating how the firm uses data, e.g., to provide a more "personalized experience," consumer $i$ also has an instrumental preference for privacy; the expected economic gain from not revealing his/her data. This is measured by the difference between the incremental value of provided to the consumer relative to the base value: $T(0) - T(d_i)$, denoted $\Delta T(d_i)$.

Therefore, the representative consumer will choose to share (additional) private data if, and only if, the privacy cost is offset by the incentive compensation value, $P$, that the service provider promises:

$$s_i = 1 \quad \text{if} \quad P > c_i + \Delta T(d_i),$$
$$s_i = 0 \quad \text{otherwise.}$$

This model reflects the empirically verified notion that consumers do not want to share private information when they are not compensated for it,[40] and is also implicit in Google's view cited before about the substantial power to capture "personal information for the right incentive."

[39] Measures of benefit to defendant's business are considered below.
[40] An average price of 33 cents per variable was found to increase the probability of sharing by about 20% across private demographic information variables. Intrinsic Preferences results (Table 2) in: T. Lin (2021), p 15.



In re Google Assistant
Privacy Litigation
July 18, 2022

HIGHLY CONFIDENTIAL – Attorney's Eyes Only
Class Economic Damages Declaration
Page 18

## D.  Market Dynamics and Private Data

In the context of the online economy where businesses like Google and consumers like the Class/Subclass members interact, private data is a valuable commodity, particularly when it is used as an aggregate. As such, the case at hand illustrates one particular dimension of this situation, where the terms of the privacy transaction analyzed in the prior subsections are violated by the way the Google Assistant service operates in practice.

To round out the conceptual basis supporting the assessment of economic damages in this case, the interaction is considered in what follows as a market for private data.

### Supply and Demand of Private Data

In this market, consumers in general, and Class members in particular, can be considered suppliers of such private data. They hold certain aspects of information about them as private and will only reveal some of it voluntarily in exchange for a benefit, much like a conventional producer of a good only supplies it for an acceptable price.

Simultaneously, businesses and advertisers, in general, and Google in particular represent the demand side for private data. The need for this data is not arbitrary at all; there is a clear business purpose for its use. Data considered private provides insights into purchasing intentions, hidden interests, and other motivators which can be used at scale to develop products, improve existing ones, to target marketing communications, customize price strategies, and increase sales and profits.

A salient characteristic of this market is that the interaction of market participants is not open or direct. Rather, the interaction occurs as a consequence of a different exchange, typically access to digital goods and

© IPmetrics, LLC – CONFIDENTIAL – Dissemination is subject to the Court's Protective Order



In re Google Assistant
Privacy Litigation
July 18, 2022

HIGHLY CONFIDENTIAL – Attorney's Eyes Only
Class Economic Damages Declaration
Page 19

services. The case at hand is a representative example: Google offers its Assistant service for free,[41] but ████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████ ██████████████████████████████████████████ .

As far as the relevant market in this case is concerned, users of the Google Assistant service pay for it by linking their use of it to their Google account and, thus, by providing access to their data, including their private data conditioned by the explicit policy and assurances at the core of the case.[42] Google provides the service at least in part because, as discussed above, it augments its collection of data for the user profile, which in turn is used to enhance its technology and its advertising business.[43]

### **Willingness to Pay and to Accept**

In dealing with the privacy of their data, consumers increasingly are aware of the transaction that has been highlighted in this analysis. Empirical research into this transaction has often looked to survey respondents as to their own appraisal of the worth of preserving their private data. [44]

This research has focused on two approaches to eliciting such valuations. One group of studies essentially asks participants what the lowest price is they would be willing to accept to give up some degree of protection of their personal data. This price is referred to as the Willingness to Accept ("WTA").

---

[41] Google, of course, does sell the specialized devices that offer the Assistant service.

[42] FAC, at §167 *et seq*.

[43] E.g., as detailed above in reference to Google's patent disclosure in US Pub. No. US20050222989A1.

[44] See, *inter alia*, A, Acquisti, L.K. John, and G. Lowenstein. "What is Privacy Worth?" Journal of Legal Studies 42, no. 2 (June 2013): 249-274.



The other group asks what the maximum price is they would be willing to pay to acquire a degree of protection of their personal data. This alternative is referred to in the literature as the Willingness to Pay ("WTP"). In principle, these two valuations are assumed to be consistent.[45]

In this context, Google's privacy preserving assurances with respect to the Assistant service and the GAEDs may create an impression of higher privacy control at the outset and, thus, lead to higher level of WTA/WTP.

### Interaction of Supply and Demand

Ultimately, in the context of the privacy transaction in the context of the sale of GAEDs, both suppliers and consumers interact, and, per the preceding analyses, Purchase Class members buy the devices relying on Google's representations that their privacy will be preserved and that for instance, Google will not share individuals' private conversations with third parties or utilize them for undisclosed purposes, such as training and testing, or targeted advertising.[46]  In that transaction, Class members valued their private data at least as highly as the value of the Assistant services. They will have overpaid if their private data was captured or shared in circumstances beyond that assurance, since private data of higher value than bargained for will have been taken.

To illustrate this interaction and how it relates to the calculation of the breach of contract damages, the following figures depict the basic supply-demand

---

[45] In practice, a discrepancy has been apparent, whereby respondents' WTA is higher than their WTP. In terms of the privacy transaction, this difference reflects the lack of transparency as to the precise nature and extent of the data that is being captured, as well as more general concepts well-known from behavioral economics: loss aversion, whereby people overestimate losses relative to gains, and the endowment effect, whereby people overestimate what they already have over its market value.

[46] FAC, at §252.

In re Google Assistant
Privacy Litigation
July 18, 2022

HIGHLY CONFIDENTIAL – Attorney's Eyes Only
Class Economic Damages Declaration
Page 21



chart for this market. In Figure 1, demand is illustrated as the green downward-sloping line, reflecting the normal increase of the quantity demanded (horizontal axis) as price goes down (vertical axis). Supply is depicted as a horizontal line, as is typical in digital services, because the supplier is able to offer any level without a significant increase in unit costs in the relevant quantity range.[47] In this simple scenario, at the supply price $p$ consumers demand $q$ units of the product (GAED with Assistant services and privacy assurances).




In Figure 2, there is a different, and lower, price recognized by consumers when the lack of privacy turns out to be the case: price $p'$. The total premium paid¸ which is the multiplication of the difference in prices ($p – p'$) times the

---

[47] It is well understood the costs of providing Assistant services like Search results, for example, are overwhelmingly fixed costs and, thus, the marginal cost is essentially zero, which is what a horizontal supply curve represents. (See: *inter alia*, E. Ricart-Costa, J., Subirana, B., Valor-Sabatier, J. (2004). Proprietary Content Providers: Aggregators (Portals). In: Sources of Information Value. Palgrave Macmillan, London, p 101.



actual quantity purchased ($q$). In the figure, this amount of damages is represented by the area of the rectangle labeled "Premium."

Moreover, if the true extent of the actual privacy risk is known in the market, the demand function itself could shift left, reducing the quantity demanded for any given product price. Demand for the combined good (GHD with Assistant services) depends on both the supply price and the privacy assurances.

## E. Economic Damage to Privacy

In the event where the private data is captured without the consumer being made aware of the transaction, the incentive is absent; $P = 0$ and the consumer suffers the loss of the economic value from not revealing his/her data, $\Delta T(d_i)$, and the cost of losing control of his/her private data, $c_i$.

Therefore, the economic damage to the consumer under this surreptitious listening and sharing scenario encompasses: the intrinsic value of the private data captured and/or shared; and the instrumental value his/her would have perceived in a voluntary exchange.[48]

The intrinsic damage element reflects consumers' preference for privacy, which is measurable monetarily in terms of their WTP to preserve privacy. The damage on account of instrumental preference is dependent on how the firm uses (i.e., benefits from) consumer data. It does not simply reflect consumer reticence to share, but how the aggregated data thus captured is used.

---

[48] E.g., in the empirical results from Lin (2021), if the private data is "purchase intent", consumers perceive an intrinsic loss of $1.825, on average, plus an instrumental loss of the value of getting a relevant discount coupon (or other intent-dependent benefit they would normally expect).



In re Google Assistant
Privacy Litigation
July 18, 2022

HIGHLY CONFIDENTIAL – Attorney's Eyes Only
Class Economic Damages Declaration
Page 23

## 5.  MEASURING ECONOMIC DAMAGES

Once discovery is completed. the preceding framework can be used to estimate economic damages to the Class members with respect to the alleged interception and recording of Plaintiffs' and Class members' confidential communications by Google's Assistant service without their consent, and subsequent unauthorized disclosure and use.

### A.  Conjoint Analysis

Consumer choices motivated by their preferences simultaneously reflect a number of product features and benefits. Thus, a statistical analysis technique is necessary to decompose such preferences and identify the partial contributions of the feature of interest.

At its core, the Conjoint Analysis methodology has been refined and employed for decades to address this problem.[49] Over the years, four types of conjoint methods have been developed:[50]

- Traditional Conjoint Analysis ("CA"), using stated preference ratings
- Choice-based Conjoint Analysis ("CBCA"), using stated choices
- Adaptive Conjoint Analysis ("ACA"), for large numbers of attributes
- Self-explicated Conjoint Analysis ("SECA"), a bottom-up method.

The underlying research question in the case at hand deals with discerning among specific privacy choices under a scenario that makes the choice

---

[49] Wharton School Professor Paul Green is often credited with opening this field by applying the mathematical conjoint measurement theory to the solution of marketing and product development problems and considering the practical measurement issues (See: Paul E. Green and Vithala R. Rao: "Conjoint measurement for quantifying judgmental data", Journal of Marketing Research, 8, 355–363.).

[50] As classified by Vithala R. Rao in "Applied Conjoint Analysis", Springer, 2014, p 5.

© IPmetrics, LLC – CONFIDENTIAL – Dissemination is subject to the Court's Protective Order



In re Google Assistant
Privacy Litigation
July 18, 2022

HIGHLY CONFIDENTIAL – Attorney's Eyes Only
Class Economic Damages Declaration
Page 24

alternatives explicit and, ultimately, surveying consumers to estimate statistically the partial contribution of such choices. Therefore, the choice-based method is particularly applicable.

Briefly stated, CBCA uses choice experiments or surveys in which respondents make a choice among a set of alternatives, each of which is described by a set of attributes. The data collected, across all choice sets and all individuals, are then analyzed using the appropriate statistical tools [51] to obtain a mathematical relationship among the attribute levels to probabilities of choice.[52] A CBCA methodology provides several advantages, including the ability to be designed to simulate choices made in a very similar way to the actual marketplace choices that consumers face, the ability to assess competitive effects on choice, and price sensitivity to price differences, among others.[53]

I understand from Counsel that a separate survey expert will be submitting a report in this case.[54] My understanding is that the survey expert report discusses, among other topics, the process for a choice-based conjoint survey utilizing the aforementioned methodology and that the CBCA survey will provide the empirical data required to measure the "price premium" distinctly attributable to the Challenged Claims. Such premium will be capable of being expressed in terms of a percentage of the price. Further, I understand that the determination of the appropriate survey sample size will also be discussed and designed so as to make the survey results reliable and

---

[51] For example, multinomial logit or probit models, depending on the situation.
[52] See: V.R. Rao (2014), Chapter 4, pp 127 *et seq.*
[53] V.R. Rao (2014), p 128.
[54] In referencing my understanding, I am not opining on the methodology, structure, or implementation of the CBCA survey, nor do I opine on whether or not the conjoint survey is properly designed to achieve its stated goals.

© IPmetrics, LLC – CONFIDENTIAL – Dissemination is subject to the Court's Protective Order



In re Google Assistant
Privacy Litigation
July 18, 2022

HIGHLY CONFIDENTIAL – Attorney's Eyes Only
Class Economic Damages Declaration
Page 25

to provide a statistically accurate measure of the price premium of interest, as well as to support the reliability of its application to the Class as a whole.

On that basis, I anticipate the results of the CBCA survey will provide the necessary input for the calculation of the Breach of Contract damages discussed, namely applying the appropriate price premium percentage in the calculations.

## B. Breach of Contract Damages

The Purchaser Class ("PC") bought Google Home devices ("GHD") at a market price reflecting in part the promises Google made in its Privacy Policy and Terms of Service that PC members' privacy would be protected. In actual use, the devices failed to do so as promised.

At the outset of the transaction, PC members had an amount of money equivalent to the average retail price of the specific device, full privacy, and did not have assistant services. The PC members subsequently purchased GHDs trading their money and information (as set forth in the Terms of Service and Privacy Policy) in exchange for services. Conceptually, the trade-off was accepted to the extent the privacy related assurances in Google's privacy policy and the terms of use were accurate. Thus, as a result of the purchase, PC members had paid to acquire the device, and suffered an unexpected loss of private data that was more than what was disclosed.

In an economic sense, PC members invested a certain amount of money on each unit contingent on the (privacy) promise.[55] The breach of this promise decreases the value of the purchase since the loss of control of the private

---

[55] At least in part. Discerning the specific empirical contributory value of the privacy attributes will be subject to the Conjoint Survey discussed in the prior section.



In re Google Assistant
Privacy Litigation
July 18, 2022

HIGHLY CONFIDENTIAL – Attorney's Eyes Only
Class Economic Damages Declaration
Page 26

information is irreversible and the device can no longer be relied upon in protecting privacy.

An accurate measure of the decrease in value would be what is known as Price Premium Damages — wherein consumers would receive the difference between the market value (purchase price) of the products (with the Challenged Claims or attributes) and the market value of the products (without the Challenged Claims or attributes), at the time and point of sale.

It is my understanding that the Price Premium calculation concerns only devices manufactured by Google and sold to consumers during the Class Period. I understand official volume and value data for sales of the various models of GHDs in the U.S. to date have not been produced to Plaintiffs so far. Only partial data on the number of devices sold along with the historical average prices consumer actually paid can be obtained from public sources, for instance from the NielsenIQ service, or other commercially available third-party databases that also aggregate retail scan data.[56] Precise figures as to the volumes sold and sales prices during the Class period, available via Google's business records, are necessary to calculate the exact total amount of Price Premium paid by the Purchaser Class.

With the price difference due to the Challenged Claims or attributes determined on a percentage basis, the calculation of class-wide damages for any Product will be:

*Damages = {percentage Price Premium} x {GHD $ Sales}*

---

[56] While such services may have gathered scan data from Walmart, Target, and BestBuy, I ███████████████████████████████████ GOOG-ASST-00017855; GOOG-ASST-00017861).

© IPmetrics, LLC – CONFIDENTIAL – Dissemination is subject to the Court's Protective Order



In re Google Assistant
Privacy Litigation
July 18, 2022

HIGHLY CONFIDENTIAL – Attorney's Eyes Only
Class Economic Damages Declaration
Page 27

I understand that the forthcoming Conjoint Survey will be able to measure the price premium attributable to the Challenged Claims or attributes. This will enable the calculation, using the formula above, to be performed on a class-wide basis, nationwide or across different geographies, and for any defined time period, provided the corresponding sales data is available from Google or elsewhere.

Although GHD product offerings vary in price (e.g., the retail price may decline as new versions/models are announced, and some devices may have been sold through special offers, promotions, or bundles), [57] the damages calculation utilizes a percentage of dollar sales and, as a result, does not require individualized adjustments to reflect the true extent of the economic damage.

In particular, due to the nature and attributes of the CBCA Survey methodology employed, the damages calculation utilizes inputs that distinguish the generalized role of privacy expectations. Thus, individual variations in expectations, or individual reasons for purchase, are irrelevant to the calculation method proffered.

As far as variations in the use of the devices are concerned, as analyzed, the damaging activations occur without the intended input of the user, and the calculations proposed are not affected by differences in the intended use.

---

[57] At their respective launches, GHD models range in price from $49 (Home mini, launched in October 2017) to $399 (Home max, launched in December 2017), including the original device at $129 (Google Home announced in May 2016). Sources: https://www.theverge.com/2017/10/4/16407344/google-home-mini-announced-price-release-date-smart-speaker; https://www.theverge.com/2017/10/4/16405218/new-google-home-mini-max-speakers-photos-video-hands-on; and https://techcrunch.com/2016/10/04/say-hello-to-google-home/, respectively.



In re Google Assistant
Privacy Litigation
July 18, 2022

HIGHLY CONFIDENTIAL – Attorney's Eyes Only
Class Economic Damages Declaration
Page 28

## C. Statutory Damages

I have been advised by Counsel for Plaintiffs that several federal and state statutes asserted by Plaintiffs provide for statutory damages. Damages associated with each statute can be calculated as follows:

### Federal Wiretap Act

I have been advised that the Federal Wiretap Act provides for statutory damages of $100 per day or $10,000, whichever is greater, based on unlawful interception. It is my understanding that only members of the Privacy Subclass would be seeking these statutory damages. Thus, the calculation of class-wide damages for the Privacy Subclass will be:

$$\text{Damages} = \$100 \times \{\text{days of violations}\}$$
$$\text{Or}$$
$$\$10,000$$

Counsel further advised that the Federal Wiretap Act provides for statutory damages for a separate violation based on the use and/or disclosure of the intercepted communication in the same amount, i.e., $100 per day or $10,000, whichever is greater. I was advised that both, the Use Subclass, and the Disclosure Subclass would be seeking these statutory damages. Thus, the calculation of class-wide damages for the Use and Disclosure Subclass will be:

$$\text{Damages} = \$100 \times \{\text{days of violations}\}$$
$$\text{Or}$$
$$\$10,000$$



In re Google Assistant
Privacy Litigation
July 18, 2022

HIGHLY CONFIDENTIAL – Attorney's Eyes Only
Class Economic Damages Declaration
Page 29

## Stored Communications Act

I have been advised that the Stored Communications Act provides for statutory damages of no less than $1,000 per violation. Further, I understand that only the Disclosure Subclass would be seeking these damages. Thus, the calculation of class-wide damages for the Disclosure Subclass will be:

$$\text{Damages} = \$1{,}000 \times \{\text{number of violations}\}$$

## California Invasion of Privacy Act

I have been advised that the California Invasion of Privacy Act provides for statutory damages of $5,000 for each violation or three times the actual damages. I further understand that only the Privacy Subclass would be seeking these damages. Thus, the calculation of class-wide damages for the Privacy Subclass will be:

$$\text{Damages} = \$5{,}000 \times \{\text{number of violations}\}$$

### D.  Nominal Damages

I was asked to assume that the Purchaser Class and each of the three Subclasses may seek nominal damages of certain set amounts for each of the alleged violations in the case. Thus, for example, the calculation of class-wide damages will be:

$$\text{Damages} = \{\$ \text{ nominal amount}\} \times \{\text{number of violations}\}$$

### E.  Defendants' Profits

Defendants' business model involves providing services to users in exchange for data on their characteristics they can monetize in various ways. This includes using data collected from users to develop products and services, which attract more users and thus result in more data being collected, as



In re Google Assistant
Privacy Litigation
July 18, 2022

HIGHLY CONFIDENTIAL – Attorney's Eyes Only
Class Economic Damages Declaration
Page 30

well as selling advertisers access to users that utilize Google services (e.g., Search, Gmail, YouTube).

One distinguishing characteristic of private or personal information in the context of Google's business model is that of scale or aggregation. Personal data although valuable individually, is especially valuable to Google in aggregate, where it can be used to develop software, build/maintain products, or offer targeted ads to a larger population. Google's business benefits from this sense of scale as the alleged activity provided Google with Speech Data that it would not have otherwise obtained and, thus, could not have monetized.

As a result, from an economic perspective, it is appropriate to measure Defendants' profits arising out of their practice of collecting and using Speech Data on an aggregate basis, rather than as the sum of individual harms to each individual Class member.

### **Advertising Revenue**

Moreover, as opposed to other sources of audio recordings for which Google has to acquire in the market, ████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████

Internally, ████████████████████████████████████████████████ ████████████████████████████[58]

---

[58] See, e.g., GOOG-ASST-03045635 and 3045642.



In re Google Assistant
Privacy Litigation
July 18, 2022

HIGHLY CONFIDENTIAL – Attorney's Eyes Only
Class Economic Damages Declaration
Page 31

a) ██████████████████████████████████████████████
██████████████████████████████████.

b) ████████████████████████████████████████████

c) ██████████████████████████████████████████████
████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████ From the limited
financial data in the discovery process at this point, the scale of these
synergies can be found in the following terms. ████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████ ██ ██ █████ ■ More indirectly, ████████ ██████████
███████████████████████████████████████████████████

███████████████████████████████████████████████████

The partial nature off this allocation of revenue serves to indicate that
█████ ██████ ██ ████ ██ █████ ████ ██ ███ ██ ████ █
███████████████████████████████████████████████████

██████████████████████████

Further, since inception, ████████████████████████████████████
█████ ██████ ████ ██████ █████ ██████ ████ ██████ ████████
██████ █████ ████ █████ ██████████ [62] The following table shows the

---

[59] ██████████████████████████████ GOOG-ASST-03045646.
[60] ██████████████████████████████████████████████
[61] Reported as $13.06 billion in the Alphabet 2021 10K, p 33.
[62] ████████████████████████████████████████████████████
████████ (GOOG-ASST-03045668).



In re Google Assistant
Privacy Litigation
July 18, 2022

HIGHLY CONFIDENTIAL – Attorney's Eyes Only
Class Economic Damages Declaration
Page 32



As an approximation to the level of profit expectations consistent with the above investments, I calculated the most recent margin for Alphabet Inc., which generated Net Income (after tax) equivalent to ▮▮▮▮ of total costs and expenses of the holding company in 2021.[64] ▮▮▮▮▮▮▮▮▮▮

In principle, a portion of these profits is attributable to the use of the audio recordings at issue in this case. Sufficient data has not been made available to Plaintiffs, so as to accurately measure the proportion of those audio recordings in the total corpus of the Assistant data logs, nor to quantify the

---

[63] GOOG-ASST-03045667.
[64] See Alphabet 2022 10K, p 50.  Net Income of $76.03 billion and Total Costs and Expenses of $176.24 billion.
[65] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.



HIGHLY CONFIDENTIAL – Attorney's Eyes Only
Class Economic Damages Declaration
Page 33

amount of advertising revenue attributable.[66] Assuming, *arguendo*, that such proportion may be found to range between ████████ the following table shows the corresponding profit amount attributable to the Class, applying the calculation illustrated in the preceding paragraph.



As the table shows, this preliminary calculation yields a class damage amount in the form of Defendants' Profits in the range between ████████ ████████████████

### Market Value of Speech Data

Google directly benefited from capturing private information in audio recordings. Documents available to date, ████████████████████ ████████████████████████

---

[66]  I understand that the data relevant to this analysis is the subject of a dispute among the parties that is currently being litigated.

© IPmetrics, LLC – CONFIDENTIAL – Dissemination is subject to the Court's Protective Order



In re Google Assistant
Privacy Litigation
July 18, 2022

HIGHLY CONFIDENTIAL – Attorney's Eyes Only
Class Economic Damages Declaration
Page 34

███████████████████████████████████████████████████████.[67] By capturing additional Speech Data from Plaintiffs and Class members without consent for free, Google avoided the cost of this Speech Data and thus, directly enhanced its profits.

The market value of the Speech Data acquired from Plaintiffs and Class members, and resulting benefit to Google, can be ascertained from data that reflects the retail price of Speech Data sold by commercial entities. In fact, based on testimony offered by Google, ████████████████████████████████████████████████████████████████.[68] Based on Counsel's representation, ████████████████████████████████████████████ Alternatively, the retail price of Speech Data can be ascertained form available services, ████████████████████████████████████████████████ if not available, from comparable third-party sources which sell or utilize such Speech Data.

To assess this value, it is necessary to derive suitable estimates of the quantity of Speech Data gathered from False Accepts of the Assistant, which represents audio not intended for Google, as well as estimates of the corresponding market price.[69]

████████████████████████████████████████████████████████████████████
███████████████.[70] From documents so far available through discovery, ███
████████████████████████████████████████████████████████████

---

[67] GOOG-ASST-00032096.
[68] Deposition Testimony of Dr. Francoise Beaufays (4/22/2022) at p 266, Li. 15-22.
[69] In terms of recording time, the only information available presently is ████████████████████████████
[70] E.g., Beaufays' deposition at p. 107 li. 24, to p. 108 li. 18.

© IPmetrics, LLC – CONFIDENTIAL – Dissemination is subject to the Court's Protective Order



In re Google Assistant
Privacy Litigation
July 18, 2022

HIGHLY CONFIDENTIAL – Attorney's Eyes Only
Class Economic Damages Declaration
Page 35

█████████████████████████████████████████.[71] At the present stage of discovery, the documentation produced by Google to Plaintiffs ████████████ ████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████.

To estimate the market price per utterance that can represent Google's profit from avoiding the cost of logged audio from False Accepts, which is captured freely from Class members, I used ███████████████████████████ ████████████████████████████████████████████████████████ ███████████████████████████████████████ ██ ███████████████ ████████████████████████████████████████████████.

These two ranges, combined in the following formulation, provide a preliminary estimate of the cost avoided in 2019. As such this amount of profit is not duplicative of Defendants' Profits previously calculated.

The calculation formulation is as follows:

$$\{Avoided\ Cost\} = \{Utterances\ logged\text{-}2019\} \times \{\%\ False\ Accepts\} \times \{Unit\ Cost\}$$

The following is a sensitivity table ████████████████████████████ ████████████████████████████████████████████████████████ █████████████████████████████████████████.

---

[71] GOOG-ASST-00023588.

[72] ████████████████████████████████████████████ e.g., GOOG-ASST-02990630-1; 00255944-6; 00029845; and 00235040.

[73] ███████████████████████████████████████████████████ E.g., GOOG-ASST-00026789. ████████████████████████

[74] ████████████████████████ (GOOG-ASST-0023604).



In re Google Assistant
Privacy Litigation
July 18, 2022

HIGHLY CONFIDENTIAL – Attorney's Eyes Only
Class Economic Damages Declaration
Page 36



The tabulated results indicate, e.g., ███████████████████████
████████████████████████████████████████████████
██████████████████ These estimates will be made more precise
and encompass the full Damages Period as the corresponding document
production from Google is available for consideration.

## 6. SUMMARY AND CONCLUSIONS

As analyzed conceptually and practically in the preceding sections, the
misappropriated private data is a measurable economic good. The economic
damage is endogenous to how Google uses Class members' audio recordings
to generate targeting outcomes and additional revenue streams. It does not
simply reflect what could be deemed consumers' reticence to share
(measurable empirically), but how the (aggregate) data thus captured is used.

---

[75] ███████████████████████████████████████████████ (GOOG-
ASST-00023588.



These economic damages are reflected in the benefit the defendant receives from not fully paying the class members for the additional, privacy-infringing voice data captured and undermining the real value of the Google Home devices to the Class members.

## A. Breach of Contract Damages

Breach of Contract damages are the appropriate measure of damages for the situation at hand. The specific measure is that of benefit of the bargain Damages, which arise as the consumer invests money in purchasing the Google Home Devices at a price incorporating the Google Assistant provider's privacy-preserving promise. Breach of this contract usually dilutes or even destroys the value of the investment and makes Class members worse off than if they had not made the purchase.[76] The measure of damages that places Class members in the economic position that they would have been in if they had never purchased the Google Home devices is a Price Premium.

The applicable Price Premium can be determined from a Choice Based Conjoint Survey, which will identify the additional price that consumers paid based on expectations created by Google's claims of certain product attributes, differentiating the other factors involved in the transaction.

Conjoint Analysis of survey data is a reliable and well-accepted economic method of measuring the monetary premium consumers are willing to pay based on products' label or other perceived attributes.

---

[76] Cooter, Robert and Ulen, Thomas, "Law and Economics, 6th edition" (2016). *Berkeley Law Books.* Book 2, p 311 (http://scholarship.law.berkeley.edu/books/2).



In re Google Assistant
Privacy Litigation
July 18, 2022

HIGHLY CONFIDENTIAL – Attorney's Eyes Only
Class Economic Damages Declaration
Page 38

## B.  Statutory Damages

I understand from Counsel that a number of state and federal statutes provide for statutory damages which may be applicable to all affected Plaintiffs and Class members uniformly.

Specifically, I understand that the Federal Wiretap Act ("FWA") may be applicable based on the alleged unlawful interception and that members of the Privacy Subclass may seek such statutory damages. Further, I understand the FWA provides for distinct statutory damages for the use and/or disclosure of the intercepted communications. I am advised by Counsel that the Use Subclass and the Disclosure Subclass would be seeking these statutory damages.

Moreover, I understand the Disclosure Class would be seeking statutory damages as provided for by the Stored Communications Act ("SCA"). Finally, the Privacy Subclass would be seeking statutory damages provided for by the California Invasion of Privacy Act ("CIPA").

## C.  Nominal Damages

I was asked to assume that the Purchaser Class and each of the three Subclasses may seek nominal damages of certain set amounts for each of the alleged violations in the case. The necessary calculation on a class-wide basis is straightforward once the amount is set.

## D.  Defendants' Profits

For Defendants, profits are both the motivation for releasing products that do not perform as promised and a measure of the ultimate benefit derived from gathering data resulting from the False Accepts.



In re Google Assistant
Privacy Litigation
July 18, 2022

HIGHLY CONFIDENTIAL – Attorney's Eyes Only
Class Economic Damages Declaration
Page 39

As discussed in the corresponding section, the Class damages amount in the form of Defendants' Profits are currently estimated as being in the range between ███████████████████████████████████████

By avoiding the market cost of capturing audio recordings, Google may have additionally profited in an amount which, presently, can only be estimated in a broad range, ████████████████████████ and this only for the year 2019.

The various types of damages and the applicable Classes and Subclasses to which they apply are summarized in the following table.



In re Google Assistant
Privacy Litigation
July 18, 2022

HIGHLY CONFIDENTIAL – Attorney's Eyes Only
Class Economic Damages Declaration
Page 40

**Table 5**
**Summary Damages Conclusions**

| Category | Purchaser Class | Privacy Class | Privacy Use Subclass | Privacy Disclosure Subclass | SCA Class |
|---|---|---|---|---|---|
| Breach of Contract: Price Premium | ✓ | | | | |
| Statutory Damages: Federal Wiretap Act (Interception) | | ✓ | | | |
| Statutory Damages: Federal Wiretap Act (Use/Disclosure) | | | ✓ | ✓ | |
| Statutory Damages: Stored Communications Act | | | | ✓ | ✓ |
| Defendant's Profits | | ✓ | ✓ | ✓ | |
| Nominal Damages | ✓ | ✓ | ✓ | ✓ | ✓ |

HIGHLY CONFIDENTIAL – Attorney's Eyes Only
Class Economic Damages Declaration
Page 41



The foregoing analysis is reliant on the current state of discovery in the case at hand. In particular, updated financial information may be forthcoming before trial, and I anticipate updating my calculation and opinions. In this context, I proffer these opinions with a reasonable degree of professional certainty. In addition to my testimony at trial, I expect to rely on exhibits prepared to depict and explain the information contained in this analysis or as a rebuttal to testimony by other witnesses. Any such exhibits will be prepared and identified in advance of trial.

Fernando Torres
Chief Economist,
IPmetrics LLC



In re Google Assistant
Privacy Litigation
July 18, 2022

HIGHLY CONFIDENTIAL – Attorney's Eyes Only
Class Economic Damages Declaration
Page 42

# APPENDICES

© IPmetrics, LLC – CONFIDENTIAL – Dissemination is subject to the Court's Protective Order



In re Google Assistant
Privacy Litigation
July 18, 2022

HIGHLY CONFIDENTIAL – Attorney's Eyes Only
Class Economic Damages Declaration
Page 43

# APPENDIX A

## Qualifications of Fernando Torres, MSc

Fernando Torres is an intellectual property economist with 30 years of work experience in economics, financial analysis, and business management in the U.S. and Mexico. He is a member and Chief Economist at IPmetrics LLC, an IP consulting firm specializing in the strategic analysis, valuation, and expert witness assessment of the full spectrum of intangible assets.

Since 2005, Mr. Torres has applied his economics, finance, and business experience, as well as skills in quantitative techniques, to the analysis and valuation of intangible assets, including valuation for transactional and litigation purposes (bankruptcy and infringement cases). Prior to joining IPmetrics in 2010, Mr. Torres served as Senior Economist at CONSOR® Intellectual Asset Management.

During recent years, Mr. Torres has undertaken projects involving the valuation and/or the assessment of infringement damages regarding copyrights, trademarks, patents, trade secrets, rights of publicity, and other intellectual assets in such industries as commercial agriculture, auto parts, apparel and footwear, retail, pharmaceuticals, entertainment, telecommunications, and non-profit organizations, among others.

Mr. Torres regularly presents on topics related to intangible asset valuation in a variety of venues, many of which qualify for CLE credit. During the past few years, Mr. Torres has been an instructor for the course "Valuing Intangible Assets for Litigation," which is part of the requirements of the Certified Forensic Financial Analyst designation issued by the National Association of Certified Valuation Analysts ("NACVA").

In re Google Assistant
Privacy Litigation
July 18, 2022

HIGHLY CONFIDENTIAL – Attorney's Eyes Only
Class Economic Damages Declaration
Page 44



Mr. Torres has been particularly active in the area of the copyright and rights of publicity infringement issues, encompassing from the unlicensed use of celebrity images to a class action lawsuit against the major social networking site.

Mr. Torres is also the editor and author of the online Patent Value Guide and his perspectives on the value of patents and other intellectual property assets have been cited in the media, including Managing Intellectual Property, The New York Times, Forbes.com, Business News Network, Business Valuation Resources, and The Democrat & Chronicle.

Mr. Torres is a member of the National Association of Forensic Economics, and of the Western Economics Association International, among others. His career has spanned from academia, to branches of government, to private industry and consulting.

He first earned a B.A. in Economics from the Metropolitan University in Mexico City (1980) and went on to earn a Graduate Diploma in Economics from the University of East Anglia (U. K., 1981), and a Master of Science Degree specializing in Econometrics from the University of London, England (1982).

Prior to specializing in IP, his career centered on financial analysis and management in the private sector, having been both a brand development consultant and an entrepreneur in several business ventures, mainly in computer services and the health care industry. During the 1980s, Mr. Torres was Professor of Economics at the Metropolitan University in Mexico City, teaching Economic Policy, Economic Growth, Microeconomics, and Quantitative Methods. Mr. Torres was later a financial consultant (NASD Series 7, 63, 65) for half a dozen years with AXA Advisors LLC.

© IPmetrics, LLC – CONFIDENTIAL – Dissemination is subject to the Court's Protective Order



In re Google Assistant
Privacy Litigation
July 18, 2022

HIGHLY CONFIDENTIAL – Attorney's Eyes Only
Class Economic Damages Declaration
Page 45

**PROFESSIONAL ASSOCIATIONS**

- National Association of Forensic Economics
- American Economic Association
- International Trademark Association
- Western Economics Association International

**SPEECHES AND PRESENTATIONS** *(past 10 years)*

- "Topics on Technology & Innovation" Session Chair, Western Economics Association International 82nd Annual Conference – San Diego, CA; June 2017

- "Discussion: Benchmarking Against Industry Data Over Time," Western Conference of the National Association of Forensic Economics; San Diego, CA; June 2017

- "Bitcoin: What it is and what it can be." The 1230 Club, La Jolla, CA, June 29, 2016

- "Valuing Intangibles: From Search to Valuation" CPE webinar, Business Valuation Resources Inc., April 2016.

- "What is a Brand Worth?" MCLE webinar, The State Bar of California, Trademark Interest Group, March 2015.

- "Intellectual Property Valuation Techniques," CLE presentation to Pillsbury Winthrop Shaw Pittman LLP, San Diego, CA, August 2014

- "10 Common Mistakes in IP Valuation/Damages," CLE presentation to Jeffer Mangels Butler & Mitchell LLP, Los Angeles, CA, July 2014.

- "Intellectual Property Valuation Techniques," MCLE presentation, San Diego, CA, April 2013

- "Intellectual Property Valuation and Monetization," a seminar for the Special American Business Internship Training (SABIT) Intellectual Property Rights program, U.S. Department of Commerce. March 2013.

- "Recent Developments in Intellectual Property Economic Damages," Presentation at the Annual Conference of the National Association of Forensic Economics. June 2011.

**PUBLICATIONS** *(Past 10 years)*

- "Options Approach to Licensing Royalties" in: LinkedIn.com, September 3, 2019.

- "IP Value in Bankruptcy" in LinkedIn.com, August 27, 2019.

- "Why only some patents are valuable" in: IPmetrics Blog, (May 13, 2015).

- "General Principle I – Lack of Intrinsic Value" in: PatentValueGuide.com, (February 11, 2013).

- "General Principle II – Patent Use is Key to Value" in: PatentValueGuide.com, (February 8, 2013).



- "Conceptual Patent Value Framework" in: <u>PatentValueGuide.com</u>, (January 31, 2013).

- "The Impact of Reorganization on Trademark Values," in: <u>IP Management and Valuation Reporter</u>, March 2012, BVR, Portland, OR.

- "Fundamental Principles of Patent Value," in: <u>IP Management and Valuation Reporter</u>, January 2012, BVR, Portland, OR.



In re Google Assistant
Privacy Litigation
July 18, 2022

HIGHLY CONFIDENTIAL – Attorney's Eyes Only
Class Economic Damages Declaration
Page 47

# APPENDIX B

## LITIGATION-RELATED EXPERIENCE OF FERNANDO TORRES, MSc.

*(Past 4 years)*

| Date Range | Parties | Case No. | Court | Status | Nature | Hired by | Involvement |
|---|---|---|---|---|---|---|---|
| Jan – Mar 2018 | C. Gainer v. **Ketchum Group dba Outdoor Technology** | 17-cv-672 | United States District Court Central District of California | *Settled* | Copyright Infringement | The Kneafsey Firm, Inc. | Expert Damages Report |
| August – Sept. 2018 | **Atelier Fashion Company, Inc.** V. Amiri And Associates, et al. | 18-cv-02308 | United States District Court Central District of California | *Settled* | Trademark Infringement | Miller Barondess, LLP | Expert Damages Report |
| Sept – Dec 2018 | **Xat.com v.** Hosting services, Inc. | 16-cv-00092 | United States District Court District of Utah | *Settled* | Contract / data breach / lost profits | Stoel Rives LLP | Expert Damages Report |
| June 2016 - Sept 2019 | **Direct Sound Headphones, LLC v.** Kevin Klug | 16SL-CC0486 | Circ. Ct. Of St. Louis County, Missouri | *Settled* | Legal Malpractice (Trademark) | The Simon Law Firm, PC / Dowd & Dowd, PC | Expert Damages Report, Deposition |
| March – May 2019 | **TEETER-TOTTER, LLC v.** Palm Bay International, Inc. | 5:17-Cv-06609 | US District Court for the Northern District of California | *Settled* | Trademark Infringement | Dickenson, Peatman & Fogarty LLP | Expert Damages Report |
| May – July 2019 | **JK Products LLC** v. Lathrop & Gage LLP, JL Johnson Esq. | 1731-CC01189 | Circuit Court of Greene County State of Missouri | Settled | Legal Malpractice (Patent) | The Simon Law Firm, PC / Dowd & Dowd, PC | Expert Damages Report |
| May – July 2019 | **Evolve Technologies** v CWS Inc. | 18-cv-00671 | US District Court for the Southern District of California | Settled | Patent Infringement | Patterson + Sheridan LLP | Expert Damages Report |
| July – Aug 2019 | **Happy Place, Inc.** v. Hofesh, LLC, et al. | 18-cv-06915 | US District Court for the Central District of California | Settled | Trademark Infringement | Pessah Law Group | Mediation Expert Damages Report |
| Sept. 2019 | **Triumphant Gold Ltd.** in: Re: Rooftop Group International. Pte. Ltd. | 19-31443-HDH11 | US Bankruptcy Court for the Northern District of Texas | Settled | IP Valuation | Hedrick Kring, PLLC | Declaration in Support of Opposition of Sale |
| Nov-Dec. 2019 | **JaM Cellars, Inc.** vs. **The Wine Group LLC** | 19-cv-1878 | US District Court for the Northern District of California | Settled | Trademark Infringement | Dickenson, Peatman & Fogarty LLP | Expert Damages Report |



In re Google Assistant
Privacy Litigation
July 18, 2022

HIGHLY CONFIDENTIAL – Attorney's Eyes Only
Class Economic Damages Declaration
Page 48

| Date Range | Parties | Case No. | Court | Status | Nature | Hired by | Involvement |
|---|---|---|---|---|---|---|---|
| Oct 2019 – February 2020 | **Hotel Airport International et al v. Best Western International Inc** | 19-cv-01393 | US District Court for the District of Arizona | Settled | Trademark Infringement | Godreau & Gonzalez Law, LLC | Expert Damages Report, Deposition |
| Dec 2019 – September 2020 | **The Coin-Tainer Company LLC** v. Pap-R Products Co. et al. | 3:19-cv-00234 | US District Court for the Southern District of Illinois | Closed | Trademark, Trade Dress, Contract Breach | Trepanier MacGillis Battina P.A. | Expert Damages Report, Deposition |
| Aug 2020 – | Kitsch LLC, vs. **DEEJAYZOO, LLC** | 19-cv-02556 | US District Court for the Central District of California | Pending | Utility, Design Patents; Trademark Infringement | Jayaram Law, Inc. | Expert Damages Report, Deposition |
| April 2020– | **RG Golf Warehouse Inc.** vs. The Golf Warehouse, Inc. | 19-CV-0585 | US District Court for the District of Minnesota | Pending | Breach of Contract | Trepanier MacGillis Battina P.A. | Expert Damages Report, Deposition |
| Dec 2020 – March 2021 | **Snik LLC,** vs Samsung Electronics, et al. | 19-cv-387 | US District Court for the Eastern District of Texas | Settled | Patent Infringement | Kyle Harris LLP | Expert Damages Report |
| July – Dec. 2021 | **Reflex Media, Inc., and Clover8 Investments Pte. Ltd.** v. Luxy Limited | 20-cv-423 | US District Court for the Central District of California | Settled | Trademark & Copyright Infringement | SF Firm, LLP | Expert Damages Report |
| March 2021 – | L.A. Oliver vs **Meow Wolf et al.** | 20-cv-00237 | US District Court for the District of New Mexico | *Pending* | Copyright Infringement & Breach of Contract | Bardacke | Allison, LLP | Expert Damages Reports, Deposition |



In re Google Assistant      HIGHLY CONFIDENTIAL – Attorney's Eyes Only
Privacy Litigation       Class Economic Damages Declaration
July 18, 2022              Page 49

# APPENDIX C

# DOCUMENTS AND SOURCES RELIED UPON

In the course of preparing this Declaration, I relied upon the following list of principal documents and sources, as well as the documents and sources cited in the body of the Declaration, including the footnote references.

1) Case Documents
   a. Fourth Amended Consolidated Class Action Complaint, in case 5:19-cv-04286-BLF, before the USDC for the Northern District of California ("FAC").
   b. Stipulated Protective Order in Case No. 5;19-cv-04286-BLF
   c. Deposition of Francoise Beaufays taken April 26, 2022
2) Documents Produced by Defendants
   a. GOOG-ASST- Bates-stamp documents:
   _____  _____  _____

| | | |
|---|---|---|
| GOOG-ASST-00001436 | GOOG-ASST-03045635 | GOOG-ASST-00251880 |
| GOOG-ASST-00008511 | GOOG-ASST-03045642 | GOOG-ASST-00255310 |
| GOOG-ASST-00012313 | GOOG-ASST-00002125 | GOOG-ASST-00231206 |
| GOOG-ASST-00240781-240824 | GOOG-ASST-00002218 | GOOG-ASST-00026888 |
| GOOG-ASST-00242571-242611 | GOOG-ASST-00235006 | GOOG-ASST-00023584 |
| | GOOG-ASST-03005475 | GOOG-ASST-00026888 |
| GOOG-ASST-00241229-241304 | GOOG-ASST-00226604 | GOOG-ASST-00026929 |
| GOOG-ASST-00243637-243880 | GOOG-ASST-00017854- | GOOG-ASST-00032304 |
| | GOOG-ASST-00224203- | GOOG-ASST-00032350 |
| GOOG-ASST-00240858-240915 | GOOG-ASST-00226349- | GOOG-ASST-00032356 |
| GOOG-ASST-00244500-244507 | GOOG-ASST-00241815- | GOOG-ASST-00032360 |
| | GOOG-ASST-00002700 | GOOG-ASST-00032690 |
| GOOG-ASST-00242719-242969 | GOOG-ASST-00240781 | GOOG-ASST-00227772 |
| | GOOG-ASST-00240858 | GOOG-ASST-00002296 |
| GOOG-ASST-00241907-242155 | GOOG-ASST-00241229 | GOOG-ASST-00002312 |
| | GOOG-ASST-00241907 | GOOG-ASST-00002419 |
| GOOG-ASST-00017855 | GOOG-ASST-00242719 | GOOG-ASST-00002443 |
| GOOG-ASST-00017861 | GOOG-ASST-00243637 | GOOG-ASST-00022753 |
| GOOG-ASST-00032096 | GOOG-ASST-03045589 | GOOG-ASST-00027319 |
| GOOG-ASST-00032102 | GOOG-ASST-03045605 | GOOG-ASST-00029845 |
| GOOG-ASST-32104-32110 | GOOG-ASST-03045622 | GOOG-ASST-00032089 |
| | GOOG-ASST-03045632 | GOOG-ASST-00255944 |
| | GOOG-ASST-03045664 | GOOG-ASST-02990630 |
| | GOOG-ASST-00250274 | |
| | GOOG-ASST-00250923 | |



In re Google Assistant       HIGHLY CONFIDENTIAL – Attorney's Eyes Only
Privacy Litigation           Class Economic Damages Declaration
July 18, 2022                    Page 50

| **Invoices:** | **Vendor Contracts** | |
|---|---|---|
| GOOG-ASST-00250923 | GOOG-ASST-00026694 | GOOG-ASST-00252569 |
| GOOG-ASST-00251031 | GOOG-ASST-00026788 | GOOG-ASST-00252599 |
| GOOG-ASST-00251041 | GOOG-ASST-00026929 | GOOG-ASST-00252629 |
| GOOG-ASST-00251236 | GOOG-ASST-00026964 | GOOG-ASST-00252673 |
| GOOG-ASST-00251238 | GOOG-ASST-00027000 | GOOG-ASST-00252710 |
| GOOG-ASST-00251268 | GOOG-ASST-00027037 | GOOG-ASST-00253228 |
| GOOG-ASST-00251618 | GOOG-ASST-00032304 | GOOG-ASST-00253277 |
| GOOG-ASST-00251640 | GOOG-ASST-00032350 | GOOG-ASST-00253327 |
| GOOG-ASST-00251916 | GOOG-ASST-00032356 | GOOG-ASST-00254275 |
| GOOG-ASST-00252018 | GOOG-ASST-00032360 | GOOG-ASST-00254495 |
| GOOG-ASST-00253807 | GOOG-ASST-00032510 | GOOG-ASST-00254656 |
| GOOG-ASST-00253854 | GOOG-ASST-00032552 | GOOG-ASST-00254728 |
| GOOG-ASST-00253862 | GOOG-ASST-00032687 | GOOG-ASST-00254787 |
| GOOG-ASST-00253876 | GOOG-ASST-00032690 | |
| GOOG-ASST-00253994 | GOOG-ASST-00032741 | **Spreadsheet files** |
| GOOG-ASST-00254305 | GOOG-ASST-00032745 | GOOG-ASST-00001875.XLSX |
| GOOG-ASST-00254322 | GOOG-ASST-00032920 | GOOG-ASST-03045688.XLSX |
| GOOG-ASST-00254775 | GOOG-ASST-00251966 | GOOG-ASST-03045689.XLSX |
| GOOG-ASST-00254844 | GOOG-ASST-00251973 | |
| | GOOG-ASST-00252071 | |
| | GOOG-ASST-00252108 | |

_____  _____  _____

3)   Other documents or sources

a.   A, Acquisti, L.K. John, and G. Lowenstein. "What is Privacy Worth?" Journal of Legal Studies 42, no. 2 (June 2013): 249-274.

b.   Acquisti, A. et al, "The Economics of Privacy," Journal of Economic Literature, 2016, 54(2), 442–492 (http://dx.doi.org/10.1257/jel.54.2.442).

c.   Alphabet Inc.'s SEC Form 10-K Report for the fiscal year ended December 31, 2021 ("Alphabet 2022 10K").

d.   Alphabet Inc.'s SEC Form 10-K Report for the fiscal year ended December 31, 2020 ("Alphabet 2021 10K").

e.   Cooter, Robert and Ulen, Thomas, "Law and Economics, 6th edition" (2016). Berkeley Law Books. Book 2, p 311 (http://scholarship.law.berkeley.edu/books/2).

f.   Jehle, G.A. and Reny, P.J., Advanced Microeconomic Theory, 3rd Ed., FT Prentice Hall, 2011, pp 4-13.

g.   Paul E. Green and Vithala R. Rao: "Conjoint measurement for quantifying judgmental data," Journal of Marketing Research, 8, 355–363.

h.   Posner, R. A., 1981. "The Economics of Privacy." American Economic Review, 71(2), 405–409.

i.   Posner, Richard A., "The Right of Privacy" (1978). Georgia Law Review, 12(3), 393–422. https://digitalcommons.law.uga.edu/lectures_pre_arch_lectures_sibley/22.



In re Google Assistant
Privacy Litigation
July 18, 2022

HIGHLY CONFIDENTIAL – Attorney's Eyes Only
Class Economic Damages Declaration
Page 51

j.  Tesary Lin, "Valuing Intrinsic and Instrumental Preferences for Privacy."  Boston University Questrom School of Business SSRN-id3406412 (March 5, 2021).

k.  E. Ricart-Costa, J., Subirana, B., Valor-Sabatier, J. (2004). Proprietary Content Providers: Aggregators (Portals). In: Sources of Information Value. Palgrave Macmillan, London. https://doi.org/10.1057/9780230512948_7

l.  Vithala R. Rao "Applied Conjoint Analysis," Springer, 2014

m.  Online documents

    i.  https://assistant.google.com/.

    ii.  https://cloud.google.com/speech-to-text.

    iii.  adsonair.withgoogle.com/events/google-marketing-live-2022/watch?talk=get-the-playbook-to-privacy-success

    iv.  https://techcrunch.com/2016/10/04/say-hello-to-google-home/, respectively.

    v.  https://voice.google.com/about.

    vi.  https://www.theverge.com/2017/10/4/16405218/new-google-home-mini-max-speakers-photos-video-hands-on

    vii.  https://www.theverge.com/2017/10/4/16407344/google-home-mini-announced-price-release-date-smart-speaker

    viii.  Search Engine: https://scholar.google.com/



In re Google Assistant
Privacy Litigation
July 18, 2022

HIGHLY CONFIDENTIAL – Attorney's Eyes Only
Class Economic Damages Declaration
Page 52

# APPENDIX D

# COMPENSATION

IPMETRICS provides consulting services in connection with litigation support projects on a time and materials basis, and bills clients based on the number of hours worked. We have agreed to provide all work relating to this engagement according to the following rate schedule:

- Document Review, Research, Analysis & Report Writing     $450 / hour
- Deposition and Trial Testimony/Preparation                        $450 / hour
- Non-working Travel                                                              $175 / hour
- Administrative Support                                                        $125 / hour

IPmetrics' compensation is not dependent, in any way, upon the conclusions reached during the performance of the analysis.