1     UNITED STATES DISTRICT COURT

2    NORTHERN DISTRICT OF CALIFORNIA

3 Before The Honorable Susan van Keulen, Magistrate Judge

4

5 IN RE: GOOGLE ASSISTANT  ) No. C 19-04286-BLF
 PRIVACY LITIGATION   )
6 _____)

7

8         San Jose, California
         Thursday, October 20, 2022

9

 _TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND_
10   _RECORDING 1:34 - 3:19 = 105 MINUTES_

11 _APPEARANCES_:

12 For Plaintiffs:

13        Lowey Dannenberg, P.C.
         44 South Broadway, Suite 1100
14        White Plains, New York 10601
         (514) 557-6500
15     BY: MARGARET MACLEAN, ESQ.

16 For Defendants:

17        Perkins Coie, LLP
         505 Howard Street, Suite 1000
18        San Francisco, California
         94105
     BY: SUNITA BALI, ESQ.
19

20 Transcribed by:    Echo Reporting, Inc.
         Contracted Court Reporter/
21        Transcriber
         echoreporting@yahoo.com
22

23

24

25

2

1  <u>Thursday, October 20, 2022</u>                              <u>1:34 p.m.</u>

2                    P-R-O-C-E-E-D-I-N-G-S

3                         --oOo--

4        THE CLERK:  This is a sealed hearing in Case

5  Number 19-CV-4286, In Re: Google Assistant Privacy

6  Litigation.

7     Counsel, please identify yourself for the record,

8  beginning with Plaintiff.

9        MS. MACLEAN (via Zoom):  Good afternoon, your

10 Honor.  I'm Margaret MacLean for the Plaintiffs.

11       THE COURT:  Ms. MacLean, hello.

12       MS. BALI (via Zoom):  Good afternoon, your Honor.

13 Sunita Bali for Defendants.

14       THE COURT:  Ms. Bali, hello.

15    All right.  And, Ms. MacLean, who do you have with you

16 who may be speaking today, please?

17       MS. MACLEAN:  We have our experts, which are Mary

18 Beth Landrum and Bennett Erickson.

19       THE COURT:  Ms. Landrum and Mr. Erickson, if you'd

20 turn on your cameras for a moment, please, that would be

21 helpful.

22    Hello, hello, good.  Welcome.  Thank you for being

23 hear.  Can you hear me okay?  All right.  Unmute yourselves

24 for just a moment and give me a sound check on you as well.

25 There we go.  Ms. Landrum?

3

1            DR. LANDRUM (via Zoom):  Hi.  Can you hear me?

2            THE COURT:  I can.  Thank you.

3            Mr. Erickson?

4            MR. ERICKSON (via Zoom):  Hi.  Can you hear me?

5            THE COURT:  I can indeed.  Thank you very much.

6     You're welcome to stay on screen or you can turn off

7  your videos if you like.  I'm -- I appreciate you being

8  here.  Thank you.

9      And, Ms. Bali, from your side, please?

10            MS. BALI:  Good afternoon, your Honor.  I have

11  with me Doctor Jonathan Borck, who's our expert on

12  statistics, and I also have --

13            THE COURT:  Mr. Borck, hello.  Thank you for being

14  here.

15            DR. BORCK (via Zoom):  Good afternoon, your Honor.

16            MS. BALI:  And I also have Doctor Francoise

17  Beaufays, who is a scientist with Google.

18            THE COURT:  All right.  And if I can get Beaufays

19  to turn on screen, please, so I can get eyes on.

20            DR. BEAUFAYS (via Zoom):  I am trying to do so,

21  but I'm not sure how to.

22            THE COURT:  There should be a camera.  All right.

23  Ms. Beaufays, can you hear me all right?

24            MS. BEAUFAYS:  I can hear you.

25            THE COURT:  Okay.  All right.  That's fine.

4

1       And, Ms. Bali, maybe you can have either someone assist
2  Ms. Beaufays or send her some instructions.  I'm not quite
3  sure what exactly she's looking at.

4       All right.  Thank you all for being here.  We're on
5  today for the third hearing on this issue, which is the
6  scope of production of certain data by Google.  This dispute
7  arose back at Docket 240 where Plaintiff moved to compel
8  production of information.  And, of course, we had a number
9  of discussions and argument around that.  That led to my
10 order at Docket 278 following, I believe, our second
11 hearing.

12      At that hearing, we had looked at -- Plaintiff had
13 submitted and also displayed, and we discussed certain
14 speech logs that reflected queries, text of queries, whether
15 or not queries were sent to human reviewers, did not on its
16 face identify or have a field for false excepts, but we --
17 we worked our way through that.  That led to my -- again, my
18 order at 278, which directed sampling, and I have sent the
19 parties away to develop a sampling plan without success,
20 which brings us here today.

21      I said in my order that the sample may exclude -- it
22 was not an exclusive list, but I reflected possible false
23 excepts, the transfer of possible false excepts to human
24 reviewers, and I have skipped utterances on there, and you
25 have to remind me what skipped utterance is, where they

5

1  fall, because I did not have a chance to go back and listen

2  to our transcript.  I'm just looking at my notes.

3      Ms. MacLean, let me just hear from you.  I don't really

4  need to hear argument.  I just need to be caught up, but I

5  will hear from both sides.  False -- excuse me -- skipped

6  utterances, refresh my recollection.

7          MS. MACLEAN:  Sure.  A skipped utterance is when a

8  human reviewer listens to a given recording and determines

9  that it was not appropriate for Google or not intended for

10 Google, and so it had skipped.

11         THE COURT:  That's right.

12     Does that comport with your understanding, Ms. Bali?

13         MS. BALI:  Largely, with one nuance, that, you

14 know, an utterance could be skipped for a variety of

15 reasons, only one of which is that the reviewer thinks that

16 the utterance was not intended for Google, but there could

17 be other -- several other reasons why the reviewer might

18 skip an utterance.

19         THE COURT:  Okay.  I do recall that.  Okay.

20 That's helpful.  Thank you.  Just update my note here.

21     Okay.  So, that -- following my order 278, that then

22 led to the parties' efforts, such as they were, as I said.

23 I received the joint status report at Docket 311.  I went

24 through that.  You saw my follow-up order setting the

25 parameters for today.

1    So, I did receive the parties' separate and I think

2    fair to say vastly different proposals from last night, and

3    I have been through those, and I always go back and do

4    exactly what I've just done over the last couple of minutes,

5    which is to review the context, how we got here, what we're

6    looking for, and what the objective is, and I also looked

7    carefully at any instructions I may have given the parties.

8    And here, where we are today and what we're going to do

9    today is come up with a proposal, and both sides, Plaintiffs

10   and Defendants, are going to have to move substantially off

11   of their current positions.  I'm not accepting either side.

12   There are deficiencies on both sides that, frankly, both

13   sides have to be well aware of.  I'm a little bit surprised,

14   to be candid, at the disparity between the parties.  I do --

15   I understand and appreciate the parties have different

16   views.  You're obviously good advocates for your respective

17   clients, but you -- you could have done better on both

18   sides, especially given where we've been in this case and

19   what we've talked about the purpose of sampling is and what

20   we're going to be able to accomplish with it in this brief

21   additional window that Judge Freeman has -- has allowed for

22   us.

23   So, I just want to make it clear that Google is going

24   to have to turn over more data than it -- than it wants to.

25   That is the way this goes.  That is the essence of

1 compromise, and the Plaintiffs are going to have to do with

2 less data than they want, and the parties are going to work

3 on -- work from what they can get and work with what they

4 have, and we're going to set that plan here today.

5     Also, the sampling plan which we will put in place,

6 neither side will be able to challenge going forward the

7 sufficiency of sampling.  In other words, whatever arguments

8 Google -- excuse me -- Plaintiffs make from the samples,

9 Google can't attack the sufficiency of the sample for that

10 because the sampling is a compromise in and of itself of not

11 having to turn over all of the raw data.

12     To be sure, either side can challenge what the other

13 side has done with the sampling data, what it means, how

14 they have extrapolated.  But neither side can -- can attack

15 the sufficiency of the sample.  We are -- we are working

16 this out.  We're going to have a sampling protocol, and

17 that's the starting point for both sides, given this

18 sampling protocol, what -- you know, what does or doesn't it

19 show, and that's what you and your respective experts will

20 -- will argue about.

21     Okay.  So, let's -- let's get to it.  We have a number

22 of parameters, and it looks like one thing that the parties

23 do agree on is that we've got 25 quarters in total in terms

24 of a temporal time frame.  So, what I -- first question I

25 have, and one thing that Plaintiffs do ask for is -- well,

8

1  let me put it this way.  So, we're going to take some number

2  of days out of each quarter for sampling, and for any given

3  sample date -- sample day, I will have -- Google will

4  identify the number of queries for that day.  So, if -- and,

5  Ms. Bali, can you give me -- I -- I know we've talked in

6  very high level numbers, which is still what I'm going for.

7  I think in the papers I saw, you know, we're talking about

8  something like a million queries a day, and I've -- I

9  appreciate it varies.  It probably varies by season and a

10 variety of other things.

11       MS. BALI:  Yes, your Honor.  I think it's -- it's

12 90 billion queries over the entire corpus approximately, and

13 I think --

14       THE COURT:  When you say "corpus", are you talking

15 about the relevant time period in this case or are you

16 talking about --

17       MS. BALI:  Yes, all the data that we're -- that is

18 -- yes, and that's an estimate, I mean, give or take, but,

19 yes, 90 billion queries overall, yeah.  And the queries per

20 day probably varies significantly, and I think -- I think

21 our estimate was somewhere between 10 and 50 million a day,

22 you know.  It's a -- it's a wide range, but given the broad

23 time period that we're covering and the variation in the

24 data, I think that's that's the best estimate we can

25 provide.

9

1          THE COURT:  Okay.  And, Ms. MacLean, do you have

2   any information to the contrary as far as you know?  I

3   appreciate this is -- this is information that Google would

4   have, not you.

5          MS. MACLEAN:  No, as far as the number of users.

6          THE COURT:  Not number of users, number --

7          MS. MACLEAN:  I'm sorry.  Number of queries, no, I

8   don't have specific information.

9          THE COURT:  Okay.  Do you have any general

10  information that's different from what Ms. Bali has just

11  described?

12         MS. MACLEAN:  No, I don't believe so.

13         THE COURT:  Okay.  All right.  Okay.  Then, again,

14  we're going to -- here's -- here's the model that I'm --

15  that I'm thinking of that gets us where we need to be and,

16  as I said, substantially moves all parties off of their

17  current proposals.  And I'm not quantifying this.  I'm

18  telling you structurally what I'm looking at, which is, as I

19  say, or have some number of days per quarter that will be

20  sampled, and then for each of those days, each of those

21  days, Google will identify, okay, on this day we had X

22  number of queries, 10 million queries, 12 million queries,

23  whatever the number is.

24      And then we are going to select a -- there'll be a

25  percentage of the days' queries, and the -- the days will be

1    randomly selected.  There'll be a percentage of the days'

2    queries that will be the sample set for that day.  All

3    right.  So, you know, maybe it's, I don't know -- well, I

4    don't.  I don't know.  I don't want to hazard numbers just

5    yet, but let me just -- and then for that sample set for

6    that day, there will be identified -- Google will identify

7    the number of queries without a hotword and the number of

8    queries sent to human reviewers and the number of queries

9    that are included in a data set.  And I'm borrowing Google's

10   language on that part, but you have to remind me what you're

11   referring to there, Ms. Bali.

12            MS. BALI:  Sure, your Honor.  I believe that that

13   refers to, you know, Plaintiffs have a subset of their claim

14   that Google used certain data in data sets that may or may

15   -- then may or may not have been used to train Google speech

16   technologies, and I think that was referenced in the Court's

17   orders were the -- one of the things that we would build

18   into this process.

19            THE COURT:  Well, I know we -- we had talked about

20   research, and I'm just --

21            MS. BALI:  Yes.

22            THE COURT:  -- if we're -- are we talking about

23   the same thing?

24            MS. BALI:  We are.

25            THE COURT:  The number of queries used?  And is

11

1  the --

2           MS. BALI:  We are.

3           THE COURT:  Okay.

4           MS. BALI:  I'll say the reason why I use slightly

5  different language is because -- just because it was in a

6  data set doesn't mean it was actually used for research.

7  So, there's a small nuance.  But theoretically, we are

8  speaking about the same thing.

9           THE COURT:  Okay.  All right.

10      All right.  So, again, very broad brush strokes, but

11  that's the approach I am -- that I think is -- accomplishes

12  what we're trying to do with sampling, which is we create a

13  random set over time, and it's of all -- all queries, and it

14  -- you know, it's very randomized.  We take a fixed

15  percentage of that days' queries each time and, again,

16  randomly identified or randomly collected and then identify

17  certain other numbers based on those queries.

18      Now, Ms. MacLean, one thing that I will circle back to

19  you on is if -- with -- with this structure, when we get it

20  down to, okay, so, for each day here are your -- you know, I

21  don't know what the number is, but here are your 500,000

22  queries or your one million -- here's your sample set for

23  that day, your randomly selected percentage of all queries

24  for that randomly selected day, if you want the -- the data,

25  the raw data or the -- or if you want -- I mean, and then

1   each side can go off and figure out how many don't have

2   hotwords, how many are sent to HR, how many are in the data

3   set or, if you want those distilled numbers from Google.

4           MS. MACLEAN:  Your Honor, so, we would want the

5   raw data.  That's for a number of reasons.  One of the

6   primary reasons that we had proposed looking at the data by

7   user rather than by day is that we were concerned that

8   looking at it by day would bias the sample towards more

9   frequent users of the device who obviously necessarily are

10  going to have more queries.  But those people may well not

11  be representative of the user population as a whole.  And,

12  so, that was why we were advocating -- or one of the primary

13  reasons we were advocating doing it on a user basis.

14      So, to the extent your Honor is not amenable to that,

15  at a minimum, we would need information about the users in

16  order to ensure that the sample is not biased.

17          THE COURT:  Well, and that's where information

18  about the users gets -- makes this very very complicated

19  very quickly, even more complicated.  And, again, we're

20  trying to work through a complex set of data, a huge volume

21  of data in an expeditious fashion, but I will -- I will hear

22  more from both sides with this modeling in mind.  Of course,

23  the -- the devil is in the details, if you will, in that

24  it's -- well, how big a sample -- how frequent and how big

25  of a sample.  And I'll -- I will start with you, Ms.

1 MacLean, and I did go through with care the Plaintiffs'

2 proposal.

3      Unfortunately, from -- from my view, it -- it really --

4 it misses the point of sampling.  We started this whole

5 exercise way back at the original hearing and -- well, at

6 the original submission at 240, with the query of -- for the

7 number of users, the inquiry for -- or the -- and the total

8 number -- I think it was the total number of false accepts.

9 And -- and it's just -- you know, those numbers are too big.

10 We have to -- we have to sample to even identify any

11 component, any component.  We're doing it by sampling.

12      So, with that in mind, I appreciate your preference for

13 doing it by user.  That implicates a number of other

14 concerns, but tell me your thoughts, and I'll hear from

15 Google, and we'll see if we can work this around.

16           MS. MACLEAN:  Sure.  I mean, of course, your

17 Honor, we do understand that it would be a sample.  It would

18 only be a small portion of the users during any given query

19 for whom we would be extracting data.  So, in that sense, it

20 would be a sample.

21      But our view on users, again, is that it -- not only

22 does it avoid the bias of going on any random day and

23 picking out users and not knowing whether those queries are

24 associated with very frequent users, with infrequent users,

25 with users of certain languages, if you go on a user basis,

14

1  you're able to control for certain of those important

2  factors such as language or device type that bear on false

3  accept rates and ensure that you're looking at people who

4  are representative of the user population as a whole, such

5  that the information you get is more easily extrapolated to

6  a class member's own experience.

7       You look at a certain day, you say, okay, on July 3rd,

8  2017, the false accept rate was 10 percent, but there is a

9  level of jumping to say from there that Joe Class user had a

10 10 percent likelihood of having a false accept, whereas if

11 you have user data, you're much more able to make those

12 kinds of extrapolations that could apply to individual class

13 members.

14      You're also able to see progression over time in a

15 user's data in a way that I think is more probative of the

16 parties' claims and defenses.  I'll give an example.

17      Google argues very frequently -- or very, you know,

18 extensively that it's constantly improving its false accept

19 practices over time, that it's constantly reducing its false

20 accepts, improving its technology.

21      If you start sampling over time, and you can see the

22 false accept range changing -- say, it's going down over

23 time.  I don't know that this is true, but say that you can,

24 you can take some information from that, but it could be

25 that it's going down not because Google's improving its

technology but because the population of users is changing
over time, whereas if you're able to look at the same user
and see their data over time, you have a much clearer view
as to what are the changes in Google's technology.  It's a
fuller and richer and more usable picture of data.

THE COURT:  How -- how do you manage -- first of
all, how would you propose identifying a sample set of
users?

MS. MACLEAN:  In order to -- obviously, in order
to pick a number, we would know more information about the
total number of users that we're working with.  I believe
that they will be chosen -- well, controlling for the
distribution of language and device type.  So, we would need
information from Google about the prevalence of certain --
you know, of each language setting and of different device
types among users during the set period, controlling for
that.

THE COURT:  So, here's -- here's the issue I have
already with that, Ms. MacLean.  As -- as I explained to
counsel previously and as is reflected in my initial order
in this case on this issue, you don't have a lot of time.
You don't have a lot of time, and the kind of drill down
that Plaintiffs are now seeking is something that can take
-- and I do a lot of these cases, and it can take many many
many months just because there is so much data and it is so

16

1  varied, and to design and identify and extract is a

2  tremendous -- it's an important task.  I get it.  I mean,

3  there's relevant information, and here there clearly is

4  relevant information that needs to be produced.  But to

5  parse it at the level that Plaintiffs are now seeking is --

6  they're just -- there isn't -- there isn't time, and I am

7  also very concerned about tracking particular users who are

8  not class members, may or may not be class members, but you

9  want to be able to track their -- their use of their Google

10 Assistant over a significant amount of time.  And they may

11 not -- they may not even be class members.  That -- that is

12 of concern, to do it by user.

13      And I appreciate you can substitute out, you know,

14 their Google ID for Gaia, but that's a concern I have.  What

15 is -- what's the Plaintiffs' -- what's Plaintiffs' response

16 to that?

17          MS. MACLEAN:  Sure.  I understand, your Honor,

18 certainly where you're coming from.  If we are going to go

19 the day-based route, then our concern is that we would need

20 certainly more days than Google is proposing by far.  Okay.

21 That's at least at a minimum, and it would also be very

22 helpful to have some information about the user in the

23 queries that are pulled, to help us unbias the sample in the

24 event that it turned out to be heavily biased towards

25 frequent users, for instance.

17

1           THE COURT:  Such as?

2           MS. MACLEAN:  The frequency of their use would be

3  one thing, and also I would say language and (Zoom glitch).

4           THE COURT:  And are you aware of any -- and I

5  think -- speech logs, because that's what we looked at last

6  time, but are you aware of any identification, any field

7  that identifies frequency of use by any given user?

8           MS. MACLEAN:  I don't think so.  I know that

9  Google maintains records on who -- on daily active users and

10 monthly active users.

11          THE COURT:  And by that --

12          MS. MACLEAN:  But that's not in the speech block

13 itself.

14          THE COURT:  I'm sorry?

15          MS. MACLEAN:  But that's not in the speech block

16 itself.

17          THE COURT:  Um-hmm.  Um-hmm.  But you're referring

18 to -- okay.  All right.

19          MS. MACLEAN:  But Google has records, for

20 instance, to say, okay, in July 2017 we had, you know, 37

21 million people who used it every day and, you know, 100

22 million who used it --

23          THE COURT:  Um-hmm.

24          MS. MACLEAN:  -- in that month.  I'm making up the

25 numbers, of course.

18

1          THE COURT:  No.  I understand.  I understand.
2  But, again, your ask is, so, but drill that down and tie it
3  to users who show up in the sample?
4          MS. MACLEAN:  Yes.
5          THE COURT:  All right.  I'm sure you have more to
6  say about my methodology, and I will come back.
7      Ms. Bali, let's talk about dates versus users.  Dates
8  obviously are easy.  I mean, we have -- we're all familiar
9  with sorting almost anything by dates, but this isn't about
10 making this easy.  As I said in my order, it's -- this is
11 going to be hard.  It's going to be complicated.  There's no
12 way around it.  It's going to take time and effort by Google
13 to organize and pull on a model that we set here today.
14     And what I want to know -- and I'll talk to somebody
15 from Google if -- if they have relevant -- relevant
16 information -- is what -- what kind of user frequency data
17 can we -- can we pull into this?
18         MS. BALI:  I mean, that's -- that is not -- well,
19 you're correct there is no user frequency data in the speech
20 logs, and I'm not sure that Google even has that data, all
21 right.  The data that -- or that Google has that data at the
22 ready, right.  What we have is -- I'm not aware of any such
23 data, and I think it would require, frankly, doing an
24 analysis of this entire corpus of 90 billion queries and --
25         THE COURT:  Well, let's say -- let's -- let's do

1  it this way.  Let's say we have a date, okay, we have a

2  sample date of --

3          MS. BALI:  Okay.

4          THE COURT:  -- you know, July 1st, 2020.  Okay.

5  That's one --

6          MS. BALI:  Okay.

7          THE COURT:  -- of our many sample dates, and on

8  that day there are -- and I'm just going to -- there's a

9  million users because I'm just going to keep the numbers to

10 something I can manage.  On that day there were -- not a

11 million users, excuse me -- there were one million queries,

12 okay, and you were going to pull, you know, 250,000 of

13 those, okay, a quarter of them.  That's a lot for one day,

14 but -- well, tell you what.  Let's do it this way.  You pull

15 25,000, 25,000.  Let me just make the number a little bit

16 smaller.  Okay.

17     So, you pull 25,000 queries from that day.  Again, all

18 of this is done random, and then you need to proceed to

19 figure out, okay, at least 25,000 queries on July 1st.  Were

20 there -- you know, are there any that don't have the

21 hotword, the steps we've been talking about.  Are there --

22 of these queries, how many don't have the hotword, how many

23 are sent to human reviewers, how many are moved into a data

24 set.

25     As you do that, when you do that, especially the first

1  one, okay, how many of these, you're -- you're at the user

2  level, right.  If you're looking -- if you're going to sort

3  or, you know, search those 25,000 queries for a hotword,

4  right, as we saw on the speech log, then, okay, well, that

5  query ties to a user, right?

6        MS. BALI:  You're correct that the query ties to a

7  Gaia ID or a user account.  That -- that is correct.

8        THE COURT:  Okay.  So, then is it because of that

9  then can we get to frequency -- I'm just trying to --

10       MS. BALI:  I don't -- I mean, I think maybe what

11 you're thinking is can we get to frequency of use within

12 that sample, so, how many times does this Gaia appear in

13 this sample.  And I'm not really sure what that -- that that

14 tells us anything, right, because --

15       THE COURT:  Because it's going to be different

16 every time.

17       MS. BALI:  Right.

18       THE COURT:  This is MacLean's point, which is it's

19 not a set of users, although, Ms. MacLean, you said, well,

20 even, okay, if we have to go days, but we need more data per

21 user such as frequency of use, but you're talking about,

22 okay, but we'd need frequency not for that sample but for

23 some larger time period for a given user?

24       MS. MACLEAN:  That's right.  I mean, we would need

25 information about whether that is a person who uses their

1  device very frequently or not as a -- as a practice, as a

2  habit.

3          MS. BALI:  Um-hmm.  I'm also not sure what that's

4  needed for.  You know, I think that there's some question

5  around whether this biasing problem is really a problem at

6  all.  I mean --

7          THE COURT:  Well, it's hard to know unless all the

8  data is turned over, and, you know, it's all sorted through.

9  We don't know what the biases are, but we're going to have

10 to work past them, and I'm just trying to figure out how we

11 can do it, if we can do it in a meaningful way.

12         MS. BALI:  I mean, and, yeah, your Honor can

13 imagine that, you know, one of the problems with sampling by

14 user in addition to like very serious privacy issues around

15 that and, frankly, some of the technological feasibility

16 concerns just with respect to the way that the data is kept,

17 but, in addition to that, you know, what if you get a user

18 that has, you know, a thick accent?  I mean, you -- you

19 know, there's benefit to sampling across queries, right,

20 because your -- your sample is taking into account a wide

21 array of users, and that's sort of the point, right, is to

22 get a random sampling of queries across the board.  So --

23         THE COURT:  But, to Ms. MacLean's point is you

24 don't know -- I mean, you know it's -- you know, it would be

25 a random selection, but how does it skew?  You know, maybe

1  everybody in that day's sample is -- you know, is a very

2  frequent flier, you know, uses -- makes these queries

3  several times every day.  So, they -- so, maybe -- I don't

4  -- I don't know what that means, but, you know, they're very

5  good at it.  Maybe they don't -- they don't make that

6  mistake.  Or -- or the other way around.

7          MS. BALI:  I don't know what that means either.

8  What does the frequency of use -- how does that bear on the

9  questions that we're trying to answer?

10         THE COURT:  Well, that's -- that's exactly the

11 question.  That begs the question, Ms. Bali, which is how

12 does it bear on the question would be -- well, you'd have to

13 control for it to figure that out.  But it's -- it's

14 complex, as I was saying to Ms. MacLean.

15         MS. BALI:  Yeah, and I think that there -- you

16 know, I think that that's part -- you know, and I'm sure our

17 -- our sampling expert can speak to it much better than I --

18 than I can, but I think that's part of -- that's sort of

19 inherent in sampling, right?  I mean, that's -- you know,

20 you're going to -- there's going to be variation.  There's

21 going to be -- you know, there's variation by a lot of

22 different factors.  And, so, I think that that's -- you

23 know, that's sort of inherent in taking a sampling approach.

24 And I think that's -- that's just what we have to deal with.

25         THE COURT:  There was an issue that both sides

23

1 highlighted about language, whether any sampling would be

2 limited to English language.

3     And, Ms. MacLean, tell me where Plaintiffs are on that.

4         MS. MACLEAN:  We actually reached agreement on

5 that.

6         THE COURT:  Ah, excellent.

7         MS. MACLEAN:  See, sometimes we do.

8         THE COURT:  And I'm very pleased to hear that.  In

9 fact, at the very top of my notes, it says "Any progress?"

10 Do you have any updates for the Court, And I --

11         MS. MACLEAN:  It does happen, yeah.

12         THE COURT:  I skipped right over that, and I'm

13 sorry, because I admonished you for not making progress, and

14 I want to obviously acknowledge where you do.  Excellent.

15 Good.

16     Is there any other progress that would be helpful for

17 the Court to know about?

18         MS. MACLEAN:  Well, some was reflected in the

19 quarters, but returning to the issue of bias, would you be

20 willing to hear from our expert directly?  I think that

21 would be a better way of explaining the issues than to have

22 me explain it directly.

23         THE COURT:  Yes, I will.  I just I kind of want to

24 ferret out the issues, and I --

25         MS. MACLEAN:  Understood, your Honor.

24

1          THE COURT:  And I want to keep us moving, but I
2   did ask you to have the -- your experts here.
3          MS. BALI:  There's just one other point, your
4   Honor, that I'd like to make with respect to this proposal
5   that we sample by user.  I just -- I think it's important to
6   just tether ourselves in what the actual RFP's were and what
7   they asked for at the outset that ultimately led to this
8   sampling order, and I think, you know, it was query based,
9   right, and it was false accept base.  And, you know, one of
10  the -- you know, I think -- there's a lot I think actually.
11  It's not perfect, but there's a lot of overlap between
12  Google's proposal and I think what the Court proposed, and
13  there's just a couple of ways in which they diverge, and I
14  think the one that your Honor is probably most committed to
15  is just wanting to see a larger volume of data.  But -- and
16  -- and we can just sort of put that aside for a second and
17  talk more specifically about what would be captured in the
18  sample, whatever the sample size ends up being, and there's
19  just a couple of points that I wanted to make on -- on your
20  Honor's proposal, one of which is that the speech logs
21  include a lot of data --
22          THE COURT:  Hang on, Ms. Bali.  I'm just going to
23  stop you there for a moment.
24          MS. BALI:  Sure.
25          THE COURT:  And I do want to hear from you, but I

1  want to hear from Ms. MacLean first because, as I say, I --

2  I gave you kind of my rough-out structure, which -- which --

3  such as it is, and we need to, you know, obviously drill

4  down on that.  And, Ms. MacLean, you raised the concern

5  about it being date based instead of user based, and I -- I

6  understand that, and the concern is that there may be

7  inherent bias if there isn't some accounting for user, and

8  we'll -- okay.  We can drill down on that a little bit

9  further, but what other -- other concern?

10      Let's say we go date based and maybe there's some user

11  data included in that.  That is an open issue.  And then are

12  there other -- and, you know, obviously it would be a larger

13  set and then, as I say, devil is in the detail.  But then if

14  we take the queries for that day and a percentage of queries

15  for each sample day and then that data is -- is turned over

16  to -- is turned over to Plaintiffs, do you have other issues

17  in that approach?

18          MS. MACLEAN:  Sure.  Well, and as far as the

19  selection of the days, we would want to be sure that it was

20  not a -- that there were representative days, right, that we

21  had weekdays versus weekends, that we had holidays versus

22  workdays, you know, to make sure we weren't getting days on

23  which Google was having a server meltdown, to make sure that

24  those days were not unrepresentative of days as a whole.

25  So, we would want different -- a different range of days,

26

1  not just -- not just more queries per day but also more days

2  within every given quarter.

3          THE COURT:  Right.  More days and some

4  distribution between weekdays and weekends?

5          MS. MACLEAN:  Yes, weekdays, weekends, holiday

6  seasons, all of that kind of thing.

7          THE COURT:  I'm not sure what that means.  I get

8  the weekdays, weekends.

9          MS. MACLEAN:  Seasons is handled really by the

10  quarter, say some holidays and avoiding some holidays, some

11  holidays and some regular days, making sure we were getting

12  24-hour periods so that -- to get all hours of the day.

13          THE COURT:  Okay.  So, those are issues around

14  days.

15          MS. MACLEAN:  And then issues around a number of

16  queries that are large enough that you are going to get a

17  representative sample or a large enough sample to get the

18  actual distribution of languages and devices and not be

19  biased at any one particular one of those.

20          THE COURT:  So, again, if it's just a random

21  selection -- you know, I'm just going to -- you know, if you

22  take one percent of the queries on any sample day, which

23  could be a lot of -- a lot of queries, depending, then if

24  it's randomly selected that that is the percentage of

25  queries, then isn't it going by -- by its nature going to be

27

1  -- I mean, it's going to be across all devices, not -- you

2  all have reached agreement on languages.  So --

3          MS. MACLEAN:  It will be randomly pulled from all

4  the languages and all the devices, but it may be biased

5  towards particular languages or particular devices who have

6  more queries.  If it turns out that Pixel users make many

7  more queries than Google Home users, if it turns out that

8  people make more queries in Spanish than they do in English,

9  you're going to end up with a disproportionate number of

10  queries coming from those kinds of users.

11          THE COURT:  Yes.  So, you're circling back to user

12  data, which we're going to have to move away from to some

13  degree at least.

14          MS. MACLEAN:  Sure.  That includes the -- sorry.

15          THE COURT:  No, and I'm just -- I understand.

16  But, again, you're not stuck with one day.  It's not like

17  you're getting one sample, that July 1st, 2020 will be your

18  only day, and so you don't know if that was the day that

19  there were, you know, a lot of whatever kind of users and

20  that that's skewed.  But you'll have a number of samples in

21  that quarter and -- and a larger number of queries each day.

22  So, I think that by increasing the numbers, that will help

23  to mitigate the kinds of concerns that you're identifying.

24      They'll exist for sure, but it would seem that, again,

25  the curve would -- would smooth out over time, and I'll --

28

1  I'll let the experts stop rolling their eyes off screen and

2  talk to me in just a few minutes.

3          MS. MACLEAN:  No, we do certainly agree with that,

4  that increasing the number of queries in days would mitigate

5  that.  We're just saying that it would have to be quite a

6  substantial increase in --

7          THE COURT:  I --

8          MS. MACLEAN:  -- the queries in --

9          THE COURT:  I hear you on substantial increase.  I

10 got it.  Okay.

11     So, we've talked about days, user, and I -- I get -- I

12 get the user issue.  I think that there is some mitigation

13 by increasing the numbers, but I appreciate it's not going

14 to be as modeled as Plaintiffs would like, representation of

15 days, a random selection of days that include weekends and

16 weekdays.

17     With regards to the model generally, anything else?

18 And we obviously need to start talking about numbers pretty

19 soon because that -- that will be the driver.

20     Any other thoughts on that model, Ms. MacLean?

21         MS. MACLEAN:  Not from Plaintiffs, your Honor.

22         THE COURT:  Okay.  All right.  Now, Ms. Bali, back

23 to you.  As you started to -- a moment ago, started to

24 observe a moment ago, by -- by going with days, you could

25 say my model is closer to Google's, so days, identifying the

29

number of queries, the total number of queries on that day

and then setting a percentage, which will be a, you know,

sufficiently meaningful -- we'll see what that means --

percentage of queries for each day and then providing that

data to Plaintiffs.  And the -- the data would have to be

able to -- from the data, would have to be able to

demonstrate the queries without a hotword and whether or not

it was sent to a human reviewer and whether or not -- and/or

whether or not it went into a data set, and there may be

something else in there as well.

     So, Ms. Bali, I'm -- to you I know the issue is, okay,

well, what -- what kind of numbers are we talking about.

But --

          MS. BALI:  Yeah.

          THE COURT:  -- concerns -- and we've talked about

the user issue.  Other concerns generally on that structure?

          MS. BALI:  Yeah, just a couple of things to note.

So, don't see an -- I don't see a problem with, you know,

selecting days and then coming up with the total queries for

that day.  That seems fine.

     On the percentage -- on the percentage point, I think

the difference between the Court's proposal and our proposal

is that we just had a set number, whereas the Court proposes

taking a percentage of the queries on that given day.

          THE COURT:  Right.

1          MS. BALI:  And I guess my only -- I want to hear

2     both from our -- our witnesses that are on the line, but I

3     guess my initial concern with that proposal is that we have

4     no idea what the sample size would be, right, and there

5     could be a lot of variation day after day depending on

6     whether, you know, one day was a particularly busy day or

7     not.  And I wonder whether that percentage approach really

8     gains us much beyond just selecting a set value, whatever

9     that value --

10          THE COURT:  Well --

11          MS. BALI:  -- may be.

12          THE COURT:  -- it allows us to capture on a day

13    that's very heavily used you get a bigger sample, because --

14    because there were a lot more queries on that day, and on a

15    day that's, you know, lightly used you get fewer, but you've

16    -- you then accounted for -- for the number of users.

17       If you go in a flat, fixed number, you might be getting

18    such a minuscule number of all the users that day that it's

19    just -- it's -- it's hard -- it's hard to -- hard to work

20    from that, will be hard for your respective experts to work

21    from it.

22          MS. BALI:  Well, I -- yeah, I mean, I'm happy to

23    -- I'm happy to listen to what our experts -- our respective

24    experts think about that.  But, you know, it seems like

25    having so much variation for every day that we're sampling

1  would be hard to track changes over time.  And maybe that's

2  right.  I am no -- I am no statistical sampling expert.  So,

3  that -- that was just an initial concern I had, and I think

4  not having a clear sample size number is problematic, where

5  I think we've got to be able to put some numbers on this and

6  some limitations around what the data is.  And then, as you

7  can imagine, if we've got a day of like, you know, 70

8  million queries and even if we're taking one percent, that's

9  a whole lot of data and a whole lot of queries.  So, I just

10 really want to be cognizant of that and hear from our -- our

11 pros on that, and then --

12         THE COURT:  The first -- the first thing I want to

13 hear, where I'm going to start, is I want to hear from

14 Google.  I want a reasoned number as to the either range of

15 numbers -- range of queries in a day or I don't know if

16 there's a mean.  I don't know how Google works with this

17 number, and I appreciate it can vary greatly day to day, but

18 Google should be able to give me an estimate of something

19 better than 10 to 50 million queries in a day.

20         MS. BALI:  It just varies a lot, and we've --

21         THE COURT:  I got to --

22         MS. BALI:  -- actually looked at --

23         THE COURT:  I got to --

24         MS. BALI:  Yea.

25         THE COURT:  -- hear now from the Google expert on

1  it.

2         MS. BALI:  Sure.  And I will just say we actually

3  looked at the numbers.  That's informed.  That's not just,

4  you know, arbitrary.  It's just --

5         THE COURT:  Okay.

6         MS. BALI:  -- you know, covering a seven-year

7  period.  So, you see a lot of variation.

8     And then the only other things I would like to note

9  about the Court's proposal is that one additional difference

10 that can be maybe a little tricky to glean between our

11 proposal and Plaintiffs is that we propose limiting the

12 sample to hotword initiated queries, right, because that's

13 really what this case is about.  This case is not about

14 queries that were initiated by pressing a button on a

15 device.  This case is about alleged false accepts or

16 instances in which the assistant activates without a hotword

17 being spoken or a manual activation of the device, and the

18 speech logs that we have here capture manual queries.  It

19 captures any speech that follows that, right.  So, that

20 would be logged on the speech log, and it also captures

21 things that are not even assistant related.

22    So, you know, for example, if a user decides to press

23 the mic on their device and do a voice search, that's

24 something -- that's something that would be captured on

25 these logs.  So, I do think it's important to cull down

33

1  whatever day we're working with to assistant hotword

2  initiated queries and sample from that, so that what we're

3  sampling is actually relevant data, not data that has

4  nothing to do with the claims in this case.

5       And then --

6            THE COURT:  So, how does that -- how does that

7  play with where there is no hotword?  I mean, what are you

8  -- how are you sorting for that?

9            MS. BALI:  There is a field -- or there's a --

10  there are fields that we can use to -- that are reflected in

11  the speech logs that can indicate whether or not a query is

12  hotword initiated.  So --

13            THE COURT:  Even if it doesn't have a hotword?

14            MS. BALI:  Yeah, it's not by -- it's not by

15  looking at the ASR, Automatic Speech Recognition's output or

16  text of -- and, in fact, you know, we'd say that that's --

17  when we've talked about this, that that's not even a

18  reliable way.  But there is a separate field that will tell

19  you whether a query -- effectively tell you whether a query

20  was hotword initiated.  So, that's a -- that -- it's --

21  it's, you know, not abundantly difficult to limit the data

22  to just those queries.

23            THE COURT:  Okay.  All right.

24            MS. BALI:  And then --

25            THE COURT:  Let's get -- Ms. Bali, I'm going to

34

1  interrupt you right there.

2      Ms. MacLean, on the hotword initiation, as opposed to

3  everything else, all the other ways to start this process?

4          MS. MACLEAN:  Yeah, that's another situation where

5  the devil is in the details.  Ms. Bali referenced a column

6  in the speech logs that indicates whether it's hotword

7  initiated.  I don't know, Ms. Bali, if you were referring to

8  the run server hotword column?  Is that what you were

9  talking about?

10          MS. BALI:  Yeah, that's one of them, yes.

11          MS. MACLEAN:  Our understanding is at least that

12  that column doesn't work in that way because not all devices

13  even run a server hotword and that server hotwords don't run

14  every time for every query they run.  Google's corporate

15  representative, Mr. Tye (phonetic), testified to that, that

16  just looking at run server hotword doesn't necessarily tell

17  you anything.  If that column is listed as false, it doesn't

18  mean that there wasn't a hotword.  It just means that it

19  didn't run the check.

20      All right.  So, we don't agree that that's a reliable

21  methodology for isolating hotword only utterances.

22          THE COURT:  Okay.  All right.  Okay.  All right.

23  Let -- let me first hear from Google.  I want more

24  information around -- I want an educated estimate of the

25  number of daily queries because that's going to help us

35

1   inform how we set some of these other parameters, and I

2   appreciate it's not a precise formula and there's not a

3   precise number.

4        So, Ms. Bali, who can field this for me?

5            MS. BALI:  I think that would be Ms. -- or Doctor

6   Francoise Beaufays, assuming she can hear us.

7   Unfortunately, I think she's having an issue with her

8   camera, but --

9            THE COURT:  Here she is.  Ms. Beaufays, good

10  afternoon.  Have you been able to figure out the camera?

11           DR. BEAUFAYS:  No.  I get the meeting alerts to

12  start my video, which I click on, but it doesn't seem to

13  change anything.

14           THE COURT:  Okay.  And do you have your camera on?

15  Are you on a laptop, desktop, phone?

16           DR. BEAUFAYS:  I am on a laptop.  I do see you.

17           THE COURT:  Okay.

18           DR. BEAUFAYS:  But I cannot make myself visible,

19  best I can tell.

20           THE COURT:  Okay.  Is your laptop camera enabled?

21  Does it have a camera?

22           DR. BEAUFAYS:  It does have a camera, and it's

23  usually working.

24           THE COURT:  Okay.  And is your laptop open so the

25  camera can activate, not --

1          DR. BEAUFAYS:  Yes, it is.

2          THE COURT:  -- not closed?  Not closed using other

3   screens?

4          DR. BEAUFAYS:  The laptop is in front of me, and I

5   see the screen with you, Ms. MacLean and Ms. Bali.

6          THE COURT:  Okay.  All right.  Well, that is the

7   extent of my debugging of not working videos.  So, that's

8   fine.  We'll proceed.

9      Do you understand the question?  Can you help me to

10  understand better?  Can you give me something a little more

11  helpful than 10 to 15 million queries a day in this time

12  frame?

13         DR. BEAUFAYS:  I do understand the question.  I

14  have not looked at this data.  So, I do not have further

15  numbers.  The only thing that comes to my mind is to

16  computer an average.  If we know that there are 90 million

17  -- 90 billion, sorry, queries over a certain period of time,

18  we can divide 90 billion by the sum of the days, and we'll

19  have an average of the number of queries per day.  I don't

20  know what that number is.  I cannot do the math in my head

21  instinctively.  And that will give us an average, and there

22  will be fluctuation around that average on a daily basis.

23         THE COURT:  What's the basis for the 90 billion

24  over this time period?  Where does that number come from,

25  before we start using it for division -- division here?

37

1          DR. BEAUFAYS:  I do not know.

2          THE COURT:  Okay.  Ms. Bali?

3          MS. BALI:  Yeah, that's -- that's from looking at

4   the data corpus of what we've preserved for this case and --

5   and processing it over a lengthy period of time because it's

6   a lot of --

7          THE COURT:  Sure.

8          MS. BALI:  -- data, to figure out how many queries

9   are in that set, and I actually think that the corpus goes

10  back to 2015 instead of 2016, which obviously predates

11  Assistant.  But, as I mentioned, speech log data captures

12  things other than Assistant queries.  So, that estimate

13  might be slightly high.  I -- you know, just with that

14  caution.  But for a nice round number, you know, Internet

15  user.

16         THE COURT:  Okay.  Have someone do the math then

17  by the number of days and the time period.  It's very rough

18  justice.  I get it.

19         MS. BALI:  Yes.

20         THE COURT:  I just want to see what -- what that

21  number is.

22         MS. BALI:  Yes.

23         THE COURT:  Okay.  And while that is being

24  calculated, Ms. MacLean, let me -- or let me know as soon as

25  you have that number, Ms. Bali, please.

1          MS. BALI:  And -- and just so I understand what

2     the number is, we want to both know -- I don't think I'm

3     going to be able to realistically get you a more -- you

4     know, the exact number of queries that --

5               THE COURT:  No.  We're just doing --

6               MS. BALI:  -- the average --

7               THE COURT:  -- Ms. Beaufays --

8               MS. BALI:  Yes.

9               THE COURT:  -- you know, again (Zoom glitch) --

10              MS. BALI:  Yes.

11              THE COURT:  I'm actually -- I'm just curious.

12    It's --

13              MS. BALI:  Yeah.

14              THE COURT:  It's going to be -- I don't know.

15    Let's see.  Let's see if it's between 10 and 59.

16              MS. BALI:  Now I have to find somebody that that's

17    good at math.

18              THE COURT:  Gee.  I'm kind of thinking there's

19    somebody --

20              MS. BALI:  There's somebody.

21              THE COURT:  -- with more --

22              MS. BALI:  It's not me, but there's somebody.

23              THE COURT:  -- that can handle that --

24              MS. BALI:  Yeah.

25              THE COURT:  -- that can handle that math.

1          MS. BALI:  Yeah.

2          THE COURT:  I'm quite sure there's an app for

3 that.  Probably -- well, never mind.  Okay.  I was going to

4 say we can ask Google Assistant, but we won't go there.

5     Okay.  Ms. MacLean, let's -- we're going to get a -- a

6 number, such as it is for what it's worth, but I would like

7 to hear from -- from your folks.  I appreciate the concern

8 around user, but we're -- we're going to go with a date

9 model.  There may be -- you know, I'm not sure what to do

10 about user frequency.  That seems to be a level of

11 complexity that will be difficult to manage under this

12 model, and we were talking about, well, why do we need that

13 if we have a -- a good sample.  Again, if there's a million

14 users on a day and we have a sample of 25,000 for that day,

15 are we -- are we by nature kind of getting -- getting a

16 cross-section more or less and certainly over a large number

17 of sample days.

18     So, if you have someone who's like to speak to that,

19 I'd like to hear it.

20          MS. MACLEAN:  Sure.  That would be Doctor Landrum.

21          THE COURT:  Excellent.  Thank you, Doctor Landrum.

22 Go ahead.

23          DR. LANDRUM:  Yes, thank you.  So, my concern

24 about the -- that because you're sampling by days --

25          THE COURT:  Uh-huh.

1    DR. LANDRUM:  -- sort of by definition more

2  frequent users are more likely to show up in a sample by

3  days.

4    THE COURT:  Um-hmm.

5    DR. LANDRUM:  So, someone who's using it daily is

6  probably 30 times more likely to show up in a sample in a

7  day than someone who's only using it monthly, and I'm

8  concerned that daily users are systematically different from

9  monthly users, and I -- I won't have a way of accounting for

10 that systematic difference without knowing something about

11 the frequency with which a particular user --

12    THE COURT:  But -- but won't I -- you know, if in

13 a month I take, you know, four days, okay.  And I'm just --

14 again, take a day roughly out in each week, and some of

15 those days -- so I end up with a hundred days over 25 -- 25

16 -- no, I'm not doing that right.  Never mind.

17    Well, yeah, if I took -- well, if I took four days out

18 of a quarter, okay -- and I'm not saying this is the right

19 number.  Again, I'm just trying to get an example, but if I

20 took four days out of a quarter, we have 25 quarters.  So,

21 that would get me to a hundred sample sets.  Okay.

22    On any one of those days I could have -- I -- I have

23 daily users, but I could -- I could have monthly users,

24 right?  I mean, if I have enough, I'm going to get some of

25 those days where the monthly users, that's the day they log

1  in.

2  　　　　DR. LANDRUM:  Right.  But the issue is when I go

3  -- when I have to extrapolate up to a user, the -- the

4  likelihood of a daily user being sampled is much higher than

5  a monthly user.

6  　　　　THE COURT:  Um-hmm.

7  　　　　DR. LANDRUM:  And, so, but we use a representative

8  sample of queries, but we don't get a representative sample

9  of users.

10  　　　　THE COURT:  Okay.

11  　　　　DR. LANDRUM:  It will be enriched with -- with

12  more frequent users.

13  　　　　THE COURT:  And do you have any information at

14  this time as to why that -- why that matters?  That is, I

15  mean, do you have -- again, I'm just trying to figure out,

16  Ms. MacLean, if -- if you don't want something answered, we

17  can talk about that, but why -- why would that bias whether

18  it's a frequent user or an infrequent user?  I appreciate

19  you don't know.  I mean, you haven't controlled for it, so

20  you don't know.  But are you concerned about something with

21  regards to frequent or infrequent users?

22  　　　　MS. MACLEAN:  Your Honor, I can answer that

23  myself.  No, I think actually your Honor put your -- we

24  don't know, but your Honor put your finger on some of the

25  things that have occurred to us as well.  Perhaps a person

42

1   who uses the device very frequently is someone for whom the

2   device works very well, who gets fewer false accepts than

3   average, who speaks very clearly, who has an accent that the

4   Assistant particularly likes or maybe vice versa, someone

5   that's constantly yelling at Google, "No.  Listen to me.

6   Listen to me, Google.  Come on.  Pick me up."  But the -- or

7   there could also be important demographic differences

8   between people who tend to use it very frequently.  People

9   who use it much less frequently, they could use it in

10  different ways.  They could use it at different times on

11  different types of devices.  There could just -- I could

12  envision many ways in which frequent users could --

13          THE COURT:  And I appreciate it would be -- it

14  would be nice to have all this information and you could run

15  these various controls, but -- but you don't -- you're not

16  saying that it -- it's biased, that the outcomes are biased

17  by when -- by, you know, certain users over others.  I mean,

18  you don't have that information.

19          DR. LANDRUM:  But -- but I would argue that it

20  could be -- that it -- it is -- the way of drawing the

21  sample ensures some bias, because not every user is equally

22  likely to be sampled, and that's what you need for an

23  extrapolation or you need to know the probability that

24  someone has been sampled.

25          THE COURT:  All right.  Ms. Bali, does someone on

43

1  your side have a response to that?

2          MS. BALI:  Yes.  Thank you for offering that.

3          Doctor Borck?

4          DR. BORCK:  Good afternoon, your Honor.

5          THE COURT:  Good afternoon.

6          DR. BORCK:  It seems to me that the -- the

7  question comes down to what's the relevant question that

8  you're trying to answer.  And, you know, as I understood it,

9  the relevant question is the percent of false activations.

10         THE COURT:  Um-hmm.  Right.

11         DR. BORCK:  And, if that's the case, I -- you

12 know, I don't know if that is, but if that's the case, then

13 it doesn't matter so much to me whether the false

14 activations are coming from frequent users or -- or

15 infrequent users.  And I would push back on the notion that

16 it's -- that the sample is somehow biased.  If the question

17 is about percent of false activations --

18         THE COURT:  Right, but I think --

19         DR. BORCK:  -- you're going to want the sample.

20         THE COURT:  I think that the -- the suggestion

21 from Plaintiffs' side is, well, but there -- there may be

22 that you -- yes, you want the percentage of false

23 activations, and there may be some bias that we -- we

24 haven't been able to detect because we don't have user

25 information.  In other words, it may be that frequent users

44

1    don't get false activations and -- and infrequent users do.

2    I don't know.  I'm just speculating, but that's what I hear

3    Plaintiffs expressing concern about.

4             DR. LANDRUM:  And so --

5             DR. BORCK:  And if that --

6             THE COURT:  Hang on, Ms. Landrum.  Hang on.

7             DR. LANDRUM:  Yes.

8             THE COURT:  I'll come back to you.

9        Go ahead.

10            DR. BORCK:  And if that turns out to be the case,

11   that seems to be a relevant finding.  If it turns out that

12   frequent users don't have as many false activations, that's

13   -- I wouldn't call that bias.  I would call that a relevant

14   finding for understanding how often overall we have false

15   activations.  So, I -- I don't consider that -- based on

16   what I understand the relevant questions to be, I don't

17   consider that a bias.  In fact, I consider that to be a

18   relevant bit of information to know.

19            THE COURT:  Right.  But you won't have that

20   information because we don't have user data.  Under my

21   current model, that's the -- I understand.  I understand.

22       Ms. Landrum, did you have something further?

23            DR. LANDRUM:  Yeah.  I actually wanted to get back

24   to the what is the question.  I actually completely agree

25   with Doctor Borck that my understanding is that it's not

45

1  about percentage of queries, but it's about percentage of

2  users who have experienced a false activation.  And, again,

3  I'm brand new to this case, as you know, and so I -- and I'm

4  getting up to speed, but that was my understanding in making

5  my argument.

6          THE COURT:  Um-hmm.  Um-hmm.  All right.  Thank

7  you -- thank you, Ms. Landrum.

8      And there's -- as counsel are aware, there's subtle

9  issues here between are you trying to identify class members

10 by this sampling?  Are you trying to identify false accepts?

11 And, you know, maybe it is some of each, but, as I say,

12 given where we are in this case, this is the approach that

13 we can -- we can put together.  And, so, we're -- we're

14 going forward from here.

15     Okay.  That's helpful.  Thank you both.

16     Ms. Bali, do you have that number for me?

17          MS. BALI:  I do.  It's 35 million.

18          THE COURT:  Thirty-five million.  Okay.  Well, as

19 you suggested, it is between 10 and 50.

20          MS. BALI:  Yeah.  Almost -- almost right in the

21 middle, not -- well, not quite, but --

22          THE COURT:  If I go to our statisticians, they --

23          MS. BALI:  Yeah.

24          THE COURT:  -- all worked up with the right in the

25 middle language.  Okay.

46

1     All right.  Let's figure out some numbers here.  Let me

2  just -- let's see.  Give me a moment.  Let me fuss with my

3  notes here.

4         MS. MACLEAN:  Your Honor, sorry to interject.  We

5  had someone doing the math as well, and they came up with 40

6  million rather than 35.

7         THE COURT:  Okay.

8         MS. BALI:  Well, I'll say I got my number from

9  Doctor Borck.  So, he can explain where the number came

10  from.  He's here.

11         THE COURT:  What number -- what did you use as the

12  divisor into your -- our 90 million, Doctor Borck?

13         DR. BORCK:  I did a quick approximation, your

14  Honor.  I took seven years time 365 days.  So, I did a full

15  seven-year period.

16         THE COURT:  Okay.

17         DR. BORCK:  That may not be quite right as I

18  understand it, but I think it's pretty close.

19         THE COURT:  Okay.  Let's see.  Oh, oh, oh.  Hang

20  on.  Ms. Maclean, did you have anything to -- did -- do you

21  know what your divisor was?

22         MS. MACLEAN:  I'm being told it was 2,346 days.

23         THE COURT:  You're going to have to translate that

24  into years, 365, because that's what Doctor Borck gave me.

25         MS. MACLEAN:  Let me ask the peanut gallery.  Oh,

47

1  so, what they're doing, they're starting it from the actual

2  class period beginning.  So, it's portions of years.  It

3  includes partial years as well because we're not dealing

4  with just --

5          THE COURT:  But is that more or less time?  It's

6  obviously --

7          MS. MACLEAN:  It's less.  That's what's they're --

8          THE COURT:  That's fine, with the bigger number.

9          MS. BALI:  I think we -- I think we do agree on

10  the 2,346 number, and I think -- I guess once we do it, we

11  get something in the 38 range, about 38 million.

12          MS. MACLEAN:  All right.  I'm seeing support from

13  the peanut gallery for 38.

14          MS. BALI:  And I like round numbers.

15          THE COURT:  I see part of you is going 363.

16          MS. BALI:  Yeah, that's about -- that's about in

17  range.  Hey, we can --

18          THE COURT:  This is the beauty of math.

19          MS. BALI:  We agreed on something.

20          THE COURT:  This is the beauty of math because the

21  numbers really don't -- there's no spin on the numbers.

22  Let's put it that way.

23          Okay.  Let me try something here on my notes.

24  Just give me a moment.

25          (Pause.)

1          THE COURT:  Okay.  All right.  So, let me -- let

2    me offer the following.  If we have 25 quarters, if we

3    sampled -- let's go back to my four days a quarter -- four

4    days a quarter, that would lead us to 100 sample sets, 100

5    sample sets.  And then for each day -- each day, if we

6    sampled one percent of the queries on that day -- one

7    percent of the queries on that day, then if there were 38

8    million queries on that day, if I'm doing the math right,

9    that will be 380,000 samples -- 380,000 samples for that

10   day.

11        So, you have a hundred sets of approximately 380,000

12   samples.  Some days would be more.  Some days would be less.

13   Again, we're doing -- we're doing very rough math here, but

14   you'd end up with a total sample set over time that

15   approaches 40 million queries, 40 million queries.  And then

16   from that, I would still be inclined to have even -- even

17   with the raw data, with specific user ID not -- you know,

18   not a -- not tied to a specific -- I mean, you can have a

19   Gaia ID but not -- not tied to an identifier, a person

20   identifier, I would still be inclined to have Google run the

21   -- the numbers through the -- the number without hotword,

22   the numbers that were sent to human reviewers and the

23   numbers that were put in a data set but also have -- have

24   that -- those classifications and the raw data provided to

25   Plaintiffs.

1          MS. BALI:  Your Honor, can I just make one point

2     that might inform the whole discussion?  So, one concern --

3     and I know we raised this previously, but it -- but it is

4     really a real concern, and it's something that we've been

5     grappling with, trying to figure out how to deal with,

6     right.  You know, obviously one of the claims that we have

7     in this case is a violation of the Stored Communications Act

8     for disclosing the content of communications, including

9     anonymized data.  So, you know, the -- and the speech logs

10    have this -- the top hypothesis that has the ASR's output,

11    what it thinks the user said in text form, and I think my

12    understanding is that what the Plaintiffs really want to

13    glean is how often is there a hotword in that field or not.

14    So, they don't really need the actual substance of the

15    query, right, what the user said after the hotword or what

16    the user said if there -- if there was no hotword.  And we

17    -- you know, we just have some real concerns about producing

18    the content absent class members' communications with no

19    consent or even notice to them at all.  And, you know, we

20    had been thinking about whether --

21          THE COURT:  What -- what -- is this -- what are

22    you saying, just the top hypothesis or as to whether or

23    not --

24          MS. BALI:  It's just that field.

25          THE COURT:  I'm sorry?

1          MS. BALI:  It was just that field but -- that

2    presents this problem, that -- the top hypothesis field.

3          THE COURT:  But the top hypothesis doesn't have

4    the whole query, does it, or does it?

5          MS. BALI:  It does.

6          THE COURT:  Um-hmm

7          MS. BALI:  It does.  It has the ASR's output of

8    what it believes the user said.  So, it does have the whole

9    query, and it also has what we refer to as the preamble,

10   which is, you know, either the hotword or there's no

11   hotword, right.

12         THE COURT:  So, what if just the preamble -- can

13   that field be edited so it's just the preamble?

14         MS. BALI:  I'm not -- so, we have been looking

15   into whether there is a way to parse out the preamble in an

16   automated way, right, because we're talking about such a

17   large volume of data.  And Ms. Beaufays may be able to speak

18   to it more.  We haven't found a solution to that.  So, one

19   of the things that we had thought about is like do we have

20   to do some manual redaction of this information, you know,

21   of the substance of the query leaving, you know, the hotword

22   or absence of the hotword, right.  And, you know, obviously

23   the larger of a sample size we get, the harder it is to do

24   that kind of redaction.  And I -- you know, I understand the

25   -- you know, the Court's desire to have a larger sample

size, but I do think we do have real problems that we have
to contend with about user privacy and the Stored
Communications Act with respect to the content of the user's
Assistant query.

THE COURT:  All right.  All right.  Ms. MacLean,
I'd like to hear your -- your response to that but also to
the numbered approach overall.

MS. MACLEAN:  Sure, your Honor.  Well, to begin
with, the privacy aspect, two things.  Number one is that
Google itself has taken the position in its recent briefing
and arguments that anonymization of any given communication
is a defense to the SCA claim.

THE COURT:  I think it's fair to say that is an
unsettled area about which parties disagree.

MS. BALI:  That's actually not exactly our
position, but leaving that aside.

THE COURT:  That's fine.  Go ahead, Ms. MacLean.

MS. MACLEAN:  So, that will be one thing, that we
think that it would be covered by anonimyzing the data.
Even if we could anonymize the non-Gaia idea, if they felt
more comfortable with a unique identifier on top of that,
that we wouldn't have an issue with that.

The reason that we are interested in having the whole
query rather than just the preamble is that Google itself,
again, relies on its argument that you have to look at the

52

entire content of a query in order to determine whether
something's a false accept.  You know, in their version, you
can't just look at hotword in that version.  You have to get
the whole information about what is said in order to
determine whether it's appropriate for Google or intended
for Google.

THE COURT:  And you're saying that's Google's
position, is that right, Ms. MacLean?

MS. MACLEAN:  Yes, and so that --

THE COURT:  Where -- where is that articulated?

MS. MACLEAN:  In their classification papers as an
opposition to ours to say that you can't look at this data
on a class-wide basis, that you have to go and you have to
individually look at each individual query in order to
figure out if something's a false acceptance.

THE COURT:  But that's different from saying you
have to look at the whole query.

MS. MACLEAN:  No, because the argument is that you
need to look at the context, that you need to know, you
know, what is being said in order to determine it.

THE COURT:  Um-hmm.

MS. MACLEAN:  And, so, that would make the content
of the query relevant as well.  If we were to defend against
that argument, we'd need access to what the contents of the
query were.

53

1          THE COURT:  All right.  Okay.  So, privacy

2  concern, it's from Plaintiffs' perspective, if it's

3  anonymous, then it would be all right.  Is that fair?

4          MS. MACLEAN:  From our perspective, certainly.

5          THE COURT:  That's what I said, from Plaintiffs'.

6          MS. MACLEAN:  Yes.

7          THE COURT:  Okay.  What about the other parameters

8  that I've outlined, the numbers where you end up with, you

9  know, a number approximating 40 million inquiries --

10  queries, excuse me?

11          MS. MACLEAN:  I mean, I think it's hard to say

12  without knowing the distribution of those queries among

13  users, which is the issue that we had discussed before.

14          THE COURT:  We're not going to -- we're not going

15  to be able to do that.

16          MS. MACLEAN:  Understood.

17          THE COURT:  But you'll have a significant sample

18  of queries.  You'll have everybody's buy-in that this is a

19  -- this is a, you know, meaningful sample.  There won't be

20  an attack on, Well, the sample is too small.  And you can --

21  you'll get the raw data.  You'll get this quantification.

22  And we're going to talk about the content of the

23  communication a little bit more here.  And, so, you can --

24  you can do with it what -- what you can, but there won't be

25  additional user input, which I -- I appreciate is -- remains

54

1  an issue for Plaintiffs.

2          MS. MACLEAN:  Understand that, your Honor.  Could

3  I ask just if my expert, Doctor Landrum, has any further

4  comments on the number?

5          THE COURT:  Um-hmm, please.  Ms. Landrum?  There

6  you are.  Excellent.

7          DR. LANDRUM:  Yeah.  So, I -- I don't have a

8  comment about the number itself.  I wonder a little bit

9  about how to get to that number, whether it might be better

10 to sample more days, you know, double the number of days per

11 quarter and only take half a percent of users.  And I -- I

12 don't have a strong view on that because I don't know the

13 data well enough to know which is the better approach, but

14 it's just a consideration.

15         THE COURT:  Okay.  All right.  All right.

16    Okay.  Ms. Bali, let's go back to the content issue

17 because if we're down to just a -- an identification in each

18 sample, okay, here are your -- your 380,000 samples and they

19 are numbered 1 to 380,000, doesn't that address the

20 concerns?  I appreciate, yes, there's still content being

21 shared, but is it -- isn't that helpful on the false accept

22 issue?  I mean, isn't that -- doesn't that inform the false

23 accept issue?

24         MS. BALI:  Well, I mean, I don't think they need

25 the substance of the query to inform the false accept issue.

55

1  I mean, our position is not, you know -- you know, is not

2  exactly what Ms. MacLean described.  Our position is that

3  you can't determine whether something is a false accept

4  without actually listening to the query, right, and

5  listening -- listening to the audio.  And Ms. Beaufays can

6  speak to that.  That's -- you know, she knows that better

7  than anybody.  But, you know, I think anonymization does

8  help, but I also think that the Stored -- oh, look, her --

9  her video worked for a moment there.

10             THE COURT:  Ah.

11             DR. BEAUFAYS:  I am an engineer after all.  I

12  could figure it out.

13             MS. BALI:  All right.

14             THE COURT:  Excellent.

15             MS. BALI:  The other -- you know, she -- she can

16  speak to that -- that piece better than anybody, but the

17  other -- the other important thing to note is that the

18  Stored Communications Act prohibits the service provider

19  from disclosing content.  It doesn't say but it's okay if

20  it's anonymized.  And, you know, I under -- I do think, you

21  know, anonymization does help from a privacy standpoint, but

22  I don't think it takes us outside the scope of the SCA, and

23  I don't think there's any articulated reason why Plaintiffs

24  would need the actual substance of the query.  I think all

25  they're trying to examine is whether or not it has a

1 preamble or not.  And that can be answered without reference

2 to the substance of the query.  So, there's really no need

3 to -- to disclose, you know, the -- the substance of the

4 query, and I -- the last point I'll make about this is that,

5 you know, a user can say anything after they say the

6 hotword, and they can even say things that might be

7 identifying or that might be private or, you know, about

8 people and their family or whatever.  I mean, and we have no

9 way of knowing what is in the substance of that query and

10 whether it, you know, might disclose private information

11 about them.

12         THE COURT:  So, let's go back to the issue that we

13 discussed a moment ago last time we spoke, because I didn't

14 quite get it in my note, which was you can't -- or you're

15 looking -- you haven't yet figured out a way to, what, just

16 assess the preamble?  Is that what we were talking about?

17         MS. BALI:  Yeah, to see if there's some automated

18 way to separate out the preamble and the main query.  And we

19 -- we are still exploring that.  We haven't found an easy

20 solution to it, but we are exploring it and hopeful that we

21 can find something that is easier than like a manual

22 redaction.

23         THE COURT:  Yeah.  Okay.  But what about Ms.

24 MacLean's point -- and I haven't reviewed the class cert

25 papers, at least not lately, with regards to an argument by

57

Google that to determine whether or not there's a false
accept, you have to, in fact, review the -- the entire
query?

MS. BALI:  It's that you have to listen to the
audio is -- is the point, and we made this point even in
connection with this dispute is that we didn't think that
this exercise of looking for whether the hotword appears in
the top hypothesis is going to reliably tell you whether or
not something is a false accepting.  And I know your Honor
decided that we need to just plow forward anyway, and we can
make arguments later about, you know, what you can extract
from this sample, and that's -- that's fine.  You can do
that.

But, you know, our argument is not you need to look at
the substance -- the text --

THE COURT:  Well, whether you're --

MS. BALI:  -- substance of the query.

THE COURT:  -- listening to it or reading it, it's
the same thing, right?  It's the same thing.  You're saying
you need access to the whole message to make that
determination.

MS. BALI:  It's not the same thing, and I'd like
to -- I'd like to -- I think really nobody can explain it
better than Ms. Beaufays.  So, I'd like to give her an
opportunity to speak on that if you -- if your Honor's okay

58

1   with that.

2           THE COURT:  First I want to hear what -- why that

3   isn't the same thing.  I will hear from Ms. Beaufays.

4           MS. BALI:  Well, all the top hypothesis tells you

5   is what the ASR captured, which is the Automatic Speech

6   Recognition model that tries to convert what the user says

7   in the text.  And sometimes, you know, at various points of

8   time -- and, again, Ms. Beaufays can speak to this better --

9   the ASR didn't even transcribe the hotword always.  So,

10  there were differences over time in what got captured by the

11  ASR, how the ASR worked, and there's things that you can

12  glean by listening to an audio for -- an audio recording

13  that you cannot glean from just looking purely at texts,

14  particularly machine-generated texts, right, which is why

15  Google has the Human Review Program to begin with, right.

16  It's like how -- how good is our ASR, and -- and how can we

17  make it better, right.  That's -- that's what you learn by

18  having --

19          THE COURT:  Your point is is we're not talking

20  about audio, if we're talking about text, then you can --

21  you know, you don't' need even more than the preamble, but

22  you don't have a way to isolate that?

23          MS. BALI:  Not yet.  Not yet, but that doesn't

24  mean we can't.

25          THE COURT:  Yeah.  I'm very confident in Google's

59

capability in that regard.  Okay.

So, it sounds like where we are -- and, Ms. MacLean, did you have further comment on Doctor Landrum's thought about, well, more days with a lower percentage, that is, still keeping the sample -- ultimate sample size the same?

MS. MACLEAN:  That's an interesting question.  I don't know offhand.  Let me ask the peanut gallery.

THE COURT:  Yeah.  Understood.

MS. MACLEAN:  But, in the meanwhile, if I might make another -- just one more point about the content of the communications.

THE COURT:  Uh-huh.

MS. MACLEAN:  And I can give you an example of communications where if you look at the text -- for example I say "Play Frozen on Google Play Music," I have not said the hotword.  I have not said "Hey Google" or "Okay Google."  I did, however, intend that query for Google.

THE COURT:  Um-hmm.

MS. MACLEAN:  Because that wouldn't be a false accept, and that is a way in which you can use the actual content of the query to determine by its context whether it is intended for Google or not, "Add this to my shopping list" for example.

THE COURT:  Um-hmm.  I understand, and there are concerns on -- on both sides.  What's not clear to me is if

1  I order -- well, it seems like it should be -- we should be

2  okay if it's completely anonymous and -- and it's -- the

3  information is turned over pursuant to court order, that

4  that's not going to lead to further liability by Google,

5  which seems to be your concern, Ms. Bali.

6      I share -- I appreciate the concern about you turning

7  over the content of users' messages.  I get that.  I'm

8  trying to also get -- you know, allow for the Plaintiffs to

9  have the meaningful -- the -- the conundrum here is we're

10 talking about false accepts, and we're talking about whether

11 certain words are in that -- are in that query or not.

12 That's -- that's the challenge.

13         MS. BALI:  I fully understand the challenge, and

14 it's a tricky one.  This one is tricky, and we've been

15 thinking about it and trying to see how we can problem solve

16 it for some time, but I just -- I don't think at least under

17 the plan language of the SCA or even, you know, producing

18 content in response to a court order in a civil case gets us

19 around the SCA.  So, it is a real problem that we just have

20 to contend with.  And, you know, I'm hopeful that we can

21 find a solution to first, you know, the preamble and the

22 substance of the -- of the query and -- and that that would

23 be a workable solution.

24         THE COURT:  But part of why I can't -- I mean,

25 it's okay, but you don't have that, right.  You can't do

61

1  that.  You can't tell the Court you can do that.  So, that

2  -- that leads to, well, I mean, Plaintiffs have to be able

3  look and see if there's a hotword.

4         MS. BALI:  No, I -- I understand.  I wish I could.

5  I wanted nothing more than to be able to provide the Court

6  with a solution to this problem, but the fact of the matter

7  is it's just -- it's a complicated one and a tricky one that

8  our -- you know, we've been working to solve but haven't

9  been able to.  But I'm not -- I'm not at the point where I

10  think a solution is not possible.  So, you know, I know -- I

11  know that the Court wants to move this along but --

12         THE COURT:  Yeah.  Yeah, we have to -- we have to

13  move forward.

14       Ms. MacLean, did you have any more information?

15         MS. MACLEAN:  Well, I'm not sure that the esteemed

16  peanut gallery -- oh, yeah, as far as the numbering?

17         THE COURT:  Yeah, yeah.

18         MS. MACLEAN:  I'll defer to Doctor Landrum.  She

19  is smarter than I am and knows more about numbers, that that

20  is a more effective way of looking at it.

21         DR. LANDRUM:  I'll just say that it does create a

22  lot more work given how the data is stored.  And the judge

23  -- your Honor may not be sympathetic to that.  I just want

24  to -- I just want to note that the way the data is kept is

25  it's by day.  So, if we're now doubling the number of days,

1    it's -- we're talking about polling and processing, you

2    know, double the amount of data.  So, it is -- it is going

3    to be a lot more time consuming and labor intensive and

4    expensive to do that.

5            THE COURT:  Well, it's pulling more days, but,

6    again, this is an automated process, to be sure.  And then

7    it's looking at the total queries on that day, and then it

8    is doing the math and then setting up the sampling.

9        Now, all of the selection of days and the sampling of

10   users has to be random and randomized.  How -- how do you

11   propose going about that and giving -- I need a way that

12   that's going to happen that also gives Plaintiffs some

13   assurance that that's how it is happening?

14       Ms. Bali, do you have a -- a -- input on that, please?

15           MS. BALI:  I think -- I think in -- you know, and

16   I'll -- I think, you know, we don't have super strong

17   feelings about what days are selected.  I think our bigger

18   concern is the number of days just because of the burden

19   imposed, and I'm not -- I'm not exactly -- I don't think

20   it's all automated.  There is definitely some engineer work

21   that is going to go into this, which is fine, but -- which

22   is fine.  I just want to --

23           THE COURT:  No.  I -- I understand.  I didn't mean

24   to imply all you have to do is sit there and push a button.

25       I think I know where you're headed, which is maybe what

63

1  you had suggested or at least was somewhere in the papers,

2  which is Plaintiffs select the days.

3       MS. BALI:  Yeah, we had given them the option

4  initially to select whatever days they think are

5  appropriate.  And I think, you know, our -- our focus at

6  least in the negotiations was more so on the number of days

7  rather than which days.

8       THE COURT:  I understand.  So, Plaintiffs can

9  select the days.  That will ensure, Ms. MacLean,

10 distribution that you want over weekdays, weekends.  That is

11 for each of the 25 quarters you can pick the days and query

12 whether that's going to be four or eight.  And, so that --

13 that takes care of the days.

14    For the  users, that is, for the queries, do you want

15 Ms. MacLean to, you know, on this day use the -- use every

16 other query or every 10th query or every whatever until you

17 cap out at the -- at the percentage?

18       MS. MACLEAN:  I would -- that would be a Doctor

19 Landrum question I would think.

20       THE COURT:  Well, yeah.  What I'm really -- I'm

21 going to give -- if I give that to the Plaintiffs, if I let

22 the Plaintiffs do that such that you're picking the days and

23 you're -- you're picking the randomization of the -- of the

24 queries, I think that addresses any concern as to is this

25 data really random.

1          MS. BALI:  I think there's a --

2          THE COURT:  You're not relying on Google is my

3   point.

4          MS. MACLEAN:  Understood, your Honor

5          MS. BALI:  I think there is like a random number

6   generator type system that can just pull like queries at

7   random from a sample set.  So, you know, which is probably

8   technologically easier than doing like every tenth query or

9   something like that, which I think would -- yeah.  So --

10         THE COURT:  I would hope that you all could agree

11  on that.  Are you talking about a tool -- a Google tool for

12  selection?

13         MS. BALI:  I think it's just a tool used in

14  statistics, and I'm sure Google has some version it can

15  used, right, that's just a random -- you know, ability to

16  make a random selection, yeah.

17         THE COURT:  Okay.  All right.  Okay.  Then this is

18  what we will do.

19         MS. BALI:  Your Honor, can we -- can we give our

20  expert just a moment to talk about sample size?

21         THE COURT:  Yeah, yeah.

22         MS. BALI:  I think that should be helpful.

23         THE COURT:  Again --

24         MS. BALI:  Thank you.

25         THE COURT:  -- I want to keep us moving.  We're

1  going to come up on two hours here, but you've got your

2  experts here, and it has been very helpful to the Court.  In

3  part, it is helpful to me to know when counsel's making

4  misrepresentations they have a source right -- right at

5  their fingertips who is -- I know is here and is engaged and

6  is either affirming or -- or saying hold up as we work

7  through these issues.

8       So, I know there's been a lot of assistance behind the

9  scenes, which I appreciate.  But, yeah, let's talk about

10 sample size.

11      Doctor Borck?

12          DR. BORCK:  Thank you, your Honor.  I can only

13 speak from a statistical perspective about this.

14          THE COURT:  Understood.

15          DR. BORCK:  But, of course, sample size is of

16 great interest in -- in many contexts.  In fact, I was

17 talking to my students about it earlier today.

18      I think one of the insights, the essential insights of

19 statistics is that you can obtain reliable results from

20 really modest samples.  :So, I just wanted to share my

21 experience.  I -- I've been involved in litigation in

22 mortgage-backed securities where samples of several hundred

23 were used in a court.  I have proposed my expert samples of

24 medical claims of about a thousand or so, and while those

25 may seem very modest and are worlds away from what we've --

66

1  what we're talking about here, I'm confident as a

2  statistician that even those sizes of samples can give

3  reliable -- very reliable results.  By that I mean very

4  small confidence intervals and margins of error.

5      So, I share this not to say that there's a right answer

6  to this --

7          THE COURT:  Um-hmm.

8          DR. BORCK:  -- but simply that reducing the sample

9  size even substantially from the one that we've been

10  discussing will have a barely noticeable effect on the

11  statistics that come out of it.  It will be almost

12  impossible to see.

13          THE COURT:  Um-hmm.  I appreciate that, Doctor

14  Borck.  One thing I'm trying to balance is we have these

15  significant levers between user data and -- and queries, and

16  you heard the Plaintiffs and their interest in and around

17  user characteristics so that, again, they could have more

18  insight into -- into what, you know, these -- any particular

19  numbers on any particular day, and to try to compensate for

20  that, for that complexity and taking that complexity of user

21  information out of our sampling model, I'm -- I'm turning to

22  the -- the sample size.  Now, it's not a -- it's not a

23  perfect give and take, but that is the -- the Court's

24  thinking is, well, at least if it's bigger, then some of

25  those -- if there are some inherent biases, perhaps those

67

1  are -- are smoothed out.  I know that's a very non-academic

2  thought, but that's -- that's kind -- those are the levers

3  or the -- the sample size versus the, you know, very -- a

4  lot of additional information about users.  And I don't know

5  in your experience with the smaller sample sizes if there

6  was more specific data behind that sampling that was

7  available.

8      DR. BORCK:  There has been -- there has been.

9  I've encountered similar issues in --

10     THE COURT:  Um-hmm.

11     DR. BORCK:  -- some of the work I've done.  And,

12 although every -- of course, every application is unique, I

13 -- I do feel that -- that much smaller sample sizes can

14 still solve the issues that you're -- that you're

15 describing.

16     THE COURT:  Appreciate that.  Thank you.

17     DR. BORCK:  Of course.

18     THE COURT:  Thank you.

19   Doctor Landrum, did you want to -- do you have further

20 thoughts on that?

21     MS. LANDRUM:  No.  I think what you brought up was

22 -- was essentially what I would have said in a slightly more

23 technical way is that this -- I mean, I agree --

24     THE COURT:  Slightly?  In a far more technical and

25 accurate way you would have described --

1          MS. LANDRUM:  In many cases, smaller sample sizes

2    are fine, but we've heard -- but the sample -- what really

3    drives the sample size calculation is how much variation

4    there is in the data.  And, so, I -- which is why I

5    suggested maybe -- specifically more days, because we've

6    heard that there's variation in the number of queries by

7    day.

8          I work in -- in healthcare data.  And, so, I'm not as

9    familiar with these kinds of data.  And, so, given that

10   there could be a lot of variation both in the false

11   acceptance rates and just the total number of queries by

12   days, it's very difficult for me to know what the right

13   sample size is without knowing more.

14          THE COURT:  Okay.  All right.  I appreciate that.

15   Thank you.

16          You all -- I mean, I know counsel, for our experts and

17   other guests, if you haven't been through a lot of

18   experiencing these -- this process through litigation,

19   you'll know there is no -- there is no right size.  If there

20   is, we -- we never get there.  But we certainly do our best,

21   and we do it with -- with the information that we have.

22          Okay.  Then here's what I'm going to -- here's what

23   we're going to do.  We will -- Google will commence

24   forthwith.  We have a -- we have a deadline, and it's going

25   to be here before we know it with regards to production of

69

sample sets, and we will go -- we'll do -- over the 25

quarters, we will do eight days, eight days in each quarter.

We will increase the number of days, and we'll take a point

five percent, half a percent of the queries on any one of

those days.  So, for each day, Plaintiffs will identify the

days and provide those to Google.  For each of those days,

Google will provide the total number of queries on that day

and will provide the data for point five percent of those

queries to be randomly selected with the -- the tool you

will agree on or you will mutually identify.  And the

information will -- the raw data for those queries will be

sufficient to determine the number of queries that did not

contain a hotword, those that were sent to a human reviewer

and the number of queries that were included in a data set,

and Google will run those calculations and provide those in

addition to the raw data to Plaintiffs, and Plaintiffs have

the information.  They can check it, and they can do

whatever else they want with the data.

     The -- Google may anonymize the data.  The queries will

be turned over.  Google does not have a way to isolate --

automate pulling out just the preamble, and so it will need

to be -- the content will be provided in full.

     I think that is everything that we have touched on

today.  I am satisfied from my discussions with Doctor

Landrum and Doctor Borck as well as the input from Ms. -- or

70

1  Doctor Beaufays that this will be meaningful.  It's not

2  perfect in either sides' eyes.  There are faults and

3  concerns with regards to the volume of work and what is

4  included and what is not included, which is, of course, the

5  essence of compromise.  But I think that this is a sampling

6  protocol that will help to move this case forward.  It will

7  meet Plaintiffs' needs, and it is doable in a time frame

8  that we have.  And, as the data becomes available, it needs

9  to be provided by Google to Plaintiffs on a rolling basis

10  with production complete December 16 or our previous

11  deadline.

12      All right.  Any other questions on this issue for the

13  Court today from Plaintiffs, Ms. MacLean?

14          MS. MACLEAN:  No, your Honor.  Thank you, your

15  Honor.

16          THE COURT:  Thank you.

17      Ms. Bali for Google?

18          MS. BALI:  Nothing further.

19          THE COURT:  Okay.  All right.  Thank you all very

20  much.  I appreciate it.  That concludes this matter, and we

21  are adjourned.  And thank you all to the other participants,

22  especially the experts.  I appreciate their availability.

23      Thank you.

24          MS. MACLEAN:  Thank you.

25          (Proceedings concluded at 3:19 p.m.)

71

1                   <u>CERTIFICATE OF TRANSCRIBER</u>

2

3        I certify that the foregoing is a true and correct

4    transcript, to the best of my ability, of the above pages of

5    the official electronic sound recording provided to me by

6    the U.S. District Court, Northern District of California, of

7    the proceedings taken on the date and time previously stated

8    in the above matter.

9        I further certify that I am neither counsel for,

10   related to, nor employed by any of the parties to the action

11   in which this hearing was taken; and, further, that I am not

12   financially nor otherwise interested in the outcome of the

13   action.

14

15                         

16

17              Echo Reporting, Inc., Transcriber

18                 Monday, October 31, 2022

19

20

21

22

23

24

25