# EXHIBIT BQ

EXHIBIT 82

*HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

IN RE GOOGLE ASSISTANT PRIVACY
LITIGATION

Master Docket No.: 19-cv-04286-BLF

**EXPERT REPORT OF RENE BEFURT, Ph.D.**

**September 13, 2022**

*HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY*

**TABLE OF CONTENTS**

I.   **Introduction** ....................................................................................................**3**

    A.  Qualifications ................................................................................................3

    B.  Case Background ..........................................................................................4

    C.  Assignment ...................................................................................................6

II.  **Summary Of Conclusions** ...............................................................................**7**

III. **The Reed-Arthurs Report's Limited Review of Academic Research and
Google's Internal Documents Overlooks Foundational Literature on Privacy
and Provides Incomplete Representations of the Few Sources It Cites** ...............**10**

    A.  The Reed-Arthurs Report's Minimalist "Review of Academic Research"
Ignores the Foundational Literature on the Privacy Paradox and Resorts to
Presenting Incomplete Representations from Only Two Articles .........................11

    B.  The Reed-Arthurs Report's Selective and Cursory Review of Internal Google
Documents Provides Incomplete Representations of the Sources It Cites ............15

        i.  *"Google Assistant At Home: Final Research Report" Presentation (GOOG-ASST-
0021071-160)*................................................................................................15

        ii.  *"Google Assistant + Privacy: US Topline Report" Presentation (GOOG-ASST-
00218676-724)*..............................................................................................16

        iii.  *Email "Re: Assistant Privacy Answers Analysis #5 – Competitive Analysis |
Suggestion Chips | False Accept" (GOOG-ASST-00225446-453)*.............................18

        iv.  *"Assistant Misactivations & Ads Personalization: Interview Study Results"
Presentation (GOOG-ASST-00238319-357)* ......................................................19

IV.  **The Reed-Arthurs Report's Flawed "Initial Survey" Shows Heterogeneity in
the Privacy Beliefs and Attitudes of Members of the Proposed Class and Fails
to Account for the Well-Established, Biasing Effects From the Privacy
Paradox** ......................................................................................................**20**

    A.  At Face Value, the Results of the Initial Survey Demonstrate Heterogeneity in
the Proposed Class's Privacy Feature Usage, and in Their Understanding of
and Attitudes Towards Privacy Practices ............................................................22

    B.  The Initial Survey's Results Are Rife with Contradictions, Indicating that Its
Results Are Not Reliable ..............................................................................29

    C.  The Initial Survey Offers No Method to Account for the Privacy Paradox and
Therefore Likely Yields Inflated Preferences and Stated Importance of
Privacy ......................................................................................................36

    D.  The Initial Survey's Persistent Probing on Privacy-Related Topics and Other
Methodological Issues Create Further Biases that Exacerbate the Inflating
Effect of the Privacy Paradox ........................................................................37

E. The Reed-Arthurs Report Lacks the Evidence Needed to Conclude that a Hypothetical Disclosure Would Likely Affect Willingness-to-Pay and Consumer Demand....................................................................................................41

**V. The Conjoint Survey(s) Proposed by Dr. Reed-Arthurs is Fundamentally Flawed and Cannot Yield a Reliable Estimate of Willingness-to-Pay or a Price Premium ........................................................................................................43**

A. The Proposed Conjoint(s) Does Not Account for Consumers Who Already Understand and Accept at the Time of Purchase that False Activations May Be Recorded and Shared with Human Reviewers ................................................45

B. The Proposed Conjoint(s) Neglects to Consider the Extent of the Complexity and Variation Among Relevant Google Assistant Enabled Devices...................52

C. The Reed-Arthurs Report Offers No Method to Account for the Upward Bias in the Proposed Conjoint(s) Introduced by the Privacy Paradox..........................57

D. The Proposed Conjoint(s) Presents Privacy-Related Features in an Imbalanced Manner that Does Not Accurately Reflect the Real-World and Omits the Benefits Associated with these Privacy Features, Preventing Respondents From Making Realistic "Trade Offs" and Likely Inflating Willingness-to-Pay Estimates in Favor of the Plaintiffs.......................................................................59

E. Because Three Out of Ten Features are Related to the Privacy Policy, the Proposed Conjoint Places Unnatural Prominence on Privacy and Creates Focalism Bias and Demand Artifacts That Will Likely Yield Inflated Willingness-to-Pay Estimates ..................................................................................65

F. The Proposed Conjoint(s) Presents Cognitively Burdensome Exercises to Respondents and is Likely to Yield Unreliable Estimates......................................68

G. The Reed-Arthurs Report's Proposed Calculation of Willingness-to-Pay Does Not Account for Supply-Side Factors and Does Not Equate to Market Price in Equilibrium, and Therefore Will Not Yield a "Price Premium" or "Price Premium Percentage"............................................................................................70

**VI. Restatement of Conclusions ..........................................................................................72**

*HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY*

## I.  INTRODUCTION

### A.  Qualifications

1.  I am a Principal at Analysis Group, Inc., a consulting firm that specializes in providing economic, financial, statistical, and strategy consulting to law firms, corporations, and government agencies. I received my M.B.A. and Diplom-Kaufmann (M.B.A equivalent) from Union College in 1999 and the University of Mannheim in 2002, respectively, both with a focus on marketing and market research. I received my Ph.D. degree in Business Administration with Focus on Marketing from the University of St. Gallen in 2009, specializing in marketing metrics and measurement, multivariate statistics, and behavioral economics. In addition, I was a visiting researcher in the Marketing Group at the MIT Sloan School of Management from 2006 to 2008. Subsequently, I joined Analysis Group in 2008.

2.  I was a lecturer on the principles of marketing at the University of Cooperative Education in Mannheim, Germany. I supervised and consulted on a number of projects during my tenure as a Researcher and Statistics Consultant at the Center for Business Metrics at the University of St. Gallen, including choice-based conjoint, market forecasting, and product positioning projects for Audi Germany, Daimler-Chrysler Germany, Swiss Postal Service, and Buehlergroup Switzerland. My clients have also included General Motors and Chrysler Group LLC.

3.  My fields of specialization within marketing include marketing strategy, marketing research related to consumer decision-making, product design, product positioning, product usage, and brand perception. I am the author (or co-author) of several articles which have been published in leading marketing journals, and I have presented my research at numerous conferences. During my career, I have taught, conducted empirical research, and written papers on the positioning of brands, product lines, and product designs. A copy of my curriculum vitae is attached as **Appendix A** to this report and includes a list of my publications.

4.  During the course of my work at Analysis Group, I have consulted for commercial entities involved in matters related to data privacy and consumer privacy expectations, intellectual property, false advertising, and trademark litigation, including matters of forward confusion, reverse confusion, secondary meaning. I have also worked extensively on cases involving consumer valuations of product features, product defects, and product usage. I have supported experts retained to evaluate and testify on these topics relating to damages. In addition, I have been engaged as an expert in litigation matters. My recent testimony at deposition or trial is attached as **Appendix B**.

*HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY*

### B.    Case Background

5.    Based on my review of the Fourth Amended Complaint ("Complaint") and Plaintiffs' Class
Certification Memorandum, I understand that Plaintiffs are Asif Kumandan, Melissa Spurr,
Melissa Spurr as guardian of B.S., a minor, Lourdes Galvan, and Eleeanna Galvan (collectively,
"Named Plaintiffs"), residing in California, New Jersey, and New York.[1] They bring suit against
Defendants Google LLC and Alphabet Inc. (collectively, "Google" or "Defendants") on their
own behalf and on behalf of several proposed classes:

- a "Purchaser Class" consisting of "[a]ll Users who purchased a Google-Made Device,"
  where "Users" are defined as "individuals whose Gmail accounts were associated with at
  least one Google-Assistant Enabled Device ('GAED') […] during the Class Period";[2]

- a "Privacy Class" consisting of "[a]ll Opted-In Users of Google Home Devices who have
  a recording resulting from a False Accept associated with their Google account," where
  "Opted-In Users" are those "who have enabled Voice and Audio Activity"[3] for their
  Google Assistant, which Google's help page states allows "Google [to] save audio
  recordings when you interact with Google […] Assistant […], in your Google Account,
  on Google servers with your Web & App Activity";[4]

---

[1]    Fourth Amended Consolidated Class Action Complaint, *In re Google Assistant Privacy Litigation*, United
States District Court, Northern District of California, San Jose Division, Master Docket No.: 19-cv-04286-
BLF, August 2, 2021 ("Complaint"), p. 1, ¶¶ 18-19, 27-28, 38. I understand from Counsel that Edward
Brekhus and Jon Hernandez, who are mentioned in the Complaint, are no longer Named Plaintiffs.

[2]    Plaintiffs' Memorandum of Law in Support of Their Motion for Class Certification, *In re Google Assistant
Privacy Litigation*, United States District Court, Northern District of California, San Jose Division, Master
Docket No.: 5:19-cv-04286-BLF, July 18, 2022 ("Plaintiffs' Class Certification Memorandum"), p. 1,
reference marks omitted. "Google-Made Devices" are defined as "GAEDs manufactured and sold by
Google, including Google's own smart home speakers, Google Home, Home Mini, and Home Max; smart
displays, Google Nest Hub, and Nest Hub Max; and its Pixel smartphones." Plaintiffs' Class Certification
Memorandum, p. 1.

[3]    Plaintiffs' Class Certification Memorandum, p. 1, reference marks omitted. "Google Home Devices" are
defined as "GAEDs for which the location is set to 'Home' or a location within 'Home,' such as 'Living
Room' or 'Dining Room.'" "False Accepts" are defined as "instance[s] in which Google Assistant records
and transmits audio to Google without manual activation or a Hotword" such as "Hey Google." Plaintiffs'
Class Certification Memorandum, p. 1.

[4]    "Manage audio recordings in your Web & App Activity," *Google Help Center*, available at
https://support.google.com/websearch/answer/6030020, accessed August 16, 2022.

- a "Privacy Disclosure Subclass" including "[a]ll members of the Privacy Class for whom Google shared at least one recording resulting from a False Accept with a human reviewer"; and

- a "Privacy Use Subclass" including "[a]ll members of the Privacy Class for whom Google used at least one recording or transcript resulting from a False Accept for: (i) testing or training of Google technology, or (ii) targeted advertising."[5]

6. The Fourth Amended Complaint defines the "Class Period" as "May 18, 2016 to present, or during the applicable statute of limitations."[6]

7. Defendants are Google LLC, a technology company with its principal place of business in Mountain View, California, and Alphabet Inc., the parent holding company of Google LLC, also with its principal place of business in Mountain View, California.[7]

8. According to the Complaint, Plaintiffs allege that Defendants engaged in "unlawful and intentional interception and recording of individuals' confidential communications without their consent and subsequent unauthorized disclosure of those communications to third parties from approximately May 18, 2016 to present (the 'Class Period')."[8] Further, Plaintiffs allege that Defendants made "false and deceptive representations – *i.e.*, that Google would only record or process their conversations or other audio if they use a specific activation phrase – to purchasers of its Google Home and Google Home Mini products."[9] Plaintiffs state that, if they and the Proposed Class had known about Defendants' alleged conduct, "Plaintiffs and [Proposed] Class Members would not have used Google Assistant with their Google Assistant Enabled Devices and would not have bought, installed, and/or would have paid less for the Google Home products and Google Manufactured Devices."[10]

9. Counsel for Plaintiffs retained Dr. Rebbecca Reed-Arthurs "to describe the process by which one or more choice based conjoint ('CBC') surveys can be designed, conducted, and analyzed to

---

[5]  Plaintiffs' Class Certification Memorandum, p. 1.

[6]  Complaint, footnote 35.

[7]  Complaint, ¶¶ 76-77.

[8]  Complaint, ¶ 1.

[9]  Complaint, ¶ 1.

[10]  Complaint, ¶ 11.

measure the change in consumer willingness to pay [("WTP")] for smartphones and smart speakers/displays if the But-For World disclosures were made at the time of purchase relative to the Actual World Disclosures being made at the time of purchase."[11] Additionally, Dr. Reed-Arthurs "summarize[d] existing academic research and internal Google documents related to consumer understanding of, concerns about, and demand for privacy when using products that provide voice assistant support."[12] Dr. Reed-Arthurs also conducted "an initial exploratory survey […] related to the use of Google Assistant in various types of [Google Assistant-enabled devices], customer understandings about how those products operate, and customer preferences for data privacy in those products."[13] Dr. Reed-Arthurs submitted an expert report in support of Plaintiffs' motion for class certification on July 18, 2022 ("Reed-Arthurs Report").

## C. Assignment

10. I have been retained by Counsel for Google to review and evaluate the Reed-Arthurs Report. In particular, I have been asked to assess whether Dr. Reed-Arthurs' conclusions from academic literature and Google's documents were developed in a scientifically appropriate and valid manner. I have also been asked to review the "initial exploratory survey" conducted by Dr. Reed-Arthurs and to form an opinion on her attempted measurements, her underlying survey instruments and their administration, and ultimately the reliability of her results. Further, I have been asked to opine on whether the conjoint survey methodology and respective data analysis proposed in the Reed-Arthurs Report is feasible to provide reliable results and assess willingness-to-pay on a class-wide basis. That is, I have been asked to examine whether the methodological descriptions in the Reed-Arthurs Report are sufficiently detailed to actually depict a concrete, evaluable approach rather than being a generic sketch of an idea of how to measure the "change in consumer willingness to pay"[14] associated with the alleged privacy disclosure features in this specific matter.

11.   In forming my opinions in this report, I have considered and relied on information from a variety of sources, each of which has been identified in **Appendix C**. This information generally

---

[11]   Opening Expert Report of Rebbecca Reed-Arthurs, Ph.D., *In re Google Assistant Privacy Litigation*, United States District Court, Northern District of California, San Jose Division, Case No: 19-cv-04286-BLF, July 18, 2022 ("Reed-Arthurs Report"), ¶ 13.

[12]   Reed-Arthurs Report, ¶ 15.

[13]   Reed-Arthurs Report, ¶ 16.

[14]   Reed-Arthurs Report, ¶ 13.

includes court filings and documents independently obtained, such as academic literature or other publicly available sources. I have also relied on my education, knowledge, experience, and expertise in consumer behavior and decision-making developed over nearly 20 years of research, teaching, and consulting.

12. Analysis Group is being compensated at a rate of $775 per hour for the time I spend on this matter. Hourly rates for other Analysis Group staff working under my direction and supervision on this matter range from $380 to $575. No compensation is contingent on the nature of my findings or on the outcome of this litigation. My work in this matter is ongoing, and I reserve the right to supplement and/or amend my opinions as appropriate based on any additional information provided by the parties and/or in light of documents or testimony brought forth after the date of my signature below.

## II.   SUMMARY OF CONCLUSIONS

13. The Reed-Arthurs Report's limited review of academic research and Google's internal documents overlooks foundational literature on privacy and provides incomplete representations of the few sources it cites.

   a.   The Reed-Arthurs Report's minimal "review of academic literature," which includes only two articles, ignores foundational literature on the privacy paradox that casts doubt on the reliability of direct survey evidence related to privacy, the type of evidence which is relied upon throughout the Reed-Arthurs Report. In addition, for the two articles it does cite, the Reed-Arthurs Report presents evidence in a selective rather than balanced manner, without acknowledging the telltale signs of heterogeneity in privacy preferences evident in both articles.

   b.   The Reed-Arthurs Report's selective review of internal Google documents also offers incomplete summaries that omit evidence in these documents that conflicts with the conclusions the Report draws related to voice assistant users' privacy concerns and related behavior.

14. The Reed-Arthurs Report's flawed "Initial Survey" shows heterogeneity in the privacy beliefs and attitudes of members of the Proposed Class at face value and fails to account for the well-established, biasing effects from the privacy paradox.

   a.   The Reed-Arthurs Report offers only a selective analysis of its Initial Survey results and ignores results that, taken at face value, demonstrate the heterogeneity of respondents'

*HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY*

attitudes and beliefs regarding privacy of audio recordings captured by Google Assistant devices. This heterogeneity calls into question the broad conclusions drawn from the Reed-Arthurs Report's selective reading of the Initial Survey's results, as well as Dr. Reed-Arthurs' ability to reliably calculate "how, if at all, consumer willingness to pay for smartphones and smart speakers/displays would change" in her but-for world on a class-wide basis.

b. Dr. Reed-Arthurs' analysis of the results of the Initial Survey also ignores contradictions and straightlining in respondents' answers that, at best, represent additional heterogeneity, and may demonstrate that the Initial Survey's results are unreliable.

c. The Reed-Arthurs Report fails to acknowledge the privacy paradox in its discussion of the design and results of the Initial Survey. Additionally, the Reed-Arthurs Report does not describe any measures in the design or analysis of the Initial Survey to try to account for it. As such, the results of the Initial Survey cannot be considered accurate or realistic representations of consumers' attitudes and intentions related to privacy and likely reflect an inflated stated importance of and preferences for privacy.

d. The Initial Survey's persistent probing on privacy-related topics and other methodological issues create further biases that exacerbate the inflating effect of the privacy paradox, including demand artifacts that may allow respondents to guess the purpose of the survey, yea-saying bias in numerous questions that did not use balanced language, and the lack of a "don't know" or "unsure" option in many questions. These methodological issues likely lead to overstated importance and preferences related to privacy in the results of the Initial Survey.

e. Additionally, the Reed-Arthurs Report claims that the results of the Initial Survey "support the conclusion that the disclosure of the At-Issue Conduct to actual or potential purchasers of [Google Assistant Enabled Devices] at the time of purchase is likely to affect willingness to pay for, and consumer demand for, the At-Issue Product categories."[15] However, the Initial Survey offers no scientifically valid way to reach such a conclusion about whether or not a hypothetical disclosure would likely be material to consumers' purchase decisions or willingness to pay, their privacy beliefs, or their willingness to act differently in light of certain disclosures. Further, the design of the Initial Survey does not allow for any way to

---

[15]   Reed-Arthurs Report, ¶ 65.

*HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY*

determine the source of consumers' stated beliefs — that is, the Initial Survey cannot determine whether consumers' stated beliefs result from Google's disclosures, or whether they result from any other sources such as news coverage, discussions with friends, personal experience, or any other non-Google source.

15. The conjoint survey(s) proposed by the Reed-Arthurs Report is fundamentally flawed and cannot yield a reliable estimate of willingness-to-pay or a price premium.

   a. Fundamentally, the proposed Reed-Arthurs conjoint neglects to account for consumers who already understand — and accept — at the time of purchase that false activations may be recorded and shared with human reviewers. As such, the proposed Reed-Arthurs conjoint would yield a willingness-to-pay measure for these consumers independent from their real life (actual world) behavior. This willingness-to-pay value is not informative of what already-informed consumers had in mind when they purchased a Google Assistant Enabled Device.

   b. Further, the Reed-Arthurs Report proposes a conjoint survey that presents consumers with product attributes that do not reflect the variation among relevant Google Assistant Enabled Devices and the purchase-motivating factors that consumers take into account when considering these devices. Dr. Reed-Arthurs' proposed conjoint glosses over these complexities, and there is no indication that the rough sketch of a conjoint in the Reed-Arthurs Report is sufficiently detailed to appropriately acknowledge the enormous hurdles that this product category creates for any conjoint researcher.

   c. In failing to acknowledge the privacy paradox and in describing no attempt to account for the privacy paradox, the proposed Reed-Arthurs conjoint studies would produce inflated measures of importance and willingness-to-pay for the privacy-related attributes in the studies, rendering the results of the proposed conjoint studies unreliable.

   d. Similarly flawed is Dr. Reed-Arthurs' approach to describe the features presented to respondents repeatedly in multiple choice tasks: the proposed features are described in an imbalanced manner that does not accurately reflect the real world, only signals the disadvantages of data storage and data processing, and omits real-world benefits that are likely to change respondents' decision making when they trade-off between features and products during the conjoint exercise.

e.   Further, because three out of ten features are related to the privacy policy, the proposed conjoint places unnatural prominence on privacy and creates focalism bias and demand artifacts that will likely yield inflated willingness-to-pay estimates.

f.   Individually and together, the lengthy feature descriptions and the high number of features in Dr. Reed-Arthurs' proposed conjoint survey will place undue cognitive burden on respondents and render the results unreliable.

g.   Finally, Dr. Reed-Arthurs' proposed analysis does not attempt to provide a price premium for the at-issue features, even though a price premium is the measure expected by Plaintiffs' damages expert. Instead, the proposed conjoint would yield only an unreliable demand-side willingness-to-pay and does not take into account the supply-side factors necessary to calculate a price premium.

## III.   THE REED-ARTHURS REPORT'S LIMITED REVIEW OF ACADEMIC RESEARCH AND GOOGLE'S INTERNAL DOCUMENTS OVERLOOKS FOUNDATIONAL LITERATURE ON PRIVACY AND PROVIDES INCOMPLETE REPRESENTATIONS OF THE FEW SOURCES IT CITES

16.   Section 2 of the Reed-Arthurs Report "summarize[s] existing academic research and internal Google documents related to consumer understanding of, concerns about, and demand for privacy when using products that provide voice assistant support."[16] Based on a review of these sources, the Reed-Arthurs Report "conclude[s] that false activations of voice assistants happen with regularity, that voice assistant users are strongly averse to such false activations, and that voice assistant users are concerned about who their data is shared with."[17] Further, based on a seemingly cursory review of internal Google documents, the Reed-Arthurs Report concludes that "users of [Google's] voice assistant products: (1) have significant concerns about privacy, (2) desire greater control over their privacy, (3) find privacy issues to be a barrier to adopting voice assistant devices, and (4) experience false activations of their devices frequently."[18]

---

[16]   Reed-Arthurs Report, ¶ 13.

[17]   Reed-Arthurs Report, ¶ 32.

[18]   Reed-Arthurs Report, ¶ 25. *See,* Deposition of Rebbecca Reed-Arthurs, Ph.D. *In Re Google Assistant Privacy Litigation*, United States District Court, Northern District of California, San Jose Division, Master Docket No.: 19-cv-04286-BLF, September 7, 2022, ("Reed-Arthurs Deposition"), p. 79:20-80:1 ("Q. Dr. Reed-Arthurs, is it correct that you only discussed two academic articles in your documents considered that relate to privacy, at least in the body of your Section 2 of your report; is that right? A. In Section 2, yes, I think that is correct.").

*HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY*

17.   In the sections below, I expand on the following: **(A)** The Reed-Arthurs Report's minimal "review of academic literature," which includes only two articles,[19] ignores foundational literature on the privacy paradox that casts doubt on the reliability of direct survey evidence related to privacy, the type of evidence which is relied upon in Section 2 and throughout the Reed-Arthurs Report. Further, the Reed-Arthurs Report's summaries of the two articles it cites are incomplete representations and ignore evidence in the articles of heterogeneity in voice assistant users' attitudes towards and beliefs related to privacy. **(B)** The Reed-Arthurs Report's selective review of internal Google documents also offers incomplete summaries that omit evidence in these documents that conflicts with the conclusions the Report draws related to voice assistant users' privacy concerns and related behavior.

### A.   The Reed-Arthurs Report's Minimalist "Review of Academic Research" Ignores the Foundational Literature on the Privacy Paradox and Resorts to Presenting Incomplete Representations from Only Two Articles

18.   The Reed-Arthurs Report claims to present a "review of academic research on voice assistant privacy."[20] However, in this "review," Dr. Reed-Arthurs cites *only two* academic articles and ignores foundational articles on privacy in the academic literature — other than the two cited articles, there is no other academic literature on privacy listed in Attachment B (Documents Considered) to the Reed-Arthurs Report.[21] In considering only these two selected articles, the Reed-Arthurs Report does not mention or discuss the well-established academic literature on the privacy paradox between consumers' stated and revealed privacy preferences, even though this literature about the privacy paradox has crucial implications for the Reed-Arthurs Report's reliance on survey and focus group evidence in the Google documents, as well as for the design of the Initial Survey and the Proposed Conjoint. In addition, for the two articles it does cite, the Reed-Arthurs Report presents evidence in a selective rather than balanced manner, without acknowledging the telltale signs of heterogeneity in privacy preferences evident in both articles.

19.   First, the "review of academic research" about privacy in the Reed-Arthurs Report does not discuss the well-established literature into the "privacy paradox" that calls into question the

---

[19]   For context, a Google Scholar search for the phrase "privacy paradox" yields "about 12,500 results." "Privacy paradox," *Google Scholar*, available at https://scholar.google.com/scholar?hl=en&as_sdt=0%2C22&q=%22privacy+paradox%22&btnG=, accessed September 9, 2022.

[20]   Reed-Arthurs Report, ¶ 32.

[21]   Reed-Arthurs Report, ¶¶ 21-24 and Attachment B.

reliability of direct surveys being used to establish the value of privacy to consumers. The "privacy paradox" describes the inconsistency between attitudes and concerns about privacy stated by individuals in surveys, and the individuals' actual behavior related to how they value their privacy. Specifically, "survey results show that the privacy of their personal data is important for online users," but "most users rarely make an effort to protect this data actively and often even give it away voluntarily."[22] The existence of the "privacy paradox" has scientific researchers question the reliability of surveys that seek to directly determine individuals' stated attitudes towards and preferences for privacy. As an article published in *Science* in 2015 observed, "doubts about the power of attitudinal scales to predict actual privacy behavior arose early in the literature" as "people who claim to care about privacy often show little concern about it in their daily behavior."[23] In other words, survey evidence on the stated importance of privacy to individuals is prone to overstating the importance implied by their behavior. For example, in three experiments conducted with MIT undergraduates in 2014, researchers found that participants "say they care about privacy, but at multiple points in the process end up making choices that are inconsistent with their stated preferences" and that small incentives can lead people to protect their data less.[24] In one of their experiments, the authors found that "small incentives such as a pizza can have a large effect on decisions about privacy," in their case, the voluntary disclosure of friends' email addresses.[25] Despite this body of well-established literature, the Reed-Arthurs Report does discuss or even mention the privacy paradox. Without acknowledging the privacy paradox in its review of privacy literature, the Reed-Arthurs Report fails to address the implications of the privacy paradox for its reliance on survey and focus group evidence in the Google documents, as well as for the design of the Initial Survey and the Proposed Conjoint (*see* Sections IV.C and V.C).

---

[22]   Gerber, Nina, Paul Gerber, and Melanie Volkamer, "Explaining the privacy paradox: A systematic review of literature investigating privacy attitude and behavior," *Computers & Society* 77, 2018, pp. 226-261, at p. 226.

[23]   Acquisti, Alessandro, Laura Brandimarte, and George Loewenstein, "Privacy and human behavior in the age of information," *Science* 347(6221), 2015, pp. 509-514, at p. 510.

[24]   Athey, Susan, Christian Catalani, and Catherine Tucker, "The Digital Privacy Paradox: Small Money, Small Costs, Small Talk," National Bureau of Economic Research Working Paper 23488, June 2017 ("Athey, Catalani, and Tucker (2017)"), pp. 17-18.

[25]   Athey, Catalani, and Tucker (2017), p. 10.

20.   Second, even within the two academic articles about privacy cited in her report, Dr. Reed-Arthurs presents incomplete evidence and ignores heterogeneity of preferences demonstrated in these articles, particularly evidence that contradicts Plaintiffs' position. For example, in citing to Malkin *et al.* (2019), the Reed-Arthurs Report selectively highlights that "31% of respondents considered it unacceptable for a human to review these recordings," that "participants were very clear that the use of their data for advertising purposes would be unacceptable," and that "data shared with third parties for the purpose of providing additional functionality was viewed as uncomfortable by most respondents."[26] However, as shown in Figure 1 below, the Reed-Arthurs Report did not address the fact that *more* respondents considered it acceptable for a human to review the audio recordings than respondents who considered it unacceptable, and a total of 69% of respondents indicated that they found it acceptable or neutral for a human to review the audio recordings.[27]

*Figure 1.*[28]
*Excerpt from Malkin et al. (2019) on Acceptability of Audio Recordings*
*to be Processed by a Computer or by a Human*



**Fig. 5.** How acceptable would it be for this audio recording to be processed by a computer vs a human?

21.   Similarly, as shown in Figure 2 below, the Reed-Arthurs Report also ignores heterogeneity in whether consumers considered various uses of audio recordings acceptable. In particular, the Reed-Arthurs Report ignores that more respondents in Malkin *et al.* (2019) deemed it acceptable than respondents who deemed it unacceptable for the company to use audio recordings for "improving services" or for "new functionality"[29] — such as the improved safety benefits

---

[26]   Reed-Arthurs Report, ¶ 23.

[27]   Malkin, Nathan, Joe Deatrick, Allen Tong, Primal Wijesekera, Serge Egelman, and David Wagner, "Privacy Attitudes of Smart Speaker Users," *Proceedings on Privacy Enhancing Technologies* 4, 2019, pp. 250-271 ("Malkin *et al.* (2019)"), at p. 258-259, Fig. 5.

[28]   Malkin *et al.* (2019), Fig. 5.

[29]   Malkin *et al.* (2019), Fig. 6.

*HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY*

described in the Complaint,[30] or the improvements to the audio recognition technology for the voice services as described in Google's disclosures.[31]

*Figure 2.*[32]
*Excerpt from Malkin et al. (2019) on Acceptability of Using Audio Recordings for Various Purposes, including Improving Services and for New Functionality*



22.    The Reed-Arthurs Report ignores this evidence from Malkin *et al.* (2019) that highlights heterogeneity in consumers' preferences.

23.    The only other privacy-related article cited in the Reed-Arthurs Report is authored by Emami-Naeini *et al.* (2019), and the Reed-Arthurs Report both ignores relevant heterogeneity in privacy preferences in this article. The Reed-Arthurs Report selectively concludes from Emami-Naeini *et al.* that "[p]rivacy and security ranked high for security cameras and smart thermostats" when respondents were "asked to rank the importance of the features of connected products."[33] However, the Reed-Arthurs Report ignores that based on qualitative interviews, Emami-Naeini *et al.* "classified interviewees into seven categories" of purchase behavior based on variation in "risk awareness, knowledge of privacy and security, pre-purchase evaluation of privacy and security, post-purchase concern, and post-purchase concern management."[34] These seven categories of interviewees ranged from those who "reported being *unconcerned* about the privacy and security of their devices in both the pre-purchase and post-purchase stages" to those

---

[30]    These benefits, for example, include alerting the user to "the sound of an intruder breaking a glass window" or "glass breaking in the kitchen." Complaint, ¶¶ 109, 116, 117.

[31]    The current help page for Google's voice and audio settings states that "Google uses audio saved when this setting is on to develop and improve its audio recognition technologies and the Google services that use them, like Google Assistant." "Manage audio recordings in your Web & App Activity," *Google Help Center*, available at https://support.google.com/websearch/answer/6030020, accessed August 16, 2022.

[32]    Malkin *et al.* (2019), Fig. 6.

[33]    Reed-Arthurs Report, ¶ 24.

[34]    Emami-Naeini *et al.* (2019), p. 6.

14

who "considered privacy or security in their comparison shopping […] and took action to manage their concerns."[35] The Reed-Arthurs Report relies on Emami-Naeini *et al.* but ignores its conclusions about heterogeneity in privacy concerns, which would lead to variation in whether and the extent to which an added disclosure about privacy would affect consumers' purchase behavior.

**B.    The Reed-Arthurs Report's Selective and Cursory Review of Internal Google Documents Provides Incomplete Representations of the Sources It Cites**

   i.    *"Google Assistant At Home: Final Research Report" Presentation (GOOG-ASST-0021071-160)*

24.    The Reed-Arthurs Report cites a September 2019 presentation titled "Google Assistant At Home: Final Research Report" to conclude that ███████████████████████████

---

[35]   Emami-Naeini *et al.* (2019), p. 7.

[36]   Reed-Arthurs Report, ¶ 26.

[37]   Reed-Arthurs Report, ¶ 26, quoting "Google Assistant At Home," September 2019, GOOG-ASST-0021071-160, at 083.

[38]   "Google Assistant At Home," September 2019, GOOG-ASST-0021071-160, at 103 (emphasis added).

[39]   "Google Assistant At Home," September 2019, GOOG-ASST-0021071-160, at 103.

[40]   Plaintiffs' Class Certification Memorandum, p. 1, reference marks omitted.

██████████████████████████████████████ ██ ████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
███████████████████████████

ii. *"Google Assistant + Privacy: US Topline Report" Presentation (GOOG-ASST-00218676-724)*

26.   The Reed-Arthurs Report asserts that ██████████████ presented in the October 2019 presentation titled "Google Assistant + Privacy: US Topline Report" "indicates ████████ ██████████████

27.   ██████████████████████████████████████████████████
██████████████████████████████████████████████████████
████████████████████████████████████████ ███████████████
██████████████████████████████████████████████
██████████████████████████████████████████████████.

28.   ██████████████████████████████████████████████████
██████████████████████████████████████████████████████
████████████████████████████████████████ ██████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████████████

---

41   "Google Assistant At Home," September 2019, GOOG-ASST-0021071-160, at 083.

42   "Google Assistant At Home," September 2019, GOOG-ASST-0021071-160, at 103.

43   Reed-Arthurs Report, Section 2.2.2.

44   Reed-Arthurs Report, Section 2.2.2, quoting "Google Assistant + Privacy: US Topline Report," October 2019, GOOG-ASST-00218676-724, at 682 (emphasis in original).

45   Demand artifacts are "all aspects of the experiment which cause the subject to perceive, interpret, and act upon what he believes is expected or desired of him by the experimenter." Sawyer, Alan G., "Demand Artifacts in Laboratory Experiments in Consumer Research," *Journal of Consumer Research* 1(4), 1975, pp. 20-30, at p. 20.

46   "Google Assistant + Privacy: US Topline Report," October 2019, GOOG-ASST-00218676-724, at 680.

*HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY*

---

[47] "Google Assistant + Privacy: US Topline Report," October 2019, GOOG-ASST-00218676-724, at 680.

[48] Reed-Arthurs Report, Section 2.2.2, quoting "Google Assistant + Privacy: US Topline Report," October 2019, GOOG-ASST-00218676-724, at 682 (emphasis in original).

[49] Reed-Arthurs Report, Section 2.2.2, quoting "Google Assistant + Privacy: US Topline Report," October 2019, GOOG-ASST-00218676-724, at 682.

[50] "Google Assistant + Privacy: US Topline Report," October 2019, GOOG-ASST-00218676-724, at 682.

[51] Reed-Arthurs Report, ¶ 9.

[52] Reed-Arthurs Report, ¶ 25.

[53] "Google Assistant + Privacy: US Topline Report," October 2019, GOOG-ASST-00218676-724, at 699.

17

*HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY*



iii. *Email "Re: Assistant Privacy Answers Analysis #5 – Competitive Analysis | Suggestion Chips | False Accept" (GOOG-ASST-00225446-453)*

32.  The Reed-Arthurs Report cites to a July 2020 email thread among Google employees to establish





54  "Google Assistant + Privacy: US Topline Report," October 2019, GOOG-ASST-00218676-724, at 699.

55  "Google Assistant + Privacy: US Topline Report," October 2019, GOOG-ASST-00218676-724, at 715.

56  "Google Assistant + Privacy: US Topline Report," October 2019, GOOG-ASST-00218676-724, at 692.

57  Reed-Arthurs Report, ¶ 29. Email ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████."

58  Reed-Arthurs Report, Section 2.2.3, ¶ 29.

59  "Prevalence," *Dictionary.com,* available at https://www.dictionary.com/browse/prevalence, accessed September 8, 2022.

60  Reed-Arthurs Deposition, p. 107: 3-11 ████████████████████████████████████████████████



    *iv. "Assistant Misactivations & Ads Personalization: Interview Study Results" Presentation (GOOG-ASST-00238319-357)*

34.    The Reed-Arthurs Report briefly addresses a March 2021 presentation titled "Assistant Misactivations & Ads Personalization: Interview Study Results," ████████████████ ████████████████████████████████████ ████████████████████████████████████ ██████████████████████████████ ██████████████████████████████████ ██████████████████████████████████ ███

35.    ████████████████████████████████ ████████████████████████████████████

████████████████████████████████████████

61   Bronstein, Manuel, "A more helpful Google Assistant for your every day," *Google Blog,* January 7, 2020, available at https://blog.google/products/assistant/ces-2020-google-assistant/; "Voice Assistants in 2022: Usage, growth, and future of the AI voice assistant market," *Insider Intelligence,* April 13, 2022, available at https://www.insiderintelligence.com/insights/voice-assistants/.

62   Reed-Arthurs Report, Section 2.2.3, ¶ 29.

63   "Hey Google sensitivity," 2020, GOOG-ASST-00213485-608, at 511.

64   Reed-Arthurs Report, ¶¶ 30-31, quoting "Assistant Misactivations & Ads Personalization: Interview Study Results," March 2021, GOOG-ASST-00238319-357, at 325.

*HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY*



The Reed-Arthurs Report ignores these indications that consumers weigh the benefits and costs in their privacy-related behavior, both in its discussion of this particular document and in the design of the proposed Reed-Arthurs conjoint (*see* Section V.D).

**IV.    THE REED-ARTHURS REPORT'S FLAWED "INITIAL SURVEY" SHOWS HETEROGENEITY IN THE PRIVACY BELIEFS AND ATTITUDES OF MEMBERS OF THE PROPOSED CLASS AND FAILS TO ACCOUNT FOR THE WELL-ESTABLISHED, BIASING EFFECTS FROM THE PRIVACY PARADOX**

36.    Dr. Reed-Arthurs conducted an "Initial Fact-Finding Survey [("Initial Survey")] "to better understand consumer use of Google Assistant in [Google Assistant Enabled Devices], customer understandings about how those products operate, and customer preferences for data privacy in

---

65    Reed-Arthurs Report, ¶ 32.

66    I discuss that the Reed-Arthurs Report also overlooks this in the proposed choice-based conjoint study in Section V.D.

67    "Assistant Misactivations & Ads Personalization: Interview Study Results," March 2021, GOOG-ASST-00238319-357, at 325.

68    "Assistant Misactivations & Ads Personalization: Interview Study Results," March 2021, GOOG-ASST-00238319-357, at 349-350.

69    "Assistant Misactivations & Ads Personalization: Interview Study Results," March 2021, GOOG-ASST-00238319-357, at 351.

those products and more generally."[70] Based on the results of her Initial Survey,[71] Dr. Reed-Arthurs concluded that "[d]ata privacy is considered important by consumers in the selection process for all of the [Google Assistant Enabled Device] types surveyed" and that a majority of those who own these devices "find it unacceptable for audio recordings or transcripts of [accidentally activated] Google Assistant interactions […] to be processed or analyzed by third party computer programs or employees performing quality control or shared with third parties for other reasons."[72] From these conclusions, Dr. Reed-Arthurs extrapolates that "the disclosure of the At-Issue Conduct to actual or potential purchasers of [Google Assistant Enabled Devices] at the time of purchase is likely to affect willingness to pay for, and consumer demand for, the At-Issue Product categories."[73]

37.  In the sections below, I expand on the following: **(A)** Taken at face value, the results of the Initial Survey demonstrate heterogeneity in the proposed class's usage of their Google Assistants and in their understanding of and attitudes towards privacy practices related to their Google Assistant. This heterogeneity calls into question the broad conclusions drawn from the Reed-Arthurs Report's selective reading of the Initial Survey's results, as well as Dr. Reed-Arthurs' ability to reliably calculate "how, if at all, consumer willingness to pay for smartphones and smart speakers/displays would change" in her but-for world on a class-wide basis.[74] **(B)** Dr. Reed-Arthurs' analysis of the results of the Initial Survey also ignores contradictions and straightlining in respondents' answers that, at best, represent additional heterogeneity, and may demonstrate that the Initial Survey's results are unreliable. **(C)** The results of the Initial Survey are further rendered unreliable by the Reed-Arthurs Report's failure to address and account for the privacy paradox and **(D)** other biases introduced by the design of the Initial Survey that likely inflate the privacy-related attitudes and preferences expressed in respondents' answers. **(E)**

---

[70]  Reed-Arthurs Report, ¶ 33.

[71]  The target population for Dr. Reed-Arthurs' Initial Survey was "U.S.-based purchasers of Google Assistant-compatible devices in 2016 or later, who had enabled and used Google Assistant on that/those device(s)." Through her panel provider, Dr. Reed-Arthurs collected responses from a sample of 1,001 respondents who qualified for and completed her survey and analyzed the responses of 962 of those respondents who passed her data quality controls. Reed-Arthurs Report, ¶¶ 39, 41, 46.

[72]  Reed-Arthurs Report, ¶ 65.

[73]  Reed-Arthurs Report, ¶ 65.

[74]  *See* Reed-Arthurs Report, ¶ 66. I further discuss the methodology that Dr. Reed-Arthurs proposes to conduct this calculation in Section V.

Additionally, although the Reed-Arthurs Report claims that the results of the Initial Survey "support the conclusion that the disclosure of the At-Issue Conduct to actual or potential purchasers of [Google Assistant Enabled Devices] at the time of purchase is likely to affect willingness to pay for, and consumer demand for, the At-Issue Product categories,"[75] the Initial Survey neither provides evidence related to such a disclosure nor offers a mechanism to isolate the influence of such a disclosure.

### A.    At Face Value, the Results of the Initial Survey Demonstrate Heterogeneity in the Proposed Class's Privacy Feature Usage, and in Their Understanding of and Attitudes Towards Privacy Practices

38. 

---

[75] Reed-Arthurs Report, ¶ 65.

[76] Reed-Arthurs Report, ¶ 9.

[77] Reed-Arthurs Report, Exhibit 8a.

[78] Reed-Arthurs Report, Exhibit 8a.

*HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY*



**Notes:**

[1]

[2]

[3]

[4]

**Sources:**

[1] Reed-Arthurs Report, Exhibits 2, 8a.
[2] Reed-Arthurs Report, Attachment D.

---

79   Reed-Arthurs Report, Exhibit 8a.

*HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY*

40. ███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████

██ ███████████████████████████████████
███████████████████████████████████
█████████████████████████████ █ ████████
███████████████████████████████████████
███████████████████████████████████
█████████████████████████ █ ████████████
███████████████████████████████████████
████████████████████ █ █████████████████
████████████████████████████████████
████████████████████████████████

██ ██████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████
███████████ █ ██████████████████████████

---

80 *See, e.g.*, Complaint, ¶ 221.

81 Reed-Arthurs Report, ¶ 59.

82 *See* Reed-Arthurs Report, Exhibit 8b.



83 Reed-Arthurs Report, ¶ 59.

84 Reed-Arthurs Report, ¶ 61.



*See* Reed-Arthurs Report, Exhibit 9a and Attachment D, p. 29.

[85] *See* Reed-Arthurs Report, Exhibit 9a and Attachment D, p. 29.

[86] *See* Reed-Arthurs Report, Exhibit 9a and Attachment D, p. 29.

[87] *See* Reed-Arthurs Report, Exhibit 9c, and Attachment D.

*HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY*



---

88    Complaint, ¶ 11.

89    The Table of Contents of the Reed-Arthurs Report contains section 3.5.8, "Knowledge of, and Demand for, Ability to Control Data Uses." *See* Reed-Arthurs Report, p. 2. The body of the Reed-Arthurs Report, however, does not contain this section.

90    Analyzed results of Q18 are not presented in the Reed-Arthurs Report, exhibits, or backup.

91    Reed-Arthurs Report backup, "Final Data 1001.xlsx." *See*

*HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY*

**Table 2.**



*HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY*





*HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY*



*HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY*



*HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY*

███████████████████████████████████████████
████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
██████████████████████████████████████
████████████████████████████████████████

█    ██████████████████████████████████
██████████████████████████████████████████
█████████████████████████████████████████
██████████████████████████████████████ █ ███
███████████████████████████████████████████
██████████████████████████████████████████
████████████████████████████████████████
███████████████████ █ ████████████████████
█████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████ █ ████████
███████████████████████████████████████████
███████████████████████████████████████████
██████████████████████████████████████████
███████████████████████████████████████████

---

[101]  Reed-Arthurs Report backup, "Final Data 1001.xlsx."

[102]  Reed-Arthurs Report backup, "Final Data 1001.xlsx." ████████████████████



*See* **Exhibit 9**.

[103]  Reed-Arthurs Report backup, "Final Data 1001.xlsx."

[104]  *See* Reed-Arthurs Report, Attachment D, pp. 22; Reed-Arthurs Report backup, "Final Data 1001.xlsx."

*HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY*



*HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY*

[REDACTED]

---

[107] The Reed-Arthurs Report provides results of Q25 and Q26 in its Exhibits 9a, 9b, and 9c, and Exhibit 10, respectively, but the results of Q27 are not analyzed and presented in the Reed-Arthurs Report, exhibits, or backup.

[108] Reed-Arthurs Report backup, "Final Data 1001.xlsx."

[109] Reed-Arthurs Report, ¶ 44.

*HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY*



*HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY*

### C.    The Initial Survey Offers No Method to Account for the Privacy Paradox and Therefore Likely Yields Inflated Preferences and Stated Importance of Privacy

53.    As discussed in Section III.A, Section 2 of the Reed-Arthurs Report fails to explain or account for the "privacy paradox" in its discussion of "evidence of consumer understanding of, and demand for privacy in, voice assistant devices."[110] Similarly, Section 3 of the Reed-Arthurs Report fails to acknowledge the privacy paradox in its discussion of the design and results of the Initial Survey. Additionally, the Reed-Arthurs Report does not describe any measures in the design or analysis of the Initial Survey to try to account for it. As such, the results of the Initial Survey cannot be considered accurate or realistic representations of consumers' attitudes and intentions related to privacy and likely reflect an inflated stated importance of and preferences for privacy.

54.    As I explained in Section III.A above, the privacy paradox describes the inconsistency between individuals' stated attitudes and concerns about privacy and their actual behavior related to protecting their privacy. Specifically, evidence on the privacy paradox has shown that "even though internet users claim that privacy is a high priority, they do not behave accordingly."[111] Literature on the privacy paradox has discussed that survey responses related to privacy often overstate the importance of privacy to respondents compared to the importance implied by their behavior. For example, as one article has explained, "doubts about the power of attitudinal scales to predict actual privacy behavior arose early in the literature" as "people who claim to care about privacy often show little concern about it in their daily behavior."[112]

55.    The Reed-Arthurs Report does not acknowledge the privacy paradox and does not describe any attempts to account for biases implied by the privacy paradox in the design or analysis of the Initial Survey. ██████████████████████████████████████████████████
██████████████████████████████████████████████████████████

---

[110]   Reed-Arthurs Report, Section 2.

[111]   Kokolakis, Spyros, "Privacy attitudes and privacy behaviour: A review of current research on the privacy paradox phenomenon," *Computers & Security* 64, 2017, pp. 122-134, at p. 124.

[112]   Acquisti, Alessandro, Laura Brandimarte, and George Loewenstein, "Privacy and human behavior in the age of information," *Science* 347(6221), 2015, pp. 509-514, at p. 510.

[113]   *See* Reed-Arthurs Report, Attachment D, p. 29 ██████████████████████████
██████████████████████████████████████████████████████████

*HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY*



**D.    The Initial Survey's Persistent Probing on Privacy-Related Topics and Other Methodological Issues Create Further Biases that Exacerbate the Inflating Effect of the Privacy Paradox**

56.    The stated importance of and preferences related to privacy expressed in the results of the Initial Survey are likely further inflated by other biases introduced by the design of the Initial Survey.

57.    First, the Initial Survey's repeated probing on privacy-related topics likely introduce demand artifacts that exacerbate the inflating effect of the privacy paradox



---

114   Acquisti, Alessandro, Laura Brandimarte, and George Loewenstein, "Privacy and human behavior in the age of information," *Science* 347(6221), 2015, pp. 509-514, at p. 510.

115   Simonson, Itamar, and Ran Kivetz, "Demand Effects in Likelihood of Confusion Surveys," in *Trademark and Deceptive Advertising Surveys: Law, Science, and Design*, American Bar Association, 2012, pp. 243-259, at p. 243.

116   Reed-Arthurs Report, Attachment D, pp. 21-32.

117   Reed-Arthurs Deposition, p. 148:9-25



118   Reed-Arthurs Deposition, p. 145:6-146:4



---

[119]

[120]   Reed-Arthurs Report, ¶ 108.

[121]   Reed-Arthurs Report, ¶ 108.

[122]   Diamond (2011), p. 388.

[123]   Blamey, R., J. Bennet, and M. Morrison, "Yea-Saying in Contingent Valuation Surveys," *Land Economics* 75, 1999, pp. 126-141, at p. 126.

*HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY*



---

124  Jacoby, Jacob, "Are Close-Ended Questions Leading Questions?" in *Trademark and Deceptive Advertising Surveys: Law, Science, and Design*, American Bar Association, 2012, pp. 261-284 ("Jacoby (2012)"), at p. 274.

125  Jacoby (2012), p. 275.

126  *See* Reed-Arthurs Report, Attachment D.

127  Reed-Arthurs Report, Attachment D, p. 25.

128  Diamond (2011), p. 390.

129  For example,

*HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY*

---

[130]   Reed-Arthurs Report, Attachment D, p. 26.

[131]   Reed-Arthurs Report, ¶ 108.

[132]   Diamond (2011), p. 388.

E.   **The Reed-Arthurs Report Lacks the Evidence Needed to Conclude that a Hypothetical Disclosure Would Likely Affect Willingness-to-Pay and Consumer Demand**

63.   Dr. Reed-Arthurs argues that her findings from the Initial Survey "support the conclusion that the disclosure of the At-Issue Conduct to actual or potential purchasers of [Google Assistant Enabled Devices] at the time of purchase is likely to affect willingness to pay for, and consumer demand for, the At-Issue Product categories."[133] Similarly, in its discussion of the Initial Survey results, Section 3 of the Reed-Arthurs Report argues that the results of some questions provide "directional evidence that disclosure of the At-Issue Conduct is likely to influence consumer demand for [Google Assistant Enabled Devices]."[134] However, Dr. Reed-Arthurs' Initial Survey offers no scientifically valid way to reach such a conclusion about whether or not a hypothetical disclosure would likely be material to consumers' purchase decisions or willingness to pay, their privacy beliefs, or their willingness to act differently in light of certain disclosures. Further, the design of the Initial Survey does not allow for any way to determine the source of consumers' stated beliefs — that is, the Initial Survey cannot determine whether consumers' stated beliefs result from Google's disclosures, or whether they result from any other sources such as news coverage, discussions with friends, personal experience, or any other non-Google source.

64.   [redacted]

---

[133]   Reed-Arthurs Report, ¶ 65.

[134]   Reed-Arthurs Report, ¶ 63. *See also*, Reed-Arthurs Report, ¶ 55 [redacted]

[135]   Reed-Arthurs Report, ¶ 65.

[136]   Diamond (2011), p. 397.

*HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY*

[REDACTED]

---

137 *See, e.g.*, Acquisti, Alessandro, Leslie K. John, and George Loewenstein, "What is Privacy Worth?" *Journal of Legal Studies* 42, 2013, pp. 249-274 ("Acquisti *et al.* (2013)"); Adjerid, Idris, *et al.*, "Sleights of Privacy: Framing Disclosures, and the Limits of Transparency," *Symposium on Usable Privacy and Security (SOUPS)*, 2013, pp. 1-17 ("Adjerid *et al.* (2013)").

138 Acquisti *et al.* (2013), p. 249 (emphasis added).

139 Adjerid *et al.* (2013), pp. 1-2.

140 Reed-Arthurs Report, ¶ 65.

*HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY*

██████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

## V.   THE CONJOINT SURVEY(S) PROPOSED BY DR. REED-ARTHURS IS FUNDAMENTALLY FLAWED AND CANNOT YIELD A RELIABLE ESTIMATE OF WILLINGNESS-TO-PAY OR A PRICE PREMIUM

67.   Plaintiffs asked Dr. Reed-Arthurs "to describe the process by which one or more choice based conjoint ('CBC') surveys can be designed, conducted, and analyzed to measure the change in consumer willingness to pay for smartphones and smart speakers/displays if the But-For World disclosures were made at the time of purchase relative to the Actual World Disclosures being made at the time of purchase."[143] I understand that Dr. Reed-Arthurs has not yet conducted any choice-based conjoint surveys in this matter, but "provided a preliminary illustrative example of what such a survey might look like for smartphones," and indicated that she will design "a CBC survey to address smart speakers/displays."[144]

68.   ████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████

---

[141]   Emami-Naeini *et al.* (2019), p. 2.

[142]   Reed-Arthurs Report, ¶ 65.

[143]   Reed-Arthurs Report, ¶ 13.

[144]   Reed-Arthurs Report, ¶ 14.

[145]   *See* Order Granting in Part and Denying in Part Google's *Daubert* Motion to Exclude Dr. Cockburn's Third Report, *Oracle America, Inc., v. Google Inc.,* United States District Court for the Northern District of California, No. C 10-03561 WHA, March 13, 2012, p. 16. In this court decision, Judge Alsup finds that "If

*HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY*

[REDACTED]

---

the conjoint analysis had been expanded to test more features that were important to smartphone buyers […], then the study participants may not have placed implicit attributes on the limited number of features tested."

[146] *See* Orme, Bryan K., "Formulating Attributes and Levels in Conjoint Analysis," *Sawtooth Software Research Paper Series*, 2002, pp. 1-4 ("Orme (2002)"), at p. 1.

[147] *See* Bedi, Suneal and David Reibstein, "Damaged Damages: Errors in Patent and False Advertising Litigation," *Alabama Law Review* 73(2), 2021, pp. 385-436 ("Bedi and Reibstein (2021)"), at p. 407. Bedi and Reibstein present Dr. Srinivasan's CBC analysis in *TV Interactive Data Corp. v. Sony Corp* (2013) in which he first had respondents prioritize attributes related to the accused product and included six attributes with similar values as the at-issue attribute.

[148] Orme (2002), p. 1. This paper discusses the proper methods of designing attribute levels: "Levels should be concise statements with concrete meaning."

[149] Class Economic Damages Declaration of Fernando Torres, MSc., *In re Google Assistant Privacy Litigation*, Case No. 5:19-cv-04286, United States District Court, Northern District of California, July 18, 2022 ("Torres Report"), pp. 5, 24.

*HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY*

███████████████████████████████████

██████████████████████████████

**A.  The Proposed Conjoint(s) Does Not Account for Consumers Who Already Understand and Accept at the Time of Purchase that False Activations May Be Recorded and Shared with Human Reviewers**

69.   The Reed-Arthurs Report does not account for consumers who already understand at the time of purchasing their Google Assistant Enabled Device that their device is listening for hotwords, and that false activations may be recorded and shared with human reviewers. Such informed consumers are likely to exist because Google has made numerous disclosures regarding false activations and human review. However, the Reed-Arthurs Report (a) does not acknowledge these disclosures and (b) makes no attempt to even suggest an approach to determine which or how many consumers would make purchases with full information about the alleged conduct. As shown in the examples below and in **Appendix D**, consumers could have learned that false activations may be saved, and that they could be shared with human reviewers, via disclosures such as the following:

*Examples of disclosures from which consumers could have learned that audio from false activations may be saved:*

*Figure 3.*[151]
*Excerpt from Voice & Audio Activity enrollment*



---

[150]   *See* Allenby, Greg M., Jeff Brazell, John R. Howell, and Peter E. Rossi, "Economic Valuation of Product Features," 2013, p. 4.

[151]   Pixel 3 Screenshots for "Actions: TD enroll with SUW > Select Assistant app > Go to Voice Match > Retrain voice model > TD > at end of flow is VAA enrollment," GOOG-ASST-03047340.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

*Figure 4.*[152,153]
*Excerpt from "Manage audio recordings in your Web & App Activity"*
*Google Account Help Page*

Audio may be saved if your device incorrectly detects an activation, like a noise that sounds like "Hey Google." We're constantly working to make our systems better at reducing unintended activations.

*Figure 5.*[154,155]
*Excerpt from "How Google Assistant is designed for your privacy"*
*Google Assistant Help Page*

Google Assistant is designed to wait in standby mode until it detects an activation, like when it hears "Hey Google." The status indicator on your device will let you know when Google Assistant is activated. When in standby mode, it won't send what you're saying to Google servers or anyone else. After Google Assistant detects an activation, it exits standby mode and sends your request to Google servers. This can also happen if there is a noise that sounds like "Hey Google" or an unintended manual activation.

---

[152] "Google Help Center: Manage audio recordings in your Web & App Activity," *Wayback Machine*, available at https://web.archive.org/web/20220606211537/https://support.google.com/websearch/answer/6030020?co=GENIE.Platform%3DDesktop&hl=en, accessed September 12, 2022, as captured on June 6, 2022. *See also*, "Manage audio recordings in your Web & App Activity," *Google Account Help*, available at https://support.google.com/accounts/answer/6030020, accessed August 16, 2022.

[153] This disclosure is consistent with language available on this help page at least as early as 2020. *See* "Google Help Center: Manage audio recordings in your Web & App Activity," *Wayback Machine*, available at https://web.archive.org/web/20200901020634/https://support.google.com/websearch/answer/6030020?co=GENIE.Platform%3DDesktop&hl=en, accessed September 12, 2022, as captured on September 1, 2020 ("**Important**: Sometimes, audio might be saved if your device incorrectly detects an activation, like a noise that sounds like 'Hey Google.' We're constantly working to make our systems better at reducing unintended activations." Emphasis in original.).

[154] "Google Help Center: How Google Assistant is designed for your privacy," *Wayback Machine*, available at https://web.archive.org/web/20220629204822/https://support.google.com/assistant/answer/11091714?hl=en, accessed September 12, 2022, as captured on June 29, 2022. *See also*, "How Google Assistant designed for your privacy," *Google Assistant Help*, available at https://support.google.com/assistant/answer/11091714?hl=en, accessed September 12, 2022.

[155] This help page also states that "Google Assistant might activate when you didn't intend it to, because it incorrectly detected that you wanted its help. For example, your Google Assistant might activate when there's a noise that sounds like 'Hey Google' or you manually activate your device accidentally. We're constantly working to reduce unintended activations. If Google Assistant accidentally activates, you can say 'Hey Google, that wasn't for you,' and your Google Assistant will delete the last thing it sent to Google

*HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY*

*Figure 6.*[156,157]
*Excerpt from Google Safety Center page for Google Assistant*

> Google Assistant might activate when you didn't intend it to because it incorrectly detected that you wanted its help - for instance when there is a noise that sounds like "Hey Google" or you manually activate it accidentally. We are constantly working to make our systems better at reducing unintended activations.
>
> If that happens, and your Web & App Activity is turned on, you can say, "Hey Google, that wasn't for you," and your Assistant will delete what you said from My Activity. You can also review and delete your Assistant interactions in My Activity at any time. If Google Assistant activates when you didn't intend it to, and your Web & App Activity setting is disabled, your Assistant interaction will not be stored in My Activity.

---

from My Activity." *See* "Google Help Center: How Google Assistant is designed for your privacy," *Wayback Machine*, available at
https://web.archive.org/web/20220629204822/https://support.google.com/assistant/answer/11091714?hl=en, accessed September 12, 2022, as captured on June 29, 2022; "How Google Assistant designed for your privacy," *Google Assistant Help*, available at https://support.google.com/assistant/answer/11091714?hl=en, accessed September 12, 2022. Similar language existed on this help page as early as 2021. *See* "Google Help Center: How Google Assistant is designed for your privacy," *Wayback Machine*, available at https://web.archive.org/web/20211109234533/https://support.google.com/assistant/answer/11091714?hl=en, accessed September 12, 2022, as captured on November 9, 2021 ("Occasionally, Google Assistant might activate when you didn't intend it to, because it incorrectly detected that you wanted its help. For example, your Google Assistant might activate when there's a noise that sounds like 'Hey Google.' We're constantly working to reduce unintended activations. If Google Assistant accidentally activates, you can say 'Hey Google, that wasn't for you,' and your Google Assistant will delete the last thing it sent to Google.").

[156] "Google Safety Center: Google Assistant is built to keep your information private, safe, and secure," *Wayback Machine*, available at
http://web.archive.org/web/20220318005607/https://safety.google/assistant/, accessed September 12, 2022, as captured on March 18, 2022. *See also*, "Google Assistant is built to keep your information private, safe, and secure," *Google Safety Center*, available at https://safety.google/assistant/, accessed September 12, 2022.

[157] Similar language was available on this page as early as 2020. *See* "Google Safety Center: Google Assistant is built to keep your information private, safe, and secure," *Wayback Machine*, available at https://web.archive.org/web/20201028142729/https://safety.google/assistant/, accessed September 12, 2022, as captured on October 28, 2020; "Google Assistant is built to keep your information private, safe, and secure," GOOG-ASST-00002551-556, at 552; "Google Assistant is built to keep your information private, safe, and secure," GOOG-ASST-00034844-849, at 845 ("Occasionally, Google Assistant might activate when you didn't intend it to, because it incorrectly detected that you wanted its help (for instance when there is a noise that sounds like "Hey Google"). We are constantly working to reduce unintended activations. If that happens, you can say "Hey Google, that wasn't for you," and your Assistant will delete the last thing it sent to Google.").

*HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY*

<u>*Examples of disclosures from which consumers could have learned that audio data, including false activations, may be shared with human reviewers:*</u>

*Figure 7.*[158]
*Excerpt from Voice & Audio Activity enrollment*



*Figure 8.*[159,160]
*Excerpt of "Manage audio recordings in your Web & App Activity" Google Account Help Page*



---

[158]   Pixel 3 Screenshots for "Actions: TD enroll with SUW > Select Assistant app > Go to Voice Match > Retrain voice model > TD > at end of flow is VAA enrollment," GOOG-ASST-03047340.

[159]   "Google Help Center: Manage audio recordings in your Web & App Activity," *Wayback Machine*, available at https://web.archive.org/web/20220606211537/https://support.google.com/websearch/answer/6030020?co=GENIE.Platform%3DDesktop&hl=en, accessed September 12, 2022, as captured on June 6, 2022. *See also*, "Manage audio recordings in your Web & App Activity," *Google Account Help,* available at https://support.google.com/accounts/answer/6030020, accessed August 16, 2022.

[160]   This disclosure is consistent with language available on this help page at least as early as 2020. *See* "Google Help Center: Manage audio recordings in your Web & App Activity," *Wayback Machine*, available at https://web.archive.org/web/20200901020634/https://support.google.com/websearch/answer/6030020?co=GENIE.Platform%3DDesktop&hl=en, accessed September 12, 2022, as captured September 1, 2020. ("To help Google services better understand what people say to them, trained reviewers analyze a small percentage of machine-selected audio samples. […] [Y]our audio is disassociated from your account when reviewers access it.").

*HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY*

*Figure 9.*[161,162]
*Excerpt from Google Safety Center page for Google Assistant*

Is anyone other than me able to listen to my saved audio recordings?

If you decide to save your audio recordings, portions of them may be reviewed to help us improve our audio recognition technologies.

For example, audio recordings can be used for Google's audio review process. During this process, a sample of machine-selected audio snippets are disassociated from their Google accounts. Then trained reviewers can analyze the audio to annotate the recording and verify if the words said were accurately understood by Google's audio recognition technologies. This helps a product like Google Assistant improve its ability to understand language even better in the future.

- Additionally, a Google YouTube video titled "Privacy on Google Assistant" posted to the Google YouTube channel on January 7, 2020 states: "[I]f you decide to turn on the voice and audio recordings setting, your audio recordings can support our human review process to make Google's speech technologies better for everyone."[163]

70. Some consumers may have reviewed one or more of the several disclosures Google has made about false activations and human review prior to purchasing a Google Assistant Enabled Device. These disclosures are similar to Dr. Reed-Arthurs' "But-For" disclosures. The Reed-Arthurs Report presents in Section 1.2 the "alleged inadequate Actual-World Disclosures made by the Defendant" and the "But-For World Disclosures that Plaintiffs contend should have been

---

[161] "Google Safety Center: Google Assistant is built to keep your information private, safe, and secure," *Wayback Machine*, available at http://web.archive.org/web/20220318005607/https://safety.google/assistant/, accessed September 12, 2022, as captured on March 18, 2022. *See also*, "Google Assistant is built to keep your information private, safe, and secure," *Google Safety Center*, available at https://safety.google/assistant/, accessed September 12, 2022.

[162] This is consistent with language that was available on this page as early as 2020. *See* "Google Safety Center: Google Assistant is built to keep your information private, safe, and secure," *Wayback Machine*, available at https://web.archive.org/web/20201028142729/https://safety.google/assistant/, accessed September 12, 2022, as captured on October 28, 2020 ("If you decide to save your audio recordings, portions of them may be reviewed to help us improve our audio recognition technologies. For example, short snippets can be used for Google's audio review process. During this process, a small percentage of audio snippets are disassociated from their Google Accounts. Then trained reviewers can analyze the audio to annotate the recording and verify if the words said were accurately understood by Google's audio recognition technologies. This helps a product like Google Assistant improve its ability to understand language even better in the future.").

[163] "Privacy on Google Assistant," *YouTube*, January 7, 2020, available at https://www.youtube.com/watch?v=ZaqZcDOoi-8.

*HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY*

made about the At-Issue conduct at the time of purchase."[164] For its proposed conjoint survey, the Reed-Arthurs Report describes privacy-related features that "present[] both the Actual World Disclosures and the But-For World Disclosures."[165] However, the "Actual World" reflected in the proposed conjoint does not account for consumers who already understand at the time of purchasing their Google Assistant Enabled Device that their device is listening for hotwords, and that false activations may be recorded and shared with human reviewers.

71. These informed consumers would already account for the alleged conduct when purchasing their device, and the conjoint does not take into account the fact that some consumers have, in fact, reviewed and accepted disclosures that are similar to Dr. Reed-Arthurs' "But-For World" disclosures. As such, the proposed Reed-Arthurs conjoint would yield a willingness-to-pay measure for these consumers independent from their real life (actual world) behavior. This willingness-to-pay value is not informative of what already-informed consumers had in mind when they purchased a Google Assistant Enabled Device.

72. The Reed-Arthurs Report's proposed study design and willingness-to-pay calculation improperly assume that in the "Actual World," no relevant consumers believe that false activations could be recorded and shared with human reviewers. The privacy-related features of the proposed Reed-Arthurs conjoint that claim to "present[] both the Actual World Disclosures and the But-For World Disclosures"[166] are shown below in Figure 10:

---

164  Reed-Arthurs Report, ¶ 92.

165  Reed-Arthurs Report, ¶ 94.

166  Reed-Arthurs Report, ¶ 94.

*HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY*

*Figure 10.*[167]
*Excerpt from Dr. Reed-Arthurs' "Preliminary Description of Feature
Disclosing At-Issue Conduct" for her proposed smartphone conjoint survey
(yellow highlighting and red labeling added)*

| Information Collection | We collect information about your activity using our services, which may be used to do things like recommend content you might like.  The activity information we collect may include: |
| --- | --- |
| **"Actual World"** → | **Use:** Voice and audio information when you use audio features. |
| **"But-For World"** → | **Use & Incorrect Activation:** Voice and audio information when you use audio features intentionally and when the Voice Assistant on your device incorrectly thinks you said a hotword (e.g., Hey Google, Alexa, or Siri). |
| Third Party Data Sharing | We do not share personal information with companies, organizations, or individuals outside of the device/software manufacturers except in the following cases: |
| **"Actual World"** → | **Processing:** We provide personal information to our affiliates and other trusted businesses or persons to process it for us, based on our instructions and in compliance with our Privacy Policy and any other appropriate confidentiality and security measures. |
| **"But-For World"** → | **Processing & Human Review:** We provide personal information to our affiliates and other trusted businesses or persons to process it for us, based on our instructions and in compliance with our Privacy Policy and any other appropriate confidentiality and security measures. This includes sharing voice and audio information with third party human reviewers, including voice and audio information collected when the Voice Assistant on your device incorrectly thinks you said a hotword (e.g., Hey Google, Alexa, or Siri). |

73.     As designed, the proposed Reed-Arthurs conjoint aims to calculate a change in willingness to pay estimates between consumers' preferences for the "Actual World" privacy policies compared to the "But-For World" privacy policies it describes. However, in the real world, many consumers may already understand and model their purchasing behavior by accounting for the descriptions in the feature levels corresponding to Dr. Reed-Arthurs' "But-For World." This is because Google has made disclosures akin to those in Dr. Reed-Arthurs' "But-For World," as described above. These consumers may be aware that "[t]he activity information [collected] may include: […] "Use & Incorrect Activation: Voice and audio information […] when the Voice Assistant on your device incorrectly thinks you said a hotword," and/or that the company may "shar[e] voice and audio information with third party human reviewers, including voice and audio information collected with the Voice Assistant on your device [if the device] incorrectly thinks you said a hotword."[168] For these informed consumers, the proposed Reed-Arthurs

---

[167]  Reed-Arthurs Report, ¶ 96.

[168]  Reed-Arthurs Report, ¶ 96.

conjoint may very well measure a preference for a privacy loss between the "Use" and "Use and Incorrect Activation" feature levels, and determine a willingness-to-pay based on this preference (ignoring everything else wrong with the conjoint). However, this willingness-to-pay would quantify a privacy loss that an informed buyer would not incur in real life — this consumer would have already accounted for the alleged privacy loss in their real-world purchase decision. The Reed-Arthurs Report ignores this scenario and would, for an undetermined number of people, quantify a privacy loss that they never incurred.

74.    Because such consumers' beliefs about their devices in the actual world are essentially the same as they would be in the but-for world, their actual world and but-for world willingness-to-pay for their Google Assistant Enabled Devices would be the same. Therefore, attributing a change in willingness-to-pay for these consumers when there is likely no change in real-world purchase behavior, the proposed Reed-Arthurs conjoint would overstate any estimated average change in willingness-to-pay.

**B.    The Proposed Conjoint(s) Neglects to Consider the Extent of the Complexity and Variation Among Relevant Google Assistant Enabled Devices**

75    ███████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████  ██████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████  ███████████████████

██████████████████████████████████████

██████████  █████████████████████████████████

████████████████████████████████████

---

[169]   Reed-Arthurs Report, ¶ 68.

[170]   Reed-Arthurs Report, ¶ 127.

[171]   Orme (2002), p. 1.

*HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY*



---

172  Bedi and Reibstein (2021), pp. 389-390.

173  Bedi and Reibstein (2021), p. 391.

174  A fundamental principle of conjoint analysis is that respondents should "hold constant" everything other than the information included in the conjoint exercise. However, in the event that important features are omitted, respondents are likely to introduce an understanding or assumption regarding the features for each product profile, contrary to the instruction that the features should be held constant across product options, leading to unquantifiable noise.

175  Reed-Arthurs Report, p. 41.

176  See, for example, a description of lexicographic decision-making in Payne, John W., James R. Bettman, and Eric J. Johnson, *The Adaptive Decision Maker*, Cambridge University Press, 1993, pp. 26-27.

177  Kamps, Haje Jan, "Samsung says people prefer flip-phone-style foldable smartphones," *TechCrunch,* July 20, 2022, available at https://techcrunch.com/2022/07/20/samsung-folds-five-goes-mainstream/. Although foldable smartphones were "once a novelty three years ago, [they are] now the preferred choice for millions."

178  "How to use or manage dual SIM cards on your phone," *Samsung,* available at https://www.samsung.com/uk/support/mobile-devices/how-to-use-or-manage-dual-sim-cards/, accessed September 8, 2022. *See also* Rutnik, Mitja and Ryan Haines, "The best dual-SIM Android phones

available," *Android Authority,* September 3, 2022, available at https://www.androidauthority.com/best-dual-sim-android-phones-529470/. "A dual-SIM setup lets you have two phone numbers while also using dedicated SIM cards for data and calls/texts. Here are our picks for the best dual-SIM Android phones you can buy, but make sure you don't accidentally grab a single SIM version instead!"

[179] List gathered from BestBuy site cited by Dr. Reed-Arthurs. Reed-Arthurs Report, ¶ 54, fn. 60; *See also*, "Compare Products," *BestBuy*, https://www.bestbuy.com/site/compare?skus=6483636,6494439, accessed August 31, 2022.

[180] Hauser, John R., Felix Eggers, and Matthew Selove, "The Strategic Implications of Scale in Choice-Based Conjoint Analysis," *Marketing Science* 38(6), pp. 1059-1081, at pp. 1059, 1075.

[181] "Consumers choose smartphones mostly because of their appearance," *ScienceDaily*, October 18, 2018, available at https://www.sciencedaily.com/releases/2018/10/181018105330.htm.

[182] Ali, Zarif and Mitja Rutnik, "Smartphone buyer's guide: How to pick your first (or next) phone," *Android Authority,* August 2, 2022, available at https://www.androidauthority.com/new-phone-1002389/.

*HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY*



*Figure 11.*[184]

*Top excerpt from Best Buy smartphone comparison page cited by Dr. Reed-Arthurs, showing images of the phones prior to the "Key Specs"*



---

[183]   Reed-Arthurs Report, ¶ 54, fn. 60; *See also*, "Compare Products," *BestBuy,* https://www.bestbuy.com/site/compare?skus=6483636,6494439, accessed August 31, 2022.

[184]   Reed-Arthurs Report, ¶ 54, fn. 60; *See also*, "Compare Products," *BestBuy,* https://www.bestbuy.com/site/compare?skus=6483636,6494439, accessed August 31, 2022.



185  Haines, Ryan, "Bixby guide: Features, compatible devices, and best commands," *Android Authority,* July 27, 2022, https://www.androidauthority.com/bixby-879091/. *See also*, "Bixby," *Samsung,* available at https://www.samsung.com/us/apps/bixby/, accessed August 31, 2022.

186  Andrade, Eduardo, B, Velitchka Kaltcheva, and Barton Weitz, "Self-Disclosure on the Web: the Impact of Privacy Policy, Reward, and Company Reputation," *Advances in Consumer Research* 29, 2002, pp. 350-353.

187  Reed-Arthurs Report, ¶ 68. Reed-Arthurs Deposition, pp. 220:20-221:2.

188  "Smart Speakers & Displays," *Best Buy*, available at https://www.bestbuy.com/site/searchpage.jsp?id=pcat17071&qp=category_facet%3Dname~pcmcat1477674238305%5Ebrand_facet%3DBrand~Google&sp=-currentprice%20skuidsaas&st=google, accessed August 31, 2022.

*HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY*

**C.  The Reed-Arthurs Report Offers No Method to Account for the Upward Bias in the Proposed Conjoint(s) Introduced by the Privacy Paradox**

80.

---

[189]  "Nest Mini (2ⁿᵈ Generation) with Google Assistant – Chalk," *Best Buy*, available at https://www.bestbuy.com/site/nest-mini-2nd-generation-with-google-assistant-chalk/6348878.p?skuId=6348878, accessed August 31, 2022. *See also*, "Compare smart displays," *Google Store*, available at https://store.google.com/us/magazine/compare_nest_hub?hl=en-US, accessed August 31, 2022.

[190]  Acquisti, Alessandro, Laura Brandimarte, and George Loewenstein, "Privacy and human behavior in the age of information," *Science* 347(6221), 2015, pp. 509-514, at p. 510.

[191]  Gerber, Nina, Paul Gerber, and Melanie Volkamer, "Explaining the privacy paradox: A systematic review of literature investigating privacy attitude and behavior," *Computers & Society* 77, 2018, pp. 226-261, at p. 226.

*HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY*



82. In addition, as demonstrated by the willingness of respondents in the aforementioned study of MIT undergraduates to trade friends' email addresses for the value of a mere pizza despite their "stated preferences" that "they care about privacy,"[193] assessments of willingness-to-pay for privacy-related features, such as what Dr. Reed-Arthurs is attempting to conduct in this matter, must be carefully designed to appropriately reflect the real-world trade-offs consumers make, rather than simply reflecting their inflated stated preferences.

83. In failing to acknowledge the privacy paradox and in describing no attempt to account for the privacy paradox, the proposed Reed-Arthurs conjoint studies would produce inflated measures of importance and willingness-to-pay for the privacy-related attributes in the studies, rendering the results of the proposed conjoint studies unreliable.

---

[192]  "Hey Google sensitivity," 2020, GOOG-ASST-00213485-608, at 511.

[193]  Athey, Catalani, and Tucker (2017), pp. 10, 17-18.

**D.** **The Proposed Conjoint(s) Presents Privacy-Related Features in an Imbalanced Manner that Does Not Accurately Reflect the Real-World and Omits the Benefits Associated with these Privacy Features, Preventing Respondents From Making Realistic "Trade Offs" and Likely Inflating Willingness-to-Pay Estimates in Favor of the Plaintiffs**

84. Providing clear definition of features and feature levels in a conjoint is necessary so survey respondents can understand the choice task accurately and uniformly and provide meaningful data. Academic literature has established that a survey's language can influence respondents' answers,[194] and a Sawtooth technical paper states that "[d]efining proper conjoint attributes and levels is arguably the most fundamental and critical aspect of designing a good conjoint study."[195] Academic literature has shown that how a purchase decision is "framed," or presented to respondents, can have drastic effects on willingness-to-pay estimates.[196]

85. In contrast with this guidance, the proposed Reed-Arthurs conjoint fails to present and describe the privacy-related features in a clear and realistic manner that would allow respondents to make trade-offs as they would in the real world. Specifically, the descriptions: 1) fail to mention critical information that any shared voice or audio information is *not* tied to a user's account; 2) fail to describe the *likelihood*, especially a small one, of any particular voice or audio information being shared with human reviewers, 3) fail to describe the fact that voice or audio are only potentially recorded and shared with human reviewers if consumers *opt into* the Voice & Audio Activity feature, and 4) fail to present *any* associated benefits for consumers to trade off on, such as improving audio recognition technologies.

86. The privacy-related disclosures Dr. Reed-Arthurs proposed for her smartphone conjoint are shown again below in Figure 12, with the "but-for" feature levels highlighted in yellow:

---

[194] Payne, Stanley L., *The Art of Asking Questions*, Princeton University Press, 1951, pp. 3-5.

[195] Orme (2002), p. 1.

[196] *See* Tversky, Amos and Daniel Kahneman, "The Framing of Decisions and the Psychology of Choice," *Science* 211(4481), 1981, pp. 453-458 at p. 453; Kahneman, Daniel and Amos Tversky, "Choices, Values, and Frames," *American Psychologist* 39(4), 1984, pp. 341-350, at pp. 348-350; Arrow, Kenneth, *et al.*, "Report of the NOAA Panel on Contingent Valuation," January 11, 1993, pp. 19-20.

*HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY*

*Figure 12.*[197]
*Excerpt from Dr. Reed-Arthurs' "Preliminary Description of Feature*
*Disclosing At-Issue Conduct" for her proposed smartphone conjoint survey*
*(emphasis added)*

| Information Collection | We collect information about your activity using our services, which may be used to do things like recommend content you might like. The activity information we collect may include: <br> - **Use:** Voice and audio information when you use audio features. <br> - **Use & Incorrect Activation:** Voice and audio information when you use audio features intentionally and when the Voice Assistant on your device incorrectly thinks you said a hotword (e.g., Hey Google, Alexa, or Siri). |
|---|---|
| Third Party Data Sharing | We do not share personal information with companies, organizations, or individuals outside of the device/software manufacturers except in the following cases: <br> - **Processing:** We provide personal information to our affiliates and other trusted businesses or persons to process it for us, based on our instructions and in compliance with our Privacy Policy and any other appropriate confidentiality and security measures. <br> - **Processing & Human Review:** We provide personal information to our affiliates and other trusted businesses or persons to process it for us, based on our instructions and in compliance with our Privacy Policy and any other appropriate confidentiality and security measures. This includes sharing voice and audio information with third party human reviewers, including voice and audio information collected when the Voice Assistant on your device incorrectly thinks you said a hotword (e.g., Hey Google, Alexa, or Siri). |

87. ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛

---

[197] Reed-Arthurs Report, ¶ 96.

[198] Reed-Arthurs Report, ¶ 96.

[199] "[A]udio snippets are never associated with any user accounts." Tasca, Nino, "Doing more to protect your privacy with the Assistant," *Google Blog,* September 23, 2019, available at https://www.blog.google/products/assistant/doing-more-protect-your-privacy-assistant/, also as GOOG-ASST-00000035-036.

*HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY*

89.

---

[200] "[L]anguage experts [i.e., as human reviewers] only listen to a small set of queries (around 0.2 percent of all audio snippets), only from users with VAA [Voice & Audio Activity] switched on." Tasca, Nino, "Doing more to protect your privacy with the Assistant," *Google Blog,* September 23, 2019, available at https://www.blog.google/products/assistant/doing-more-protect-your-privacy-assistant/, also as GOOG-ASST-00000035.

[201] The chance of getting nine tails when flipping a coin nine times is $(1/2)^9 = 0.00195$, or 0.195%.

[202] "Manage audio recordings in your Web & App Activity," *Google Help Center*, available at https://support.google.com/websearch/answer/6030020, accessed August 16, 2022.

---

203  "Manage audio recordings in your Web & App Activity," *Google Help Center*, available at
https://support.google.com/websearch/answer/6030020, accessed August 16, 2022. *See* "Google Help
Center: Manage audio recordings in your Web & App Activity," *Wayback Machine*, available at
https://web.archive.org/web/20200901020634/https://support.google.com/websearch/answer/6030020?co=
GENIE.Platform%3DDesktop&hl=en, accessed September 12, 2022, as captured September 1, 2020; Pixel
3 Screenshots for "Actions: TD enroll with SUW > Select Assistant app > Go to Voice Match > Retrain
voice model > TD > at end of flow is VAA enrollment," GOOG-ASST-03047340.

204  "Manage audio recordings in your Web & App Activity," *Google Help Center*, available at
https://support.google.com/websearch/answer/6030020, accessed August 16, 2022. *See* "Google Help
Center: Manage audio recordings in your Web & App Activity," *Wayback Machine*, available at
https://web.archive.org/web/20200901020634/https://support.google.com/websearch/answer/6030020?co=
GENIE.Platform%3DDesktop&hl=en, accessed September 12, 2022, as captured September 1, 2020; Pixel
3 Screenshots for "Actions: TD enroll with SUW > Select Assistant app > Go to Voice Match > Retrain
voice model > TD > at end of flow is VAA enrollment," GOOG-ASST-03047340.

205  Reed-Arthurs Deposition, p. 55:15-56:12 ("Q. So the VAA allows users to choose if they want to allow
Google to save their audio activity when they interact with Google Assistant-enabled devices. Are you
aware that the VAA has always been off by default? […] THE WITNESS: I'm not specifically aware of
that, one way or another. Although you say "always," which perhaps makes me a bit skeptical. So I -- I
can't speak to that, one way or another. […] Q. It's the idea that users have to opt in to have their -- Google
save their audio activity. If they don't opt in, Google doesn't save their activity. I'm just wondering if you
understand that as a -- as a matter of course. […] THE WITNESS: I haven't specifically made an
assumption with respect to that, one way or another.").

*HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY*

[REDACTED]

91.

[REDACTED]

---

[206] Kokolakis, Spyros, "Privacy attitudes and privacy behavior: A review of current research on the privacy paradox phenomenon," *Computers & Security* 64, 2017, pp. 122-134, at p. 128 (emphasis added).

[207] Gerber, Ninba, Paul Gerber, and Melanie Volkamer, "Explaining the privacy paradox: A systematic review of literature investigating privacy attitude and behavior," *Computers & Security* 77, 2018, pp. 226-261, at p. 229 (emphasis added).

[208] Wottrich, Verena M., Eva A. van Reijmersdal, and Edith G. Smit, "The privacy trade-off for mobile app downloads: The roles of app value, intrusiveness, and privacy concerns," *Decision Support Systems* 106, 2018, pp. 44-52, at p. 44 (emphasis added).

[209] Athey, Catalini, and Tucker (2017), p. 18 (emphasis added).

[210] "Manage audio recordings in your Web & App Activity," *Google Help Center*, available at https://support.google.com/websearch/answer/6030020, accessed August 16, 2022.

*HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY*



92. ██████████████████████████████████████

93. ██████████████████████████████

---

[211]  Reed-Arthurs Report, Exhibit 9c.

████████████████████████████████████████

[212]  "Assistant Misactivations & Ads Personalization: Interview Study Results," March 2021, GOOG-ASST-00238319-357, at 350. Cited in Reed-Arthurs Report, Section 2.2.4.

[213]  "Assistant Misactivations & Ads Personalization: Interview Study Results," March 2021, GOOG-ASST-00238319-357, at 350. Cited in Reed-Arthurs Report, Section 2.2.4.

*HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY*

**E.    Because ████ Out of ██ Features are Related to the Privacy Policy, the Proposed Conjoint Places Unnatural Prominence on Privacy and Creates Focalism Bias and Demand Artifacts That Will Likely Yield Inflated Willingness-to-Pay Estimates**

94.    

---

[214] ████████████████████████████████

*Figure 13.*[215]

*Screenshot of Dr. Reed-Arthurs' Preliminary Choice Task for the Smartphone Conjoint (emphasis added)*

| | Smartphone A | Smartphone B | Smartphone C | Smartphone D |
|---|---|---|---|---|
| **Brand & OS** | Apple (iOS) | Motorola (Android) | Samsung (Android) | Google (Android) |
| **Retail Price** | $750 | $250 | $500 | $1000 |
| **Battery Life** | 20 hours | 50 hours | 50 hours | 20 hours |
| **Rear Camera Array** | Ultrawide and Telephoto | Ultrawide | Ultrawide and Telephoto | Ultrawide |
| **Camera Modes** | Portrait | Portrait | Portrait & Night Mode | Portrait & Night Mode |
| **Information Collected** | Use | Use & Incorrect Activation | Use & Incorrect Activation | Use & Incorrect Activation |
| **Third Party Data Sharing** | Processing & Human Review | Processing | Processing | Processing & Human Review |
| **Information Management** | Delete & Export | Delete & Export | Delete | Delete |
| **Screen Size** | 4.7" | 5.4" | 6.7" | 6.1" |
| **Storage Capacity** | 256 GB | 128 GB | 64 GB | 512 GB |
| **Mark Choice Here** | | | | |

95.

---

[215] Reed-Arthurs Report, p. 41.

[216] Bedi and Reibstein (2021), p. 415.

---

217  Bedi and Reibstein (2021), p. 415.

218  *See*, *e.g.*, Schkade, David A. and Daniel Kahneman, "Does Living in California Make People Happy? A Focusing Illusion in Judgments of Life Satisfaction," *Psychological Science* 9(5), 1998, pp. 340-346.

219  Sawyer, Alan G., "Demand Artifacts in Laboratory Experiments in Consumer Research," *Journal of Consumer Research* 1(4), 1975, pp. 20-30, at p. 20.

220  Reed-Arthurs Report, ¶ 86.

*HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY*

**F.    The Proposed Conjoint(s) Presents Cognitively Burdensome Exercises to Respondents and is Likely to Yield Unreliable Estimates**

98. 

---

221 ████████████████████████████████████████████████████████████████████████████████████████████████████████████████

222 Krosnick, Jon A. and Stanley Presser, "Chapter 9: Question and Questionnaire Design," in *Handbook of Survey Research: Second Edition*, Emerald Group Publishing Limited, 2010, pp. 263-313, at pp. 264-265.

223 Reed-Arthurs Report, ¶¶ 102, 86. ████████████████████████████████████████████████████████████████████████████████████████████████████████████████

224 Reed-Arthurs Report, ¶ 100.

[Content redacted]

---

[225] Ben-Akiva, Moshe, Daniel McFadden, and Kenneth Train, "Foundations of Stated Preference Elicitation: Consumer Behavior and Choice-based Conjoint Analysis," *Foundations and Trends in Econometrics* 10(1-2), 2019, pp. 1–144, at p. 22.

[226] Bedi and Reibstein (2021), pp. 390, 399-400, 404. "Someone new to this task might ask why only a certain subset of features are included in the design of a conjoint study. This is because research has shown that respondents are overwhelmed with more than six or seven features. If a conjoint design uses, say, twenty features, respondents will often ignore all the features except a few critical ones. This will frustrate the purpose of the task."

[227] Reed-Arthurs Report, Attachment E, pp. 7-14. [Content redacted]

[228] Reed-Arthurs Report, ¶¶ 100-103.

██████████████████████████████████ ██████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████

█ ███████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████

**G.    The Reed-Arthurs Report's Proposed Calculation of Willingness-to-Pay Does Not Account for Supply-Side Factors and Does Not Equate to Market Price in Equilibrium, and Therefore Will Not Yield a "Price Premium" or "Price Premium Percentage"**

102. ████████████████████████████████████████

████████████████████████ █ █████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████

████████████████████████████ █ ██████████████

████████████████████████████████████████████

████████████████████████████████████████████

---

[229]   Krosnick, Jon A. and Stanley Presser, "Chapter 9: Question and Questionnaire Design," in *Handbook of Survey Research: Second Edition*, Emerald Group Publishing Limited, 2010, pp. 263-313, at p. 265.

[230]   Reed-Arthurs Report, ¶ 13. *See also*, Reed-Arthurs Report, ¶ 66 (emphasis added)



[231]   Torres Report, p. 24 (emphasis added).

*HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY*



---

232 I understand that Mr. Torres states that ███████████████████████████████
█████████████████████████████████████████████████████████████████████████
██████████████████████████████████████ Torres Report, p. 21, footnote 47.

233 Allenby, Greg M., Jeff Brazell, John R. Howell, and Peter E. Rossi, "Valuation of Patented Product Features," *Journal of Law and Economics* 57(3), 2014, pp. 629-663, at p. 630.

234 Reed-Arthurs Report, ¶¶ 123, 125.

235 Allenby, Greg M., Jeff Brazell, John R. Howell, and Peter E. Rossi, "Valuation of Patented Product Features," *Journal of Law and Economics* 57(3), 2014, pp. 629-663, at p. 650.

236 Allenby, Greg M., Jeff Brazell, John R. Howell, and Peter E. Rossi, "Valuation of Patented Product Features," *Journal of Law and Economics* 57(3), 2014, pp. 629-663, at p. 630.

237 Orme, Bryan K., *Getting Started with Conjoint Analysis: Fourth Edition*, Research Publishers, 2020, p. 88.

*HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY*



## VI.  RESTATEMENT OF CONCLUSIONS

105.  The Reed-Arthurs Report's limited review of only two academic articles overlooks foundational literature on the privacy paradox. Further, in its review of the two academic articles and a few Google's internal documents, the Reed-Arthurs Report provides incomplete representations of those sources and ignores evidence of heterogeneity in voice assistant users' attitudes towards and beliefs related to privacy.

106.  As for its Initial Survey, the Reed-Arthurs Report ignores that the results, taken at face value, demonstrate heterogeneity in the proposed Class's usage, understanding, and attitudes that call into question the broad conclusions it presents from the Initial Survey results. The Reed-Arthurs Report also ignores various other flaws and biases in the Initial Survey, including contradictions and quality issues in respondents' answers, its failure to account for the privacy paradox in its design, and demand artifacts. In addition, although the Reed-Arthurs Report draws conclusions from the Initial Survey about the likely effect of privacy disclosures on willingness to pay and consumer demand, the Initial Survey neither provides evidence related to such disclosures nor offers a mechanism to isolate the influence of such disclosures.[241]

107.  Finally, the proposed Reed-Arthurs conjoint survey(s) and analysis are deeply flawed and cannot provide reliable estimates of willingness-to-pay. Fundamentally, the proposed conjoint does not account for consumers who already understand and accept at the time of purchase that false

---

[238]  Allenby, Greg M., Jeff Brazell, John R. Howell, and Peter E. Rossi, "Valuation of Patented Product Features," *Journal of Law and Economics* 57(3), 2014, pp. 629-663, at p. 630 (emphasis added).

[239]  Allenby, Greg M., Jeff Brazell, John R. Howell, and Peter E. Rossi, "Valuation of Patented Product Features," *Journal of Law and Economics* 57(3), 2014, pp. 629-663, at p. 661.

[240]  Allenby, Greg M., Jeff Brazell, John R. Howell, and Peter E. Rossi, "Economic Valuation of Product Features," 2013, p. 43.

[241]  Reed-Arthurs Report, ¶ 65.

*HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY*

activations may be recorded and shared with human reviewers. Further, the proposed conjoint does not capture the complexity and variation in the relevant devices. The proposed conjoint is also subject to numerous biases and design flaws that would render its results unreliable: specifically, offering no method to account for the upward bias introduced by the privacy paradox; presenting privacy-related features in an imbalanced manner with unclear and unrealistic descriptions; creating focalism bias and demand artifacts by placing unnatural prominence on the privacy-related features; and presenting cognitively burdensome exercises to respondents.

108.  Beyond these design flaws described above, the proposed calculation of the change in willingness-to-pay from the choice-based conjoint survey data does not account for supply-side factors and therefore cannot yield a price premium, in contrast with the expectation stated in the Torres Report.



_____

Rene Befurt

September 13, 2022