EXHIBIT BS

EXHIBIT 85

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN JOSE DIVISION

|                                              |
| --- |

IN RE GOOGLE ASSISTANT PRIVACY
LITIGATION                  |      Master Docket No. 19-cv-04286-BLF

---

### EXPERT REPORT OF JESSE DAVID, PH.D.

## I.    ASSIGNMENT

1.      Named Plaintiffs in this action have accused Defendants Alphabet Inc. and Google LLC
(collectively, "Google") of intercepting, recording, and disclosing to third parties individuals'
communications without their consent and breaching promises allegedly made to purchasers of
various Google products—including Google Home and Nest smart speakers and displays, and
Pixel smartphones—as well as certain products manufactured by third parties that included
Google software (collectively, "Google Assistant Enabled Devices" or "GAEDs").[1]
Specifically, Plaintiffs allege that Google recorded and disclosed their conversations, without
their authorization, by means of software installed on GAEDs called "Google Assistant"—an
artificial intelligence-based voice-activated software application that can engage in two-way
conversations with users.[2] Plaintiffs also allege that Google breached promises to purchasers of
Google Home products that Google would record their audio if only users spoke specific
activation phrases known as "hotwords."[3] Plaintiffs seek to represent various classes of
consumers who purchased and used GAEDs since the launch of Google Assistant in May 2016
and who allegedly suffered damages due to Google's alleged conduct.[4]

2.      In support of their motion for class certification, Plaintiffs filed an expert report
authored by Fernando Torres that describes several proposed methodologies to calculate

---

[1] Fourth Amended Consolidated Class Action Complaint, August 2, 2021 ("Complaint"); and Plaintiffs'
Memorandum of Law in Support of Their Motion for Class Certification, July 18, 2022 ("Plaintiffs' Memorandum").

[2] Complaint, ¶¶ 2-4 and 124.

[3] Complaint, ¶¶ 2 and 90.

[4] Plaintiffs' Memorandum, pp. 1-2; and Complaint ¶¶ 1-2.

damages for the putative classes.[5] In his report, Mr. Torres proposes multiple forms of damages, including statutory damages, nominal damages, Google's purported profits associated with the alleged violations, and a measure of damages incorporating a purported "price premium" that he states will be calculated using a consumer survey to be performed by another expert.[6] Plaintiffs filed another expert report authored by Dr. Rebbecca Reed-Arthurs that describes potential survey methodologies through which Dr. Reed-Arthurs asserts she will be able to "measure the change in consumer willingness to pay for smartphones and smart speakers/displays if the But-For World disclosures were made at the time of purchase relative to the Actual World Disclosures being made at the time of purchase."[7]

3.      I have been asked by counsel for Google to review Plaintiffs' filings and other information in the record and to provide opinions regarding the damages methodologies proposed by Plaintiffs' experts. This report is based on my education, professional training, and experience and my review and analysis of information produced in the course of this litigation as well as public information. The materials reviewed by me and my staff and which I have considered in the preparation of my opinions are listed in Appendix 1. I reserve the right to revise my opinions if additional information is provided to me or if additional research, reflection, or the correction of inadvertent errors leads me to change my opinion.

4.      Edgeworth Economics, L.L.C.'s ("Edgeworth") fees for professional services are based on hourly billing rates. My time is currently billed at $790 per hour. Edgeworth's compensation does not depend on the conclusions reached in my analysis or the outcome of Plaintiffs' class certification motion or this case.

## II.   QUALIFICATIONS

5.      I am an economist and Partner at Edgeworth, a consulting firm that provides economic and financial analysis for complex litigation and public policy matters. Prior to founding

---

[5] Class Economic Damages Declaration of Fernando Torres, MSc., July 18, 2022, attached as Exhibit 57 to Declaration of Margaret MacLean in Support of Plaintiffs' Administrative Motion to Consider Whether Another Party's Materials Should Be Sealed ("Torres Report").

[6] Torres Report, pp. 23-36.

[7] Opening Expert Report of Rebbecca Reed-Arthurs, Ph.D., July 18, 2022 attached as Exhibit 58 to Declaration of Margaret MacLean in Support of Plaintiffs' Administrative Motion to Consider Whether Another Party's Materials Should Be Sealed ("Reed-Arthurs Report"), ¶ 13.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Edgeworth with a group of economists in 2009, I was Senior Vice President at Criterion Economics and, before that, a Vice President at National Economics Research Associates, where, for approximately a dozen years, I performed economic analysis for a range of litigation, strategy, and public policy matters.

6.       I hold a Bachelor's degree in Physics and Economics from Brandeis University and a Ph.D. in Economics from Stanford University. Throughout my professional career, I have specialized in applied microeconomics and econometrics (the application of statistics to economic problems), as well as economic sub-fields related to regulation, antitrust, and intellectual property. My practice has focused on complex valuation matters, analysis of markets and regulations, and assessing damages in a variety of types of civil disputes, including those related to infringement of various forms of intellectual property—such as patents, trademarks, and copyrights—as well as cases involving claims of false or misleading advertising and product labeling. In some instances, my research has been incorporated in public speeches, published writings, and expert testimony. I have testified as an expert witness in deposition and at hearings or trials on more than 100 occasions. My curriculum vitae, which includes lists of my previous testimony, publications, and public presentations, is attached as Appendix 2.

## III.   BACKGROUND

### A.  Google Assistant Enabled Devices

7.       Google is a U.S. company that (among other lines of business) sells a variety of electronic products and software systems for consumers and businesses.[8] Google Assistant, launched in May 2016, is a "virtual personal assistant that can help users with a variety of tasks, including setting reminders, making telephone calls, answering questions, looking up the weather, playing music, and getting driving directions."[9] Google Assistant operates on various devices manufactured by Google—including Google Home and Nest smart speakers and

---

[8] Google 2021 Form 10-K.

[9] Declaration of Françoise Beaufays in Support of Defendants Alphabet Inc. and Google LLC's Opposition to Plaintiffs' Motion for Class Certification, September 13, 2022 ("Beaufays Declaration"), ¶ 3; see also Complaint, ¶ 4.

displays, and Pixel smartphones—as well as various devices manufactured by third parties.[10] When activated on these GAEDs, Google Assistant can record audio information from the user and process that information to assist the user with a variety of tasks.[11] Users can activate Google Assistant by saying a hotword (such as "OK Google") or by manually activating it on the device.[12] Once activated, Google Assistant records audio information and transmits it to Google's servers for processing.[13] On some occasions, Google Assistant may activate without intention by the user if the software mistakenly detects a hotword, a situation that Plaintiffs refer to as a "false accept."[14]

### B. Plaintiffs' Allegations

8.      Plaintiffs allege that, due to the existence of false accepts, Google's use of information generated during false accepts, and the purported lack of disclosure to consumers of the potential for such incidents, Google has violated various privacy laws and breached its contract with purchasers of GAEDs.[15] As described by Plaintiffs' expert, Mr. Torres, the allegedly improper actions by Google since the launch of Google Assistant in May 2016 include:[16]

- The interception and recording, by Google's Assistant service, of Plaintiffs' confidential communications without their consent.

- Google's use of the allegedly wrongfully obtained communications for commercial purposes, including for training and testing algorithms and models in order to improve its speech technology in addition to targeted advertising.

- Google's sharing of the allegedly wrongfully obtained communications with human reviewers who listened to and manually transcribed or annotated the recorded audio.

According to Mr. Torres, Plaintiffs allege further that Google made misrepresentations in its Terms of Service and Privacy Policy.[17] Specifically, Google allegedly represented that "Google

---

[10] Beaufays Declaration, ¶ 4; and Complaint, ¶ 4.

[11] Beaufays Declaration, ¶¶ 3-6; and Complaint, ¶ 4.

[12] Beaufays Declaration, ¶ 5.

[13] Beaufays Declaration, ¶¶ 8-9.

[14] Beaufays Declaration, ¶ 10; and Complaint, ¶ 252.

[15] Complaint, ¶¶ 156-305.

[16] Torres Report, p. 4.

[17] Torres Report, p. 4.

Assistant does not record Plaintiffs' and the Class's confidential communications absent the utterance of a 'Hotword' or manual activation, and that it does not share the recordings with third party human reviewers."[18] Mr. Torres refers to these alleged representations as the "Challenged Claims."[19]

9.      Plaintiffs seek to represent various classes and subclasses of consumers who have owned GAEDs since May 2016. These include (as characterized by Mr. Torres):[20]

- All Users who purchased a Google-Made Device (the "Purchaser Class").

- All Opted-In Users of Google Home Devices who have a recording resulting from a False Accept (the "Privacy Class").

- All members of the Privacy Class for whom Google shared at least one recording resulting from a False Accept with a human reviewer ("the Privacy Disclosure Subclass").

- All members of the Privacy Class for whom Google used at least one recording resulting from a False Accept for (i) testing or training to improve the functionality of Google speech technology, or (ii) targeted advertising (the "Privacy Use Subclass").

- All Opted-In Users of GAEDs for whom Google shared a recording with a human reviewer (the "SCA Class").

10.     Plaintiffs claim multiple forms of damages arising from these alleged violations and that each form of damages can be calculated on a classwide basis using common evidence.[21] In particular, Plaintiffs assert that damages associated with the claim for breach of contract can be calculated as the "price premium associated with Google's failure to deliver on its uniform, contractual promises of privacy."[22] For other alleged violations, Plaintiffs claim damages equal to "Google's profits arising from its violations of class members' privacy, and specifically from

---

[18] Torres Report, p. 5.

[19] Torres Report, p. 5.

[20] Torres Report, p. 6. According to Mr. Torres' descriptions: "Users" are individuals whose Gmail accounts were associated with at least one Google Assistant Enabled Device or "GAED" during the Class Period; "Google-Made Devices" refers to GAEDs manufactured and sold by Google, including Google's own smart home speakers, Google Home, Home Mini, and Home Max; smart displays, Google Nest Hub, and Nest Hub Max; and its Pixel smartphones, laptops, and tablets; "Opted-In Users" means Users who have enabled Voice and Audio Activity; and "False Accept" means an instance in which Google Assistant records and transmits audio to Google without manual activation or a Hotword.

[21] Plaintiffs' Memorandum, pp. 2-3 and 21-25.

[22] Plaintiffs' Memorandum, p. 3.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Google's taking of users' audio recordings."[23] Finally, Plaintiffs claim statutory damages for other alleged violations, and alternatively seek nominal damages.[24]

### C. The Torres Report

11.     Mr. Torres describes the various categories of damages that, according to Plaintiffs, apply to each of the proposed classes and subclasses.[25] With respect to the Purchaser Class, he states that a breach of contract occurred and that economic damages can be measured as a price premium "representing the difference between the market price of the promised device and service (i.e., with privacy protections), and that of the device and service delivered by Google (i.e., a set that records, shares, and uses Users' communications)."[26] Mr. Torres states his understanding from counsel that a separate survey expert—presumably Dr. Reed-Arthurs—will conduct a choice-based conjoint survey that will "provide the empirical data required to measure the 'price premium' distinctly attributable to the Challenged Claims."[27] He states that the "accurate measure" of price premium damages equals "the difference between the market value (purchase price) of the products (with the Challenged Claims or attributes) and the market value of the products (without the Challenged Claims or attributes), at the time and point of sale."[28] Mr. Torres claims that once he has the price premium (in percentage form) from the survey expert, he will calculate total damages by multiplying that percentage by the dollar value of sales of the relevant devices during the Class Period.[29]

12.     Mr. Torres also discusses potential calculations of statutory and nominal damages that he has been advised, by Plaintiffs' counsel, may apply under the various statutes asserted by Plaintiffs. In each case, these calculations involve the multiplication of a fixed statutory amount

---

[23] Plaintiffs' Memorandum, p. 24.

[24] Plaintiffs' Memorandum, pp. 23-24.

[25] Torres Report, p. 6 and Table 1.

[26] Torres Report, p. 7.

[27] Torres Report, p. 24.

[28] Torres Report, p. 26.

[29] Torres Report, p. 26.

(or an unspecified nominal amount) by either the number of days of violations or by the number of violations, depending on the applicable statute.[30]

13.     Finally, Mr. Torres provides a discussion of damages related to what he refers to as "Defendants' Profits."[31] He provides calculations purportedly estimating Google's profits arising from "the taking of individuals' audio recordings" using two methods. First, he performs calculations based on Google's expenditures on Google Assistant.[32] He makes several assumptions to enable a calculation of the company's purported profits associated with the "Assistant business" and an attribution of some of those purported profits to "the use of the audio recordings at issue in this case."[33] Mr. Torres provides another calculation, based on several assumptions and a couple of scattered data points, to provide "a preliminary estimate" of Google's purported avoided costs of speech data "reflecting individuals speaking the Hotword" in 2019.[34] Mr. Torres acknowledges that he does not have the data necessary to make the above estimates correctly and that "[t]hese estimates will be made more precise and encompass the full Damages Period" when he has the required data and documents.[35]

### D.  The Reed-Arthurs Report

14.     Dr. Reed-Arthurs states that Plaintiffs' counsel has asked her to describe how she would design, conduct, and analyze one or more choice-based conjoint ("CBC") surveys "to measure the change in consumer willingness to pay for smartphones and smart speakers/displays" if Google's actual disclosures to users of certain GAEDs (the "Actual World Disclosures") were replaced by disclosures that Plaintiffs allege should have been made instead (the "But-For World Disclosures").[36] Dr. Reed-Arthurs describes two sets of disclosures, as presented to her by counsel for Plaintiffs, which she names "Information Collected" (purportedly representing the type of information collected by Google Assistant when activated) and "Third Party Data

---

[30] Torres Report, pp. 28-29.

[31] Torres Report, pp. 29-36.

[32] Torres Report, pp. 32-33.

[33] Torres Report, pp. 31-33.

[34] Torres Report, pp. 33-36.

[35] Torres Report, p. 36.

[36] Reed-Arthurs Report, ¶¶ 13 and 17.

Sharing" (purportedly representing some of Google's use of information collected through Google Assistant).[37] For each set, the But-For World Disclosures differ only from the Actual World Disclosures by the addition of language indicating that information may be collected and shared with third parties "when the Voice Assistant on your device incorrectly thinks you said a hotword."[38]

15.     Dr. Reed-Arthurs then provides a brief discussion of academic research and Google's internal documents based on which she concludes "that false activations of voice assistants happen with regularity, that voice assistant users are strongly averse to such false activations, and that voice assistant users are concerned about who their data is shared with."[39] ███████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

█████████████████████████████████

16.     Finally, Dr. Reed-Arthurs provides a discussion of the conjoint survey she proposes to use to study "how, if at all, consumer willingness to pay for smartphones and smart speakers/displays would change" if the Actual World Disclosures were replaced by the But-For World Disclosures, as defined by Plaintiffs.[41] ████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████████

---

[37] Reed-Arthurs Report, ¶ 11.

[38] Reed-Arthurs Report, ¶ 11.

[39] Reed-Arthurs Report, ¶¶ 20-32.

[40] Reed-Arthurs Report, ¶¶ 33-65.

[41] Reed-Arthurs Report, ¶¶ 66-110.

[42] Reed-Arthurs Report, ¶ 104.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY



17.     Importantly, however, nowhere in her report does Dr. Reed-Arthurs claim that the results of her proposed survey could be used to determine how the *market price* of the products would have changed had they been sold with the But-For Disclosures instead of the Actual World Disclosures (to the extent that the Actual World Disclosures accurately represent the relevant disclosures in this case). In other words, Dr. Reed-Arthurs does not propose an analysis that could be used to measure any purported "price premium" resulting from the disclosures at issue. Dr. Reed-Arthurs also does not propose, nor does Mr. Torres, any methodology to study Google's pricing decisions or any other aspects of Google's supply of the relevant devices or software which, as I describe in detail below, would be required if one were attempting to predict the impact of a change in disclosures on the market prices of the devices at issue in this case.

## IV.    DAMAGES FRAMEWORK

18.     I understand that, in order for a class to be certified, the plaintiff must present a method for computing damages for each member of the putative class that relies on common, as opposed to individualized, evidence. I further understand that, at the class-certification stage, the plaintiff must provide a reliable damages model that specifically measures only the damages attributable to the plaintiff's particular theory of liability.

---

[43] Reed-Arthurs Report, ¶ 122.

[44] Reed-Arthurs Report, ¶ 123.

[45] Reed-Arthurs Report, ¶ 123.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

19.     I understand that a consumer's damages due to misrepresentations made by a seller of a product are equal to the difference between the consumer's actual financial circumstances and her financial circumstances in a hypothetical scenario in which the misrepresentations did not occur (the "but-for" world)—i.e., a hypothetical scenario in which the seller changes the descriptions of the product to be true and non-misleading.[46] These damages also can be described as the difference between the actual price paid by the consumer and the actual value received. This approach satisfies the notion of a "make-whole" damages award by placing the consumer in the financial position she would have held had the allegedly wrongful conduct not occurred.

20.     Assuming actual prices paid by each member of the class are known[47], to estimate damages as defined above one must identify the actual value received by each class member. The only economically objective measure of "value" in this context is market value—i.e., the price that would have prevailed in the marketplace had the defendant not made the misrepresentations at issue, or the "but-for" price.[48]

21.     In a class action related to inadequate or false disclosures, if the misrepresentations caused retail prices to be higher than what they otherwise would have been, then damages for a particular class member who would continue to purchase the product in the but-for world with the adequate or correct disclosures would equal the difference between the price she actually paid for the product and the but-for price. This difference can be described as a "price premium" associated with the alleged misrepresentations. Figure 1 shows a stylized example of the market outcome in this scenario, with quantity of the product at issue on the horizontal axis and price on the vertical. The grey line represents consumer demand in the actual world (i.e., demand for products with the misrepresentations), which is constructed by aggregating

---

[46] See, for example, Federal Judicial Center, Reference Manual on Scientific Evidence, 3rd ed., National Academies Press: Washington, D.C., 2011, pp. 432-443.

[47] Prices paid by class members could vary depending on the retail channel through which they purchased their device as well as any promotions or sales those retail channels may have offered.

[48] As I note above, Mr. Torres apparently agrees with this framework, defining damages associated with the alleged breach of contract as "the difference between the market value (purchase price) of the products (with the Challenged Claims or attributes) and the market value of the products (without the Challenged Claims or attributes), at the time and point of sale." [Torres Report, p. 26] In contrast, each class member's "personal value"—i.e., the amount each consumer would be willing to pay for the product in the but-for scenario—is not common across all class members and could not be determined without individualized inquiries.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

consumers' willingness to pay ("WTP") for the product.[49] Demand intersects supply, the orange line representing the willingness of the seller to supply the product at each price, at a point known as the "market equilibrium." In this example, the supply curve is assumed to slope upward, a situation that occurs when marginal costs increase with quantity supplied due to the law of diminishing returns. The market equilibrium represents the outcome in the actual marketplace in terms of price and units sold. In this example, quantity sold equals six units (one unit purchased by each of six consumers, labeled A-F) and the market price equals $5 per unit.[50]

---

[49] See, for example, Hal R. Varian, Intermediate Microeconomics, 4th ed., W. W. Norton & Co.: New York, 1996, pp. 3-5; and Jeffrey M. Perloff, Microeconomics, 6th ed., Addison-Wesley, 2012, p. 11.

[50] It is important to note the difference between consumers' WTP, which vary across individuals, and the market price, which is determined by the intersection of supply and demand and is the same for all consumers. While different consumers may pay different prices for the same product across various retail channels and over time, the analysis here concerns itself with a single market equilibrium.

Highly Confidential – Attorneys' Eyes Only

**Figure 1**
**Stylized Example of the Impact of Product Misrepresentations on Marketplace Outcomes**



22.     Figure 1 also shows consumers' demand in a hypothetical scenario in which the misrepresentations are removed from the product and replaced by correct and adequate disclosures (the blue line). In this example, it is assumed that when the product is sold with the but-for representations, there is a downward shift in aggregate consumer demand, with each consumer's willingness to pay for the product being $2 lower than for the same product with the actual representations. The market finds equilibrium at this lower level of demand—the "but-for market equilibrium"—at a quantity equal to four units and a price equal to $4. In the but-for world, four consumers (A, B, C, D) would continue to purchase the product. One can determine the harm to these four consumers by subtracting the price they would have paid but-for the misrepresentations ($4) from the price they actually paid ($5). The difference, $1, is a measure of the price premium caused by the misrepresentations. Note that the price premium in this case is less than the $2 change in demand, but still positive, due to the upward slope of the supply curve.

12

23.     Damages for the other two consumers (E, F) are not clear in this scenario, since their WTP for the product in the "but-for" world is less than the market price of $4, and therefore they would not have purchased it in that scenario. Those consumers' damages would be unrelated to the price premium and instead would depend on their actions in the but-for world, which in turn would depend on their preferences and the alternatives available to them. For example, suppose that in the but-for world Consumer E would choose instead to buy a competing product. That consumer's damages would depend on the different features and prices of the accused product relative to the alternative product, but certainly could be no more than $1.50, the difference between the actual market price ($5.00) and that consumer's willingness to pay for the product with the but-for world disclosures ($3.50 in this example). Measuring such damages therefore would require inquiries into the availability, characteristics, and prices of other potential choices as well as those consumers' preferences.[51]

24.     In his report, Mr. Torres claims that a horizontal supply curve should be used to represent supply of digital services such as Google Assistant because the marginal costs of production are "essentially zero."[52] It must be noted that the products whose supply and demand are being depicted and analyzed by Plaintiffs' experts in this case are the GAEDs that are enabled by Google Assistant, and not Google Assistant as a standalone service (which is free). In any case, depending on the seller's business strategy and cost structure, it is possible that the supply curve of the product at issue is horizontal.[53] Figure 2 shows this scenario with supply represented by the horizontal orange line. In such a scenario, while some consumers may not purchase the product in the but-for world, those who would do so would pay the same price as they did in the actual world. In other words, the price premium associated with the

---

[51] This appears to be the case for at least one of the former named Plaintiffs in the present matter, according to the Complaint. For example, the Complaint alleges that former named Plaintiff Hernandez "would not have purchased the Google Home device, nor would he have set it up or used it, had he known that any of Google's representations were false." [Complaint, ¶ 66] Damages suffered by members of the putative classes who similarly would not have purchased or obtained GAEDs apparently are unrelated to any potential difference between the actual prices of their products and the prices that would have prevailed in the absence of the alleged misrepresentations (the purported price premium), since they would not have purchased their products in the but-for world in any case.

[52] Torres Report, footnote 47.

[53] The conditions that may result in a horizontal supply curve are described in the following manner by a widely read economics textbook: "If an industry has a perfectly horizontal supply curve, it means that the industry will supply any amount of a good at a constant price. In this situation the equilibrium *price* is determined by supply conditions, while the equilibrium *quantity* is determined by the demand curve." [Varian (1996), p. 285 (emphasis in original)]

misrepresentations is zero. However, this scenario still would require a different damages approach for different consumers, depending on whether their purchasing behavior would have been different in the but-for world relative to the actual world. In the world with the but-for representations, only Consumers A and B would purchase the product. It is clear that these two consumers were not harmed, since they pay the same price ($5) for the product in the scenarios with and without the misrepresentations. As above, however, damages for the other four consumers (C, D, E, F) would depend on their actions in the but-for world, since their WTP is below the but-for market price and they would not have purchased the product in the but-for scenario.

**Figure 2**
**Stylized Example of the Impact of Product Misrepresentations on Marketplace Outcomes (Horizontal Supply Curve)**



25.     In addition to the general economic principles illustrated here, these examples also demonstrate that, when assessing damages related to a price premium, the supply curve, which represents the supplier's actions in response to market conditions, directly impacts the extent of

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

harm to consumers as well the number of consumers harmed by the misrepresentations. In circumstances where the supply curve is horizontal, as asserted by Mr. Torres in this case, the price premium necessarily is zero. As shown above, however, this circumstance does not imply that no consumers were harmed by the misrepresentations. Rather, it implies that the only consumers who were harmed were those who would have changed their purchasing behavior if the misrepresentations had been repaired. Consumers who would have bought the product in any case would have experienced no damages related to a price premium.

26.     In summary, calculating class-wide damages in a matter involving claims of alleged misrepresentations or false disclosures requires a determination of the market price and quantity of the product if sold with only true and non-misleading disclosures or representations. That assessment requires an evaluation of both supply- and demand-side considerations, including: 1) the alternative strategy of the seller with regard to disclosures (supply); 2) the pricing strategy of the seller given the alternative disclosures (supply); 3) the reactions of competitors to those changes, which may affect consumers' decisions in the but-for world (supply); and 4) consumers' responses to those strategies (demand). An assessment of demand factors alone cannot lead to an accurate estimate of damages, since it cannot provide a basis for determining how market prices would have changed in the but-for world relative to the actual world.

## V.     MR. TORRES' PROPOSED METHODOLOGIES ARE BASED ON UNSUPPORTED ASSUMPTIONS AND CANNOT PROVIDE AN OBJECTIVE MEASURE OF CLASSWIDE DAMAGES

### A.  Mr. Torres' Discussion of His "Analytical Framework" Is Flawed and Unrelated to His Proposed Damages Calculations

27.     Mr. Torres provides a lengthy discussion of what he refers to as his "analytical framework" in which he comments on issues such as the "economics of privacy," Google's supposed "business model," and a purported "conceptual model" of a "privacy transaction."[54] The main thrust of this discussion appears to be that "consumers do not want to share private information when they are not compensated for it."[55] Mr. Torres also refers to a market in

---

[54] Torres Report, pp. 11-20.

[55] Torres Report, p. 17 (citations omitted).

which "consumers in general, and Class members in particular, can be considered suppliers of such private data."[56]

28.　　While Mr. Torres' discussion has no apparent bearing on the methods he proposes to calculate damages, it is noteworthy that much of the academic literature he cites actually contradicts his assertions. For example, one of the papers cited by Mr. Torres points out the subjectivity of consumers' valuations of data privacy, stating: "The answers to questions such as What is privacy worth? and Do people really care for privacy? depend not just on whom, but how, you ask."[57] Another academic study by some of the same authors states the following with respect to markets for private data:[58]

> For most products and services that economists traditionally study, the way to address these questions is generally self-evident: the market captures the accurate price of privacy and personal data, reflecting the reservation prices of different buyers (data holders) and sellers (data subjects). However, there is yet no open, recognized market for personal data in which data subjects themselves can participate. Personal data is continuously bought, sold, and traded among firms (from credit-reporting agencies to advertising companies to so-called "infomediaries," which buy, sell, and trade personal data), but consumers themselves do not have access to those markets: they cannot yet efficiently buy back their data, or offer their data for sale.

The same study also points to the differences in the valuation of private information across individuals:[59]

> The value of keeping some personal information protected and the value of it being known are almost entirely context-dependent and contingent on essentially uncertain combinations of states of the world. Furthermore, privacy sensitivities and attitudes are subjective and idiosyncratic, because what constitutes sensitive information differs across individuals. Specifically, individuals differ in what they may experience if some private information were to be shared with others or made public . . .

---

[56] Torres Report, p. 18.

[57] Alessandro Acquisti, Leslie K. John, and George Loewenstein. "What Is Privacy Worth?" *Journal of Legal Studies*, v. 42, n. 2, June 2013, pp. 249–274 at 268.

[58] Alessandro Acquisti, Curtis Taylor, and Liad Wagman, "The Economics of Privacy," *Journal of Economic Literature*, v. 54, n. 2, June 2016, pp. 442-492 at 447.

[59] Acqusiti, et. al. (2016), p. 446.

Thus, Mr. Torres' analytical framework regarding supposed objective, market-based evidence of the value of personal data appears to be contradicted by the same academics he cites in his report.

29.     Next, Mr. Torres provides an illustration of the "interaction of supply and demand" to show "how it relates to the calculation of breach of contract damages."[60] He represents consumer demand for GAEDs with a downward sloping line and the supply of GAEDs with a horizontal line (see Figure 3, excerpted from Mr. Torres' report). Mr. Torres states that it is typical in the digital services realm for supply to be horizontal because "the supplier is able to offer any level without a significant increase in unit costs in the relevant quantity range."[61] Mr. Torres' "Figure 1" is intended to represent the interaction of supply and demand for GAEDs in the actual world and shows an equilibrium price, $p$, and equilibrium quantity sold, $q$. Mr. Torres then states: "In Figure 2, there is a different, and lower, price recognized by consumers when the lack of privacy turns out to be the case: price $p'$."[62] He depicts this in his "Figure 2" by keeping the demand curve unchanged and introducing a lower price, apparently unrelated to any actual or but-for market outcome, represented by the purple line.[63] Although not labeled as such in his report, in deposition Mr. Torres testified that the purple line represents a lower supply curve, although he was somewhat unclear on this point.[64] Thus, the only difference between these two scenarios, according to Mr. Torres' characterization, is that while his "Figure 1" depicts the actual world, his "Figure 2" depicts a world in which consumers have been made aware of the "lack of privacy." He refers to the difference between the two

---

[60] Torres Report, p. 20. In deposition, Mr. Torres appears to contradict this position, testifying that the illustration in his report does *not* represent either his "calculation of damages" or his "methodology of damages." [Deposition of Fernando Torres, MSc, September 7, 2022 ("Torres Deposition"), p. 135]

[61] Torres Report, p. 21 (citations omitted). As I note above, while Mr. Torres refers to the marginal costs of providing digital services, the supply curve in his figures is intended to illustrate the supply of devices (GAEDs), which may have quite different supply characteristics.

[62] Torres Report, p. 21.

[63] In deposition, Mr. Torres testified that the lower price, $p'$, is simply the actual price less consumers' willingness to pay for "more privacy protection." [Torres Deposition, p. 139]

[64] Torres Deposition, pp. 148-151. Despite at one point indicating that his purple line represented a new supply curve, at other points in his deposition he testified that the purple line may represent "something behind [the supply and demand] functions." In any case, he also testified that "the price of the product would be lower," apparently confirming his original position that price premium damages are intended to represent a difference in market outcomes.

17

equilibrium prices that he obtains, *p* and *p'*, as the "price premium" and proposes to use an estimate of that amount to measure damages in this case by multiplying it by the quantity purchased by class members.[65] Mr. Torres represents those damages in his figure as the rectangle labeled "Premium."[66]

**Figure 3**
**Mr. Torres' Stylized Representations of Supply and Demand for "GAED with Assistant services and privacy assurances"**



Source: Torres Report, p. 21.

30.     Mr. Torres' representations and the conclusions he draws from them, however, have no basis in economic principles. It is unclear what Mr. Torres means by consumers "recognizing" a new price after receiving information about the purported "lack of privacy." In a market such as that for cellular devices or other electronics, consumers must choose to pay the price offered by the seller or else not buy the product.[67] Consumers' "recognition" of the price (whatever that means) is irrelevant to the marketplace outcome. Moreover, a change in consumer perceptions

---

[65] Torres Report, pp. 21-22.

[66] Torres Report, pp. 21-22. Again, in deposition, Mr. Torres appears to contradict this position, testifying that his illustrations are *not* intended to represent his "methodology of damages." [Torres Deposition, p. 135 and 138-139]

[67] In deposition, Mr. Torres appears to agree with this position, stating that consumers simply see the price at the point of and "recognize" it, and then choose whether to buy the product. [Torres Deposition, p. 144-145]

alone cannot affect the supply curve, since that is a function only of the seller's costs to produce and sell the product and is unrelated to consumers' demand.

31.     Later in his report, Mr. Torres states: "Moreover, if the true extent of the actual privacy risk is known in the market, the demand function itself could shift left, reducing the quantity demanded for any given product price."[68] Here, Mr. Torres appears to be offering a completely different assessment of the impact of the alleged misrepresentations on the marketplace, and one that is inconsistent with his first position. In contrast to that first claim, his second statement may, in fact, relate to actual marketplace outcomes—i.e., a change in representations could under some circumstances result in a reduction in demand for a product—although that scenario is not represented in his figures shown above. Moreover, if demand were indeed to "shift left" because consumers now find the product to be less valuable given the new representations, the presence of a horizontal supply curve, as Mr. Torres claims exists in the market for GAEDs, would imply that the market price would remain unchanged (see my Figure 2, above). Therefore, Mr. Torres' own analytical framework would lead one to the conclusion that there is *no price premium* associated with the privacy information at issue, based on his own definition of such a premium as the difference between an actual market price and a but-for market price.[69]

### B. Mr. Torres' Proposed Classwide Damages Calculation Requires a Price Premium Attributable to the Challenged Claims Which Neither He nor Dr. Reed-Arthurs Provides

32.     In his declaration, Mr. Torres states that a price premium is an appropriate measure of damages to the putative Purchaser Class resulting from the alleged breach of contract and can be calculated as "the difference between the market price of the promised device and service (i.e., with privacy protections), and that of the device and service delivered by Google (i.e., a set that records, shares, and uses Users' communications)."[70] In other words, he opines that

---

[68] Torres Report, p. 22.

[69] In deposition, Mr. Torres stated that his approach is *not* based on "the intersection of demand and supply," apparently contradicting his position that price premium damages relate to a difference between two market prices. [Torres Deposition, p. 158] Later, however, he testified that he *does* consider "supply-side factors," although those factors apparently have no impact on the calculation that he proposes, which is simply a multiplication of the total dollar amount of sales by a percentage obtained from a survey. [Torres Deposition, p. 166-168]

[70] Torres Report, p. 7.

damages equal the difference between the actual price paid by consumers and the but-for price—or the price they would have paid had the actual disclosures been replaced by disclosures that Plaintiffs allege should have been made instead. Mr. Torres claims he can calculate classwide damages by multiplying this price premium on a percentage basis by total sales to purported class members of Google Home devices at issue.[71]

33.     Notwithstanding his lengthy discussion of an "analytical framework" for damages, Mr. Torres does not propose any methodology to calculate the purported price premium he plans to use to calculate classwide damages. Instead, he states his understanding, from Plaintiffs' counsel, that a choice-based conjoint survey conducted by a separate survey expert will "provide the empirical data required to measure the 'price premium' distinctly attributable to the Challenged Claims."[72] However, as I discuss in Section VI, below, the separate survey expert—apparently Dr. Reed-Arthurs—does not claim that her proposed survey will produce a price premium. In fact, the phrase "price premium" does not appear in her report. Moreover, as I describe below, a conjoint survey approach cannot be used to estimate a price premium as defined by Plaintiffs because prices are determined by the interaction of both supply and demand factors, while surveys of consumers only address demand. Mr. Torres does not propose any method to use the results of the survey proposed by Dr. Reed-Arthurs to estimate the change in price that would have resulted had the actual disclosures been replaced by the but-for disclosures.[73] In sum, with regard to damages measured by a "price premium," Mr. Torres has not proposed a workable classwide method because he has provided no way to determine a critical element of his proposed calculation.

### C.  Mr. Torres' Proposed Damages Related to Google's Profits Are Based on Unfounded Assumptions

34.     Mr. Torres states that "from an economic perspective, it is appropriate to measure Defendants' profits arising out of their practice of collecting and using Speech Data on an

---

[71] Torres Declaration, p. 26.

[72] Torres Declaration, p. 24.

[73] In deposition, Mr. Torres testified that willingness to pay, alone, is an "indicator" of the price premium, and that he could use willingness to pay as measured by a survey expert in his damages calculations, notwithstanding the fact that he conceded willingness to pay is not the same as market price. [Torres Deposition, pp. 202 and 206]

aggregate basis, rather than as the sum of individual harms to each individual Class member."[74] He claims that, due to the disclosures or lack of disclosures at issue, Google was able to obtain speech data via users of the Google Assistant service that it otherwise would not have been able to obtain, which it was able to monetize.[75]

35.    Mr. Torres then provides a calculation of what he claims to be Google's profits "attributable to the use of the audio recordings at issue in this case."[76] As the first step in his calculation he lists ██████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████████████ However, instead of using Google's assessments of revenues and profits associated with the Google Assistant, he performs his own calculations based on unfounded assumptions. ████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████ ██████████████████████████████ █ ██████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████ █

36.    ██████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████ █ ██████████████████

---

[74] Torres Report, p. 30.

[75] Torres Report, p. 30.

[76] Torres Report, p. 32.

[77] Torres Report, pp. 31-32, citing GOOG-ASST-03045668.

[78] Torres Declaration, p. 32. Mr. Torres cites Alphabet, Inc.'s 2021 annual filing as a source for his company-wide income and expense figures; however, he wrongly identifies "Total Costs and Expenses" to be $176.24 billion when the correct figure from the filing actually is $178.92 billion. [Torres Declaration, footnote 64; and Google 2021 Form 10-K, p. 50] The correct ratio of Alphabet's "Total Costs and Expenses" to net income therefore should be 42.5 percent, rather than Mr. Torres' figure of 43.1 percent.

[79] Google 2021 Form 10-K, p. 50; and GOOG-ASST-03045667.

[80] Torres Deposition, pp. 255-256.

37.

---

[81] Torres Report, p. 36.

[82] Deposition of Hailey Crowel, July 21, 2022 ("Crowel Deposition v. 1"), p. 109.

[83] Crowel Deposition v. 1, pp. 102-103 and 107

[84] Torres Deposition, pp. 230-232 and 246-247.

[85] Torres Report, pp. 32-33.

[86] Torres Report, p. 33 (emphasis in original).

███████████████████ In any case, Mr. Torres offers no methodology to provide accurate figures for this purpose, nor does he identify any additional information from Google or elsewhere that could be used to do so.

39.     Mr. Torres then provides a separate calculation to address Google's purported avoided costs of acquiring speech data resulting from its use of putative class members' data "without consent for free."[88] His approach is based on the assumption that "Google pays to acquire Speech Data in the market, including audio reflecting individuals speaking the Hotword, for use in its product development efforts."[89] Mr. Torres proposes the following formula: "{Avoided Cost} = {Utterances logged-2019} x {% False Accepts} x {Unit Cost}."[90] This approach is apparently based on the assumption that data obtained from Google through false accepts provides benefits to Google equal to the cost of acquiring the same number of "utterances" from other sources. Mr. Torres provides no analysis, logic, theory, or any other basis to support this fundamental underlying assumption.

40.     Moreover, Mr. Torres acknowledges that he doesn't have sufficient data to determine the proportion of "utterances" that were recorded as part of the at-issue conduct, ████████ ████████████████████████████████████████████████████████ ██ ████████████████████████████████████████████████████████████ ████████████████████████

41.     For the "Unit Cost" component of his calculation, Mr. Torres cites two Google documents to claim that ████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████ ████████████████████████████

---

[87] Torres Deposition, p. 239-240.

[88] Torres Report, p. 34.

[89] Torres Report, pp. 33-34 (citations omitted).

[90] Torres Report, p. 35.

[91] Torres Report, p. 35, citing GOOG-ASST-02990630 – 631, GOOG-ASST-00255944 – 946, GOOG-ASST-00029845, and GOOG-ASST-00235006 – 043 at 040.

[92] GOOG-ASST-02990630 – 631.

[93] Torres Declaration, p. 35. In deposition, Mr. Torres acknowledged that ████████████████ ███████████████████████████████████████████ GOOG-ASST-00026793; and Torres Deposition, p. 267]

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Thus, the range of potential damages according to Mr. Torres' approach could be as high as a factor of almost 300, and Mr. Torres again provides no basis to choose any number within this range nor any potential methodology to derive any particular figure.

42.     In conclusion, none of the inputs into Mr. Torres' proposed calculations of Google's avoided purchase costs of utterances provide a reliable basis for assessing damages in this case; the numbers in Mr. Torres' report do not appear to correspond to the data that he cites and the actual figure could be as little as one-twentieth of the low end of the range that he presents in his report; and Mr. Torres has provided no further indication of how he would refine these estimates or obtain accurate data for his stated purpose.

---

[94] GOOG-ASST-00026788 – 821 at 789.

[95] GOOG-ASST-00026788 – 821 at 793.

[96] Torres Report, p. 35, citing GOOG-ASST-00023584 – 614 at 604.

[97] Torres Deposition, pp. 267-268.

## VI. DR. REED-ARTHURS' PROPOSED SURVEY CANNOT PROVIDE AN OBJECTIVE MEASURE OF CLASSWIDE DAMAGES

### A. Dr. Reed-Arthurs Acknowledges That Consumer Willingness to Pay, as She Claims Could Be Measured by Her Proposed Survey, Is Not the Same as Market Price

43.     Dr. Reed-Arthurs proposes a conjoint survey to "estimate a change in consumer willingness-to-pay for smartphones (or smart speakers/displays) due to the disclosures of the At-Issue Conduct."[98] However, she does not claim that her proposed conjoint survey could be used to estimate changes in market price resulting from changes in disclosures, nor does she propose any other analysis that could be used to predict market prices in a scenario in which the products at issue were sold with the But-For World Disclosures, as defined by Plaintiffs, instead of the Actual World Disclosures.

44.     It is a basic tenet in the field of economics that consumer willingness to pay—defined as the maximum price a consumer is willing to pay for a product or service—is fundamentally distinct from the product's price in the marketplace. As I describe above, a product's demand curve represents the amount of the product that consumers are willing to buy at each potential price, and can, in theory, be constructed by aggregating the willingness to pay of all actual and potential consumers of the product.[99] The equilibrium price or market price, on the other hand, is the price at which quantity demanded equals quantity supplied.[100] Consumer WTP can vary significantly across individuals, while all consumers who purchase the product at a given market equilibrium pay the same price, regardless of their individual WTP.[101] In deposition, Dr. Reed-Arthurs acknowledged that she had not been asked to "measure supply-side factors or to reach a conclusion about, for example, equilibrium concepts or a change in market price."[102] Dr. Reed-Arthurs states that she "specifically was asked to address and measure consumer

---

[98] Reed-Arthurs Report, ¶¶ 17, 91, and 122-124.

[99] See also, for example, Varian (1996), pp. 3-5; and Perloff (2012) , p. 11.

[100] See also, for example, Perloff (2012), pp. 22-23.

[101] See also, for example, Perloff (2012), p. 276.

[102] Deposition of Rebbecca Reed-Arthurs, September 7, 2022 ("Reed-Arthurs Deposition"), p. 254.

willingness to pay," and while, in some circumstances it might be "synonymous with the market price premium," she was not asked to "conduct that additional step."[103]

45.     In her report, Dr. Reed-Arthurs acknowledges the distinction between consumer willingness to pay—which she claims her conjoint survey can measure—and market price, stating that "economic theory predicts that the change in willingness-to-pay for marginal consumers of a product *may have a stronger influence* on how market prices change in equilibrium if product features change."[104] Thus, while Dr. Reed-Arthurs asserts that her analysis will provide a metric that "may" have an "influence" on market prices, she does not indicate what that "influence" may entail, or how one could use the results of her analysis to determine the *actual* impact of the alleged misrepresentations on market prices. As I demonstrate above, the impact of a change in demand due, for example, to a change in product disclosures can have quite different impacts on market prices depending on supply conditions. For example, when the supply curve is horizontal, the impact (or "influence" as described by Dr. Reed-Arthurs) of a change in consumer demand on market prices necessarily is zero, whereas when the supply curve slopes upward, the impact on market prices is positive but necessarily still less than the change in demand. Moreover, Dr. Reed-Arthurs does not propose any other methodology that could be used to predict changes in price resulting from changes in the disclosures at issue.[105] Thus, despite Mr. Torres' claim that he will use the output of Dr. Reed-Arthurs' analysis, none of the methods actually proposed by Dr. Reed-Arthurs can be used to "measure the 'price premium' distinctly attributable to the Challenged Claims."

### B. A Conjoint Survey Alone Cannot Measure the Impact of Disclosures on Market Prices and Therefore Cannot Provide an Objective Measure of Damages

46.     In general, consumer surveys only can provide information regarding consumers' willingness to pay for a product with a particular set of features or attributes. In other words, a consumer survey, such as a conjoint survey, only can indicate how the "demand side" of the

---

[103] Reed-Arthurs Deposition, p. 256.

[104] Reed-Arthurs Report, ¶ 123 (emphasis added).

[105] In deposition, Dr. Reed-Arthurs further clarified her position, stating that willingness to pay alone may not be "synonymous" with a price premium, depending on supply-side conditions, but that she had not been asked to make that determination in any case. [Reed-Arthurs Deposition, p. 257-258]

market might react to changes in a product disclosure. However, as I describe above, consumers' willingness to pay is inherently *subjective* in that such values generally vary across individuals depending on their preferences, budget, etc. in a manner that only could be determined through individual inquiry. By its very nature, a consumer survey cannot provide information about how the seller or its competitors would react to a change in disclosures. Thus, in this matter, a consumer survey cannot provide an estimate of how but-for market prices in that scenario might differ from actual market prices, which could represent an *objective* measure of the value of the product or a feature of the product. As stated by distinguished economist, Jeffrey Perloff, in his widely used economics textbook:[106]

> Knowing how much consumers want is not enough, by itself, to tell us what price and quantity are observed in a market. To determine the market price and quantity, we also need to know how much firms want to supply at any given price.

Thus, a methodology that only evaluates consumer preferences, while ignoring the supply side of the market, cannot be used to determine what prices would have been but-for the alleged misrepresentations and, consequently, a consumer survey cannot be used to determine a market-based "price premium" or provide an objective measure of harm to consumers in this matter.

47.     The fact that a measurement of consumer value for a product feature from a survey does not necessarily bear any relation to a "price premium," however defined, has been addressed in the literature on conjoint analysis. For example, a paper presented jointly by several conjoint practitioners and academics at a conference organized by Sawtooth, the conjoint software provider that Dr. Reed-Arthurs proposes to use for her survey, states: "In the context of conjoint studies, feature valuation is achieved by using various measures that relate only to the demand for the products and features and not to the supply."[107] The authors state that estimates of consumer willingness to pay derived from conjoint surveys "do not take into account

---

[106] Perloff (2012), p. 17.

[107] Greg Allenby, Jeff Brazell, John Howell, and Peter Rossi, "Using Conjoint Analysis to Determine the Market Value of Product Features," in Proceedings of the Sawtooth Software Conference, October 2013, p. 343. These same conclusions have been included in peer-reviewed articles; see, for example, Greg Allenby, Jeff D. Brazell, John R. Howell, and Peter E. Rossi, "Valuation of Patented Product Features," *The Journal of Law & Economics*, v. 57, n. 3, August 2014, pp. 629-663; and Greg Allenby, Jeff D. Brazell, John R. Howell, and Peter E. Rossi, "Economic Valuation of Product Features," *Quantitative Marketing and Economics*, v. 12, n. 4, August 2014, pp. 421-456.

equilibrium adjustments in the market as one of the products is enhanced by addition of a feature" (i.e., responses to the feature change by the supplier as well as competitors' responses) and further that "[c]omputation of changes in the market equilibrium due to feature enhancement of one product will be required to develop a measure of the economic value of the feature."[108] The authors find that estimates based solely on consumer willingness to pay "will overstate the price premium afforded by feature enhancement."[109]

48.     Finally, neither of Plaintiffs' experts attempt to provide any analysis of supply-side considerations that would enable them to determine the price that would have prevailed in the market but-for Google's alleged misrepresentations. In fact, as discussed above, Dr. Reed-Arthurs acknowledges that the information related to the change in consumer willingness-to-pay that could be determined from her proposed survey and subsequent analysis is not the same as the change in market price.[110]

Jesse David
September 13, 2022

---

[108] Allenby, et al. (2013), pp. 346-347.

[109] Allenby, et al. (2013), p. 347.

[110] Reed-Arthurs Report, ¶¶ 123-124.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

## APPENDIX 1: MATERIALS CONSIDERED

**Case Documents**

Fourth Amended Consolidated Class Action Complaint, August 2, 2021

Plaintiffs' Memorandum of Law in Support of Their Motion for Class Certification, July 18, 2022

Declaration of Margaret MacLean in Support of Plaintiffs' Administrative Motion to Consider Whether Another Party's Materials Should Be Sealed, July 18, 2022, with Exhibits 1-58

Declaration of Margaret MacLean in Support of Plaintiffs' Motion for Class Certification, July 18, 2022, with Exhibits 1-58

Plaintiffs' Notice of Motion and Motion for Class Certification, July 18, 2022

Plaintiffs' Proposed Order Granting Plaintiffs' Motion for Class Certification, July 18, 2022

Opening Expert Report of Rebbecca Reed-Arthurs, Ph.D., July 18, 2022 (Exhibit 58 to Declaration of Margaret MacLean in Support of Plaintiffs' Administrative Motion to Consider Whether Another Party's Materials Should Be Sealed), with supporting materials

Class Economic Damages Declaration of Fernando Torres, MSc., July 18, 2022 (Exhibit 57 to Declaration of Margaret MacLean in Support of Plaintiffs' Administrative Motion to Consider Whether Another Party's Materials Should Be Sealed), with supporting materials

Deposition of Hailey Crowel, July 21, 2022, with Exhibits 1-8

Deposition of Hailey Crowel, August 10, 2022, with Exhibits 2, 5, and 7

Defendants Alphabet Inc. and Google LLC's Notice of Motion and Motion for Summary Judgment; Memorandum of Points and Authorities in Support (redacted), August 22, 2022

Deposition of Fernando Torres, MSc, September 7, 2022, with Exhibits 1-11

Deposition of Rebbecca Reed-Arthurs, Ph.D., September 7, 2022

Declaration of Françoise Beaufays in Support of Defendants Alphabet Inc. and Google LLC's Opposition to Plaintiffs' Motion for Class Certification, September 13, 2022

**Bates Numbered Documents**

GOOG-ASST-00000005 – 007

GOOG-ASST-00000022 – 028

GOOG-ASST-00000029 – 032

GOOG-ASST-00000035 – 036

GOOG-ASST-00000071 – 072

GOOG-ASST-00002551 – 556

GOOG-ASST-00034844 – 849

GOOG-ASST-00035016 – 017

GOOG-ASST-00035031 – 032

GOOG-ASST-00040632 – 653

GOOG-ASST-03047340

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**Publicly Available Documents and Websites**

Alessandro Acquisti, Curtis Taylor, and Liad Wagman, "The Economics of Privacy," *Journal of Economic Literature*, v. 54, n. 2, June 2016, pp. 442-492

Alessandro Acquisti, Leslie K. John, and George Loewenstein. "What Is Privacy Worth?" *Journal of Legal Studies*, v. 42, n. 2, June 2013, pp. 249–274

Federal Judicial Center, Reference Manual on Scientific Evidence, 3rd ed., National Academies Press: Washington, D.C., 2011

Greg Allenby, Jeff Brazell, John Howell, and Peter Rossi, "Using Conjoint Analysis to Determine the Market Value of Product Features," in Proceedings of the Sawtooth Software Conference, October 2013

Greg Allenby, Jeff D. Brazell, John R. Howell, and Peter E. Rossi, "Economic Valuation of Product Features," *Quantitative Marketing and Economics*, v. 12, n. 4, December 2014, pp. 421-456

Greg Allenby, Jeff D. Brazell, John R. Howell, and Peter E. Rossi, "Valuation of Patented Product Features," *The Journal of Law & Economics*, v. 57, n. 3, August 2014, pp. 629-663

Google 2021 Form 10-K

Hal R. Varian, Intermediate Microeconomics, 4th ed., W. W. Norton & Co.: New York, 1996

Jeffrey M. Perloff, Microeconomics, 6th ed., Addison-Wesley, 2012

**APPENDIX 2: CURRICULUM VITAE OF JESSE DAVID, PH.D.**



201 S. Lake Ave., Suite 308
Pasadena, CA 91101
626-657-7950
jdavid@edgewortheconomics.com

## Jesse David, Ph.D.

Jesse David is a Partner at Edgeworth Economics and head of Edgeworth's Los Angeles office. Dr. David is an expert on the valuation of intangible assets, market definition, and the assessment of economic impacts in complex commercial disputes and regulatory proceedings. His experience spans intellectual property, antitrust, labor, regulatory, and class certification matters, among other economic issues related to the intersection of business and government.

Dr. David has provided economic consulting and expert testimony for many industries, including pharmaceuticals, telecommunications, agricultural products, finance, petroleum products, chemicals, software, and consumer products. He frequently submits expert reports to and testifies before decision-making bodies, including U.S. federal and state courts, the Federal Energy Regulatory Commission, the National Energy Board of Canada, and various arbitration venues.

Dr. David's consulting practice also includes developing cost-benefit analyses of government regulations and assessing the economic impacts of government policies and other changes in industry structure. Dr. David has prepared studies for entities such as the American Trucking Associations, the National Football League Players Association, the San Diego County Water Authority, the New York Power Authority, and the Ocean Conservancy.

### EDUCATION

Stanford University
Ph.D., Economics, 2000

Brandeis University
B.A., *magna cum laude,* Economics and Physics, 1991

### EMPLOYMENT

Edgeworth Economics, LLC, Washington, D.C.
2019 - 2020, President
2012 - 2018 and 2021 - present, Partner
2009 - 2012, Senior Vice President

Criterion Economics, LLC, Washington, D.C.
2009, Senior Vice President

National Economic Research Associates, Inc., White Plains, NY
2004 - 2009 Vice President
2000 - 2004 Senior Consultant
1997 - 1999 Senior Analyst

Stanford University, Palo Alto, CA
1993 - 1995 Research Assistant/Teaching Assistant

**TESTIMONY AND EXPERT REPORTS**

*Before Presidential Emergency Board No. 250*, expert report, July 20, 2022; arbitration testimony, July 25, 2022 and July 28, 2022

*City of Creve Coeur, Missouri v. Netflix, Inc. and Hulu, LLC*, Circuit Court of St. Louis County, Missouri; expert report, January 28, 2022; deposition, February 25, 2022

*Western Digital Corporation and Subsidiaries, et al. v. Commissioner of Internal Revenue*, U.S. Tax Court; expert report, January 7, 2022; deposition, February 18, 2022

*Theda Jackson-Mau v. Walgreen Co. and International Vitamin Corporation*, U.S. District Court for the Eastern District of New York; expert report, December 13, 2021; deposition, January 14, 2022

*Keurig Green Mountain, Inc. v. Sun Chemical Corporation*, Commonwealth of Massachusetts, Suffolk County Superior Court; expert reports, November 5, 2021 and January 7, 2022

*Felix Obertman v. Electrolux Home Products, Inc.*, U.S. District Court for the Eastern District of California; expert report, September 1, 2021; deposition, October 15, 2021

*Gulf Distributing Holdings, LLC, et al. v. Keurig Dr Pepper, Inc. and The American Bottling Company, Inc.*, U.S. District Court for the Southern District of Alabama, Southern Division; expert report, August 9, 2021; deposition, August 25, 2021

*Indivior Inc., et al. v. Alvogen Pine Brook LLC*, U.S. District Court for the District of New Jersey; expert report, July 1, 2021; deposition, October 7, 2021

*City of New Boston, Texas v. Netflix, Inc. and Hulu, LLC*, U.S. District Court for the Eastern District of Texas, Texarkana Division; expert report, June 21, 2021

*City of Maple Heights, Ohio v. Netflix, Inc. and Hulu, LLC*, U.S. District Court for the Northern District of Ohio; expert report, May 17, 2021; deposition, May 28, 2021

*Jeff Olberg, et al. v. Allstate Insurance Company, et al.*, U.S. District Court for the Western District of Washington; declaration and expert report, May 7, 2021; deposition, June 18, 2021

*Stephanie Wedra v. Cree, Inc.*, U.S. District Court for the Southern District of New York; expert report, April 30, 2021; deposition, May 26, 2021

*Rigo Amavizca v. Nutra Manufacturing, LLC*, U.S. District Court for the Central District of California; expert report, April 12, 2021; deposition, April 21, 2021

*Lashawn Sharpe, et al. v. A&W Concentrate Company and Keurig Dr Pepper Inc.*, U.S. District Court for the Eastern District of New York; expert reports, April 7, 2021 and January 13, 2022; depositions, May 19, 2021 and January 28, 2022

*Daniel Zeiger v. WellPet LLC*, U.S. District Court for the Northern District of California, San Francisco Division; expert report, September 14, 2020; deposition, October 16, 2020

*Silvergate Pharmaceuticals, Inc. v. Amneal Pharmaceuticals LLC*, U.S. District Court for the District of Delaware; expert report, August 21, 2020; deposition, November 16, 2020; trial testimony, February 4, 2021

*Cameron Lundquist and Leeana Lara v. First National Insurance Company of America, et al.*, U.S. District Court for the Western District of Washington; expert report, July 27, 2020; deposition, August 25, 2020

*Winn-Dixie Stores, Inc. and BI-LO Holdings, LLC v. Eastern Mushroom Marketing Cooperative, Inc., et al.*, U.S. District Court for the Eastern District of Pennsylvania; expert reports, July 23, 2020 and February 21, 2022; deposition, August 19, 2020; declaration, August 30, 2020; trial testimony, March 16 and 17, 2022

*Elizabeth E. Belin, et al. v. Health Insurance Innovations, Inc., et al.*, U.S. District Court for the Southern District of Florida, Ft. Lauderdale Division; expert report, May 15, 2020; deposition, May 29, 2020

*Kathleen Smith v. Keurig Green Mountain, Inc.*, U.S. District Court for the Northern District of California; declaration, January 31, 2020

*XY, LLC v. Trans Ova Genetics, LC*, U.S. District Court for the District of Colorado; declaration, December 3, 2019

*H&H Wholesale Services, Inc., et al. v. Kamstra International, B.V.*, U.S. District Court for the Eastern District of Michigan, Southern Division – Detroit; expert reports, July 31, 2019 and February 1, 2022

*Jeff Young v. Cree, Inc.*, U.S. District Court for the Northern District of California, San Francisco Division; expert report, March 22, 2019; deposition, April 17, 2019

*Sylvia Leyva v. NFI Industries Inc.*, Superior Court of the State of California for the County of San Bernardino, Central District; deposition, February 15, 2019

*Amphastar Pharmaceuticals, Inc. and International Medication Systems, Ltd. v. Momenta Pharmaceuticals, Inc. and Sandoz, Inc.*, U.S. District Court for the District of Massachusetts; expert reports, December 21, 2018, February 15, 2019, and March 15, 2019; deposition, April 4, 2019

*Entrata, Inc. v. Yardi Systems, Inc.*, U.S. District Court for the District of Utah, Central Division.; expert reports, December 7, 2018 and February 8, 2019; deposition, February 20, 2019

*POET, LLC, et al. v. Nelson Engineering, Inc., et al.*, U.S. District Court for the District of South Dakota, Southern Division; expert reports, September 28, 2018 and November 28, 2018; declaration, March 22, 2019; deposition, January 8, 2019

*Evert Fresh, Inc. v. Housewares America, Inc.*, U.S. District Court for the District of New Jersey; expert reports, June 4, 2018 and July 17, 2018

*Rosa Alvarez v. NBTY, Inc. and Nature's Bounty, Inc.*, U.S. District Court for the Southern District of California; expert report, June 1, 2018; deposition, September 4, 2018

*Bal Seal Engineering, Inc. v. Nelson Products, Inc., et al.*, U.S. District Court for the Central District of California; expert reports, May 7, 2018, June 5, 2018, and October 30, 2019; deposition, July 27, 2018

*XY, LLC, Beckman Coulter, Inc. and Inguran, LLC v. Trans Ova Genetics, LC*, U.S. District Court for the District of Colorado; expert report, April 13, 2018; deposition, June 6, 2018

*Sandra Bond v. Berkshire Bank and Berkshire Hills Bancorp*, U.S. District Court for the District of Massachusetts; expert report, November 21, 2017; deposition, January 16, 2018; affidavit, August 13, 2018

*DSM IP Assets, B.V. and DSM Bio-Based Products & Services, B.V. v. Lallemand Specialties, Inc. and Mascoma LLC*, U.S. District Court for the Western District of Wisconsin; expert report, November 21, 2017; deposition, December 14, 2017; trial testimony, May 11 and 14, 2018; declaration, June 20, 2018

*Abbott Laboratories, et al. v. Adelphia Supply USA, et al.*, U.S. District Court for the Eastern District of New York; expert reports, November 15, 2017 and January 29, 2018; deposition, February 13, 2018

*Before an Interest Arbitration Board between the Northeast Illinois Regional Commuter Railroad Corporation and the Brotherhood of Railroad Signalmen*, National Mediation Board; expert report, October 20, 2017; arbitration testimony, November 8, 2017

*American Helios Constructors, LLC v. Shoals Technology Group*, American Arbitration Association; expert report, August 29, 2017

*Rembrandt Enterprises, Inc. v. Eurovo S.r.l.*, U.S. District Court for the Northern District of Iowa; expert report, July 21, 2017

*United Energy Trading, LLC. v. Pacific Gas and Electric Company, et al.*, U.S. District Court for the Northern District of California, San Francisco Division; expert report, May 19, 2017; deposition, September 28, 2017

*Staci Chester, et al. v. TJX Companies, Inc., et al.*, U.S. District Court for the Central District of California, Eastern Division; declaration, April 17, 2017

*Stanley Johnson v. Time Warner Cable, et al.*, U.S. District Court for the District of South Carolina, Columbia Division; declaration, March 24, 2017

*Momenta Pharmaceuticals, Inc. and Sandoz Inc. v. Amphastar Pharmaceuticals, Inc., et al.*, U.S. District Court for the District of Massachusetts; expert report, February 16, 2017; deposition, March 28, 2017; trial testimony, July 18, 2017; declaration, March 20, 2018

*Chad Herron, et al. v. Best Buy Stores, LP*, U.S. District Court for the Eastern District of California; declaration, August 18, 2016; deposition, August 25, 2016

*In Re: AZEK Decking Sales Practices Litigation*, U.S. District Court for the District of New Jersey; declaration, July 25, 2016; deposition, August 17, 2016

*Boston Cab Dispatch, Inc. and EJT Management, Inc. v. Uber Technologies, Inc.*, U.S. District Court for the District of Massachusetts; expert report, May 20, 2016

*In Re: Nest Labs Litigation*, U.S. District Court for the Northern District of California; declaration, April 15, 2016; deposition, May 10, 2016

*The Bakery, LLC, et al. v. Kenneth Pritt and Woodford Transportation, LLC, et al.*, Circuit Court of Greenbrier County, West Virginia; expert reports, March 21, 2016 and May 27, 2016

*In Re: Scotts EZ Seed Litigation*, U.S. District Court for the Southern District of New York; expert report, March 11, 2016; deposition, April 20, 2016

*Digital Recognition Network, Inc. v. Accurate Adjustments, Inc., et al.*, U.S. District Court for the Northern District of Texas, Fort Worth Division; expert reports, January 22, 2016 and February 22, 2016; deposition, February 25, 2016

*American Helios Contractors, LLC v. Bradley Kogan, Precision Renewables, LLC, and 3TAC, LLC*, District Court for Clark County Nevada; expert report, November 13, 2015

*Christopher Lewert v. Boiron, Inc. and Boiron USA, Inc.*, U.S. District Court for the Central District of California; expert report, October 1, 2015; deposition, April 14, 2016

*Wreal, LLC v. Amazon.com, Inc.*, U.S. District Court for the Southern District of Florida, Miami Division; expert report, September 10, 2015; deposition, September 28, 2015

*Novadaq Technologies Inc. v. Karl Storz Endoscopy-America, Inc. and Karl Storz GmbH & Co. KG*, U.S. District Court for the Northern District of California, San Jose Division; expert report, July 28, 2015; declaration, November 10, 2015

*Globus Medical, Inc. v. DePuy Synthes Products, LLC and DePuy Synthes Sales, Inc.*, U.S. District Court for the District of Delaware; expert reports, July 22, 2015 and October 14, 2015; deposition, November 6, 2015

*Broadband iTV, Inc. v. Hawaiian Telcom, Inc., et al.*, U.S. District Court for the District of Hawaii; expert reports, June 30, 2015 and July 28, 2015; declaration, July 10, 2015; deposition, July 29, 2015

*Greater Houston Transportation Company, et al. v. Uber Technologies, Inc. and Lyft Inc.*, U.S. District Court for the Southern District of Texas, Houston Division; expert reports, June 29, 2015 and November 19, 2015; declaration, August 27, 2015; deposition, January 8, 2016

*Crystal Good, et al. v. American Water Works Company, Inc., et al.*, U.S. District Court for the Southern District of West Virginia; expert report, May 22, 2015; deposition, June 12, 2015

*In Re: Processed Egg Products Antitrust Litigation*, U.S. District Court for the Eastern District of Pennsylvania; expert report, March 13, 2015; deposition, May 5, 2015; affidavit, September 8, 2015; hearing testimony, December 16, 2015; trial testimony, May 29, 2018 and December 4, 2019

*Santarus, Inc. and The Curators of the University of Missouri v. Par Pharmaceutical, Inc.*, U.S. District Court for the District of Delaware; expert report, April 21, 2014; deposition, June 12, 2014

*Mylan Technologies, Inc. and Mylan, Inc. v. Zydus Noveltech, Inc., et al.*, Vermont Superior Court, Chittenden Civil Division; expert report, October 2, 2013; deposition, November 19, 2013

*Alcon Pharmaceuticals Ltd. and Alcon Research, Ltd. v. Lupin Ltd. and Lupin Pharmaceuticals, Inc.*, U.S. District Court for the District of Delaware; expert report, June 28, 2013; deposition, July 24, 2013

*Warner Chilcott Company, LLC v. Lupin Ltd. and Lupin Pharmaceuticals, Inc.*, and *Warner Chilcott Company, LLC v. Watson Laboratories, Inc.*, U.S. District Court for the District of New Jersey; expert report, June 12, 2013; deposition, July 11, 2013; trial testimony, October 8, 2013

*In Re: Mushroom Direct Purchaser Antitrust Litigation*, U.S. District Court for the Eastern District of Pennsylvania; expert report, May 15, 2013; deposition, October 25, 2013; hearing testimony, March 24-25, 2015

*Lisy Corp. v. Barry A. Adams, McCormick & Company, Inc. and Mojave Foods Corporation*, Circuit Court for Howard County, Maryland; deposition, May 23, 2012; trial testimony, April 26, 2013

*Dey, L.P. and Dey, Inc. v. Teva Parenteral Medicines, Inc., et al.*, U.S. District Court for the Northern District of West Virginia; expert report, January 13, 2012; deposition, February 7, 2012; trial testimony, August 2, 2013

*Dow Corning Corporation and Hemlock Semiconductor Corporation v. Jie (George) Xiao, et al.*, U.S. District Court for the Eastern District of Michigan, Northern Division; declaration, January 9, 2012; expert report, March 1, 2012

*Riverplace Development, LLC v. Charles Cranford, Esquire and Rogers Towers, P.A.*, Circuit Court, Fourth Judicial Circuit, in and for Duval County, Florida; depositions, October 12, 2011 and December 21, 2011

*Pfizer, Inc., et al. v. Teva Pharmaceuticals USA, Inc. and Teva Pharmaceuticals Industries, Ltd.*, U.S. District Court for the District of Delaware; expert report, June 3, 2011; deposition, July 22, 2011

*Ramona Trombley, et al. v. National City Bank*, U.S. District Court for the District of California; expert report, May 27, 2011; declaration, August 29, 2011

*Rocky Mountain Farmers Union, et al. v. James N. Goldstene*, U.S. District Court for the Eastern District of California; declarations, October 29, 2010 and March 14, 2011

*Investment Technology Group, Inc., et al. v. Liquidnet Holdings, Inc.*, U.S. District Court for the Southern District of New York; expert report, April 12, 2010; deposition, June 2, 2010

*AOB Properties, Ltd. v. Laserspine Institute, LLC, et al.*, U.S. District Court for the Middle District of Florida, Tampa Division; expert report, December 11, 2009

*Glaxo Group Ltd. and SmithKlineBeecham Corporation v. Teva Pharmaceuticals USA, Inc.*, U.S. District Court for the District of Delaware; expert reports, October 15, 2009 and November 3, 2009; declaration, April 9, 2010; deposition, November 3, 2009

*Tyco Healthcare Group LP and Mallinckrodt Inc. v. Pharmaceutical Holdings Corporation, et al.*, U.S. District Court for the District of New Jersey; declaration, July 22, 2009; deposition, July 23, 2009; hearing testimony, July 29, 2009

*ESCO Corporation v. Bradken Resources Pty Ltd,* International Chamber of Commerce, International Court of Arbitration; expert reports, June 15, 2009 and December 21, 2009; arbitration testimony, January 29, 2010

*Schering Corporation and MSP Singapore Company LLC v. Glenmark Pharmaceuticals Inc., USA and Glenmark Pharmaceuticals Ltd.*, U.S. District Court for the District of New Jersey; expert report, May 8, 2009; deposition, June 18, 2009

*Eli Lilly and Company v. Sicor Pharmaceuticals, Inc. and Teva Pharmaceuticals USA, Inc.*, U.S. District Court for the Southern District of Indiana; expert report, February 24, 2009; deposition, March 20, 2009

*Tobacco Technology, Inc. v. Taiga International N.V., et al.*, U.S. District Court for the District of Maryland; expert report, August 21, 2008; deposition, November 25, 2008

*Dow Jones & Company, Inc. v. Ablaise Ltd. and General Inventions Institute A, Inc.*, U.S. District Court for the District of Columbia; expert report, August 20, 2008

*Aspex Eyewear, Inc. and Contour Optik, Inc. v. Clariti Eyewear, Inc.*, U.S. District Court for the Southern District of New York; expert report, June 20, 2008

*Boldstar Technical, LLC and Michael S. Powell v. The Home Depot, Inc. and Industriaplex, Inc.*, U.S. District Court for the Southern District of Florida, Fort Lauderdale Division; expert reports, April 25, 2008 and May 30, 2008; deposition, August 29, 2008; trial testimony, February 10-11, 2010

*Novartis Pharmaceuticals Corporation, et al. v. Mylan Pharmaceuticals, Inc. and Mylan Laboratories, Inc.*, U.S. District Court for the District of New Jersey; expert report, March 26, 2008; declaration, October 1, 2008; deposition, October 9, 2008

*Gary W. Ogg and Janice Ogg v. Mediacom LLC*, Circuit Court of Clay County, Missouri in Liberty; expert reports, March 5, 2008 and April 3, 2008; deposition, April 4, 2008; trial testimony, March 13 and 17, 2009

*Source Search Technologies, LLC v. LendingTree, LLC, et al.*, U.S. District Court for the District of New Jersey; expert report, May 1, 2007; deposition, June 21, 2007

*Federal Insurance Company v. InterDigital Communications Corporation, et al.*, JAMS arbitration; deposition, February 27, 2007; arbitration testimony, May 16, 2007

*Student Lifeline, Inc. v. The Senate of the State of New York, et al.*, U.S. District Court for the Eastern District of New York; expert report, January 29, 2007; deposition, July 26, 2007

*Pediatrix Screening, Inc., et al. v. Telechem International, Inc.*, U.S. District Court for the Western District of Pennsylvania; expert reports, December 15, 2006, February 16, 2007, and July 6, 2007; deposition, March 28, 2007; trial testimony, July 18-19, 2007

*Green Mountain Chrysler-Plymouth-Dodge-Jeep, et al. v. Torti*, U.S. District Court for the District of Vermont; expert reports, October 9, 2006 and January 17, 2007

*The Procter & Gamble Company v. Teva Pharmaceuticals USA, Inc.*, U.S. District Court for the District of Delaware; expert report, August 31, 2006; deposition, October 13, 2006; trial testimony, November 6, 2006

*Central Valley Chrysler Jeep, Inc., et al. v. Witherspoon*, U.S. District Court for the Eastern District of California; expert reports, June 12, 2006, October 9, 2006, and January 16, 2007; deposition, October 27, 2006

*Sierra Club, et al. v. Robert B. Flowers, et al.*, U.S. District Court for the Southern District of Florida, Miami Division; depositions, June 6, 2006 and June 20, 2006; hearing testimony, October 5, 2006; declaration in support of appeal, U.S. Court of Appeals for the Eleventh Circuit, July 27, 2007

*Merck & Co., Inc. v. Teva Pharmaceuticals USA, Inc.*, U.S. District Court for the District of Delaware; expert report, April 6, 2006; deposition, August 8, 2006

*Alliance Security Products, Inc. v. Fleming and Company, Pharmaceuticals*, U.S. District Court for the Southern District of New York; expert report, March 30, 2006; deposition, May 17, 2006

*Re Colonial Pipeline Company*, Federal Energy Regulatory Commission; declaration, February 28, 2006

*Tesoro Canada Supply & Distribution Ltd. in Hearing Order MH-2-2005 Regarding an Application for Priority Destination from Chevron Canada Limited, et al.*, National Energy Board of Canada; direct testimony, January 18, 2006

*McKesson Information Solutions, LLC v. The TriZetto Group, Inc.*, U.S. District Court for the District of Delaware; expert report, November 17, 2005; deposition, November 30, 2005

*Touch-n-Buy, Inc. v. Radiant Telecom, Inc., et al.*, U.S. District Court for the Southern District of Florida; expert report, November 9, 2005; deposition, February 8, 2006

*Jamaica Recycling Corp., et al. v. The City of New York, et al.*, Supreme Court of the State of New York, County of New York; affidavit, August 18, 2005

*Amerisource Corporation v. RX USA International, Inc., et al.*, U.S. District Court for the Eastern District of New York; expert report, August 15, 2005; deposition, June 5, 2006

*Ruth S. King v. McNeil Nutritionals LLC and McNeil PPC-Inc.*, Supreme Court of the State of New York, County of New York; declaration, August 3, 2005; deposition, September 26, 2005; also in *Rochelle Suchoff, et al. v. McNeil Nutritionals LLC and McNeil PPC-Inc.*, Superior Court of New Jersey, Law Division, Essex County; *Jason Gregory Turner v. McNeil Nutritionals LLC and McNeil PPC-Inc.*, Superior Court of the State of California for the County of Los Angeles; *Harry Clendenan v. McNeil Nutritionals LLC and McNeil PPC-Inc.*, Circuit Court of Kanawha County, West Virginia; *Elizabeth Leser v. McNeil Nutritionals LLC and McNeil PPC-Inc.*, Court of Common Pleas, Erie County, Ohio; *Bobby Allen Green v. McNeil Nutritionals, LLC*, Judicial Court, Fourth Judicial Circuit in and for Duval County, Florida, Division CV-A; and *Jacqueline Burrows, et al. v. McNeil Nutritionals LLC and McNeil PPC-Inc.*, Superior Court of Massachusetts, Middlesex County

*Braun GmbH v. Rayovac Corporation*, U.S. District Court for District of Massachusetts; expert reports, May 23, 2005 and June 27, 2005; deposition, September 8, 2005

*PediaMed Pharmaceuticals, Inc. v. Breckenridge Pharmaceutical, Inc. and Scientific Laboratories, Inc.*, U.S. District Court for the District of Maryland, Southern Division; expert report, October 1, 2004

*Forrest W. Garvin and E-Netec, Corp. v. McGuireWoods, LLP, et al.*, General Court of Justice, Superior Court Division for the State of North Carolina, Mecklenburg County; deposition, July 27, 2004

*ResQNet.com, Inc. v. LANSA, Inc.*, U.S. District Court for the Southern District of New York; expert reports, July 14, 2004 and January 25, 2007; depositions, August 9, 2004 and May 6, 2011; trial testimony, May 21, 2007 and June 7, 2011

*Allocco Recycling, Ltd. v. John Doherty*, U.S. District Court for the Southern District of New York; expert report, February 4, 2004; deposition, December 9, 2004; declaration, December 2, 2005

*Pinnacle Systems, Inc. v. XOS Technologies, Inc., et al.*, U.S. District Court for the Northern District of California expert report, November 7, 2003; deposition, January 15, 2004; trial testimony, February 11, 2004

*Sinclair Oil Corporation v. BP Pipelines (North America), Inc.*, Federal Energy Regulatory Commission; direct testimony, September 18, 2003; rebuttal testimony, March 16, 2004.

## SELECTED CONSULTING PROJECTS AND REPORTS

*Evaluation of the Potential Economic and Carbon-Emission Benefits Associated with the Conversion of E10 to E15 in New York* – white paper submitted to NYSERDA as comment on the New York State Climate Action Council Draft Scoping Plan assessing the impacts of converting gasoline from E10 to E15 in New York.

*The Impact of EPA's Policies Regarding RVOs and SREs* – white paper submitted as comment on EPA rulemaking; analysis of EPA's policies with respect to the RFS and the impact of those policies on biofuel production and consumption.

*Economic Issues Associated with a Change in the RFS Point of Obligation* – analysis of proposals put forward by various petitioners to change the point of obligation for the RFS regulation from refiners/importers to blenders.

Calculation of potential exposure related to class action claims for false labeling of retail food product – analysis of retail scanner data and wholesale transaction databases to determine potential price premiums associated with label claims and calculate potential damages related to allegedly false claims.

Calculation of potential exposure related class action claims for unpaid wages – analysis of card-swipe, payroll, and scheduling data for a public utility to assess potential damages in a class action claim.

*Analysis of EPA's Proposal for a Reduction in the RFS Volume Requirements for 2014* – analysis of EPA's proposal to adjust the volumetric requirements under the RFS.

*Economic Impacts of the RFS Program: An Analysis of the NERA Report Submitted to the EPA* – analysis of the findings of NERA and CRA regarding economic impacts of waiving the Clean Air Act requirement for ethanol blending in gasoline.

Calculation of potential exposure related class action claims for payroll violations – analysis of login, payroll, and expense report data for financial services firm to assess potential damages in a class action claim.

*The Impact of a Waiver of the RFS Mandate on Food/Feed Prices and the Ethanol Industry* – analysis of the impacts of waiving the Clean Air Act requirement for ethanol blending in gasoline on animal feed prices, household expenditures on food, and the ethanol industry.

Analysis of generic pharmaceutical company's exposure for a potential at-risk launch – financial analysis of the potential damages against a pharmaceutical company for launching a generic product before patent expiration.

Analysis of coal supply contract escalator – report on the expected escalation in various cost indices used to determine the pricing of coal in a contract between a mining company and an electric utility.

*Review of PHMSA's Regulatory Analysis for the External Piping Requirement* – analysis of cost-benefit for a proposed regulation on external loading pipes for hazardous materials tankers.

*The Economic Impact of a Potential NFL Lockout in 2011* – analysis for the National Football Players Association of the impact of a loss of professional football games to the local economies of host cities.

*Review of FMCSA's Regulatory Impact Analysis for the 2010-2011 Hours of Service Rule* – cost-benefit study for the American Trucking Associations on the proposed change in regulations of hours of service for long-haul truckers; testified before Congressional Sub-Committee.

Consulting for an electric power cooperative on class certification in a claim for trespass damages – analyzed factors involved in hypothetical negotiations between landowners and a transmission line operator related to value of an easement for telecommunications use.

*A Cost-Benefit Analysis of Gear Replacement for Gulf Shrimp Fishermen* – analysis prepared for the Ocean Conservancy on the costs and benefits associated with industry-wide changes in equipment used by shrimp fishermen in the Gulf of Mexico.

Analysis of the impacts on competition of a merger in the solid-waste collection industry – prepared databases for turnover to the U.S. Department of Justice in response to a Second Request; prepared economic and statistical analyses of transaction data to address questions of competitive impact of consolidation.

*A Review of FMCSA's Regulatory Evaluation for the Proposed Minimum Training Requirements for Entry-Level Commercial Motor Vehicle Operators* – analysis of the U.S. Department of Transportation's proposed regulation regarding the minimum training requirements for truck and bus drivers.

Separable Costs–Remaining Benefits calculation for a dam reconstruction project – report on cost allocation for a municipal water district which assessed the relative benefits and costs of recreational and water-supply uses of a reservoir.

Peer review for U.S. EPA STAR Grant program – peer review of grant applications to the EPA's National Center for Environmental Research; provided expertise in the areas of environmental economics, statistics, and policy analysis.

Evaluation of potential Natural Resource Damage liabilities at current and former aerospace manufacturing sites – estimated the potential costs associated with NRD liabilities at contaminated sites for an aerospace manufacturer, for use in negotiations with insurance carriers.

Non-compete valuation for real estate executives – assessment of the value of non-compete agreements for two senior executives at a real estate management firm.

Evaluation of Natural Resource Damage liabilities at an operational mining site – report on the potential litigation and regulatory risk associated with environmental damages at an operational mining site, including estimates of cost, probability, and timing.

Economic impact report for entertainment-related industry – analysis of the economic impact of an entertainment-related industry on the economies of four states, including the impact of content-generation, distribution, and retail sales on employment, output, and tax revenue.

*The Past, Present, and Future Socioeconomic Effects of the Niagara Power Project* – analysis of the economic impact of a hydro-electric facility on the local and regional economies, demographics, industry, and real estate as part of a supplemental environmental impact statement for re-licensing.

## PUBLICATIONS

"EPA *Enforcement* of the Renewable Fuel Standard Program," *Agriculture and Food Committee Newsletter*, American Bar Association, Section of Antitrust Law, v. 4, n. 1, Fall 2013

"An Economic Perspective on Food Labeling Cases," in *Intellectual Property Law360*, May 30, 2013

"Empirical Evidence and Class Certification in Labor Market Antitrust Cases," 25 *Antitrust* 1 (2010), co-authored with John Johnson and Paul Torelli

"Economic Approaches to Royalty Calculations," in *Intellectual Property Law360*, May 25, 2010, co-authored with Kara Gorski

"Intellectual Property Rights in Developing Nations," research paper for NERA Economic Consulting, prepared for the International Intellectual Property Institute (2008), co-authored with Sourav Chatterjee, Fei Deng, Christian Dippon, and Mario Lopez

"Commercial Success: Economic Principles Applied to Patent Litigation," in Economic Approaches to Intellectual Property Policy, Litigation, and Management (Gregory K. Leonard & Lauren J. Stiroh, eds. National Economic Research Associates 2005); also in Economic Damages in Intellectual Property (Daniel Slottje ed., John Wiley & Sons 2006); co-authored with Marion B. Stewart

"Interest and Discount Rates in Intellectual Property Damages," in Economic Approaches to Intellectual Property Policy, Litigation, and Management (Gregory K. Leonard & Lauren J. Stiroh, eds. National Economic Research Associates 2005), co-authored with Christine Meyer

"Determining Reasonable Compensation for Employee Inventions in Japan," 6 *Global Intellectual Property Asset Management Report* 9 (2004), co-authored with Satoshi Nakashima

"Where Is the Market Failure? A Review of OSHA's Economic Analysis for Its Proposed Ergonomics Standard," 22 *Journal of Labor Research* 75 (2001), co-authored with Mark Berkman

"Water Subsidies in Southern California, Do They Exist and Have They Contributed to Urban Sprawl?" 37 *California Western Law Review* 121 (2000), co-authored with Mark Berkman

A2-10

"The Welfare Implications of Recycled Newsprint Regulation," doctoral dissertation, Stanford University (2000).

### PRESENTATIONS

"Proving Market Power in Unilateral Conduct Cases," webinar for the ABA Section of Antitrust Law, Unilateral Conduct Committee, June 2020

"Classwide Damage Models in Misleading and False Advertising Consumer Class Actions," Strafford CLE webinar, November 2017

"Hedonic Price Regressions in False Advertising Class Actions," webinar for The Knowledge Group: *Expert Testimony and Survey Methodology in False Advertising Cases: A 2017 Perspective*, January 2017

"Food & Beverage Class Actions: National Trends, Best Practices, and Emerging Claims," at Perrin Conference: *Challenges Facing the Food and Beverage Industries in Complex Consumer Litigations*, Chicago, IL, April 2014

"Clone Wars: *Abraham & Veneklasen Joint Venture v. American Quarter Horse Association*," webinar for the ABA Section of Antitrust Law, Agriculture and Food Committee, March 2014

"Expert Data Analysis in Wage & Hours Class Actions after *Dukes, Comcast*, and *Brinker*," at American Conference Institute's 19th National Forum on Wage & Hour Claims and Class Actions, San Francisco, CA, September 2013

"Food Labeling Class Actions: Economic and Legal Perspectives on the Rule 23 Predominance Requirement," Edgeworth Economics Webinar, June 2013

"Economic Issues in Pharmaceutical Patent Litigation," at Edgeworth Economics CLE Seminar, Washington, DC, September 2010

"The Evolution of a Complex Damages Report," at Edgeworth Economics CLE Seminar, Philadelphia, PA, April 2010

"Economists' Views of Recent Patent Damages Decisions," at Edgeworth Economics CLE Seminar, Washington, DC, April 2010

"When Does a Damages Expert's Analysis Cross the Daubert Line?" at the *Judicial Education Program* presented by Northwestern University School of Law, Chicago, IL, February 2009

"Copyright Valuation and Damages Assessment," at Law Seminars International Conference: *Copyright Law Counseling, Management and Litigation*, Seattle, WA, April 2008

"Trade Secret Valuation and Damages Assessment," at Lexis-Nexis Conference: *Trade Secret Protection: Realizing Best Practices for Trade Secret Protection*, Shanghai, China, December 2007

"Comparables: The Use and Misuse of Benchmark Royalty Rates for Patent Damages," at NERA CLE Seminar, San Francisco, CA, January 2007

"When You Get to the Fork in the Road, Take It! Alternative Approaches to Defending your Transaction before the Agencies," at *NERA Antitrust Trade and Regulation Conference*, Santa Fe, NM, July 2006

"The Role of Economic Analysis in Intellectual Property Litigation," at Sonnenschein Nath & Rosenthal CLE Program, Chicago, IL, January 2006; also at *NERA Intellectual Property Roundtable*, Tokyo, Japan, July 2004

"IP/Antitrust Lawsuits: Relevant Markets and Class Actions," at Practising Law Institute Workshop: *Intellectual Property Antitrust 2005*, New York City, June 2005

"The Role of Economics in Complex Business Litigation," at Columbus Bar Association CLE Program, Columbus, OH, December 13, 2004

"Is Bankruptcy the Answer?" at *Asbestos Litigation Conference* sponsored by Glasser LegalWorks, New York, NY, April 2003

A2-11

The Secondary Impact of Asbestos Liabilities, at U.S. Chamber of Commerce conference: *Understanding Asbestos Litigation: The Genesis, Scope, and Impact*, Washington, D.C., January 2003

"Trends in Intellectual Property Litigation," at Licensing Executives Society conference, San Jose, CA, April 2002

"Environmental Risk and the Bottom Line," at 2001 NAEM *Environmental Management Forum*, San Antonio, TX, October 2001; also at *Financial Executives Summit*, Scottsdale, AZ, May 2001

"Competitive Analysis in the Refined Petroleum Products Pipeline Industry," at *Advanced Workshop in Regulation and Competition*; Competitive Change in Network Industries 14th Annual Western Conference, San Diego, CA, June 2001