# EXHIBIT B



**HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY**

*IN RE GOOGLE ASSISTANT PRIVACY LITIGATION*

*Case No. 5:19-cv-04286, U.S.District Court,*

*Northern District of California*

# Reply Report to the Expert Report of Jesse David, PhD by Fernando Torres, MSc.

Submitted to:
**LOWEY DANNENBERG, P.C.**
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
Attorneys for Plaintiffs

Submitted by



9320 Chesapeake Drive, Suite 110
San Diego, CA  92123
858.538.1533

October 3, 2022

© IPmetrics, LLC – CONFIDENTIAL – Dissemination is subject to the Court's Protective Order

Case 5:19-cv-04286-BLF   Document 384-3   Filed 03/03/23   Page 3 of 20

| | | |
|---|---|---|
| In re Google Assistant | HIGHLY CONFIDENTIAL – Attorney's Eyes Only |  |
| Privacy Litigation | Torres Reply Report | |
| October 3, 2022 | Page i | |

# TABLE OF CONTENTS

1. INTRODUCTION ................................................................................................................. 1

2. DAVID REPORT ................................................................................................................. 2

    A. BREACH OF CONTRACT DAMAGES ........................................................................... 2
        *Supply-side factors* ............................................................................................ 5
        *Market Structure and the But for Scenario* ...................................................... 8
    B. DEFENDANT'S PROFITS ........................................................................................... 11

**APPENDICES** ........................................................................................................................... **16**



In re Google Assistant  HIGHLY CONFIDENTIAL – Attorney's Eyes Only
Privacy Litigation  Torres Reply Report
October 3, 2022  Page 1

## 1. INTRODUCTION

I submit this report to respond to comments Defendants' expert, Dr. Jesse David, has made in his Report[1] (the David Report") about the methodologies proposed in my initial Class Economic Damages Declaration[2] (the "Declaration"). Dr. David and I disagree about several issues, including:[3]

- The proper conceptualization of the market for GAEDs
- The relevant supply side factors
- The conceptualization of the "but for" market
- The correct way to account for Google's profits from the Assistant service.

The first three points above each depend on Dr. David's assumption that the relevant market exists in perfect competition, a fact that is not borne out by the record. As I explain below, and reiterate from my Declaration, the relevant market in this case is one of monopolistic competition, which exhibits different supply side considerations from those applicable in Dr. David perfectly competitive market. My methodology, which accurately reflects these supply and demand factors, accurately captures the relevant market.

As for the calculation of Google's profits from the Assistant, Dr. David and I disagree about how to interpret Google's financial statements. As I explain below, Google's financial information shows that the Assistant generates significant revenue for the company, beyond the narrow sales revenue from the GAEDs. Dr. David's claim that the operation of the GAEDs and Assistant services result in losses

---

[1] Expert Report of Jesse David, PhD (September 13, 2022).
[2] Class Economic Damages Declaration of Fernando Torres, MSc (July 18, 2022).
[3] If a particular issue is not addressed herein, that should not be taken to imply that I agree with Dr. David's opinion or analysis.



| | | |
|---|---|---|
| In re Google Assistant | HIGHLY CONFIDENTIAL – Attorney's Eyes Only | |
| Privacy Litigation | Torres Reply Report | |
| October 3, 2022 | Page 2 | |

is based on partial calculations that do not reflect Google's particular business model.

## 2. DAVID REPORT

The David Report takes issue with several of my methodologies to measure damages in this case,[4] specifically with the assessment of damages related to the Purchaser Class and the award of defendant's profits. In the following I respond to each topic of criticism in turn.

### A. Breach of Contract Damages

The David Report claims that the appropriate measure of damages for the Purchaser Class claims applicable to the Purchaser Class is the difference between the "actual prices paid by the consumer" and the "market value,"[5] which is defined in the report as "…the price that would have prevailed in the marketplace had the defendant not made the misrepresentations at issue..".[6] in other words, the hypothetical "but for' price.

Dr. David and I disagree about the proper conceptualization of how the relevant market actually operates, and thus about how to estimate that "but for" price.

Specifically, the David Report assumes that the determination of the price of GAEDs is adequately represented by a perfectly competitive, hypothetical market model in equilibrium.[7] As a result, the damages measure, per GAED, is also determined by a perfectly competitive, hypothetical "but for" market

---

[4] Dr. David's report also includes comments about the Expert Report of Rebbecca Reed-Arthurs, PhD, another expert that I understand Plaintiffs have retained. My response below addresses only the references to my Declaration.
[5] David Report, p 10, at §19.
[6] David Report, p 10, at §20.
[7] David Report, pp 10-13.

© IPmetrics, LLC – CONFIDENTIAL – Dissemination is subject to the Court's Protective Order



| In re Google Assistant | HIGHLY CONFIDENTIAL – Attorney's Eyes Only |
|---|---|
| Privacy Litigation | Torres Reply Report |
| October 3, 2022 | Page 3 |

model in equilibrium, where the differentiation is the position of the demand function.[8]

In the analysis of the GAEDs market, the difference between the "as is" scenario[9] and the "but for" scenario[10] is a downward shift of the demand function.[11] This shift reflects consumers' preference for preserving the privacy of their communications, which underlies their willingness to pay ("WTP") a certain amount to preserve such privacy.[12]

Dr. David then proposes that the perfectly competitive[13] market should be analyzed to determine the "but for" equilibrium price and quantity that would prevail under the demand shift assumption and contrasted to the original "as is" perfectly competitive equilibrium.

This approach is incorrect. Critically, the David Report takes for granted the characterization of the relevant market as "perfectly competitive" whereby, most importantly, Google would be assumed to be a passive price-taker among many suppliers of the same homogeneous commodity.[14] Under that theoretical construct, Google would be unable to sell any devices at a higher price because a hypothetical sufficient number of alternative suppliers would undercut them and, inversely, Google would not have any incentive to sell for less than the hypothetical market equilibrium price. This basic dynamic is

---

[8] David Report, *Ibid*.
[9] The situation in which GAEDs are sold with misrepresentations about privacy.
[10] The hypothetical situation in which GAEDs are sold with accurate representations about privacy.
[11] In Economics, this function is used to represent the inverse relation between the price of a commodity and the quantity of it that consumers are willing to buy.
[12] Dr. David and I agree on this point. See: David Report, p 10 at §21; and, Declaration, p 22.
[13] It bears noting that, in perfectly competitive market analyses, it is assumed that "…buyers and sellers are sufficiently large in number to ensure that no single one of them, alone, has the power to determine market prices." Jehle, GA, Reny, PJ, "Advanced Microeconomic Theory," 3rd Ed., Financial Times | Prentice Hall, 2011, p 165.
[14] See, *inter alia*, Jehle & Reny (2011), p 145.

© IPmetrics, LLC – CONFIDENTIAL – Dissemination is subject to the Court's Protective Order

Case 5:19-cv-04286-BLF   Document 384-3   Filed 03/03/23   Page 7 of 20

In re Google Assistant
Privacy Litigation
October 3, 2022

HIGHLY CONFIDENTIAL – Attorney's Eyes Only
Torres Reply Report
Page 4



counterfactual in this case, where only Google sells Google-made GAEDs at prices it sets, and the companies it identifies as competing Digital Assistant providers (Amazon and Apple) [15] are typically higher-price suppliers of alternative products which are not perfect substitutes.[16]

Under a hypothetical perfectly competitive scenario, the direction of the price change, keeping all other factors equal and only shifting down the demand curve, is given by the assumptions as to the behavior of the suppliers' marginal cost[17] function. Essentially, with increasing costs, the equilibrium price would fall, with constant costs, it would remain the same, and with decreasing costs, it may rise.[18]

There is no doubt that the comparative static analysis in the David Report reflects the behavior of an idealized market model. However, this analysis is irrelevant because that it is not an accurate conceptualization of the market in this case. That is, it is not consistent with the facts of the case and the task of measuring damages stemming from the claims alleged by the Purchaser Class.

There are at least two central aspects where my perspective in the Declaration differs materially from the analysis on this issue in the David Report, namely the characterization of the supply-side factors and the conception of the market structure.

---

[15] In the "Competition" section of the "Business" statement in Alphabet Inc.'s 2022 Form 10-K Annual Report, p 7.

[16] For example, the simplest dedicated devices from Google (Net mini) and Amazon (Echo Dot) are currently offered at $49, while Apple's (HomePod mini) sells for $99. Larger devices, with a screen vary but Google's (Nest Hub) is $54.99, Amazon's (Echo Show 8) starts at $79.99, while Apple offers similar functionality by combining the mini device with TVs and iOS devices costing at least $179 more.

[17] In theory, "marginal cost" is defined as the optimal incremental cost of an additional unit of output, given the prices of all inputs. See, inter alia, Jehle and Reny (2011), p 135-139.

[18] The market cost function is directly the supply function under perfect competition. Shifts in Demand, as in the David Report, actually imply equilibrium prices change along the Supply function.

© IPmetrics, LLC – CONFIDENTIAL – Dissemination is subject to the Court's Protective Order

Case 5:19-cv-04286-BLF   Document 384-3   Filed 03/03/23   Page 8 of 20



In re Google Assistant  HIGHLY CONFIDENTIAL – Attorney's Eyes Only
Privacy Litigation  Torres Reply Report
October 3, 2022  Page 5

**Supply-side factors**

As referenced in the Declaration, GAEDs are offered in the market as a platform to access Google's services, such as Search, using the Google Assistant service.[19] Something similar is true of other competing products in the market (e.g., other "Smart Speakers" like the Amazon Echo, or Apple HomePod), which function primarily to provide access to their supplier's own platform for digital assistant services. In fact, there prevails a high degree of differentiation among products in this market, not only in simply offering distinctive-looking products, but rigorously branding them as belonging to a specific platform, or highlighting in advertising features such as convenience, style, or privacy protections. Therefore, it is incorrect to treat them as perfect substitutes for each other, as necessarily assumed in the perfectly competitive model.

Moreover, each platform invests resources advertising their respective products, and these branding efforts not only support differentiating each platform's market segment,[20] but over time create substantial barriers to entry for new competitors. In sum, these characteristics of the supply side highlight the flaws in Dr. David's model because they are incompatible with the perfectly competitive, ideal market employed in the David Report to analyze the "but for" scenario in measuring damages due to the alleged breach of contract.

Rather, in light of the factors discussed above, the applicable structure for the relevant market in this case is one of "Monopolistic Competition." This structure is appropriate where, as here,[21] there are only a few firms (i.e., mainly Google,

---

[19] See, *inter alia*, Torres Declaration, pp 14-15.
[20] The sustained price differences among platforms are consistent with the robust market segmentation.
[21] See, *inter alia*, Jehle and Reny (2011), p 177-179.

© IPmetrics, LLC – CONFIDENTIAL – Dissemination is subject to the Court's Protective Order

Apple, and Amazon), selling highly differentiated products, and thus able to exert a degree of market power[22] in making pricing decisions. This model is a materially better fit to the characteristics of the market at issue in this case than the one applied in the David Report.

A central consequence of re-focusing the analysis under the Monopolistic Competition structure is that the price chosen to maximize profits is higher than the minimum or optimal marginal cost, i.e., than the equilibrium price that would exist under perfectly competition. Moreover, as a "Price Setter," (as compared to a "Price Taker" in the perfectly competitive market assumed in the David Report), the supplier in this market structure will tend to set the price so as to maximize profits, defined as revenue minus cost.[23] At that price, consumers will buy the quantity of product as defined by the Demand Function.

To illustrate the "as is" scenario in terms of this market structure, the following figure utilizes the same Demand function as the David Report.

[22] For these purposes, this term is only used in the economic sense that a firm has control over its pricing decisions on the basis of product differentiation and barriers to entry.

[23] Technically, maximum profit thus defined is identified at the price, quantity combination where marginal cost equals marginal revenue.

© IPmetrics, LLC – CONFIDENTIAL – Dissemination is subject to the Court's Protective Order


**Figure 1**
**Illustration of Profit-Maximizing Price Setting**



In Figure 1 above, the supplier chooses the price at a level that maximizes profits which, analytically can be found from the intersection of the Marginal Cost ("MC"), which for purposes of this example is assumed constant at $2.50, and the Marginal Revenue ("MR"), which represents the increase in revenue from an increase in the quantity sold. MR declines as increases in sales quantities require declining prices. Thus, even though competitors are unlikely to enter the segment, the supplier does not set a higher price, than the illustrative price of $5.00 in the figure, because profits will be lower due to the contraction of demand. A lower price would not be set, on the other hand, because the increased demand will not offset the loss of revenue, reducing profits. As the illustration shows, the Monopolistic Competition price is higher than the Perfectly Competitive equilibrium price of $2.5, as represented by the intersection of the Demand ("D") and Marginal Cost lines. Moreover, the

| In re Google Assistant | HIGHLY CONFIDENTIAL – Attorney's Eyes Only |  |
|---|---|---|
| Privacy Litigation | Torres Reply Report | |
| October 3, 2022 | Page 8 | |

Monopolistic Competition price is not sensitive to a pivoting of the Marginal Cost about the intersection with the Marginal Revenue function. That is, whether the supplier experiences decreasing, or increasing costs, for output levels around the optimum price described above, is not overly important to setting that price. In general, suppliers in this type of market structure are expected to have excess production capacity,[24] as the difference between the perfectly competitive equilibrium quantity in Figure 1 (11 units) and the Monopolistic Competition optimum quantity (6 units) illustrates. In those circumstances, stable or even declining marginal costs are to be expected, rather than increasing.

### Market Structure and the But for Scenario

This model of the market provides a conceptually sound analysis of the But For scenario, the hypothetical situation in which Defendants' alleged breach of contract does not occur.

As noted in the Declaration, knowing the true extent of the privacy risks, Purchaser Class members would reduce their demand price for the GAEDs, shifting the demand function.[25] The shift would decrease the market demand price, for any given quantity, by the amount of consumers' willingness to pay for privacy protections (WTP). My understanding is this amount will be determined from the results of a Choice Based Conjoint Analysis Survey.

In this alternative scenario, the downward shift in demand is not a sufficient determinant of the market price, which is set by the Monopolistically Competitive supplier in seeking to maximize profits. This decision can be

---

[24] Relative to the competitive equilibrium. This is one of the reasons the Monopolistic Competition is deemed "Inefficient." See: Jehle & Reny (2011), pp177-9.
[25] Torres Declaration, p 22.

© IPmetrics, LLC – CONFIDENTIAL – Dissemination is subject to the Court's Protective Order

Case 5:19-cv-04286-BLF   Document 384-3   Filed 03/03/23   Page 12 of 20

| In re Google Assistant | HIGHLY CONFIDENTIAL – Attorney's Eyes Only | |
|---|---|---|
| Privacy Litigation | Torres Reply Report |  |
| October 3, 2022 | Page 9 | |

illustrated in the following figure, where the only change vis-à-vis Figure 1 is the shifted demand.

**Figure 2**
**Illustration of Profit-Maximizing Price Setting**
**Given a Shift in Demand**



The Demand function in Figure 2 is shifted down by an amount of $2.00, relative to Figure 1, to represent consumers' WTP for privacy assurances. Following the profit maximizing principle, the supplier will find the optimum sales quantity, at which Marginal Cost equals Marginal Revenue, is 4 units, which will be sold at a price of $4.00. A lower, or higher, price is not compatible with maximum profits. Thus, a $2.00 WTP shift is expected to be reflected in a $1.00 reduction in the market price. The 2-to-1 ratio is a characteristic of a linear Demand

© IPmetrics, LLC – CONFIDENTIAL – Dissemination is subject to the Court's Protective Order

Case 5:19-cv-04286-BLF   Document 384-3   Filed 03/03/23   Page 13 of 20

In re Google Assistant  HIGHLY CONFIDENTIAL – Attorney's Eyes Only
Privacy Litigation  Torres Reply Report
October 3, 2022  Page 10



function,[26] and is approximately the same ratio in the general case since a normal demand function around the relevant quantities can be approximated by a linear function.[27]

Thus, the methodology set out[28] in the Declaration can use the Willingness to Pay amount from a conjoint analysis survey and, adjusting it by the 2:1 ratio above, obtain the Price Premium between the 'as is' and 'but for' scenarios. Since this would be the excess price paid by Purchaser Class members per GAED, this premium is the measure of damages corresponding to the claims alleged by that class.

The David Report finds a similar result, with the key exception that the Perfectly Competitive market structure it assumes not only requires additional assumptions that are not supported by the facts of this market but gives a substantial role to the exact shape of the Marginal Cost function. In addition, the David Report assumes the goal of expectation damages in this case is the individual identification of damages measured by individual price premiums (i.e., what each individual in the person would be willing to pay for the product).[29] This is not only contrary to the relevant class-wide measure sought, but ignores the fact that the price premium arises from the actions of consumers as a whole (represented by the market Demand function) interacting with a Monopolistic supplier's objectives in relation to profits, not the individual influence of any particular consumer. Thus, framing the analysis

---

[26] Which implies a quadratic profit function, see: Varian, HR, Microeconomic Analysis, 3rd Edit. Norton 1992, p 236.
[27] Such as, e.g., a tangent line. In general, see Deaton, A and Muellbauer, J, Economics and Consumer Behavior, Cambridge University Press, 1980, p 64-67.
[28] Torres Declaration, p 26, *inter alia*.
[29] David Report, pp 12-13 at §22-23.

© IPmetrics, LLC – CONFIDENTIAL – Dissemination is subject to the Court's Protective Order

Case 5:19-cv-04286-BLF   Document 384-3   Filed 03/03/23   Page 14 of 20

In re Google Assistant
Privacy Litigation
October 3, 2022

HIGHLY CONFIDENTIAL – Attorney's Eyes Only
Torres Reply Report
Page 11



with the goal of determining what each individual person would pay is incorrect.

Moreover, the two scenarios do not have the same characteristic. Class members bought a certain quantity of the devices in the 'as is' scenario but were overcharged to the extent of the price premium relative to the 'but for' scenario. Perhaps some class members would not have bought the devices in question had they had complete information, but that scenario did not occur as there is no indication in the record that such complete information was provided. As a result, Class Members were damaged economically as a class in the "as is" scenario.[30]

Applying the Price Premium derived from the Willingness to Pay as stated in my declaration is a sound method for restoring to the class the overpayment and achieves the "Expectation Damages" goal of restoring "an amount sufficient to give the plaintiff the same economic value the plaintiff would have received if the defendant had fulfilled the promise or bargain."[31]

## B. Defendant's Profits

Dr David and I also disagree about the correct way to measure Google's profits. The analysis of the profitability of Defendant's business is a necessarily complex process. The business generates most of its revenue (81%) from advertising services, offers significant online services at no charge, and appears to only operate one profitable reporting segment (Broadly described

---

[30] The David report questions whether some consumers would be damaged at all if they would not have bought in the 'But For' scenario. David Report, pp 13-14 at §23-24.
[31] Federal Judicial Center, Reference Manual on Scientific Evidence, 3rd ed., National Academies Press: Washington, D.C., 2011, p. 433.

| In re Google Assistant | HIGHLY CONFIDENTIAL – Attorney's Eyes Only |  |
| --- | --- | --- |
| Privacy Litigation | Torres Reply Report | |
| October 3, 2022 | Page 12 | |

as "Google Services") while incurring operating losses in the others.[32] There is no doubt, however, that the company is highly profitable (43.1% Net income ratio[33]) and that it invests heavily in operating and capital expenditures.[34]

Because of this complexity, where conventional distinct product lines are not used, the key challenge is one of attribution. Clearly, most revenue comes from advertising, but Google's competitive advantage in advertising is founded on its targeting capabilities,[35] which are driven by data it collects from its users.[36] In turn, the "free" services Google offers have the role of attracting targetable audiences for advertisers and gathering information from the users to improve those targeting capabilities. Therefore, a certain proportion of Google's advertising revenue is attributable to those other services.

This attribution challenge is recognized internally by management, for example in the Declaration I relied on a document titled "Assistant Enabled Sources of Value,"[37] to establish three ways in which the Google Assistant service generates revenue through the rest of the company's operations, despite the fact that the service is offered at no charge. This document discusses "How to think about Assistant financial metrics"[38] beyond the direct sales revenue from the devices. As this discussion shows, it would be insufficient to limit the analysis of Defendant's Profits relative to the Google Assistant

---

[32] "Google Services" comprise advertising on all channels, plus non-advertising revenues from: the Google Play Store; Devices and services such as Fitbit, Nest Home, and Pixel; and premium and subscription services via YouTube. Alphabet Inc. 2022 Form 10-K, p 29-30, 33, 38.

[33] The David Report disputes this calculation (p 21 at §35, fn. 78) using a narrower definition of total Costs and Expenses, whereas I added the net Other Income and deducted the provision for income taxes, which are part of Net Income.

[34] Alphabet Inc. 2022 Form 10-K, p 29.

[35] See "Targeting your ads" at: https://support.google.com/google-ads/answer/1704368?hl=en

[36] See "Personalized advertising" at: https://support.google.com/adspolicy/answer/143465?hl=en&ref_topic=7012636

[37] GOOG-ASST-03045632.

[38] GOOG-ASST-03045635.

Case 5:19-cv-04286-BLF   Document 384-3   Filed 03/03/23   Page 16 of 20

In re Google Assistant
Privacy Litigation
October 3, 2022

HIGHLY CONFIDENTIAL – Attorney's Eyes Only
Torres Reply Report
Page 13



business to the conventional "profit and loss statement" [39] as Dr. David proposes,[40] because it would be inconsistent with how Google itself "thinks" about Assistant financial metrics.

Moving beyond the traditional profit and loss statement, it is possible as portrayed in my Declaration to approximate revenue attributable to Google Assistant using the data available.[41] A critical parameter that remains to be determined is the proportion of False Accepts in the data generated through the Assistant service. The calculations in the Declaration are illustrations contingent on the production of that proportion, which I understand from Plaintiffs' counsel is data they expect to receive.

Moreover, internally, even in the aforementioned Assistant profit and loss statement,[42] Google financial management labels, ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

---

[39] As depicted, for example, in the accounting spreadsheets in: GOOG-ASST-03045688, e.g., tab "x-fn pnl 2020 – ACTUAL".
[40] David Report, p 22, at §37.
[41] Declaration, pp 29-33.
[42] GOOG-ASST-03045688, e.g., tab "x-fn pnl 2020 – ACTUAL".
[43] Such as that reported publicly in reference to the "Google Cloud" segment in: Alphabet Inc. 2022 Form 10-K, p 38.

███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

[45] See e.g.: Hayes, A. 'Investment," 8/20/2021 in: Investopedia at www.Investopedia.com/terms/i/investment.asp

Case 5:19-cv-04286-BLF   Document 384-3   Filed 03/03/23   Page 17 of 20

In re Google Assistant
Privacy Litigation
October 3, 2022

HIGHLY CONFIDENTIAL – Attorney's Eyes Only
Torres Reply Report
Page 14



[redacted]

Finally, as to the assessment of the avoided cost, in the Declaration I explain how it may be a consideration if the proportion of utterances captured from False Accepts is available. To the extent Defendants used this category of voice data, they benefited by not having to acquire it in the open market, as they do.[46]

Dr. David is skeptical about the use of market-based comparables to estimate the cost avoided.[47] Nevertheless, the methodology I propose in the Declaration is drawn from the widely recognized "Market Approach" in financial valuation. The choice of the range of prices Google pays for "Non-standard Speech Data" is justified as a comparable transaction in that both, Non-standard and False Accept speech data are likely to be harder to understand than speech data clearly intended to be understood By the GAEDs at issue in this case. Dr. David does not offer an alternative methodology on this issue, nor points to any evidence that Defendants do not in fact use the speech data they capture.

---

[46] Declaration, pp 33-36.
[47] David Report, p 23, at §39-42.

Case 5:19-cv-04286-BLF   Document 384-3   Filed 03/03/23   Page 18 of 20

| | | |
|---|---|---|
| In re Google Assistant | HIGHLY CONFIDENTIAL – Attorney's Eyes Only |  |
| Privacy Litigation | Torres Reply Report | |
| October 3, 2022 | Page 15 | |

The foregoing analysis is reliant on the current state of discovery in the case at hand. In particular, updated financial information may be forthcoming before trial, and I anticipate updating my calculation and opinions if new data is provided. In this context, I proffer these opinions with a reasonable degree of professional certainty. In addition to my testimony at trial, I expect to rely on exhibits prepared to depict and explain the information contained in this analysis or as a rebuttal to testimony by other witnesses. Any such exhibits will be prepared and identified in advance of trial.

*[signature]*

Fernando Torres
Chief Economist,
IPmetrics LLC

Case 5:19-cv-04286-BLF   Document 384-3   Filed 03/03/23   Page 19 of 20

In re Google Assistant Privacy Litigation
October 3, 2022

HIGHLY CONFIDENTIAL – Attorney's Eyes Only
Torres Reply Report
Page 16



# APPENDICES

Case 5:19-cv-04286-BLF   Document 384-3   Filed 03/03/23   Page 20 of 20

| | | |
|---|---|---|
| In re Google Assistant | HIGHLY CONFIDENTIAL – Attorney's Eyes Only |  |
| Privacy Litigation | Torres Reply Report | |
| October 3, 2022 | Page 17 | |

# APPENDIX A

# Additional Documents Considered

Fernando In the course of preparing this Reply, I relied upon the documents already listed in the Declaration as well as the following additional documents.

1) Case Documents
    a. Expert Report of Jesse David, PhD, dated September 13, 2022.
2) Other documents or sources
    a. Deaton, A and Muellbauer, J, Economics and Consumer Behavior, Cambridge University Press, 1980, p 64-67.
    b. Varian, HR, Microeconomic Analysis, 3rd Edit. Norton 1992, p 236.
    c. https://support.google.com/google-ads/
    d. https://support.google.com/adspolicy/