# EXHIBIT 1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

IN RE GOOGLE ASSISTANT PRIVACY LITIGATION.,
Plaintiff,

§
§
§
§
§
§
§
§
§
§
§
§
§
§

Master Docket No: 19-cv-04286-BLF

Expert Reply Report of Rebbecca Reed-Arthurs, Ph.D.

October 3, 2022

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

*Highly Confidential – Attorneys' Eyes Only*

# Table of Contents

| | | |
|---|---|---|
| **1.** | **Qualifications, Assignment, and Background** | **3** |
| **2.** | **Privacy Paradox** | **3** |
| 2.1. | Summary of Dr. Befurt's Opinions | 4 |
| 2.2. | Privacy Paradox and Conjoint Analysis Literature | 6 |
| 2.2.1. | Conjoint Analysis is Accepted as a Valid Technique to Quantify the Value Consumers Place on Their Personal Information | 6 |
| 2.2.2. | Conjoint Analysis Results are More Consistent with Consumers Behavior | 8 |
| 2.2.3. | Presenting Privacy Information as a Feature in Conjoint Analysis Does Not Bias Willingness-to-Pay | 10 |
| 2.2.4. | Revealed Preferences May be Biased as a Result of Confusing Privacy Policies | 11 |
| 2.2.5. | Summary | 12 |
| **3.** | **Heterogeneity and Conjoint Analysis** | **13** |

*Highly Confidential – Attorneys' Eyes Only*

1. **QUALIFICATIONS, ASSIGNMENT, AND BACKGROUND**
    1. My name is Rebbecca Reed-Arthurs. I previously submitted an expert report in this matter on July 18, 2022, entitled "Opening Expert Report of Rebbecca Reed-Arthurs, Ph.D." (hereinafter my "Opening Report"). My background, qualifications, and foundational opinions were set out in that report, and I incorporate that material herein by reference.

    2. On September 13, 2022, Dr. Befurt issued an expert report which included responses to my report (hereinafter the "Befurt Report). In this report, I respond to two of Dr. Befurt's main critiques of the conjoint analysis proposed in my Opening Report. I do not attempt to list all of my critiques or opinions related to Dr. Befurt's opinions. If a particular issue is not addressed herein, that should not be taken to imply that I agree with Dr. Befurt's opinion or analysis.

    3. In **Section 2** I review Dr. Befurt's criticisms with respect to the privacy paradox and demonstrate that his concerns are unfounded with respect to the conjoint analysis I proposed in my Opening Report. In **Section 3** I review Dr. Befurt's criticisms with respect to heterogeneity and demonstrate that his concerns are unfounded with respect to the conjoint analysis I proposed in my Opening Report.

2. **PRIVACY PARADOX**
    4. Dr. Befurt argues that the "privacy paradox" leads to skewed survey results, including biasing any attempts to estimate a change in willingness-to-pay for privacy using choice based conjoint ("CBC") surveys. However, Dr. Befurt failed to consider research which has shown that the privacy paradox is not an issue for conjoint surveys. Conjoint surveys are fundamentally different than the majority of the surveys considered in the research cited by Dr. Befurt. Further, because privacy policies are often designed to be difficult to understand and interpret, consumers' real-world actions don't necessarily mean that they don't value privacy (as Dr. Befurt appears to argue the privacy paradox implies) but may instead be indicative of a lack of understanding of the consequences of their actions in the real world.

## 2.1. Summary of Dr. Befurt's Opinions

5. With respect to the design of the CBC survey proposed in my Opening Report, Dr. Befurt states:

   "When assessing willingness-to-pay for a privacy-related feature, it is especially critical to implement a design that accounts for the privacy paradox, as survey evidence on the stated importance of privacy to individuals often overstates the importance implied by their real-world behavior. In particular, as I described previously, 'people who claim [in surveys] to care about privacy often show little concern about it in their daily behavior,' and '[a]lthough survey results show that the privacy of their personal data is an important issue for online users,' 'most users rarely make an effort to protect this data actively and often even give it away voluntarily.'"[1]

6. Dr. Befurt concludes that "in failing to acknowledge the privacy paradox and in describing no attempt to account for the privacy paradox, the proposed Reed-Arthurs conjoint studies would produce inflated measures of importance and willingness-to-pay for the privacy-related attributes in the studies, rendering the results of the proposed conjoint studies unreliable."[2]

7. Dr. Befurt describes the privacy paradox as:

   "describ[ing] the inconsistency between attitudes and concerns about privacy stated by individuals in surveys, and the individuals' actual behavior related to how they value their privacy. Specifically, 'survey results show that the privacy of their personal data is important for online users,' but 'most users rarely make an effort to protect this data actively and often even give it away voluntarily.'"[3]

8. Dr. Befurt cites to experiments conducted on MIT undergraduates where the researchers concluded that participants "say they care about privacy, but at multiple points in the process end up making choices that are inconsistent with their stated preferences"[4] Dr. Befurt then highlights a particular experiment where "authors found that 'small incentives such as a pizza

---

[1] Expert Report of Rene Befurt, Ph.D., September 13, 2022, ¶81. (citations omitted)
[2] Expert Report of Rene Befurt, Ph.D., September 13, 2022, ¶83.
[3] Expert Report of Rene Befurt, Ph.D., September 13, 2022, ¶19.
[4] Expert Report of Rene Befurt, Ph.D., September 13, 2022, ¶19. Athey, Susan, Christian Catalani, and Catherine Tucker, "The Digital Privacy Paradox: Small Money, Small Costs, Small Talk," National Bureau of Economic Research Working Paper 23488, June 2017, pp. 17-18.

can have a large effect on decisions about privacy,' in their case, the voluntary disclosure of friends' email addresses."[5]

9. In his deposition, Dr. Befurt could not point to articles that specifically studied privacy concerns with respect to smart speakers, merely stating that the privacy paradox was a general proposition.[6] He further acknowledged that he did not cite articles related to the privacy paradox that analyzed the results of a conjoint survey, stating:

> "[A]mong the numerous survey types the articles don't say that there are exceptions to the privacy paradox. The privacy paradox was true whenever respondents thin[k] about and express the importance of privacy, which doesn't match the actions that they actually take to protect privacy. [] I don't think that the authors I quote here and the authors that I've reviewed over the [] course of time that I spent with privacy felt that it was necessary to cover every single aspect of survey design. For example, the specific conjoint survey. What matters here is and I can say this as a conjoint expert [] the presentation of privacy related aspects and having people make choices that take into account how important privacy is to them. The privacy paradox applies in conjoints as well."[7]
> "[T]he privacy paradox would apply to conjoint as to many other survey types, and there is no need for -- for articles that are being cited by these authors to point to conjoint to make -- to derive that the privacy paradox would affect conjoint as well.  It does."[8]

10. Finally, Dr. Befurt testified that he was not aware of any academic literature showing that conjoint surveys estimating the demand for privacy features can more accurately predict real world behavior than other survey methods.[9]

---

[5] Expert Report of Rene Befurt, Ph.D., September 13, 2022, ¶19.

[6] Deposition of Rene Befurt, Ph.D., September 22, 2022, p. 169-170.  For example, the literature reviewed by Gerber, Gerber, and Volkamer (2018) relating to privacy paradox often focused on social network applications, social network games, location-based applications/mobile websites, website specific privacy concerns, and general privacy concerns. Gerber, Nina; Gerber, Paul; and Volkamer; Melanie, "Explaining the privacy paradox: A systemic review of literature investigating privacy attitude and behavior," Computers & Security, 77, (2018), 226-261. See also, Barth, Susanne; de Jong, Menno D.T., "The privacy paradox – Investigating Discrepancies between expressed privacy concerns and actual online behavior – A systematic literature review," Telematics and Informatics, 34, (2017), 1038-1058.

[7] Deposition of Rene Befurt, Ph.D., September 22, 2022, pp. 170-171.

[8] Deposition of Rene Befurt, Ph.D., September 22, 2022, p. 175.

[9] Deposition of Rene Befurt, Ph.D., September 22, 2022, p. 172.

*Highly Confidential – Attorneys' Eyes Only*

## 2.2. Privacy Paradox and Conjoint Analysis Literature

### 2.2.1. Conjoint Analysis is Accepted as a Valid Technique to Quantify the Value Consumers Place on Their Personal Information

11. Academic researchers commonly use conjoint analyses to quantify the value of information privacy to consumers.[10]

12. For example, Butler and Glasgow (2014) used "survey and modeling-based techniques to quantify the value that consumers place on their personal information."[11] The paper involved designing a CBC survey.[12] Survey respondents "were asked to evaluate a set of hypothetical streaming video service packages (e.g., online providers of movies and television shows) where the options differed along a variety of dimensions, including the extent to which the provider kept the user's personal data private."[13]

13. Of the five features included, the feature of interest, privacy policy, was allowed to take three levels: Information is collected but not shared (baseline category), Usage information is

---

[10] See, *e.g.* Glasgow, Garrett, Butler, Sarah, and Iyengar, Samantha, "Survey response bias and the 'privacy paradox': evidence from a discrete choice experiment," Applied Economics Letters, 2021, Vol. 28, No. 8, 625-629; Butler, Sarah and Glasgow, Garrett, "The Value of Personal Information to Consumers of Online Services: Evidence from a Discrete Choice Experiment," NERA Economic Consulting, June 19, 2014; Krasnova, Hanna; Hildebrand, Thomas; and Guenther, Oliver, "Investigating The Value of Privacy in Online Social Networks: Conjoint Analysis," International Conference on Information Systems, 2009; Naous, Dana; Legner, Christine, "Understanding Users' Preferences for Privacy and Security Features – A Conjoint Analysis of Cloud Storage Services," BIS 2019 Workshops, LNBIP 373, pp. 352–365, 2019; Kuzmanovic, Marija and Savic, Gordana, "Avoiding the Privacy Paradox Using Preference-Based Segmentation: A Conjoint Analysis Approach," Electronics 2020, 9, 1382; Buck, Christoph, Stadler, Florian, Suckau, Kristin, Eymann, Torsten, "Privacy as a Part of the Preference Structure of Users App Buying Decision," 13th International Conference on Wirtschaftsinformatik, February 12-15, 2017, St. Gallen, Switzerland; D'Souza, Giles; Phelps, Joseph E., "The Privacy Paradox: The Case of Secondary Disclosure," Review of Marketing Science, 2009, Volume 7, Article 4; Hann, Il-Horn; Hui, Kai-Lung; Lee, Tom S.; Png, I.P.L., "Online Information Privacy: Measuring the Cost-Benefit Trade-Off," Twenty-Third International Conference on Information Systems, 2002; Hann, Il-Horn; Hui, Kai-Lung; Lee, Sang-Yong Tom; Png, Ivan P.L., "Overcoming Online Information Privacy Concerns: An Information-Processing Theory Approach," Journal of Management Information Systems, Fall 2007, Vol. 24, No. 2, pp. 13–42; Derikx, Sebastian; de Reuver, Mark; Kroesen, Maarten, "Can privacy concerns for insurance of connected cars be compensated?" Electron Markets, 2016, 26, 73-81.

[11] Butler, Sarah and Glasgow, Garrett, "The Value of Personal Information to Consumers of Online Services: Evidence from a Discrete Choice Experiment," NERA Economic Consulting, June 19, 2014, p. 1. ("Butler and Glasgow (2014)")

[12] Butler and Glasgow (2014), p. 2.

[13] Butler and Glasgow (2014), p. 2.

shared with 3rd parties ("share usage"), and Usage and personal information are shared with 3rd parties ("share usage and personal").[14] Further, the privacy policy feature was described using passages which described what type of data would be shared with third parties:

- "Some services do not share any information with third parties, except when necessary to provide services directly related to the streaming video service, such as credit card billing."
- "Some services share your usage information with third parties engaged in research, marketing, or advertising."
- "Some services share your personally identifying information with third parties engaged in research, marketing, or advertising.[15]

14. Butler and Glasgow (2014) analyzed the response data using a conditional logit model to "determine the role that each attribute plays in determining the probability that a respondent will select a particular streaming video service package."[16] The results of the regression included "negative coefficients on the two data privacy policy variables — 'usage data shared' and 'usage and personal data are shared' — [which] reveal that consumers are more likely to choose a streaming video package that did not share their data and less likely to choose a streaming video package that shared their data. Thus, the results of our model suggest that the survey respondents value their personal data."[17] The paper further used the coefficient to calculate consumers' willingness-to-pay (WTP) for particular attributes. The results "suggest a WTP of $3.90 per month to not share usage information with third parties [and a] WTP to not share both usage and personally identifying information [of] $6.01 per month."[18]

15. As another example, Krasnova, Hildebrand, Guenther (2009) used a conjoint methodology to examine how much users of online social networks would be willing to pay for their privacy.[19] The results of the conjoint analysis showed that "on average a user would be

---

[14] Butler and Glasgow (2014), p. 3.
[15] Butler and Glasgow (2014), pp. 3-4.
[16] Butler and Glasgow (2014), p. 4.
[17] Butler and Glasgow (2014), p. 5.
[18] Butler and Glasgow (2014), p. 5.
[19] Krasnova, Hanna; Hildebrand, Thomas; and Guenther, Oliver, "Investigating The Value of Privacy in Online Social Networks: Conjoint Analysis," International Conference on Information Systems, 2009. ("Krasnova, Hildebrand, Guenther (2009)")

ready to pay between €14.14 and €17.24 a year [] if the OSN provider refrained from using his or her demographic information for personalized advertising.[20]

### 2.2.2. Conjoint Analysis Results are More Consistent with Consumers Behavior

16. Researchers have found that when using conjoint analysis, consumers' preferences are more consistent with their behavior as compared to other survey techniques.

17. Kuzmanovic and Savic (2020) discussed the effect of the privacy paradox when utilizing conjoint analysis, concluding that "conjoint analysis can improve users' segmentation and consequently provide better solutions for avoiding the gap between users' concerns, attitudes, and behavior."[21] The paper describes the Privacy Paradox similarly to Dr. Befurt:

    > "Even though recent research results show that information privacy is an important issue for OSN [online social network] users, most of them rarely make sufficient effort in personal data protection. This phenomenon is usually referred to in the literature as the privacy paradox. Although a real intention of data protection exists, common OSN user behavior goes beyond intentions in terms of personal data disclosure."[22]

18. Kuzmanovic and Savic (2020) "employed the technique of conjoint analysis to identify OSN user preferences toward privacy and to group them into adequate segments. The data were collected through a web-based questionnaire, which included four sections: (1) Conjoint analysis tasks (stimuli) from an efficient experimental design; (2) Socio-demographic questions, (3) Questions regarding respondents' habits in using OSNs, both general and privacy-related, and (4) Respondents' concerns toward data privacy and safety."[23] The conjoint analysis was used "to investigate the importance of privacy preserving techniques related to sharing personal health data in online health systems."[24] The conjoint analysis

---

[20] Krasnova, Hildebrand, Guenther (2009), p. 15.
[21] Kuzmanovic, Marija and Savic, Gordana, "Avoiding the Privacy Paradox Using Preference-Based Segmentation: A Conjoint Analysis Approach," Electronics 2020, 9, 1382, p. 1. ("Kuzmanovic and Savic (2020)")
[22] Kuzmanovic and Savic (2020), p. 3. (citations omitted)
[23] Kuzmanovic and Savic (2020), p. 4.
[24] Kuzmanovic and Savic (2020), p. 4.

"evaluated individual trade-off among the four OSN [online social network] factors, two of which are related to privacy concerns."[25]

19. The results of Kuzmanovic and Savic (2020) showed that:

> "Most respondents showed moderate concern about the privacy of personal data and photos (mean score 3.05, SD = 1.145), with 13.8% of those showing extreme concern. They are somewhat less concerned about the privacy of their friends' data and photos (mean score 2.60, SD = 1.050), and just 4.7% of them are extremely concerned."[26]

20. The authors compare the respondents' online behavior and habits with the results from respondents' stated preferences for privacy from Westin Privacy Segmentation Index approach (which is what is often what is analyzed in the privacy paradox literature) and with the privacy preferences implied by an analysis of the conjoint analysis.[27] The authors find results consistent with the privacy paradox when using the classic measure of stated preferences (the Westin approach), but do not find evidence of the privacy paradox when examining the results of the conjoint analysis.[28] Specifically, the authors determine that: "for segments identified by CA [conjoint analysis], there is no gap between behavior and preference (as with Westin segmentation), which indicates that CA can be successfully used for the purpose of clustering indexing and even for predicting the behavior of OSN users when it comes to privacy."[29]

21. Kuzmanovic and Savic (2020) concluded that:

> "Having in mind that deciding to provide personal information online is a complex psychological process, conjoint analysis appeared to be an adequate method that attempts to experimentally uncover the hidden rules that individuals use to make trade-offs."[30]
>
> "The predicted behavior of CA segment members has been shown to be consistent with their self-reported behavior. Therefore, conjoint analysis can be

---

[25] Kuzmanovic and Savic (2020), p. 4.
[26] Kuzmanovic and Savic (2020), p. 9.
[27] Kuzmanovic and Savic (2020), p. 15.
[28] Kuzmanovic and Savic (2020), pp. 14-15.
[29] Kuzmanovic and Savic (2020), pp. 14-15.
[30] Kuzmanovic and Savic (2020), p. 16.

successfully used for the purpose of cluster indexing and even to predict the behavior of OSN users when it comes to privacy."[31]

22. Other research has noted the relative strength of conjoint surveys when assessing the value of privacy. For example, Buck et. al (2017) analyses the effect of defining privacy as a product attribute of mobile applications to "measure the importance of privacy as part of users' preference structure." [32] The authors chose to use CBC "because of its methodological and practical strengths" and state:

> "The CBC proves to avoid the distortions in surveys caused by group dynamics and social desirability. The advantages of the indirect measurement of preferences for certain product attributes utilizing the CBC approach shine especially against the background of the privacy paradox."[33]

### 2.2.3. Presenting Privacy Information as a Feature in Conjoint Analysis Does Not Bias Willingness-to-Pay

23. Glasgow, Butler, and Iyengar (2021) explores whether the privacy paradox is an issue in CBC analysis by looking at one potential criticism for how privacy information is presented in the context of CBC surveys related to privacy.[34] As Dr. Befurt argued: "Dr. Reed-Arthurs' proposed choice tasks place unnatural prominence on privacy-related features in a manner that not only deviates from consumers' real-world smartphone purchase decisions, but also introduces demand artifacts, ultimately artificially inflating any resulting willingness-to-pay estimates for the at-issue privacy-related features."[35]

24. Glasgow, Butler, and Iyengar (2021) compares estimates of willingness-to-pay for privacy using a CBC design where privacy information is presented as one of the attributes of a product in a conjoint survey (a within survey design that Dr. Befurt criticizes) versus when the privacy information is presented as a disclaimer prior to the CBC tasks and not as an

---

[31] Kuzmanovic and Savic (2020), p. 17.
[32] Buck, Christoph, Stadler, Florian, Suckau, Kristin, Eymann, Torsten, "Privacy as a Part of the Preference Structure of Users App Buying Decision," 13th International Conference on Wirtschaftsinformatik, February 12-15, 2017, St. Gallen, Switzerland, p. 792. ("Buck et. al (2017)")
[33] Buck et. al. (2017), p. 796.
[34] Glasgow, Garrett, Butler, Sarah, and Iyengar, Samantha, "Survey response bias and the 'privacy paradox': evidence from a discrete choice experiment," Applied Economics Letters, 2021, Vol. 28, No. 8, 625-629. ("Glasgow, Butler, and Iyengar (2021)")
[35] Expert Report of Rene Befurt, Ph.D., September 13, 2022, ¶94.

attribute in the CBC questions (a between subjects design).[36] The authors found the difference in mean WTP estimates for the within and between survey designs are "relatively small and statistically insignificant"[37] and conclude that:

> "On average, survey respondents placed a positive value on their personal location data under both survey designs. The difference in value between the survey designs was statistically insignificant, indicating there is no evidence that the within-subjects design led to the type of survey response bias that might contribute to the privacy paradox."[38]

2.2.4. **Revealed Preferences May be Biased as a Result of Confusing Privacy Policies**

25. Dr. Befurt's analysis assumes that the discrepancy sometimes observed between real world actions and stated preferences for privacy (the Privacy Paradox) must indicate that people's stated preferences are necessarily be inflated or incorrect.

26. In fact, the privacy paradox may instead be due to the bias attributable to consumers' revealed preferences. As explained in Glasgow, Butler, and Iyengar (2021), there are two potential biases that could lead to the effect described by the privacy paradox:

> "This discrepancy could arise from biases on both sides. From the revealed preference side, measures of the value of personal information could be biased downwards due to imperfect information. For example, many individuals may be unaware of the extent to which their personal information is collected online or of the actions they might take to protect their personal information. (*e.g.* Acquisti, Taylor, and Wagman 2016).
> From the stated preference side, surveys could be subject to response biases that exaggerate the apparent value of personal information. For instance, a survey with a clear focus on privacy may induce an experimenter demand effect by signaling to survey respondents that they should regard their personal information as valuable or induce a social desirability bias under which survey respondents downplay their willingness to trade privacy for convenience (*e.g.* Braunstein et al. 2011)."[39]

27. Some research has suggested that the potential bias implied by the privacy paradox is not the result of "an experimenter demand effect [caused] by signaling to survey respondents

---

[36] Glasgow, Butler, and Iyengar (2021), p. 626.
[37] Glasgow, Butler, and Iyengar (2021), p. 628.
[38] Glasgow, Butler, and Iyengar (2021), p. 625.
[39] Glasgow, Butler, and Iyengar (2021), p. 625.

11

that they should regard their personal information as valuable" but instead may be the result of imperfect information.[40] As explained in Glasgow, Butler, and Iyengar (2021), if individuals are "unaware of the extent to which their personal information is collected online or of the actions they might take to protect their information" then the bias suggested by the privacy paradox may be influenced more by consumers' revealed preferences.[41]

28. This revealed preference bias is consistent with research showing consumers' general lack of understanding about the type, amount, and frequency of data collected. For example, Butler and Glasgow (2014) notes that:

> "Given that the highest priced service in our survey was $12.99, this WTP suggests that consumers care a great deal about privacy and would be willing to pay a substantial fee to avoid sharing their information with third parties. Given this, it is perhaps surprising that the majority of our respondents were unaware that streaming video services collected usage and personally identifying information and could potentially share this information with third parties. Overall, only 40.3% of our respondents were aware that usage data are collected by streaming video services, and only 35.3% were aware that personally identifying data are collected by streaming video services. Awareness was higher among those respondents that already had a subscription to a streaming video service, but even so, more than half of these consumers are unaware that personal and usage data are collected."[42]

29. The data collected for the initial survey included in my Opening Report likewise shows that many respondents displayed limited understanding of how data is collected by GAEDs, what type of data is collected, and how that data is used.[43]

### 2.2.5. Summary

30. The findings of Kuzmanovic and Savic (2020) indicates that conjoint analysis can be successfully used to examine issues related to consumers' demand for privacy and does not exhibit the privacy paradox sometimes found using other survey methodologies. Glasgow, Butler, and Iyengar (2021) demonstrates that including privacy related characteristics as

---

[40] Glasgow, Butler, and Iyengar (2021), p. 626.
[41] Glasgow, Butler, and Iyengar (2021), p. 626.
[42] Butler and Glasgow (2014), p. 5.
[43] Dr. Befurt discussed some of the initial survey results in his report. See Expert Report of Rene Befurt, Ph.D., September 13, 2022, pp. 22-29.

features in a CBC survey does not inflate the value of that feature relative to incorporating such information in a different manner. Finally, to the extent that the privacy paradox exists for a particular methodology or product category, economic literature is unclear as to whether the difference between stated preferences and real-world behavior is due to bias caused by exaggerated value in stated preferences or due to a consumers lack understanding of real-world risks.

### 3. HETEROGENEITY AND CONJOINT ANALYSIS

31. Dr. Befurt states that my Opening Report "ignores evidence of heterogeneity in voice assistant users' attitudes towards and beliefs related to privacy."[44] He further concludes that the Initial Survey in my Opening Report "ignores that the results, taken at face value, demonstrate heterogeneity in the proposed Class's usage, understanding, and attitudes that call into question the broad conclusions it presents from the Initial Survey results."[45]

32. Any heterogeneity in consumer preferences for privacy will be appropriately dealt with using the CBC methodology proposed in my Opening Report. In that report, I specifically discuss how the random coefficient logit model appropriately accommodates heterogeneity when estimating consumer willingness-to-pay for privacy:

> "Under a random coefficient logit model, the utility function is changed to allow for such heterogeneous preferences as follows:
> $$U_{njt} = \beta_n * X_{njt} + \varepsilon_{njt}$$
> where $\beta_n$ is a vector of consumer-specific marginal utility coefficients."[46] And "Using the survey data, the parameters of the model using a random coefficients mixed logit model can be estimated. One approach is to re-parameterize the model to estimate the distribution of the willingness-to-pay for each attribute directly, rather than to estimate the distribution of the utility coefficients for each attribute and price, and then derive willingness-to-pay as the ratio of the coefficients. In other words, the approach allows for heterogeneity in willingness-

---

[44] Expert Report of Rene Befurt, Ph.D., September 13, 2022, ¶105.
[45] Expert Report of Rene Befurt, Ph.D., September 13, 2022, ¶106.
[46] Opening Report, ¶116.

13

  to-pay directly, e.g., $\left(\frac{\beta_{Processing\&HumanReview}}{\beta_{Price}}\right)$ instead of allowing for heterogeneity in $\beta_{P\&HR}$ and heterogeneity in $\beta_{Price}$ and then dividing the two. This approach is referred to as modeling in willingness-to-pay space (or "WTP-space") instead of in preference-space. This approach allows for heterogeneity in consumer preferences for price while avoiding many of the pitfalls associated with allowing for log-normal heterogeneous preferences for price in the denominator of a willingness-to-pay calculation."[47]

33. Dr. Befurt does not put forth a position that this heterogeneity would compromise the results of the proposed conjoint analysis. In fact, Dr. Befurt appears to agree that such approaches accommodate such heterogeneity. Dr. Befurt testified that:

> "[Based on a random coefficient logit] model that you just mentioned, and the underlying estimation procedure, the hierarchical [bayes] approach, they, combined, lend themselves to determining heterogeneity and utility functions, which is something that we expect and observe across respondents who participate in a conjoint. In simple terms here, heterogeneity would be the person-specific differences in utility functions that we can discover using these statistical methods."[48] And
>
> "I think it is fair to say that the implementation of a random logit coefficient model [] – any logit model for that matter, using hierarchical [bayes], coming back to our example as an estimation procedure will yield respondent level heterogeneity. And that heterogeneity is something that one would carefully assess to determine how far the preferences between respondents diverge."[49]

34. Dr. Jesse David describes in his expert report, that the "amount each consumer would be willing to pay for the product [] is not common across all class members."[50] Dr. David further explained that there is a "difference between consumers' WTP, which vary across individuals, and the market price, which is determined by the intersection of supply and demand and is the same for all consumers."[51] In essence, Dr. David is confirming that by looking at the market price premium, it is possible to calculate a common impact across class members that accounts for heterogeneity in consumers' preferences.

---

[47] Opening Report, ¶121. (citations omitted)
[48] Deposition of Rene Befurt, Ph.D., September 22, 2022, p. 112.
[49] Deposition of Rene Befurt, Ph.D., September 22, 2022, p. 118.
[50] Expert Report of Jesse David, Ph.D., September 13, 2022, ¶20.
[51] Expert Report of Jesse David, Ph.D., September 13, 2022, ¶21.

*Highly Confidential – Attorneys' Eyes Only*

35. Neither expert appears to take issue with the fact that the conjoint methodology proposed in my Opening Report will appropriately accommodate heterogeneity in consumer preferences.

*[signature]*

Rebbecca Reed-Arthurs, Ph.D.

October 3, 2022

**Attachment A**
**Documents Considered**

| Academic Literature |
|---|
| Acquisti, Alessandro; Brandimarte, Laura; Loewenstein, George, "Privacy and human behavior in the age of information," Science, January 30, 2015, Vol 347, Issue 6221 |
| Acquisti, Alessandro; John, Leslie K.; Loewenstein, George, "What Is Privacy Worth," The Journal of Legal Studies, June 2015, Vol 42, No. 2 |
| Acquisti, Alessandro; Taylor, Curtis; Wagman, Liad, "The Economics of Privacy," Journal of Economic Literature, 2016, 54(2), 442-492 |
| Adjerid, Idris; Acquisti, Alessandro; Brandimarte, Laura; Loewenstein, George, "Sleights of Privacy: Framing, Disclosures, and the Limits of Transparency," Symposium on Usable Privacy and Security (SOUPS) 2013, July 24–26, 2013, Newcastle, UK |
| Athey, Susan, Christian Catalani, and Catherine Tucker, "The Digital Privacy Paradox: Small Money, Small Costs, Small Talk," National Bureau of Economic Research Working Paper 23488, June 2017 |
| Barth, Susanne; de Jong, Menno D.T., "The privacy paradox – Investigating Discrepancies between expressed privacy concerns and actual online behavior – A systematic literature review," Telematics and Informatics, 34, (2017), 1038-1058 |
| Braunstein, Alex; Granka, Laura; Staddon, Jessica, "Indirect Content Privacy Surveys: Measuring Privacy Withour Asking About It," Symposium on Usable Privacy and Security (SOUPS) 2011, July 20–22, 2011, Pittsburgh, PA USA. |
| Buck, Christoph, Stadler, Florian, Suckau, Kristin, Eymann, Torsten, "Privacy as a Part of the Preference Structure of Users App Buying Decision," 13th International Conference on Wirtschaftsinformatik, February 12-15, 2017, St. Gallen, Switzerland |
| Butler, Sarah and Glasgow, Garrett, "The Value of Personal Information to Consumers of Online Services: Evidence from a Discrete Choice Experiment," NERA Economic Consulting, June 19, 2014 |
| Derikx, Sebastian; de Reuver, Mark; Kroesen, Maarten, "Can privacy concerns for insurance of connected cars be compensated?" Electron Markets, 2016, 26, 73-81 |
| D'Souza, Giles; Phelps, Joseph E., "The Privacy Paradox: The Case of Secondary Disclosure," Review of Marketing Science, 2009, Volume 7, Article 4 |
| Gerber, Nina; Gerber, Paul; and Volkamer; Melanie, "Explaining the privacy paradox: A systemic review of literature investigating privacy attitude and behavior," Computers & Security, 77, (2018), 226-261 |
| Glasgow, Garrett, Butler, Sarah, and Iyengar, Samantha, "Survey response bias and the 'privacy paradox': evidence from a discrete choice experiment," Applied Economics Letters, 2021, Vol. 28, No. 8, 625-629 |
| Hann, Il-Horn; Hui, Kai-Lung; Lee, Sang-Yong Tom; Png, Ivan P.L., "Overcoming Online Information Privacy Concerns: An Information-Processing Theory Approach," Journal of Management Information Systems, Fall 2007, Vol. 24, No. 2, pp. 13–42 |
| Hann, Il-Horn; Hui, Kai-Lung; Lee, Tom S.; Png, I.P.L., "Online Information Privacy: Measuring the Cost-Benefit Trade-Off," Twenty-Third International Conference on Information Systems, 2002 |
| Kokolakis, Spyros, "Privacy attitudes and privacy behaviour: A review of current research on the privacy paradox phenomenon," Computers & Security, 64, (2017), 122-134 |
| Krasnova, Hanna; Hildebrand, Thomas; and Guenther, Oliver, "Investigating The Value of Privacy in Online Social Networks: Conjoint Analysis," International Conference on Information Systems, 2009 |
| Kuzmanovic, Marija and Savic, Gordana, "Avoiding the Privacy Paradox Using Preference-Based Segmentation: A Conjoint Analysis Approach," Electronics 2020, 9, 1382 |
| Naous, Dana; Legner, Christine, "Understanding Users' Preferences for Privacy and Security Features – A Conjoint Analysis of Cloud Storage Services," BIS 2019 Workshops, LNBIP 373, pp. 352–365, 2019 |

**Attachment A**
**Documents Considered**

| |
|---|
| Wottrich, Verena M.; van Reijmersdal, Eva A.; Smit, Edith G., "The privacy trade-off for mobile app downloads: The roles of app value, intrusiveness, and privacy concerns," Decision Support Systems, 106, (2018), 44-52 |

| **Depositions** |
|---|
| Deposition of Rene Befurt, Ph.D., September 22, 2022 |
| Deposition of Jesse David, Ph.D., September 23, 2022 (Rough Transcript) |

| **Expert Reports** |
|---|
| Expert Report of Jesse David, Ph.D., September 13, 2022 |
| Expert Report of Rene Befurt, Ph.D., September 13, 2022 (including supporting material) |

\*\* I incorporate by reference any documents cited in my Opening Report or Reply Report