# EXHIBIT 12

1   Bobbie J. Wilson, Bar No. 148317
    BWilson@perkinscoie.com
2   Sunita Bali, Bar No. 274108
    SBali@perkinscoie.com
3   PERKINS COIE LLP
    505 Howard Street, Suite 1000
4   San Francisco, California 94105
    Telephone: +1.415.344.7000
5   Facsimile:  +1.415.344.7050

6   Erin K. Earl, *pro hac vice*
    EEarl@perkinscoie.com
7   PERKINS COIE LLP
    1201 Third Avenue, Suite 4900
8   Seattle, WA 98101-3099
    Telephone: +1.206.359.8000
9   Facsimile:  +1.206.359.900

10  Attorneys for Defendants
    Alphabet Inc. and Google LLC

11
                    UNITED STATES DISTRICT COURT
12
                  NORTHERN DISTRICT OF CALIFORNIA
13
                         SAN JOSE DIVISION
14

15

16
    IN RE GOOGLE ASSISTANT PRIVACY          Case No. 5:19-CV-04286-BLF
17  LITIGATION
                                            **DEFENDANTS ALPHABET INC. AND**
18                                          **GOOGLE LLC'S OPPOSITION TO**
                                            **PLAINTIFFS' MOTION FOR CLASS**
19                                          **CERTIFICATION**

20                                          Date:      October 20, 2022
                                            Time:      9:00 a.m.
21                                          Judge:     Hon. Beth Labson Freeman

22

23

24

25

26

27

28

# TABLE OF CONTENTS

Page

I.     INTRODUCTION ....................................................................................................... 1

II.    REQUEST FOR JUDICIAL NOTICE ...................................................................... 1

III.   FACTUAL BACKGROUND ...................................................................................... 2

       A     Google Assistant and Google Assistant enabled devices ("GAEDs")................... 2

       B     Google's ongoing efforts to limit Assistant misactivations. ................................. 3

       C     Google's ongoing efforts to increase transparency and user control over
             Assistant's collection and use of audio recordings. ............................................. 5

       D     Both Google and news media have publicly disclosed potential
             misactivations and human review practices. ......................................................... 7

       E     ███████████████████████████████ .................................................. 8

       F     The putative class representatives show varying Assistant use. .......................... 9

IV.    ARGUMENT .............................................................................................................. 10

       A     Plaintiffs' proposed class definitions improperly seek to expand the scope
             of the putative classes beyond the claims alleged in the 4AC. ........................... 10

       B     Plaintiffs' proposed classes include countless members who lack Article III
             standing. .............................................................................................................. 11

       C     Common issues do not predominate. .................................................................... 12

             1.    Individualized inquiries are required to determine whether class
                   members had a reasonable expectation of privacy. ................................... 12

             2.    Resolving consent requires individualized inquiries that cannot be
                   resolved on a classwide basis. ................................................................... 17

             3.    Putative class members may be subject to arbitration agreements. .......... 19

             4.    Damages cannot be determined on a classwide basis. .............................. 20

       D     Plaintiffs are neither typical nor adequate class representatives. ......................... 23

       E     Plaintiffs fail to address whether a class action is a superior method of
             adjudicating this action. ....................................................................................... 25

V.     CONCLUSION .......................................................................................................... 27

1

## TABLE OF AUTHORITIES

2

**Page(s)**

3

CASES

4

*Ang v. Bimbo Bakeries USA, Inc.*,

5

No. 13-CV-01196-HSG, 2018 WL 4181896 (N.D. Cal. Aug. 31, 2018) ...............................22

6

*Backhaut v. Apple Inc.*,
No. 14-CV-02285, 2015 WL 4776427 (N.D. Cal. Aug. 13, 2015) ...................................17, 25

7

*Bee, Denning, Inc. v. Cap. All. Grp.*,

8

310 F.R.D. 614 (S.D. Cal. 2015) .............................................................................8, 10, 14, 22

9

*Betts v. Reliable Collection Agency, Ltd.*,

10

659 F.2d 1000 (9th Cir. 1981) ...............................................................................................9

11

*Briseno v. ConAgra Foods, Inc.*,
844 F.3d 1121 (9th Cir. 2017) ...............................................................................................24

12

*Bruton v. Gerber Prod. Co.*,

13

No. 12-CV-02412-LHK, 2018 WL 1009257 (N.D. Cal. Feb. 13, 2018) ...............................19

14

*Carrese v. Yes Online Inc.*,

15

No. 16-CV-05301-SJO, 2016 WL 6069198 (C.D. Cal. Oct. 13, 2016) ...................................15

16

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013) ................................................................................................................19

17

*Condon v. Condon*,

18

No. CV 07-4985-JFW (SSX), 2008 WL 11338437 (C.D. Cal. June 6, 2008) .........................21

19

*Conti v. L'Oreal USA S/D, Inc.*,
No. 1:19-CV-00769-LJO-SKO, 2020 WL 416403 (E.D. Cal. Jan. 27, 2020) ........................23

20

*County of Los Angeles v. Los Angeles County Emp. Rels. Com.*,

21

56 Cal. 4th 905 (2013) .........................................................................................................14

22

*Darisse v. Nest Labs, Inc.*,

23

No. 5:14-CV-01363-BLF, 2016 WL 4385849 (N.D. Cal. Aug. 15, 2016) .............................24

24

*DirecTV, Inc. v. Huynh*,
No. C 04-3496 CRB, 2005 WL 5864467 (N.D. Cal. May 31, 2005) ......................................21

25

*Federal Agric. Mortg. Corp. v. It's A Jungle Out There, Inc.*,

26

No. C 03-3721, 2005 WL 3325051 (N.D. Cal. Dec. 7, 2005) .................................................21

27

*Flagstone Dev., LLC v. Joyner*,
No. CV-08-100-BLG-RFC, 2011 WL 5040663 (D. Mont. Oct. 24, 2011) .............................21

28

1

**TABLE OF AUTHORITIES (continued)**

2

**Page(s)**

3

*Gen. Tel. Co. v. Falcon,*

4
    457 U.S. 147 (1982)................................................................................................22

5

*Griggs-Ryan v. Smith,*
    904 F.2d 112 (1st Cir. 1990)................................................................................16

6

*Huff v. Spaw,*

7
    794 F.3d 543 (6th Cir. 2015)...........................................................................14, 15

8

*In re Apple iPhone 3G Prod. Liab. Litig.,*

9
    859 F. Supp. 2d 1084 (N.D. Cal. 2012) .............................................................18

10

*In re Genesisintermedia, Inc. Securities Litig.,*
    No. CV 01-9024 SVW, 2007 WL 1953475 (C.D. Cal. June 28, 2007)................24

11

*In re Google Inc. Gmail Litig.,*

12
    No. 13-MD-02430, 2014 WL 1102660 (N.D. Cal. Mar. 18, 2014)..................16, 17

13

*In re Initial Pub. Offerings Sec. Litig.,*

14
    471 F.3d 24 (2d Cir. 2006)................................................................................12

15

*In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig.,*
    500 F. Supp. 3d 940 (N.D. Cal. 2020) .............................................................20

16

*Katz v. United States,*

17
    389 U.S. 347 (1967)..........................................................................................14

18

*Low v. LinkedIn Corp.,*

19
    No. 11-cv-01468, 2011 WL 5509848 (N.D. Cal. Nov. 11, 2011) .........................10

20

*Madrigal v. Tommy Bahama Group, Inc.,*
    No. CV 09-08924 SJO, 2011 WL 10511339 (C.D. Cal. June 27, 2011)................25

21

*Mateo v. V.F. Corp.,*

22
    No. C 08–05313 CW, 2009 WL 3561539 (N.D. Cal. Oct. 27, 2009)....................23

23

*Mays v. Wal-Mart Stores, Inc.,*
    804 F. App'x 641 (9th Cir. 2020) .....................................................................10

24

*Mazza v. Am. Honda Motor Co.,*

25
    666 F.3d 581 (9th Cir. 2012).................................................................11, 18, 19

26

*Medina v. County of Riverside,*

27
    308 F. App'x 118 (9th Cir. 2009) ......................................................................16

28

1

**TABLE OF AUTHORITIES (continued)**

2

**Page(s)**

3

*Moore v. Apple, Inc.*,
   309 F.R.D. 532 (N.D. Cal. 2015) ........................................................................11

4

5

*Murray v. Fin. Visions, Inc.*,
   No. CV-07-2578, 2008 WL 4850328 (D. Ariz. Nov. 7, 2008) .................................17

6

*Nader v. Cap. One Bank (USA), N.A.*,
   No. 12-CV-01265, 2012 WL 12887100 (C.D. Cal. Oct. 1, 2012) .........................12

7

8

*O'Connor v. Ortega*,
   480 U.S. 709 (1987) ...............................................................................................12

9

10

*O'Donovan v. Cashcall, Inc.*,
   278 F.R.D. 479 (N.D. Cal. 2011) .........................................................................17

11

*O'Shea v. Littleton*,
   414 U.S. 488 (1974) ...............................................................................................10

12

13

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
   31 F.4th 651 (9th Cir. 2022) (en banc) ...................................................................9

14

15

*Opperman v. Path, Inc.*,
   84 F. Supp. 3d 962 (N.D. Cal. 2015) .....................................................................1

16

*People v. Nakai*,
   183 Cal. App. 4th 499 (2010) ...............................................................................16

17

18

*Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*,
   402 F. Supp. 3d 615 (N.D. Cal. 2019) ..................................................................14

19

20

*Radnet, Inc. v. Travelers Prop. Cas. Co. of Am.*,
   No. CV-116041-GHK-MANX, 2012 WL 13009125 (C.D. Cal. Feb. 21, 2012) ....................19

21

22

*Renton v. Kaiser Found. Health Plan, Inc.*,
   2001 WL 1218773 (W.D. Wash. Sept. 24, 2001) ................................................19

23

*Reynolds v. City & County of San Francisco*,
   No. 09-CV-00301-MHP, 2009 WL 3569288 (N.D. Cal. Oct. 30, 2009) .................14

24

25

*Rivera v. Invitation Homes, Inc.*,
   No. 18-CV-03158-JSW, 2022 WL 504161 (N.D. Cal. Feb. 18, 2022) ....................9

26

*San Pedro-Salcedo v. Haagen-Dazs Shoppe Co., Inc.*,
   No. 5:17-CV-03504-EJD, 2019 WL 6493978 (N.D. Cal. Dec. 3, 2019) ................24

27

28

1

**TABLE OF AUTHORITIES (continued)**

2

**Page(s)**

3

*Sanchez v. Los Angeles Dep't of Transportation*,
4
    39 F.4th 548 (9th Cir. 2022) ........................................................................................14

5
*Sandoval v. County of Sonoma*,
    Case No. 11-cv-05817-TEH, 2015 WL 1926269 (N.D. Cal. Apr. 27, 2015) ...........................9
6

7
*Saulsberry v. Meridian Fin. Servs., Inc.*,
    No. 14-CV-6256, 2016 WL 3456939 (C.D. Cal. Apr. 14, 2016) ...........................................12

8
*Shasta Linen Supply, Inc. v. Applied Underwriters, Inc.*,
    No. 2:16-CV-158 ...........................................................................................................25
9

10
*Shields v. Federation Internationale de Natation*,
    No. 18-CV-07393-JSC, 2022 WL 425359 (N.D. Cal. 2022)................................................25

11
*Shivkov v. Artex Risk Sols. Inc.*,
12
    974 F.3d 1051 (9th Cir. 2020)......................................................................................19

13
*Sweet v. Pfizer*,
    232 F.R.D. 360 (C.D. Cal. 2005) ................................................................................24
14

15
*Torres v. Nutrisystem, Inc.*,
    289 F.R.D. 587 (C.D. Cal. 2013) ................................................................................12

16
*TransUnion LLC v. Ramirez*,
17
    141 S. Ct. 2190 (2021) ................................................................................................10

18
*United States v. Florida*,
    No. 14-CR-00582, 2016 WL 3999593 (N.D. Cal. July 26, 2016) ......................................12
19

20
*United States v. Van Poyck*,
    77 F.3d 285 (9th Cir. 1996)....................................................................................13, 16

21
*Wal-Mart Stores, Inc. v. Dukes*,
22
    564 U.S. 338 (2011) ....................................................................................................11

23
*Woods v. Google LLC*,
    No. 11-CV-01263-EJD, 2018 WL 4030570 (N.D. Cal. Aug. 23, 2018) ...............................23
24

25
*Yoon v. Gap, Inc.*,
    No. CV 08-0512 SVW, 2010 WL 11597565 (C.D. Cal. Oct. 6, 2010) ................................23

26
*Zakaria v. Gerber Prod. Co.*,
27
    755 F. App'x 623 (9th Cir. 2018) ................................................................................20

28

**TABLE OF AUTHORITIES (continued)**

**Page(s)**

*Zinser v. Accufix Research Inst., Inc.*,
   253 F.3d 1180 (9th Cir. 2001)................................................................................24

**STATUTES**

Wiretap Act ................................................................................12, 21

**OTHER AUTHORITIES**

Fourth Amendment ................................................................................14

Fed. R. Civ. P. 15(a)(2) ................................................................................10

Fed. R. Evid. 201(b)................................................................................1

Rule 23 ................................................................................ *passim*

## I.      INTRODUCTION

This action is not suitable for class treatment. Plaintiffs' claims arise out of inadvertent recordings made when Google Assistant misdetected the hotword, and Google's alleged use and disclosure of those recordings. Plaintiffs' claims turn on the specific circumstances of those recordings, including the who, what, why, when, and where, which informs whether any reasonable expectations of privacy arose. This requires an individualized inquiry into each recording and plainly cannot be assessed on a classwide basis. Further, the underlying facts have changed significantly during the six-year class period. For example, Google's ability to detect and delete audio resulting from misactivations has improved, Google has provided increased transparency to users about the potential for misactivations and its use of human reviewers to improve its speech technologies, and Google released additional settings to give users enhanced control over when recordings are made, stored, and how they are used.

Without meaningfully addressing any of these issues, Plaintiffs seek to certify three new proposed classes, plus two subclasses. But they do not come close to meeting their burden under Rule 23. For starters, they do not even identify which of the five remaining Plaintiffs is seeking to represent each class, or which claims each class seeks to assert. They also do not support their arguments with evidence, preferring to rely on allegations in their Fourth Amended Complaint, Dkt. 141 ("4AC"). Allegations are not evidence, nor are they sufficient to satisfy Rule 23. But it's no surprise Plaintiffs attempt to rely on mere allegations because the evidence shows Plaintiffs' proposed classes are incurably flawed, including because individualized inquiries are ubiquitous, most Plaintiffs are not members of most proposed classes, and Plaintiffs have not even attempted to satisfy superiority. Plaintiffs' motion should be denied.

## II.     REQUEST FOR JUDICIAL NOTICE

Google requests that the Court consider Exhibits 24–27 and 39–52, attached to the concurrently filed Declaration of Sunita Bali ("Bali Decl."). Judicial notice of the existence of these materials, which appear on public websites, is appropriate. Fed. R. Evid. 201(b); *Opperman v. Path, Inc.*, 84 F. Supp. 3d 962, 976 (N.D. Cal. 2015).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### III.     FACTUAL BACKGROUND

#### A.     Google Assistant and Google Assistant enabled devices ("GAEDs").

Google Assistant ("Assistant"), which launched in May 2016, is a virtual personal assistant that can help users with a wide array of tasks. Declaration of Françoise Beaufays ("Beaufays Decl.") ¶ 3; *see also* Bali Decl., Ex. 67 (April 22, 2022 Deposition of Françoise Beaufays ("Beaufays Dep. II")) at 88:23–89:4, 97:13–21. Users can generally activate Assistant by saying a hotword ("OK Google" or "Hey Google"), or manually activating it on their device (e.g., pressing a button). Beaufays Decl. ¶ 5. Not all GAEDs can be activated by hotword. Declaration of Yair Cohen ("Cohen Decl.") ¶ 7.

Assistant is available on a wide range of Google and third-party GAEDs, including smart speakers and displays, smartphones, laptops, tablets, cars, televisions, and more. Beaufays Decl. ¶ 4. GAEDs manufactured by Google ("Google GAEDs"), including Pixel phones, Pixel earbuds, Nest Hub, Nest Mini, and Nest Audio (previously called "Google Home" and "Google Mini"), certain Nest cameras, certain Chromebooks, and Chromecast with Google TV can all be purchased directly from Google via its online Google Store and two physical retail stores. Tasca Decl. ¶¶ 21–22. Device purchases from the online Google Store are governed by the Google Store Sales Terms, which includes an arbitration provision and class action waiver, *id.* ¶ 22; Bali Decl.,

1    Ex. 42 at 10–13, and certain other devices, including some Pixel and Nest devices, arrive with an

2    additional arbitration agreement in the box, Tasca Decl. ¶ 23; Bali Decl., Ex. 41. Google GAEDs

3    also can be purchased from a wide array of authorized third-party retailers. Tasca Decl. ¶ 24; Bali

4    Decl., Ex. 55. Those purchases may be subject to those retailers' own contractual terms. Tasca

5    Decl. ¶ 24; *e.g.*, Bali Decl., Exs. 39-40.

6          Certain GAEDs, such as Nest smart speakers and displays, allow the user to set a location

7    (the default is "Home") and choose a "room" for the device using the Google Home app. Tasca

8    Decl. ¶ 12. Users can input any name they like for the location or the room. *Id.* ¶ 13. These

9    configuration options are not available for mobile devices. *Id.* ¶ 12.

10         **B.      Google's ongoing efforts to limit Assistant misactivations.**

11         Google is constantly working to improve the accuracy of its speech technology, including

12   its hotword model and ASR system. Beaufays Decl. ¶ 17.



5:19-CV-04286-BLF
DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

**C.**     **Google's ongoing efforts to increase transparency and user control over Assistant's collection and use of audio recordings.**

To sign up for a Google account and use most Google services, users must agree to Google's Terms of Service ("TOS") and are provided Google's Privacy Policy. Tasca Decl. ¶ 2. But the TOS and Privacy Policy are not specific to Assistant, and are far from the only disclosures users encounter when setting up Assistant or a new GAED; they also are presented with a variety of other information and settings options that allow them to control what data Google collects from their Assistant interactions, and what Google does with that data. *Id.* ¶¶ 2–3. Even after users set up Assistant, they can change these settings at any time. *Id.* ¶ 3.

For example, the Web & App Activity ("WAA") setting controls whether Google stores users' activity on Google's services, including Assistant, to their Google accounts. *Id.* ¶ 4. The Voice and Audio Activity ("VAA") setting (a sub-setting under WAA), controls whether Google saves users' audio activity, including Assistant audio, in their Google accounts. *Id.* ¶ 5; Bali Decl. Ex. 38. VAA has always been "off" by default, meaning no audio is saved to a user's account unless the user affirmatively turns it on. Tasca Decl. ¶ 5; *see* Bali Decl. Ex. 32. Users can delete their audio at any time through the My Activity page of their Google account, by issuing a voice command to Assistant, or by selecting an auto-delete option. Bali Decl., Exs. 29, 31, 38. Since at least May 2016 when Assistant launched, users have been informed that by enabling VAA, they are consenting to Google saving and using their audio data to improve Google's speech technologies. Tasca Decl. ¶ 5; Bali Decl., Ex. 32.

In August 2020, Google updated the VAA consent language. Tasca Decl. ¶ 6. It expressly states that "a sample of audio is analyzed by trained reviewers, who listen to, transcribe, and annotate it," and that "audio might be saved if your device incorrectly detects an activation." *Id.* ¶ 6; Bali Decl., Ex. 38. When this update launched, Google disabled VAA for all users, and notified users by email that VAA would remain off until they reviewed the updated language and reenabled the setting. Tasca Decl. ¶ 7; Bali Decl., Exs. 32, 65.

1    Users also can enroll in Voice Match, which first launched in 2017, and allows Assistant

2    to recognize a user's voice. Tasca Decl. ¶ 8. When Voice Match is enabled, hotword-initiated

3    queries are only logged to the user's account if they match the user's voice. *Id.* On certain

4    Android mobile devices, hotword activation only works if users enable Voice Match and consent

5    to activate Assistant by hotword, and all incoming voice queries must pass both the hotword and

6    Voice Match check to activate Assistant and log audio to the user's account. *Id.* ¶ 9.

7    In April 2020, Google released the hotword Sensitivity Slider, which allows users to

8    control how sensitive their smart speakers and displays are to a hotword. Bali Decl., Ex. 35;

9    Tasca Decl. ¶ 10; Beaufays Decl. ¶ 31; *see also* Beaufays Dep. II at 221:22–227:12; Bali Decl.,

10   Exs. 53, 56. ███████████████████████████████████████████████████████

11   ███████ Tasca Decl. ¶ 10; Bali Decl., Ex. 56 at GOOG-ASST-00213511. Since December 2020,

12   Google has allowed users on mobile devices to control whether Assistant can be activated by a

13   hotword at all, and users can mute the microphone on smart speakers and smart displays to

14   disable voice activation. Beaufays Decl. ¶¶ 6, 30; Tasca Decl. ¶ 9; *see also, e.g.*, Bali Decl., Ex.

15   28. In January 2021, Google launched "guest mode" for users of shared devices, such as smart

16   speakers and smart displays. Tasca Decl. ¶ 11; Beaufays Decl. ¶ 32. When guest mode is on,

17   Google does not save Assistant audio to users' Google accounts, even if the device owner has

18   VAA enabled. Tasca Decl. ¶ 11; Beaufays Decl. ¶ 32. Anyone can activate guest mode by voice,

19   such as by saying "Hey Google, turn on Guest Mode." Tasca Decl. ¶ 11; Beaufays Decl. ¶ 32.

20   ████████████████████████████████████████████████████████████████

21   ████████████████████████████████████████████████████████████████

22   ████████████████████████████████████████████████████████████████

23   ████████████████████████████████████████████████████████████████

24   ████████████████████████████████████████████████████████████████

25   ████████████████████████████████████████████████████████████████

26   ████████████████████████████████████████████████████████████████

27   ████████████████████████████████████ However, Google preserved and produced Assistant

28   audio and related metadata associated with Google accounts identified by Plaintiffs, pursuant to

1    the Order re: Discovery of Electronically Stored Information, Dkt. 85. Tai Decl. ¶¶ 6–7.

2        **D.**   **Both Google and news media have publicly disclosed potential misactivations**

3              **and human review practices.**

4        Google has never promised that misactivations would never occur, but rather has made

5    numerous disclosures about possible misactivations and human review in Help Center articles,

6    Safety Center pages, blog posts, and YouTube videos, including: "Occasionally, the Assistant

7    will activate when you didn't intend it to, because it incorrectly detected that you wanted its

8    help," Bali Decl., Ex. 30; *see also id.* Ex. 19; "language experts review and transcribe a small set

9    of queries to help us better understand those languages. . . . Rarely, devices that have the Google

10   Assistant built in may experience what we call a 'false accept.' This means that there was some

11   noise or words in the background that our software interpreted to be the hotword (like 'Ok

12   Google')," Bali Decl., Ex. 34; "We're updating our settings to highlight that when you turn on

13   VAA, human reviewers may listen to your audio snippets to help improve speech technology. . . .

14   The Assistant already immediately deletes any audio data when it realizes it was activated

15   unintentionally—e.g., by a noise that sounds like 'Hey Google,'" Bali Decl., Ex. 32; and "[I]f you

16   decide to turn on the Voice and Audio Recordings setting, your audio recordings can . . . support

17   our human review process, to make Google's speech technologies better for everyone.

18   Occasionally, the Assistant may activate when you didn't intend it to, because it incorrectly

19   detected that you wanted its help," Bali Decl., Ex. 18.

20       Copious non-Google sources also have discussed and publicized potential misactivations

21   and use of human reviewers, both by Google and other providers of virtual assistants. As early as

22   2017, news reports surfaced of virtual assistant misactivations. *See, e.g.*, Bali Decl., Ex. 24.

23   Indeed, the original complaint itself relies heavily on a July 2019 VRT article regarding Google's

24   human review program and potential misactivations. Dkt. 1 ¶¶ 5, 24-29; Bali Decl., Ex. 25. There

25   was also coverage of these issues in national publications. *See, e.g.*, Bali Decl., Ex. 26. News

26   articles and third-party reference sites continue to post information related to virtual assistants'

27   potential to misactivate and human review. *See, e.g.*, Bali Decl., Ex. 27.

28

**F.      The putative class representatives show varying Assistant use.**

Plaintiffs' Motion proposes plaintiffs Melissa Spurr, B.S., Lourdes Galvan, Eleeanna Galvan, and Asif Kumandan as class representatives. Former plaintiffs Edward Brekhus and Jon Hernandez were not proposed as class representatives and have dismissed their claims. Dkts. 222, 243.

1

2

3

4

5

6

7

8

9

10

11    **IV.    ARGUMENT**

12          Plaintiffs fall far short of satisfying Rule 23. Plaintiffs must "prove the facts necessary" to

13    support class certification "by a preponderance of the evidence." *Olean Wholesale Grocery*

14    *Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 665 (9th Cir. 2022) (en banc). Mere

15    allegations do not suffice. *Id.* at 664. And *each* proposed class "must independently meet the

16    requirements of Rule 23." *Betts v. Reliable Collection Agency, Ltd.*, 659 F.2d 1000, 1005 (9th Cir.

17    1981). Not one does.

18          **A.    Plaintiffs' proposed class definitions improperly seek to expand the scope of**

19                **the putative classes beyond the claims alleged in the 4AC.**

20          The "party moving for class certification cannot *expand* the class definition . . . used in the

21    complaint." *Sandoval v. County of Sonoma*, Case No. 11-cv-05817-TEH, 2015 WL 1926269, at

22    *2 (N.D. Cal. Apr. 27, 2015). Plaintiffs' proposed classes violate this rule. *Compare* Mem. at 1,

23    *with* 4AC ¶ 140.

24          Neither the proposed Purchaser Class nor the SCA Class are defined to require "False

25    Accepts," which have been the consistent focus of Plaintiffs' allegations across years of litigation

26    and "multiple amendments to [their] complaint." *Rivera v. Invitation Homes, Inc.*, No. 18-CV-

27    03158-JSW, 2022 WL 504161, at *4 (N.D. Cal. Feb. 18, 2022); 4AC ¶¶ 193–96, 199; 3AC ¶¶ 1,

28    6–8, 244; Dkt. 138 at 2. If Plaintiffs are trying to use their proposed class definitions to effectuate

1  a *sub silentio* amendment to the claims in the 4AC, that attempt is both improper and untimely.

2  *See* Fed. R. Civ. P. 15(a)(2); Dkt. 77 (pleadings amendment deadline set months before class

3  certification deadline); *Bee, Denning, Inc. v. Cap. All. Grp.*, 310 F.R.D. 614, 621 (S.D. Cal.

4  2015). And if the proposed Privacy Class and subclasses are pursuing breach of contract and/or

5  UCL claims (a question Plaintiffs leave unanswered), they too are flawed for the same reason.

6  Plaintiffs should not be permitted to expand the scope of the putative classes so substantially

7  when discovery has closed and the time to further amend their complaint has long since passed.

8     **B.     Plaintiffs' proposed classes include countless members who lack Article III**

9          **standing.**

10     Plaintiffs also fail to honor the Supreme Court's command that "every class member must

11 have Article III standing in order to recover individual damages." *TransUnion LLC v. Ramirez*,

12 141 S. Ct. 2190, 2208 (2021) (citations omitted). This failure is most obvious as to their SCA

13 claims because Plaintiffs *themselves* lack Article III standing

14

15

16

17

18

19

20

21

22          *See, e.g.*, *Low v. LinkedIn Corp.*, No. 11-cv-01468, 2011 WL 5509848, at *3

23 (N.D. Cal. Nov. 11, 2011); Beaufays Decl. ¶ 24. Even if some users might have standing to bring

24 an SCA claim, Plaintiffs do not, which means "none may seek relief on behalf of himself or any

25 other member of the class." *O'Shea v. Littleton*, 414 U.S. 488, 494 (1974); *Mays v. Wal-Mart*

26 *Stores, Inc.*, 804 F. App'x 641, 643 (9th Cir. 2020).

27     In addition, all Plaintiffs' proposed classes would sweep in countless individuals who

28 suffered no injury at all and thus lack Article III standing. The theories of injury undergirding all

-10-

1    Plaintiffs' claims are invasion of privacy, expectation damages, and disgorgement of profits in

2    which Plaintiffs retain a stake. 4AC ¶¶ 228, 233–242, 262, 264; Dkt. 138 at 16–25. But many

3    putative class members may not have experienced any invasion of their privacy, *see infra* section

4    IV.C.1; many others experienced no expectation damages because they were aware of the

5    potential for misactivations and human review *before* they purchased a GAED, like Kumandan

6    who purchased his Pixel 4 after bringing this action, *see* Kumandan Dep. at 132:22–133:6; *infra*

7    section IV.C.4; and

8                                                                     Crowel Dep. I at 99:23–113:15; Bali Decl., Exs. 20–23.

9    Plaintiffs thus cannot meet their burden to show that each member of each proposed class has

10   Article III standing to bring all claims asserted by that class.

11         **C.    Common issues do not predominate.**

12         Plaintiffs have not, and cannot, satisfy the commonality and predominance requirements

13   of Rule 23(a) and Rule 23(b)(3). Commonality addresses not merely "the raising of common

14   'questions' but rather the capacity of a classwide proceeding to generate common answers apt to

15   drive the resolution of the litigation." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).

16   Common issues predominate only when they constitute such a significant portion of the action

17   that "there is clear justification for handling the dispute on a representative rather than an

18   individual basis." *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 589 (9th Cir. 2012), *overruled*

19   *in part on other grounds by Olean*, 31 F.4th at 669 n.14. Here, Google's practices relating to

20   potential misactivations and human review have changed substantially during the six-year class

21   period, as Google continually sought to further limit misactivations, identify misactivations when

22   they occur and delete resulting audio, and offer users enhanced transparency and control over

23   what data Google stores and how it is used, including regarding its human review program. *See*

24   *supra* sections III.B-C. These variable practices and disclosures, combined with the

25   individualized issues of the context for each alleged interception, notice(s) received by each user,

26   and damages (if any), "strike at the heart of" Plaintiffs' claims, which "would degenerate into a

27   series of individual trials on issues material to any showing of liability." *Moore v. Apple, Inc.*, 309

28   F.R.D. 532, 549 (N.D. Cal. 2015) (cleaned up and citation omitted).

**1.     Individualized inquiries are required to determine whether class members had a reasonable expectation of privacy.**

Plaintiffs fail to show that common proof can establish that putative class members had a reasonable expectation of privacy in their allegedly intercepted communications—a necessary element of their claims under the Wiretap Act, CIPA § 632, intrusion upon seclusion, and invasion of privacy, as well as any UCL unlawful conduct claim premised on the foregoing (the "Interception Claims"). A reasonable expectation of privacy requires showing "the communications were made by a person (1) who has a subjective expectation of privacy, and (2) whose expectation was objectively reasonable." *United States v. Florida*, No. 14-CR-00582, 2016 WL 3999593, at *2 (N.D. Cal. July 26, 2016). This is a "fact-intensive" inquiry, *Nader v. Cap. One Bank (USA), N.A.*, No. 12-CV-01265, 2012 WL 12887100, at *3 (C.D. Cal. Oct. 1, 2012), which "must be addressed on a case-by-case basis," *O'Connor v. Ortega*, 480 U.S. 709, 718 (1987) (plurality), making these claims often inappropriate for class certification. *See, e.g.*, *Saulsberry v. Meridian Fin. Servs., Inc.*, No. 14-CV-6256, 2016 WL 3456939, at *15–16 (C.D. Cal. Apr. 14, 2016); *Torres v. Nutrisystem, Inc.*, 289 F.R.D. 587, 593–94 (C.D. Cal. 2013).

Indeed, this Court initially dismissed Plaintiffs' Interception Claims because Plaintiffs failed to "alleg[e] any facts regarding the participants in the conversations, the locations of the conversations, or examples of content from the conversations." Dkt. 80 at 12. Confirming the fact-intensive nature of this inquiry, the Court allowed these claims to proceed because Plaintiffs added allegations regarding the circumstances of the allegedly intercepted communications. Dkt. 138 at 9–12. Because the Interception Claims require both an inherently individualized inquiry into each class member's subjective expectation for each alleged interception, as well as an individualized inquiry into whether the circumstances of each alleged interception made that expectation objectively reasonable, they are not susceptible to common proof.

***Subjective Expectation of Privacy.*** Determining whether class members meet the subjective prong would require a series of mini trials to determine whether *each* individual *actually* expected *each* allegedly intercepted communication to be private. *See In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24, 44 (2d Cir. 2006) (class certification vacated in part because

1   "inquiry into the subjective intent of the purchaser" would "[o]bviously . . . require an

2   individualized determination").

3          Plaintiffs attempt to wave away this fundamental flaw, contending "the Privacy Class

4   consists exclusively of individuals who used their Google devices in their homes." Mem. at 19.

5   Not so. Plaintiffs define "Google Home Device" not as a device *actually used* at home, but as *any*

6   GAED "for which the location is set to 'Home' or a location within 'Home,' such as 'Living

7   Room' or 'Dining Room.'" Mem. at 1. But this "location" setting is not a proxy for actual device

8   location: "Home" is the *default* location for those GAEDs with the option to select one, users can

9   input any location name they like, and Google neither does nor can confirm any location name is

10  accurate. Tasca Decl. ¶ 12. Nor have Plaintiffs identified a method to account for GAEDs set to

11  locations or rooms that are ambiguous, such as "Office" or "Kitchen." *See, e.g.*, Bali Decl., Ex. 5;

12  Tai Decl. ¶ 16; Spurr Dep. at 93:3–11 ████████████████████████████████████████

13         Even for alleged intercepted communications that *do* occur at home, Plaintiffs cite only a

14  single question from their retained expert regarding *generalized* expectations about privacy at

15  home, and (unsurprisingly) many respondents said they expected "some" privacy at home. Mem.

16  at 19; MacLean Decl., Ex. 58 ("Reed-Arthurs Report") at 10, 25. But that superficial

17  commonality splinters when users were asked about privacy vis-à-vis Assistan██████████████

18  ███████████████████████████████████████████████████████████████████████████

19  ███████████████████████████████████████████████████Bali Decl., Ex. 83

20  at Ex. 9 (exhibit to rebuttal report summarizing responses). Putting aside the many defects in this

21  survey, *see e.g.*, *id*. ¶¶ 14, 37, Plaintiffs' own results confirm many users are unlikely to

22  subjectively expect privacy in conversations near GAEDs because they know misactivations are

23  possible, *see United States v. Van Poyck*, 77 F.3d 285, 290 (9th Cir. 1996) (petitioner lacked

24  subjective expectation of privacy when he knew phone calls could be monitored).

25         This result aligns with Google's market research, which shows ████████████████

26  ███████████████████████████████████████████████████████████████████████████

27  ███████████████████████████████████████████████████████████████████████████

28  ███████████████████████████████████████████████████████████████████████████

1

2 ███████████████████████████████████████████ Indeed, Plaintiffs themselves had variable subjective expectations:

3 Kumandan, E. Galvan, and Spurr did not expect the Assistant's hotword detection to work

4 perfectly, whereas L. Galvan testified she believed Assistant should function without error. *See*

5 Kumandan Dep. at 132:22–133:6; E. Galvan Dep. at 72:17–20; Spurr Dep. at 111:25–112:6; L.

6 Galvan Dep. at 74:20–75:10. Evidence thus supports the common-sense conclusion that any

7 inquiry into subjective expectations of privacy requires individualized determinations.

8       ***Objectively Reasonable.*** Individualized inquiries also are required to determine whether

9 any subjective expectation of privacy in allegedly intercepted communications is "one that

10 society is prepared to recognize as reasonable." *Sanchez v. Los Angeles Dep't of Transportation*,

11 39 F.4th 548, 555 (9th Cir. 2022). For this inquiry, "[t]he context of each recording must be

12 analyzed based on its specific facts." *Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med.*

13 *Progress*, 402 F. Supp. 3d 615, 690 (N.D. Cal. 2019); *see also County of Los Angeles v. Los*

14 *Angeles County Emp. Rels. Com.*, 56 Cal. 4th 905, 927 (2013). Contextual facts include: where a

15 recording occurred, the volume of the conversation, the proximity of other individuals who could

16 overhear, whether it could be overheard by the naked ear, whether it occurred in the open, any

17 affirmative actions taken to shield privacy, and whether it involved business or private matters.

18 *Reynolds v. City & County of San Francisco*, No. 09-CV-00301-MHP, 2009 WL 3569288, at *4

19 (N.D. Cal. Oct. 30, 2009) (collecting cases). The objective prong thus turns on the *specific context*

20 of each alleged intercepted communication. It is no answer that Privacy Class members' alleged

21 intercepted communications occurred at home because (again) there is no reliable evidence of that

22 and, even if there were, that alone is not sufficient. Courts recognize that not *all* expectations of

23 privacy in the home are objectively reasonable. *See, e.g.*, *Katz v. United States*, 389 U.S. 347, 351

24 (1967) ("What a person knowingly exposes to the public, even in his own home or office, is not a

25 subject of Fourth Amendment protection."); *Huff v. Spaw*, 794 F.3d 543, 552 (6th Cir. 2015)

26 (homeowners can lack reasonable expectation of privacy as to "viewers looking through the

27 window that he neglected to cover or receiving signals from the webcam he left on").

28       Discovery shows many examples of why this individualized inquiry is required for each

1  recording. Material variations include: how many people were present and whether they could

2  overhear the conversation, *see* L. Galvan Dep. at 118:13–121:1 (two potential misactivations

3  recorded at a 50-person pool party at her home); Bali Decl., Exs. 13–14; whether the speaker saw

4  a visual indicator on the device and knew that audio was being recorded, *see* Spurr Dep. at 170:7–

5  11; whether the content was sensitive, *see* Spurr Dep. at 158:5-7; Bali Decl., Ex. 15; whose voice

6  is captured in the recording, Spurr Dep. at 156:25–157:2; and whether the recording is so unclear

7  that neither the speaker nor the content can be gleaned, *see, e.g.*, Spurr Dep. at 204:20–22; S.

8  Spurr Dep. at 99:9–100:18; Bali Decl., Exs. 16–17. And it takes no great leap of imagination to

9  identify a plethora of additional circumstances that would bear on objective reasonableness:

10  where the conversation occurred; whether strangers were present; whether a recording captured a

11  TV or the radio; the volume of the conversation and whether it could be heard by neighbors; and

12  whether the conversation was consensually recorded by another device.

13      The objective reasonableness also depends on other factors that necessitate their own

14  individualized inquiries. For example, a user on notice that a voice-activated service may

15  occasionally activate in error and who takes no steps to prevent it lacks an objectively reasonable

16  expectation of privacy in conversations near Assistant. *See Huff*, 794 F.3d at 551 (no reasonable

17  expectation of privacy when a person "knew or should have known that the operation of a device

18  might grant others access to his statements or activities"). That factor in turn requires its *own*

19  individualized inquiries into (for example) what notices or news articles the user may have seen

20  or read, *see infra* section IV.C.2, and the privacy settings selected (or not selected) by each user,

21  including "Guest Mode," the Sensitivity Slider (including non-use, use, and whether the user

22  made hotword triggering more or less sensitive), and if the user enabled hotword activation, the

23  microphone, or the Assistant, *see supra* section III.C. And *who* is speaking also bears on objective

24  reasonableness, because a user has a reasonable expectation of privacy only in recordings of *her*

25  conversations. *See, e.g., Carrese v. Yes Online Inc.*, No. 16-CV-05301-SJO, 2016 WL 6069198,

26  at *4 (C.D. Cal. Oct. 13, 2016) (finding lack of statutory standing under CIPA because complaint

27  failed to allege that plaintiff "was a party to the communication at issue").

28                                                      *See* Beaufays Decl. ¶ 40.

1
2

**2.      Resolving consent requires individualized inquiries that cannot be resolved on a classwide basis.**

3      Consent poses another insurmountable barrier to certification of the proposed Privacy

4   Class and subclasses, and any other proposed class that may be pursuing Interception Claims.

5   Consent "is an intensely factual question that requires consideration of the circumstances

6   surrounding the interception to divine whether the party whose communication was intercepted

7   was on notice that the communication would be intercepted." *In re Google Inc. Gmail Litig*., No.

8   13-MD-02430, 2014 WL 1102660, at *16 (N.D. Cal. Mar. 18, 2014) ("*Gmail*"); *see also Medina*

9   *v. County of Riverside*, 308 F. App'x 118, 120 (9th Cir. 2009). Courts consider factors that

10   include: whether an individual saw written disclosures of the disputed practice, *Van Poyck*, 77

11   F.3d at 292; was aware of relevant online privacy policies, *People v. Nakai*, 183 Cal. App. 4th

12   499, 518 (2010); received oral explanations, *Griggs-Ryan v. Smith*, 904 F.2d 112, 117–18 (1st

13   Cir. 1990); or saw news articles, *Gmail*, 2014 WL 1102660, at *17–19.

14      Here, there is a wealth of evidence that Google has repeatedly disclosed the possibility of

15   misactivations to current and prospective Assistant users. Notice could come from: the screens

16   presented when users are asked whether to enable VAA, Bali Decl., Ex. 38 ("Sometimes, audio

17   might be saved if your device incorrectly detects an activation."); several of Google's public Help

18   Center pages, *see, e.g.*, *id.*, Ex. 30 at GOOG-ASST-00000029 ("Occasionally, the Assistant will

19   activate when you didn't intend it to, because it incorrectly detected that you wanted its help (like

20   by a noise that sounds like 'Hey Google')."); Google's public Safety Center pages, *see, e.g.*, *id.*

21   Ex. 36 at GOOG-ASST-00034845 (same); posts to Google's public blog, *see, e.g.*, *id.* Ex. 32 at

22   GOOG-ASST-00000035 ("The Assistant already immediately deletes any audio data when it

23   realizes it was activated unintentionally – e.g., by a noise that sounds like 'Hey Google.'"); Ex. 34

24   at GOOG-ASST-00000071 ("Rarely, devices that have the Google Assistant built in may

25   experience what we call a 'false accept.' This means that there was some noise or words in the

26   background that our software interpreted to be the hotword (like 'Ok Google')."); and YouTube

27   videos, *see e.g.*, *id.*, Ex. 18 ("Occasionally, Google Assistant may activate when you didn't intend

28   it to, because it incorrectly detected that you wanted its help."). *See also, e.g.*, *id.* Ex. A (summary

1    exhibit). And numerous publications have discussed the potential for misactivations by virtual

2    assistants, including Assistant. *See, e.g.*, *supra* section III.D; Bali Decl., Exs. 24–27; *compare*

3    *Gmail*, 2014 WL 1102660, at *17 (recognizing "the panoply of sources from which [class

4    members] could have learned of Google's interceptions").

5         These disclosures and publications have been effective in reaching individuals who may

6    or do use Assistant

7

8

9

10              *See, e.g.*, Kumandan Dep. at 132:22–133:6; E. Galvan Dep. at 72:17–20; Spurr

11   Dep. at 111:25–112:6.

12        This evidence—including website disclosures, news articles, and other third-party

13   publications—shows that many putative class members would have been on notice about the

14   alleged interceptions. Because resolving consent would require the Court to determine which

15   disclosures (if any) each may have seen and "whether that specific combination of disclosures

16   was sufficient to imply consent," this inquiry will "lead to numerous individualized inquiries that

17   will overwhelm any common questions." *Gmail*, 2014 WL 1102660, at *21; *see also Backhaut v.*

18   *Apple Inc.*, No. 14-CV-02285, 2015 WL 4776427, at *15 (N.D. Cal. Aug. 13, 2015); *Murray v.*

19   *Fin. Visions, Inc.*, No. CV-07-2578, 2008 WL 4850328, at *4 (D. Ariz. Nov. 7, 2008).

20        Plaintiffs fail to address these individualized inquiries. Rather, they point to the Court's

21   order denying Google's motion to dismiss based solely on Google's TOS and Privacy Policy as

22   settling the issue. Mem. at 19–20 (citing Dkt. 138 at 15). But the case was in a different posture,

23   and there is no question that each notice viewed by each putative class member impacts the

24   consent calculus. *See, e.g.*, *Backhaut*, 2015 WL 4776427, at *15 (distinguishing between

25   "predominance problems" posed by fact-intensive notice inquiry from consent defense "raised at

26   the motion to dismiss stage"); *O'Donovan v. Cashcall, Inc.*, 278 F.R.D. 479 (N.D. Cal. 2011).

27   Plaintiffs' argument that class members could not have consented because Google purportedly

28   attempted to mislead users or conceal its practices, Mem. at 8, 20, has still less merit. It is belied

by the evidence of Google's copious disclosures, as recounted above, and Plaintiffs have not (and cannot) point to a single representation by Google that misactivations do *not* occur. Instead, they cite statements about keeping information confidential and that audio "snippets are deleted if the hot word is not detected, and none of that information leaves your device until the hot word is heard." Mem. at 8, 20. But the Court has already recognized the "big difference" between saying "when the hotword is *detected* as opposed to when it is *spoken*." Apr. 9, 2020 Hr'g. Tr. 8:8–9 (emphasis added). And even if Google *had* tried to conceal information (it did not), Plaintiffs' argument would require evidence of a "massive advertising campaign" that leaves "little doubt that almost every class member had been exposed to" the misleading representations. *Mazza*, 666 F.3d at 596. Plaintiffs have not even attempted such a showing.

**3.**     **Putative class members may be subject to arbitration agreements.**

Certification of the proposed classes also fails because many putative class members may only be entitled to seek relief through individual arbitration. For example, consumers that purchase GAEDs directly from the online Google Store are subject to Google's Store Sales Terms, which, since at least August 3, 2020, have required individual arbitration of "any disputes regarding your use of your Device . . . regardless of the legal theory on which you base your claim." Bali Decl., Ex. 42 ¶ 23. Similarly, "any disputes regarding the design, performance, features, or functionality" of certain Google GAEDs, including certain Pixel and Home devices, are subject to a separate arbitration agreement. Bali Decl., Ex. 41. And many class members purchased GAEDs from third-party retailers, likely subject to separate terms. *See* Tasca Decl. ¶ 24. For example, Verizon customers could purchase GAEDs under the Verizon Retail Installment Contract, which includes an arbitration agreement. Bali Decl., Ex. 40; *see also, e.g.*, *id.* Ex. 39 (BestBuy.com Terms and Conditions, including an arbitration agreement and class action waiver). And even though Google is not a signatory to those agreements, users' claims against Google may still be subject to arbitration under an equitable estoppel theory. *See, e.g.*, *In re Apple iPhone 3G Prod. Liab. Litig.*, 859 F. Supp. 2d 1084, 1096 (N.D. Cal. 2012).

Because the claims asserted in this case arise out of the purchase and use of GAEDs, many putative class members' claims fall within the scope of these arbitration agreements. *See*

1  *Shivkov v. Artex Risk Sols. Inc.*, 974 F.3d 1051, 1063–64 (9th Cir. 2020); *Radnet, Inc. v.*

2  *Travelers Prop. Cas. Co. of Am.*, No. CV-116041-GHK-MANX, 2012 WL 13009125, at *4 (C.D.

3  Cal. Feb. 21, 2012). The existence of these agreements creates material differences in the law and

4  facts applicable to different class members, and weighs against class certification. *See Renton v.*

5  *Kaiser Found. Health Plan, Inc.*, 2001 WL 1218773, at *5–6 (W.D. Wash. Sept. 24, 2001).

6                    **4.     Damages cannot be determined on a classwide basis.**

7            Rule 23(b)(3) requires Plaintiffs to provide "evidentiary proof" that the damages alleged

8  "are capable of measurement on a classwide basis" by a common methodology "consistent with

9  [the plaintiffs'] liability case." *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013). None of

10  Plaintiffs' four theories meets this standard.

11          ***Price Premium.*** Plaintiffs' price premium theory for their contract and UCL claims,

12  which purports to measure how much GAED purchasers paid above what they would have if they

13  received the notice Plaintiffs contend was required, fails at the start because it relies on surveys

14  *yet to be done* and analysis *yet to be performed.* That is not sufficient. *Bruton v. Gerber Prod.*

15  *Co.*, No. 12-CV-02412-LHK, 2018 WL 1009257, at *5, *12 (N.D. Cal. Feb. 13, 2018) (*Comcast*

16  requires a "likely method for determining class damages" with a "real explanation" of how it will

17  function, not merely a promise of "subsequent analysis").

18          Plaintiffs' model also fails because it neither is susceptible of classwide measurement, nor

19  measures only damages consistent with Plaintiffs' theory of liability. *Comcast*, 569 U.S. at 35.

20  *First*, the proposal would compensate consumers who suffered no injury, providing a theoretical

21  price premium recovery even to the many purchasers who knew about potential misactivations

22  before purchasing their GAED, e.g., through the numerous public disclosures, and thus would

23  have purchased the device anyway (as well as members of the Purchaser Class who never

24  experienced a False Accept or who purchased a GAED that cannot be activated by hotword).

25  MacLean Decl., Ex. 57 ("Torres Report") at 7–8; Bali Decl., Ex. 52 ("Befurt Rebuttal Report")

26  ¶¶ 69–74. This defeats predominance. *See Mazza*, 666 F.3d at 596 (class members who learned of

27  omitted information before purchase must be excluded).

28          *Second*, Plaintiffs' methodology does not actually measure the purported "price

premium." Mem. at 22–23; Bali Decl., Ex. 85 ("David Rebuttal Report") ¶¶ 32–33. Plaintiffs'
damages expert, Fernando Torres, says he will identify the "price premium" from the results of a
conjoint survey by Plaintiffs' survey expert, Dr. Reed-Arthurs. Torres Report at 24. But Dr. Reed-
Arthurs has designed her future survey to measure only consumers' *willingness to pay* for their
GAED, which considers only "consumer demand," i.e., how much consumers will pay for a
product. Reed-Arthurs Report ¶ 66; *see also* Deposition of Rebbecca Reed-Arthurs ("Reed-
Arthurs Dep.") at 253:17–254:18; David Rebuttal Report ¶¶ 44–45. A price premium requires
measuring demand *and supply*, Befurt Rebuttal Report ¶¶ 102–104, as Plaintiffs concede, Mem.
at 22 (arguing that "methods that evaluate what a consumer would have been willing to pay" for
an accurately labeled product can measure classwide damages, if "those methods 'reflect *supply-
side considerations* and marketplace realities that would affect product pricing'" (emphasis
added)). Mr. Torres has no evidence about how the supply of GAEDs might be affected, if at all,
by consumers' supposed shift in demand, and merely assumes supply would be "a horizontal
line." Torres Report at 21; Bali Decl., Ex. 87 (Deposition of Fernando Torres ("Torres Dep.")) at
129:3–21; David Rebuttal Report ¶¶ 24, 29–31. Plaintiffs' price premium model is therefore one-
sided and, ultimately, flawed. *See, e.g.*, *Zakaria v. Gerber Prod. Co.*, 755 F. App'x 623, 624 (9th
Cir. 2018) (conjoint analysis inadequate for measuring class-wide damages because it "did not
reflect market realities and prices") (cited in Mem. at 22); *In re Volkswagen "Clean Diesel"
Mktg., Sales Pracs., & Prod. Liab. Litig.*, 500 F. Supp. 3d 940, 949 (N.D. Cal. 2020) (excluding
conjoint analysis that "does not actually calculate a market price premium" because it "ignores
the 'supply' part of the supply/demand curve"), *aff'd sub nom. Schell v. Volkswagen AG*, No. 20-
17480, 2022 WL 187841 (9th Cir. Jan. 20, 2022).

    *Finally*, Torres does not account for actual market conditions, including the wide variation
in factors that actually drive consumer choice across the broad range of GAED types. Assistant
plays a far different role in consumers' assessment of a potential smartphone or car (which offer a
wide array of functionality and features) than a potential smart speaker (which has a more focused
purpose tied to Assistant). *See* Mem. at 3; Befurt Report ¶¶ 75–77, 79. Applying the *same*
percentage to the price of such widely varying devices cannot yield a valid outcome.

***Disgorgement of Profits.*** For their intrusion upon seclusion and invasion of privacy claims, Plaintiffs seek disgorgement of Google's profits from the "benefit" it purportedly obtained "from the uses of voice recordings obtained through Google Assistant." Mem. at 24.

Moreover, Torres's disgorgement theory assumes he can apply the profit percentage from the *net income of Alphabet, Inc. as a whole,* to the net income purportedly associated with Assistant. Torres Report at 31–32. And Torres admits that he does not know what percentage of those purported profits *are attributable to "False Accepts." Id.* at 32–33, 35–36 (emphasis added). He simply picks 3–6% as an "assumption," out of thin air. *Id.* at 33; *see also* Torres Dep. at 258:5–259:4; David Rebuttal Report ¶¶ 36–38. Such guesswork is plainly insufficient. *Flagstone Dev., LLC v. Joyner*, No. CV-08-100-BLG-RFC, 2011 WL 5040663, at *2 (D. Mont. Oct. 24, 2011), *aff'd*, 545 F. App'x 602 (9th Cir. 2013).

***Statutory Damages.*** Statutory damages are not automatic under the Wiretap Act, SCA, or CIPA: the Court *may* exercise its discretion to award them, or may elect not to award damages at all. *See, e.g.*, *Campbell v. Facebook*, Inc., 315 F.R.D. 250, 268–69 (N.D. Cal. 2016) ("statutory damages are not to be awarded mechanically" under the Wiretap Act, SCA, or CIPA); *Condon v. Condon*, No. CV 07-4985-JFW (SSX), 2008 WL 11338437, at *5 (C.D. Cal. June 6, 2008). Several factors guide courts' discretion, including the severity of the violation, the extent of any intrusion into plaintiff's privacy, the parties' relative financial burdens, and whether there was actual damage to the plaintiff, a reasonable purpose for the violation, or any useful purpose to be served by imposing statutory damages. *See Campbell*, 316 F.R.D. at 268–69; *see also, e.g.*, *DirecTV, Inc. v. Huynh*, No. C 04-3496 CRB, 2005 WL 5864467, at *8 (N.D. Cal. May 31, 2005), *aff'd sub nom. DIRECTV, Inc. v. Hoa Huynh*, 503 F.3d 847 (9th Cir. 2007). These factors

indicate statutory damages are not appropriate here, but several require individualized analysis, defeating predominance. *Campbell*, 315 F.R.D. at 268–69. These include the severity of any violation and any privacy intrusion, *see supra* sections IV.C.1-2, and whether any class members suffered actual damage. At least some Plaintiffs testified that they do not believe they lost money as a result of Google's alleged conduct, and none could identify any harm to their privacy interests. *See* Kumandan Dep. at 182:3–8; Spurr Dep. at 77:15–79:16; E. Galvan Dep. at 167:19–20;  L. Galvan Dep. at 77:11–79:7; 87:15–89:5. As "many class members" have "suffered little, if any, harm," statutory damages for many class members' claims "would be disproportionate, and sorting out those disproportionate damages awards would require individualized analyses," so predominance is not satisfied. *Campbell*, 316 F.R.D. at 269.

     **Nominal Damages.** Plaintiffs suggest in a footnote as an "alternative" that they are entitled to nominal damages on a class-wide basis. Mem. at 25 n.16. But "courts in this district have not been inclined" to "look[] to nominal damages to satisfy the predominance requirement under Rule 23(b)(3)." *Ang v. Bimbo Bakeries USA, Inc.*, No. 13-CV-01196-HSG, 2018 WL 4181896, at *16 (N.D. Cal. Aug. 31, 2018). The Court should not do so here.

     **D.**     **Plaintiffs are neither typical nor adequate class representatives.**

     Plaintiffs have not (and cannot) show typicality and adequacy under Rule 23(a). First, they fail the requirement that class representatives "must be part of the class," *Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 156, (1982), with the potential exception of Kumandan, who is *at most* a member of the Purchaser Class. *See* Bali Decl., Ex. B (summary chart). L. Galvan, E. Galvan, Spurr, and B.S. cannot represent the Purchaser Class because not one "purchased a Google-Made Device"; indeed, E. Galvan, Spurr, and B.S did not purchase *any* GAED.  *See* E. Galvan Dep. at 53:18–22; Spurr Dep. at 77:19–79:6; S. Spurr Dep. at 56:7–24. Even Kumandan's membership is tenuous, as he failed to produce any documents or even a declaration to support his supposed purchases. Kumandan Dep. at 65:24–68:24. Further, no Plaintiff is a member of the SCA Class, the Privacy Class, or either Privacy Subclass ████████████████████████████████████ ████████████████████████████ Tai Decl. ¶ 20. Indeed, VAA (which has always been disabled by default) ████████████████████████████████████ Tai Decl. ¶ 20.

1  Although L. Galvan and Kumandan ███████████████████████████████████

2  ████████████████████████████████████████████████████████████████████

3  ████████████████████████████████████████████████████████████████████

4  ████████████████████████████████████████████████████████████████████

5  █████████████████ Tai Decl. ¶ 13. And no Plaintiff has identified any *evidence* that Google

6  used any ████████████████████████████████████████████████

7  ████████████████ further confirming their lack of membership in the Privacy Use Subclass.

8        Second, Plaintiffs fail to meet the typicality requirement. Google's Motion for Summary

9  Judgment, Dkt. 245, showed Plaintiffs' claims are subject to "unique defenses which threaten to

10  become the focus of the litigation." *Mateo v. V.F. Corp.*, No. C 08–05313 CW, 2009 WL

11  3561539, at *4 (N.D. Cal. Oct. 27, 2009) (citation omitted). Although Google's motion was

12  recently terminated without prejudice for scheduling reasons, it still shows "there is certainly a

13  danger present that Plaintiff[s] will be preoccupied with rebutting these relevant defenses." *Yoon*

14  *v. Gap, Inc.*, No. CV 08-0512 SVW, 2010 WL 11597565, at *5 (C.D. Cal. Oct. 6, 2010) (finding

15  plaintiff to be atypical on that basis).

16        Finally, Plaintiffs fail the adequacy requirement. Each has "close relationships" with

17  counsel that may "create a conflict that renders the class representative inadequate to protect the

18  interests of the class." *Woods v. Google LLC*, No. 11-CV-01263-EJD, 2018 WL 4030570, at *4

19  (N.D. Cal. Aug. 23, 2018). Spurr attended law school and is close family friends with Plaintiffs'

20  attorney Christian Levis (of Lowey Dannenberg); indeed, he was a groomsman at her wedding.

21  Spurr Dep. at 46:2–21; S. Spurr Dep. at 23:23–24:3. Kumandan went to law school with former

22  Plaintiffs' counsel Henry Kusjanovic (formerly of Lowey Dannenberg), Kumandan Dep. at 51:9–

23  53:16, and the Galvans are long-time friends with Plaintiffs' counsel Kirk Wood, L. Galvan Dep.

24  at 32:20–33:3, 36:7–12; E. Galvan Dep. at 36:16–37:5.

25        These friendships are even more problematic when combined with indications that

26  Plaintiffs may not be sufficiently interested in prosecuting this case. No Plaintiff submitted a

27  declaration "setting forth facts to support their adequacy as [class] representatives." *Conti v.*

28  *L'Oreal USA S/D, Inc.*, No. 1:19-CV-00769-LJO-SKO, 2020 WL 416403, at *7 (E.D. Cal. Jan.

27, 2020), *report and recommendation adopted*, No. 1:19-CV-00769-NONE-SKO, 2020 WL 820155 (E.D. Cal. Feb. 19, 2020). Spurr's testimony revealed her lack of understanding of claims and facts at issue in this case, *see* Spurr Dep. at 44:2–17, 105:3–19, and Kumandan and E. Galvan both testified they do not know who they are trying to represent, E. Galvan Dep. at 35:9–20; Kumandan Dep. at 47:5–17. Given these circumstances, Plaintiffs' "lack of familiarity" with the case, "coupled with [their] close personal relationship[s]" with counsel, make them inadequate class representatives. *San Pedro-Salcedo v. Haagen-Dazs Shoppe Co., Inc.*, No. 5:17-CV-03504-EJD, 2019 WL 6493978, at \*4 (N.D. Cal. Dec. 3, 2019); *see also Darisse v. Nest Labs, Inc.*, No. 5:14-CV-01363-BLF, 2016 WL 4385849, at \*7 (N.D. Cal. Aug. 15, 2016) (brother-in-law relationship between class representative and class counsel was not persuasive "on its own" but defeated adequacy "when it is added to the other difficulties [plaintiff] brings to the table").

E.     **Plaintiffs fail to address whether a class action is a superior method of adjudicating this action.**

Plaintiffs entirely fail to address whether "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy," a necessary element under Rule 23(b)(3). They instead argue their proposed classes are "ascertainable" under Rule 23(a), but the Ninth Circuit has not "adopted an 'ascertainability' requirement." *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1124 n.4, 1127 (9th Cir. 2017). Ascertainability is a consideration in evaluating superiority, but it does not account for the "whole range of practical problems that may render the class action format inappropriate for a particular suit." *In re Genesisintermedia, Inc. Securities Litig.*, No. CV 01-9024 SVW (VBKx), 2007 WL 1953475, at \*14 (C.D. Cal. June 28, 2007); *see also* Fed. R. Civ. P. 23(b)(3). Plaintiffs' failure to address this requirement is reason alone to deny their motion. *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1189 (9th Cir. 2001). This failure is compounded by the absence of *any* "suitable and realistic plan for trial of the class claims," *id.* at 1189, which must be filed with Plaintiffs' opening motion, *Sweet v. Pfizer*, 232 F.R.D. 360, 369 (C.D. Cal. 2005) (refusing to consider plan filed with reply).

Even if the Court considered Plaintiffs' "ascertainability" arguments as bearing on "superiority" (and particularly on manageability) they still fall short. Contrary to Plaintiffs'

1  conclusory statements,

7  *See Shields v. Federation Internationale de Natation*, No. 18-CV-07393-JSC, 2022 WL 425359,
8  at *15 (N.D. Cal. 2022); *Madrigal v. Tommy Bahama Group, Inc.*, No. CV 09-08924 SJO (CWx),
9  2011 WL 10511339 (C.D. Cal. June 27, 2011).

10     Moreover,

12                                   Beaufays Decl. ¶ 38. Such deletion is contemplated by the
13  parties' ESI Stipulation, which only requires preservation of Plaintiffs' audio data. Dkt. No. 85
14  § 6(e)(5). For this same reason, Plaintiffs' suggestion that each putative class member identify
15  their own "False Accepts" is no solution, not to mention Plaintiffs' demonstrated difficulty
16  identifying their own "False Accepts." *See* Spurr Dep. at 182:11-183:13, Kumandan Dep. at
17  152:17-153:7, 158:20-24, 160:25-161:4, 165:14-17, 167:6-9, S. Spurr Dep. at 91:16-92:1, 98:10-
18  11, 103:16-21, 104:12-22, 106:2-107:18, 111:19-21, 112:3-8; *see also Backhaut*, 2015 WL
19  4776427, at *12.

20     Finally, although Google disputes that Plaintiffs or any putative class members are entitled
21  to any recovery, the availability of statutory damages and the possibility of fee-shifting "gives
22  each absent class member a strong interest in individually prosecuting an action should the
23  member so choose," defeating superiority. *Shields*, 2022 WL 425359, at *15; *Shasta Linen
24  Supply, Inc. v. Applied Underwriters, Inc.*, No. 2:16-CV-158 WBS-AC, 2019 WL 3244487, at *2
25  (E.D. Cal. Apr. 17, 2019).

26  **V.     CONCLUSION**
27     For the foregoing reasons, Google respectfully requests that the Court deny Plaintiffs'
28  motion for class certification with prejudice.

1    Dated:  September 13, 2022                          **PERKINS COIE LLP**

2

3                                                        By:  */s/ Sunita Bali*
                                                              Bobbie J. Wilson, Bar No. 148317
4                                                             Sunita Bali, Bar No. 274108

5
                                                         Attorneys for Defendants
6                                                        Alphabet Inc. and Google LLC

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28