Bobbie J. Wilson, Bar No. 148317
BWilson@perkinscoie.com
Sunita Bali, Bar No. 274108
SBali@perkinscoie.com
**PERKINS COIE LLP**
505 Howard Street, Suite 1000
San Francisco, California 94105-3204
Telephone: +1.415.344.7000
Facsimile:  +1.415.344.7050

Erin K. Earl, Bar No. 49341
EEarl@perkinscoie.com
**PERKINS COIE LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Telephone: +1.206.359.8000
Facsimile:  +1.206.359.9000

*Attorneys for Defendants*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| IN RE GOOGLE ASSISTANT PRIVACY LITIGATION | Case No. 19-cv-04286-BLF-SVK |
| | **GOOGLE'S BRIEF ADDRESSING SAMPLING IN RESPONSE TO COURT ORDER** |
| | Mag. Judge:    Hon. Susan van Keulen |

169062817.2

## I.      INTRODUCTION

As this Court has already observed, "the proportionality analysis has shifted dramatically" following the denial of class certification with respect to Plaintiffs' Privacy and Stored Communications Act Classes. There is no longer a justification for Google to produce tens of millions of Google Assistant queries as required under the prior sampling order, and as Plaintiffs continue to demand. The only certified class is the Purchaser Class, and Google's speech log data cannot be restricted to members of the Purchaser Class. Thus, any sampling would necessarily sweep in data regarding Assistant users who are not members of the class, and would not answer Plaintiffs' questions regarding the rate of false accepts or the rate that audio recordings are sent to human reviewers *with respect to the Purchaser Class*. Moreover, the proportionality factors weigh against sampling, given that the amount in controversy is smaller now, Google has already produced documents regarding the rate of false accepts and the rate that audio recordings are sent to human reviewers, Plaintiffs already have access to their own speech log data which includes thousands of log entries, and the burden associated with developing a custom-built tool capable of processing large volumes of data is significant particularly given that such sampling will not be informative as to the Purchaser Class.

If the Court nonetheless determines that some sampling is appropriate, Google requests that the scope of the sampling be substantially reduced in line with that ordered in Class Counsel's false accept matter against Apple, *Lopez v. Apple Inc.*, 4:19-cv-04577-JSW (N.D. Cal.), and that the Court allow Google to redact the records to avoid issues under the Stored Communications Act and protect the privacy of Google Assistant users, many of whom are not even members of the certified class.

## II.     BACKGROUND

Plaintiffs first brought this dispute to the Court on July 15, 2022, when they sought to compel Google to produce documents that they claimed might be responsive to their RFPs. ECF Nos. 218, 218-1. The relevant RFPs sought (1) the total number of false accepts analyzed by a human reviewer (RFP No. 7), (2) "all instances" in which the Google Assistant activated into listening mode without a hotword or manual activation (RFP No. 10), (3) the identification of "all

1   audio recordings and/or transcripts" made by a GAED in the absence of a hotword (RFP 18), and

2   (4) instances showing Google's use of false accept data (RFP No. 13, Set 2). *See* ECF No. 278 at

3   1-2; *see also* ECF No. 218-1.

4       Although the plain language of Plaintiffs' RFPs could only be read to call for the

5   production of every single query resulting from a false accept (which is both unduly burdensome

6   and impossible), Plaintiffs claimed that they were instead seeking evidence of (1) "the rate,

7   frequency, and total number of False Accepts" during the class period, as well as (2) documents

8   that would enable Plaintiffs to "identify class members." ECF No. 218 at 1. Plaintiffs further

9   argued that this information was "central" to their Wiretap Act and California privacy claims, and

10  that it was necessary for them to establish "numerosity and ascertainability in the context of their

11  class certification motion." *Id*. In contrast, Plaintiffs did ***not*** claim that this information was

12  relevant to their breach of contract or Unfair Competition Law ("UCL") claims (which are the

13  only claims remaining for the certified Purchaser Class), either in writing or in the numerous

14  hearings about this dispute held by this Court before Judge Freeman's class certification order.

15      On October 20, 2022, this Court ordered Google to produce "sample sets" of Assistant

16  and other user data, amounting to tens of millions of queries. ECF No. 331 ("Sampling Order");

17  *see also* ECF No. 346, Oct. 20, 2022 Hr'g Tr. at 48:11-15. Google timely filed a Motion for

18  Relief from the Sampling Order on the grounds that it was vastly overbroad, and that the

19  disclosure of users' communications content runs afoul of Assistant users' privacy interests,

20  including under Plaintiffs' interpretation of the Stored Communications Act, 18 U.S.C. §§ 2701,

21  *et seq*. ECF No. 349. Google further explained that "if [Judge Freeman] certifies only the

22  'Purchaser Class' . . . there would be no need for Google to produce transcribed content of any

23  queries because the presence of 'false accepts' would have no bearing on class membership or

24  possibly even the underlying claims[.]" ECF No. 353, at 2.

25      On December 16, 2022, Judge Freeman did just that – she denied certification of the SCA

26  and Privacy Classes, and certified only a "Purchaser Class" asserting claims for breach of contract

27  and violation of the UCL predicated on breach of contract. ECF No. 360 at 31. The certified

28  Purchaser Class is defined as "All Users who purchased a Google-Made Device." A Google-

1  Made Device is defined as a "Google Assistant Enabled Device[] **manufactured and sold by**

2  **Google**, including Google's own smart home speakers, Google Home, Home Mini, and Home

3  Max; smart displays, Google Nest Hub, and Nest Hub Max; and its Pixel smartphones." *Id*.

4  (emphasis added).

5  On January 6, 2023, Judge Freeman ordered that the "scope of the Sampling Order should

6  be revisited" in light of the class certification order. ECF No. 370. This Court conducted a hearing

7  on January 24, 2023, during which it recognized that "the proportionality analysis that is the

8  underpinning to the sampling plan has shifted" in light of the class certification order, and that

9  "there will be a change to the sampling plan, if it stays in place at all." *See* Jan. 24, 2023 Hrg. Tr.

10  at 5:3-4, 14:21-23. The Court ordered supplemental briefing "addressing the need for a sampling

11  plan, modified or otherwise, in light of the class certification order." ECF No. 375.

12  On February 6, 2023, the day before Google's deadline to file its supplemental brief, all

13  case deadlines (including the supplemental briefing deadlines) were stayed while the parties

14  pursued mediation. *See* ECF No. 380; ECF No. 389. In June 2023, once the stay was lifted, Judge

15  Freeman instructed the parties to return to this Court to resolve the sampling issue. *See* Hr'g Tr.

16  of Case Management Conference, ECF No. 396 at 3:22-4:16. Fourteen months later, Plaintiffs

17  contacted Google to renew their sampling dispute and the parties submitted a joint brief on

18  August 15, 2024. ECF No. 431. On August 27, 2024, this Court held a hearing and ordered the

19  parties to submit this briefing. ECF No. 435.

20  **III.    ARGUMENT**

21  **1.    The Sampling Order Should Be Terminated Because It Will Not Yield
            Relevant Information and Is Not Proportional to the Needs of the Case Given
22          the Limited Certified Class**

23  Judge Freeman's denial of class certification with respect to the Privacy and SCA classes

24  confirms that any sampling across *all* Assistant users is not proper under Rule 26(b)(1) because it

25  will not yield relevant information and is not proportional to the needs of the case. Indeed,

26  Plaintiffs' stated basis for demanding that Google produce speech log data was to support their

27  privacy claims and to "identify class members." ECF No. 218 at 1. It was only *after* class

28  certification, in a last-ditch effort to maintain the sampling previously ordered, that Plaintiffs ever

-3-

argued that sampling is relevant to the Purchaser Class. *See* Jan. 24, 2023 Hrg. Tr. at 13:6-15.

The only conceivable relevance of a data sample would be if it could show the rate of false accepts (i.e., instances where Assistant activates but the user has neither said the hotword ***nor*** manually activated Assistant) on Google-Made Devices purchased by the Purchaser Class. *See, e.g.*, ECF No. 370, at 1 (ordering that the Sampling Order be revisited because it "includes sampling of data collected through Google devices and third-party devices" whereas only "Users who purchased a Google-Made Device" are in the certified Purchaser Class); *see also* ECF No. 431, at 4 (argument from Plaintiffs that it would make "no sense to attempt to resolve the proper scope of data sampling without clarity on the scope of the class"). Even putting aside that Google continues to dispute whether any meaningful information regarding the rate of false accepts can be gleaned from speech logs, any sample of those logs ***cannot be limited to Purchaser Class members***. There is no information within the speech logs that can be used to identify whether a particular query is associated with a member of the Purchaser Class, *i.e.*, someone who purchased a Google-Made Device. See Hr'g Tr. of Discovery Hearing, ECF No. 373 at 10:3-14 (any sample would not "tell us anything about purchasers because there's nothing in the speech logs that identify whether a particular query is associated with a purchaser"). The vast majority of Google-Made Devices are purchased from third-party retailers and Google has no records related to those purchases. Even as to the small subset of those devices purchased directly from Google, Google cannot identify which speech log records relate to those devices because neither the speech logs nor Google's sales records include device serial number or any other durable device identifier that could be used to cross-reference data from those two disparate sources. And although Google *can* limit the data sampled to Google-Made Device *types* as discussed below, that limitation still will sweep in many users who (like Plaintiff Spurr) did not *purchase* those devices and thus are not members of the Purchaser Class. *See, e.g.*, ECF No. 360, at 11 (rejecting Plaintiffs' argument that Plaintiff Spurr could be a member of the Purchaser Class although she did not purchase the device).

Indeed, even before Judge Freeman's class certification order—when there was still a possibility that Plaintiffs' Privacy Class and SCA Class might be certified—this Court was

attuned to problems raised by any sampling plan that would require production of extensive data about Assistant users who "may not even be class members." ECF No. 346 at 16:4-12; *see also* Hr'g Tr. of Discovery Hearing, ECF No. 373 at 7:23-8:11 (raising concerns over the sampling plan capturing data for "individuals who are not class members and will never be class members"). Now that the court has denied certification of Plaintiffs' Privacy and SCA classes, those problems are even more real.

Moreover, the broadscale sampling that Plaintiffs seek is not proportional to the needs of the case. In evaluating proportionality, Rule 26(b)(1) requires courts to consider "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Here, these factors weigh in favor of no sampling. First, the amount in controversy has dropped significantly following the denial of class certification as to the Privacy and SCA Classes, as they were pursuing claims that allowed for significant "per violation" statutory penalties. That is not the case with the Purchaser Class. *See* Hr'g Tr. of Jan. 24, 2023 Discovery Hearing, ECF No. 373 at 6:5-20 (recognizing that the Stored Communications Act Claim was a "significant underpinning to the breadth" of the prior Sampling Order, and questioning whether a "statistically significant quantification of each violation" is warranted by the Purchaser Class).

Second, the parties have access to the same relevant information. Google conducted a diligent search and produced over 3,000,000 pages of documents in this case, including documents that speak to the rates of false accepts and queries sent to human reviewers. Although those documents do not neatly quantify those events on a quarterly basis for every year of the class period like the prior Sampling Order required, they demonstrate continuous and iterative work done by Google engineers and researchers to develop a mechanism for quantifying misactivations (including false accepts, which is inherently challenging) and reduce their frequency, which in 2021-2022 culminated in concrete and reliable data estimating the rate of false accepts (which data Google has already produced). *See, e.g.*, GOOG-ASST-03047490 at Tab 3. Google has also produced documents showing the results of other workstreams using

various proxies to estimate false accepts and misactivations more broadly from earlier points in the class period. *See, e.g.*, GOOG-ASST-00256752 at 861; GOOG-ASST-00035843. Google has likewise produced documents regarding the quantity of audio recordings sent to human reviewers. Indeed, in 2019 Google publicly stated that "around 0.2 percent of all user audio snippets" are shared with human reviewers to improve the Assistant. GOOG-ASST-00000035; *see also* GOOG-ASST-00000071. And Google has produced documents substantiating this estimate across the class period. *See, e.g.*, GOOG-ASST-02990129 (2017 and 2018); GOOG-ASST-00231206 at 208 (2019, including no human transcription starting in July 2019); GOOG-ASST-00254861 at 864, 881 (2020 and 2021, including no human transcription in 2020); GOOG-ASST-03047296 at 296 (2022). In addition, Google has already produced speech logs associated with accounts belonging to Plaintiffs or their family members (including queries to Google-Made Devices), which include thousands of log entries dating back as early as January 2017. Thus Plaintiffs already have a sample of speech logs to analyze.

Finally, the burden associated with sampling and producing speech log data of the volume required under the prior Sampling Order is significant, as it requires Google engineers to develop and use a custom-built tool capable of processing such a large volume of data. *See* Declaration of Francoise Beaufays in Support of Status Report, ECF No. 352-1, ¶¶ 3-9. And the burden is only exacerbated by Plaintiffs' lengthy delay in reviving this dispute once the temporary stay was lifted, as some of the engineers previously working on this have left Google or moved on to other projects. Such a significant burden is not justified given that sampling will not be informative as to the Purchaser Class.

Accordingly, because the speech log data cannot be limited to members of the Purchaser Class, sampling speech log data will not inform the rate of false accepts or the rate at which such queries are sent to human reviewers, *with respect to the Purchaser Class*, and thus is not within the proper scope of discovery under Rule 26(b)(1).

### 2.     If the Court is Inclined to Allow Any Data Sampling, the Scope Must be Narrowed and the Methodology Must be Modified

Google's position is that no data sampling is warranted for the reasons discussed above.

GOOGLE'S BRIEF ADDRESSING SAMPLING
19-CV-04286-BLF-SVK

1  But if the Court is nonetheless inclined to allow some sampling, the scope must be narrowed and

2  the methodology must be modified.

3      Since the Court issued the Sampling Order nearly two years ago, another court in this

4  District has considered and rejected a demand from Class Counsel for a vast data sample in a

5  similar class action based on alleged false accepts by Siri, Apple's voice-activated virtual

6  assistant. Class Counsel argued there, as here, that they need samples from across the "pool of

7  users over the Class Period" in order to "understand[ ] the full scope of the data Apple collects

8  from **each user**." *Lopez v. Apple Inc.*, Case No. 4:19-cv-04577, ECF No. 198 at 2 (emphasis

9  added). Nonetheless, the court adopted Apple's proposal to provide samples of 500,000 Siri

10 requests resulting from a "voice trigger." *Id.*, ECF No. 202. Apple's proposal adopted by the

11 Court also reflected various protections and limitations, which Apple contended were necessary

12 to "balance[ ] any putative need for discovery against the interest of other [ ] users who made the

13 [queries] that may be sampled despite having no interest in this case." *Id.*, ECF No. 197, at 1.

14     The parties have yet to brief class certification in *Lopez*, leaving open the possibility of a

15 class being certified to pursue statutory claims, including under the federal Wiretap Act. No such

16 possibility exists here. Thus, the proportionality analysis under Rule 26 confirms that no data

17 sampling should be ordered in this case, or at least dictates that any data sample here should be

18 far smaller—and definitely not any larger—than the 500,000 Siri requests ordered in *Lopez*.

19     In addition, the sampling methodology must also be modified. For example, although any

20 data sample cannot be limited to members of the Purchaser Class or the Google-Made Devices

21 they purchased, any sample *can and should be* limited to only hotword-initiated Assistant queries

22 from Google-Made Devices. Google's speech logs do not reflect whether any given device *was*

23 *purchased by the user*. Rather, they include information about the *type of device* being used, so

24 any sampled data should at a minimum be limited to only those device types manufactured and

25 sold by Google since the Purchaser Class is similarly limited. In addition, Google Assistant may

26 activate *either* because it detects the hotword *or* because a user has manually activated the device

27 (e.g., by pressing a button) and the logs indicate whether a particular query was activated based

28 on hotword detection or manual activation. False accepts are instances of Assistant activation

GOOGLE'S BRIEF ADDRESSING SAMPLING
19-CV-04286-BLF-SVK

when the user *neither* says the hotword *nor* manually activates Assistant. *See, e.g.*, 4AC ¶¶ 6, 82-83, 87, 90, 124. Because any Assistant queries that follow a manual activation have no bearing on the "rate of false accepts," they should be excluded and any data sample should be limited to hotword-initiated Assistant queries. And finally, Google should be allowed to redact the content of the query (leaving the hotword, where present) consistent with the SCA and user privacy, particularly because any sampling will necessarily involve disclosure of data pertaining to people who are not class members or otherwise interested in this case.

## IV.    CONCLUSION

For the reasons stated above, Google respectfully asks the Court to terminate the existing Sampling Order and not order further sampling, or at a minimum, significantly reduce the scope and modify the methodology of any sampling.

Dated:  September 10, 2024

**PERKINS COIE LLP**

By:    /s/ Sunita Bali
Bobbie J. Wilson, Bar No. 148317
BWilson@perkinscoie.com
Sunita Bali, Bar No. 274108
SBali@perkinscoie.com
PERKINS COIE LLP
505 Howard Street, Suite 1000
San Francisco, California 94105
Telephone: +1.415.344.7000
Facsimile:  +1.415.344.7050

Erin K. Earl, Bar No. 49341
EEarl@perkinscoie.com
PERKINS COIE LLP
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Telephone: +1.206.359.8000
Facsimile:  +1.206.359.9000

*Attorneys for Defendants*

ALPHABET INC. and GOOGLE LLC