**Pages 1 - 18**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Susan van Keulen, Magistrate Judge

| | |
|---|---|
| IN RE GOOGLE ASSISTANT PRIVACY LITIGATION | )<br>)   **NO. C 19-04286 BLF (SVK)**<br>)<br>) |

San Jose, California
Tuesday, January 24, 2023

**TRANSCRIPT OF OFFICIAL ELECTRONIC SOUND RECORDING**

**OF REMOTE ZOOM VIDEO CONFERENCE PROCEEDINGS**

**TIME:  11:03 A.M.  -  11:31 A.M.  = 28 MINUTES**

**APPEARANCES VIA ZOOM:**

For Plaintiffs:
         LOWEY DANNENBERG
         44 South Broadway, Suite 1100
         White Plains, New York 10601
  **BY:  MARGARET C. MACLEAN, ATTORNEY AT LAW**
       **ANDREA FARAH, ATTORNEY AT LAW**

For Defendant:
         PERKINS COIE LLP
         Four Embarcadero Center, Suite 2400
         San Francisco, California 94111
  **BY:  SUNITA BALI, ATTORNEY AT LAW**

         PERKINS COIE LLP
         405 Colorado Street, Suite 1700
         Austin, Texas 78701-0089
  **BY:  JUSTIN POTESTA, ATTORNEY AT LAW**

TRANSCRIBED BY:  Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG
                CSR No. 7445, Official U.S. Reporter

|   |   |   |
|---|---|---|
| 1 | **Tuesday - January 24, 2023** | **11:03 a.m.** |

P R O C E E D I N G S

---o0o---

THE COURT: Good morning, everyone. Welcome to the 11 o'clock calendar.

Ms. Van Thorpe, if you'll call the matter, we'll get underway.

THE CLERK: Calling Case 19-cv-4286, In Re Google Assistant Privacy Litigation.

Counsel, please identify yourselves for the record and who you have present here, beginning with plaintiff.

MS. MacLEAN: Sure. I'm Margaret MacLean from Lowey Dannenberg for the plaintiffs. I'm here with my colleague Andrea Farah, also from -- from Lowey Dannenberg.

THE COURT: Ms. MacLean, Ms. Farah, good morning.

MS. MacLEAN: Good morning.

MS. BALI: Good morning, Your Honor. Sunita Bali here for defendants Google and Alphabet. And I also have my colleague Justin Potesta on the line.

THE COURT: Thank you, Ms. Bali. Good morning.

Good morning, Mr. Potesta.

I see his name. He's been admitted, but not on video, but I assume you will have the mic today, Ms. Bali.

MS. BALI: That's right. Thank you, Your Honor.

THE COURT: All right. Thank you.

1     I have -- we're here today to -- on a hearing on
2 reconsideration of the sampling order, which this Court put in
3 place -- I put in place.  And that's in Document 370, and
4 that's back from -- wait a minute.  No.  That's not 370.  The
5 sampling order is 331, and that was posted in October.
6     Since that time, Judge Freeman had the parties' class
7 certification briefing and hearing, and her class certification
8 order came out.  That's Document 360, and that was issued in
9 December.
10     And following her order on class certification, she asked
11 the parties for input as to whether or not the sampling order
12 should be revisited.  She took that input, decided yes, it
13 should be, and has sent it back to me.
14     So I have reviewed Judge Freeman's class certification
15 order.  I have reviewed -- well, starting, obviously, with the
16 original sampling order and what got us there, including the
17 hearing notes and the briefing.  And then I reviewed the class
18 certification order and your parties' -- the parties'
19 submissions that initially went to Judge Freeman but state the
20 parties' positions on what, if anything, should be done to the
21 sampling plan in light of class certification.  And your
22 submissions are at Documents 367 and 368, respectively.
23     So I have been through all of that material.
24     And let me just further set the stage because I think it
25 will inform what I'd like to hear from each side today as well

as some of my questions.

And as I'm sure you are aware from the class certification order, the only class that was certified is the purchaser class, and that is all users who purchased a Google-made device, a Google-made device. And then there are additional definitions of "users" and the "Google-made device" included in that.

Judge Freeman also identified common questions, certified common questions, and there are three of those. And that is, one, whether Google made uniform representations to the class members in its contracts; two, whether Google breached those promises by surreptitiously recording users' audio and then subsequently sharing such audio with third parties; and, three, whether the breach resulted in harm to the plaintiffs and class members who overpaid for Google Assistant-enabled devices as a result of the price premium attributable to Google's uniform contractual promises of privacy.

So of those common questions, it really is the second -- whether Google breached promises by recording users' audio and sharing such audio with third parties -- that is, I think, pertinent to our discussion here today in terms of the role of the sampling plan.

I noted with interest in Judge Freeman's order that a privacy class, to the extent one was defined, and perhaps more clearly the Stored Communications Act violation class, were not

1  certified.  And in light of that, particularly we have the
2  purchaser class; we don't have a Stored Act Communications
3  violation class, I think that the proportionality analysis that
4  is the underpinning to the sampling plan has shifted.
5      So that's kind of where I -- how I see the landscape.
6  What does that mean and where do we go from here, I'd like to
7  hear the parties' views on that.  I will start with the
8  plaintiff, and then I'll come to Ms. Bali.
9      So, Ms. MacLean, if you please.
10     **MS. MacLEAN:**  Sure, Your Honor.
11     I think you got right to the point of it with the common
12 questions and, again, that Google's liability on plaintiffs'
13 breach of contract claim will turn on whether Google, quote,
14 surreptitiously recorded users' audio and then subsequently
15 shared such audio with third parties.
16     The District Court also noted at page 21 of its opinion
17 that the answer to that second question will be shown by
18 analysis of Google's voice records and speech logs.
19     So, again, that is the data that we're going to need, just
20 as much as we ever did, to know whether and to what extent
21 Google was recording users without hot words, without consent,
22 and whether Google was sending that recorded audio to third
23 parties.  And both of those things are going to be in the
24 speech logs, and, again, they are at the very crux of our case,
25 just as they ever were.

1       And so as far as proportionality, we would -- I understand
2  your point of view, how it has shifted; but it is still, again,
3  enormously central to the determination of the claims that are
4  at issue, even just for this one class.
5       **THE COURT:** As I recall, a significant justification
6  argued by plaintiff -- plaintiffs in support of a broad
7  sampling plan, which I think is reflected in the plan that I
8  ordered, a significant underpinning to the breadth of that plan
9  was that -- was the Stored Communications Act and that each
10 recording is a violation.  And there had to be a means of
11 quantifying, in a reliable way, a precise number of violations.
12 And I don't think that that -- I think that this class
13 doesn't -- doesn't have that.
14      There may still be an issue -- there is clearly, by the
15 common questions, still an issue of recordings and passing
16 those recordings to human reviewers; but it's in a -- isn't it
17 in a very different context now in that they don't need to be
18 each and every -- each and every one or a -- you know, a
19 statistically significant quantification of each violation, is
20 that still warranted by a purchaser class?
21      **MS. MacLEAN:** Your Honor, I would say yes, not so much on
22 a violation-by-violation basis; but the rate, the frequency
23 with which this occurred, I think, is still relevant.
24      I would anticipate that Google would want to argue, for
25 instance, that if it happened, it was de minimis; that it only

1  happened during certain time periods, things of this nature.
2  And without the relevant data, plaintiffs will be in a hard
3  place to rebut those kinds of arguments.
4          And it should also be relevant to damages too.  Again,
5  to -- if you're looking at the price premium, by how much did
6  people -- people overpay for their devices, how bad the
7  violation was, how bad the breach was should play into that as
8  well.
9          As the District Court said during the oral argument, she
10 framed it as a quality question.  Here, let me find the exact
11 quote.
12         That (as read):
13             "It's a quality issue.  I paid a premium for
14         something that had this protection.  Just because it
15         didn't activate for me doesn't mean I wasn't harmed
16         by having something that might falsely listen in."
17         So, again, we're talking about how likely is it that
18 something might falsely listen in?  How likely is it that
19 something might falsely listen in and transmit that audio to a
20 third party without my consent?
21         And so numbers are still relevant in that context, we
22 would submit.
23         **THE COURT:**  Ms. MacLean, wouldn't the sampling plan -- the
24 sampling plan, as currently formatted, has no parameters
25 around -- around purchasers of Google-made devices.  So as --

1  as currently formatted, doesn't that plan necessarily capture
2  recordings of individuals who are not class members and will
3  never be class members?
4      **MS. MacLEAN:** I'm certain that -- yes, there will be some;
5  but that would have been the case before -- right? -- because
6  not all of the audio necessarily are -- were false accepts.
7  Right? I mean, there was always going to be a certain
8  percentage of audio captured of people who weren't class
9  members. It's not so much a matter of identifying class
10 members as figuring out, again, the frequency of false accepts
11 and of audio being sent to human reviewers.
12     **THE COURT:** Okay. All right.
13     **MS. MacLEAN:** The other thing I would add to that is that
14 we do -- it would be helpful, of course, to have some
15 information from Google about what percentage of the total
16 universe of Google Assistant-enabled devices is, in fact, made
17 up of Google-manufactured devices.
18     We also have our experts here on the line in case there
19 are specific questions that we want to look at with respect to
20 that, whether the sample size is sufficiently large as it is to
21 encompass -- to get statistically significant results for,
22 specifically, the Google-made devices, which we think it should
23 be if it's anything over somewhere in the range of
24 10 to 20 percent of the total.
25     But, again, we have our experts here to the extent we get

1  into the nitty-gritty of those kinds of questions.
2       **THE COURT:** All right.  Thank you.
3       Ms. Bali, what information has Google already produced in
4  this suit that relates to the frequency of false accepts?
5       And I remember this issue came up.  We had this discussion
6  early in the days of whether or not there was a need for
7  sampling.  So --
8       **MS. BALI:** That's right.
9       **THE COURT:** -- (inaudible.)
10      **MS. BALI:** That's right.  That's right, Your Honor.
11      I mean, in connection with the discovery in this case,
12 Google produced all of the documents that existed in its
13 possession, custody, or control that had any bearing on the
14 rates of false accepts.  And that included work that -- in a
15 variety of different work streams.
16      So, for example, Google had several work streams designed
17 to try to reduce misactivations generally, including false
18 accepts; and Google produced a slew of documents connected with
19 that work stream.
20      There was a subse- -- another work stream that was
21 specifically focused on quantifying and reducing what were
22 referred to as non-rejected misactivations, which are instances
23 where Google's technology does not identify it as a query that
24 was not intended for Google and doesn't just reject it at the
25 outset.  And Google produced all of the numbers that it had

1  around rates with regard to non-rejected misactivations,
2  including across different device types.
3       And so, you know, Google's position is certainly that
4  Your Honor hit it on the -- hit the nail on the head with
5  respect to proportionality; and now that they've only got a
6  purchaser class, you know, a broad -- broad sampling is not
7  proportional to the only class that's been certified, and that
8  Google has produced numerous documents that bear on the rate
9  and frequency of false accepts and, you know, has -- has
10 complied with -- with its discovery obligations in that regard.
11      And the sample is not going to really tell us anything
12 about purchasers because there's nothing in the speech logs
13 that identify whether a particular query is associated with a
14 purchaser.
15      And, in fact, in the way that the purchaser class is
16 defined, you could have someone who purchased a device and
17 never used the Assistant at all, doesn't have any queries at
18 all associated with their account.
19      So, again, I think Your Honor's absolutely right that any
20 sample is necessarily going to be overbroad and include -- and
21 include purchasers -- or include folks who are not in the
22 purchaser class, which I think is problematic.
23      **THE COURT:**  Mm-hmm.  Mm-hmm.
24      **MS. MacLEAN:**  Your Honor, may I respond to one point
25 there, or are you still taking it in?

1          **THE COURT:** Yes.  No, you may in just a moment,
2  Ms. MacLean.
3          **MS. MacLEAN:** Okay.
4          **THE COURT:** Don't worry.  I'm coming back to both sides.
5                        (Pause in proceedings.)
6          **THE COURT:** Okay.  Ms. MacLean, I'd like to -- I would
7  like to hear from plaintiffs with regards to the productions by
8  Google in the -- already, productions that speak to the
9  frequency of false accepts.
10          But before I go there, I remember I had a follow-up
11  question for Ms. Bali, which was:
12          Ms. Bali, you referred to documents that indicate
13  frequency of false accepts.  What has Google -- what, if
14  anything, has Google produced that indicates the passing of
15  those audio files to human reviewers?
16          Oops.  You're on mute.  You're on mute, Ms. Bali.
17          **MS. BALI:** Thank you.
18          My understanding is that Google has produced numerous
19  documents in connection with its speech data ops team, which
20  oversees sort of the human review program.  I'd have to go back
21  and look if any of that -- those records include specific
22  numbers about the rates of queries that go to human reviewers.
23          There are certainly -- like, Google has published blog
24  posts that disclose the rate of Assistant queries that get sent
25  to human reviewers.  And I think it's something in the range

1  of, like, .2 percent or something -- something in that range.
2  But that does not -- that is not specific to false accepts.
3  That's overall Assistant queries.
4      And so I -- I would have to refresh my recollection if
5  there's anything in our current production that speaks to the
6  rate of false accepts that go to human reviewers.
7      **THE COURT:**  Okay.
8      Okay.  Ms. MacLean, back to you now.
9      **MS. MacLEAN:**  Sure.
10     So I guess I'll start with that point.  Yeah, to our
11 knowledge, there isn't anything on -- certainly on the rates of
12 false accepts sent to human reviewers or, to that matter, much
13 more generally, anything sufficiently comprehensive to cover
14 the whole class period as far as either false accepts or audio
15 being sent to human reviewers.
16     For instance, Ms. Bali had referenced certain documents
17 relating to work streams put in place to reduce false accepts.
18 That's something that's very recent.  It happened, I think --
19 I believe as late at 2020, 2021.  But we have a class period
20 stretching much further back from that.
21     And that, again, was one of the things that --
22     **THE COURT:**  Remind me the class period.
23     **MS. MacLEAN:**  2016 onward.
24     **THE COURT:**  That's right.
25     **MS. MacLEAN:**  And that was, again, one of the reasons that

1  we ended up with the sampling, is that even if we have certain
2  statistics from Google, documents that they might have
3  reflecting rates at a certain location, at a certain point in
4  time, it was not sufficiently comprehensive to actually cover
5  the class.
6     But then another point that I wanted to make was regarding
7  users versus purchasers.  And, again, the purchaser class has
8  damages.  A person can be a member of a purchaser class whether
9  or not that individual user had a false accept.  Again, as the
10 District Court put it during oral argument, it's a quality
11 issue.  Whether or not the individual had a false accept, they
12 purchased an item that had the propensity to have false accepts
13 and to have audio sent to human reviewers, and they paid a
14 price premium at the point of sale, again, before even opening
15 up their device.
16    So it's really not relevant whether someone did or didn't
17 purchase as far as knowing how many -- or did or didn't have a
18 false accept as far as knowing whether they're a class member.
19    And this data isn't really aimed at identifying class
20 members.  Again, it's identi- -- aimed at identifying the
21 rates, as we said before.
22    **THE COURT:**  Okay.
23    All right.  Ms. Bali, anything further?
24    **MS. BALI:**  No.  I'll just say that, you know, I -- I
25 disagree with counsel's representation about the time period.

1  Certainly, the non-rejected misactivation project happened
2  later, over the course of discovery, and was produced promptly
3  after -- you know, in a supplement production promptly after
4  those documents came into existence.
5      But there are documents that far predate that and are from
6  much earlier points in the class period that speak to the rates
7  of false accepts.  That's just one category of documents.
8      And I think one of our earlier letter briefs sort of walks
9  through all of the types of documents that we have produced
10 that speak to this issue.  And I don't have the docket cite in
11 front of me, but I can certainly pull it up if that would be
12 helpful for the Court.
13     **THE COURT:**  Well, I think what I want is further input
14 from both sides.
15     As I understand it, plaintiff -- plaintiffs' position is
16 that the sampling plan should stay in place as is for the
17 reasons articulated here on the record.  And as I'm
18 understanding, Google's position is there should be no sampling
19 plan.  So we're at these -- we're at the two extremes.
20     I will tell both sides, as I did at the outset, the
21 proportionality analysis has shifted dramatically; and there
22 will be a change to the sampling plan, if it stays in place at
23 all.
24     If it does stay in place, it will have to -- it will be --
25 it will be restructured to bring it into proportion to the

1  remaining needs of the case.
2      I don't know what that is.  I don't know what that looks
3  like.  I don't know if there's a plan at all.
4      I would like to hear further from both sides; in
5  particular from Google as to what has been produced
6  specifically.  You know, here are -- here's a Bates range, and
7  this goes to both the false accept quantification -- estimation
8  quantification issue -- and I know this has been addressed
9  before, but now we're in a different light.  I want to know
10 what has been produced that speaks to the frequency or
11 likelihood, quantity or estimation, as I refer to it, of false
12 accepts and what speaks to, you know, recordings being passed
13 to human reviewers.  And, you know, maybe that overlaps.  I
14 mean, I leave it to Google to explain what it has produced and
15 why that is sufficient.
16     So I think it needs to be -- you know, the production
17 needs to be organized by:  Here are all the responsive
18 categories.  Those can be described in an index on a chart.
19 And then, you know, you can have five pages to tell me why
20 that's good enough in terms of either sampling is not required
21 or to propose a modification to a sampling plan.
22     If there are gaps in terms of false accepts or passing to
23 human reviewers, either substantively or temporally, what
24 does -- what does Google propose, if anything?  Again, maybe
25 Google's position is absolutely -- absolutely not.  So I want

1  to -- I want to hear that.
2      And then I'll hear from plaintiffs, similarly -- or, well,
3  in response to that, as to why what Google has proposed is not
4  sufficient, along with what plaintiff is proposing.
5      You have your experts.  You've got good input.  What --
6  given what Google has said and demonstrated is -- has been
7  produced, what sampling would you -- I know everybody wants
8  sampling, but I'm not sure it's warranted in this case.  So it
9  would have to be a substantially modified proposal, and I'm --
10 and it would have to be justified, in the first instance.  So
11 that's -- that's what I'm looking for.
12     And I'm trying to think what attachments from the -- I
13 really don't want more than five pages of briefing from either
14 side.  I want to be sure everybody has an opportunity to make
15 their points.
16     And on the plaintiff side, if your rebuttal to what
17 they've produced -- you know, you can take their chart and do a
18 "Why This Isn't Sufficient" column, that would probably be --
19 that would be a good way to organize it.  And then you can have
20 your five pages of argument.  Okay?
21     So let's talk about timing.  Again, this is an old
22 conversation.  There may be some old work that can be
23 resurrected, but it does have a fresh look to it.
24     So let me grab my calendar.  Excuse me.
25     So where are we?  Can we do it in 10 days and 10 days or

```
 1  14 days and 14 days?
 2       MS. BALI:  I'd request 14, if that's okay with the Court.
 3       THE COURT:  It is.
 4       What do you have coming up next with Judge Freeman,
 5  what --
 6       MS. BALI:  We've got --
 7       THE COURT:  -- deadlines?
 8       MS. BALI:  Plaintiffs are due to file a proposed notice
 9  plan, and we've been meeting and conferring about that.  That's
10  due on the 3rd of February.
11       THE COURT:  Okay.
12       MS. BALI:  And we are separately anticipating bringing a
13  motion to compel arbitration with respect to a big portion of
14  the certified purchaser class because there are arbitration
15  agreements that apply to their claims.
16       THE COURT:  Okay.  But those are the deadlines on the
17  horizon?
18       MS. BALI:  Yeah.  And then there's a -- end of --
19  April 27th, I believe, is the date for hearing on motions for
20  summary judgment.  So that's the next (inaudible).
21       THE COURT:  So those are coming up.
22       So we want to get this taken care of so we're either
23  underway or not.
24       Ms. MacLean, timing on your end?  Can we do two weeks and
25  two weeks?
```

1    **MS. MacLEAN:** That's fine for us, Your Honor.

2    **THE COURT:** Okay. Then I'll take further briefing from Google in accordance with as I've outlined here today. My goodness. Time flies. That'll be due on February 7 and then a response -- plaintiffs' response on the 21st.

I expect I'll be able to look at that information and make a decision on the papers. And if I think I want you in here, I'll call you in on fairly short order. But we'll do it remotely like this, and we'll get it in place. Okay?

**MS. BALI:** Thank you very much, Your Honor.

**MS. MacLEAN:** Thank you, Your Honor.

**THE COURT:** Okay. Other questions or concerns, Ms. MacLean, for today?

**MS. MacLEAN:** No, Your Honor.

**THE COURT:** Okay. Ms. Bali?

**MS. BALI:** Nothing further. Thank you.

**THE COURT:** All right. I'll look forward to those submissions, and we'll get this taken care of.

Thank you very much.

**MS. BALI:** Thank you.

**MS. MacLEAN:** Thank you, Your Honor.

**THE COURT:** We are adjourned.

(Proceedings adjourned at 11:31 a.m.)

---o0o---

## CERTIFICATE OF TRANSCRIBER

I, ANA DUB, CSR NO. 7445, RDR, RMR, CRR, CCRR, CRG, CCG, certify that the foregoing is a true and correct transcript, to the best of my ability, of the above pages of the official electronic sound recording provided to me by the U.S. District Court, Northern District of California, of the proceedings taken on the date and time previously stated in the above matter.

I further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which this hearing was taken; and, further, that I am not financially nor otherwise interested in the outcome of the action.

DATE:  Thursday, January 26, 2023

*Ana Dub*

_____

Ana Dub, Transcriber