Vincent Briganti (*pro hac vice*)
Christian Levis (*pro hac vice*)
Margaret MacLean (*pro hac vice*)
Andrea Farah (*pro hac vice*)
**LOWEY DANNENBERG, P.C.**
44 South Broadway, Suite 1100
White Plains, NY 10601
Telephone: (914) 997-0500
Facsimile: (914) 997-0035
vbriganti@lowey.com
clevis@lowey.com
mmaclean@lowey.com
afarah@lowey.com

*Counsel for Plaintiffs*
[Additional counsel on signature page.]

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN JOSE DIVISION

| | |
|---|---|
| IN RE GOOGLE ASSISTANT PRIVACY LITIGATION | Master Docket No.: 19-cv-04286-BLF |
| This Document Relates to: | **PLAINTIFFS' BRIEF ADDRESSING DATA SAMPLING PLAN** |
| ALL ACTIONS | |
| | Mag. Judge: Hon. Susan van Keulen |

## I. INTRODUCTION

The original purpose of the data sampling this Court ordered was to determine the rate and frequency with which Google recorded users' communications without consent and subsequently shared those communications with third parties. The District Court has now certified a class of purchasers of Google-made devices who assert that their devices did not perform in accordance with Google's representations that it would *not* record without consent or disseminate user information to third parties. Data sampling of Google's speech logs goes straight to the heart of that claim. And given the massive size of this case, involving tens of millions of purchasers (at a minimum), data sampling is entirely appropriate and proportional.

In accordance with the Court's order, Plaintiffs reviewed the list of documents that Google contends provide adequate information about the rate and frequency of False Accepts throughout the Class Period and arranged a meet and confer. At that meet and confer, Google's counsel candidly acknowledged that the documents Google cited do not provide a comprehensive view of the rate and frequency of False Accepts over time throughout the Class Period or across different device types or language settings. On top of that, Google's counsel indicated that the documents from earlier in the Class Period might not even be *accurate*, as they date from a time period when Google was less concerned about tracking False Accepts. Plaintiffs' counsel asked if Google would agree not to challenge the accuracy of the False Accept rates presented in the documents it identified if Plaintiffs agreed to rely on them as an alternative to data sampling. The answer was no. In other words: Google wants Plaintiffs to use an admittedly incomplete and unreliable set of documents to prove one of the core contentions in their case, and then intends to argue that Plaintiffs have failed to prove their case because the evidence is incomplete and unreliable. "Unfair" does not begin to describe Google's position. This Court should simply order the same data sampling plan that it already expended great effort to develop, with a few minor tweaks to target it more precisely to the Purchaser Class.

## II. PROCEDURAL BACKGROUND ON DATA SAMPLING

Plaintiffs served multiple discovery requests on Google, including RFP Nos. 7, 10, 16, and 13 (set 2) and Rog Nos. 4, 8, 11, 16, 17 and 18 aimed at identifying instances in which class members

1

PLAINTIFFS' BRIEF ADDRESSING
DATA SAMPLING PLAN                                                                              Case No. 5:19-cv-04286-BLF

were recorded, and/or their recordings used by Google and/or shared with human reviewers, without their consent. Google objected to these requests on burden and cost grounds. The Parties ultimately ended up negotiating—and extensively litigating—a proposal for data sampling that would get Plaintiffs the needed information without Google having to produce the entirety of its speech logs for the Class Period.

On September 15, 2022, the Court held an over hour-long hearing on sampling. In its subsequent order (ECF No. 278) ("First Sampling Order"), the Court wrote:

> The Court takes Google at its word that [sampling] . . . presents a complex problem. ***Complexity by itself, however, does not necessarily outweigh the need for production of responsive data.*** The argument that there is not a readily accessible "perfect" data set that inarguably identifies False Accepts that were transferred to human reviewers is unavailing. Plaintiffs are entitled to responsive data. ***The admissibility, weight, and what conclusions the evidence at issue here does or does not support are arguments for the trial court.*** Nor are concerns of privacy implications necessarily a bar to production.

*Id.* at 3-4. With that said, the Court requested that the Parties submit supplemental briefing, proposing specific sampling plans in conformity with the Court's instructions, which the Parties completed on October 19, 2022. *See* ECF Nos. 322 and 323. The Court addressed the Parties' sampling proposals during a two-hour-long oral argument held the next day, October 20, 2022. At that time, the Court heard from the Parties' statistical experts[1] on the statistical validity of the competing sampling plans. *See generally,* Hr'g Tr. dated October 20, 2022 (discovery hearing). Ignoring the Court's previous findings, once again, Google argued that any sampling was disproportionate (*id.* at 8, 9), not relevant to the case (*id.* at 24), burdensome (*id.* at 21), and improper (*id.* at 10). And once again, the Court found that "Google is going to have to turn over more data than it [ ] wants to." *Id.* at 6:23-7:1. On that same day, the Court issued its Order ("Second Sampling Order"), giving the Parties detailed instructions on how sampling would take place. *See* ECF No. 331 (mandating that Google samples 25 quarters, equal to 200 days of queries; extracts 0.5% of those queries; and anonymizes the data; and provide the full

---

[1] On Plaintiffs' side, in attendance was Dr. MaryBeth Landrum, Ph.D., a professor of biostatistics at Harvard University. On behalf of Google attended Dr. Jonathan Borck, Ph. D., a professor of public policy at Harvard University and Dr. Francoise Beaufays, a research scientist at Google.

queries to Plaintiffs by December 16, 2022).

Most recently, in the context of the Parties' Joint Brief Regarding Discovery Dispute (ECF No. 431) relating to sampling, instead of answering the Court's question regarding "if [sampling] should be adjusted," (ECF No. 434 at 4:19-23) Google—for the third time—rehashed its burden and proportionality arguments, this time, seeking to avoid its discovery obligations on the grounds of a purported waiver resulting from the Parties' efforts to resolve the case via private mediation and Google's unsuccessful arbitration motion (ECF No. 397). After rejecting Google's waiver argument, the Court instructed Google to submit a brief identifying documents that it has produced in this litigation showing the False Accept rate and metrics related to its human review. ECF No. 431 at 1. The result was the list of documents (ECF No. 438-1) that Google's counsel has subsequently admitted during the Parties' meet and confer are inadequate (MacLean Decl., ¶3) and a brief of tired proportionality arguments.

## III.    ARGUMENT

### A. Sampling Remains Highly Relevant in Light of the Court Certifying Purchaser Class

Judge Freeman certified a Purchaser Class that alleges that Google breached its contract with members by recording users' private conversations when they were not using their device; disclosing such conversations to third parties without their consent; and using such conversations for its own internal purposes, including testing and training of its technology for its own commercial benefit without Plaintiffs' knowledge or consent. 4AC ¶ 244. The Purchaser Class brings claims for (1) breach of contract and (2) violation of the "unlawful" prong of the California Unfair Competition Law, Cal. Bus. & Prof. Code §17200, predicated on Google's breach of contract and violation of Cal. Bus. & Prof. Code §22576. The Purchaser Class comprises "[a]ll Users who purchased a Google-Made Device" (ECF No. 222-1 at 1)—individuals who purchased at least one device manufactured by Google that comes with Google Assistant pre-installed and whose Gmail account is associated with such device.[2] *Id.*

---

[2]    The Purchaser Class is intended to include all devices that Google manufactured and sold. The

The Court also certified a specific common question for the Purchaser Class: "Whether Google breached [its] promises by surreptitiously recording users' audio and then subsequently sharing such audio with third parties." ECF No. 414 at 32. It noted that the answer to this question "will be shown by analysis of Google's voice records and Speech logs." *Id.* at 21; *see also* Hr'g Tr. dated Jan. 24, 2023 at 4:18-22 (noting that this question is "pertinent" in terms of the sampling plan). The sampling data will permit just that: an analysis of Google's voice records and speech logs to show whether and to what extent Google "surreptitiously record[ed] users' audio," and whether and to what extent Google "shar[ed] such audio with third parties," as reflected in the speech logs, indicating the content of users' communications, whether audio was sent for human review, and whether such audio was used by Google for its own testing and training purposes. *See, e.g.*, GOOG-ASST-03026660.

Google's argument that the Sampling Plan will sweep in users who are not members of the Purchaser Class, and that the data sampled will not show whether any given user is in fact a class member (Br. at 4) is a red herring. The point of the Sampling Plan is to show whether the devices Google made and sold performed as promised. These are mass-produced devices all using the same Google Assistant software. If the data shows, for example, a False Accept rate of 30% for 2016 Google Pixel phones, Plaintiffs will be able to show that a user who purchased a 2016 Google Pixel phone overpaid for that device because it did not perform as promised. The only adjustment to the Sampling Plan that is needed to tailor it to the class certification decision is to limit the devices sampled to only those made by Google (as opposed to devices made by third parties).

**B. Sampling Is Proportional to the Needs of the Case in Light of the Court's Certifying Purchaser Class and No Existing Discovery Substitutes It**

By Plaintiffs' estimate, the Purchaser Class consists of over a hundred million individuals.

---

"sale" need not be directly to the consumer (i.e., class member). Rather, a device would fall under the definition of the Purchaser Class even if such device was sold by a third party, and not by Google directly. Google intentionally reads the requirement that a device be sold directly by Google to the user, in order to introduce yet another purported obstacle in complying with the Sampling Plan. *See* Brief Addressing Sampling in Response to Court Order (ECF No. 438) ("Br.") at 7. Since each device is associated with a unique identifier (i.e., the GAIA ID), each device can be specifically linked to a single user, the identity of who is part of Google's data collection. *See* GOOG-ASST-03026660 (Column "A" containing the GAIA ID) which is linked to Plaintiff Kumandan. *See* GOOG-ASST-03026751 (linking the GAIA ID to Plaintiff Kumandan).

4

Even by Google's most conservative and underinclusive estimates, it certainly includes at least tens of millions of individuals. It is only by comparison to the even larger scope of the case prior to the class certification decision that this case could ever look anything but gargantuan. Further, Google's claims of burden are undermined by Google's own representation in November 2022 that it was ready to extract data pursuant to the Sampling Plan. Google submitted a status report in December 2022 stating that it had fully developed the necessary code to extract the data sample. *See* ECF No. 352 (Google's status report detailing its compliance with the Sampling Plan). There is little if any further burden for Google to incur in simply pressing the button to execute the code it has written.

As Google's counsel frankly admitted during the meet and confer, the documents it has previously produced are not an adequate substitute for sampling. MacLean Decl. ¶3. Indeed, Google readily admitted that Google "[does] not have a way to accurately calculate False Accepts," "cannot tell [] if every number [in the exhibit list] is accurate," and that "[the exhibit list] is the best Google has [on that.]" *Id.* As set forth in the attached Plaintiffs' Responses to Google's Exhibit Chart, the identified documents represent an incomplete set of False Accept calculations and estimates from random points in time during the Class Period across an anecdotal set of device types and operating software. In fact, **not one** of the 99 documents Google identified as purportedly providing aggregate False Accept statistics, allow Plaintiffs to calculate the rate, frequency, and number of False Accepts during the Class Period, nor are they sufficient to determine the volume of user audio that was shared with third parties for grading and annotation purposes and which Google exploited to improve its own technology. *See* Plaintiffs' Responses to Google's Exhibit Chart, filed simultaneously with this filing. Google knows that what it produced in discovery does not adequately substitute sampling. In its filing, Google admits it does not have documents that "sufficient[ly] identify, on an aggregate basis, all instances in which Google Assistant activated into a listening mode without the utterance of a hotword or manual activation [and therefore] Google cannot produce documents responsive to this request." *See* ECF No. 240, Ex.1. As described above, Google was even more direct about this reality in its meet and confer with counsel. MacLean Decl., ¶3.

PLAINTIFFS' BRIEF ADDRESSING
DATA SAMPLING PLAN                                                                 Case No. 5:19-cv-04286-BLF

### C. The Sampling Plan May Be Narrowly Modified to Exclude Button Press Activation

Without providing any rationale or justification, Google argues that the sampling protocol should be modified to conform to that adopted in another case, *Lopez v. Apple, Inc*. No. 4:19-cv-04577-JSW (N.D. Cal.) (*"Apple"*), which concerned a different device and a different defendant that followed entirely different data collection and storage practices. In so arguing, Google misunderstands the sampling protocol adopted in *Apple* and ignores glaring differences between the two cases. The sampling that Apple produced was not limited to just 500,000 utterances, as Google mistakenly argues (Br. at 7). Rather, Apple produced *millions* of utterances. *Apple*, ECF No. 300 at 9 (redacted). Additionally, the sampling protocol adopted in *Apple*—which was proposed by Apple itself—reflected and took into account how Apple collected and retained user data as well as the number of Siri queries that arrive to Apple servers on a daily basis. None of those factors apply to Google.

Google suggests three ways in which the sampling proposal may be modified. Two are acceptable to Plaintiffs.

**Limiting by Hotword Initiated Queries**: Google proposes that the scope of the sampling data should be narrowed such that "any sample *can and should be* limited to only hotword-initiated" queries as opposed to queries initiated by a button press. Google Br. at 7-8. This filtering of the sampled data is acceptable to Plaintiffs and will likely yield a more targeted data sample. Plaintiffs clarify that this limitation does not include filtering for queries that Google recognizes as containing a valid "Hey Google" hotword, and only limits queries that are triggered by voice as a method of invocation.

**Google-Made Devices:** The Purchaser Class includes individuals who purchased Google Assistant Enabled Devices, defined as devices manufactured and sold by Google. ECF No. 222-1 at 1. Google's proposal to limit the sampled data to only devices that Google manufactured (Br. at 7) is consistent with the definition of Purchaser Class and is acceptable to Plaintiffs. Plaintiffs add however, that such limitation is intended to filter for devices that Google manufactured, regardless of whether such device was sold by Google or a third party.

**Redacting the Query's Content:** Google's request to redact the content of the query should be rejected. Google admittedly has not identified any method through which the speech logs can be

filtered. As stated by Google's software engineer, Mr. Terry Tai, in his declaration in opposition to the class certification motion (ECF No. 270-92), filtering specifically for "Hey Google" would not provide a reliable method of searching for False Accept. This was already considered by this Court in its Second Sampling Order ("Because Google has not identified a way to automatically parse the preamble from other portions of a query, and because Plaintiffs dispute whether the preamble alone is adequate to determine a "false accept," Google must turn over the entirety of each sampled query as reflected in the speech logs."), when it ordered Google to produce the entire query, as that is the only way to accurately determine if a command was indeed directed at the Assistant or not.

Nor is Google's purported concerns over privacy of user's information a credible excuse. Google violated users' privacy for many years by recording and sharing their recordings without consent. Plaintiffs are now seeking this information to obtain redress for those very harms. Additionally, Google's own Privacy Policies explicitly provides that Google may share users' personal information "for legal reasons" including "meet[ing] any applicable…legal process." ECF No. 56-1 at 31. Google's disclosure of the contents of users' queries pursuant to the Sampling Order would squarely fall within this category and thus does not violate any law. *See also*, ECF No. 278 at 4 (Court noting "concerns of privacy implications [are not] necessarily a bar to production.").

## IV.   CONCLUSION

For the foregoing reasons, Plaintiffs respectfully ask that the Court orders Google to proceed with the Sampling Plan with the modifications set forth herein.

Dated: September 26, 2024

/s/ *Margaret MacLean*
Vincent Briganti (*pro hac vice*)
Christian Levis (*pro hac vice*)
Margaret MacLean (*pro hac vice*)
Andrea Farah (*pro hac vice*)
**LOWEY DANNENBERG, P.C.**
44 South Broadway, Suite 1100
White Plains, NY 10601
Telephone: (914) 997-0500
vbriganti@lowey.com
clevis@lowey.com
mmaclean@lowey.com

7

afarah@lowey.com

Joseph P. Guglielmo (*pro hac vice*)
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169-1820
Telephone: (212) 223-6444
jguglielmo@scott-scott.com

Erin Green Comite (*pro hac vice*)
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
156 South Main Street
P.O. Box 192
Colchester, CT 06415
Telephone: (860) 537-5537
ecomite@scott-scott.com

John T. Jasnoch (Bar No. 281605)
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
600 W. Broadway, Suite 3300
San Diego, CA 92101
Telephone: (619) 233-4565
jjasnoch@scott-scott.com

Mark N. Todzo (Bar No. 168389)
Eric S. Somers (Bar No. 139050)
**LEXINGTON LAW GROUP**
503 Divisadero Street
San Francisco, CA 94117
Telephone: (415) 913-7800
mtodzo@lexlawgroup.com

*Attorneys for Plaintiffs*

PLAINTIFFS' BRIEF ADDRESSING
DATA SAMPLING PLAN                                   Case No. 5:19-cv-04286-BLF