1            UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3    Before The Honorable Susan van Keulen, Magistrate Judge

4

5   IN RE: GOOGLE ASSISTANT        )
     PRIVACY LITIGATION,           )
6                                  )
                 Defendant.        )   No. C 19-04286-BLF
7    _____)

8
                                   San Jose, California
9                                  Thursday, October 3, 2024

10

     TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND
11         RECORDING 1:32 - 2:38 = 1 HOUR, 6 MINUTES

12   APPEARANCES:

13   For Plaintiffs:
                               Lowey Dannenberg, P.C.
14                             44 South Broadway
                               Suite 1100
15                             White Plains, New York 10601
                          BY:  ANDREA FARAH, ESQ.
16                             RADHIKA GUPTA, ESQ.

17                             Lowey Dannenberg, P.C.
                               44 South Broadway
18                             Suite 1100
                               White Plains, New York 10601
19                        BY:  ALESANDRA GRECO, ESQ.

20   For Defendants:
                               Perkins Coie LLP
21                             505 Howard Street
                               Suite 1000
22                             San Francisco, California
                                94105
23                        BY:  SUNITA BALI, ESQ.

24
                 (APPEARANCES CONTINUED ON NEXT PAGE)
25

2

1  For Defendants:

2                              Perkins Coie LLP
                               1201 Third Avenue
3                              Suite 4900
                               Seattle, Washington 98101
4                         BY:  ERIN K. EARL, ESQ.

5  Transcribed by:            Echo Reporting, Inc.
                              Contracted Court Reporter/
6                             Transcriber
                              echoreporting@yahoo.com
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1  <u>Thursday, October 3, 2024</u>                                    <u>1:32 p.m.</u>

2                      P-R-O-C-E-E-D-I-N-G-S

3                            --oOo--

4            THE CLERK:  Calling case 19-cv-4286, In re Google

5   Assistant Privacy Litigation.

6       Counsel, please identify yourselves for the record,

7   beginning with Plaintiff.

8            MS. FARAH (via Zoom):  Good afternoon.  This is

9   Andrea Farah from Lowey Dannenberg on behalf of Plaintiffs,

10  and I also see Radhika Gupta and Alesandra Greco, also from

11  Lowey Dannenberg, my colleagues.

12           THE COURT:  Thank you, Ms. Farah.  Welcome back.

13           MS. FARAH:  Thank you.

14           MS. BALI (via Zoom):  Good afternoon, your Honor.

15  This is Sunita Bali from Perkins Coie for Defendants Google

16  and Alphabet.  And also on the line is my colleague Erin

17  Earl, as well as our sampling expert, just in the event the

18  Court has questions for him.

19           THE COURT:  Thank you, Ms. Bali.  Welcome back as

20  well.

21           MS. BALI:  Thank you.

22           THE COURT:  All right.  And thank you to everyone

23  else who is appearing today.  But you have your videos off,

24  which I appreciate.  It just gives me -- helps the screen to

25  be a little bit more manageable.  Okay.

4

1          THE CLERK:  Your Honor --

2          THE COURT:  Yes.

3          THE CLERK:  -- excuse me.  I also have Mr. Levis.

4   I have a Christian as an attendee.  Does he need to be

5   promoted, or is he just staying as an attendee?

6          THE COURT:  Say the name again, Ms. Fanthorpe?

7          THE CLERK:  Christian Levis for Plaintiff.  I

8   didn't promote him.  I have an attendee -- Christian.  I

9   don't know if it's the same person.

10          MS. FARAH:  He is not appearing today.

11          THE CLERK:  Okay.

12          MS. FARAH:  Sorry, I didn't see him on the

13   panelist list.

14          THE CLERK:  Perfect.  Thank you.

15      Sorry, Judge, for the interruption.

16          THE COURT:  That's fine.  Thank you for

17   clarifying.

18      Okay.  We're on today to revisit the issue around a

19   sampling plan.  And I think we are all familiar with the

20   history of where we've been on this issue.  I certainly have

21   reacquainted myself with it.  And as we discussed some time

22   ago, I gave the parties an opportunity to -- for Google to

23   complete its production, for Plaintiff to review that, for

24   the parties to meet and confer further.

25      I have from Plaintiff a motion to either have no

5

1  sampling in light of the class certification order or a very

2  limited sampling plan both in quantity and in methodology.

3  And from Plaintiff, I have your response to that, which is

4  that the original sampling plan, with some modest

5  adjustments, is what should remain in place.

6      Let me share with you sort of how I see the landscape

7  and my -- where I've been and where I think we're headed,

8  and then I'll hear from the parties respectively.

9      First of all, we're having this discussion -- all of

10 this revisiting of the sampling plan arises out of the

11 motion for class certification and the class certification

12 order, which limited the class -- pardon me -- to the --

13 well, limited -- we have a cause of action for breach of

14 contract under the unfair competition law, and that --

15 that's the claim, and the purchaser class, which is defined

16 in various places, including the Plaintiffs' motion for

17 class certification, and that is the definition that was

18 adopted by Judge Freeman in her class cert order limiting

19 the class -- the purchaser class to certain users.  Let me

20 just get the -- I'm not going to read the whole definition,

21 but it has "users who purchased Google-made devices," and

22 then goes on to define Google-made devices as "Google

23 Assistant enabled devices manufactured and sold by Google,

24 including Google's own Smart Home Speakers, Google Home

25 Mini," et cetera, the product list continues.  And I'm just

6

1   reading that verbatim from the class cert order at docket

2   360, and that is the exact language taken verbatim from

3   Plaintiffs' motion to certify the class at docket 22-1.

4         So as I understand Plaintiffs' argument here to keep

5   the sampling plan in place or perhaps just with modest

6   modifications, it's Plaintiffs' position that the purchaser

7   class includes -- is limited to devices manufactured by

8   Google, but they don't have to be sold by Google to the

9   user.  They -- it's just devices sold by Google, even if

10  it's sold to the third party and then sold to the user.  I

11  find that to be a very strained reading of class definition.

12  I think the plain and ordinary meaning of the class

13  definition is that the devices have to be both manufactured

14  and sold by Google and that it's sold to the user, to the

15  class member.

16        And I did -- I went back through all the places where

17  the definition appears, and I am satisfied with proceeding

18  with that reading of definition that the class is limited to

19  devices that are manufactured and sold by Google to the

20  class member.  And I conferred with Judge Freeman.  You can

21  take a request for clarification to her, but I wanted to be

22  sure I was -- I hadn't missed anything in the class cert

23  process since that was not the argument in front of me.

24        So that's where I am starting, as we have a very

25  narrowed class from where we were when we set the initial

1  sampling plan quite some time ago, and that significant

2  narrowing has a lot -- has significant impact on, well,

3  relevance and proportionality as we have been discussing in

4  recent months around the sampling plan.

5      So with that in mind, a few key facts that I think were

6  proffered by Google in their papers, and I don't believe

7  they are disputed.  And, again, we're talking about, I mean,

8  the objective under the breach of contract claim.  We're

9  still looking at, "Well, what's the rate, frequency, and

10 total number of false accepts?"  That's what we're talking

11 about in this class with regards to devices manufactured and

12 sold by Google.  I understand from Google's representations

13 in its statement to me that it can sort the logs, the speech

14 logs, can limit them to Google-made devices, that that can

15 be done.  So that's part --

16          MS. FARAH:  Your Honor, I apologize.  I apologize.

17 May I please interject for a moment?

18          THE COURT:  Let me just finish because -- let me

19 finish with these facts.  Can limit it to Google-made

20 devices, but Google proffers that there is no indicator as

21 to whether or not the user purchased the device from Google.

22 The second leg of the definition, if you will.  And Google

23 went on -- goes on to explain that there are neither sales

24 records nor speech logs that tie back to a device serial

25 number or other identifier.

8

1      So I think that is the -- that's the -- a problem or

2  the crux of a problem, if you will, with sampling, is, how

3  do we actually take a meaningful sample in light of the

4  class definition?

5      Ms. Farah, briefly.

6          MS. FARAH:  Yes.  Yes, your Honor.

7          THE COURT:  But I'm not done, but go on.

8          MS. FARAH:  Yeah.  Understood.  Understood.  This

9  is something that the parties actually discussed, and I

10 don't think that Google disputes that the definition --

11         THE COURT:  I need you to speak up, Ms. Farah, I'm

12 sorry, I'm having a hard -- closer to the microphone.

13         MS. FARAH:  Yes, your Honor.  Our understanding is

14 that these are only devices that were manufactured by

15 Google, and this is not something that Google actually

16 disputes.  We have had conversations in the context of meet

17 and confer and via e-mail, and Google confirmed that we are

18 only talking about devices that are made -- manufactured by

19 Google, regardless whether they were sold by Google directly

20 or by third parties.  So this should not be an issue for

21 purposes of sampling.  This is not a dispute between the

22 parties.

23         THE COURT:  Ms. Bali?

24         MS. BALI:  We did meet and confer about that, and

25 it was our understanding that the class applied to, you

9

know, any devices made by Google.  But, you know, we're all
reading the same order and doing our best to understand, you
know, what we're -- you know, the scope of the class here.
So, you know, if your Honor has a particular reading and has
confirmed that reading with Judge Freeman, I certainly don't
want to question that.

THE COURT:  Well, I'm not trying to undo anything
here.  Again, I'm trying to figure out what makes sense in
terms of sampling, and it looks like that for sampling
purposes, the logs can be sorted with regards to Google-made
devices.  And I understood Google's position to be in the
papers that this -- the piece about the sale couldn't be,
and that was really driving the no sampling position.  Is
that right?

MS. BALI:  Yes, you're correct about that, your
Honor.  Our -- you know, as you accurately summarize, the
position that we took in our brief is that there is no way
to narrow the speech logs to only the purchaser class,
because there is no indication in the speech logs whether a
particular query is associated with a purchaser as defined
in the court's class certification order.  So there's just -
- based on the data that Google has, there is no way to
tailor a sampling plan to the certified class.  No matter
how we do it, we're going to sweep in people who are not
members of this class.

10

1          MS. FARAH:  Your Honor, I think there is a little
2  bit of a disconnect.  When Google argues that there is --
3          THE COURT:  Wait, hang on, Ms. Farah.
4      I didn't quite understand your last point, Ms. Bali.
5  You were just repeating what was in your brief.
6          MS. BALI:  Yes, every -- what is in our brief is
7  accurate, and your summary is accurate.  And the point I was
8  trying to make is that there is no way, based on Google's
9  records, to tailor a sampling plan to the certified class,
10 because the logs do not have any indication of whether it's
11 associated with someone who purchased a Google-made device.
12         THE COURT:  Okay.
13         MS. BALI:  We don't --
14         THE COURT:  No purchaser information regardless
15 who sold it is --
16         MS. BALI:  Correct.  And we can limit it to device
17 type, as you noted, but not -- we cannot limit it to
18 purchasers.
19         THE COURT:  Okay.  So has Google's position
20 changed with regards to its position in the brief with
21 regards to either no sampling or a limited sampling?
22         MS. BALI:  No, your Honor.
23         THE COURT:  Okay.  And the justification is
24 essentially the same as stated in your brief.
25         MS. BALI:  Correct.

1          THE COURT:  Notwithstanding the meet and confer

2   progress that you all have made?

3          MS. BALI:  Correct.

4          THE COURT:  Okay.  If you -- have you -- I take it

5   that the parties have not made -- come to any agreement on

6   some form or what a limited sampling plan would look like.

7          MS. BALI:  That's correct, your Honor.  What we

8   did is, you know, we met and conferred pursuant to your

9   Court's order about, you know, the chart submission that we

10  made and, you know, the document cited.  During that meet

11  and confer, I raised with Plaintiffs' counsel that if the

12  Court is inclined to consider sampling at all, it would

13  behoove the parties to discuss what a sampling plan might

14  look like.  Maybe we can narrow the issues in dispute, you

15  know, and, you know, come to the Court with a proposal.

16      So in that vein, we worked with our sampling expert to

17  put together a limited sampling plan and proposed that to

18  Plaintiffs last week.  We had a meet and confer.  They were

19  not in agreement with our proposal and essentially maintain

20  the position that they took in their briefing.

21      So, really, the negotiations have not changed either

22  party's position as summarized in our respective briefs.

23          THE COURT:  All right.  And maybe I can help you

24  all with that here today.

25      Ms. Farah, did you have anything to elucidate, just on

1  these points?  Because I really want to get to the heart of

2  the matter, which is the need --

3          MS. FARAH:  Yes.  Absolutely.

4          THE COURT:  -- you know, what we do, if anything,

5  in terms of sampling.

6          MS. FARAH:  Absolutely, your Honor.  So I just

7  want to clarify that when Google is arguing in its brief and

8  today that there is no way to associate purchasers with

9  the --

10         THE COURT:  Ms. Farah, please speak into the

11  microphone.  I'm sorry, I'm just -- you're either a little

12  far from the microphone --

13         MS. FARAH:  Your Honor, I think there is a little

14  bit of a disconnect in terms of what the briefing says, what

15  we're discussing.  The issue Google had with associating

16  purchasers with devices was never about whether the device

17  is sold by Google --

18         THE COURT:  I understand.

19         MS. FARAH:  -- directly or by a third party.  It

20  was a matter of, "Hey, is it possible that the device

21  overheard a conversation of someone who didn't purchase it,

22  a passerby or a guest in the house?" whatever the issue may

23  be.  But it was never about the sold devices by Google

24  directly.

25         THE COURT:  Okay.

1          MS. FARAH:  And we have -- in our definition of

2     the purchaser class, we do have a mechanism embedded in it

3     that ensures that only individuals who purchased the device

4     are the ones who are actually using it.  And that is the

5     definition of user.  It is someone who has a device

6     associated with their Gmail account.  So I am not concerned

7     that there is a meaningful -- there might be a de minimis

8     number, but there is no meaningful number of individuals who

9     will be -- who would be encompassed within the sample that

10    are not -- that would not be, you know, within the

11    definition of the purchaser class.  Google knows exactly

12    which devices are Google manufactured, and they also know if

13    that person has a Gmail account created with Google.  There

14    is no concern over overinclusiveness of the sample to a

15    point where --

16          THE COURT:  I understand.  I understand.  I --

17          MS. FARAH:  And then --

18          THE COURT:  -- understood that distinction about,

19    you know, who is the device responding to is the purchaser.

20          MS. FARAH:  Yes.  And then it is not a matter of

21    who sold it to the consumer, okay?

22       In terms of the sampling plan, yes, Google did propose

23    a sampling plan to us after we met and conferred.  It is the

24    same sampling plan that we have seen two years ago, which we

25    have rejected because the number of queries they proposed

14

1  was entirely too low.  Our experts could not confirm that

2  with that sample size, we would see all strata within the

3  sample.  We would not see all the languages, all the device

4  types across the different variables.

5          THE COURT:  Okay.  All right.  Well, we're going

6  to get to the sampling plan in just a moment, so --

7      Okay.  Anything further?

8          MS. FARAH:  The two concessions that we could make

9  -- the two adjustments that we agreed to, based on the meet

10 and confer and our discussion, were the ones that are

11 included in the briefing, and that is the Google-made

12 devices and the hot word initiated.  Everything else --

13 nothing else is new in terms of -- in terms of sampling.

14         THE COURT:  Yeah.  No, I gleaned that from the

15 papers.

16     Okay.  So continuing on with -- from my review of the

17 parties' positions and your submissions, unfortunately, it's

18 not a case -- does not appear to be a case where -- that

19 documents produced to date by Google are particularly

20 helpful or useful in terms of creating some sort of

21 quantification -- defensible quantification on the false

22 accepts.

23     Now, you know, there's a lot of material there, and

24 there were a lot of documents, and the arguments supporting

25 those and the arguments against those get pretty repetitive

15

1  pretty quickly, and I understand that.  But that brings me
2  to -- I think that sampling is still appropriate, but it
3  will need to be a substantially narrowed sampling approach,
4  because the class is more defined, more narrowly defined,
5  substantially more narrowly defined, and that affects --
6  it's not only a quantification, but, of course, from my
7  perspective, it affects the proportionality analysis as
8  well.  And that is, of course, weighing the burdens and
9  complications, not only to Google, but we have in this case
10 always these embedded privacy concerns, and capturing non-
11 class members -- pardon me, capturing people outside the
12 class, but having all of the, you know, query transcribed,
13 which is sort of where we were in the original plan, now
14 that proportionality and that balancing on both privacy
15 rights and burden has shifted because the class is more
16 narrowly defined under either of your perspectives.
17      So I didn't find the general reference to the Apple
18 approach particularly helpful.  Obviously, we don't have any
19 context for that.
20      Ms. Bali, why don't you just describe at a high level
21 the plan that you proposed to Plaintiff, and I'm
22 particularly interested -- I heard Ms. Farah's concern about
23 the sampling size being too small to really capture, you
24 know, the diverse data that we need, the time period, and
25 the devices, and so forth.  So why don't we start there?

1           MS. BALI:  Happy to, your Honor.

2      So what we proposed is similar in structure to the

3  sampling order, but scaled down significantly.  So it would

4  result in a total sample size of 12,500 queries.  Those are

5  collected by taking a 500 query sample for each day in a

6  quarter, you know, over the course of the entire class

7  period, which, you know, taking all quarters would lead to a

8  total sample size of 12,500.  And that would -- that is

9  essentially what the sample would look like.

10      The one point that I think is really important here is,

11  you know, Ms. Farah keeps making a point of, you know,

12  wanting -- needing to capture all strata, all languages, all

13  device types.  For starters, I'm not sure why that's

14  relevant.  And second, this sampling plan was never designed

15  to capture each and every scenario based on device type and

16  language.  There are nearly 40 different types of devices at

17  issue here.  There are nearly 50 different language options.

18  And there is never going to be a world in which, you know, a

19  sampling plan like this that is not, you know, much more

20  complicated, much more, you know -- crafted with much more

21  detail with respect to each of those variations, there's

22  never going to be a world in which a sampling plan is going

23  to capture each of those variations.  And the way that you

24  control for that is not by expanding the sample size to tens

25  of millions of queries because you still don't know whether

17

1  you're capturing each of those scenarios.

2      So this is not a scenario where simply expanding the

3  sample size is going to control for that.  And, you know,

4  I'm no sampling expert.  Our expert, Doctor Burke

5  (phonetic), is on the call, and he -- we consulted with him

6  in crafting the proposal that we made and -- including

7  coming up with the, you know, 12,500 number.  And he can

8  speak to that if the Court has any questions about that.

9          THE COURT:  So other than -- what -- so there's a

10 sample size at 12,500.  You explained how that was arrived

11 at.  And then what?  What about methodology?

12          MS. BALI:  Yes.  And then our proposal -- I think

13 the initial sampling order required both that Google

14 disclose the sampled queries to the Plaintiffs, as well as

15 conduct an analysis to quantify the metrics that we're

16 looking for here, which is the number of instances in which

17 there is no hot word present in the transcript and the

18 number of instances -- excuse me, the number of instances in

19 which those were disclosed to human reviewers.

20     What we proposed in our sampling proposal to Plaintiffs

21 is that Google perform that analysis and provide those

22 metrics, but that Google does not disclose the underlying

23 query content, both due to privacy concerns, with respect to

24 Assistant users who may very well not be members of the

25 class, and, you know, to ensure that there's no issues under

1    the Stored Communications Act or Wiretap Act.  I mean,

2    Plaintiff spent years suing Google for allegedly disclosing,

3    you know, the content of queries as, you know, and arguing

4    that such conduct violated the Stored Communications Act and

5    the Wiretap Act, but now they want us to disclose it here.

6    And it seems that there are ways to accomplish the sampling

7    objective without such broad disclosure of communications

8    content, which, you know, does not fall with any exception

9    under the Stored Communications Act.

10           THE COURT:  So what would be disclosed?  Not the -

11   - so you take your sample -- you're looking for absence of

12   hot words, but it goes to a human reviewer.  Is that -- am

13   I --

14           MS. BALI:  Both.  Both.  Absence of hot word and

15   instances in which those go to human reviewers.  Correct.

16           THE COURT:  And then running that, what, just

17   those numbers and giving those numbers to Plaintiff?

18           MS. BALI:  Correct.  I mean, it's an objective

19   analysis.  It's not one that, you know, requires any

20   subjective determinations.  Either the top hypothesis field

21   has a hot word or it does not.  There's no, you know,

22   judgment call to be made.  So, you know, of course, we --

23   we've informed the Court and said in previous papers that,

24   you know, there are instances where you can listen to the

25   audio and the hot word -- you can hear the hot word even if

1  it's not, you know, apparent from the top hypothesis.  So

2  it's not a perfect analysis, and there may very well be

3  instances where, you know, a hot word does not appear, but

4  if you listen to the audio, it was spoken.  And I think we

5  would all agree that that does not constitute a false

6  accept.  We're not going to be able to control for that in

7  this exercise, you know, the --

8            THE COURT:  And vice versa, right --

9            MS. BALI:  Right.  Right.

10            THE COURT:  -- that it -- it's a hot word, but

11  it's not, which is what got us to the turn over the query

12  discussion in the initial stages of this process.

13            MS. BALI:  Right.  So -- I mean, it's not a

14  perfect exercise, you know, I think both sides can make

15  whatever arguments they want about what this sampling

16  exercise tells us about the issues in this case, but, you

17  know, I think the exercise, as we've laid it out, is an

18  objective exercise.  It's not one that requires subjective

19  determinations.

20            THE COURT:  Okay.  And what is the -- what was the

21  basis for the selection of 500?  I mean, it's -- I assume

22  that's just an arbitrary number.  And as a practical matter,

23  I would appreciate that Google would not want it to be too

24  big of a number because it's just easier to manage on your

25  end.  And, obviously, Plaintiff would want a much larger

1  number.

2          MS. BALI:  I mean, that's correct, your Honor, and

3  there's not -- you know, Doctor Burke can speak to this

4  probably better than I can, but there's not a whole lot of

5  magic to coming up with the number.  It really is, you know,

6  coming up with a sample that gets you within a reasonable

7  confidence interval and margin of error, and -- you know,

8  and coming up with a number that's sort of proportionate to

9  the needs of the case and that's manageable, given the time

10  that we have, you know, until dispositive motions and -- you

11  know, and gives us a number that we can work with.

12          THE COURT:  Okay.  But the number of queries per

13  quarter -- the number of queries per quarter are tens of

14  millions?

15          MS. BALI:  Oh, wow.  Probably.  Probably.  I don't

16  have a concrete estimate, but, yeah, there's a lot, that's

17  for sure.

18          THE COURT:  Yeah, I'm sure.

19      Okay.  So you touched on the issues that I had gleaned

20  from the papers, which was obviously sample size and sample

21  methodology.  The issue on methodology really seems to come

22  down to whether or not it's limited to the hot word -- not

23  limited just to hot word.  I think Plaintiff agreed to that,

24  the hot word queries, but whether the whole query should be

25  redacted or not, or, you know, how that -- how much

21

1  information Plaintiff should get back.  And I understand

2  that that is a point in contention.

3          MS. FARAH:  Yes.

4          THE COURT:  Ms. Farah, let me hear from you with

5  regards to sample size, please.

6          MS. FARAH:  Sure.  Sure.  Your Honor, can I just

7  make one preliminary point on the purchaser class?

8          THE COURT:  Yeah.  I just need you to --

9          MS. FARAH:  Yes.  Yes.

10         THE COURT:  -- speak up into the microphone.  I'm

11 sorry, but it just --

12         MS. FARAH:  Sure.  The purchaser class is -- was

13 always the broadest of the proposed classes.  It is a class

14 that spans across the entire class period and includes

15 individuals who purchased all types of devices.  The other

16 proposed classes and subclasses that were not certified were

17 either duplicated or were completely subsumed within the

18 purchaser class.  So I would dispute that the class has

19 become significantly narrower.  It has become clear, for

20 sure, and now we know -- now we have a clear understanding

21 of who is in and who is not.  But it is not necessarily a

22 narrower class such that the proportionality balance changes

23 significantly, okay?  Just to say that.  The sample, because

24 it is a sample and because the whole point of a sample is to

25 be able to draw meaningful conclusions from it, the whole

22

1  point was to always cover the different variables that are

2  the ones that determine the frequency and rate of false

3  accepts.  Tablets have different false accepts than do

4  smartphones, than does Google TV, than does the watch.

5  Certain languages have higher or lower rates of false

6  accepts.  That's why we have carved out the sample or

7  intended to grab a sample that covers all of those different

8  categories.  That's the whole point of sampling.  If I am --

9  if I am pulling 100,000 queries and I know that by

10 representation 99-percent of those are going to be a Google

11 smartphone in English, I am not getting an overall rate of

12 false accepts as it pertains to all device types and all

13 languages and other variables that are all represented in

14 the purchaser class.  So --

15         THE COURT:  Okay.  So let me just stop you right

16 there, Ms. Farah, because that's a question that I have as

17 well.

18     So, Ms. Bali, in selecting -- in your proposal, 500

19 samples -- how are those -- is it just random selection, or

20 is it from -- what -- how is -- where are those pulled from?

21 Or how is that -- where they're pulled from determined?

22         MS. BALI:  Random selection, because that's how

23 sampling works, random selection.  And even in the last

24 sampling order, there was no, you know, attempt to sort of,

25 you know, I -- you know, sample a particular number of

1 queries depending on the device type or language, right?

2         THE COURT:  Well, because it was very

3 comprehensive in other aspects.  So -- I mean, you know,

4 certainly in size.  Now we're talking about a quantity, a

5 cap, and I'm just trying to figure out, so where -- you

6 know, where did those 500 come from?  Is it just through all

7 the speech logs?

8         MS. BALI:  It's through all the speech logs.

9 There's no handpicking selection at all.  I mean, we pick a

10 day -- and that can be selected randomly or Plaintiff can

11 pick the day, you know, we don't care either way.  But we

12 pick a day in a quarter, and then we randomly sample 500

13 queries from that day.  So you get what you get in that

14 sample.  I mean, theoretically, you can imagine that you'll

15 have a spread that's on par with the broader set, but

16 there's no, you know, mechanism for confirming that.  It's

17 just a random selection process.

18         THE COURT:  Okay.

19         MS. BALI:  But, again, I mean, we've got a lot of

20 different device types and a lot of languages, and if --

21         THE COURT:  No, I --

22         MS. BALI:  Yeah.  And if Plaintiffs' position is

23 that, you know, there's differences in each of those, I

24 mean, that certainly sounds like individualized issues to

25 me, which begs the question of how we're going to litigate

24

1 this on a class --

2        THE COURT:  No, different -- totally different

3 issue.

4        MS. BALI:  Understand, understand, but --

5        THE COURT:  Okay.

6        MS. FARAH:  Well, your Honor --

7        THE COURT:  Wait, let me also just address one

8 other point that Ms. Farah made with regards to, you know,

9 is the class more narrow or not?  When I think of narrowing,

10 I'm looking at the limit just to the purchaser class, but

11 also the claim that's remaining being the breach of contract

12 claim with a lot of the statutory claims and the per

13 violation fines or penalties not being part of the

14 calculation.  Am I reading that correctly?

15        MS. BALI:  Absolutely, your Honor, absolutely,

16 including the damages at stake, right?  I mean, those claims

17 come with much more significant statutory damages than, you

18 know, a breach of contract or --

19        THE COURT:  Right.  I'm really thinking about the

20 number of violations, though, as a tally, again, part of

21 which fed the breadth of the prior sampling plan.

22        MS. BALI:  That's correct.

23        THE COURT:  Ms. Farah, you were making your

24 points, and I --

25        MS. FARAH:  Yeah.

1    THE COURT:  -- interrupted you just so I could get

2  clarification on Google's position.  So please proceed.

3    MS. FARAH:  Sure.  Sure.  Your Honor, with regards

4  to the sample of 500 we -- our experts have calculated the

5  margins of error and the confidence bands and determined

6  that they are actually below zero, such that we would not be

7  able to draw statistically significant conclusions from it,

8  which is why we rejected the 500 number two years ago and

9  why the Court partially did not adopt that number and

10  compelled Google to do a lot more.  So the 500 is a non-

11  starter for us, given, as counsel says, the variety of

12  devices and the variety of languages that are -- that we are

13  supposed to be looking at when we pull that sample.

14    If the Court is inclined to keep it at the 500 or

15  something so significantly lower than what we initially

16  contemplated, meaning the 0.5-percent of daily queries, then

17  we would ask for at least multiple additional days within

18  each quarter to kind of make up for the loss of data that we

19  will suffer by virtue of getting such a small sample.

20    THE COURT:  So what's the number of queries that -

21  - I mean, what gets you to a statistically significant

22  number?  And I appreciate the statistical experts on both

23  sides will differ in this view, but whether it's, you know,

24  more on one -- on any given day in a quarter or more days

25  across a quarter, you know, is it twice as many, 1,000?  Is

1  it 10 times as many, 5,000?  I mean, what's the --

2          MS. FARAH:  Well, your Honor, we -- our experts

3  and we don't know what is the stratification of the sample,

4  right?  We don't know how are the different devices and the

5  variables represented in the sample, which is exactly why

6  they were never able to come up with a specific number.  And

7  that applies the same for Google's expert himself.  We were

8  comfortable with the 0.5-percent that the Court determined

9  initially.  It was 0.5-percent of daily queries, those 25

10 pulls during the -- 25 quarters during the class period.

11 That was the number at which our experts could say they're

12 confident that they -- that we will receive a representative

13 sample of all different devices and languages within the

14 bundle.

15          MS. BALI:  I mean, your --

16          THE COURT:  Yeah.  And I just think for all the

17 reasons we have talked about, and as I have articulated in

18 our discussions in my previous order since we started

19 meeting again on this subject, I have proportionality

20 concerns about the breadth and scope.  I think now that a

21 cap, a fixed number, is -- I mean, that's not inappropriate.

22 Five hundred strikes me as extremely low because it leads us

23 to a total of 12,500 queries across -- what did we say?  It

24 was two-and-a-half-year.  I didn't do the math, but it's --

25          MS. FARAH:  Twenty-five quarters.

27

1          THE COURT:  Twenty-five quarters.  Thank you.

2    Yes.  Over 25 quarters, and, you know, obviously, tens of

3    millions of queries.  I -- the plan was never going to be

4    able to guarantee or even, frankly, address the sort of

5    across the stratification, I think is the word, of both

6    devices and languages.  We can get a big enough sample that

7    I think everyone is comfortable -- I mean, it is what it is.

8    You're not going to get -- to your example, Ms. Farah,

9    you're not going to get samples that are all iPhones because

10   that, you know, just isn't the way it -- it's not the way it

11   works.  If you're taking so many on a day, lots of devices

12   are being used that day, and there'll be a variety of

13   devices.  But it's got to be a big enough number that you

14   can, you know, at least have a chance of capturing, you

15   know, again, as meaningful a sample as possible.  But we're

16   -- so --

17          MS. BALI:  Your Honor, I would -- I understand

18   that the 12,500 numbers sounds small in light of the volume

19   of queries that come in on a given day, and I'll give you an

20   analogy that our expert gave me, which helped me

21   conceptualize this a little bit.  But you can imagine if

22   you're testing a lake for contaminants and you need to

23   evaluate the water, you can take a vial and put it in the

24   water and evaluate the vial.  You don't -- your results are

25   not better if you, you know, evaluate gallons upon gallons,

28

1  right?  I mean it -- so you don't necessarily get better

2  results with a bigger sample size.  You can actually do a

3  lot with a reasonably small sample size.  And so I don't

4  think -- I think the inclination to go bigger, just because,

5  you know, there's so many variations in language and device

6  is not really sound from a statistical standpoint -- that --

7  or a sampling standpoint.  That's not the way you do that,

8  right?  I mean, even a sample, you know, of this magnitude

9  will give you, you know, a large variety because we're

10 randomly sampling.  We're not -- you know, we're -- you

11 know, so you can get a spread that's akin to the spread that

12 you see over the entire data.  So -- you know -- and suffice

13 it to say, you know, Ms. Farah keeps saying that her, you

14 know, expert says that the confidence interval would be

15 below zero at a sample of the size.  I have yet to see any

16 analysis of that or how her expert reached that conclusion

17 or had an opportunity to discuss that with my expert.

18 Suffice it to say my expert disagrees with that and thinks

19 that you can -- that it's very reasonable and happens all

20 the time, frankly, for sampling to use small sample sizes

21 and that they're still nonetheless informative.  And, you

22 know, again, if the Court has questions for him, he's on the

23 line and happy to answer them.

24         THE COURT:  Well -- I mean, we're -- if we adopt a

25 -- well, we're going to figure out a more narrow sampling

1 plan.  I mean, the statistical significance -- I mean,
2 Google would be hard-pressed to challenge it because, I
3 mean, it's going to be limited, and limiting it is Google's
4 proposal.  So --
5         MS. BALI:  Yeah.  And again -- I mean, we invited
6 Ms. Farah to present a counter proposal.  We said we would
7 consider it.  She didn't share anything with us.  So --
8         THE COURT:  Well, I think we have -- I think we
9 have the Plaintiffs' counter proposal.  I think --
10         MS. BALI:  Yes.
11         THE COURT:  -- it's not to cap it or to, you
12 know --
13         MS. BALI:  Right.
14         THE COURT:  -- increase it to some significance.
15 But that's fair.  That's fair.
16     Ms. Farah, you wanted to respond.
17         MS. FARAH:  Yes, yes.  Yes, your Honor.
18         THE COURT:  I get the water analogy.
19         MS. FARAH:  Yeah.
20         THE COURT:  If you want to --
21         MS. FARAH:  Yeah, yeah.  I don't want to --
22         THE COURT:  -- speak to it, you can, but you --
23         MS. FARAH:  Sure.  Sure.  I don't want to belabor
24 the point, but that's a terrible, terrible example, right,
25 the vial and the lake, because we are -- we -- the devices -

30

1  - the device types and languages are distinct elements that

2  need to be pulled.  When you have a contaminated lake, it

3  presumably is everywhere, so no matter how much you pull,

4  you're getting a -- it's a terrible, terrible example.  It

5  is more of a when you have three colors in a bunch of 50,

6  you cannot just pull one to get a sense of how many

7  different colors are in the bunch.  And that is the analogy

8  to be used here.  We need the sample to be large enough to

9  capture all of the different strata in the sample.

10      So it's -- your Honor, like I said, you know, the

11  proportionality analysis, if you consider -- we initially

12  considered pulling 400,000 queries on each of those 25

13  quarters, on each of the pulls.  The proportionality

14  analysis did not change so drastically that we go from

15  400,000 queries to 500 queries.  The purchaser class has not

16  shrinked (sic) the case or the class to such point that 500

17  would be justified.  We would absolutely like to see the

18  0.5-percent.  And if not, then at least a much significantly

19  bigger number than 500 queries per pull to be able to draw,

20  you know, relevant, statistically valid conclusions from the

21  sample, which is the entire point of sampling.

22      And then, your Honor, one other point on the content of

23  the queries, it has been always Google's position that false

24  accepts cannot be strictly determined from their automated

25  technology, okay?  They said it in the context of opposing

31

1  our class certification, that you just can't take the

2  automated speech recognition and go by that.  They cannot

3  separate the preamble -- what they called a preamble --

4          THE COURT:  Okay.

5          MS. FARAH:  -- they cannot look at their speech

6  logs to determine if it's false accept, which was the reason

7  why the Court said you have to provide the totality of the

8  query, because you don't have a mechanism to disengage the

9  two or to determine what is a false accept.

10      Nothing has changed since then.  We're still in the

11  position where we want to test the veracity of their

12  assessments.  We want to calculate our own rates of false

13  accepts from the queries.  And if the only way to do it is

14  to listen to it, then we're going to need the entirety of

15  the query.  This is the position that Google has previously

16  taken --

17          THE COURT:  I know.  I know, Ms. Farah.  And as

18  I've said over and over, the analysis of the scope, both the

19  quantity and the methodology of the sampling, we are

20  revisiting that, and the privacy concerns are -- you know,

21  are in sharp focus, as they were before, but, you know, the

22  -- again, the proportionality has shifted.  I appreciate

23  Plaintiffs disagree with that.  From my perspective, it has.

24  So we are going to have some tightening, but we need a

25  meaningful way to develop the number of queries, whether

1    it's a larger sample or it's -- on a given day or it's over

2    more days because I -- I mean, it -- the proposal is too

3    low.  I mean, I can pick a number, but that doesn't -- and I

4    will if I have to.  I would hope that the parties or the

5    parties' experts could talk through this, but we've been at

6    this a long time, and I'm inclined to think that there

7    really is no choice but for me to set the parameters, but

8    I'm -- I am open to suggestions on how to proceed.

9         Ms. Bali.

10              MS. BALI:  Your Honor --

11              MS. FARAH:  Well, your Honor --

12              THE COURT:  Wait, wait, wait.  One at a time.  One

13   at a time.  Ms. Bali.  And then I'm coming back to you, Ms.

14   Farah.

15              MS. BALI:  Thank you, your Honor.

16        I mean, suffice it to say I agree with -- disagree with

17   a number of the things Ms. Farah made, but in the interest

18   of moving forward, I would just say that from a

19   proportionality standpoint, the burden is significantly

20   higher for Google to choose multiple days rather than a

21   single day because, as you can imagine, you've got to pull

22   all the queries and then take a random sample from that set.

23   So if they're pulling from multiple days, it's a lot more

24   burdensome.  So I think, you know, just from a

25   proportionality standpoint, we should stick to the same

33

1  cadence, the same number of days, if we can.

2      And, again, we are happy to meet and confer with

3  Plaintiffs to come up with a more reasonable number.  The

4  number that they are sticking with, which was somewhere in

5  the neighborhood of, you know, 40 million queries is off the

6  table now.  So I understand that that's what they want, but

7  that's not realistic.  It's not proportional.  And we need

8  to have a real meet and confer about what the number should

9  be if they don't think that the number we proposed is

10  significant.

11      So, you know, I know that your Honor is, you know,

12  eager to sort of put this -- make a decision and put this to

13  bed and let us -- I mean, this has been pending for some

14  time, and I appreciate that.  But, again, we are open to

15  engaging in a meet and confer, informed by the respective

16  views of our expert, to come up with a number that we think

17  is reasonable.

18          THE COURT:  I appreciate that.  That approach

19  doesn't seem to have worked so far, but I am open to

20  constructive suggestions, because I don't think either side

21  wants me to pick the number because -- I mean you -- it'll

22  be way too low for Plaintiffs and way too high for Google,

23  and it will be arbitrary, because I'm not doing the

24  statistical analysis.  You know, you could give me

25  statistical analysis and a declaration from each side as to

34

1  what's significant, but, you know, presumably, they'll be

2  far apart, and I'm still picking something arbitrarily,

3  perhaps in between, and, you know -- and just -- you might

4  as well talk to each other about it.

5          MS. BALI:  I mean --

6          MS. FARAH:  Your Honor.

7          THE COURT:  Ms. Farah, it's your turn.  It's Ms.

8  Farah, please.

9          MS. FARAH:  Yeah.  Your Honor, I think you're

10  absolutely right.  This has been going on for entirely too

11  long, and we have tried.  We have spoken, we have engaged

12  our experts, we have had the experts available talking to

13  each other, asking questions.  They could have -- you know,

14  I think that all of the inquiries that went into this

15  already were exhausted.  I think we should just put a stop

16  to it, set up a plan, and move forward, because it is going

17  to take some time for us to review the recordings, to

18  process it, to work with it, if there are deficiencies, to

19  bring it back to the Court.  I think we should just go ahead

20  and pick a number, and both sides will live with it.  I can

21  tell you, from our perspective, we can -- and I think it

22  already is a huge concession -- we can receive half of what

23  we what we anticipated.  If the Court deems the

24  proportionality analysis changing so significantly, we can

25  take one quarter of a percent as opposed to half a percent

35

1  on a -- on those 25 quarter pulls as we originally set out.

2      And on top of that, we will live with the concessions

3  we already made, meaning we are reducing it to a hot word

4  initiated and Google-made devices.  That is a huge chunk of

5  data that we now are agreeing not to receive.  We believe

6  that that is still going to be sufficient for our purposes,

7  and we will be able to work with that sample, short of not

8  receiving -- short of receiving what we originally wanted.

9          THE COURT:  Under the original model, which you're

10  -- from -- which you're proposing be adapted is to -- for

11  any given day, one day in a quarter, you need to know the

12  total number of queries, and then from that you take one

13  quarter of a percent of the queries?

14          MS. FARAH:  Yes, yes.

15          THE COURT:  Okay.  All right.

16          MS. BALI:  And, your Honor, we're still --

17          THE COURT:  And remind me what you think number

18  wise -- I mean, again -- I mean, is that --

19          MS. FARAH:  So, originally, and these were

20  somewhat speculative, but we believe that there may be 40

21  million queries coming to Google on a daily basis.  So if

22  I'm still operating with those same numbers, we are looking

23  at 200,000 queries per that one quarter percentage pull.

24          MS. BALI:  Your Honor, I don't know where counsel

25  got those numbers, but when we did our --

36

1        MS. FARAH:  From the last hearing.

2        THE COURT:  Wait, wait, wait.  Wait, wait.  Let me

3   just be sure I'm following.

4        MS. BALI:  Yeah, when we did our estimate before,

5   the 0.5-percent of pulls, we estimated to be around 40

6   million.  So if she's cutting it in half, we're still

7   talking about 20 million queries, which is significant and I

8   don't think enough to address the proportionality concerns

9   that your Honor has already noted.  Plus counsel is

10  reverting back to a percentage approach rather than a fixed

11  number, which also, you know, is problematic in light of

12  proportionality concerns, because we don't really know what

13  that number will be because it depends on the number of

14  queries that come in in a given day.  And I don't see why we

15  can't, you know, have something that's more predictable,

16  which is a fixed number of queries on every day selected.

17       MS. FARAH:  We already contemplated doing that

18  during the October 2022 hearing.  These precise arguments

19  were made.  And we were concerned that there are certain

20  days when the traffic is heavier than on other days, and we

21  wanted to account for the difference in the traffic.  So we

22  said percentage wise, it's smarter to do it that way, so

23  that on heavier days, the sample would be slightly bigger

24  than on days that aren't so --

25       THE COURT:  Right.  But the flip side of that is

1  it does increase the burden on Google's side.  It increases

2  the uncertainty in terms of the numbers that we're pulling,

3  and that feeds into my concerns regarding proportionality.

4       We're going to do a limited sampling of a fixed number

5  on a -- taken from one day per quarter across the class

6  period.  It's the hot word -- or absence of hot word perhaps

7  is a better way to put it.  And the entire query will not be

8  -- will not be produced.  And I know we had that discussion.

9  The privacy concerns were paramount in the Court's mind, but

10  the balance tipped again in light of the number of --

11  especially the number of violations as it related to

12  damages.  Those issues are gone now, so I will allow the

13  queries to be -- it's going to be limited to the erroneous

14  hot words.  That's what will be revealed.  The rest of the

15  query will be redacted.

16       So the only thing left on my list is to figure out the

17  number that will be picked on a given day.  I will say 500

18  strikes me as grossly inadequate, but, you know, I did the

19  math the same way Ms. Bali did, "Well, if it was 40 million

20  and now it's 20 million" -- we're not talking about

21  millions.  I -- it would seem to me that it is possible to

22  get a statistically meaningful query, and, you know, the

23  parties will agree to this and Google won't challenge the

24  statistical meaningfulness because this is going to be a --

25  you know, this is a stipulated -- this is how we're going to

38

1  produce this relevant information in a meaningful and

2  responsive way.  This is responsive and it's meaningful.

3      So what remains is to figure out how to get to that

4  number.  And in the past, having experts talk doesn't seem

5  to get the job done.  Plaintiffs have invited me to go ahead

6  and pick a number.  I -- just as I say, again, neither side

7  would be happy with it.  So I'm -- given all the other

8  parameters I have set, is there discussion to be had?  Do

9  you want the Court to select a number?  What -- how do you

10  want to proceed?

11          MS. BALI:  I mean, I would like to think that this

12  is something that the parties could make progress on in a

13  meet and confer.  I don't see why we couldn't, informed by

14  both of our experts positions.  I don't get the sense that

15  Ms. Farah is interested in having a meet and confer on this,

16  which makes my job a little hard.  It makes it hard to make

17  some progress on my own.  So, you know, I'm open to it if,

18  you know, Ms. Farah is interested in having a meet and

19  confer on that and trying to make a joint proposal to the

20  Court.  I'm open to that.  You know, I don't think that, you

21  know, picking an arbitrary number is necessarily the best

22  approach, but I think, you know, we've certainly got to be a

23  lot lower.  I think -- you know, offering to cut it in half

24  is not good enough.  It doesn't address the concerns that

25  Google and the Court has expressed, and it's not -- you

39

1 know, we need to do better than that.

2          THE COURT:  And Google needs to do a lot better

3 than 500 queries.

4          MS. BALI:  I mean --

5          THE COURT:  I mean, I just want to be sure that's

6 very clear.  I just want to be sure that's very clear.  I

7 appreciate we can't -- you know, we -- no one can make a

8 deal on their own, but we're not talking about millions of

9 queries.  We're just --

10          MS. BALI:  Yeah.  And I understand your Honor

11 wants to see a higher number, and we're open to -- we're

12 open to considering a higher number, so long as it's

13 reasonable.  But, again, I don't have a counter proposal

14 from Plaintiffs that is, like, less than, you know, 20

15 million queries at this point, and that -- and even that

16 proposal was only made today for the first time.  So, you

17 know --

18          MS. FARAH:  Your Honor, may I ask for

19 clarification on the recordings or the queries that contain

20 the erroneous hot word?  Is the Court ordering Google to

21 produce the part of the query that captures the speaking of

22 the hot word and the rest is to remain redacted?  Or is it

23 that the entirety of the query, including the hot word

24 portion, will be redacted, such that we won't see the query

25 at all?

40

1          THE COURT:  Yeah.  And that's a fair question, and

2  I raised that.  I had that marked myself to be sure to

3  clarify.

4      As I understood, Google's proposal was to just -- to do

5  the analysis and feed numbers to the Plaintiff.  And the

6  question is, can the preamble be produced that either shows

7  hot word or absence of hot word?  Is that --

8          MS. BALI:  Yeah.  I mean, our preference would be

9  to just do the analysis and share the numbers.  But if the

10  Court is inclined to, you know, order some production, then

11  I think what we would do is redact everything but the hot

12  word, so what you could see is the presence or absence of a

13  hot word and that's all.

14          THE COURT:  But in the preamble or anywhere in the

15  query.

16          MS. BALI:  In the -- what's called the top

17  hypothesis field.  So the preamble is technically the hot

18  word portion of the query.  And then it is followed by the

19  query itself.

20          THE COURT:  Right.

21          MS. BALI:  So what would happen is Google would

22  redact the substance of the query, so all you would see is,

23  you know, if the hot -- you know, if there's a preamble --

24  if there's a hot word, you would see that and nothing else,

25  right?  Either the presence or absence of a hot word.

41

1 Nothing else.

2          THE COURT:  And I'm sorry, is that in a preamble

3 or not in the -- I'm -- maybe my -- maybe I've forgotten

4 some of the vocabulary.

5          MS. BALI:  Yeah, the actual field, I believe, is

6 called the top hypothesis field.

7          THE COURT:  Okay.

8          MS. BALI:  So it doesn't always distinguish

9 between preamble and not preamble.  It's just -- it's called

10 the top hypothesis field, and, usually, for example, when

11 it's a query that is preceded by the hot word, you'll see

12 the hot word, and then you'll see the query follow it in

13 that same field.  And here, what we are proposing is that we

14 would redact everything other than the hot word, where the

15 hot word is present.  And if there's no hot word present,

16 then obviously you're not going to see the hot word in the

17 field.  So --

18          THE COURT:  So what do they -- what do they see?

19 Just --

20          MS. BALI:  No hot word, and which, you know, I

21 guess, you know, will suggest that there was no hot word

22 spoken, right?  I mean, there's no --

23          THE COURT:  Okay.

24          MS. BALI:  -- yeah.

25          THE COURT:  But the query is still accounted for.

1 I mean, the -- this is part -- one of the -- in your
2 example, this is one of the 500, and it may not have a hot
3 word, but they still --

4        MS. BALI:  Correct.  It would still be captured in
5 the sample, but it would not -- the substance of the query
6 would not be visible to the Plaintiffs because it would have
7 been redacted.  And because there's no hot word in that top
8 hypothesis field, they also wouldn't see a hot word.  So
9 it's just a binary, "Yes, the hot word is there," or, "No,
10 it's not."

11        THE COURT:  Okay.  Excuse me, just a minute,
12 they're doing some construction next door.  I have to get
13 them to stop.  They obviously don't know we're --

14     (Pause.)

15        THE COURT:  Okay.  I'm back.  We have lots of
16 activity in the courthouse.  We're fine.

17     Okay.  So I think that that answers your question, Ms.
18 Farah --

19        MS. FARAH:  Yeah.

20        THE COURT:  -- because it is the top level that'll
21 be -- top level hypothesis that will be produced -- well, if
22 there's a hot word in it, it'll show.  If there wasn't, I
23 mean, you'll see that.  The rest of the query will be
24 redacted.

25     Okay.  So, again, we are remolding, reshaping the

43

1  sampling plan, but it still has to be effective, and that, I

2  think, is very much about the quantity, you know, where do

3  we start it?  And I think it does make sense to go with a

4  fixed number cap on a day per quarter.  But, again,

5  millions, it's -- we're not going there.  And, you know,

6  some, you know, tens of thousands -- well, I mean, we're in

7  -- we're just -- that's not appropriate either.

8      So there's a universe of middle ground there.  It needs

9  to be somewhat meaningful.  And it seems, if we limit it to

10  a day and with a fixed number, that those address a number

11  of Google's burdensome concerns.  And, you know, obviously,

12  the redaction has to take place, and the bigger number, the

13  more those have to be -- have to be looked at, but there's a

14  long way to go to tip it to being overburdened.

15          MS. BALI:  I think -- I mean, just speaking for

16  myself, but I think this guidance gives the parties a window

17  to negotiate within.  So, you know, maybe I'm the eternal

18  optimist, but I seem to think that there can be progress

19  made during a meet and confer, and I don't think we need a

20  long window to do it.  You know, I would think a week would

21  be sufficient.  And if we can't reach agreement, then we can

22  submit our respective proposals.

23          THE COURT:  Ms. Farah, your thoughts?

24          MS. FARAH:  Certainly, your Honor.  We are happy

25  to meet and confer.  We would ask the Court to put a

44

1  deadline on that process, because it has been very difficult

2  to even engage Google -- meaningfully engage them, which is

3  why we are here after two years of meeting and conferring.

4          THE COURT:  Okay.  I'm sure both sides feel a lot

5  of frustration, probably more than the Court does, on this

6  process, and I understand that.  So I think what you need to

7  do is to --

8      Google, you got to go back to the drawing board.  And,

9  you know, you can't do this in little, tiny pieces.  You

10  have to make a very -- you know, there's going to have to be

11  a lot of movement.  I can't overemphasize that.

12      And, Plaintiffs, I mean, I haven't heard any real

13  number -- again, the number with millions is not -- it's not

14  happening.

15      So you both need to step back and figure out something,

16  or I will pick a number.  And you may complain later on

17  appeal somewhere that it's arbitrary, but I will make it

18  very clear in my order that I was left no choice.  I have

19  given the parties every opportunity to work this out.

20      So you meet and confer, see if you can do it, get me a

21  proposal.  You know, I want you to meet and confer and

22  exchange proposals over the course of the next week, so

23  between now and October 10.  And then, you know, continue

24  those discussions, but get me -- if you cannot agree, then I

25  will take a short statement from each side on the 15th --

45

short statement from each side on the 15th, "Here's what we
propose as a cap, and here's why," and you better give me
some support for it.  Here are the, you know, number of
queries, number -- you know, I want to hear -- I want to
hear on both sides.

I'm not going to break out my handbook on statistics --
my textbook on statistics and refigure it out.  If you want
to give me a -- you know, a one or two-page declaration that
supports your number, that's fine, but it's not required.
I'll take counsel's proffer on it.  That's fine.  What's
really important is that you all meet and confer and
understand, "This is what the plan is going to look like.
These are the parameters.  All we're filling in now is that
cap."

So let's get it done.  Get it to me.  And at least --
you know, at least, ideally, I'll have a range, and we'll go
from there.  But I will make a selection and issue an order
that week, because I'm going to be in trial then the rest of
October and you all have to get to work.  Okay?

So those are the dates, parameters are understood as of
this moment, and you're going to work on the cap.  I know
that hasn't worked well.  I don't want to set anyone up for
failure, but I would like to think that now you understand,
you have a very focused, singular objective, and let's try
to get it done, at least get very close, all right?

46

1          MS. BALI:  Thank you, your Honor.

2          THE COURT:  Okay.  Thank you.  Thank you both very

3    much.  I know there's been a lot of work and a lot of time

4    and effort behind this.  We're going to close it out, and

5    it'll be closed out soon.  So thank you.

6          MS. FARAH:  Thank you.

7          MS. BALI:  Thank you.

8          THE COURT:  All right.  That concludes our

9    hearing, and we are adjourned.  Thank you.

10          MS. FARAH:  Thank you.

11       (Proceedings adjourned at 2:38 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

47

1

2                    CERTIFICATE OF TRANSCRIBER

3

4        I certify that the foregoing is a true and correct

5   transcript, to the best of my ability, of the above pages of

6   the official electronic sound recording provided to me by

7   the U.S. District Court, Northern District of California, of

8   the proceedings taken on the date and time previously stated

9   in the above matter.

10       I further certify that I am neither counsel for,

11  related to, nor employed by any of the parties to the action

12  in which this hearing was taken; and, further, that I am not

13  financially nor otherwise interested in the outcome of the

14  action.

15

16

17

18              Echo Reporting, Inc., Transcriber

19                 Friday, October 4, 2024

20

21

22

23

24

25