Exhibit B

Bobbie J. Wilson, Bar No. 148317
BWilson@perkinscoie.com
Sunita Bali, Bar No. 274108
SBali@perkinscoie.com
PERKINS COIE LLP
505 Howard Street, Suite 1000
San Francisco, California 94105
Telephone: +1.415.344.7000
Facsimile:  +1.415.344.7050

Erin K. Earl (*pro hac vice*)
EEarl@perkinscoie.com
PERKINS COIE LLP
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Telephone: +1.206.359.8000
Facsimile: +1.206.359.9000

Attorneys for Defendants
Alphabet Inc. and Google LLC

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| IN RE GOOGLE ASSISTANT PRIVACY LITIGATION | Case No. 5:19-cv-04286-BLF-SVK |
| | **DEFENDANTS ALPHABET INC. AND GOOGLE LLC'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT** |
| | Date:      May 8, 2025 |
| | Time:     9:00 a.m. |
| | Dept.:    Courtroom 3, 5th Floor |
| | Judge:    Hon. Beth Labson Freeman |

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ................................................................................................................. 1

II. SUMMARY OF CLASS CLAIMS ...................................................................................... 2

III. STATEMENT OF UNDISPUTED FACTS ........................................................................ 2

    A.    Google's Terms of Service and PP ............................................................................ 2

    B.    Voice and Audio Activity Setting .............................................................................. 3

    C.    Assistant and Google-Made Devices ......................................................................... 3

    D.    "False Accepts" Occur Infrequently .......................................................................... 4

    E.    Human Review of Assistant Audio Data Is Also Rare ............................................... 5

    F.    Plaintiff Kumandan ..................................................................................................... 6

IV. LEGAL STANDARD ......................................................................................................... 6

V. ARGUMENT ....................................................................................................................... 7

    A.    The Purchaser Class's Breach of Contract Claim Fails as a Matter of Law ............ 7

        1.    Google Did Not Promise Class Members that Assistant Would Only Record User Audio When They Intentionally Query Assistant ........ 7

            a.    There Was No Actionable Promise ................................................. 8

            b.    The PP Is Not Susceptible to Plaintiffs' Interpretation ................. 9

            c.    The Representations in Google's PP Were Not Uniform Throughout the Class Period ........................................................ 11

        2.    Google Did Not Make Uniform Promises to Class Members That It Would Not Share False Accept Audio with Human Reviewers ............. 12

        3.    Google Did Not Breach Any Promises ..................................................... 14

        4.    Any Breach of Any Promises in Google's PP Did Not Result in a Common Harm to the Purchaser Class ...................................................... 17

            a.    Google's Alleged Breach Did Not (and Could Not) Result in the Purchaser Class Overpaying for Google-Made Devices ..................................................................................... 17

            b.    There Is No Evidence the Purchaser Class Overpaid for Google-Made Devices Due to a Price Premium for Google's Privacy Promises ......................................................................... 20

B.    The Purchaser Class's UCL Claims Fail As A Matter of Law ............................ 22

      1.    The UCL Unlawful Prong Claims Premised on the Same Failed
             Breach of PP Theory Likewise Fail ........................................................ 22

      2.    The Purchaser Class Cannot Establish Economic Injury ........................ 23

      3.    The Purchaser Class Is Not Entitled to Equitable Relief ........................ 24

C.    Alphabet Is Not a Proper Defendant and Should Be Dismissed ......................... 25

VI.    CONCLUSION .............................................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Aguilera v. Pirelli Armstrong Tire Corp.*,
    223 F.3d 1010 (9th Cir. 2000)........................................................ 20

*Amchem Prods, Inc. v. Windsor*,
    521 U.S. 591 (1997)..................................................................... 16

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
    568 U.S. 455 (2013)..................................................................... 12

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)....................................................................... 7

*Berger v. Home Depot USA, Inc.*,
    741 F.3d 1061 (9th Cir. 2014), *abrogated on other grounds by*
    *Microsoft Corp. v. Baker*, 582 U.S. 23 (2017)................................. 12

*Block v. eBay, Inc.*,
    747 F.3d 1135 (9th Cir. 2014)......................................................... 8

*Brazil v. Dole Packaged Foods, LLC*,
    660 F. App'x 531 (9th Cir. 2016) ................................................... 17

*Cal. Architectural Bldg. Prods., Inc. v. Franciscan Ceramics, Inc.*,
    818 F.2d 1466 (9th Cir. 1987)......................................................... 7

*Cappello v. Walmart, Inc.*,
    394 F. Supp. 3d 1015 (N.D. Cal. 2019) .......................................... 24

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)..................................................................... 6, 7

*Cetera Advisor Networks LLC v. Protective Prop. and Casualty Ins. Co.*,
    No. 2:19-cv-00299, 2024 WL 4347399 (E.D. Cal. Sept. 30, 2024) ....... 23

*Chowning v. Kohl's Dep't Stores, Inc.*,
    733 F. App'x 404 (9th Cir. 2018) ................................................... 25

*Courtesy Oldsmobile, Inc. v. Gen. Motors Corp.*,
    329 F. App'x 73 (9th Cir. 2009) ...................................................... 9

*Day v. GEICO Casualty Co.*,
    No. 21-cv-02103, 2024 WL 251408 (N.D. Cal. Jan. 23, 2024)............ 20

*Delaney v. Aurora Loan Servicing, Inc.*,
    No. C 09-3131, 2010 WL 11583448 (N.D. Cal. Mar. 1, 2010)............ 22

*Dore v. Arnold Worldwide, Inc.*,
    39 Cal. 4th 384 (2006) ................................................................. 11

*Gardiner v. Walmart Inc.*,
    No. 20-cv-04618, 2021 WL 2520103 (N.D. Cal. Mar. 5, 2021)............................................ 20

*Genesis Ins. Co. v. Magma Design Automation, Inc.*,
    No. 5:06-CV-05526, 2017 WL 4642443 (N.D. Cal. Oct. 16, 2017) ................................. 18

*Gerber v. Twitter, Inc.*,
    No. 4:23-cv-00186, 2024 WL 5173313 (N.D. Cal. Dec. 18, 2024)....................................... 24

*Ginoyan v. Barclays Bank Del.*,
    443 F. Supp. 3d 1136 (C.D. Cal. 2010)................................................................. 10

*Golden Sec. Thrift & Loan Assn. v. First Am. Title Ins. Co.*,
    53 Cal. App. 4th 250 (1997)................................................... 9, 15, 18, 20

*Gross v. Symantec Corp.*,
    No. C 12-00154, 2012 WL 3116158 (N.D. Cal. July 31, 2012) ............................................ 19

*Guzman v. Polaris Indus. Inc.*,
    49 F.4th 1308 (9th Cir. 2022)............................................................ 24

*Hammerling v. Google LLC*,
    615 F. Supp. 3d 1069, 1095 (N.D. Cal. 2022) ............................................. 8, 14, 15

*Harmoush v. Allstate Ins. Co.*,
    No. CV 10-4664, 2012 WL 13005929 (C.D. Cal. Mar. 12, 2012) ............................... 21

*Huynh v. Quora, Inc.*,
    No. 18-CV-07597, 2019 WL 11502875 (N.D. Cal. Dec. 19, 2019) ....................................... 22

*In re Anthem, Inc. Data Breach Litig.*,
    162 F. Supp. 3d 953 (N.D. Cal. 2016) .................................................................. 19

*In re Ethan C.*,
    54 Cal. 4th 610 (2012) .................................................................................. 18

*In re Facebook, Inc. Tracking Litig.*,
    956 F.3d 589 (9th Cir. 2020)................................................................................. 8

*In re Facebook Priv. Litig.*,
    192 F. Supp. 3d 1053 (N.D. Cal. 2016) .............................................................. 15

*In re LinkedIn User Priv. Litig.*,
    932 F. Supp. 2d 1089 (N.D. Cal. 2013) ....................................................... 18, 19, 21

*In re Tobacco Cases II*,
    240 Cal. App. 4th 779 (2015)............................................................................. 25

-iv-

*Key v. Qualcomm Inc.*,
  No. 23-3354, 2025 WL 597604 (9th Cir. Feb. 25, 2025) ..................................................... 24

*Kwiket Corp. v. Superior Court*,
  51 Cal. 4th 310 (2011) ................................................................................................... 23

*Lopez v. Apple, Inc.*,
  519 F. Supp. 3d 672 (N.D. Cal. 2021) ............................................................................ 15

*Michaels v. Greenberg Traurig, LLP*,
  62 Cal. App. 5th 512 (2021) ........................................................................................... 18

*Mitchell v. Gonzales*,
  54 Cal. 3d 1041 (1991) ................................................................................................... 18

*Moore v. Apple Inc.*,
  No. 14-cv-02269, 2015 WL 7351464 (N.D. Cal. Nov. 20, 2015) ....................................... 16

*Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Argonaut Ins. Co.*,
  701 F.2d 95 (9th Cir. 1983) ............................................................................................ 11

*Noori v. Bank of Am., N.A.*,
  710 F. App'x 757 (9th Cir. 2018) .................................................................................... 24

*Olson v. Doe*,
  12 Cal. 5th 669 (2022) .................................................................................................... 16

*Perdue v. Crocker Nat'l Bank*,
  38 Cal. 3d 913 (1985) ..................................................................................................... 14

*Rodriguez v. Google LLC*,
  No. 20-cv-04688, 2022 WL 214552 (N.D. Cal. Jan. 25, 2022) ............................................ 8

*Ruiz v. Gap, Inc.*,
  380 F. App'x 689 (9th Cir. 2010) .................................................................................... 20

*Ryan v. Aegis Specialty Ins.*,
  No. CV 20-1230, 2021 WL 6618753 (C.D. Cal. Nov. 1, 2021) .......................................... 25

*Schertzer v. Bank of Am., NA*,
  109 F.4th 1200 (9th Cir. 2024) ................................................................................... 9, 11

*Schulken v. Wash. Mut. Bank*,
  No. 09-CV-02708, 2012 WL 28099 (N.D. Cal. Jan. 5, 2012) ............................................ 12

*Shroyer v. New Cingular Wireless Servs., Inc.*,
  622 F.3d 1035 (9th Cir. 2010) .................................................................................. 22, 23

*Sonner v. Premier Nutrition Corp.*,
  971 F.3d 834 (9th Cir. 2020) .......................................................................................... 24

*St. Paul Fire & Marine Ins. Co. v. Am. Dynasty Surplus Lines Ins. Co.*,
  101 Cal. App. 4th 1038 (2002) .................................................................... 17

*Stickrath v. Globalstar, Inc.*,
  527 F. Supp. 2d 992 (N.D. Cal. 2007) ........................................................ 25

*Svenson v. Google Inc.*,
  65 F. Supp. 3d 717 (N.D. Cal. 2014) .................................................... 21, 22

*T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*,
  809 F.2d 626 (9th Cir. 1987) ........................................................................ 7

*Trident Ctr. v. Conn. Gen. Life Ins. Co.*,
  847 F.2d 564 (9th Cir. 1988) ...................................................................... 11

*US Ecology, Inc. v. State of Cal.*,
  129 Cal. App. 4th 887 (2005) ...................................................................... 18

*Viacom Int'l Inc. v. MGA Ent., Inc.*,
  No. CV 15-9621, 2016 WL 7448142 (C.D. Cal. Aug. 11, 2016) ................ 23

*Wright v. Allstate Ins. Co. of Cal.*,
  No. 15-CV-01020, 2015 WL 1548949 (N.D. Cal. Apr. 7, 2015) ................. 25

*Wynn v. United Parcel Serv., Inc.*,
  No. 23-CV-06044, 2024 WL 3560727 (N.D. Cal. July 26, 2024) ................ 24

**STATUTES**

Cal. Bus. & Prof. Code § 17204 ...................................................................... 23

Cal. Bus. & Prof. Code § 22576 ........................................................... 2, 22, 23

Cal. Civ. Code § 1636 ........................................................................................ 9

Cal. Civ. Code § 1638 ........................................................................................ 9

Cal. Civ. Code § 1641 ...................................................................................... 10

Cal. Civ. Code § 1642 ...................................................................................... 11

Cal. Civ. Code § 1643 ...................................................................................... 11

Cal. Civ. Code § 3300 ...................................................................................... 17

**OTHER AUTHORITIES**

Fed. R. Civ. P. 23(b)(3) ............................................................................................ 16

Fed. R. Civ. P. 26(a)(2) ............................................................................................ 20

Fed. R. Civ. P. 56(a) .................................................................................................. 6

Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/use
    (last accessed February 27, 2025) ...................................................................... 9

Merriam Webster, https://www.merriam-webster.com/dictionary/process
    (last accessed Feb. 27, 2025) ............................................................................ 13

## NOTICE OF MOTION AND MOTION

**TO THE COURT, ALL PARTIES, AND COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE** that on May 8, 2025, at 9:00 a.m. in Courtroom 3 of the United States District Court for the Northern District of California, at 280 South 1st Street, San Jose, California 95113, Defendants Alphabet Inc. ("Alphabet") and Google LLC ("Google") (collectively, "Defendants") move, under Federal Rule of Civil Procedure 56, for summary judgment on all certified Purchaser Class claims, including Plaintiff Asif Kumandan's breach of contract and California Unfair Competition Law ("UCL") claims. *See* Dkt. 360. This motion is based on this Notice, the Memorandum of Points and Authorities below, the declarations of Sunita Bali, Françoise Beaufays, Yair Cohen, James Flynn, and Terry Tai, and the exhibits thereto, all materials in the record, any oral argument, and any other information and evidence on which the Court may rely.

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

The certified class claims all hinge on the theory that Google breached promises in its Privacy Policy ("PP") regarding the collection and sharing of Assistant "false accept" audio data, and that those breaches somehow harmed the Purchaser Class in the form of a price premium paid for their Assistant enabled devices. But the record establishes that Defendants are entitled to judgment on all class claims because: (1) the PP does not make the purported promises on which the class claims rely; (2) even if it did, Google did not breach any such contractual promises classwide; (3) there is no evidence any such breach resulted in a common harm to the Purchaser Class through a price premium or otherwise; and (4) the Purchaser Class's UCL claims premised on the same breach of the PP fail for the same reasons as the breach of contract claim, and also because the class cannot establish economic injury required for UCL standing or entitlement to equitable relief. Finally, the claims against Alphabet fail for the independent reason that its only role in this case is as Google's parent company. It is not a party to the contract and had no role in the alleged conduct on which the claims are based. The Court should enter summary judgment in Defendants' favor and against the Purchaser Class and Kumandan on all certified claims.

## II.  SUMMARY OF CLASS CLAIMS

On December 16, 2022, the Court certified a "Purchaser Class" represented by Kumandan to "proceed on the breach of contract claim and UCL 'unlawful' prong claims predicated on breach of contract and violation of California Business and Professions Code § 22576." Dkt. 360 at 31–32; *see also* Dkt. 467 at 5. The Court certified three common questions: (1) Whether Google made uniform representations to class members in its contracts, promising that Assistant will only record information when users intentionally use the Assistant (e.g. activating it with a Hotword) and that Google will not share users' audio beyond those circumstances disclosed in its Privacy Policies; (2) Whether Google breached those promises by surreptitiously recording users' audio and then subsequently sharing such audio with third parties; and (3) Whether Google's breach resulted in a common harm to Plaintiffs and class members who overpaid for GAEDs as a result of the price premium attributable to Google's uniform, contractual promises of privacy.

## III.  STATEMENT OF UNDISPUTED FACTS

### A.  Google's Terms of Service and PP

Google's Terms of Service ("TOS") and PP apply to "a broad range of services" provided by Google. *See* Decl. of James Flynn ("Flynn Decl.") ¶¶ 5–6; Declaration of Sunita Bali ("Bali Decl."), Exs. 17–21, 22–49. Throughout the class period, users were generally required to agree to the TOS and were provided with the PP when they first created their Google account in order to use any of those Google services. Flynn Decl. ¶¶ 5–6.

The class claims all stem from Google's alleged breach of purported promises in its PP, which they contend was "incorporated" into the TOS. *See* Fourth Amended Complaint, Dkt. 141 ("FAC") ¶¶ 245–249; *see also* Dkt. 360 at 16–17. Specifically, they allege that the PP promised users that Google will only collect their voice and audio information when they "use audio features" and that Google breached that promise by collecting voice and audio information in the case of false accepts, i.e., when users did not intentionally query Assistant. *See* FAC ¶¶ 250–51; *see also* Dkt. 360 at 21. They also allege that the PP promises that Google will not share "personal information" outside of Google, except in enumerated circumstances, and that Google breached that promise by sharing class members' false accept audio with human review vendors.

1    *See* FAC ¶¶ 253–258; *see also* Dkt. 360 at 16–17.

2        During the class period, there were 28 versions of the PP and five versions of the TOS,

3    including some material changes to the "promissory" language. *See* Bali Decl., Ex. 1.

4        **B.    Voice and Audio Activity Setting**

5        Google does not collect voice and audio data unless a user enables the Voice and Audio

6    Activity ("VAA") setting. Flynn Decl. ¶¶ 8, 10. VAA has always been "off" by default. *Id.* ¶ 10.

7    ████████████████████████████████████████. *Id.*; *see also* Bali

8    Decl., Ex. 54 at GOOG-ASST-00003516, Ex. 55 at GOOG-ASST-02992224.

9        Since Assistant launched in 2016, Google has informed users that by enabling VAA, users

10   are consenting to Google recording, saving, and using their audio data to improve Google's

11   speech technologies. Flynn Decl. ¶ 9. In August 2020, Google updated the VAA consent

12   language to also state that "a sample of audio is analyzed by trained reviewers, who listen to,

13   transcribe, and annotate it," and that "audio might be saved if your device incorrectly detects an

14   activation." *Id.* ¶ 11; *see also* Bali Decl., Ex. 7. When this update launched, Google disabled

15   VAA for all users, and notified users by email that VAA would remain off until they reviewed

16   and consented to the updated language and re-enabled the setting. Flynn Decl. ¶ 12.

17       **C.    Assistant and Google-Made Devices**

18       Assistant, which launched in May 2016, is a free virtual personal assistant that can help

19   users with a variety of tasks, including setting reminders, making telephone calls, answering

20   questions, looking up the weather, playing music, and getting driving directions. Decl. of

21   Françoise Beaufays ("Beaufays Decl.") ¶ 3; Bali Decl., Ex. 14 (April 22, 2022 Deposition of

22   Françoise Beaufays ("Beaufays Tr.")) at 88:23–89:4, 97:13–21. Assistant is available on a wide

23   range of first and third-party devices, including smart speakers and displays, smartphones,

24   laptops, tablets, and more. Beaufays Decl. ¶ 4; Beaufays Tr. at 96:7–21. Google-Made Devices

25   may be purchased from Google directly or from third-party retailers. Flynn Decl. ¶¶ 16–17.

26   Google-Made Device users are required to agree to the TOS and are presented with the PP when

27   they first activate their device, *after* purchasing it. *Id.* ¶ 19.

28       Users can activate Assistant by saying a hotword ("OK Google" or "Hey Google") or by

1    manually activating their device (e.g., pressing a button). *See* Beaufays Decl. ¶ 5; Beaufays Tr. at

2    103:7–104:2. Since December 2020, hotword activation on mobile devices running Android 5.0

3    and up (including, for example, most Pixel phones) is only enabled after a user expressly agrees

4    to hotword activation on that device. Flynn Decl. ¶ 13; Bali Decl., Ex. 7. Users can also disable

5    hotword activation on their mobile device after they consent to enabling it. Flynn Decl. ¶ 13;

6    Beaufays Decl. ¶ 6. And users can mute the microphone on their smart speakers or displays if

7    they do not want the ability to access Assistant by voice on those devices. *See* Beaufays Decl. ¶ 6.

8        When hotword activation is enabled, Assistant waits in standby mode until it detects an

9    activation, such as a hotword. Beaufays Decl. ¶ 7; Bali Decl., Ex. 7; Beaufays Tr. at 99:12–103:6.

10   ████████████████████████████████████████████████████████

11   ████████████████████████████████████████████████████████████

12   ████████████████████████████████████████████████████████████

13   ████████████████████████████████████████████████████████████

14   ████████████████████████████████████████████████████████████

15   ████████████

16   ██████████████████████████████████████████████

17   ████████████████████████████████████████████████████████████

18   █████████████████████████████████████████████████████████

19   *Id.* ¶ 10. At the conclusion of the user's Assistant interaction, the audio data is discarded unless

20   the user enabled VAA, in which case that audio data may be saved to the user's account. *Id.* ¶ 13.

21       **D.    "False Accepts" Occur Infrequently**

22       Although Google's systems are effective at identifying and rejecting misactivations before

23   they are logged, Google's technology is not perfect. Beaufays Decl. ¶ 12; *see also* Beaufays Tr. at

24   246:7–13. In some instances, Assistant may misactivate, and Google's systems do not identify the

25   audio as a misactivation or reject it. Beaufays Decl. ¶ 12; Declaration of Yair Cohen ("Cohen

26   Decl.") ¶ 2. In these cases, ████████████████████████████████████████

27   ████████████████████████████████████████████████████████

28   ████. Beaufays Decl. ¶ 12; Cohen Decl. ¶ 2. These are referred to as "non-rejected

-4-

1   misactivation[s]" ("NRMAs"), *id*., and most closely match what Plaintiffs refer to as "false

2   accepts." *See* FAC ¶ 252.

3        It is notoriously difficult to quantify the frequency of misactivations, particularly NRMAs.

4   Bali Decl., Ex. 9 at nn. 1, 4; Beaufays Decl. ¶ 17. Google's internal policies require the voice-

5   activation NRMA rate to be below ███ Bali Decl., Ex. 9 at GOOG-ASST-03041954. Around the

6   end of the class period, ████████████████████████████████████████████████

7   █████████████████████████████████████████████████████████████████████████

8   ███████████████████████████████████████████████████████████████████ Cohen

9   Decl. ¶¶ 5–6. ████████████████████████████████████████████████████████

10  ██████████████████ *Id.* ¶ 6.

11       Google also produced, pursuant to Court order, speech log data for a random sample of

12  250,000 hotword-initiated queries made to Google-Made Devices during the class period. *See*

13  Dkt. 455 at 1–2; *see also* Bali Decl., Ex. 56. ██████████████████████████████████

14  ████████████████████ *See* Decl. of Terry Tai ("Tai Decl.") ¶ 17; Bali Decl., Ex. 3. Thus,

15  based on Plaintiffs' own methodology for quantifying false accepts, these queries should not be

16  counted as false accepts. Dkt 240 at 1; Dkt. 323 at 2. ████████████████████████

17  ███████████████████████████████████████. Tai Decl. ¶ 18. █████████

18  █████████████████████████████████████████████████████████████████████████

19  █████████████████████████████████████████████████████████████████████████

20  ██████████████████████████████████████████" Tai Decl. ¶ 19; Bali Decl.,

21  Ex. 4. Taken together, these results show that only approximately ███ of the sampled queries

22  were potential false accepts under Plaintiffs' theory. Tai Decl. ¶ 20.

23       **E.    Human Review of Assistant Audio Data Is Also Rare**

24       A necessary step to improving speech models is for human reviewers to listen to,

25  transcribe, and annotate audio data to assess the accuracy of Google's models. *See* Beaufays Decl.

26  ¶¶ 18; Beaufays Tr. at 239:2–240:19. During the class period, Google contracted with select

27  vendors to perform this function at Google's direction. Bali Decl., Ex. 16 (April 14, 2022

28  Deposition of Caroline Kenny ("Kenny Tr.")) at 17:11–21, 22:12–23, 46:13–18, 125:6–127:19;

*id.,* Ex. 10 at GOOG-ASST-00026645–47. Only a small fraction of Assistant queries is selected for human review, and only from users with VAA enabled. Beaufays Decl. ¶ 21; Bali Decl., Ex. 11. And where Google has identified audio as resulting from an NRMA, that audio is not selected for human review. *See* Bali Decl., Ex. 9 at GOOG-ASST-03041955. Out of the 250,000 queries Google sampled and produced, only ▮▮▮ were reviewed by human reviewers, and only ▮▮▮ of queries were both reviewed by human reviewers and did not include a visible hotword in the speech log data. Tai Decl. ¶ 18.

### F. Plaintiff Kumandan

Kumandan agreed to the TOS and was presented with the PP when he first created his Google account in 2012 (four years before Assistant launched). *See* Bali Decl., Ex. 15 ("Kumandan Tr.") at 108:14–18; 109:14–110:19. He has been using Google Pixel smartphones with Assistant since 2016. *Id.* at 62:6–8, 65:14–23, 98:3–17, 100:25–103:12, 116:4–117:2, 185:13–186:19. He purchased at least one Pixel device from Verizon in July 2020, after filing this lawsuit, and thus would have agreed to the TOS and been presented with the PP again during activation of that device, after he purchased it. Bali Decl., Ex. 13; Flynn Decl. ¶ 19; *see also* Kumandan Tr. at 186:13–19; Bali Decl., Ex. 8 at 5.

Kumandan first enabled VAA on January 24, 2017. Tai Decl. ¶ 13; Bali Decl., Ex. 6. On August 4, 2020, VAA was automatically disabled by Google as part of Google's VAA update and reconsent process, and ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Tai Decl. ¶ 13; Flynn Decl. ¶¶ 11–12. ▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮. Bali Decl., ¶ 4, Ex. 2, Ex. 8 at 6; Tai Decl. ¶ 7. ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Tai Decl. ¶ 9.

## IV. LEGAL STANDARD

Summary judgment is proper where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). Thus,

1  summary judgment is required "against a party who fails to make a showing sufficient to establish

2  the existence of an element essential to that party's case, and on which that party will bear the

3  burden of proof at trial." *Id.*

4       The moving party may satisfy its initial burden to demonstrate the absence of any genuine

5  issue of fact by pointing out the absence of evidence of an essential element. *Id.* at 325. If the

6  moving party meets its burden, the burden shifts to the nonmoving party to put forth "significant

7  probative evidence" to support their claims. *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n,*

8  809 F.2d 626, 630 (9th Cir. 1987) (cleaned up). A mere "scintilla of evidence in support of the

9  plaintiff's position will be insufficient." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252

10 (1986). If factual context makes a nonmoving party's claim implausible, they must have "more

11 persuasive evidence than would otherwise be necessary to show that there is a genuine issue for

12 trial." *Cal. Architectural Bldg. Prods., Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1468

13 (9th Cir. 1987).

14 **V.    ARGUMENT**

15      **A.    The Purchaser Class's Breach of Contract Claim Fails as a Matter of Law**

16      There is no evidence that (1) Google promised in its PP not to record or share audio data

17 resulting from false accepts, (2) Google breached any such purported promise, or (3) the

18 Purchaser Class overpaid for Google-Made Devices as a result of any such breach. *See* Dkt. 360

19 at 32. Google is entitled to summary judgment on this claim.

20            **1.    Google Did Not Promise Class Members that Assistant Would Only**

21                   **Record User Audio When They Intentionally Query Assistant**

22      Plaintiffs base their false accept breach of contract claim on the following language that

23 was in the PP from May 25, 2018, until February 10, 2022: "We collect information about your

24 activity in our services . . . The activity information we collect may include . . . Voice and audio

25 information when you use audio features." Bali Decl., Ex. 1; *see also* Ex. 29 at 4, Ex. 39 at 4;

26 FAC ¶ 250. This language cannot reasonably be interpreted to promise anything, much less that

27 Assistant only collects audio data when a user intentionally activates it. *See* FAC ¶ 251; Dkt. 360

28 at 32.

CASE NO. 5:19-CV-04286-BLF-SVK
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

1

**a.    There Was No Actionable Promise**

2      To prove a breach of contract, Plaintiffs must first identify an "explicit promise" they

3   allege was breached. *In re Facebook, Inc. Tracking Litig.*, 956 F.3d 589, 610 (9th Cir. 2020)

4   (affirming dismissal of breach of contract claim where contract did "not contain an explicit

5   promise not to track logged-out users"). Describing information that Google "may" collect in

6   certain circumstances does not amount to an enforceable promise by Google that it will never

7   collect voice and audio information absent those circumstances. *See Block v. eBay, Inc.*, 747 F.3d

8   1135, 1139 (9th Cir. 2014) (affirming dismissal of breach of contract claim where no enforceable

9   promise was made and language "can be plausibly read only as a general description of eBay's

10   services"); *Rodriguez v. Google LLC*, No. 20-cv-04688, 2022 WL 214552, at *3 (N.D. Cal. Jan.

11   25, 2022) (dismissing contract claim based on help center page containing explanatory language

12   about Google's products).

13      In *Hammerling v. Google LLC*, the court interpreted the same section of Google's PP at

14   issue here. 615 F. Supp. 3d 1069, 1095 (N.D. Cal. 2022). The plaintiff there alleged that Google

15   breached the provision stating that "the activity information we collect may include . . . [a]ctivity

16   on third-party sites and apps that use our services." *Id.* (internal quotation marks and citation

17   omitted). The court found that "these statements do not plausibly amount to a promise to collect

18   data <u>only</u> from Google apps or third-party apps that use Google services," and dismissed the

19   plaintiffs' breach of contract claim for failure to allege a promise that Google breached. *Id.* at

20   1095 (citing *Facebook Tracking*, 956 F.3d at 610) (emphasis in original).

21      The Court should reach the same conclusion here. The purpose of this section of the PP is

22   to help users "understand the types of information we collect as you use our services." Bali Decl.

23   Ex. 29 at 3. To that end, the section titled "Your activity" describes the information that Google

24   "may" collect "about your activity in our services," and lists as an example "[v]oice and audio

25   information when you use audio features." *Id.* at 4. This language contains no express promise

26   regarding the information that Google will or will not collect and thus is not actionable on a

27   breach of contract theory. *See Block*, 747 F.3d at 1138–39 (distinguishing language describing

28   eBay's services from "explicit promissory language" stating that the parties "will" or "will not"

1   take certain actions). Google is entitled to summary judgment on this ground alone. *See Courtesy*

2   *Oldsmobile, Inc. v. Gen. Motors Corp.*, 329 F. App'x 73, 76 (9th Cir. 2009) (affirming summary

3   judgment on breach of contract claim because contractual language at issue is "insufficient to

4   impose an obligation on [defendant]").

5              **b.      The PP Is Not Susceptible to Plaintiffs' Interpretation**

6          Even if the Court finds an express promise in the subject provision, it cannot be

7   interpreted to mean that Google will not collect audio data unless a user intentionally activates

8   Assistant. Plaintiffs' theory is that to "use audio features" in the context of Assistant requires an

9   intentional activation. *See* FAC ¶ 251; *see also* Dkt. 360 at 32. But Plaintiffs' self-serving

10  interpretation finds no support in the plain text or the user settings that control Google's

11  collection of audio data. Rather, such context makes clear that an Assistant user "use[s] audio

12  features" anytime she enables hotword functionality on her GAED, and consents to Google's

13  "collect[ion]" of her audio data by enabling VAA.

14         Under California law, a contract must be interpreted to give effect to the mutual intention

15  of the parties when the contract was formed. Cal. Civ. Code § 1636; *Schertzer v. Bank of Am.,*

16  *NA*, 109 F.4th 1200, 1208 (9th Cir. 2024). Such intent is to be inferred solely from the language

17  of the contract, provided that the language "is clear and explicit, and does not involve an

18  absurdity." Cal. Civ. Code § 1638. In interpreting a contract, courts (a) look to the ordinary and

19  popular meaning of the terms; (b) give effect to surrounding provisions to avoid superfluity;

20  (c) read the contract as a whole; and (d) avoid an absurd or inequitable result. *See Schertzer*, 109

21  F.4th at 1208. A court also considers extrinsic evidence where it is "relevant to prove a meaning

22  to which the language of the instrument is reasonably susceptible." *Id.* at 1212 (quoting *Dore v.*

23  *Arnold Worldwide, Inc.*, 39 Cal. 4th 384, 391 (2006)).

24         The ordinary and popular meaning of "use" is "to put into action or service" or "avail

25  oneself of." Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/use (last

26  accessed February 27, 2025); *see also Golden Sec. Thrift & Loan Assn. v. First Am. Title Ins. Co.*,

27  53 Cal. App. 4th 250, 256 (1997) (a dictionary definition is "the best arbiter of the ordinary and

28  popular meaning"). When an Assistant user enables hotword functionality on her GAED by, for

example, setting up a Nest Mini in her home or consenting to hotword functionality on her Pixel smartphone, she has plainly "avail[ed]" herself of Assistant's audio features. There is no dispute that—when hotword functionality is enabled—Assistant waits in "standby mode" until it detects a hotword, at which point it exits standby mode to fulfill the user's request, and that is how the technology is described to users. FAC ¶¶ 90, 92; Beaufays Decl. ¶ 7. Thus, Assistant's audio features are "put into action" any time hotword functionality is enabled because Assistant is constantly working to detect a hotword so that it can process and respond to a query directed to it. That Assistant may misactivate does not change this analysis, as a person can still "use" Assistant's audio features even if they do not perform as desired. *See Ginoyan v. Barclays Bank Del.*, 443 F. Supp. 3d 1136, 1141 (C.D. Cal. 2010) (plaintiff "used" his credit card even though the transaction was not successful). Indeed, the term "use" appears throughout the PP, including in the heading of the relevant provision: "Information we collect as you *use* our services." *See, e.g.*, Bali Decl., Ex. 29 at 3 (emphasis added). If "use" requires an intentional activation, as Plaintiffs argue, then a person who experiences a false accept is not *using* Google's services *at all*. Thus, under Plaintiffs' interpretation of "use," this section does not apply to false accepts *at all*, and it certainly cannot be interpreted as a promise that Google will not collect audio data when one occurs. *See* Cal. Civ. Code § 1641 ("The whole of a contract is to be taken together . . . each clause helping to interpret the other").

Moreover, the PP makes clear elsewhere that Google's "collect[ion]" of audio data depends on whether a user has consented to VAA, not whether a user intended to activate Assistant. The PP expressly states that "[t]he information Google collects . . . depends on how you use our services and how you manage your privacy controls." Bali Decl., Ex. 29 at 3. And the term "voice and audio information" appears later in the PP as a hyperlink to Google's Help Center page that explains how to manage audio recordings with VAA. Bali Decl., Ex. 34 at 18, Ex. 12. Indeed, it cannot be disputed that throughout the class period, voice and audio information was *only* collected by Google if users enabled VAA. Flynn Decl. ¶¶ 8–10; *see also* Bali Decl., Ex. 7. And beginning in August 2020, the VAA consent expressly disclosed that "audio might be saved if your device incorrectly detects an activation." Flynn Decl. ¶ 11; Bali Decl., Ex. 7. This

1   disclosure directly conflicts with Plaintiffs' interpretation of the PP. It makes no sense that

2   Google would promise in its PP to collect voice and audio information only when the user intends

3   to activate Assistant, but also disclose in the VAA consent that audio data may be collected if the

4   user's device incorrectly detects an activation. *See Trident Ctr. v. Conn. Gen. Life Ins. Co.*, 847

5   F.2d 564, 566 (9th Cir. 1988) (explaining that "courts must interpret contracts, if possible, so as to

6   avoid internal conflict"); *see also* Cal. Civ. Code § 1642.

7            Finally, Plaintiffs' proposed interpretation would lead to an absurd conclusion. *See*

8   *Schertzer*, 109 F.4th at 1211. Reading a subjective intent requirement into the word "use" would

9   create a contractual standard that Google could not meet. *See* Cal. Civ. Code § 1643 (contract

10  should be interpreted so it is "capable of being carried into effect"). Google has no failsafe way of

11  determining, on a query-by-query basis, whether a user intended to invoke Assistant such that

12  Google can collect her audio data without running afoul of Plaintiffs' interpretation of the PP. *See*

13  Beaufays Decl., ¶ 17; Tai Decl. ¶ 18. Given the volume of Assistant queries, Google needs an

14  objective rule on whether to collect query audio data. That objective rule is the VAA consent. If a

15  user has enabled VAA, both Google and the user can objectively determine whether the user

16  consented to Google collecting that user's audio data, including in the case of a false accept.

17  Indeed, not even Kumandan interpreted the contract as Plaintiffs do now. *See* Kumandan Tr. at

18  133:3–6, 201:8–202:6 (testifying that he did not view the PP to be "speaking to whether

19  [Assistant will] activate" and did not "think about whether [Assistant] will misactivate or not"

20  when reviewing the relevant language).

21           Because the PP is not "reasonably susceptible" to Plaintiffs' interpretation, and there is no

22  evidence to support such interpretation, the "case is over." *Dore*, 39 Cal. 4th at 393; *see also See*

23  *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Argonaut Ins. Co.,* 701 F.2d 95, 97 (9th Cir. 1983).

24                   **c.      The Representations in Google's PP Were Not Uniform**

25                           **Throughout the Class Period**

26           The provision at issue was added on May 25, 2018 (two years after the start of the class

27  period), and on February 10, 2022, Google deleted the phrase "when you use audio features." Bali

28  Decl., Ex. 1; *see also* FAC ¶ 250. Also on February 10, 2022, the term "voice and audio

1  information" was converted to a hyperlink to another section of the PP explaining that users can

2  choose to save Assistant audio that is "record[ed]" when their device "detects" a hotword, and

3  further linking to the Google Help Center Page explaining how users can manage their audio

4  recordings with VAA. Bali Decl., Ex. 1, Ex. 39 at 4.

5        Because the Purchaser Class cannot sustain a classwide claim based on contractual

6  language that did not exist and materially changed during the class period, this claim should be

7  dismissed. *See Berger v. Home Depot USA, Inc.*, 741 F.3d 1061, 1069 (9th Cir. 2014) (individual

8  questions of contract interpretation predominated where there were "five contracts" that each

9  "required an independent legal analysis"), *abrogated on other grounds by Microsoft Corp. v.*

10 *Baker*, 582 U.S. 23 (2017). At a minimum, the Court should limit the class period to May 25,

11 2018, through February 9, 2022. *See Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455,

12 479 n.9 (2013) (class certification orders "are not frozen once made"); *Schulken v. Wash. Mut.*

13 *Bank*, No. 09-CV-02708, 2012 WL 28099, at *12 (N.D. Cal. Jan. 5, 2012) (amending class

14 definition where the original definition "contain[ed] multiple form contracts with materially

15 different language rais[ing] the possibility that there may be a breach of contract for some class

16 members but not others").

17              **2.      Google Did Not Make Uniform Promises to Class Members That It**

18                      **Would Not Share False Accept Audio with Human Reviewers**

19       Plaintiffs' other breach of contract theory is that Google shared false accept audio data

20 with third-party human review vendors to improve Google's speech technology, in breach of

21 specific promises in the PP. *See* FAC ¶¶ 253–59. The relevant provision of the PP states: "We do

22 not share your personal information with companies, organizations, or individuals outside of

23 Google except in the following cases: [1] With your consent, [2] With domain administrators,

24 [3] For external processing, [4] For legal reasons." Bali Decl., Ex. 1; *see also* Ex. 22 at 8–10, Ex.

25 39 at 12–14; *see also* FAC ¶ 253. Both the external processing and consent exceptions apply. Dkt.

26 80 at 35 (explaining that "external processing" and "consent" are two distinct exceptions to the

27 prohibition against sharing personal information).

28       ***External Processing.*** The "external processing" exception has always stated: "We provide

1   personal information to . . . trusted businesses or persons to process it for us, based on our

2   instructions and in compliance with our PP and any other appropriate confidentiality and security

3   measures." Bali Decl., Ex. 1, Ex. 22 at 9. Although "process" is not defined, it is commonly

4   understood as "a series of actions or operations conducing to an end." Merriam Webster,

5   https://www.merriam-webster.com/dictionary/process (last accessed Feb. 27, 2025). This

6   certainly encompasses listening to and transcribing audio data at Google's direction. Indeed, since

7   February 10, 2022, the external processing exception has specifically stated that external

8   processing includes the use of "service providers" to "analyze and listen to samples of saved user

9   audio to help improve Google's audio recognition technologies." Bali Decl., Ex. 1, Ex. 39 at 13.

10        Moreover, this interpretation of the "external processing" exception is consistent with

11   other sections in the PP that have long informed users that third parties may process user data on

12   Google's behalf. *See* Bali Decl., Ex. 22 at 10 (explaining that Google restricts "access to personal

13   information to Google employees, **contractors** and agents who need that information **in order to**

14   **process it**" and are subject to "strict contractual confidentiality obligations"); *see also* Ex. 32 at

15   17 (Google "shares information with service providers to perform services on [its] behalf, in

16   compliance with our [PP] and other appropriate confidentiality and security measures"). This is

17   precisely what the human review vendors were doing—"process[ing]" audio data for Google,

18   pursuant to Google's specific instruction, and under strict confidentiality and security measures.

19   ███████████████████████████████████████████████████

20   ███████████████████████████████████████████████

21   ████    *See* Beaufays Decl. ¶¶ 18–19, 21; Bali Decl., Ex. 11; Tai Decl. ¶ 16; *see also* Kenny Tr.

22   at 83:22–85:22. ██████████████████████████████████

23   ████████████████████████████████████████████████████

24   █████████████████████████████████████. Kenny Tr. at 169:24–171:11; Bali Decl.,

25   Ex. 52. ████████

26   ██████████████████████████████████████████████████████.

27   Bali Decl., Exs. 51 and 52; Beaufays Decl. ¶ 22; *see also* Kenny Dep. at 210:4–211:23, 216:4–21.

28   ██████████████████████████████████████████████

1    ███  *See, e.g.*, Bali Decl., Ex. 10 at GOOG-ASST-00026651, Ex. 53. ████████

2    ██████████████████████████████████████████████████████████

3    █████████████████████████████████  Beaufays Decl. ¶ 21.

4        ***Consent.*** The PP also independently authorized Google to share users' personal

5    information with their consent. *See* Bali Decl., Ex. 1. Users who enabled VAA have always

6    consented to Google saving and using their audio data to improve Google's speech recognition

7    technologies. Flynn Decl. ¶ 9. And starting in August 2020, when Google updated the VAA

8    consent language, users who enabled VAA expressly consented to Google using their saved

9    "audio to develop and improve its audio recognition technologies and the services that use them,

10   like Google Assistant," including by having "audio . . . analyzed by trained reviewers, who listen

11   to, transcribe, and annotate it." Bali Decl., Ex. 7. Google even disclosed that this may include

12   audio that is "saved if your device incorrectly detects an activation." *Id*. Thus, even if false accept

13   audio qualifies as "sensitive personal information" under the PP as Plaintiffs' contend, FAC

14   ¶ 255—and it plainly does not, *see* Dkt. 80 at 35–36—since at least August 2020, any Assistant

15   user who consented to VAA also explicitly consented to human review of their audio.

16          **3.     Google Did Not Breach Any Promises**

17       Because Google never promised in its PP not to collect or share false accept audio for the

18   reasons discussed above, Google could not have breached its PP by doing so. *See, e.g.*,

19   *Hammerling*, 615 F. Supp. 3d at 1095 ("The question is whether Google breached anything that it

20   promised, not whether Google did anything it did not promise."); *see also Perdue v. Crocker*

21   *Nat'l Bank*, 38 Cal. 3d 913, 932 (1985). But even if the Court concludes Google *did* make such

22   promises in its PP, no reasonable jury could find that Google breached those promises classwide

23   "by surreptitiously recording users' audio and then subsequently sharing such audio with third

24   parties." Dkt. 360 at 32.

25       Any promise in Google's PP to only "collect" a user's audio data when she intentionally

26   activates Assistant can only be breached if Google *in fact* collects a user's false accept audio data.

27   Likewise, any promise in Google's PP to only "share" such audio under "those circumstances

28   disclosed in its Privacy Policies" can only be breached if Google *in fact* shared such false accept

-14-

audio outside those circumstances. Dkt. 360 at 32; *Hammerling*, 615 F. Supp. 3d at 1088. The undisputed facts establish that Google did not do so classwide.

*First*, Google did not "collect" *any* Assistant audio data for most class members. Google only "collects" Assistant audio data when VAA is enabled and ███████████████████ ██████████. *See* Flynn Decl. ¶ 10; Bali Decl., Ex. 54 at GOOG-ASST-00003516, Ex. 55 at GOOG-ASST-02992224. █████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████. Google therefore could not have breached the PP as to them. *See Lopez v. Apple, Inc.*, 519 F. Supp. 3d 672, 692 (N.D. Cal. 2021) (dismissing breach of contract claim based on Apple's Siri service because plaintiffs "fail to allege facts showing interception and disclosure in their particular circumstances"); *In re Facebook Priv. Litig.*, 192 F. Supp. 3d 1053, 1058 (N.D. Cal. 2016) (plaintiff whose personal information was not transmitted to any third party lacked standing to bring breach of contract claim based on disclosure of personal information to advertisers).

*Second*, the evidence shows that even for those class members who enabled VAA, ███ ████████████████████████████████████████████████████████████ ████████. *See* Bali Decl., Ex. 56. As ordered by the Court at Plaintiffs' request, Google produced a random sample of 250,000 logged, hotword-initiated Assistant queries made on Google-Made Devices by users who enabled VAA (since Google only has speech log data for users with VAA enabled). *See* Dkt. 455; Tai Decl. ¶ 14. Plaintiffs requested this sample expressly to determine the false accept rate. *See* Dkt. 240 at 1; Dkt. 323 at 2; Dkt. 443 at 1, 6–7. Indeed, this Court accepted Plaintiffs' position that "whether Google breached" the alleged promises in its PP "will be shown by analysis of Google's voice records and Speech logs." Dkt. 360 at 21 (citing Dkt. 222-1 at 10–12, 17). That analysis reveals that only ████ of the sampled queries could have resulted from false accepts, and only ████ of the sampled queries could have resulted from false accepts and been disclosed to human reviewers. Tai Decl. ¶ 20. This result also aligns with Google's own internal policy, research, and public statements. *See* Cohen Decl. ¶¶ 4–7 (estimating NRMA rate of ████ on Android mobile devices, ████ on Google Home and Nest speakers, and ████ for Google Nest displays, which devices account for the vast majority of Assistant traffic); Bali

Decl., Ex. 9 at GOOG-ASST-03041954 (internal policy requires voice-activation NRMA rate to be below ████ Ex. 11 (estimating that ████ percent of user audio snippets are shared with human reviewers). The miniscule rates in the record establish that ████████████ class members who enabled VAA did not experience any false accepts or have any disclosed to human reviewers and thus also did not experience a breach of the purported promises in the PP.

Because most Purchaser Class members experienced no breach at all, a classwide breach of contract claim cannot survive. *See Olson v. Doe,* 12 Cal. 5th 669, 679 (2022) (describing "breach[]" as an "essential element" of a "breach of contract action"); *see also Moore v. Apple Inc.,* No. 14-cv-02269, 2015 WL 7351464, at *8 (N.D. Cal. Nov. 20, 2015) (denying certification of a Rule 23(b)(3) class where "[r]esolving whether there was an actual breach of a class member's contract requires individualized inquiries"). ████████████████ ██████████████████████████████████████████████████ ████████████████████████████████. Bali Decl., Ex. 2; *see also* Ex. 5; Tai Decl. ¶ 9. At a minimum, summary judgment should be granted as to Kumandan's disclosure-based breach of contract claim and he should not be permitted to represent the class with respect to that claim. *See Amchem Prods, Inc. v. Windsor*, 521 U.S. 591, 625–26 (1997) ("[A] class representative must be part of the class and possess the same interest and suffer the same injury as the class members.") (cleaned up).

The same result holds even if the putative promises in Google's PP could be breached merely by selling Google-Made Devices susceptible to false accepts and subsequent sharing with review vendors, even if most class members never experienced either. *See* Dkt. 338 at 27:6–29:20. To be clear, they cannot—nothing in Google's PP promises any specific quality or performance for Google-Made Devices. Indeed, Google offers a limited warranty for hardware, including Google-Made Devices, which "is the only express warranty Google provides," and that warranty expressly limits any remedy to a device repair, replacement, or refund, at Google's discretion, within a year of purchase. Flynn Decl. ¶ 15; Bali Decl., Ex. 50. If the Purchaser Class truly takes issue with the quality of their Google-Made Devices, there is a process for addressing those concerns and it is not a claim for breach of the PP. Thus, even under this erroneous breach

theory, the de minimis rates of collection and disclosure of false accept audio, not to mention that the audio is collected only if a user opts into VAA, belies any argument that Google-Made Devices were susceptible to false accepts and subsequent sharing. Because there is no evidence of a classwide breach under any theory, summary judgment is warranted.

**4.    Any Breach of Any Promises in Google's PP Did Not Result in a Common Harm to the Purchaser Class**

Even if Google had made the alleged uniform promises in its PP (it did not) and even if there were evidence that Google breached those promises classwide (there is not), the breach of contract claim still fails because the Purchaser Class cannot show they paid a premium for their device or incurred any other common harm as a result of any such breach.

**a.    Google's Alleged Breach Did Not (and Could Not) Result in the Purchaser Class Overpaying for Google-Made Devices**

"An essential element of a claim for breach of contract are damages *resulting from the breach*." *St. Paul Fire & Marine Ins. Co. v. Am. Dynasty Surplus Lines Ins. Co.*, 101 Cal. App. 4th 1038, 1060 (2002) (emphasis in original); *see also, e.g.*, Cal. Civ. Code § 3300 (breach of contract damages are generally "the amount which will compensate the party aggrieved for all the detriment proximately caused thereby, or which, in the ordinary course of things, would be likely to result therefrom."); 1 Witkin, Summary 11th Contracts § 895 (2024) ("It is essential to establish a causal connection between the breach and the damages sought.").

Plaintiffs seek to omit causation entirely, framing their price premium as "the difference between what consumers paid for their device and what consumers would have paid for the device had Google adequately disclosed how Google Assistant operates"—i.e., damages caused by Google's alleged *promises*, not Google's alleged *breach*. Dkt. 360 at 25; *see also* Dkt. 222-1. This may be the appropriate measure in cases sounding in fraud, where a defendant sells a product while either concealing or misrepresenting the product's true characteristics. *See, e.g.*, *Brazil v. Dole Packaged Foods, LLC*, 660 F. App'x 531, 534–35 (9th Cir. 2016) (price premium should be "limited to the premium paid under a misunderstanding that Dole's fruit was indeed 'All Natural Fruit'"). But for *breach of contract*, the material question is not whether the

Purchaser Class overpaid for Google-Made Devices based on Google's alleged *promises*, but whether any such overpayment *resulted from* Google's purported *breach* of those promises. *See, e.g.*, *In re LinkedIn User Priv. Litig.*, 932 F. Supp. 2d 1089, 1093–94 (N.D. Cal. 2013) (distinguishing breach of contract elements from food-labeling misrepresentation claims). There is no evidence it did, whether a breach occurs when false accept audio is collected or disclosed to human reviewers or (incorrectly) understood to occur when a device is sold with lower quality than purportedly promised.

If a breach occurs when false accept audio is collected or shared, it cannot cause any price premium in the purchase of a Google-Made Device because (1) a Purchaser Class Member would purportedly "overpay" even if they never experienced a breach; and (2) the "overpayment" (i.e., damages) would *precede* any collection or sharing (i.e., breach).

***First***, damages are only recoverable for breach of contract where the breach "was a substantial factor in causing the damages." *US Ecology, Inc. v. State of Cal.*, 129 Cal. App. 4th 887, 909 (2005). "Conduct is not a substantial factor in causing harm if the same harm would have occurred without that conduct." *Michaels v. Greenberg Traurig, LLP*, 62 Cal. App. 5th 512, 531 (2021). Here, most class members paid for Google-Made Devices but never had any false accept audio collected or disclosed to human reviewers. *See supra* pp. 14–17. Because under Plaintiffs' theory these class members paid a "price premium" for their devices just like those whose false accept audio *was* collected or disclosed, they experienced the same damages without the allegedly wrongful conduct (collection and sharing of false accept audio). Price premium damages thus cannot result from the alleged breach. *See, e.g.*, *In re Ethan C.*, 54 Cal. 4th 610, 640 (2012); *Mitchell v. Gonzales*, 54 Cal. 3d 1041, 1052 (1991).

***Second***, damages cannot result from a breach that has not yet occurred. *See, e.g.*, *Genesis Ins. Co. v. Magma Design Automation, Inc.*, No. 5:06-CV-05526, 2017 WL 4642443, at *6 (N.D. Cal. Oct. 16, 2017) (recognizing that "injury sustained prior to the purported breach of a contract cannot support a claim for general or special damages, because it is factually impossible for a pre-existing injury to be proximately caused by a subsequent breach"). Here, any damages were purportedly incurred when a class member purchased a Google-Made Device. But at the time of

1    purchase, the contract has not even been formed, much less breached. A breach (i.e., the

2    collection and sharing of false accept audio) can only occur *after* the user purchases and activates

3    that device, makes an Assistant query, and experiences a false accept. Because an alleged price

4    premium for a device (damage) must *precede* any collection or sharing of false accept audio from

5    using Assistant on the device (breach), the breach plainly could not have caused the premium.

6    *See, e.g.*, *In re LinkedIn User Priv. Litig.*, 932 F. Supp. 2d at 1094 (breach of contract based on

7    failing to provide promised levels of security cannot cause a purchaser to not receive the full

8    benefit of the bargain because "this injury could only have occurred at some point before the

9    breach," when "the parties entered into the contract").

10    　　　　Even if a breach were (incorrectly) understood as occurring in the sale of a Google-Made

11    Device overly susceptible to collecting and disclosing false accept audio, such a breach also

12    cannot cause any price premium in payment for that device because breach and damages cannot

13    occur before contract formation. Most Google-Made Device users are not required to agree to

14    Google's TOS and PP until device activation, *after* they purchase the device. Flynn Decl. ¶¶ 18–

15    19. The alleged overpayment in purchase price for a device of lower-than-promised quality (i.e.,

16    breach and damages) thus would *precede* formation of the contract. But a party cannot breach a

17    contract or sustain resulting damages *before* the contract is even formed. *See, e.g.*, *In re Anthem,*

18    *Inc. Data Breach Litig.*, 162 F. Supp. 3d 953, 980 (N.D. Cal. 2016) (breach of contract cannot be

19    sustained if notices containing the alleged promises were sent to plaintiffs after the alleged

20    breach); *Gross v. Symantec Corp.*, No. C 12-00154, 2012 WL 3116158, at *12 (N.D. Cal. July

21    31, 2012) (dismissing breach of contract claim where "any 'breach' stemming from defects in

22    [the relevant software] must have occurred before the contract formed," because "a breach cannot

23    occur before contract formation"). Any alleged overpayment for poor performing Google-Made

24    Devices thus cannot comprise either damages or breach of promises in Google's PP.

25    　　　　That some class members (including Kumandan) may have agreed to the TOS and PP to

26    use *other* Google services before purchasing Google-Made Devices (in Kumandan's case, over a

27    decade before, and well before the launch of Assistant) does not affect this conclusion because

28    most Google-Made Device purchasers are only *required* to accept Google's TOS and PP *after* the

1   purchase is complete. *See, e.g.*, *Gardiner v. Walmart Inc.*, No. 20-cv-04618, 2021 WL 2520103,

2   at *6 (N.D. Cal. Mar. 5, 2021) (no benefit of the bargain damages for alleged breach of privacy

3   policy where plaintiff did not "allege that he was required to agree to or accept the terms of the

4   privacy policy prior to engaging in any purchase").

5           **b.    There Is No Evidence the Purchaser Class Overpaid for**

6                   **Google-Made Devices Due to a Price Premium for Google's**

7                   **Privacy Promises**

8           Finally, there is not even a scintilla of evidence to support class members' putative

9   "overpa[yment] for GAEDs as a result of the price premium attributable to [] Google's uniform,

10  contractual promises of privacy." Dkt. 360 at 32.

11          ***First***, the Purchaser Class has adduced zero evidence substantiating or quantifying any

12  "price premium" damages (or any other damages, for that matter). Although Plaintiffs filed expert

13  reports in support of class certification that proposed a survey and price premium calculation,

14  nothing further about either was ever produced or disclosed after class certification briefing was

15  complete. Bali Decl. ¶ 2. Indeed, Plaintiffs did not disclose *any* experts who may testify at trial, or

16  provide written merits reports, as required by Fed. R. Civ. P. 26(a)(2) and the Court's scheduling

17  orders. *Id.*; Dkts. 161, 205. Now it is too late. *See Day v. GEICO Casualty Co.*, No. 21-cv-02103,

18  2024 WL 251408, at *3 (N.D. Cal. Jan. 23, 2024) (striking supplemental expert declaration

19  provided for the first time in opposition to a motion for summary judgment). This alone is

20  dispositive. *See Aguilera v. Pirelli Armstrong Tire Corp.*, 223 F.3d 1010, 1015 (9th Cir. 2000)

21  ("Under California law, a breach of contract claim requires a showing of appreciable and actual

22  damage."); *see also Ruiz v. Gap, Inc.*, 380 F. App'x 689, 691 (9th Cir. 2010) (similar).

23          Tellingly, even Kumandan (1) could not remember how much he paid for his Pixel

24  devices, (2) did not produce any purchase receipts, and (3) testified that he might have received a

25  discount or traded in an older phone at the time of purchase. Kumandan Tr. at 65:24–71:8; 84:5–

26  90:1. Kumandan also rightfully testified that he did *not* lose money or suffer any financial harm.

27  *See id.* at 70:18–71:8, 80:8–21, 182:4–8. Indeed, Kumandan continued to purchase Pixel devices

28  even *after* filing this lawsuit. *See id.* at 98:3–8. Kumandan thus exemplifies the absence of

evidence substantiating damages for the Purchaser Class. Because neither Kumandan nor the Purchaser Class can show that anyone overpaid for their devices, but rather the evidence shows that they received exactly what they bargained for, summary judgment is proper. *See Harmoush v. Allstate Ins. Co.*, No. CV 10-4664, 2012 WL 13005929, at *4 (C.D. Cal. Mar. 12, 2012) (granting summary judgment for defendant on breach of contract claim because plaintiff "failed to substantiate the damages").

**Second**, there is no evidence that *any* portion of the payments (or overpayments) made by the Purchaser Class was attributable to the privacy promises allegedly made in the PP. Google makes the same promises in its PP to all users across a range of services, whether or not they purchased a Google-Made Device. Flynn Decl. ¶ 5; Dkt. 80 at 40 (observing that the TOS and PP "do not allude to any particular product or products"). As a result, the purchase price cannot be paid in exchange for any such promises. *See, e.g.*, *In re LinkedIn User Priv. Litig.*, 932 F. Supp. 2d at 1093 (because the LinkedIn terms "are the same for the premium membership as they are for the nonpaying basic membership," when "a member purchases a premium account upgrade, the bargain is not for a particular level of security").

Further, a Google-Made Device sale or purchase does not require agreement to Google's TOS and PP: many Purchaser Class members (including Kumandan) purchased Google-Made Devices from third-party retailers subject to *those retailers'* own contractual terms, not Google's. Flynn Decl. ¶ 14; Kumandan Tr. 65:16–19; 86:17–23 (testifying he purchased his devices from third-party Verizon); Dkt. 463 at 4. Any putative promises in Google's PP therefore must be entirely independent from any amounts paid for Google-Made Devices. This is fatal to any attempt to obtain benefit-of-the-bargain damages. In *Svenson v. Google Inc.*, the plaintiff allegedly agreed to Google's PP and other terms, in which Google allegedly promised privacy protections it did not deliver, but did so "separately from her actual purchase of the App." 65 F. Supp. 3d 717, 724 (N.D. Cal. 2014). There were no allegations that Plaintiff "entered into a new or different agreement upon purchase of the App that could have given rise to new or additional privacy protections" and "the only payment made was . . . $1.77 to the third-party vendor for the App." *Id.* Because those allegations did "not show that Plaintiff paid *anything* for the asserted

1  privacy protections," this Court dismissed the breach of contract claim. *Id.* (emphasis added). So

2  too here: there is no evidence of any "new or additional privacy protections" promised "upon

3  purchase of" a Google-Made Device, only at most the *same TOS and PP* presented to any user of

4  Assistant or a wide array of other Google services. Accordingly, no evidence supports Plaintiffs'

5  price premium damages theory.

6      **Finally**, Plaintiffs' price premium theory fails because their grievance is with Assistant,

7  which is a free service. Their claims have always been premised on Google's allegedly wrongful

8  collection and disclosure of false accept audio via ***Assistant itself***, not tethered to the type, make,

9  or model of any device(s) on which it runs. *See, e.g.*, Dkt. 360 at 2–3; FAC ¶¶ 4, 8, 79–83, 92–93,

10  96–99, 103, 124, 245. This is fatal to the breach of contract claim because Assistant "is available

11  free of charge for use on Google Assistant Enabled Devices." Dkt. 80 at 37; *see also* Flynn Decl.

12  ¶ 14. No price premium is available for free services. *See Huynh v. Quora, Inc.*, No. 18-CV-

13  07597, 2019 WL 11502875, at *10 (N.D. Cal. Dec. 19, 2019) (concluding the plaintiff failed to

14  allege "benefit of the bargain" damages because they could not show that "they paid anything for

15  the asserted privacy protections," given that the "services were free"); *Svenson*, 65 F. Supp. 3d at

16  724; *see also* Dkt. 80 at 37 (it "cannot be said that Plaintiffs received less than what they paid

17  for—they appeared to have paid nothing" for Assistant).

18      For all these reasons, there is no genuine dispute of material fact as to any element of the

19  Purchaser Class's breach of contract claim and Defendants are entitled to summary judgment.

20      **B.    The Purchaser Class's UCL Claims Fail As A Matter of Law**

21      Defendants are likewise entitled to summary judgment on the Purchaser Class's tagalong

22  UCL "unlawful" prong claims, premised on the same failed theory that Google breached privacy

23  promises in its PP, whether predicated on common law breach of contract or a violation of Bus. &

24  Prof. Code Section 22576.

25          **1.    The UCL Unlawful Prong Claims Premised on the Same Failed Breach**

26              **of PP Theory Likewise Fail**

27      Because the Purchaser Class's breach of contract claim fails, so too does their UCL

28  unlawful claim predicated on it. *See Delaney v. Aurora Loan Servicing, Inc.*, No. C 09-3131,

2010 WL 11583448, at *3 (N.D. Cal. Mar. 1, 2010). In any event, a breach of contract claim "alone do[es] not amount to violation of the 'unlawful' prong of § 17200." *Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1043–44 (9th Cir. 2010). Plaintiffs must show that Google "engaged in a business practice forbidden by law," as "a common law violation such as a breach of contract is insufficient." *Id*. at 1044 (cleaned up); *see also Cetera Advisor Networks LLC v. Protective Prop. and Casualty Ins. Co.*, No. 2:19-cv-00299, 2024 WL 4347399, at *14 (E.D. Cal. Sept. 30, 2024) (granting summary judgment on UCL claim predicated on breach of contract where there was no evidence the conduct was otherwise unlawful, unfair, or fraudulent).

And although Plaintiffs' UCL unlawful claim is also predicated on Bus. & Prof. Code Section 22576, that claim fails too. Section 22576 prohibits "[a]n operator of a[n] . . . online service" from "[k]nowingly and willfully" or "[n]egligently and materially" violating "its posted privacy policy." But again, there is no evidence that Google "violate[d] its posted privacy policy." *See supra* pp. 7–17. And even if there were, there is no evidence that any purported violation was knowing and willful, or negligent and material. Cal. Bus. & Prof. Code § 22576. Instead, Google makes substantial efforts *not* to collect or share false accept audio, including designing its systems to *avoid* collecting false accept audio, working to reduce the occurrence of false accepts, and ███████████████████████████████████████████████████████████████ ██████████████████████████████████████████████ *See, e.g.*, Beaufays Decl. ¶¶ 14–20; Cohen Decl. ¶ 3; Bali Decl., Ex. 9 at GOOG-ASST-03041953–55, Ex. 11. Finally, the small number of false accepts logged by Google, and the even smaller number made accessible to review vendors, makes any purported violation not "material." *See Viacom Int'l Inc. v. MGA Ent., Inc.*, No. CV 15-9621, 2016 WL 7448142, at *1 (C.D. Cal. Aug. 11, 2016) (finding no material breach of contract where defendant achieved 96% compliance with contractual obligations).

### 2. The Purchaser Class Cannot Establish Economic Injury

To have standing under the UCL, the Purchaser Class must have "lost money or property as a result of the unfair competition." Cal. Bus. & Prof. Code § 17204; *see also Kwiket Corp. v. Superior Court*, 51 Cal. 4th 310, 320 (2011). Assuming Plaintiffs' theory of economic harm is the same as their damages theory—that they overpaid for devices that did not perform as Google

1  promised in its PP (*see* Dkt. 360; FAC ¶ 262)—that theory does not work where Plaintiffs cannot

2  show that Google breached the terms of its PP (*see supra* pp. 7–17), or that such breach deprived

3  them of the benefit of their bargain (*see supra* pp. 17–22). *See, e.g.*, *Cappello v. Walmart, Inc.*,

4  394 F. Supp. 3d 1015, 1020 (N.D. Cal. 2019) (standing based on theory that breach of privacy

5  protections deprived plaintiffs of the benefit of their bargain requires adequately alleging breach

6  of privacy agreement); *Gerber v. Twitter, Inc.*, No. 4:23-cv-00186, 2024 WL 5173313, at *10

7  (N.D. Cal. Dec. 18, 2024) (UCL harm requirement not satisfied where plaintiffs' "express breach

8  of contract claim for violations of the privacy policy is not actionable").

9                    **3.      The Purchaser Class Is Not Entitled to Equitable Relief**

10         The Purchaser Class cannot establish that they lack an adequate remedy at law, which is

11  required for equitable relief under the UCL. *See, e.g.*, *Sonner v. Premier Nutrition Corp.*, 971

12  F.3d 834 (9th Cir. 2020); *see also* Dkt. 360 at n.7 (noting that "equitable relief under the UCL

13  dependent on Plaintiffs' breach of contract claim may be foreclosed under *Sonner*"). Plaintiffs

14  advance the same price premium theory as damages for breach of contract and as restitution under

15  the UCL, but fail to explain "how the same amount of money for the exact same harm is

16  inadequate or incomplete." *Sonner*, 971 F.3d at 844.

17         There also is no risk of ongoing harm warranting injunctive relief. *See Noori v. Bank of

18  Am., N.A.*, 710 F. App'x 757, 759 (9th Cir. 2018) (affirming summary judgment on UCL claim

19  where defendant "corrected" issue and "mooted" need for injunctive relief); *see also Wynn v.

20  United Parcel Serv., Inc.*, No. 23-CV-06044, 2024 WL 3560727, at *5 (N.D. Cal. July 26, 2024)

21  (dismissing UCL claim where plaintiff had "no claim for injunctive relief" and sought restitution

22  "duplicative of damages available" under other claims). Google has already amended its PP to

23  make it even more clear that whether Google collects voice and audio information depends on

24  whether a user enables VAA and that "external processing" covers the use of human review

25  vendors. Bali Decl., Ex. 7, Ex. 49 at 15. And the current VAA consent expressly discloses both

26  the possibility of misactivations and the use of human reviewers to analyze audio. *Id.*, Ex. 7.

27         Because a price premium for breach of contract is an adequate remedy at law, Plaintiffs'

28  UCL claim should be dismissed without prejudice for lack of equitable jurisdiction, even if the

1  breach of contract claim fails. *See Guzman v. Polaris Indus. Inc.*, 49 F.4th 1308, 1313 (9th Cir.

2  2022); *see also Key v. Qualcomm Inc.*, No. 23-3354, 2025 WL 597604, at *9 (9th Cir. Feb. 25,

3  2025) (explaining that plaintiffs' "failure to prove" their damages claim at summary judgment

4  "does not make that remedy inadequate") (citation omitted).

5        Further, despite extensive discovery, the record evinces no support for restitution.

6  Restitution is measured by "[t]he difference between what the plaintiff paid and the value of what

7  the plaintiff received." *Chowning v. Kohl's Dep't Stores, Inc.*, 733 F. App'x 404, 405 (9th Cir.

8  2018) (cleaned up). Nothing in the record addresses how much class members paid for their

9  devices or how much those devices were worth, thus summary judgment is proper for this reason

10  too. *See id.* at 406 (affirming summary judgment on UCL claim where plaintiff "introduced no

11  competent evidence" about value received making the calculation of restitution "impossible"); *see*

12  *also In re Tobacco Cases II*, 240 Cal. App. 4th 779, 792 (2015); *supra* pp. 20–22.

13        **C.    Alphabet Is Not a Proper Defendant and Should Be Dismissed**

14        Alphabet—Google's parent company—has no role in this case. Alphabet is not a party to

15  the contract. *See, e.g.*, Ex. 20 at 3 ("Google services are provided by, and you're contracting with:

16  Google LLC . . ."), Ex. 49 at 23 ("This Privacy Policy applies to all of the services offered by

17  Google LLC and its affiliates . . ."). Thus, it cannot be liable for breach of those contracts. *See*

18  *Wright v. Allstate Ins. Co. of Cal.*, No. 15-CV-01020, 2015 WL 1548949, at *2 (N.D. Cal. Apr. 7,

19  2015); *Ryan v. Aegis Specialty Ins.*, No. CV 20-1230, 2021 WL 6618753, at *5 (C.D. Cal. Nov. 1,

20  2021) (parent company was not proper defendant for breach of contract claim because "the

21  agreement attached to the FAC did not involve [the parent company]"). Further, there is no

22  evidence that Alphabet directly participated in any of the alleged conduct on which Plaintiffs' and

23  the class claims are based, thus it cannot be held liable for those claims, which are "merely

24  derived from its parent-subsidiary relationship." *Stickrath v. Globalstar, Inc.*, 527 F. Supp. 2d

25  992, 1002–03 (N.D. Cal. 2007). As a result, Alphabet should be dismissed.

26  **VI.    CONCLUSION**

27        For the foregoing reasons, Google respectfully requests that the Court grant summary

28  judgment in favor of Defendants on all of the Purchaser Class claims.

CASE NO. 5:19-CV-04286-BLF-SVK
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Dated:  February 28, 2025

**PERKINS COIE LLP**


By:    /s/ Sunita Bali
Bobbie J. Wilson, Bar No. 148317
Sunita Bali, Bar No. 274108
Erin Earl (*pro hac vice*)

Attorneys for Defendants
Alphabet Inc. and Google LLC

CASE NO. 5:19-CV-04286-BLF-SVK
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT