EXHIBIT G

Redacted Version of Borck Decl.

Dkt. 512-7

| | |
|---|---|
| 1 | Bobbie J. Wilson, Bar No. 148317 |
|  | BWilson@perkinscoie.com |
| 2 | Sunita Bali, Bar No. 274108 |
|  | SBali@perkinscoie.com |
| 3 | Elliott Joh, Bar No. 264927 |
|  | EJoh@perkinscoie.com |
| 4 | PERKINS COIE LLP |
|  | 505 Howard Street, Suite 1000 |
| 5 | San Francisco, California 94105 |
|  | Telephone: +1.415.344.7000 |
| 6 | Facsimile:  +1.415.344.7050 |
| 7 | Erin K. Earl (*pro hac vice*) |
|  | EEarl@perkinscoie.com |
| 8 | PERKINS COIE LLP |
|  | 1201 Third Avenue, Suite 4900 |
| 9 | Seattle, Washington 98101-3099 |
|  | Telephone: +1.206.359.8000 |
| 10 | Facsimile: +1.206.359.9000 |
| 11 | Justin Potesta, Bar No. 314133 |
|  | JPotesta@perkinscoie.com |
| 12 | PERKINS COIE LLP |
|  | 405 Colorado Street, Suite 1700 |
| 13 | Austin, TX 78701 |
|  | Telephone: +1.737.256.6100 |
| 14 | Facsimile: +1.737.256.6300 |
| 15 | Attorneys for Defendants |
|  | ALPHABET INC. and GOOGLE LLC |

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| IN RE GOOGLE ASSISTANT PRIVACY LITIGATION. | Case No. 5:19-cv-04286-BLF<br><br>**DECLARATION OF JONATHAN BORCK, PH.D.**<br><br>**HIGHLY CONFIDENTIAL – AEO** |

EXHIBIT FILED UNDER SEAL

<u>HIGHLY CONFIDENTIAL – AEO</u>

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

| | |
|---|---|
| IN RE GOOGLE ASSISTANT PRIVACY LITIGATION | Case No. 5:19-cv-04286-BLF |

**DECLARATION OF JONATHAN BORCK, PH.D.**

**April 18, 2025**

**Highly Confidential – AEO**

<u>**HIGHLY CONFIDENTIAL – AEO**</u>

## I. INTRODUCTION

### A. Qualifications

1. I am a Vice President at Analysis Group, Inc., an international economics consulting firm headquartered in Boston, Massachusetts, and an Adjunct Lecturer in Public Policy at Harvard Kennedy School, Harvard University. I specialize in the application of statistics and economics to topics in business and public policy.

2. In my professional career as a consultant over the past 16 years, I have selected, analyzed, and evaluated samples in sectors across the economy. For example, I have designed protocols for the sampling of software invoices, title insurance documents, and medical claims. I have conducted statistical analyses in the context of disputes in health care, finance, data privacy, and other areas. I have testified as an expert in multiple forums.

3. I have taught probability, statistics, and economics to master's degree students at Harvard Kennedy School since 2013. My course in probability and statistics covers sampling, the evaluation and analysis of datasets, and the interpretation of statistical results, among other topics. My course in economics includes the measurement of benefits, costs, and profits, among other topics. I was previously an instructor in microeconomics and environmental economics at Harvard College and Northeastern University.

4. I hold a Bachelor of Science degree in Civil Engineering, with a focus on environmental engineering, from Rice University, and a Ph.D. in Public Policy from Harvard University. A copy of my CV, including a list of the trial and deposition testimony I have given in the last four years, is attached as **Appendix A**.

### B. Case Background

5. I submitted a declaration in this matter on October 15, 2024, in response to the Court's instructions to the parties to design a plan for the sampling of hotword-initiated Assistant queries.[1] I understand that the Court ultimately ordered that Google "randomly select 10,000 Google Assistant queries" on "1 randomly selected day per quarter."[2] I further understand that 25 quarters (2016 Q4 through and including 2022 Q4) are at issue, leading to a total sample size of 250,000 queries.

6. I understand that Google randomly selected the sample and then evaluated the 250,000 sampled queries according to the Court's instructions.[3] Terry Tai, a Software Engineer at Google, submitted a declaration on February 26, 2025, summarizing, among other things, the results of Google's analysis of the sample of 250,000 queries that it had selected.[4]

7. Dr. Mary Beth Landrum submitted a declaration on behalf of Plaintiffs on March 28, 2025.[5] Dr. Landrum offered opinions related to the Tai Declaration and the underlying data.

### C. Assignment

8. Counsel for Google has asked me to review and respond to the Landrum Declaration.

9. In performing this work, I have relied on the Landrum Declaration, the Tai Declaration, the Supplemental Beaufays Declaration, the data about the sampled queries included in the

---

[1] Declaration of Jonathan Borck, Ph.D. in Support of Defendants' Statement on Data Sampling, October 15, 2024.

[2] Corrected Order Re Modified Sampling Protocol, October 18, 2024.

[3] Supplemental Declaration of Françoise Beaufays in Support of Defendants Alphabet Inc. and Google LLC's Reply in Support of Motion for Summary Judgment, April 17, 2025 ("Supplemental Beaufays Declaration").

[4] Declaration of Terry Tai in Support of Defendants Alphabet Inc. and Google LLC's Motion for Summary Judgment, February 26, 2025 ("Tai Declaration").

[5] Declaration of Dr. Mary Beth Landrum, Ph.D., March 28, 2025 ("Landrum Declaration").

2

two files Bates labeled GOOG-ASST-03047491 and GOOG-ASST-03047493, and the publicly available materials cited in the footnotes in this declaration.

10. Analysis Group is compensated at the rate of $970 per hour for my time. Research and analysis for this report was also performed by Analysis Group personnel under my direction and guidance. Neither my compensation nor that of Analysis Group is contingent upon my findings, the testimony I may give, or the outcome of this litigation.

**II.    RESPONSES TO THE LANDRUM DECLARATION**

11. The Landrum Declaration seeks to cast doubt in several ways on the validity of the sampling methodology and the sample that Google selected and analyzed in response to the Court's October 18, 2024, order. I have seen no evidence to suggest anything invalid with the sample that Google selected nor the approach that Google took to analyze it.

12. <u>First</u>, Dr. Landrum reviewed the full sample of 250,000 queries, notes that Android (i.e., Pixel) phones accounted for a larger share of the subsamples of 10,000 queries each quarter in early years than in later years, and observes that "it is unclear if the drop in Android queries over time is consistent with the full universe of data or if this is indicative of an unrepresentative sample."[6] To be sure, Dr. Landrum does not conclude that the sample is unrepresentative, but she speculates that it might be.

13. In statistical parlance, an unrepresentative sample is a sample that does not approximately match the characteristics of the population from which it was drawn. I use the word "approximately" because some limited differences between the sample and the population are to be expected given the randomness inherent to sampling, i.e., the "luck of the draw."

---

[6] Landrum Declaration, ¶ 7.

3

When a sample is randomly selected — as I understand was the case for each subsample of 10,000 queries in a quarter, per the Court's order and as confirmed in the Supplemental Beaufays Declaration[7] — it is expected to be representative of the population.[8] It is highly unlikely for a randomly chosen sample not to approximately match the characteristics of the population from which it was selected. This is especially true for a sample size of 10,000 queries each quarter, which is a relatively large sample.

14. The fact that the share of queries from Pixel devices in each quarterly subsample of 10,000 queries declined over time does not by itself mean that the sample is unrepresentative of the full population of logged queries from a given quarter. In raising the possibility, Dr. Landrum does not appear to have considered that the composition of all logged queries may well have changed over time. For example, as Google introduced more non-Pixel devices into the marketplace, even if the total number of queries increased from one quarter to the next, the *share* of those queries made from Pixel phones may have gone down. If this were the case, each quarterly subsample of 10,000 queries would likely include a smaller percentage of queries from Pixel phones.

15. Publicly available information indicates that the set of Google-made devices with voice activation capabilities did in fact change over time.[9] For example, Google introduced and

---

[7]   Supplemental Beaufays Declaration, ¶ 4.

[8]   See, e.g., David H. Kaye and David A. Freedman, "Reference Guide on Statistics," pp. 211-302 in *Reference Manual on Scientific Evidence*, Third Edition, The National Academies Press, 2011, at p. 226 ("Probability sampling ensures that within the limits of chance… the sample will be representative of the sampling frame.").

[9]   See also Supplemental Beaufays Declaration, ¶ 5 (discussing "some advanced Google Home and Nest devices (launched during the later part of the class period)…").

4

started selling the Google Home Hub in Q4 2018, two years into the sampling period.[10] Similarly, Google introduced and started selling the Google Nest Hub Max in Q3 2019, even later in the sampling period.[11] Both devices can be used to activate Assistant by a hotword. Consequently, it is not surprising that the quarterly subsamples in later quarters include a larger share of queries from Google Home, Google Nest Hub Max, and other devices that did not exist in earlier quarters, and a smaller share of queries from Pixel phones, which were available throughout the sampling period. I see no reason to doubt the representativeness of each quarterly subsample that Google selected based on the statistics that Dr. Landrum provides.

16. Second, Dr. Landrum opines that the subset of ▬ sampled queries that Google manually reviewed is "skewed."[12] To be clear, Dr. Landrum does not opine that the entire sample of 250,000 queries was in any way "skewed." Her opinion appears limited to the subset of sampled queries that Google manually reviewed. But even with respect to the subset of ▬ manually reviewed queries, Dr. Landrum's conclusion is incorrect and appears to be based on a misleading interpretation of the approach that Google took and that is described in the Tai Declaration and the Supplemental Beaufays Declaration. In my view, Google's approach is statistically reasonable and valid. I summarize it below.

---

[10] See, e.g., Natt Garun, "The 5 Biggest Announcements from the Google Pixel 3 Event," *The Verge*, October 9, 2018, available at https://www.theverge.com/2018/10/9/17938340/google-pixel-3-event-news-recap-highlights-2018.

[11] See, e.g., Andrew Gebhart, "Google confirmed Nest Hub Max has a release date: Sept. 9," *CNET*, July 24, 2019, available at https://www.cnet.com/home/smart-home/google-confirmed-nest-hub-max-has-a-release-date-sept-9/.

[12] Dr. Landrum uses the phrases "skewed" or "heavily skewed" six times in her declaration. Landrum Declaration, ¶¶ 10, 11, and 13.

5

a. First, as noted above, Google selected a random sample of 10,000 queries from one randomly selected day each quarter for 25 quarters.[13] The total sample size was therefore 250,000 queries.

b. Second, Google analyzed the top hypothesis field for all 250,000 queries in the sample.[14] As Mr. Tai explained, that analysis determined that ▇ of the 250,000 queries (▇ of the sample) included a hotword in the "top hypothesis" field, while ▇ of the queries (▇ of the sample) did not.[15]

c. Third, Google took a closer look at the ▇ queries that did not include a hotword in the "top hypothesis" field.[16] This closer look consisted of "a manual review of the unredacted versions" of this subset of queries.[17] The manual review found that ▇ of the ▇ queries were likely intended for Google even though they did not have a hotword in the "top hypothesis" field; ▇ queries were likely not intended for Google; and ▇ queries were coded as "unknown."[18]

---

[13]  Tai Declaration, ¶ 14; Supplemental Beaufays Declaration, ¶ 4.

[14]  Dr. Landrum states that "Google only reviewed ▇ of the sample" (Landrum Declaration, ¶ 9). If, by "reviewed," Dr. Landrum means "manually reviewed," I agree. If she means "analyzed," I disagree: Google analyzed *all* 250,000 queries in the sample.

[15]  The hotwords included the phrases "hey Google" and "okay Google." (*See* GOOG-ASST-03047491.) Dr. Landrum states that Mr. Tai "assum[es]" that these ▇ queries "were all intended for Google." (Landrum Declaration, ¶ 9.) I cannot find such an assumption in the Tai Declaration. Mr. Tai is clear to distinguish between the two types of findings: a hotword in the "top hypothesis" field; or a query that, based on a manual review, appears as likely intended for Google (Tai Declaration, ¶ 20).

[16]  Tai Declaration, ¶ 19.

[17]  Tai Declaration, ¶ 19.

[18]  Tai Declaration, ¶ 19.

6

17. Dr. Landrum is therefore incorrect to refer to the subset of ▮ queries as "skewed" or a "skewed sample." The subset of ▮ queries is not a random sample at all, and it was never intended to be a random sample. Instead, it is a portion of the random sample of 250,000 queries that Google determined was worthy of further review after its initial analysis of the entire sample of 250,000 queries had been completed.

18. In my view, there is nothing invalid about the two-step approach that Google took to evaluate the random sample of 250,000 queries. As described above, Google screened the "top hypothesis" field for all queries to determine whether it contained a hotword. For the vast majority of queries, it did. For the ▮ that did not, Google embarked on a more labor-intensive manual review to learn more. Such an approach is reasonable given what I understand to be the relevant questions in this matter.

19. Dr. Landrum notes that the subset of ▮ queries that Google manually reviewed in the second step of its analysis includes larger-than-expected shares of queries from certain device types and from certain time periods.[19] There is nothing statistically invalid about this result, however, and in my view it raises no statistical concerns. Again, the subset of ▮ queries was not a randomly selected sample and thus would not be expected to be representative of the population of all queries. Instead, the composition of the subset of ▮ queries is driven by what appears (or, more precisely, what does *not* appear) in the "top hypothesis" field. It turned out that more queries from certain devices and certain time periods do not include a hotword in the "top hypothesis" field. That observation in no way suggests that the sampling process or the sample itself is flawed.

---

[19] Landrum Declaration, ¶¶ 10-11.

20. My conclusions are as follows. Based on my review of the Tai Declaration, the Supplemental Beaufays Declaration, and the underlying data that Google produced, I see no reason to dispute Mr. Tai's conclusion that "only ▮ queries, which is approximately ▮ of the 250,000 sampled queries, did not include the hotword in the 'redacted top hypothesis' [field] (Column E) or otherwise appear to reviewers to be likely intended for Google."[20] Dr. Landrum's observations about trends in the composition of the sample of 250,000 queries over time do not mean that the sample of 250,000 queries is not representative of the population from which it was drawn, as I would expect any patterns in a randomly selected sample to reflect underlying patterns in the population itself. Finally, I see no evidence for any "skew" in Google's approach or the subset of ▮ sampled queries it manually reviewed. I consider Dr. Landrum's repeated use of the word "skew" to be inapt and misleading.

April 18, 2025

_____
Jonathan C. Borck, Ph.D.

---

[20] Tai Declaration, ¶ 5.

# APPENDIX A

# JONATHAN C. BORCK
**Vice President**

| | |
|---|---|
| Direct Line: 617 425 8207 | 111 Huntington Avenue |
| Office: 617 425 8001 | 14th Floor |
| jonathan.borck@analysisgroup.com | Boston, MA 02199 |

Dr. Borck specializes in the application of statistics and economics to topics in business and public policy. He has developed, executed, and critiqued sampling protocols for the sampling of medical claims, business records, and mortgage loans. He has conducted statistical analysis in diverse areas, including antitrust and competition, technology and digital platforms, health care, mortgages and housing, property insurance, and the environment. Dr. Borck has served as an expert in disputes involving sampling, statistics, and the calculation of damages before federal courts, state courts, and arbitration panels. He has coauthored chapters and consulting reports on various topics in economics, business, and public policy, including an overview of firms' abilities to achieve lost profits, the economics of apps, and the economics of scrap metal recycling. In addition to his work as a consultant and expert witness at Analysis Group, he is an adjunct lecturer in public policy at the Harvard Kennedy School, where he has designed and taught a course in probability and statistics for more than 10 years.

**EDUCATION**

| | |
|---|---|
| 2008 | Ph.D., public policy, Harvard University |
| 2000 | B.S.C.E. (*summa cum laude*), Rice University |

**PROFESSIONAL EXPERIENCE**

| | |
|---|---|
| 2008–Present | Analysis Group, Inc. <br> *Vice President (2015–Present)*, *Manager (2011–2014)*, *Associate (2008–2010)* |
| 2013–2016 and 2018–Present | John F. Kennedy School of Government, Harvard University <br> *Adjunct Lecturer in Public Policy* <br> Courses taught: Probability and Statistics (API-201), Economics (API-102) |
| 2006–2010 | Department of Economics, Harvard University <br> *Tutorial Leader* <br> Course taught: Sophomore Tutorial (ECON 970) |
| 2006 | Department of Economics, Northeastern University <br> *Instructor* <br> Courses taught: Principles of Microeconomics, Senior Seminar in Economics |

A-2

2003–2008  John F. Kennedy School of Government, Harvard University
*Graduate Student Instructor*
Courses taught: Microeconomics, Math Camp for Incoming Ph.D. Students

**EXPERT TESTIMONY (SAMPLING AND STATISTICS)**

*Revvity Signals Software, Inc. v. Cloud Software Group, Inc. f/k/a TIBCO Software Inc.*
Superior Court of the Commonwealth of Massachusetts, County of Suffolk
Civil Action No. 2484CV00766-BLS1
Topic: Sampling and damages in a breach of contract dispute involving software
Expert reports, deposition, testimony at trial
2024–2025

*In re: Google Assistant Privacy Litigation*
US District Court, Northern District of California, San Jose Division
No. 5:19-cv-04286-BLF
Topic: Sampling of voice activation records
Declaration
2024

*The Connectors Realty Group Corporation and Darryl Williams v. State Farm Fire & Casualty Company*
US District Court, Northern District of Illinois, Eastern Division
No. 19-cv-00743
Topic: Sampling and statistics in a dispute involving insurance claims
Declaration, expert report, deposition
2022–2023

*Aetna, Inc., et al. v. Mednax, Inc. et al.*
US District Court, Eastern District of Pennsylvania
No. 18-cv-02217-WB
Topic: Sampling and statistics in a dispute involving medical claims
Expert reports, deposition
2020–2021

**EXPERT TESTIMONY (DAMAGES)**

*Confidential arbitration*
American Arbitration Association
Topic: Damages in a breach of contract dispute involving medical claims
Expert reports, deposition
2023–2024

*Confidential arbitration*
American Arbitration Association
Topic: Damages in a breach of contract dispute involving medical claims
Expert reports, deposition, testimony at arbitration hearing
2022

*Oakland Bulk and Oversized Terminal, LLC, et al. v. City of Oakland*
Superior Court of the State of California, County of Alameda
Consolidated Civil Case Nos. RG18930929/RG20062473
Topic: Damages in a breach of contract dispute involving shipments of goods
Expert reports, depositions, testimony at trial
2021–2023

**SELECTED CONSULTING ENGAGEMENTS**

**Antitrust and Competition**

- Supported an expert in the analysis of allegedly anticompetitive practices among health insurers and the effects on provider reimbursements
- Supported an expert in the analysis of allegedly anticompetitive practices among pharmacy benefit managers
- Supported an expert in the analysis of potential competitive effects of a proposed acquisition in the book publishing sector
- Supported experts in the analysis of alleged anticompetitive behavior in the recycling industry
- Supported an expert in analyzing contracts and estimating damages in an antitrust matter in the technology sector
- Supported experts in evaluating alleged overcharges by a cartel in the cargo transportation sector
- Supported an expert in the analysis of alleged monopsony power in the agricultural sector

**Technology and Digital Platforms**

- Supported several of the plaintiff's experts in litigation over Elon Musk's 2022 acquisition of Twitter (*Twitter, Inc. v. Elon Musk, et al.*, Delaware Chancery Court)
- Coauthored studies estimating the size of the Apple App Store ecosystem in 2019, 2020, and 2022
- Coauthored a study surveying commission rates charged by Apple's App Store, other app stores, and other digital marketplaces
- Assessed a popular platform's algorithms for sampling and identifying objectionable content on the platform
- Conducted an economic impact study for a US technology company of a regulatory change on workers, consumers, and tax revenue

**Illinois Biometric Information Privacy Act (BIPA)**

- Prepared several estimates of potential class sizes and penalties for alleged violations of BIPA

**Mortgages and Housing**

- Supported an expert in the analysis and critique of statistical sampling methodologies for the evaluation of mortgages and mortgage-backed securities (MBS)
- Supported several experts in the analysis of the performance of mortgages and MBS, including through the use of econometric modeling techniques
- Supported an expert in the analysis of discrimination in the maintenance of real estate owned (REO) properties

**Energy and Environment**

- Supported an expert in the analysis of the benefits and costs of proposed restrictions on water use in *Florida v. Georgia*, an "equitable apportionment" case before the US Supreme Court
- Analyzed issues in the design of state and federal climate policies
- Analyzed the value of water and the costs of options to provide it for a state government
- Supported an expert in the estimation of damages from groundwater contamination
- Supported an expert in the analysis of the history of regulatory rulemaking related to a fuel additive and the benefits and costs of an alternative fuel
- Supported an expert in the analysis and critique of the use of benefit transfer and contingent valuation methods for estimating damages arising from contamination of wetlands
- Supported an expert in the analysis and critique of hedonic property value methods to estimate groundwater contamination in an urban area
- Coauthored a study on the economics of the scrap metal recycling industry
- Coauthored a study on the likely effectiveness of green building requirements

**Other**

- Supported experts and the Government of Australia in the statistical analysis of survey data on smoking habits and the effectiveness of public policies designed to reduce smoking prevalence
- Supported experts on damages and advertising issues in a breach-of-contract dispute in the personal care products sector
- Supported an expert in the analysis of a contractual non-compete clause in the agricultural industry
- Supported an expert in the estimation of damages in a patent infringement matter in the jewelry industry
- Analyzed medical malpractice verdicts involving a condition addressed by a new drug
- Supported an expert in evaluations of the safety cultures of firms in the oil and gas industry, the mining industry, and the automobile sector

A-4

**ARTICLES, CHAPTERS, REPORTS, AND OTHER PUBLICATIONS**

"The Continued Growth and Resilience of Apple's App Store Ecosystem," with Juliette Caminade, prepared for Apple, May 2023

"Small Business Developers and App Creators on the App Store," with Juliette Caminade, prepared for Apple, May 2023

"The Ability to Achieve Lost Sales as a Consideration in Damages Analyses," with Aaron C. Yeater, Chapter 15 in *Lost Profits Damages: Principles, Methods, and Applications*, second edition, Everett P. Harry III and Jeffrey H. Kinrich, eds., 2022

"A Global Perspective on the Apple App Store Ecosystem: An Exploration of Small Businesses Within the App Store Ecosystem," with Juliette Caminade and Markus von Wartburg, prepared for Apple, June 2021

"Apple's App Store and Other Digital Marketplaces: A Comparison of Commission Rates," with Juliette Caminade and Markus von Wartburg, prepared for Apple, July 22, 2020

"How Large is the Apple App Store Ecosystem? A Global Perspective for 2019," with Juliette Caminade and Markus von Wartburg, prepared for Apple, June 15, 2020

"Great Recession Holds Mortgage Crisis Lessons for Today," with Mark Howrey and Lauren Hunt, *Law360*, May 19, 2020

"An Economic Perspective on Building Labeling Policies," with Robert N. Stavins and Todd Schatzki, prepared for the Greater Boston Real Estate Board, March 28, 2013

"The Applicability of the EPA Market Forces Study to the Scrap Metal Recycling Industry," with Robert N. Stavins and Janis Carey, prepared for the Institute of Scrap Recycling Industries, October 20, 2011

"Beyond Compliance: Explaining Business Participation in Voluntary Environmental Programs," with Cary Coglianese, Chapter 7 in *Explaining Compliance*, Christine Parker and Vibeke Nielsen, eds., 2011

"Voluntary Environmental Programs: Assessing Their Effectiveness," with Cary Coglianese, *Annual Review of Environment and Resources* 34, November 2009

"Next Steps for California with Federal Cap-and-Trade Policy on the Horizon," with Robert N. Stavins and Todd Schatzki, prepared for the Western States Petroleum Association, July 2009

"Evolving GHG Trading Systems Outside its Borders: How Should California Respond?" with Robert N. Stavins and Todd Schatzki, prepared for the Western States Petroleum Association, July 2009

"The Scope and Options for the Economics and Allocation Advisory Committee," with Todd Schatzki, letter submitted to the Economic and Allocation Advisory Committee, California Environmental Protection Agency, June 29, 2009

"Environmental Leadership Programs: Toward an Empirical Assessment of their Performance," with Cary Coglianese and Jennifer Nash, *Ecology Law Quarterly*, Volume 35, Issue 4, February 2009, pp. 771–834

"Comments on the Economics Analysis Supplement to the Draft Scoping Plan," with Judson Jaffe, prepared for the AB 32 Implementation Group, October 21, 2008

"Evaluating the Social Effects of Environmental Leadership Programs," with Cary Coglianese and Jennifer Nash, *Environmental Law Reporter*, Volume 38, 2008, pp. 10697–10702 (reprinted in *Environmental Protection: Regulatory Issues*, L. Lakshmi, ed., 2008)

"Beyond Compliance: Three Essays on Voluntary Corporate Environmentalism," Harvard University Ph.D. dissertation; Richard Zeckhauser, Robert N. Stavins, Erich Muehlegger, and Cary Coglianese, advisors, 2008.

"Countering the 'Loading Dock' Approach to Linking Science and Decision Making: A Comparative Analysis of ENSO Forecasting Systems," with David W. Cash and Anthony G. Pratt, *Science, Technology and Human Values*, Volume 31, Number 4, July 2006, pp. 465–494

"Decision Making in Endangered Species Management," *Journal of Public and International Affairs*, Volume 16, Spring 2005, pp. 70–93

**SELECTED SPEAKING ENGAGEMENTS**

"The Current Financial Landscape and Future Case Trends," panel discussion, Securities Expert Roundtable, 2023 Annual Membership Meeting and Conference, Boston, Massachusetts, September 23, 2023

"How to Effectively Use Statistical Sampling in Class Action Litigation: Tips and Strategies in 2017," presentation and panel discussion via webinar, The Knowledge Group, November 16, 2017

"Green Jobs," panel discussion, California Council for Environmental and Economic Balance, 2009 Summer Issues Seminar, Lake Tahoe, California, July 21, 2009

"Use of AB 32 Revenue," panel discussion, California Council for Environmental and Economic Balance, 2009 Summer Issues Seminar, Lake Tahoe, California, July 20, 2009

"Cap-and-Trade Program Features: Revisiting the Benefits of Cap-and-Trade," panel discussion, California Council for Environmental and Economic Balance, 2009 Summer Issues Seminar, Lake Tahoe, California, July 20, 2009

"State and Federal Performance-Based Environmental Programs: Assessing Goals, Activities, Communication, and Data Collection," workshop on Performance-Based Voluntary Programs: Better Ways to Measure and Communicate Results, Harvard Kennedy School, Cambridge, Massachusetts, March 11–12, 2008

A-7

"Why Do They Join? An Exploration of Business Participation in Voluntary Environmental Programs," poster session, Conference on the Institutional Foundations of Industry Self-Regulation, Harvard Business School, Boston, Massachusetts, February 16–17, 2007

"Contribution Shares in Alliances," Public Choice Society Annual Meeting, Baltimore, Maryland, March 11–14, 2004

"Contribution Shares in Alliances," IASTED International Conference on Alliances, Mergers, and Acquisitions, Banff, Canada, July 2–3, 2003

**AWARDS AND AFFILIATIONS**

Graduate Research Fellow, National Science Foundation, 2001–2006

Fellow, Thomas J. Watson Foundation, 2000–2001