# EXHIBIT H

## Unredacted Befurt Rebuttal Decl.

## Dkt. 513-3

Bobbie J. Wilson, Bar No. 148317
BWilson@perkinscoie.com
Sunita Bali, Bar No. 274108
SBali@perkinscoie.com
Elliott Joh, Bar No. 264927
EJoh@perkinscoie.com
PERKINS COIE LLP
505 Howard Street, Suite 1000
San Francisco, California 94105
Telephone: +1.415.344.7000
Facsimile:  +1.415.344.7050

Erin K. Earl (*pro hac vice*)
EEarl@perkinscoie.com
PERKINS COIE LLP
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
Telephone: +1.206.359.8000
Facsimile: +1.206.359.9000

Justin Potesta, Bar No. 314133
JPotesta@perkinscoie.com
PERKINS COIE LLP
405 Colorado Street, Suite 1700
Austin, TX 78701
Telephone: +1.737.256.6100
Facsimile: +1.737.256.6300

Attorneys for Defendants
ALPHABET INC. and GOOGLE LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| IN RE GOOGLE ASSISTANT PRIVACY LITIGATION. | Case No. 5:19-cv-04286-BLF<br><br>**DECLARATION OF RENE BEFURT, PH.D.**<br><br>**HIGHLY CONFIDENTIAL – AEO** |

*HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY*

## TABLE OF CONTENTS

I.   Introduction ........................................................................................................1
    A.  Qualifications ...............................................................................................1
    B.  Case Background ..........................................................................................1
    C.  Assignment ...................................................................................................4

II.  Summary of Conclusions ...................................................................................5

III. The Conjoint Surveys Conducted by Dr. Reed-Arthurs are Fundamentally
Flawed and Cannot Yield Reliable Estimates of Willingness-to-Pay or Price
Premiums ............................................................................................................6

    A.  The Initial Reed-Arthurs Report and the Reed-Arthurs Declaration Provide No
Evidence that Estimates of Willingness-to-Pay for the Privacy-Related
Features are Different from Zero ....................................................................6

    B.  The Reed-Arthurs Declaration Deviates from Principles of Scientific Research
by Not Describing Any Qualitative Pretesting Promised in the Initial Reed-
Arthurs Report, and Differences in Study Design Across Dr. Reed-Arthurs'
Materials Render It Impossible to Know What Respondents Actually Saw in
the Conjoint Surveys ......................................................................................7

    C.  The Reed-Arthurs Conjoint Surveys Suffer from Additional Defects ...................10

IV.  Restatement of Conclusions .............................................................................11

*HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY*

## I.   INTRODUCTION

### A.   Qualifications

1.   I am a Principal at Analysis Group, Inc., a consulting firm that specializes in providing economic, financial, statistical, and strategy consulting to law firms, corporations, and government agencies. I received my M.B.A. and Diplom-Kaufmann (M.B.A equivalent) from Union College in 1999 and the University of Mannheim in 2002, respectively, both with a focus on marketing and market research. I received my Ph.D. degree in Business Administration with Focus on Marketing from the University of St. Gallen in 2009, specializing in marketing metrics and measurement, multivariate statistics, and behavioral economics. In addition, I was a visiting researcher in the Marketing Group at the MIT Sloan School of Management from 2006 to 2008. I joined Analysis Group in 2008.

2.   My fields of specialization within marketing include marketing strategy, marketing research related to consumer decision-making (with emphasis on consumer perception, consumer choice, and conjoint surveys), product design, product positioning, product usage, and brand perception. A copy of my curriculum vitae, which details my education, experience, and publications, is attached as **Appendix A** to this report.

3.   During the course of my work at Analysis Group, I have consulted for commercial entities involved in numerous matters related to data privacy and consumer privacy expectations, intellectual property, false advertising, and trademark litigation. I have also worked extensively on cases involving consumer valuations of product features, product defects, and product usage. I have supported experts retained to evaluate and testify on these topics relating to damages. In addition, I have been engaged as an expert in litigation matters and conducted surveys to evaluate consumers' perceptions, expectations, and behavior. A list of cases in which, during the previous four years, I have testified as an expert at trial or by deposition is attached as **Appendix B**.

### B.   Case Background

4.   Based on my review of the Order Granting Class Certification, I understand that the court has certified "a Purchaser Class led by [Plaintiff] Kumandan" in this matter.[1] The Purchaser Class

---

[1]   Order Granting in Part and Denying in Part Plaintiffs' Motion for Class Certification, *In re Google Assistant Privacy Litigation*, United States District Court, Northern District of California, San Jose

*HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY*

consists of "[a]ll Users who purchased a Google-Made Device," where "Users" are defined as "individuals whose Gmail accounts were associated with at least one Google-Assistant Enabled Device ['GAED'] during the Class Period," GAEDs are defined as "devices that come with Google Assistant preinstalled," and "Google-Made Devices" are defined as "Google Assistant Enabled Devices manufactured and sold by Google either directly or through third-party retailers," and include "Google's own smart home speakers, Google Home, Home Mini, and Home Max; smart displays, Google Nest Hub, and Nest Hub Max; and its Pixel smartphones."[2] I understand that the Purchaser Class was certified to pursue "[a] breach of contract claim and UCL 'unlawful' prong claims predicated on breach of contract and violation of California Business and Professions Code § 22576."[3]

5.   Based on my review of the Fourth Amended Complaint ("Complaint") and the Order Granting Class Certification, I understand that the "Class Period" runs from May 18, 2016 to December 16, 2022.[4]

6.   Defendants are Google LLC, a technology company with its principal place of business in Mountain View, California, and Alphabet Inc., the parent holding company of Google LLC, also with its principal place of business in Mountain View, California.[5]

7.   According to the Complaint, Plaintiffs allege that Defendants engaged in "unlawful and intentional interception and recording of individuals' confidential communications without their consent and subsequent unauthorized disclosure of those communications to third parties from approximately May 18, 2016 to present (the 'Class Period')."[6] Further, Plaintiffs allege that Defendants made "false and deceptive representations – *i.e.*, that Google would only record or

---

Division, Master Docket No.: 19-cv-04286-BLF, December 16, 2022 ("Order Granting Class Certification"), p. 31.

[2]   Order Granting Class Certification, pp. 31-32; Order Denying Administrative Motion for Clarification of Class Definition, *In re Google Assistant Privacy Litigation*, United States District Court, Northern District of California, San Jose Division, Master Docket No.: 19-cv-04286-BLF, December 2, 2024, p. 4.

[3]   Order Granting Class Certification, p. 31.

[4]   Fourth Amended Consolidated Class Action Complaint, *In re Google Assistant Privacy Litigation*, United States District Court, Northern District of California, San Jose Division, Master Docket No.: 19-cv-04286-BLF, August 2, 2021 ("Complaint"), footnote 35. See also, Order Granting Class Certification, p. 12.

[5]   Complaint, ¶¶ 76-77.

[6]   Complaint, ¶ 1.

*HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY*

process their conversations or other audio if they use a specific activation phrase – to purchasers of its Google Home and Google Home Mini products."[7] Plaintiffs state that, if they and the Proposed Class had known about Defendants' alleged conduct, "Plaintiffs and [Proposed] Class Members would not have used Google Assistant with their Google Assistant Enabled Devices and would not have bought, installed, and/or would have paid less for the Google Home products and Google Manufactured Devices."[8]

8.  Counsel for Plaintiffs retained Dr. Rebbecca Reed-Arthurs "to describe the process by which one or more choice based conjoint ('CBC') surveys can be designed, conducted, and analyzed to measure the change in consumer willingness to pay [("WTP")] for smartphones and smart speakers/displays if the But-For World disclosures were made at the time of purchase relative to the Actual World Disclosures being made at the time of purchase."[9] Dr. Reed-Arthurs first submitted an expert report in support of Plaintiffs' motion for class certification on July 18, 2022 ("Initial Reed-Arthurs Report").

9.  Dr. Reed-Arthurs then submitted a declaration on March 28, 2025 ("Reed-Arthurs Declaration") containing the coding instructions, design files, and survey data files for two CBC surveys (the "Smartphone Conjoint" and the "Smart Speaker Conjoint").[10] Dr. Reed-Arthurs fielded her "Smartphone Conjoint" on August 25-30 and September 8-13, 2022, and her "Smart Speaker Conjoint" on August 24-31 and September 8-14, 2022.[11] Dr. Reed-Arthurs has not provided an analysis of the data from these two CBC surveys or presented a willingness-to-pay estimate, noting only that she "can perform the analyses described in Section 5 of my Opening Expert Report using these data files and explain the results to the jury at trial."[12]

---

[7]  Complaint, ¶ 1.

[8]  Complaint, ¶ 11.

[9]  Opening Expert Report of Rebbecca Reed-Arthurs, Ph.D., *In re Google Assistant Privacy Litigation*, United States District Court, Northern District of California, San Jose Division, Case No: 19-cv-04286-BLF, July 18, 2022 ("Initial Reed-Arthurs Report"), ¶ 13.

[10]  Declaration of Rebbecca Reed-Arthurs, Ph.D., *In re Google Assistant Privacy Litigation*, United States District Court, Northern District of California, San Jose Division, Case No: 19-cv-04286-BLF, March 28, 2025 ("Reed-Arthurs Declaration"), ¶¶ 1-6.

[11]  Backup to the Reed-Arthurs Declaration, "SmartphoneSurveyData_Reed-Arthurs_CONFIDENTIAL.xlsx" and "SmartSpeakerSurveyData_Reed-Arthurs_CONFIDENTIAL.xlsx."

[12]  Reed-Arthurs Declaration, ¶ 6.

*HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY*

**C.    Assignment**

10.    I was initially retained by Counsel for Google to review and evaluate the Initial Reed-Arthurs Report in connection with their Opposition to Plaintiffs' Motion for Class Certification. In particular, I was asked to assess the Initial Reed-Arthurs Report, including whether Dr. Reed-Arthurs' conclusions were developed in a scientifically appropriate and valid manner. I submitted an expert report addressing this assignment on September 13, 2022 ("Initial Befurt Report").[13]

11.    I have now been asked by Counsel for Google to review and evaluate the Reed-Arthurs Declaration. Specifically, I have been asked to review the survey instruments for the Smartphone Conjoint and the Smart Speaker Conjoint and opine on whether the data generated by these surveys could be analyzed to provide reliable results if Dr. Reed-Arthurs' proposed analyses of the data gathered as reflected in the Initial Reed-Arthurs Report were to be conducted. If the data generated by these surveys were to be analyzed by Dr. Reed-Arthurs or others, or if any additional related materials, analyses, or surveys were to be produced in this matter, I reserve the right to analyze such materials to supplement and/or amend my opinions.

12.    In forming my opinions in this report, I have considered and relied on information from a variety of sources, each of which has been identified in **Appendix C**. This information generally includes court filings and documents independently obtained, such as academic literature or other publicly available sources. I have also relied on my education, knowledge, experience, and expertise in consumer behavior and decision-making developed over nearly 20 years of research, teaching, and consulting.

13.    Analysis Group is being compensated at a rate of $1,075 per hour for the time I spend on this matter. Hourly rates for other Analysis Group staff working under my direction and supervision on this matter range from $485 to $830. No compensation is contingent on the nature of my findings or on the outcome of this litigation. My work in this matter is ongoing, and I reserve the right to supplement and/or amend my opinions as appropriate based on any additional information provided by the parties and/or in light of documents or testimony brought forth after the date of my signature below.

---

[13]    Expert Report of Rene Befurt, Ph.D., *In re Google Assistant Privacy Litigation*, United States District Court, Northern District of California, San Jose Division, Master Docket No: 19-cv-04286-BLF, September 13, 2022 ("Initial Befurt Report").

*HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY*

## II.  SUMMARY OF CONCLUSIONS

14.  The conjoint surveys conducted by Dr. Reed-Arthurs are fundamentally flawed and cannot yield reliable estimates of willingness-to-pay or price premiums.

   a.  Although Dr. Reed-Arthurs gathered data with her conjoint surveys in August and September 2022, the Reed-Arthurs Declaration still does not analyze the data or report willingness-to-pay estimates or price premia. Due to the absence of these calculations, Dr. Reed-Arthurs presents no evidence that the willingness-to-pay estimates for the at-issue features are different from zero.

   b.  The Initial Reed-Arthurs Report described that the conjoint survey(s) "will be tested using one or more focus groups." However, Dr. Reed-Arthurs deviates from the principles of scientific research by not documenting the procedure, findings, or resulting changes from any qualitative pretests she may have conducted prior to fielding the conjoint surveys — despite creating a new Smart Speaker Conjoint Survey script from scratch and despite making changes to the script of her Smartphone Conjoint Survey. By neglecting to conduct qualitative pretesting, Dr. Reed-Arthurs fails to demonstrate that her conjoint surveys are free from demand artifacts and that they did not lead to respondent confusion. Further, differences in study design across Dr. Reed-Arthurs' materials render it impossible to know what respondents actually saw in the conjoint surveys.

15.  As described in the Initial Befurt Report, the Reed-Arthurs Conjoint Surveys suffer from additional defects. Specifically, the conjoint surveys offer no method to account for the upward bias introduced by the privacy paradox; present privacy-related features in an imbalanced manner with unclear and unrealistic descriptions; create focalism bias and demand artifacts by placing unnatural prominence on the privacy-related features; and present cognitively burdensome exercises to respondents. These flaws ultimately lead to willingness-to-pay estimates that do not reflect consumers' actual willingness-to-pay for certain aspects of privacy.

*HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY*

III.   **THE CONJOINT SURVEYS CONDUCTED BY DR. REED-ARTHURS ARE FUNDAMENTALLY FLAWED AND CANNOT YIELD RELIABLE ESTIMATES OF WILLINGNESS-TO-PAY OR PRICE PREMIUMS**

A.   **The Initial Reed-Arthurs Report and the Reed-Arthurs Declaration Provide No Evidence that Estimates of Willingness-to-Pay for the Privacy-Related Features are Different from Zero**

16.   The Initial Reed-Arthurs Report described methods for a "willingness-to-pay analysis" she would conduct "[o]nce the survey data are collected."[14] On March 28, 2025, Dr. Reed-Arthurs submitted the Reed-Arthurs Declaration, which contained the coding instructions, design files, and survey data files for two CBC surveys, one on smartphones, and another on smart speakers.[15]

17.   Although Dr. Reed-Arthurs gathered data with her conjoint surveys in August and September 2022, the Reed-Arthurs Declaration still does not analyze the data or report willingness-to-pay estimates or price premia.[16] Due to the absence of these calculations, Dr. Reed-Arthurs presents no evidence that the willingness-to-pay estimates for the at-issue features are different from zero.

18.   Simply assuming that calculating willingness-to-pay estimates for the features at issue would show that those features are valuable to consumers is presumptuous. If one ignores the biased nature of the Reed-Arthurs Conjoint Surveys for the sake of the argument, a conjoint survey conducted in an unbiased, scientifically proper manner *can* produce a willingness-to-pay estimate that is not statistically significantly different from zero, and therefore show that consumers do not care for the specific product benefit presented to them.

19.   Moreover, the Reed-Arthurs Conjoint Surveys were not conducted in an unbiased, scientifically proper manner. As I discuss in the Initial Befurt Report and reiterate in **Section III.C** below, the Reed-Arthurs Conjoint Surveys are rife with fundamental flaws and are likely to yield inflated willingness-to-pay estimates, particularly for the privacy-related features. Despite stacking the deck in favor of Plaintiffs, Dr. Reed-Arthurs still can at most merely hypothesize about the value — if any — of the features at issue, as she has not performed the analyses to demonstrate that the

---

[14]   Initial Reed-Arthurs Report, Section 5.

[15]   Reed-Arthurs Declaration, ¶¶ 1-6.

[16]   Reed-Arthurs Declaration, ¶ 6. Backup to the Reed-Arthurs Declaration, "SmartphoneSurveyData_Reed-Arthurs_CONFIDENTIAL.xlsx" and "SmartSpeakerSurveyData_Reed-Arthurs_CONFIDENTIAL.xlsx."

willingness-to-pay estimates for privacy-related features generated by her conjoint surveys are different from zero.

**B.    The Reed-Arthurs Declaration Deviates from Principles of Scientific Research by Not Describing Any Qualitative Pretesting Promised in the Initial Reed-Arthurs Report, and Differences in Study Design Across Dr. Reed-Arthurs' Materials Render It Impossible to Know What Respondents Actually Saw in the Conjoint Surveys**

20.    In the Initial Reed-Arthurs Report, Dr. Reed-Arthurs described that her conjoint survey(s) "will be tested using one or more focus groups" to "determine whether the participants can identify the sponsor and purpose of the survey and whether the features included in the survey are appropriate."[17] However, the Reed-Arthurs Declaration does not describe procedures for conducting these focus groups, whether they were conducted in an unbiased, scientifically proper way, and what their specific findings were.

21.    Literature and guides on survey research recommend pretest activities, such as focus groups and cognitive interviews, "for questionnaire evaluation" and to prevent questions from "systematically distorting responses if respondents are misled in a particular direction."[18] However, despite this recommendation from the survey literature and despite describing a plan to conduct pretests for her conjoint surveys in the Initial Reed-Arthurs Report, the Reed-Arthurs Declaration includes no indication of pretesting the conjoint surveys.

22.    Notably, the Initial Reed-Arthurs Report only included an "illustrative" and "preliminary" conjoint survey script for smartphones,[19] and did not include a smart speaker survey script at all. Dr. Reed-Arthurs deviates from principles of proper scientific research by not documenting the procedure, findings, or resulting changes from any qualitative pretests she may have conducted prior to fielding the conjoint surveys mentioned in the Reed-Arthurs Declaration — despite creating a new Smart Speaker Conjoint Survey script from scratch and despite making changes to the script of her Smartphone Conjoint Survey. By neglecting to conduct qualitative pretesting, Dr. Reed-Arthurs fails to demonstrate that her conjoint surveys are free from demand artifacts and that they did not lead to respondent confusion.

---

[17]    Initial Reed-Arthurs Report, ¶¶ 107-108.

[18]    Diamond, Shari S., "Reference Guide on Survey Research," in *Reference Manual on Scientific Evidence: Third Edition*, The National Academies Press, 2011, pp. 359-423 ("Diamond (2011)"), p. 388.

[19]    Initial Reed-Arthurs Report, Attachment E.

*HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY*

23.   In addition, substantive discrepancies exist between the Reed-Arthurs Conjoint Surveys
      presented in the Reed-Arthurs Declaration and the backup data and design files that Dr. Reed-
      Arthurs produced alongside her declaration. These discrepancies listed below render it
      impossible to know what respondents to the Reed-Arthurs Conjoint Surveys actually saw:

   - According to the raw data files for both Reed-Arthurs Conjoint Surveys, at least two separate
     versions of each survey were fielded. For the Smartphone Conjoint Survey, a version denoted
     "1" was fielded August 25-30, 2022, and a version denoted "2" was fielded September 8-13,
     2022. For the Smart Speaker Conjoint Survey, a version denoted "1" was fielded August 24-
     31, 2022, and a version denoted "2" was fielded September 8-14, 2022.[20] In contrast, the
     Reed-Arthurs Declaration presented only one version of each conjoint survey.[21]

   - The Reed-Arthurs Declaration described that respondents would be presented with the
     following instruction in each choice task in the Reed-Arthurs Smartphone Conjoint Survey:
     "Suppose the four smartphones below are *the only options* available for purchase."[22] In
     contrast, the raw data file indicates that respondents were instructed "Suppose the four
     smartphones below are available for purchase."[23] In fact, the Reed-Arthurs Smart Speaker
     Conjoint Survey's raw data file indicates that the same instruction, pertaining to *smartphones*
     and <u>not</u> smart speakers, was shown to respondents answering this question about smart
     speakers.

   - The Reed-Arthurs Declaration described that respondents would be presented with the
     following instruction in each choice task in the Reed-Arthurs Smart Speaker Conjoint
     Survey: "Suppose four smart speakers/displays are available for purchase. Each smart
     speaker/display in this set is the same, except for the features listed below. Which smart

---

[20]   The data file for each of the Reed-Arthurs Conjoint Surveys includes the variable "Survey_Version" with
       the description "Saves the survey version for the study (increments in case of any live updates)."
       SmartphoneSurveyData_Reed-Arthurs_CONFIDENTIAL.xlsx; SmartSpeakerSurveyData_Reed-
       Arthurs_CONFIDENTIAL.xlsx.

[21]   Reed-Arthurs Declaration, Appendix A, Appendix B.

[22]   Reed-Arthurs Declaration, Appendix A, p. 21 (emphasis added).

[23]   SmartphoneSurveyData_Reed-Arthurs_CONFIDENTIAL.xlsx, tab "Datamap," variables "QDCM_1"-
       "QDCM_11," rows 256, 329, 402, 475, 548, 621, 694, 767, 840, 913, 986. Elsewhere in the raw data file,
       values of the "vdropout" variable (which has the description "Last seen question") present the "are the only
       options available for purchase" language, suggesting that the raw data file is, at a minimum, internally
       inconsistent. *See* SmartphoneSurveyData_Reed-Arthurs_CONFIDENTIAL.xlsx, tab "Datamap," rows
       1141, 1164, 1166, 1168, 1170, 1172, 1174, 1176, 1178, 1180, 1182, 1184.

*HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY*

speaker/display would you purchase? If you would like to see the feature descriptions again, position your mouse over any of the feature labels below."[24] By contrast, the raw data file for the Smart Speaker Conjoint Survey indicates that respondents were instructed "Suppose *the four smartphones* below are available for purchase. *Each smartphone in this set* is identical, except for the features listed below. *Which smartphone* would you purchase? If you would like to see the feature descriptions again, position your mouse over any of the feature labels below" for each choice task question.[25]

- If Dr. Reed-Arthurs' raw data file correctly reflects the survey she conducted, such contradicting language likely confused respondents and rendered their choices — and any resulting estimates that could be calculated based on those choices — unreliable.

- The Reed-Arthurs Declaration includes "Google (Google Assistant)" as one of the "[a]vailable brands and voice assistants" in the Reed-Arthurs Smart Speaker Conjoint Survey's "Brand & Voice Assistant" feature.[26] However, the sample choice task included in the Reed-Arthurs Declaration's Smart Speaker Coding Instructions, and the design and raw data files produced alongside the Reed-Arthurs Declaration all indicate that respondents were presented with "Google (Ok Google)" in the choice tasks.[27]

24. Individually and together, these discrepancies raise questions regarding what study designs Dr. Reed-Arthurs' produced survey data actually reflect, and therefore whether the data and any resulting estimates can be reliable. Specifically, not only is it unclear what survey versions Dr. Reed-Arthurs pretested, if any, but it is also unclear how many versions and which versions were presented to respondents to generate the data produced. As noted by Dr. Diamond in her oft-cited "Reference Guide on Survey Research":

---

[24] Reed-Arthurs Declaration, Appendix B, p. 44.

[25] SmartSpeakerSurveyData_Reed-Arthurs_CONFIDENTIAL.xlsx, tab "Datamap," variables "QDCM_1"-"QDCM_12," rows 251, 317, 383, 449, 515, 581, 647, 713, 779, 845, 911, 977. Elsewhere in the raw data file, values of the "vdropout" variable (which has the description "Last seen question") present the "smart speaker"-specific language, suggesting that the raw data file is, at a minimum, internally inconsistent. *See* SmartSpeakerSurveyData_Reed-Arthurs_CONFIDENTIAL.xlsx, tab "Datamap," rows 1125, 1148, 1150, 1152, 1154, 1156, 1158, 1160, 1162, 1164, 1166, 1168, 1170.

[26] Reed-Arthurs Declaration, Appendix B, p. 36.

[27] Reed-Arthurs Declaration, Appendix B, p. 44; SmartSpeakerDesignFile_Reed-Arthurs_CONFIDENTIAL.xlsx; SmartSpeakerSurveyData_Reed-Arthurs_CONFIDENTIAL.xlsx.

*HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY*

> "To make it possible for the court and the opposing party to closely scrutinize the survey so that its relevance, objectivity, and representativeness can be evaluated, the party proposing to offer the survey as evidence should also ***describe in detail the design, execution, and analysis of the survey***."[28]

In failing to provide such information, Dr. Reed-Arthurs not only deviates from principles of proper scientific research but also entirely disregards established academic literature on the requirements surrounding the use of surveys in litigation.

### C.    The Reed-Arthurs Conjoint Surveys Suffer from Additional Defects

25.   As described in the Initial Befurt Report, Dr. Reed-Arthurs' Conjoint Surveys suffer from several additional defects. I describe each of these fundamental flaws at a high-level below.

26.   The Reed-Arthurs Conjoint Surveys offer no method to account for the upward bias in preferences for privacy introduced by the privacy paradox.[29]

27.   Dr. Reed-Arthurs' approach to describing the privacy-related features presented to respondents repeatedly in multiple choice tasks is flawed: the features are described in an imbalanced manner that does not accurately reflect the real world, only signals the disadvantages of data storage and data processing, and omits real-world benefits that are likely to change respondents' decision making when they trade-off between features and products during the conjoint exercise.[30]

28.   Dr. Reed-Arthurs' Conjoint Surveys likely created focalism bias due to presenting respondents with an unusually large number of privacy-related features that stand out from an unusually small number of hardware features, brand, and operating system. The combination of a disproportionate number of privacy features and one-sided drawbacks is bound to inflate estimates of willingness-to-pay.[31]

29.   Additionally, the Reed-Arthurs Conjoint Surveys likely placed undue cognitive burden on respondents, inviting straightlining, and leading to uninformed hasty choices and, ultimately, to

---

[28]   Diamond (2011), p. 362 (emphasis added).

[29]   *See* Initial Befurt Report Section V.C. See also, Initial Befurt Report, Section III.A.

[30]   *See* Initial Befurt Report, Section V.D.

[31]   *See* Initial Befurt Report, Section V.E.

willingness-to-pay estimates that do not reflect consumers' actual willingness-to-pay for certain aspects of privacy.[32]

## IV.    RESTATEMENT OF CONCLUSIONS

30.    The Reed-Arthurs Conjoint Surveys are deeply flawed and the data generated from the surveys cannot provide reliable estimates of willingness-to-pay. In fact, Dr. Reed-Arthurs has not analyzed the survey results nor shown a willingness-to-pay for the at-issue features that is different from zero. Further, despite creating a new survey script and making changes to an existing survey script, Dr. Reed-Arthurs deviates from the principles of scientific research by not documenting the procedure, findings, or resulting changes from any qualitative pretests she may have conducted prior to fielding the conjoint surveys. Dr. Reed-Arthurs therefore fails to demonstrate that her conjoint surveys are free from demand artifacts and that they did not lead to respondent confusion. In addition, differences in study design across Dr. Reed-Arthurs' materials render it impossible to know what respondents actually saw in the conjoint surveys. Finally, the Reed-Arthurs Conjoint Surveys are also subject to numerous biases and design flaws that would render the data generated by them unreliable: specifically, the conjoint surveys offer no method to account for the upward bias introduced by the privacy paradox; present privacy-related features in an imbalanced manner with unclear and unrealistic descriptions; create focalism bias and demand artifacts by placing unnatural prominence on the privacy-related features; and present cognitively burdensome exercises to respondents. These flaws ultimately lead to willingness-to-pay estimates that, once calculated, would not reflect consumers' actual willingness-to-pay for certain aspects of privacy.

Rene Befurt

**Rene Befurt**

**April 18, 2025**

---

[32]    *See* Initial Befurt Report, Section V.F.

*HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY*

# APPENDIX A

## CV

*HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY*

# RENE BEFURT
## Principal

Phone: 617 425 8283

Fax: 617 425 8001

rene.befurt@analysisgroup.com

111 Huntington Avenue

14th Floor

Boston, MA 02199

Dr. Befurt is an expert in applying marketing research methods to litigation matters and strategic business problems. He specializes in developing survey experiments and choice modeling approaches in consumer surveys. He has served as an expert witness in survey and sampling matters, and has assisted academic affiliates in survey conceptualization, administration, and evaluation. Dr. Befurt's many clients include the US Department of Justice (DOJ), the US Federal Trade Commission (FTC), the Office of the Attorney General of New York, Microsoft, Oracle, Keurig Dr Pepper, Fiat Chrysler Automobiles, Ford, General Motors, Toyota, the Louisiana Farm Bureau, Cree Lighting, Research In Motion, and Nestlé. He has testified at numerous depositions and trials.

As an expert witness, Dr. Befurt has worked on matters pertaining to patent infringement, trademark disputes, consumer disclosures, product liability, false advertising, brand reputation, and sampling. He has extensive experience developing experimental studies and usage surveys, as well as modeling consumer choice, including conducting and examining conjoint analyses. Dr. Befurt's work also includes the evaluation and application of market research techniques in the finance and automotive manufacturing sectors. He has designed survey instruments, analyzed complex survey data, and created tools to allow clients to understand consumer preferences and market forces through market simulations. Dr. Befurt's experience spans over two decades and includes numerous projects for automobile manufacturers in Europe and the US.

## EDUCATION

| | |
|---|---|
| 2009 | Ph.D., marketing, University of St. Gallen Center for Business Metrics, St. Gallen, Switzerland<br>Dissertation: "Product Lines and the Conflict between Similarity and Autonomy" |
| 2002 | Dipl. Kaufmann *(M.B.A. equivalent)*, University of Mannheim, Mannheim, Germany<br>*Specialization: Marketing, Marketing Research, International Management* |
| 1999 | M.B.A., Union College<br>*Specialization: Marketing, Market Research* |

## WORK EXPERIENCE

| | |
|---|---|
| 2008–Present | Analysis Group<br>*Principal (2022–Present)*<br>*Vice President (2015–2022)*<br>*Manager (2011–2014)*<br>*Associate (2008–2010)* |

*HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY*

| 2006–2008 | MIT Sloan School of Management |
| | *Visiting Researcher – Marketing Group* |
| 2002–2006 | University of St. Gallen Center for Business Metrics, Switzerland |
| | *Research Assistant and Statistics Consultant* |
| 2001–2003 | University of Cooperative Education, Germany |
| | *Lecturer, Principles of Marketing* |

## SELECTED EXPERT CASE WORK

- **Brand reputation matter**
  Prepared a declaration to examine how a video containing potentially harmful claims may have impacted the brand, reputation, and business opportunities of a locally operated firm in Tennessee. Case settled before deposition.

- **Sampling strategy matter**
  Developed a sampling strategy to determine the share of counterfeit products in a warehouse containing shipments of counterfeit and original products. Case settled before reports were filed.

- **Trade secret matter**
  Prepared an expert report that examined the consequences of a trade secret breach for a manufacturer's marketing and sales strategies, including estimated damages related to trade secret breach. Case settled before deposition.

- **Consumer disclosure matter**
  Prepared two expert reports which rebutted a survey that attempted to measure the value of certain security features in home security systems. Case settled before depositions.

- **Trademark matter**
  Prepared an expert report that rebutted a survey aimed at measuring the secondary meaning of a restaurant trademark. Testified in deposition and at trial.

- **Intellectual property matter**
  Prepared an expert report rebutting a survey that attempted to measure the value of certain features associated with a productivity software application. Case is ongoing.

- **False advertising matter**
  Designed a consumer survey to determine the influence of an allegedly false advertisement on consumers' perceptions and decision making related to a replacement part in a vehicle. Testified in deposition. Case is ongoing.

- **Valuation methodology matter**
  Prepared an expert report that examined survey methods to reliably determine the value of a used vehicle. Testified in deposition and at court hearing. Case is ongoing.

- **Trademark matter**
  Designed a consumer survey to determine whether or not consumers confuse two allegedly similar sports apparel trademarks. Testified in deposition. Case is ongoing.

*HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY*

- **False advertising matter**
  Prepared an expert report rebutting a series of surveys that attempted to determine the understanding, impact, and value of an allegedly false claim on a beverage label. Testified twice in deposition. Case is ongoing.

- **Product liability/lack of disclosure matter**
  Prepared an expert report that rebutted a proposed conjoint analysis survey intended to determine consumer valuations of an allegedly improved feature in a vehicle and/or adequate risk disclosures. Testified in deposition. Case is ongoing.

- **Intellectual property matter**
  Prepared an expert report that rebutted a survey intended to assess the impact of patented features on consumers' purchases of a product. Testified in deposition. Case settled during trial.

## SELECTED CONSULTING EXPERIENCE

- **False advertising matter**
  Developed a survey to test whether a soft drink label is confusing to consumers with regard to specific claims and pictures on the label.

- **False advertising matter**
  Developed a survey to test whether marketing materials used by a diagnostic testing laboratory are confusing with respect to the test's actual capabilities.

- **False advertising matter**
  Developed a survey about cigarettes to evaluate product characteristics and their intrinsic worth to consumers.

- **Trademark matters**
  Assisted with the development of rebuttal reports in cases involving forward and/or reverse confusion.

- **Warning label matter**
  Assisted with the development of affirmative and rebuttal reports demonstrating the effects of a highly salient warning label on consumers' perceptions and decision making pertaining to soft drinks.

- **Tax dispute**
  Prepared an overview of branding strategy to describe motivations for a sporting goods manufacturer and a professional golf player to engage in an endorsement contract.

- **Patent infringement suit**
  Developed a survey on smartphone devices to assess the importance of patent-related product features and their impact on market demand.

## ARTICLES & PUBLICATIONS

**Peer-reviewed publications**

- "The Eyes Have It: How a Car's Face Influences Consumer Categorization and Evaluation of Product Line Extensions," with Susan M. Keaveney, Andreas Herrmann, and Jan R. Landwehr, *Psychology & Marketing*, 29(1), 36-51 (2012)

- "Disjunctions of Conjunctions, Cognitive Complexity, and Consideration Sets," with John Hauser, Olivier Toubia, Theodoros Evgeniou, and Daria Dzyabura, *Journal of Marketing Research*, 47(3), 485-496 (2010)

- "Asymmetrische Urteile über die Produktähnlichkeit" ("Asymmetric Judgments about Product Similarity)," with Andreas Herrmann and Mark Heitmann, *Wirtschaftswissenschaftliches Studium* (WiSt), 2008(4), 223-226 (2008)

- "Alles für die Marke? Zum Konflikt zwischen der Konformität mit der Marke und der eigenständigen Positionierung von PKW Produktlinien (Everything for the Brand? The Conflict between Brand Familiarity and Product Line Autonomy)," with Andreas Herrmann, Mark Heitmann, and Hans Berger, *Zeitschrift für betriebswirtschaftliche Forschung*, 59(8), 1055-1080 (2007)

- "Mit einem Lächeln zum wirtschaftlichen Erfolg?," with Andreas Herrmann, *Thexis*, 24(2), 8-12 (2007)

- "Produktkonfiguration online: was für Kunden nutzen dieses Medium?," with Andreas Herrmann, *Wirtschaftswissenschaftliches Studium* (WiSt), 36(3), 125-131 (2007)

- "Determinants of Radical Product Innovations," with Andreas Herrmann and Torsten Tomczak, *European Journal of Innovation Management*, Vol. 9(1), 20-43 (2006)

**Other publications**

- "Parody and Tarnishment: How Empirical Methods Can Aid Triers of Fact," with Elizabeth Milsark, Marie Warchol and Josh Ng, *IPWatchdog* (May, 19, 2023)

- "Recent Cases on "Green" Messaging in Food and Beverage Company Advertising," with A. Cai, Rebecca Kirk Fair and Helen Rowland, *Top Food and Drug Cases, 2022, & Cases to Watch, 2023*, ed. August T. Horvath (June 2023)

- "Use of Conjoint Analysis in Litigation: Challenges, Best Practices, and Common Mistakes," with N. MacMenamin, and A. Pour, in *Legal Aspects of Marketing Theory*, ed. with J. Gersen, New York: Cambridge University Press, (Forthcoming)

- "Moore v. Trader Joe's Co.," with Genna Liu and Rebecca Kirk Fair, *Top Food and Drug Cases, 2021, & Cases to Watch, 2022*, ed. August T. Horvath (June 2022)

- "Food and Drug Cases to Watch in 2022," with James M. Beck, August T. Horvath, William Janssen and Ginger Pigott, *Top Food and Drug Cases, 2021, & Cases to Watch, 2022*, ed. August T. Horvath (June 2022)

- "The Use of Surveys in Lost Profits Analyses", with A. Cai and Rebecca Kirk Fair, chapter in *Lost Profits Damages: Principles, Methods, and Applications*, co-ed by Jeffrey H. Kinrich and Everett P. Harry III, second edition, (2022)

- "Cigar Association of America et al. v. United States Food and Drug Administration et al," with Niall MacMenamin and Genna Liu, *Top Food and Drug Cases, 2020, & Cases to Watch, 2021*, ed. August T. Horvath (June 2021)

- "COVID-19 and Bottom Line Impacts in Trademark Litigation," with A. Cai, *Quickread*, (December 9, 2020)

- "Expert Analysis: New Survey Methods May Assess Trademark Dilution with More Detail," with A. Cai and Joel Steckel, *Law 360*, (August 14, 2020)

- "How Purchase Probability Scales Can Shed Light on Consumer Purchase Intentions," with Alvin J. Silk, *Landslide*, Vol. 12(1), (2019)

- "Hilsley v. Ocean Spray Cranberries, Inc.," with Rebecca Kirk Fair, *Top Food and Drug Cases, 2018 & Cases to Watch, 2019*, ed. August T. Horvath (May 2019)

- "The Tyranny of Market Shares: Incorporating Survey-Based Evidence into Merger Analysis," with Rebecca Kirk Fair and Emily Cotton, *Corporate Disputes* (July–September 2018)

- "Survey evidence to evaluate a marketing claim: Skye Astiana, Plaintiff v. Ben & Jerry's Homemade, Inc., Defendant," with Alan G. White, chapter in *Handbook of Marketing Analytics*, Natalie Mizik and Dominique M. Hanssens, eds. (April 2018)

- "Music Consumption and Marketing Science: Does Spotify Change Users' Music Consumption?" with Liz Neyens, *LinkedIn* (April 2018)

- "Can benefit-based conjoint analysis benefit product design?," *LinkedIn* (January 2017)

- *Is It Worth Anything? Using Surveys in Intellectual Property Cases*, with Joel H. Steckel and Rebecca Kirk Fair, white paper (2013)

- "Die Produktfamilie – wer ist wer?," with Andreas Herrmann, *Jahrbuch des Verbands der Schweizer Markt- und Sozialforscher*, 30-35 (2007)

## PRESENTATIONS

- "Cognitive Simplicity and Consideration Sets," with Hauser, J., Toubia, O., Theodoros, E., and Dzyabura, D., INFORMS Marketing Science Conference, Ann Arbor, Michigan (2009)

- "Modeling Cognitive Complexity to Predict Consideration Sets," with Dzyabura, D., Hauser, J., Toubia, O., and Theodoros, E., INFORMS Marketing Science Conference, Vancouver, British Columbia, Canada (2008)

- "Product Line Positioning, Direction of Comparison, and Asymmetric Similarity Judgements," with Herrmann, A. and Heitmann, M., Annual Conference of the European Marketing Academy, Brighton, England (2008)

- "Everything for the Brand? Conflicts Between Brand Conformity and Independent Product Lines," with Herrmann, A. and Heitmann, M., Annual Conference of the European Marketing Academy, Athens, Greece (2006)

- "Conflicts Between Brand Conformity and Independent Product Lines," with Herrmann, A., Heitmann, M., and Kaiser, C., Annual Conference of the European Marketing Academy, Vienna, Austria (2005)

- "Value-oriented Product Positioning," with Herrmann, A. and Hoffmann, N., Proceedings of the Annual Conference of the Academy of Marketing Science, Vancouver, British Columbia, Canada (2004)

*HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY*

- "Designing Health Services – How Consumers Differentiate between the Concepts Health, Fitness and Wellness," with Bauer, H. and Keller, T., 21st Annual Conference of the Association for Health Care Research, Big Sky, Montana (2002)

## GRANTS

| | |
|---|---|
| 2006–2007 | Swiss National Science Foundation (SNF) scholarship for promising researchers: full scholarship for research projects at Massachusetts Institute of Technology (MIT) |
| 2006 | Max Planck Institute full scholarship for Summer Institute Bounded Rationality Program classes and project work related to frugal decision making |
| 2005 | SNF scholarship for the ICPSR Summer Program, University of Michigan |
| 2004 | SNF scholarship for the ICPSR Summer Program, University of Michigan |
| 1998–1999 | Federation of German American Clubs (DAAC) full scholarship for Union College's M.B.A. program |

*HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY*

# APPENDIX B

## Recent Testimony

## RECENT TESTIMONY OF RENE BEFURT, PH.D.

*Fin Cap Inc. and Blueacorn PPP, LLC v. Pay Nerd LLC, PayNerdier LLC, Matthew Mandell, and Taylor Hendricksen*, Case No. N21C-12-118 AML CCD, Superior Court of the State of Delaware. Deposition testimony, August 20, 2024.

*Kathleen Cadena, et al. v. American Honda Motor Company*, Case No. 2:18-cv-04007-MWF-MAA, United States District Court, Central District of California. Deposition testimony February 9, 2024.

*Broadcom Corporation et al., v. Netflix, Inc.*, Case No. 3:20-cv-04677-JD, United States District Court for the Northern District of California. Deposition testimony, June 23, 2023.

*William Squires, et al., v. Toyota Motor Corporation, et al.*, Case No. 4:18-cv-00138, United States District Court, Eastern District of Texas. Deposition testimony, December 7, 2022.

*In Re Google Assistant Privacy*, Case No.: 19-cv-04286-BLF, United States District Court, Northern District Of California, San Jose Division. Deposition testimony, September 22, 2022. Retained by Defendants, Google LLC and Alphabet, Inc.

*Think Green Limited d/b/a Haakaa, v. Medela AG and Medela LLC*, Case No. 21-5445, United States District Court for the Northern District of Illinois, Eastern Division. Trial testimony, December 7, 2021.

*Taqueria El Primo LLC et al. v. Farmers Group, Inc. et al.*, Case No. 19-CV-03071, United States District Court, District of Minnesota. Deposition testimony, November 18, 2021.

*Raul Siqueiros, et al. v. General Motors LLC*, Case No. 16-CV-07244-EMC, United States District Court for the Northern District of California, San Francisco Division. Deposition testimony, September 30, 2021.

*Joseph Harvey Gautreaux, Individually and on behalf of other similarly situation, v. Louisiana Farm Bureau Casualty Insurance Company*, Case No. 081835, Division A, 16th Judicial District Court Parish of St. Martin, State of Louisiana. Deposition testimony, March 1, 2018 and July 26, 2021. Trial testimony, April 22, 2018.

*Sitelock, LLC, v. GoDaddy.com, LLC*, Case No. 2:19-cv-02746-DWL, United States District Court for the District of Arizona. Deposition testimony, June 18, 2021.

*Clarence Simmons, et al., v. Ford Motor Company*, Case No. 9-18-cv-81558-RAR, United States District Court Southern District of Florida. Deposition testimony, May 27, 2021.

*Delta T, LLC, d/b/a Big Ass Fans, v. Dan's Fan City, Inc. and Troposair, LLC*, Case No. 8:19-cv-1731-VMC-SPF, United States District Court for the Middle District of Florida Tampa Division. Deposition testimony, December 4, 2020.

*Cheryl Slade, Individually and on behalf of others similarly situated, v. Progressive Security Insurance*, Case No. 6:11-cv-02164, United States District Court for the Western District of Louisiana. Deposition testimony, June 23, 2020.

*Interior Molded Doors Indirect Purchaser Antitrust Litigation*, Case No. 3:18-cv-00850-JAG, United States District Court Eastern District of Virginia. Deposition testimony, May 27, 2020. Retained by Defendants, Jeld-Wen, Inc., and Masonite Corporation.

*Roche Diagnostics Corporation,* v. *Meso Scale Diagnostics, LLC.,* Case No. 1:17-cv-00189-LPS-CJB, United States District Court for the District of Delaware. Deposition testimony, April 10, 2019. Trial testimony, November 22, 2019.

*In Re: FCA US LLC Monostable Electronic Gearshift Litigation MDL No. 2744*, Case No. 16-md-02744, United States District Court for the Eastern District of Michigan Southern Division. Deposition testimony, January 25, 2019 and September 11, 2019. Trial testimony, September 14, 2022. Retained by Defendants, FCA US LLC (Chrysler).

*In the Matter of Certain Cartridges for Electronic Nicotine Delivery Systems and Components Thereof*, Investigation No. 337-TA-1141, United States International Trade Commission, Washington, D.C. Deposition testimony, July 11, 2019. Retained by Complainant, Juul Labs, Inc.

*Richard Campfield and Ultra Bond, Inc.,* v. *Safelite Group, Inc., Safelite Solutions LLC, and Safelite Fulfillment, Inc.,* Case No. 2:15-cv-2733, United States District Court for the Southern District of Ohio. Deposition testimony, October 25, 2018.

*Jackie Fitzhenry-Russell, Robin Dale, and Gegham Margaryan, as individuals, on behalf of themselves, the general public and those similarly situated,* v. *Dr. Pepper Snapple Group, Inc.,* Dr. Pepper/Seven Up, *Inc., and DOES 1-50.,* Case Nos. 5:17-cv-00564-NC (lead); 5:17- 02341-NC (consolidated); 5:17-cv-04435-NC (consolidated), United States District Court for the Northern District of California. Deposition testimony, May 31, 2018 and October 11, 2018.

*Under Armour, Inc.,* v. *Battle Fashions, Inc. and Kelsey Battle,* Case No. 1:17-cv-03223-RBD, United States District Court for the District of Maryland. Deposition testimony, September 20, 2018.

*Milk Street Cafe, Inc.,* v. *CPK Media, LLC, d/b/a Milk Street Kitchen*, Case No. 1:16-cv-11416-DJC, In the United States District Court, District of Massachusetts. Deposition testimony, June 14, 2017. Trial testimony, July 21, 2017 and July 24, 2017.

*HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY*

# APPENDIX C

## MATERIALS CONSIDERED

*HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY*

**Case Documents**

Declaration of Rebbecca Reed-Arthurs, Ph.D., *In re Google Assistant Privacy Litigation*, United States District Court, Northern District of California, San Jose Division, Case No: 19-cv-04286-BLF, March 28, 2025, and provided survey data (including "SmartphoneDesignFile_Reed-Arthurs_CONFIDENTIAL.xlsx," "SmartphoneSurveyData_Reed-Arthurs_CONFIDENTIAL.xlsx," "SmartSpeakerDesignFile_Reed-Arthurs_CONFIDENTIAL.xlsx," and "SmartSpeakerSurveyData_Reed-Arthurs_CONFIDENTIAL.xlsx") and materials cited therein.

Expert Report of Rene Befurt, Ph.D., *In re Google Assistant Privacy Litigation*, United States District Court, Northern District of California, San Jose Division, Master Docket No: 19-cv-04286-BLF, September 13, 2022.

Fourth Amended Consolidated Class Action Complaint, *In re Google Assistant Privacy Litigation*, United States District Court, Northern District of California, San Jose Division, Master Docket No.: 19-cv-04286-BLF, August 2, 2021.

Opening Expert Report of Rebbecca Reed-Arthurs, Ph.D., *In re Google Assistant Privacy Litigation*, United States District Court, Northern District of California, San Jose Division, Case No: 19-cv-04286-BLF, July 18, 2022, and provided survey data (including "Completes.pdf," "Terminates.pdf," "Final Survey Data.xlsx," and "Final Data 1001.xlsx") and materials cited therein.

Order Denying Administrative Motion for Clarification of Class Definition, *In re Google Assistant Privacy Litigation*, United States District Court, Northern District of California, San Jose Division, Master Docket No.: 19-cv-04286-BLF, December 2, 2024.

Order Granting in Part and Denying in Part Plaintiffs' Motion for Class Certification, *In re Google Assistant Privacy Litigation*, United States District Court, Northern District of California, San Jose Division, Master Docket No.: 19-cv-04286-BLF, December 16, 2022.

**Academic Literature**

Diamond, Shari S., "Reference Guide on Survey Research," in *Reference Manual on Scientific Evidence: Third Edition*, The National Academies Press, 2011, pp. 359-423.