**To:** Clerk of the Court United States District Court for the Northern District of California

280 South 1st Street San Jose, CA 95113

**Re:** *In re Google Assistant Privacy Litigation*, Case No. 5:19-cv-04286-BLF

**From:** Samuel B. Goldstone 5365 Rod Ct. Unit 101

Las Vegas, NV 89122

Phone: (626) 416-6274

Email: samuelbgoldstone@yahoo.com

FILED

SEP 10 2026

CLERK, U.S. DISTRICT COURT
NORTH DISTRICT OF CALIFORNIA
SAN JOSE OFFICE

**I. INTRODUCTION AND STANDING** I am a member of the Privacy Settlement Class in this action. During the Class Period, I operated a Samsung Galaxy Tab A 10.5" and a Samsung Galaxy Tab A9+ 5G, both of which are Google Assistant Enabled Devices. I have submitted a timely and valid claim via the Settlement Website and my Claim Reference Number is **12033REF1441417**.

I submit this letter to formally object to the proposed Settlement, the Plan of Allocation, and Class Counsel's request for attorneys' fees. This objection applies to the entire Settlement and all Settlement Classes.

## II. GROUNDS FOR OBJECTION

### 1. The "Cy Pres" Blindfold Denies Class Members the Right to Scrutinize the Settlement

The Settlement Agreement fails to identify a specific *cy pres* recipient, instead stating that residual funds will go to a "non-profit organization approved by the Court." This is a material omission. Because the Claims Administrator reports that only 859,969 claims were filed (a 0.49% claim rate from the 171 million delivered notices), the pro-rata distribution will mathematically result in millions of dollars in residual funds. As the attached FTC Staff Report (Exhibit 1) demonstrates, 100% check-

cashing rates in consumer class actions do not exist, making a massive pool of uncashed checks and bounced digital payments an absolute statistical certainty. Shielding the identity of the organization receiving this multi-million-dollar windfall prevents the class from verifying whether the chosen charity is heavily funded by Google or tied to the attorneys. Due process requires that any *cy pres* recipient be identified prior to the objection deadline, ensuring class members have a meaningful opportunity to evaluate potential conflicts of interest before their rights are extinguished.

**2. The 33.3% Attorney Fee Request is Unjustified by the Settlement's Predictable Failure**

Class Counsel is requesting $22,666,667, representing 33.3% of the Settlement Fund. This massive premium far exceeds the Ninth Circuit's 25% benchmark for common fund cases, and it is entirely unjustified given the results achieved for the class.

Class Counsel engineered a settlement structure reliant on an email-blast notice campaign and a high-friction claim form. It is an empirical fact that this methodology suppresses class participation. According to the Federal Trade Commission's *Consumers and Class Actions: A Retrospective and Analysis of Settlement Campaigns* (attached as Exhibit 1), the median claims rate for cases requiring a claims process is just 9% (Page 11), with email-based campaigns routinely yielding microscopic returns.

Class Counsel knew the historical failure rates of this exact notice structure. The result is a 0.49% claim rate, meaning roughly 99.5% of the notified class will receive nothing while still broadly releasing Google from liability for secret audio recordings. A structure designed to pay 0.5% of the class while securing a $22.6 million fee for counsel is not an "exceptional result" that warrants an upward departure from the 25% benchmark.

## III. REQUIRED DISCLOSURES

- **Previous Objections (Past 5 Years):** I have objected to the following class action settlements in the past five years:

    1. *Abarca v. Werner Enterprises, Inc.*, Case No. 14-cv-00319-JFB-MDN (D. Neb.)
    2. *In re: Fidelity Investments Data Breach Litigation*, Lead Case No. 1:24-cv-12601-LTS (D. Mass.)
    3. *Lawson et al. v. Grubhub Holdings Inc. et al.*, Case No. 3:15-cv-05128-JSC (N.D. Cal.)
    4. *Wang et al. v. Grubhub, Inc.*, Case No. 23STCV24118 (Cal. Super. Ct., L.A. County)
    5. *Jana Rabinowitz, et al. v. Colgate-Palmolive Company and Tom's of Maine, Inc.*, Case No: 2:25-cv-06996-JMW (E.D.N.Y.)

- **Intent to Speak:** I do not intend to speak at the Final Approval Hearing.

- **Witnesses:** I do not intend to call any witnesses to testify at the Final Approval Hearing.

- **Exhibits:** I intend to introduce one exhibit, which is enclosed with this letter: *Consumers and Class Actions: A Retrospective and Analysis of Settlement Campaigns*, An FTC Staff Report (September 2019) (Cover Page and Page 1 and 11).

Respectfully submitted,

Date: August 26, 2026

Samuel Goldstone

Samuel B. Goldstone

Exhibit 1

# Consumers and Class Actions:

## A Retrospective and Analysis of Settlement Campaigns

**AN FTC STAFF REPORT**

**Federal Trade Commission**
**September 2019**

# Executive Summary

As part of its consumer protection mission, the Federal Trade Commission ("FTC") has examined issues related to the effectiveness of class action settlements for more than a decade. To further the FTC's understanding of these issues and develop information to help improve settlement outcomes for consumers, the FTC staff conducted two studies. First, pursuant to Section 6(b) of the FTC Act,[1] we obtained a sample of 149 consumer class action cases from large class action administrators (the "Administrator Study"). Based on the data collected, we analyzed several characteristics of these settlements, such as notice methods and redress (*i.e.*, compensation) amounts available, and how these characteristics relate to outcomes, including claim filing and check cashing rates. Second, we fielded an Internet-based consumer research study (the "Notice Study") to explore consumer perceptions of emailed class action notices, including whether consumers understand the options provided in such notices. In this preliminary report, we present the results of these studies. The FTC seeks comments on these results and their implications for improving the class action process.

## Administrator Study

The results of the Administrator Study revealed several notable facets of claims rates, notice types, check cashing rates, and redress amounts. First, the overall claims rate of the cases in the sample was less than 10% and varied depending on whether class members received notice by packets, postcards, or email.[2] Second, we did not find different claims rates when publication notices were used as a supplement to direct notices. Third, we did not find that changes in median compensation were related to claims rates, but the study did show that check cashing rates were higher as median compensation increased. Finally, in a supplementary examination of qualitative notice and claim form characteristics, we found that the claims rate was higher in cases where the notices used visually prominent, "plain English" language to describe payment

---

[1] 15 U.S.C § 46(b).

[2] We define "notice packet" as any non-postcard mailed notice, typically consisting of a detailed notice with a claims form. The claims rate for each case was calculated by dividing the number of claims filed by the number of notice recipients. The check cashing rate for each case was calculated by dividing the number of checks cashed by the number of checks mailed to class members. The relationships, or lack thereof, noted here are based on statistical significance testing at the 95 percent confidence level. *See* Chapter 2 for further details.

# Chapter 2: Administrator Study

## 2.1 Summary of Results

This analysis represents the first systematic, empirical examination of a broad set of consumer class action cases, and the findings represent the most reliable quantitative descriptions of consumer class action settlements to date. This study reveals several relationships between aspects of the class action cases in the sample, such as claims rates, notice types, check cashing rates, and redress amounts. Specifically, the study found:

- *Overall Claims Rate:* Across all cases in our sample requiring a claims process, the median calculated claims rate was 9%, and the weighted mean (*i.e.*, cases weighted by the number of notice recipients) was 4%. We calculated these claims rates as a percentage of direct notice recipients.

- *Claims Rates by Method:* The claims rates varied by method. On average, campaigns that primarily used notice packets with claim forms to inform class members about the settlement had claims rates of approximately 10%.[26] In contrast, the average claims rate for campaigns using primarily postcards and email was about 6% and 3%, respectively. Notably, campaigns that utilized postcard notices with a detachable claim form had average claims rates more in line with the 10% notice packet claims rate.

- *Approval, Objection, and Exclusion Rates:* The vast majority (86%) of submitted claims in our sample received approval (*i.e.*, the claims administrator determined that the consumer qualified for compensation). Objection and exclusion rates were miniscule; only 0.01% of notice recipients excluded themselves from the settlement and 0.0003% objected to the proposed settlement.

- *Publication and Direct Notice*: The use of publication notice along with direct notice does not appear to have a significant relationship with the claims rate in our sample.

- *Compensation Amounts and Check Cashing Rates*: Half of the settlements in our sample provided median compensation of $69 or more, and a quarter provided median compensation of $200 or more. There does not appear to be a statistically significant

[26] Throughout the analysis, averages are represented as weighted means where the weights are assigned based on the size of the denominator. For claims rates, weights are equivalent to the number of notice recipients. *See* Section 2.3 for further details.